## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**CURTIS KLAASSEN, Ph.D.,**

       Plaintiff

v.

**KANSAS BOARD OF REGENTS, UNIVERSITY OF KANSAS SCHOOL OF MEDICINE, UNIVERSITY OF KANSAS, BARBARA ATKINSON, GERALD CARLSON, PAUL TERRANOVA, BRUNO HAGENBUCH, GREGORY KOPF, STEVEN STITES, HARTMUT JAESCHKE, CODY TULLY, ROBERT KLEIN, AND ALAN RAWITCH,**

       Defendants.

Case No.: 13-CV-2561

## COMPLAINT

The Plaintiff, Dr. Curtis Klaassen, Ph.D., moves this Court for entry of judgment in his favor against the Kansas Board of Regents, University of Kansas, School of Medicine (KUMC), University of Kansas, Barbara Atkinson, Gerald Carlson, Paul Terranova, Bruno Hagenbuch, Gregory Kopf, Steven Stites, Hartmut Jaeschke, Cody Tully, Robert Klein, and Alan Rawitch.

## NATURE OF ACTION AND JURISDICTION

1.     This is a civil action arising pursuant to the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §§ 1983 and 1988, as amended; the Federal False Claims Act, 31 U.S.C. §3730(h); the Age Discrimination in Employment Act (ADEA) as amended, 29 U.S.C. § 621 et. seq.; the Kansas False Claims Act, K.S.A. §75-7506; and the Kansas Common Law.

2.     Dr. Klaassen seeks damages and injunctive relief against all Defendants for committing acts, under color of law, with the intent and for the purpose of depriving Dr.

- 1 -

Klaassen of his rights secured under the Constitution and laws of the United States; retaliating against Dr. Klaassen for his exercise of constitutionally protected speech; for depriving Dr. Klaassen of his constitutional rights without due process of law; for retaliating against Dr. Klaassen for complaining about KUMC's misappropriation of federal monies; for damaging his personal and professional career because of his age; and interfering with his prospective business relationships.

3.      This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343. The declaratory and injunctive relief sought is authorized by 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and Rule 57 of the Federal Rules of Civil Procedure.

4.      This Court has supplemental jurisdiction over the state law causes of action pursuant to 28 U.S.C. § 1367.

5.      This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391.  The actions complained of took place in this judicial district; evidence and employment records relevant to the allegations are maintained in this judicial district.

## THE PARTIES

6.      Plaintiff Dr. Curtis Klaassen is a University Distinguished Professor and employee of the University of Kansas School of Medicine, where he has served as a professor since 1968.  He is a citizen and resident of Kansas.

7.      The Kansas Board of Regents, the University of Kansas and the University of Kansas School of Medicine (KUMC) are state supported public institutions and are persons subject to suit pursuant to 42 U.S.C. § 1983.

8.      Barbara Atkinson was the Dean of KUMC from 2002 until April 2012.  She is sued for damages in her individual capacity.

9.      Gerald Carlson is a professor and chair of the Department of Biochemistry and Molecular Biology for KUMC. He is sued for damages in his individual capacity and for declaratory and injunctive relief in his official capacity.

10.      Paul Terranova is a professor and Vice Chancellor for Research in the Department of Molecular and Integrative Physiology for KUMC.  He is sued for damages in his individual capacity and for declaratory and injunctive relief in his official capacity.

11.      Bruno Hagenbuch is a professor for KUMC.  He is sued for damages in his individual capacity and for declaratory and injunctive relief in his official capacity.

12.      Gregory Kopf is a professor, Associate Vice Chancellor for Research Administration, and Executive Director of KUMC Research Institute for KUMC.  He is sued for damages in his individual capacity and for declaratory and injunctive relief in his official capacity.

13.      Steven Stites is a professor and Chair of the Department of Internal Medicine at KUMC.  He served as interim Dean following Atkinson's resignation.   He is sued for damages in his individual capacity and for declaratory and injunctive relief in his official capacity.

14.      Hartmut Jaeschke is a professor and Chair of the Pharmacology, Toxicology & Therapeutics Department at KUMC.  He is sued for damages in his individual capacity and for declaratory and injunctive relief in his official capacity.

15.      Cody Tully is a finance director at KUMC.  He is sued for damages in his individual capacity and for declaratory and injunctive relief in his official capacity.

16.      Robert Klein is a Vice Chancellor for Academic Affairs at KUMC.  He is sued for damages in his individual capacity and for declaratory and injunctive relief in his official capacity.

17.     Alan Rawitch is a Vice Chancellor for Academic Affairs at KUMC.  He is sued for damages in his individual capacity and for declaratory and injunctive relief in his official capacity.

18.     At all times relevant, Defendants acted pursuant to the color of state law.

## FACTS

19.     Dr. Klaassen has a bachelor's degree in biology from Wartburg College.  He received his Ph.D. in pharmacology from the University of Iowa in 1968.

20.     Since 1968, Dr. Klaassen has worked for KUMC and he has served as a tenured professor for KUMC since 1974.  He has served as a University Distinguished Professor since 2002.

21.     Among the particular highlights of Dr. Klaassen's distinguished 40-year career are his service as president of the Society of Toxicology (1990-1991) and the International Union of Toxicology (1992-1995) and as editor of Casarett and Doull's "Toxicology: The Basic Science of Poisons," considered the premier textbook in the field. He has twice been named a "Highly Cited Researcher" (2002, 2007) by the Institute for Scientific Information, a designation held by less than one half of one percent of all researchers.

22.     Over the course of his 40-year career, Dr. Klaassen established a business relationship with the National Institute of Health (NIH).  The NIH, a subordinate agency within the Department of Health of Human Services, is the United States' principal administrative body for medical research and provides billions of dollars each year to fund scientific and medical research.

23.     Dr. Klaassen possesses a constitutionally recognized property right to conduct unimpeded and unfettered research established by both KUMC's adoption of the American

4836-1639-6310.1                                   - 4 -

Association of University Professor's *1940 Statement of Academic Freedom and Tenure* and KUMC's custom and practice created over the course of Dr. Klaassen's 40-year career.

24.     Dr. Klaassen, pursuant to his tenure rights to conduct unimpeded and unfettered research, applied for and received, as a principal investigator, an average of three NIH grants per year over the course of his career.

25.     A principal investigator (PI) initiates a research project by writing a grant proposal.  Once the NIH or other governmental agency funds the grant, the PI is responsible for the scientific and technical direction of the research project.

26.     Dr. Klaassen's financial compensation from KUMC was directly tied to his ability to successfully obtain NIH grants as a PI.

27.     Grant proceeds from the NIH help pay for professors' salaries, laboratories, lab equipment, and employees including research assistants to conduct research.  Federal grant monies help fund the basic sciences departments at KUMC including the Pharmacology/Toxicology Department and Internal Medicine Department.

28.     In addition, Dr. Klaassen had an endowment account for over 35 years comprised of funds given to him by his friends, students, and corporations to fund his research students' stipends and research.  Over the years, the endowment earmarked for Dr. Klaassen's research was approximately 1 million dollars.

29.     In 2006, Dr. Klaassen, as PI, received a NIH grant titled "Nuclear Receptors in Liver Health and Disease" that was funded by the NIH for $10,632,518.  The grant is commonly known as the COBRE grant and, subject to certain terms, is renewable.  Due to the underhanded and tortious actions of Defendants beginning in November 2011, Dr. Klaassen no longer serves as the PI on the COBRE grant, although KUMC continues to receive the grant proceeds.

30.     In 1979, Dr. Klaassen, as PI, received a NIH grant titled "Training program in environmental toxicology." This grant has been renewed every 5 years in 2011 in was funded by the NIH for $1,541,170 for another 5 years. The grant is commonly known as the T32 Training grant and, subject to certain terms, is renewable. Due to the underhanded and tortious actions of Defendants beginning in November 2011, Dr. Klaassen no longer serves as the PI on the T32 Training grant, although KUMC continues to receive the grant proceeds.

31.     In 2002, Barbara Atkinson, M.D., was appointed to Dean of KUMC. Atkinson asked Dr. Klaassen to serve as the Chair of the Pharmacology/Toxicology Department.

32.     Dr. Klaassen became concerned that Atkinson was not making appropriate decisions regarding the basic sciences departments at KUMC and that there was a breakdown of shared governance—a hallmark of academia.

33.     Because of his concerns, Dr. Klaassen helped form the "Committee of Eight." The Committee of Eight included the chairs of various basic sciences departments including Anatomy, Biochemistry, Physiology, Pharmacology/Toxicology, and Microbiology. The Committee of Eight's goal was to help Atkinson make more informed decisions regarding the basic sciences departments. To that end, the Committee of Eight met with the University of Kansas Chancellor Bernadette Gray-Little, on January 4, 2010 and explained their concerns about KUMC's financial situation and lack of shared governance.

34.     Because of the Committee of Eight, the Chancellor wrote a stern letter to Atkinson informing her that there should be more shared governance at KUMC.

35.     Because of the Chancellor's letter, Atkinson began meeting with the Committee of Eight every few weeks. During meetings in March 2011, Dr. Klaassen accused Atkinson and

KUMC of inappropriately siphoning money from the basic sciences to pay for other KUMC programs including the remodeling of facilities.

36.     One month later, in April 2011, Atkinson dismissed Dr. Klaassen as Chair of the Toxicology/Pharmacology Department.  In addition to the stigma associated with the removal, Dr. Klaassen's annual salary was also reduced by $40,000.

37.     Defendant Gerald Carlson accepted Dr. Klaassen's former position and became Interim Chair of the Pharmacology/Toxicology Department.

38.     KUMC and Carlson reduced Dr. Klaassen's administrative support staff, whose wages were paid in part by the proceeds of the COBRE grant in which Dr. Klaassen served as the PI.  Dr. Klaassen complained to Carlson about his lack of support staff.  Carlson refused to take Dr. Klaassen's complaints seriously and instead replied, "Curt, Curt, Curt, you silly lug, you," "XOXO, Gerry," and "cuz pipples is pipples, Loves and kisses, Gerry."

39.     In July 2011, issues arose with the renewal of the COBRE grant.

40.     Cody Tully was the financial manager of the COBRE grant.

41.     At the direction or guidance of Carlson and KUMC, Tully was misappropriating funds from the COBRE grant and from an endowment fund earmarked for Dr. Klaassen's research.

42.     Despite repeated requests for the grant's financial accountings, KUMC, Tully, and Carlson refused to provide Dr. Klaassen with an accounting of the COBRE grant's financials.

43.     Despite the resistance and lack of cooperation from KUMC's administration, the COBRE grant was eventually renewed

44.     On October 28, 2011, Dr. Klaassen still served as a PI for the COBRE grant and held a meeting to discuss the COBRE grant.  At the meeting Dr. Klaassen accused KUMC, Carlson, and Tully of financial mismanagement of federal grant monies – including the COBRE grant.

45.     On November 1, 2011, Dr. Klaassen spoke with the Associate Vice Chancellor of Research Administration and Executive Director of the KUMC Research Institute, Dr. Gregory Kopf, about the COBRE grant and about KUMC's mismanagement of federal grant monies.

46.     Several hours later on that same day, Dr. Klaassen personally met with a representative of the NIH.  Tully interrupted the meeting and directed the NIH representative to a different meeting.   Several minutes later, Paul Terranova, Dean of Research, entered Dr. Klaassen's office with two-armed policemen and escorted him off campus.

47.     Dr. Klaassen was later informed that he was being placed on administrative leave and was not allowed to set foot on campus, contact his students, the NIH, or any other KUMC employee.

48.     By letter dated October 31, 2011, Terranova accused Dr. Klaassen of "belligerent" behavior and mishandling grant funds stating that "several discrepancies regarding your allocation of grant funding have been reported."  The letter was a pretext; Dr. Klaassen was placed on administrative leave because he had complained about KUMC's mismanagement of federal grant monies.

49.     KUMC, at the direction of Terranova, placed Dr. Klaassen on administrative leave from November 1 to November 30, 2011.  KUMC confiscated Dr. Klaassen's computer and removed his name from their website.  People who tried to contact Dr. Klaassen thought he was dead.

50.    While on administrative leave Dr. Klaassen was completely cut off from his students, his work, his research, and the NIH.

51.    During Dr. Klaassen's leave, KUMC, without prior notice to Dr. Klaassen, stripped him of his status as PI on the lucrative T32 Training and COBRE grants.

52.     On November 21, 2011, Bruno Hagenbuch and Gregory Kopf wrote the NIH and requested a change in PI for the T32 grant.  KUMC requested that Bruno Hagenbuch be the new PI on the T32 training grant.  The NIH later granted KUMC's request.  Hagenbuch is unqualified to be a PI on the T32 training grant because he is not an environmental toxicologist.  However, after becoming the PI on the T32 training grant, Hagenbuch's annual salary increased 15% from approximately $150,000 to $175,000.

53.    On the same day, Gregory Kopf and Hartmut Jaeschke wrote the NIH and requested a change in PI for the COBRE grant.   KUMC requested that Hartmut Jaeschke be the new PI on the COBRE grant.  The NIH granted KUMC's request.  The COBRE grant was titled "Nuclear receptors in liver health and disease." Jaeschke is not an expert on nuclear receptors and is unqualified to serve as a PI on the COBRE grant.  After becoming PI on the COBRE grant, Jaeschke's annual salary increased approximately 25% from $205,000 to $267,000.

54.    While awaiting a response from the NIH regarding a change in the PI, two days later, on November 23, 2011, Terranova notified Dr. Klaassen that his 30-day administrative leave was extended until December 15, 2011.

55.    While Dr. Klaassen was on leave in November 2011, Terranova notified Allen Rawitch, Vice Chancellor for Academic Affairs, that Dr. Klaassen had been placed on administrative leave.   After Dr. Klaassen had already been placed on administrative leave,

Rawitch prepared an inquiry report that outlined a list of incidents that KUMC allegedly considered to be evidence of unprofessional behavior.  Those incidents included:

    a.  An October 15, 2010 meeting with Chancellor Bernadette Gray-Little in which Dr. Klaassen complained of the "colossal mismanagement" of KUMC;

    b.  A March 29, 2011, Basic Sciences planning meeting in which Dr. Klaassen complained about the reduction in budget, forecasted the end the basic sciences departments, and argued for more transparency in the government of KUMC;

    c.  The incidents previously described at the October 28, 2011, meeting.

56.    The inquiry report was a pretext; the real reason that Dr. Klaassen was placed on administrative leave was because he had complained about KUMC's mismanagement of federal grant monies.  In fact, most of the incidents listed in the inquiry report involve Dr. Klaassen's complaints to KUMC's administration about mismanagement of federal grant monies, lack of oversight and administration, failure to appropriately manage KUMC, and lack of transparency and shared governance.

57.    Dr. Klaassen returned to work on December 16, 2011.  He was informed by Carlson that he had to move offices.  While Dr. Klaassen was on administrative leave, KUMC rekeyed and locked his old office.  Carlson told Dr. Klaassen that he would only have between 8 a.m. and 5 p.m. on weekdays to move his materials to his new office. Dr. Klaassen was given until January 3, 2012 to move offices.

58.    On December 16, the same date he returned to work, Dr. Klaassen requested a meeting at 3:00 p.m. regarding the status of the COBRE grant. At 2:46 pm, Terranova notified Dr. Klaassen via e-mail that he was no longer the PI on the grant and that KUMC was seeking to

change the PI on the COBRE and T32 training grants and instructed Dr. Klaassen to assist KUMC with the changes in PI.

59.     On January 4, 2012, Dr. Klaassen began work in his new office.  Dr. Klaassen was then called into a meeting with Terranova and Carlson.  Terranova and Carlson informed Dr. Klaassen that he was to move offices again. Dr. Klaassen was forced to move to an office without a window in 1000 Hixon, the oldest research building on campus.  The location was less desirable than his previous office.

60.     Dr. Klaassen's laboratory was also moved to the less desirable 1000 Hixon location.  The 1000 Hixon space is inadequate for Dr. Klaassen to perform his research.

61.     Dr. Klaassen and his students were instructed that the office and laboratory move was to be completed by February 1, 2012.  But on January 23, 2012, Tully and Jaeschke rekeyed the locks to Dr. Klaassen's new office and his laboratory forcing him and his students to move immediately.

62.     On January 10, 2012, KUMC's administration informed Dr. Klaassen that he had overspent on the remaining grants that KUMC had yet to remove from him.  Dr. Klaassen was also informed on that date he was being moved from the Pharmacological/Toxicology Department to the Internal Medicine Department.

63.     On January 25, 2012, students of Dr. Klaassen's laboratory met with KUMC representatives Atkinson, Terranova, Jaeschke, Rawitch, and Tully. At the meeting, the KUMC representatives promised the students that they would have access to necessary laboratory equipment after the students were moved into the Internal Medicine Department.

64.     In April 2012, KUMC reneged on its prior promise and denied Dr. Klaassen's students access to critical equipment necessary for them to conduct their research.

65.     On May 29, 2012, an *ad hoc* committee hearing was held on the allegations outlined in the inquiry report. After the hearing, the *ad hoc* committee recommended that KUMC publically censure Dr. Klaassen and asked that Dr. Klaassen issue a general apology.

66.     Dr. Klaassen provided a written apology and KUMC publically censured Dr. Klaassen describing Dr. Klaassen's conduct (*i.e.* – complaints of the administration's misappropriation of money) as unprofessional and unacceptable.

67.     In August 2012, Dr. Klaassen complained to KUMC's administration about his students' lack of access to necessary laboratory equipment. KUMC denied pharmacological students that studied under Dr. Klaassen access to laboratories, lab equipment, freezers, meeting rooms, and even break rooms.

68.     In September 2012, a group of students and graduate assistants wrote to KUMC's administration including Drs. Stites, Terranova, and Rawitch complaining that their access to necessary shared laboratory equipment was completely denied without any previous warning. To date, KUMC has not granted those students that study under Dr. Klaassen access to necessary equipment.  In fact, it has fired most of them.

69.     In December 2012, Dr. Klaassen sent an e-mail correspondence to KUMC professors including Interim Dean Stites. In the e-mail Dr. Klaassen contends that KUMC continued to misappropriate NIH grant monies by transferring grant money from accounts in which Dr. Klaassen served as a PI to other accounts not related to the grant's research.  Dr. Klaassen complained that KUMC was using grant money to fund work in other areas.

70.     Around this time, KUMC sent letters to people that contributed money to the endowment earmarked for Dr. Klaassen's research and, without Dr. Klaassen's permission, had the money transferred to the Pharmacological/Toxicology Department. At this time, Dr. Klaassen

was no longer a member of the Pharmacological/Toxicology Department and was instead a member of the Internal Medicine Department.

71.     On May 1, 2013, Dr. Klaassen had a meeting with Stites; Buddhadeb Dawn, Professor of Medicine and Director of Research for the Internal Medicine Department; Amy O'Brien-Ladner, Professor of Medicine; and employees Christina Hopkins and Dustin Carrillo.

72.     Stites began the meeting by asking Dr. Klaassen "How are you, young man?" Stites then asked Dr. Klaassen, in front of the others, to come up with a plan to transition his remaining endowment funds and responsibilities to a younger faculty member "because you're not a spring chicken anymore."

73.     At the meeting, the parties discussed grant funds and a $250,000 deficit.  Dr. Klaassen informed Stites that he was writing two new grants.  Stites suggested using those monies to cover the deficit.  Dr. Klaassen informed Stites that it would be unethical to use new grant money to pay for past expenses.  Dawn confirmed Dr. Klaassen's position, stating, "we can't go back . . . we have to go back and pay from the slush fund."

74.     Dr. Klaassen further explained to Stites that the administration had misappropriated approximately $200,000 dollars' worth of grant monies from grants in which Dr. Klaassen either presently or previously served as a PI.  Stites refused to discuss the topic. The meeting abruptly ended.

75.     One week later, on May 8, 2013, Stites placed Dr. Klaassen on administrative leave again due to his objections about the administrations mishandling of grant monies.

76.     In July 2013, with Dr. Klaassen away on administrative leave unable to acquire grant funding for his department and students, KUMC fired nearly all the students that worked on research projects pursuant to the direction of Dr. Klaassen. In addition, KUMC killed

important laboratory animals the students used to conduct their research.  KUMC has destroyed the careers of nearly all the graduate assistants, researchers, and students that worked with Dr. Klaassen.

77.     In September 2013, KUMC contacted NIH and requested that it remove Dr. Klaassen as the PI on several of his remaining NIH grants.

78.     To date, Dr. Klaassen remains on administrative leave and is unable to contact his students, work on grants, conduct research, publish papers, or undertake any activity to further his career.

79.     Dr. Klaassen has shared information regarding KUMC's mismanagement of funds with a news outlet.  As a result of his comments, various news stories were ran regarding the management of KUMC.

## CAUSES OF ACTION

### Count 1

### Constitutional and Civil Rights Violation Pursuant to 42 U.S.C. §§ 1983, 1988; Violation of First Amendment Speech Rights Against All Defendants

80.     Dr. Klaassen realleges and incorporates by reference the foregoing allegations of the Complaint as if they were fully set forth herein.

81.     Dr. Klaassen's objections and complaints regarding KUMC's lack of shared governance, misappropriation of federal grant monies, lack of transparency, and overall mismanagement are speech protected by the First Amendment to the U.S. Constitution.

82.     Dr. Klaassen's objections and complaints never infringed or affected KUMC's ability to efficiently operate.

83.     Dr. Klaassen never engaged in speech inconsistent with the educational mission of KUMC.

84.     At all times, Dr. Klaassen's speech about misappropriation of federal grants monies, lack of transparency, lack of shared governance, and mismanagement of KUMC was speech of a private citizen on a matter of private concern.

85.     Dr. Klaassen's free speech right to expose socially important issues such misappropriation and conversion of federal monies outweighs any interest of the Defendants in suppressing that speech.

86.     Defendants' actions violated Dr. Klaassen's right to free speech in a number of ways including placing him on administrative suspension, transferring him to a different department, removing his status as a PI on several lucrative NIH grants, preventing him from conducting research and working with his graduate students, and by derailing the research of people who worked with Dr. Klaassen by eliminating their access to necessary equipment and terminating their employment. Defendants' combined activities culminated in the destruction of Dr. Klaassen's career.

87.     Defendants acted intentionally and with callous disregard for Dr. Klaassen's clearly established constitutional rights.

88.     Defendants' actions were a direct and proximate cause of Dr. Klaassen's severe and substantial damages.  These damages include lost employee benefits, lost raises, lost salary, diminished earning capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages in an amount to be determined by a jury and the Court.

**Count 2**

**Constitutional and Civil Rights Violation Pursuant to 42 U.S.C. §§ 1983, 1988;
Violation of Procedural Due Process Rights Against All Defendants**

89.     Dr. Klaassen realleges and incorporates by reference the foregoing allegations of the Complaint as if they were fully set forth herein.

90.     Dr. Klaassen possessed a property interest in his tenure right to conduct unfettered and unimpeded research established by both KUMC's adoption of the American Association of University Professor's *1940 Statement of Academic Freedom and Tenure* and KUMC's custom and practice established over the course of Dr. Klaassen's forty-year career.

91.     Because Dr. Klaassen served as a PI on multiple NIH grants, his total income as a tenured professor was increased.  Dr. Klaassen possessed a property interest in his remuneration because he is a tenured faculty member.

92.     Dr. Klaassen possessed a property interest in the endowment fund that contained donations from Dr. Klaassen's colleagues, former students, friends, and corporations earmarked to support his research and development of the students working for him.

93.     Dr. Klaassen further possessed a liberty interest in his ability to make and/or earn a living, *i.e.* to serve as a distinguished professor of toxicology by working in a research laboratory, teaching, obtaining and working on grants, publishing peer reviewed journal articles, and participating in professional activities critical for career advancement.

94.     KUMC, acting under color of state law, deprived and continues to deprive Dr. Klaassen of his property and liberty interests without notice or chance to be heard.

95.     KUMC's decision to deprive Dr. Klaassen was arbitrary, capricious, and without a rational basis.

96.     KUMC's hearing on May 29, 2012 failed to provide Dr. Klaassen with a meaningful opportunity to be heard in a meaningful manner.

97.     KUMC's actions constitute an unlawful deprivation of Dr. Klaassen's property and liberty rights without procedural due process of law in violation of the Fourteenth Amendment to the United States Constitution.

98.     Defendants' actions were a direct and proximate cause of Dr. Klaassen's severe and substantial damages.  These damages include lost employee benefits, lost raises, lost salary, diminished earning capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages in an amount to be determined by a jury and the Court.


**Count 3**

**Constitutional and Civil Rights Violation Pursuant to 42 U.S.C. §§ 1983, 1988; Violation of Substantive Due Process Rights Against All Defendants**

99.     Dr. Klaassen realleges and incorporates by reference the foregoing allegations of the Complaint as if they were fully set forth herein.

100.     Dr. Klaassen possessed a property interest in his tenure right to conduct unfettered and unimpeded research established by both KUMC's adoption of the American Association of University Professor's 1940 Statement of Academic Freedom and Tenure and KUMC's custom and practice established over the course of Dr. Klaassen's forty-year career.

101.     Because Dr. Klaassen served as a PI on multiple NIH grants, his total income as a tenured professor was increased.  Dr. Klaassen possessed a property interest in his remuneration because he is a tenured faculty member.

102.     Dr. Klaassen possessed a property interest in the endowment fund that contained donations from Dr. Klaassen's colleagues, former students, friends, and corporations earmarked to support his research and development of the students working for him.

103.     Dr. Klaassen further possessed a liberty interest in his ability to make and/or earn a living, *i.e.* to serve as a distinguished professor of toxicology by working in a research laboratory, teaching, obtaining and working on grants, publishing peer reviewed journal articles, and participating in professional activities critical for career advancement.

104.     KUMC, acting under the color of state law, deprived and continues to deprive Dr. Klaassen of his liberty and property interests.

105.     KUMC's decision to deprive Dr. Klaassen of his property interests was arbitrary, capricious, and without a rational basis.

106.     KUMC's actions constitute an unlawful deprivation of Dr. Klaassen's property rights without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

107.     Defendants' actions were a direct and proximate cause of Dr. Klaassen's severe and substantial damages.  These damages include lost employee benefits, lost raises, lost salary, diminished earning capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages in an amount to be determined by a jury and the Court.

**Count 4**

**Violation of the Federal False Claims Act Pursuant to 31 U.S.C. §3730**

108.    Dr. Klaassen realleges and incorporates by reference the foregoing allegations of the Complaint as if they were fully set forth herein.

109.    Dr. Klaassen complained to KUMC's administration and the Chancellor of the University about KUMC's misappropriation of grant funding when the University: (1) allowed certain employees and their departments to inappropriately receive grant funds; (2) used federal grant monies to pay for activities unrelated to those federal grants; and (3) used new federal grant monies to cover pre-existing debts.

110.    KUMC's inappropriate use of federal grant monies caused Dr. Klaassen to reasonably believe that KUMC misappropriated public funds in violation of the Federal False Claims Act and that it was making false claims to fund projects from public funds.

111.    Dr. Klaassen took lawful action in furtherance of the False Claims Act by investigating KUMC's attempts to defraud the federal government by misappropriating NIH grant funds.

112.    After Dr. Klaassen engaged in protected conduct by complaining to KUMC's administration, KUMC retaliated against Dr. Klaassen by placing him on administrative leave, transferring him to a different department, removing his status as a PI on several lucrative NIH grants, preventing him from conducting research, and preventing him from working with his graduate students.

113.    KUMC would not have taken these retaliatory actions against Dr. Klaassen if it were not for Dr. Klaassen's complaints of KUMC's misappropriation of grant monies.

114.    Defendants' actions were a direct and proximate cause of Dr. Klaassen's severe and substantial damages.  These damages include lost employee benefits, lost raises, lost salary, diminished earning capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages in an amount to be determined by a jury and the Court.

## Count 5

### Violation of the Age Discrimination in Employment Act (ADEA) as amended, 29 U.S.C. § 621 et. seq.; Kansas Age Discrimination in Employment Act (KADEA), K.S.A. 44-1111, et. seq.

115.    Dr. Klaassen realleges and incorporates by reference the foregoing allegations of the Complaint as if they were fully set forth herein.

116.    On October 31, 2013, Dr. Klaassen filed a complaint with the Kansas Human Rights Commission alleging age discrimination in violation of the ADEA and KADEA.

117.    Pursuant to its work share agreement with the Equal Employment Opportunity Commission (EEOC), the Kansas Human Rights Commission cross-filed or will cross-file Dr. Klaassen's complaint with the EEOC.

118.    Dr. Klaassen's claim pursuant to the ADEA and KADEA is not yet ripe.

119.    Dr. Klaassen will amend his claim upon receipt of his right to sue letter.

## Count 6

### Violation of the Kansas False Claims Act Pursuant to K.S.A. §75-7501 et seq.

120.    Dr. Klaassen realleges and incorporates by reference the foregoing allegations of the Complaint as if they were fully set forth herein.

121.   KUMC's annual budget is approximately 330 million dollars.  Approximately 100 million dollars of KUMC's budget is provided from the State of Kansas's general fund.  The general fund of the State of Kansas is used to help pay for KUMC's research programs.

122.   Dr. Klaassen complained to KUMC's administration and the Chancellor of the University about KUMC's misappropriation of research funding when the University: (1) allowed certain employees and their departments to inappropriately receive grant funds; (2) used federal grant monies to pay for activities unrelated to those federal grants; and (3) used new federal grant monies to cover pre-existing debts.

123.   KUMC's inappropriate use of research monies caused Dr. Klaassen to reasonably believe that KUMC misappropriated public funds in violation of the Kansas False Claims Act and that it was making false claims to fund projects from public funds.

124.   Dr. Klaassen took lawful action in furtherance of the Kansas False Claims Act by investigating and raising concerns to the administration of KUMC that he believed there was an attempt to defraud the state government by misappropriating funds.

125.   After engaging in protected conduct by complaining to KUMC's administration, KUMC retaliated against Dr. Klaassen by placing him on administrative leave, transferring him to a different department, removing his status as a PI on several lucrative NIH grants, preventing him from conducting research, and preventing him from working with his graduate students.

126.   KUMC would not have taken these retaliatory actions against Dr. Klaassen if it were not for his disclosure of KUMC's misappropriation of research monies.

127.   Defendants' actions were a direct and proximate cause of Dr. Klaassen's severe and substantial damages.   These damages include lost employee benefits, lost raises, lost salary, diminished earning capacity, lost career and business opportunities, litigation expenses including

attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages in an amount to be determined by a jury and the Court.

## Count 7

## Kansas Common Law Cause of Action for Unlawful Retaliation

128.     Dr. Klaassen realleges and incorporates by reference the foregoing allegations of the Complaint as if they were fully set forth herein.

129.     Dr. Klaassen complained to KUMC's administration and the Chancellor of the University about KUMC's misappropriation of NIH grant funding and research monies when the University: (1) allowed certain employees and their departments to inappropriately receive grant funds; (2) used federal grant monies to pay for activities unrelated to federal grants; and (3) used new federal grant monies to cover pre-existing debts.

130.     KUMC's inappropriate use of federal grant monies and other research monies caused Dr. Klaassen to reasonably believe that KUMC was misappropriating public funds in violation of rules, regulations, and laws pertaining the health, safety, and general welfare of the public.

131.     Dr. Klaassen took lawful action by raising concerns to the administration of KUMC that he believed there was an attempt to defraud the federal and state government in violation of laws pertaining to the health, safety, and general welfare of the public.

132.     KUMC and its administration were aware of Dr. Klaassen's reporting.

133.     After engaging in protected conduct by complaining to KUMC's administration, KUMC retaliated against Dr. Klaassen by placing him on administrative leave, transferring him to a different department, removing his status as a PI on several lucrative NIH grants, preventing

him from conducting research, and preventing him from working with his graduate students. KUMC's actions effectively destroyed Dr. Klaassen's career.

134.    KUMC committed wrongful associational retaliation when it locked Dr. Klaassen's students out their necessary laboratories, refused to provide them access to necessary laboratory equipment, fired them from the employment positions as research assistants, and killed important laboratory animals the students used to conduct their research.

135.    KUMC would not have taken these retaliatory actions against Dr. Klaassen if it were not for his disclosure of KUMC's misappropriation of grant monies.

136.    Defendants' actions were a direct and proximate cause of Dr. Klaassen's severe and substantial damages. These damages include lost employee benefits, lost raises, lost salary, diminished earning capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages in an amount to be determined by a jury and the Court.

## Count 8

### Kansas Common Law Cause of Interference with a Prospective Business Relationship

137.    Dr. Klaassen realleges and incorporates by reference the foregoing allegations of the Complaint as if they were fully set forth herein.

138.    Over the course of Dr. Klaassen's 40-year career he averaged 3 NIH grants per year.

139.   Dr. Klaassen had an established business relationship with the NIH.  As a result of his relationship with the NIH, Dr. Klaassen received grant funding from NIH on well over 100 grants.

140.   As a result of obtaining NIH grant funding, Dr. Klaassen's salary and remuneration was increased.  In addition, obtaining the NIH grant funding allowed Dr. Klaassen to perform his job, *i.e.* conduct valuable research and work with graduate students.

141.   Dr. Klaassen reasonably expected his good working relationship with the NIH to continue and to provide him future economic benefit.

142.   KUMC, as one recipient of the NIH's grant monies, was aware of Dr. Klaassen's relationship with the NIH.

143.   KUMC interfered with Dr. Klaassen's relationship with the NIH by requesting Dr. Klaassen be removed from the PI position on NIH grants, including the COBRE and T32 grants.

144.   But for KUMC's actions, Dr. Klaassen's business relationship, including consulting opportunities with pharmaceutical and chemical companies, with the NIH would have continued.

145.   Defendants' actions were a direct and proximate cause of Dr. Klaassen's severe and substantial damages.  These damages include lost employee benefits, lost raises, lost salary, diminished earning capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages in an amount to be determined by a jury and the Court.

## PRAYER FOR RELIEF

Plaintiff, Dr. Curtis Klaassen requests judgment against Defendants as follows:

A.      For appropriate declaratory relief regarding the unlawful and unconstitutional acts and practices of Defendants;

B.      For appropriate compensatory damages in an amount to be determined at trial;

C.      For appropriate equitable relief against all Defendants as allowed by 42 U.S.C. § 1983, including the enjoining and permanent restraining of these violations, and direction to Defendants to take such affirmative action as necessary to ensure that the effects of the unconstitutional and unlawful employment practices are eliminated and do not continue to affect Plaintiff's or others' employment opportunities;

D.      For an award of reasonable attorney's fees and costs to the maximum extent allowed by law including available attorney's fees and costs  pursuant to 42 U.S.C. § 1988;

E.      For a final judgment which grants Dr. Klaassen such other and further legal and equitable relief as may be just and proper under the circumstances.


Respectfully Submitted,



s/ Alan L. Rupe
Alan L. Rupe                                    #08914
Jeremy K. Schrag                            #24164
KUTAK ROCK LLP
1605 N. Waterfront Parkway, Suite 150
Wichita, Kansas 67206
Telephone: (316) 609-7900
Facsimile:  (316) 630-8021
alan.rupe@kutakrock.com
jeremy.schrag@kutakrock.com

*Attorneys for Plaintiff*

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38 and D. Kan. Rule 40.2, Plaintiff respectfully requests a jury trial on all matters so triable in Kansas City, Kansas.

**s/ Alan L. Rupe**
Alan L. Rupe                                    #08914