**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

**CURTIS KLAASSEN, Ph.D.,**

Plaintiff

v.                                                    Case No.: 13-CV-2561

**UNIVERSITY OF KANSAS SCHOOL OF
MEDICINE, UNIVERSITY OF KANSAS,
KANSAS UNIVERSITY MEDICAL
CENTER, BARBARA ATKINSON,
DOUGLAS GIROD, GERALD CARLSON,
PAUL TERRANOVA, BRUNO
HAGENBUCH, GREGORY KOPF,
STEVEN STITES, HARTMUT
JAESCHKE, CODY TULLY, ROBERT
KLEIN, AND ALLEN RAWITCH,**

Defendants.

## CONSOLIDATED RESPONSE MEMORANDUM
## TO  DEFENDANTS' MOTIONS TO DISMISS

Dr. Curtis Klaassen served the University of Kansas as a University Distinguished Professor for approximately 45 years.  He served as Chair of the Pharmacology and Toxicology department.  He is a world renowned researcher.  But the moment he spoke about the University of Kansas's poor handling and administration of university funds and misappropriation of National Institute of Health (NIH) grants monies, the University and the individual defendants retaliated against him.  The University stripped Dr. Klaassen of his NIH grants, fired the students and staff that worked with him, relegated him to a closet-sized office in an old building far removed the administration he criticized, and suspended him.  Identified by the media as a "whistleblower," Dr. Klaassen stood up for his students, his profession, and the taxpayers that

4810-6668-7259.1

publically fund the University and its research programs.[1]  In return, the University of Kansas fired him and nearly everybody affiliated with him.  The University even refused to return his personal property to him. The individuals that criticized and harassed Dr. Klaassen were promoted.  And now, the University seeks to prevent Dr. Klaassen from having his long overdue due process.  Therefore, in response to the various motions to dismiss filed by the University of Kansas, the University of Kansas School of Medicine, and the individual defendants, Dr. Klaassen submits this response memorandum. (*See* Docs. 42-61.) For the sake of clarity, the University of Kansas and the University of Kansas School of Medicine are collectively referred to as KUMC, unless otherwise specified.

## FACTUAL OVERVIEW

Dr. Curtis Klaassen began working for the University of Kansas as a professor for its School of Medicine in 1968. He became a tenured Professor in 1974 and a University Distinguished Professor (top 1%) in 2002. He is arguably one of the top 10, of approximately 20,000, Pharmacologist/Toxicologists in the world. Dr. Klaassen is the most prolific researcher in the history of KUMC. He published on average one peer-reviewed manuscript every month; and he averaged three NIH federal research grants per year, obtaining approximately $75 million dollars in research money for KUMC over the course of his career. Very few faculty at KUMC average one NIH grant per year. Dr. Klaassen served as the president of both the national and international toxicology societies. He is the editor of the number one toxicology textbook in the world, and is the founding editor of what is now the number one toxicology journal in the world.

---

[1] See *Whistle-blower: The KU Medical Center professor censured last week for his behavior nonetheless played an important role in pushing for change in KUMC's leadership*, Lawrence Journal-World (June 19, 2012); Dolph C. Simons, Jr., *Dean's firing reveals broader concerns at KU Medical Center*, Lawrence Journal-World (June 19, 2012).

Dr. Klaassen is most proud of the more than one hundred graduate and post graduate students that he has mentored. (Doc. 66, ¶ 6, 20-23.)

In 2003, Dr. Klaassen became chair of the Pharmacology and Toxicology Department at KUMC. Five years later, Dr. Klaassen became a member of an unofficial KUMC committee, consisting of the five Basic Science Chairs (anatomy, biochemistry, physiology, microbiology, pharmacology/toxicology) and three university distinguished professors. Dr. Klaassen formed the committee to better communicate with Dean Barbara Atkinson regarding the structure, organization, and operation of KUMC.  By 2010, the efforts of the committee proved futile.  The committee spoke to KU Chancellor Bernadette Gray-Little.  The committee discussed the academic, research and financial mismanagement of KUMC by Dean Atkinson.  As a result of the meeting, the Chancellor sent the Dean a candid letter regarding her performance. However, no significant improvements occurred. In March 2011, the same month the committee met with Dean Atkinson, Dr. Klaassen questioned the administration's lack of shared governance and alleged mismanagement and misallocation of funds. Dr. Klaassen repeated these comments at a meeting with KUMC scientific center directors. Shortly thereafter, on April 6, 2011, Dean Atkinson demoted Dr. Klaassen; she fired him as Chair of the Department and decreased his salary by $40,000. In reaction to the Dean's actions against Dr. Klaassen, six Pharmacology/Toxicology faculty—that Dr. Klaassen had hired while Chair—left KUMC to join prestigious universities.  The leaving professors took approximately $8 million federal research dollars along with them.  Under a firestorm of criticism, Dean Atkinson, along with her financial assistant Kim Myers, resigned in April 2012.  (Doc. 66, ¶¶ 36 – 41.)

After Dean Atkinson fired Dr. Klaassen as Chair of the Pharmacology and Toxicology Department, she appointed Dr. Gerald Carlson as interim Chair.  Carlson and his assistant, Cody

Tully, hindered Dr. Klaassen's research and interfered with the progress of his grants. At the time, Dr. Klaassen served as the principal investigator on a $10.6 million dollar federal grant known as the COBRE grant. Carlson and Tully refused to respond to Dr. Klaassen's emails and harassed him with nonsensical responses. For example, Dr. Carlson's responses included the following statements:

- "Curt, Curt, Curt, you silly lug, you. XOXO, Gerry;"

- "cuz pipples is pipples;"

- "You'd best be prepared much better than displayed by your ad hominem remarks;" and

- "You may want to set aside your limbic reactions and ask yourself what is your long term cerebral plans, Love and kisses, Gerry."

In addition to this harassment and the reduction of his administrative support, Dr. Carlson, Dr. Paul Terranova, and other members of KUMC's administration prohibited Dr. Klaassen from communicating with his administrative staff members. Tully threatened Dr. Klaassen's staff members with the loss of their jobs if they communicated or helped Dr. Klaassen. However, these staff members' salaries were being paid by Dr. Klaassen's NIH grants. On October 28, 2011, Dr. Klaassen held a meeting with faculty intimately involved in the $10.6 million COBRE grant and informed them that Carlson and Tully were interfering with the progress of the grant and that they were mismanaging and misallocating federal NIH funds. (Doc. 66, ¶¶ 43-51.)

Three days later, on November 1, 2011, the Dean of Research, Dr. Paul Terranova, and two armed KUMC policemen escorted Dr. Klaassen out of the building and banned him from campus. During Dr. Klaassen's forced exile, KUMC secretly stripped Dr. Klaassen of the following two lucrative federal NIH grants worth over $ 13 million: the $10.6 million COBRE grant and the T-32 training grant. The grants are extremely important to KUMC's research

program.  The COBRE grant funded research of junior faculty members and provided shared laboratory equipment to be used free of charge by to faculty and students at KUMC.  The T-32 training paid for salaries of graduate and post-doctoral students. Until KUMC stripped Dr. Klaassen of his NIH grants, no professor at KUMC had ever been involuntarily removed as principal investigator from a federal grant. (Doc. 66, ¶¶ 52-62.)

After KUMC stripped him of the grants, on December 16, 2011, KUMC allowed Dr. Klaassen to return to campus. But he could not enter his office because Tully had changed the lock.  KUMC blocked access to his office except for restrictive hours—not evenings or on weekends. Carlson then made Dr. Klaassen move to a smaller office.  The day Dr. Klaassen finished the move to a smaller office, Carlson moved him again. Carlson told him to not only to move offices but also to move his laboratory. Dr. Terranova sent him letter telling Dr. Klaassen that his laboratory and office were to be relocated from a state of the art research building, Hemenway, to the oldest building on campus, Hixon.  And Dr. Klaassen was assigned to a room more akin to a furnace room than a laboratory. Dr. Terranova's letter stated, "Hemenway space is needed for junior faculty to be recruited by the new department chair." The students and staff in Dr. Klaassen's laboratory tried to discuss with Terranova and Carlson how the move would disrupt their education, but they responded with a very sarcastic, rude, and "I don't care" attitude. (Doc. 66, ¶¶ 61, 65, 70, 76.)

On January 9, 2012, Dr. Hartmut Jaeschke became the permanent Chair of the Pharmacology and Toxicology Department. Soon thereafter, KUMC removed Dr. Klaassen from the Pharmacology and Toxicology Department. KUMC transferred him to the Internal Medicine Department and prohibited him from communicating with anyone in the Pharmacology and Toxicology Department. Jaeschke picked up where Carlson left off and continued to harass the

students and staff of Dr. Klaassen.  KUMC professors told Dr. Klaassen's students that they were "like the band playing on the titanic." Tully further increased his harassment of Dr. Klaassen's students and told them that they were not welcome in the Pharmacology and Toxicology Department. (Doc. 66, ¶¶ 61, 65, 70, 76.)

After Dr. Klaassen banned Dr. Klaassen from campus on November 1, 2011, Terranova suggested that Dr. Klaassen misallocated federal funds and was non-professional in his dealing with some faculty at KUMC.  Terranova asked the Dean of Faculty Affairs, Dr. Allen Rawitch, to investigate. KUMC had no evidence that Dr. Klaassen had spent federal funds inappropriately and the allegation was dropped. Because there was no evidence of wrong-doing, Rawitch and Terranova searched for perceptions of wrong-doing. There was not one complaint against Dr. Klaassen in his four decades of employment files at KUMC. Therefore, Rawitch interviewed faculty around campus to find individuals willing to say negative things about Dr. Klaassen. Rawitch obtained negative comments from Tully, Rosa Meagher, Ken McCarson, Beth Levant, Jaeschke, Bruno Hagenbuch and Gregory Reed.  KUMC then publicly censored Dr. Klaassen for the perception of misconduct.  The people who contributed to the report received raises in a range from 15 to 61% when typical raises during this time period at KUMC were 2%.  KUMC rewarded the people who testified against Dr. Klaassen. (Doc. 66, ¶¶ 61-64, 77-79.)

On January 25, 2012, while Dr. Klaassen moved to Hixon—the old building with insufficient and inadequate scientific equipment—KUMC's top four administrators—Dean Atkinson, Terranova, Rawitch, and Jaeschke—met with Dr. Klaassen's students.  They promised the students that they would be able to continue to use necessary state of the art research equipment in the Pharmacology and Toxicology department free of charge for years to come. The students recorded the meeting. But, within weeks, the administration reversed course. Tully

changed the locks to the equipment rooms. Only when Tully physically unlocked a door for them, did the students have access to the equipment; they could no longer use the equipment in the evenings, on weekends, or when Tully felt like being unavailable.  Eventually, Tully completely denied Dr. Klaassen's students access to the common equipment room.   Dr. Klaassen's students' research came to halt.  Dr. Klaassen and the students complained to the administration.  The administration did not respond.  Dr. Steven Stites, Dean of Medical School and Chair of Internal Medicine, billed Dr. Klaassen for the use of the equipment that KUMC promised the students they could use for free.   Dr. Stites then removed money from Dr. Klaassen's remaining NIH grant accounts without consulting him.  Contrary to the promise of access to the equipment, Dr. Stites declared that Dr. Klaassen and his research team would have to pay for the future use of the necessary laboratory equipment. KUMC lied to Dr. Klaassen, his students, and his staff.  (Doc. 66, ¶¶ 73-75; 105).

KUMC misappropriated Dr. Klaassen's NIH grant monies. Dr. Klaassen was responsible for the oversight and management of his NIH grants, *i.e.*, the grants in which he served as principal investigator.  But KUMC usurped his authority in violation of NIH grant accounting rules. The examples are numerous:

- While Dr. Klaassen served as principal investigator on the COBRE grant, Carlson and Tully removed money from Dr. Klaassen's other NIH research grants to pay equipment costs despite Dr. Klaassen's instruction to use the COBRE account for these expenses;

- Jaeschke and Tully removed Dr. Klaassen's NIH grant money for student training expenses without Dr. Klaassen's approval as principal investigator;

- Carlson charged Dr. Klaassen's NIH accounts for personnel salaries of individuals who were not working on the NIH grants because KUMC had prohibited them from interacting with Dr. Klaassen;

4810-6668-7259.1

- Jaeschke and Tully removed funds from Dr. Klaassen's endowment association account, which consisted of specific donations by previous students and friends directed specifically for Dr. Klaassen;

- Terranova forced Dr. Klaassen off campus, and while he was away, spent more than $180,000 from Dr. Klaassen's NIH research grants without his authorization as principal investigator;

- Terranova continued to remove money from Dr. Klaassen's federal grant for months after Dr. Klaassen returned to campus even though Dr. Klaassen was still principal investigator on the grants;

- Stites used Dr. Klaassen's NIH grant money without authorization to pay for the cost of using state of the art equipment; and

- KUMC transferred expenses from one federal grant to another without regard to whether the expenses were incurred in support of the grant.

In short, when it was in the best interest of the Department of Internal Medicine, KUMC's administration charged Dr. Klaassen's expenses from one federal grant to another or unlawfully removed money from Dr. Klaassen's NIH grant accounts without regard for NIH grant accounting rules.  (Doc. 66, 81-84, 115, 121, 186-87).

Dr. Klaassen sought help for his students from the administration.  He sent numerous e-mail correspondences to Dr. Buddha Dawn, head of research in the Internal Medicine Department, Stites, and other KUMC faculty, with little to no response.  When he was forced to move laboratories, it took KUMC months to obtain from the administration laboratory basics such as distilled water, ice and liquid nitrogen. In December 2012, Dr. Klaassen wrote Stites and raised additional concerns about KUMC's apparent misappropriation of NIH grant monies. Dr. Klaassen realized that KUMC was spending money from his grants without his approval or knowledge as principal investigator contrary to NIH grant rules, regulations, and laws. (Doc. 66, ¶¶ 115, 83).

After months of asking for help, on May 1, 2013, the administration finally agreed to meet with Dr. Klaassen.  This was Dr. Klaassen's first meeting in over two years with Dr. Stites,

his department Chair. Two other faculty members, Dr. Amy O'Brien-Ladner and Dr. Dawn, and two department associates attended the meeting to discuss Dr. Klaassen's university scientific research budget. Throughout the meeting, Stites made derogatory comments concerning Dr. Klaassen's age. Stites called him a "young man."  He told Dr. Klaassen to "have a transition plan" for endowment monies in case he died.  And he told Dr. Klaassen that he was "not a spring chicken." (Doc. 66, ¶¶ 85-89.)

Stites presented an accounting summary for Dr. Klaassen's grants.  Stites concluded that Dr. Klaassen's budget was $54,000 short. Dr. Klaassen did not agree, and stated he suspected a $250,000-$300,000 deficit. Dr. Klaassen tried to explain to Stites that his budget was deficient because KUMC had misappropriated over $200,000 from grants that Dr. Klaassen oversaw. Dr. Stites shouted at Dr. Klaassen to stop talking.  He told Dr. Klaassen to leave the room.  Stites abruptly ended the meeting. Dr. Klaassen recorded the meeting. (Doc. 66, ¶¶ 85-89.)

The next week, on May 7, 2013, Dr. Klaassen met with Christina Hopkins, the KUMC associate which prepared Stites's grant accounting statement. Dr. Klaassen attempted to explain to her legal NIH grant accounting methods.  The next day, on May 8, 2013, Dr. Dawn and KUMC police again escorted Dr. Klaassen from campus and banned him from communicating with any KUMC employee or student.  KUMC then transferred Dr. Klaassen's last remaining NIH grant monies to other faculty. KUMC charged Dr. Klaassen with professional misconduct, alleging that he was belligerent at the May 1, 2013 meeting.  (Doc. 66, ¶¶ 85-89.)

During the next eight months, while Dr. Klaassen was again suspended, KUMC prohibited his students and staff from communicating with him.  KUMC did not mentor Dr. Klaassen's students concerning their research projects.  KUMC fired four of Dr. Klaassen's students, including a talented minority student who had received a prestigious federal fellowship.

Without Dr. Klaassen's supervision, the student was forced to forfeit the fellowship. KUMC's blamed the firing on Dr. Klaassen's laboratory dire financial situation. But an additional grant that Dr. Klaassen had obtained was to be funded in August 2013. However, KUMC obstructed the acceptance of this $1.8 million grant when it banished Dr. Klaassen from campus. The grant failed. It would have been more than sufficient to pay the salaries and research of all of Dr. Klaassen's students beginning in August, 2013, for an additional five years. (Doc. 66, ¶¶ 91-92.)

After being banned from campus for 6 months, KUMC held a hearing on November 13, 2013 charging Dr. Klaassen with professional misconduct at the May 1, 2013 meeting. In spite of all its policies, duties, and past practices with tenured faculty, KUMC demanded Dr. Klaassen's firing. The hearing was held before a committee of his peers. Despite KUMC's efforts, the hearing committee recommended that Dr. Klaassen be immediately reinstated and receive only a written warning. (Doc. 66, ¶¶ 94-97).

But KUMC did not let the committee's recommendation stop them. On January 6, 2014, the Executive Vice Chancellor of KUMC, Dr. Douglas Girod, fired Dr. Klaassen by email after 45 years of outstanding service. In spite of the rules, policies, and practices, the firing was immediate. Simultaneously, Girod announced major promotions for two faculty that testified against Dr. Klaassen. Girod promoted Stites to a dual role as Vice Chancellor for Clinical Affairs for KUMC and Senior Vice President for Clinical Affairs for the University of Kansas Hospital Authority. Girod promoted Amy O'Brien Ladner to active chair of the Department of Internal Medicine. To date, Dr. Klaassen remains banned from KUMC's campus. He is not even allowed to accompany his wife or children to KUMC's hospital or clinics. (Doc. 66, ¶¶ 94-97).

Dr. Klaassen, a "whistleblower," spoke out against misappropriation and poor administration of millions of NIH grant monies. He criticized the administration's handling of

federal taxpayer funded grants and their lack of shared governance. In response, KUMC's administration ignored his tenured status, suspended him without notice, fired the students whom he mentored, stripped him of approximately $13 million dollars of federal NIH grant monies, blocked him from receiving $1.8 million in additional grant funds, and ignoring his federally protected right, a committee's recommendation, and federal law, KUMC and these individual defendants fired the tenured and eminent Distinguished Professor Curtis Klaassen.

## **ARGUMENT AND AUTHORITIES**

The University of Kansas, the University of Kansas School Of Medicine, the Board of Regents, and the individual defendants filed multiple motions to dismiss. Most of the allegations in the Motions to Dismiss are moot in light of Dr. Klaassen's First Amended Complaint. (Doc. 66). Regardless, Dr. Klaassen submits the following consolidate response.

### **Standard of Review**

The standard of review on a motion to dismiss is well known. As this exact Court recently stated:

> To survive a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a complaint must present factual allegations, assumed to be true, that "raise a right to relief above the speculative level" and must contain "enough facts to state a claim to relief that is plausible on its face." Under this standard, "the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." The plausibility standard does not require a showing of probability that "a defendant has acted unlawfully, "but requires more than "a sheer possibility."
>
> The plausibility standard enunciated in *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007) seeks a middle ground between heightened fact pleading and "allowing complaints that are no more than labels and conclusions' or a formulaic recitation of the elements of a cause of action, 'which the Court stated will not do.'" *Twombly* does not change other principles, such as that a court must accept all factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven.

*Proud Veterans, LLC v. Ben-Menashe*, No. 12-CV-1126, 2014 WL 791200, at *12 (D. Kan. 2014) (citations omitted).

## Section 1983 Claims

### Dr. Klaassen's Section 1983 Claims Survive
### The Individual Defendants' *Twombly* Challenges

In their motions to dismiss, the University of Kansas, the University of Kansas School of Medicine, and the Board of Regents collectively argue that they are immune pursuant to the Eleventh Amendment. Their arguments are moot in light of Dr. Klaassen's First Amended Complaint, which clarifies the § 1983 claims and respective defendants. (*See* Doc. 66, Counts 1-7).

The individual defendants contend that Dr. Klaassen's original complaint failed to state a claim on which relief can be granted. The individual defendants contend the original complaint failed the *Twombly v. Bell Atlantic* pleading standard because the original complaint failed to specifically allege which defendant engaged in which action. (*See* Hagenbuch 47, Jaeschke 50, Stites, Doc. 59; Klein, Doc. 57; Atkinson, Rawitch, Terranova, Kopf, Doc. 61; Carlson, Doc. 55; and Tully, Doc. 53). Both the state agencies' and the individual defendants' arguments are moot. Dr. Klaassen's First Amended Complaint's § 1983 claims identify each defendant and explain in detail the individual actions taken by the defendant in support of the claim. *See* Doc. 66, Counts 1-7.

In § 1983 claims, the Tenth Circuit requires plaintiffs to "nudge their claims across the line from conceivable to plausible," by "alleg[ing] facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights, and that those rights were clearly established at the time. This requires enough allegations to give the defendants notice of the theory under which their claim is made." *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th

- 12 -

Cir. 2008).  Dr. Klaassen's First Amended Complaint satisfies Rule 9's pleading standard and the *Twombly* standard. The First Amendment Complaint itemizes the allegations against each individual defendant and explains the actions taken by each individual defendant in violation of Dr. Klaassen's rights. And all of Dr. Klaassen's rights are well established.  *See, e.g.*, *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972) (recognizing tenure, property, and due process rights for professors); *Perry v. Sindermann*, 408 U.S. 593 (1972) (same); *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1204-05 (10th Circ. 2007) (recognizing First Amendment rights for educators).  The individual defendants have clear notice of their claims and Dr. Klaassen's theories of recovery.  The individual defendants' arguments are moot.

## Federal False Claims Act Claim

### KUMC Waived its Sovereign Immunity by Accepting the NIH Grant Monies

KUMC, in its motion's headings, argues that Dr. Klaassen's claim pursuant to the False Claims Act (FCA) is barred by the Eleventh Amendment. (Doc. 43, p. 6.). However, KUMC only actually argues that it is immune pursuant to the FCA's retaliation provision because a state agency is not a "person" pursuant to the FCA's *qui tam* provision.  (Doc. 43, p. 10.) KUMC's argument misses the point. The question is not whether KUMC is a person pursuant to FCA's *qui tam* section but whether Dr. Klaassen may assert a claim against KUMC as an employer pursuant to the retaliation provision.

KUMC relies on *Vt. Agency of Natural Res. V. United States ex. rel. Stevens*, 529 U. 765, 787 (2000) and *Payne v. Attorney Gen. of Massachusetts,* No. 12-4062-SAC, 2012 WL 2580183 (D. Kan. July 3, 2012).  The *Payne* case is wholly irrelevant.  And *Stevens* is largely inapplicable because the court did not consider whether a state is immune pursuant to the FCA.  Although, the *Stevens* Court did note that "there is 'a serious doubt' on that score."  *Stevens*, 529 U.S. at 787.

*But see Huang v. Rector and Visitors of University of Virginia*, No. 11-CV-00050, 2011 WL 6329755, at *5 (W.D. Va. Dec. 19, 2011) (unpublished opinion) (stating that "*Stevens*, while somewhat relevant to the inquiry here, is by no means dispositive").

Despite KUMC's lack of argument, Dr. Klaassen is aware that other courts have expressly held that state agencies are immune from a post-2009 FCA retaliation claim. *Accord United States ex rel., King v. University of Texas Health Science Center*, 544 Fed. Appx. 490 (5th Cir. Nov. 13, 2013); *Huang*, 2011 WL 6329755, at *5, (W.D. Va. Dec. 19, 2011); *Bell v. Dean*, No. 09-CV-1082, 2010 WL 1856086, at *3 (M.D. Ala. May 4, 2010); *Gentilello v. Univ. of Texas Sw. Health Sys.*, No. 07-CV-1172-K, 2012 WL 3638676 (N.D. Tex. Aug. 24, 2012). And while the Tenth Circuit has not expressly held that state agencies are immune pursuant to the FCA, it has ruled in a case involving both FCA *qui tam* and a retaliation claim that the state's liability turned not on whether Eleventh Amendment immunity applied but on whether the defendant was a state agency. *See United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702 (10th Cir. 2006).

However, in this case, on these facts, KUMC waived its sovereign immunity. Recently, in *Pettigrew v. State of Oklahoma ex rel. The Oklahoma Dept. of Public Safety*, 722 F.3d 1209 (10th Cir. 2013), the Tenth Circuit held that Oklahoma waived its sovereign immunity by entering into a settlement agreement with the plaintiff. The agreement stated:

> The laws of the State of Oklahoma shall govern interpretation of this Agreement. In the event that any litigation is commenced by either party to enforce the terms and conditions of the Agreement, the litigation will be brought in the appropriate Oklahoma court having jurisdiction, either state or federal, and the losing party shall pay to the prevailing party all reasonable attorneys' fees and costs incurred by the prevailing party defending against the claim(s).

*Pettigrew*, 722 F.3d at 1211 (emphasis added).  The Tenth Circuit held the language, "court having jurisdiction, either state or federal," resulted in a waiver of Eleventh Amendment immunity.

In reaching its conclusion, the Tenth Circuit recognized that a state can enter into a contract and thereby waive its Eleventh Amendment immunity to suits related to the contract. *Pettigrew*, 722 F.3d at 1213; (*citing Watson v. Texas*, 261 F.3d 436, 442 (5th Cir.2001) (settlement agreement waived state's immunity to suit by claimants to recover settlement proceeds); *Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186, 1195, 1195 n.11 (10th Cir.1998) ("Our conclusion [that the agreement at issue did not indicate the state's intent to waive immunity] does not foreclose the possibility that a State may demonstrate an unequivocal intent to waive Eleventh Amendment immunity by participating in a settlement.")).  The Court concluded that venue provision was sufficient to waive immunity even though the "Venue Provision [did] not explicitly grant consent to be sued in federal court." *Pettigrew*, 722 F.3d at 1214.  Furthermore, a state may waive its immunity by participating in a federal program. *See Robinson v. Kansas*, 295 F.3d 1183, 1189 (10th Cir. 2002) (stating "waiver may also result from a state's actions, specifically, its participation in a particular federal program").

In this case, Dr. Klaassen served as a principal investigator (PI) on multiple NIH Grants. It is uncontroverted that KUMC was a recipient of the NIH grants.  (*See* Doc. 43, p. 15.)  To that end, KUMC accepted federal money and agreed to be bound by statutes, rules, and regulations accompanying NIH Grant monies. Specifically, as a recipient, KUMC must comply with 2 C.F.R. Part 215:   Uniform Administrative Requirements for Grants and Agreements with Institutions of Higher Education, Hospitals, and other Nonprofit Organizations.  *See* 2 C.F.R. Part 215, § 215.1 ("This part establishes uniform administrative requirements for Federal grants

and agreements awarded to institutions of higher education. . .").  Notably, § 215.41, makes the recipient the "responsible authority, without recourse to the Federal awarding agency, regarding the settlement and satisfaction of all contractual and administrative issues arising out of procurements entered in support of an aware or other agreement."  Specifically, the statute provides that issues, concerns, disputes, and violations of statute related to the NIH grant awards "are to be referred to such Federal, State, or local authorities as may have proper jurisdiction."  2 C.F.R. Part 215, § 215.41 (emphasis added).  This Court is that.

The regulation is nearly identical to contract in *Pettigrew*.  The only difference is that the *Pettigrew* language allowed a claim to be brought in the appropriate Federal or state court "having" jurisdiction while § 215.41 allows claims to be brought in the appropriate jurisdiction that "may have" jurisdiction.  The language is indistinguishable.

The use of NIH awards by KUMC is at issue here.  Specifically, Dr. Klaassen charges KUMC violated NIH regulations and statutes when it misappropriated NIH grant funds.  The language of the § 215.41 clearly states that Dr. Klaassen's claims are proper before "Federal, State, or local authorities" because Dr. Klaassen's FCA claim raises contractual and administrative issues arising out of and stemming from the NIH grant awards.  KUMC voluntarily accepted the award.  KUMC voluntarily agreed to be bound by NIH rules and regulations.  KUMC voluntarily waived its sovereign immunity.

Finally, in the alternative, KUMC's motion to dismiss is premature.  As evidenced in *Pettigrew*, many contracts contain venue selection and choice of law provisions.  The NIH grant award contracts are in the control and possession of KUMC.  Any venue or choice of law provisions in any of Dr. Klaassen's NIH grants contracts are relevant inquiries into whether

KUMC waived its sovereign immunity.  Without the applicable contracts, this Court may not be in a position to determine whether KUMC waived its sovereign immunity.

**The False Claims Act's Retaliation Provision Authorizes Suits against Individuals**

Each of the individual defendants filed similar if not identical motions to dismiss. (See Hagenbuch 47, Jaeschke 50, Stites, Doc. 59; Klein, Doc. 57; Atkinson, Rawitch, Terranova, Kopf, Doc. 61; Carlson, Doc. 55; and Tully, Doc. 53).  They argue that the FCA's retaliation provision, 31 U.S.C. § 3730(h), does not apply to individual defendants.  In support of their argument, the defendants cite case law that predates the 2009 amendments to the FCA.  As this Court recognized, "exclusive reliance on pre-Amendment cases is misplaced and not helpful to the court's analysis of the issue."  *Lipka v. Advantage Health* Group, No. 13-DV-2223, 2013 WL 5304013, at *10 (D. Kan. Sept. 20, 2013).  The pre-2009 version of the FCA limited the scope of the FCA's retaliation provision to claims against "employers."  However, in 2009, §3730(h) was amended and expanded.  The amendment expanded retaliation protection from employees to employees, contractors, and agents and eliminated the word "employers."

Section 3730(h) of the FCA now states,

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, or agent or associated others in furtherance of other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h).

Despite the amendment and plain language of the statute, courts are currently split on whether the post-2009 version of the FCA creates a cause of action against individual defendants.  However, courts across the country have concluded that the elimination of the word "employer" gives rise to individual liability pursuant to the FCA.  *See United States ex rel.*

- 17 -

*Moore v. Community Health Servs., Inc.*, 2012 WL 1069474 (D.Conn. Mar.29, 2012) (allegations regarding post-Amendment conduct give rise to FCA retaliation claim against individual defendants); *Weihua Huang v. Rector & Visitors of Univ. of Virginia*, 896 F.Supp.2d 524, 548 n. 16 (W.D. Va.2012) (declining to dismiss individual liability because the 2009 amendment eliminated reference to "employers"); *Laborde.v. Rivera–Dueno*, 719 F.Supp.2d 198, 205 (D.P.R. 2010) (court denied Rule 12(b)(6) motion to dismiss individual defendants).

*Huang* is particularly and persuasively on point.  In *Huang*, a university professor alleged that the university misappropriated NIH grant funds by spending grant money on tasks unrelated to the grant. Dr. Klaassen makes the exact same allegation. The University of Virginia terminated the professor for making the complaints.  The professor sued.  The Court held that the professor could assert claims against the individual defendants in both their individual capacity for damages and their official capacity for prospective relief.  Dr. Klaassen's raises similar allegations and should be afforded similar relief.  *See Huang*, 2011 WL 6329755, at *15, (W.D. Va. Dec. 19, 2011) (unpublished opinion) ("Dr. Huang's individual-capacity claim and official-capacity claim for prospective relief against Dr. Li and Dr. Johnson pursuant to the FCA both remain; however, his official-capacity claim for damages against Dr. Li and Dr. Johnson pursuant to the FCA shall be dismissed.").

Admittedly, one court in the District of Kansas recently concluded that, in the context of a non-state agency employer, the FCA's retaliation did not give rise to individual liability. *See Lipka v. Advantage Health* Group, No. 13-DV-2223, 2013 WL 5304013, at 10-11 (D. Kan. Sept. 20, 2013) (citation omitted). The *Lipka* Court relied on the legislative history of the §3730(h) to reach its conclusion.  Relying on one paragraph out of the Senate Report, the Court noted that one of the reasons that Congress eliminated the word "employer" from the retaliation provision

was to "add protection against retaliation against contractors and agents of the discriminating who have been denied relief by some courts because they are not technically employees." *Lipka v*, 2013 WL 5304013, at 10-11 (citation omitted); S. Rep. No. 110-507 110th Cong. 2nd Session (Sept. 25, 2008), 2008 WL 4415147. But the *Lipka* Court too narrowly read the purpose behind the amendment. By eliminating the word employer, Congress did more than make causes of action available to agents and independent contractors. Congress made it clear that the focus is not on the employer-employee relationship but instead upon the aggrieved individual's right to be made whole.

The *Lipka* Court's reliance on one paragraph of the Senate Report is misplaced. The Court's interpretation creates incongruent statutory interpretation because individual state employee defendants are liable pursuant to the FCA's *qui tam* provisions. *See United States v. University of Utah Sciences Center,* No. 11-CV-1200, 2013 WL 5372609 (D. Utah Sept. 24, 2013). The *Lipka* Court draws an unnecessary line between the FCA's *qui tam* and retaliation provisions.

Title 31 U.S.C. § 3730(h) has three basic requirements. First, a plaintiff must take acts or efforts to "stop 1 or more violations" of the FCA. Second, the plaintiff must be harmed in response to his or her efforts, *i.e.* discharged, demoted, or harassed. Third, the statute then proclaims that the plaintiff shall be made "whole."

Neither KUMC nor the individual defendants argue that Dr. Klaassen failed to take "efforts to stop 1 or more violations" of the FCA. Nor do the individual defendants or KUMC argue that Dr. Klaassen was not "discharged, demoted, suspended, threatened, harassed" in response to his lawful actions. The plain language of the statute means that Dr. Klaassen is "entitled to all relief necessary" to be made whole. Notably, the language of the statute

references actions made by a plaintiff to "stop 1 or more violations" of the FCA.  There is no doubt that an individual person can commit an FCA violation.  See 31 U.S.C. § 3729(a)(1).

Section 3729(a)(1) provides in relevant part that "any <u>person</u> who . . . knowingly presents or causes, or causes to be presented, a false or fraudulent claim for payment or approval" is liable for certain civil penalties.  31 U.S.C. § 3729(a)(1) (emphasis added).  At least two Tenth Circuit district court have concluded that state employees are "'persons' who may be sued if they are sufficiently involved in the submission of a false claim to the United States."  *See U.S. ex. rel. Burlbaw v. Regents of New Mexico State Univ.*, 324 F. Supp. 2d 1209. 1215 (D. N.M. 2004); *U.S. ex. rel. Jones*, 2013 WL 5372609, at *5-6.  One court described an FCA suit against individual defendants as similar to a § 1983 claim.  It stated, "[An FCA claim] is no different than the legions of § 1983 claims that are brought against state officials in their individual capacities, the vast majority of which involve state employees (prison guards, police officers, zoning administrators, *et al.*) acting within the scope of their employment."  *United States v. Menominee Tribal Enterprises*, 601 F.Supp.2d 1061, 1071 (E.D. Wis. 2009).

The *Lipka* Court's reasoning cannot be squared with the other Tenth Circuit district court's opinions concluding that an individual state employee may be liable for a *qui tam* action.  Pursuant to the *Lipka* Court's reasoning, an individual defendant may not defraud the government pursuant to § 3729, but the defendant may punish any whistleblower  pursuant to § 3730 that attempts to bring the fraud to light.  Such rationale defies the purpose of the FCA.  According to the United States Senate, the importance of whistleblowers cannot be understated.

> Fraud is usually buried in mountains of paper or digital documents. It is hidden within an organization. Many different people within an organization, in multiple offices, divisions, and corporate capacities, may have participated in the illegality. Because of the complex nature of economic crime and the diffuse nature of business environments, it may not be apparent, perhaps for years, that

malfeasance is afoot. By then, <u>victims will have been hurt, records and witnesses will have disappeared, and memories will have faded.</u>

Given these facts, insiders who are willing to blow the whistle are the only effective way to learn that wrongdoing has occurred. Information from insiders is the only way to effectively and efficiently piece together what happened *7 and who is responsible. Insiders can provide invaluable assistance during an investigation by identifying key records and witnesses, interpreting technical or industry information, providing expertise, and explaining the customs and habits of the business or industry. Help from an insider can save time and expense for both law enforcement and putative defendants by focusing the investigation on relevant areas. Because of the valuable information brought by insiders, it is no surprise that Government officials state: 'Whistleblowers are essential to our operation. Without them, we wouldn't have cases.'

S. Rep. No. 110-507 110th Cong. 2nd Session (Sept. 25, 2008), 2008 WL 4415147, at *6-7 (emphasis added).

The *Lipka* Court's interpretation of the FCA retaliation provision undermines the legitimacy of the entire act.  It authorizes state agencies to terminate a whistleblower without authorization the moment the whistleblower suspects fraud is afoot.  The whistleblower is unable to provide assistance and "piece together what happened" because he or she has been terminated. And state institutions of higher education received $4,609,851,685 in NIH grant awards in 2014 alone.  See NIH Awards by Location & Organization, *available at http://report.nih.gov/award/index.cfm*. That is over $4.5 billion of unaccounted for taxpayer money if the federal courts allow state universities to terminate whistleblowers at will.

In addition, the *Lipka* Court's interpretation is poor statutory construction. "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."  *Engine Mfrs. Assn. v. South Coast Air Quality Management Dist.*, 541 U.S. 246, 252 (2004).  Further, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the <u>overall statutory scheme</u>." *Davis v. Mich. Dep't of*

*Treasury*, 489 U.S. 803, 809 (1989) (emphasis added); *accord Kunz v. United Sec. Bank*, 489 F.3d 1072, 1077 (10th Cir. 2007).   Section §3730(h) is not ambiguous.   It is not vague.   It expressly grants Dr. Klaassen the right to seek the relief necessary to make him whole.   That right includes the right to sue the individual tortfeasors who retaliated against him for alleging NIH fraud. Any other interpretation draws an arbitrary line between the FCA's retaliation and *qui tam* provisions.   In the event this Court concludes that KUMC is immune pursuant to the Eleventh Amendment, then Dr. Klaassen possesses no remedy pursuant to the FCA, despite the statute's requirement that he be made "whole."

<u>**Age Discrimination Claim**</u>

**The Kansas Age Discrimination in Employment Act claim is properly before this Court.**

In its motion to dismiss, KUMC argues that Dr. Klaassen's federal Age Discrimination in Employment Act (ADEA) cause is improper.   (Doc. 43, pp. 10-11.) The ADEA claim does not appear in the First Amended Complaint. (Doc. 66, Count 9.) KUMC's argument is moot. However, Dr. Klaassen's Kansas Age Discrimination in Employment Act (KADEA) cause remains.

Dr. Klaassen's KADEA cause is still proceeding through administrative channels.   To date, the Kansas Human Rights Commission (KHRC) is still in process of investigating the complaint.   On August 28, 2014, the KHRC is required by law to provide Dr. Klaassen with his "right to sue" letter, which constitutes final administrative action.   *See* K.S.A. 44-1115.

Dr. Klaassen acknowledges that his KADEA cause is not yet ripe.   He states as much in his pleading.   However, Dr. Klaassen's KADEA cause will be proper on or about August 28, 2014.   KUMC does not argue that Dr. Klaassen failed to timely seek administrative relief.   Only that the cause is improper today.   The cause may be proper tomorrow. Assuming that the KHRC

does not issue a right to sue letter tomorrow, on August 28, 2014, the KADEA cause will become proper by law. *See* K.S.A. 44-1115.

This Court is realistic and practical; it does not exalt form over substance. *See Logue By and Through Logue v. Shawnee Mission Public School Unified School Dist. No. 512*, 959 F. Supp. 1338, 1349 (D. Kan. 1997).   There is no prejudice in allowing the cause to continue at this time.   First, KUMC can raise this exact argument at any time.   *See Zhu v. Federal Housing Finance Bd.*, 389 F.Supp.2d 1253, 1279 (D. Kan. 2005) (administrative prerequisites necessary for a Title VII claim implicate subject matter jurisdiction). Second, dismissing the complaint now serves no purpose.   It will only serve to delay discovery.   The KADEA cause of action stems from Stites's actions at the May 1 meeting.   The events of the May 1 meeting form the basis or are implicated in at least a half dozen of Dr. Klaassen's other complaints.   Discovery regarding the events of the May 1 meeting will be ongoing regardless of the KADEA complaint. By next August, the parties will hopefully be wrapping up discovery.   However, if this court dismisses the KADEA cause, discovery may need to be reopened.   Rule 1 of the Federal Rules of Civil Procedure requires Dr. Klaassen to proceed in order to "secure the just, speedy, and inexpensive determination" of his proceeding.   Rule 1 suggests that this cause of action continue now.

In addition, "[T]he failure to obtain a right-to-sue letter prior to the commencement of a suit is a curable defect." *Martin v. Cent. States Emblems, Inc.*, 150 Fed. Appx. 852, 855 n. 3 (10th Cir. 2005) (unpublished) (*quoting Jones v. Am. State Bank*, 857 F.2d 494, 499 (8th Cir. 1988)). And one Tenth Circuit district court recently recognized that "a Title VII complainant may file an action before receiving a right-to-sue letter, so long as the record contains no evidence that the premature filing deterred the EEOC from performing its administrative duties

or that the premature filing caused any prejudice to defendant." *Campos v. Las Cruces Nursing Center*, 828 F.Supp.2d 1256, 1270 (D.N.Mex. 2011).  KUMC does not argue it was prejudiced by the premature filing.

If this Court disagrees dismisses Dr. Klaassen's KADEA cause, he requests that the dismissal be without prejudice and that he receive leave to file an amended complaint after the administrative proceedings close and he receives his right to sue letter.

### Dr. Klaassen May State a Complaint against Individual KADEA Defendants

The individual defendants contend that individual capacity suits are prohibited pursuant to the KADEA.  (*See* Hagenbuch 47, Jaeschke 50, Stites, Doc. 59; Klein, Doc. 57; Atkinson, Rawitch, Terranova, Kopf, Doc. 61; Carlson, Doc. 55; and Tully, Doc. 53).  In support of their argument, the defendants rely on *Davidson v. MAC Equipment*, 878 F. Supp. 186, 187-88 (D. Kan. 1995) and *Johnson v. Van Tuyl*, No. 92-2103-KHV, 1994 WL 373884 (D. Kan. June 9, 1994) (same). These courts summarily concluded that the discrimination claims can only be brought against "employers." However, the courts' reasoning is inconsistent with Kansas statutes. The courts were not even asked to engage in statutory interpretation.

When interpreting Kansas statutes, this Court must begin and end with the plain language of the statute.  *State v. Hendrix,* 289 Kan. 859, Syl. ¶ 2, 218 P.3d 40 (2009) ("In interpreting a statute, the fundamental rule to which all other rules are subordinate is that the intent of the legislature governs if that intent can be ascertained. Intent of the legislature is to be derived in the first place from the words used."); *Steffes v. City of Lawrence*, 284 Kan. 380, Syl. ¶ 2, 160 P.3d 843 (2007) ("An appellate court merely interprets the language as it appears; it is not free to speculate and cannot read into the statute language not readily found there.").

The KADEA defines "employer" to be "any person in this state who employs four or more persons <u>and</u> any person acting directly or indirectly for such a person, <u>and</u> includes the state and all political subdivisions of the state."   K.S.A. 44-1112(d) (emphasis added).   In addition, the KADEA defines "person" to include "individual[s]." K.S.A. 44-1112(i). The KADEA further prohibits an "employer" from discriminating against an individual based on age. *See* K.S.A. 44-1113(a)(1). And K.S.A. 44-1127, which authorizes civil actions, states that any person may bring a claim against the "alleged violator."  *See* K.S.A. 44-1127.

There is no logical reading of the KADEA to exclude individual defendants.  Employer is defined to include state agencies as well as the "person acting directly or indirectly for them." Individuals working for state agencies are employers pursuant to the plain language of the act. The KADEA's authorization for suits against individual defendants is consistent with Kansas tort law, which authorizes suits against corporate directors that participate in the torts.  *See Ruisinger v. HNB Corp.*, No. 10-CV-02640, 2012 WL 3758656, at *2 (D. Kan. Aug. 8, 2012) (citing *Kerns v. G.A.C.*, 255 Kan. 264, 274, 875 P.2d 949 (1994)); *see also Russell v. American Rock Crusher Co.*, 181 Kan. 891, 894-95, 317 P.2d 847 (Kan. 1957) (stating that an agent cannot escape liability by pleading "he acted at the common or on account of the principal" because he has an obligation to "so act or use that which he controls as not to injure another").

Stites and Girod work for a state agency.  They are alleged violators of the KADEA and employers pursuant to the plain language of the KADEA.  This Court may not second guess the Kansas legislature's language.  Dr. Klaassen KADEA claim is proper.

4810-6668-7259.1

## Kansas State Law Claims

### This Court Should Exercise Pendant Jurisdiction Over KUMC

KUMC argues that pendant jurisdiction is improper because there are no existing federal claims against it.   KUMC does not argue that sovereign immunity prevents this Court from exercising pendant jurisdiction over KUMC.  An argument not raised is waived and abandoned. *See First Specialty Ins. Corp. v. NAIS, Inc.*, 459 F.Supp.2d 1094 (D.Kan. 2006); *Morris v. Okla. Dep't of Human Servs.*, 685 F.3d 925, 932 n.4 (10th Cir. 2012). And KUMC's argument that it should dismiss the state common law claims against KUMC for the sake of judicial economy lacks merit. First, this court possesses original jurisdiction over KUMC pursuant to its waiver of sovereign immunity under the False Claims Act.  Second, supplement pendant jurisdiction over KUMC is necessary because the common law claims arise out of the same operative facts.

Although a statutory basis is necessary for federal courts to exercise jurisdiction over a controversy, "it is well established - in certain classes of cases - that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy."  *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2007). The supplemental jurisdiction statute, 28 U.S.C. § 1367(c) enumerates four factors that this Court must consider:  (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.  28 U.S.C. § 1367(c).

Numerous courts have acknowledged that 28 U.S.C. § 1367(c) requires that, unless one of the conditions of 28 U.S.C. § 1367(c) exists, courts are not free to decline jurisdiction. *See*

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 447 (2d Cir.1998)("[S]ection 1367 has indeed altered *Gibbs'* discretionary analysis."); *McLaurin v. Prater*, 30 F.3d 982, 985 (8th Cir. 1994) ("The statute plainly allows the district court to reject jurisdiction over supplemental claims only in the four instances described therein."); *Executive Software N. Am. v. U.S. Dist. Court*, 24 F.3d 1545, 1557 (9th Cir. 1994) ("By codifying preexisting applications of Gibbs in subsections (c)(1)-(3), however, it is clear that Congress intended the exercise of discretion to be triggered by the court's identification of a factual predicate that corresponds to one of the section 1367(c) categories."), *overruled on other grounds by Cal. Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087 (9th Cir. 2008); *Palmer v. Hosp. Auth.*, 22 F.3d 1559, 1569 (11th Cir. 1994) ("[S]upplemental jurisdiction must be exercised in the absence of any of the four factors of section 1367(c)...."); *Bonadeo v. Lujan*, No. CIV 08-0812 JB/ACT, 2009 WL 1324119, at *8 (D.N.M. April 30, 2009) ("28 U.S.C. § 1367(c) changed the district courts' supplemental jurisdiction discretion analysis to prohibit courts from declining jurisdiction unless one of the conditions of 28 U.S.C. § 1367(c) exists."). And at least two Tenth Circuit district courts have reached the same conclusion.

In fact, this Court has held that "'any exercise of discretion declining jurisdiction over pendent claims or parties cannot occur until triggered' by the existence of one of the four conditions enumerated." *Gudenkauf v. Stauffer Commc'ns, Inc.*, 896 F.Supp. 1082, 1084 (D. Kan. 1995); *see also Williams v. Bd. of Regents of Univ. of New Mexico*, CIV 13-0479 JB/WPL, 2014 WL 59866 (D.N.M. Jan. 6, 2014).  KUMC has not argued that a single factor of §1367(c) supports its argument.

In addition, pendant jurisdiction is appropriate because this Court has supplemental jurisdiction over "all other claims that are so related ... that they form part of the same case or

controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties." 28 U.S.C. § 1367(a). As the Supreme Court explained in *United Mine Workers v. Gibbs*,

> The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in federal courts to hear the whole.

383 U.S. at 725. "In practice, § 1367(a) requires only that the jurisdiction-invoking claim and the supplemental claim have some loose factual connection." 13D C. Wright, A. Miller, E. Cooper, & R. Freer, supra, § 3567.1, at 349. Dr. Klaassen's state law claims arise from the same exact facts as its federal claims. KUMC does not argue otherwise. And even if this Court concludes that KUMC is not a proper defendant on the federal claims due to sovereign immunity, it may be added pursuant to § 1367(a). This Court should exercise pendant jurisdiction over KUMC.

### Kansas State Law Claims

### The Individual Defendants Are Proper Parties Pursuant to § 1367

Finally, for the same reasons that KUMC is a proper party, this Court should exercise pendant jurisdiction over the individual defendants. As mentioned, the individual defendants' claims that Dr. Klaassen's §1983 claims will not survive a *Twombly* challenge is moot with the filing of the new pleading. Dr. Klaassen states viable § 1983 claims pursuant to the *Ex Parte Young* doctrine. KUMC has not argued otherwise. Consequently, there is no reason pursuant to 28 U.S.C. § 1367(c) to dismiss the individual defendants state common law claims. The individual defendants are proper defendants pursuant to Dr. Klaassen's federal and state causes of action.

## Kansas False Claims Act Claim

### Dr. Klaassen's First Amended Complaint is Proper and
### States a Viable Claim Pursuant to the *Twombly* Pleading Standard

KUMC and the individual defendants argue that Dr. Klaassen failed to meet the *Twombly* pleading standard because Dr. Klaassen failed to take steps in support his belief that KUMC was misappropriating Kansas general fund monies.  KUMC, and the individual defendants, further claim that Dr. Klaassen did "not engaged in the kind of protected activity required to state a KFCA claim."  (*See, e.g.,* Doc. 43, p. 15.) The argument is moot in light of Dr. Klaassen's amended pleading.

As stated in the First Amended Complaint, Dr. Klaassen reasonably believed that KUMC used state general fund monies to cover for its misuse of NIH grant funds.  The misuse of NIH grant funds often created account overages and caused Dr. Klaassen's accounts to operate with a negative balance. (Doc. 66, ¶ 71.)  As alleged in Dr. Klaassen's amended pleading, KUMC used state general fund monies to pay for account overages caused by the misappropriation of NIH grant funds.  (Doc. 66, ¶¶ 199-201.)  Or in the words of Dr. Dawn, KUMC used the "slush" fund to pay for its prior misappropriations.  Dr. Klaassen diligently protested the slush fund and misuse of research funds.  Embedded and inseparable in Dr. Klaassen's objection to this misappropriation is Dr. Klaassen's contention that KUMC misused state general funds to cover any negative balances caused by the misuse of NIH funds.  *See United States v. Adegboye*, 732 F.3d 1195 (10th Cir. 2013) (covering up fraud is evidence of the underlying fraud).

In order to survive a Rule 12(b)(6) motion, Dr. Klaassen need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  And "specific facts are not necessary." *Khalik v. United Air Lines,* 671 F.3d 1188, 1190 (10th Cir. 2012).  Dr. Klaassen's complaint states sufficient facts.  Dr. Klaassen objected to

KUMC's grant accounting methods, including the means in which KUMC used state general funds to cover up misappropriations.  On May 7, 2013, Dr. Klaassen directly questioned the accounting practices of KUMC.  The next day KUMC banned him from campus. (Doc. 66, ¶ 186.)  KUMC retaliated against Dr. Klaassen before he had a chance to finish his investigation.  Dr. Klaassen should not be punished because of KUMC's malfeasance. *See United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C.Cir. 1998) (The FCA "manifests Congress' intent to protect employees while they are collecting information about a possible fraud, before they have put all the pieces of the puzzle together").  Notably, the retaliation provision of the KFCA expressly prohibits retaliation against an employee for "investigation" into violations of the KFCA.  *See* K.S.A. 75-7506 ("Any employee who is discharged, demoted, suspended, threatened, harassed or in any other manner retaliated against in the terms and conditions of employment by such employee's employer because of lawful acts undertaken in good faith by the employee on behalf of the employee or others, in furtherance of an action under this act, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this act, shall be entitled to all relief necessary to make the employee whole.").  Dr. Klaassen states a viable cause against KUMC.

Finally, the individual defendants, citing pre-2009 FCA case law, argue that claims against them individually are prohibited.  The individual defendants ignore the statutory language.  First, the KFCA is to be "liberally construed and applied to promote the public interest."  K.S.A. 75-7507(b).  Second, the KFCA allows a plaintiff to bring a claim once they have been suffered an adverse employment action from their employer.  Finally, the statue defines "person" to include natural persons.  The plain language of the retaliation provision does not preclude a plaintiff from seeking relief against individual defendants.  *See* K.S.A. 75-7506.

## Kansas Common Law Retaliation

### Dr. Klaassen's Common Law Retaliation Claim is Valid

KUMC and some of the individual defendants argue that Dr. Klaassen's common law retaliation claims is deficient for the following reasons:

- "Kansas law does not recognize a common law claim for retaliatory employment actions short of discharge."
- "Kansas courts require evidence that the employee actually filed a written complaint or document prior to discharge." (Doc. 49, p. 16; Doc. 43, p. 14).

KUMC is outright wrong.   First, discharge is not necessary.   *Brigham v. Dillon Companies, Inc.*, 935 P.2d 1054, 262 Kan. 12, Syl. ¶ 2 (Kan. 1997) ("The tort of <u>retaliatory demotion</u> is recognized in Kansas."). Second, Kansas courts allow retaliation claims on the basis of oral complaints.   *Deeds v. Waddell & Reed Inv. Mgmt. Co.*, 47 Kan. App. 2d 499, 506, 280 P.3d 786, 792 (2012) ("An oral complaint should be sufficient, but only if the complaint is clear enough that the employer would understand that the employee is asserting rights protected by the statute.").   In addition, many of the complaints from Dr. Klaassen involve writing and e-mails. (*See* Doc. 66, ¶ 83.)  In fact, at the May 1, 2013 meeting, Dr. Klaassen went to a whiteboard and started writing out his allegations of grant misappropriation.   KUMC took pictures of the whiteboard and entered into evidence at his November 13, 2013 administrative hearing.   KUMC introduced his written complaints as evidence in support of its argument that it lawfully discharged him.   Now KUMC claims there is no written evidence of any complaint.   KUMC's position is ingenuous.

Finally, KUMC's argument that there is no case law expressly recognizing a right to assert claim for wrongful discharge for exercising rights pursuant to the FCA is unavailing. Ironically, the case KUMC cites in support of its argument, *Lumrey v. State*, 49 Kan. App. 2d

276, 302, 307 P.3d 232 (Kan. App. 2013) states, "To date, the Kansas Supreme Court has recognized public policy exceptions to the employment-at-will doctrine in five circumstances: (1) filing a claim under the Kansas Workers Compensation Act, K.S.A. 44-501 et seq.;  (2) whistleblowing; (3) filing a claim under the Federal Employers Liability Act (FELA), 45 U.S.C. § 51 (2006) et seq.;  (4) exercising a public employee's First Amendment right to free speech on an issue of public concern; and (5) making a claim under the Kansas Wage Payment Act." (emphasis added).  Whistleblowing and the exercise of First Amendment rights are expressly recognized Kansas common law retaliation claims. KUMC ignores the law.

In addition, the Kansas Supreme Court looks to statutory provisions when determining public policy. *Campbell v. Husky Hogs,* 292 Kan. 225, 230, 255 P.3d 1 (2011). And both Kansas and the Federal government have enacted false claims act laws discouraging governmental fraud. Dr. Klaassen's common law retaliation claim is proper.  *See also Moyer v. Allen Freight Lines, Inc.*, 885 P.2d 391, 20 Kan.App.2d 203, Syl. ¶ 1 (Kan. App. 1994) ("The termination of an employee in retaliation for the good faith reporting of a serious infraction of a rule, regulation, or law (affecting public health, safety, or general welfare) by a co-worker or an employer to either company management or law enforcement officials (whistle-blowing), is an actionable tort.").

Finally, some of the individual defendants argue that the common law causes of action against them individually fail pursuant to the *Twombly* pleading standard because Dr. Klaassen's original complaint failed to specifically identify how each defendant participated in the common law claim.  (Stites, Doc. 59; Klein, Doc. 57; Atkinson, Rawitch, Terranova, Kopf, Doc. 61; Carlson, Doc. 55; and Tully, Doc. 53).  Their argument is now moot. Dr. Klaassen's First Amended Complaint's state law claims identify each defendant and explain in detail the

individual actions taken by the defendant in support of the claim.  (Doc. 66, Counts 11-14.)  Dr. Klaassen's First Amended Complaint satisfies the *Twombly* pleading standard.

## Kansas Common Law Tortious Interference

### Dr. Klaassen's Common Law Tortious Interference Claim is Valid

KUMC argues that Dr. Klaassen's claim against KUMC for tortious interference fails as a matter of law.  The argument is now moot in light of the First Amended Complaint because KUMC is no longer identified as a defendant to that particular claim.  (Doc. 66; Count 12).

### KUMC's Statute of Limitations Arguments Lack Merit

In passing, KUMC raises a broad statute of limitations argument in which KUMC states, "To the extent Klaassen is attempting to assert claims arising before October 31, 2011, such claims are barred by the two-year statute of limitations under K.S.A. 60-513(a)(4)." The argument is inadequately briefed.  KUMC does not argue that any of Dr. Klaassen's claims accrued before October 31, 2011 or are barred by K.S.A. 60-513(a)(4).  KUMC is not *pro se* and it is not Dr. Klaassen's responsibility to broadly construe its argument.  In addition, K.S.A. 60-513(a)(4) is not the controlling statute of limitations for all of Dr. Klaassen's claims.  *See* 31 U.S.C. § 3130(h)(3) (three-year statute of limitations for FCA retaliation claims).

Finally, in construing the statute of limitations for § 1983 claims, Kansas courts recognize that facts preceding the two-year statute of limitations are relevant considerations.

> Yes, the statute of limitations is for a 2-year period for Section 1983 claims under Kansas law. *See* K.S.A. 60-513(a)(4); *Jacobs v. Lyon County Detention Center*, 371 Fed. Appx. 910, 912 (10th Cir.2010) (unpublished opinion). But evidence of events that occurred more than 2 years before the filing of a plaintiffs claims may well be relevant to a claim of continuing violation of constitutional rights. More importantly, continuing unconstitutional actions are not insulated from suit just because they began more than 2 years before suit was brought.

*See Brull v. Jordan*, No. 101,755 2011 WL 420700, at *9 (Kan. App. 2011) (unpublished opinion); *see also Loard v. Sorenson*, No. 13-4141, 2014 WL 1364678, at*3 (10th Cir. Apr. 8, 2014) (unpublished opinion) (assuming without deciding the continuing violation applies to § 1983 cases).

Finally, any factual event occurring before October 31, 2011 is relevant and reflects a continuing violation of Dr. Klaassen's constitutional rights.  For example, Dean Atkinson's removal of Dr. Klaassen as Chair of the Pharmacology and Toxicology department after he protested about KUMC's improper financial accounting and oversight was a continuing act in violation of Dr. Klaassen's constitutional rights.  (Doc. 66, p. 40-41.) KUMC continued its mistreatment with individual continuing acts including removing his grants, transferring him to a different department, denying him accounting information, misappropriating his NIH grant funds, and ultimately terminating him in January 2014.  *Bergman v. United States*, 751 F.2d 314, 317 (10th Cir.1984) ("A continuing violation is occasioned by continual unlawful acts, not by continual ill effects from the original violation.").

### The University of Kansas School of Medicine is a Proper Party

The University of Kansas School of Medicine, ironically through the attorney for the University of Kansas, argues that the School of Medicine is not a proper party because it is inseparable from the University of Kansas.  The School of Medicine argues that there "is no separate statutory authority creating the University of Kansas School of Medicine as a person or legal entity separate and distinct from the University of Kansas or granting it authority to sue or be sued. *See* K.S.A. § 76- 711 ("State educational institution" means the University of Kansas . . . .); § 76-713 ("Any state educational institution may be sued and may defend any action brought against it.")."

Dr. Klaassen is aware of this Court's recent opinion in *Boxum-Debolt v. Office of the District Attorney*, No. 12–CV-2641, 2013 WL 5466915 (D. Kan. Sept. 30, 2013) (unpublished opinion), which held that a Kansas state entity does not have capacity to be sued in absence of a statutory authorization.  However, there is no dispute that the University of Kansas may be sued. *See* K.S.A. § 76-711, 713. And there is no doubt that Dr. Klaassen identified the University of Kansas as proper defendant to this action.

The School of Medicine's argument is that it is indistinguishable from the University of Kansas. Notably, the University of Kansas does not argue that Dr. Klaassen was not an employee of the University of Kansas or that the University of Kansas is, in any manner, an improper defendant.  The School of Medicine appears to be requesting a change in the caption of the case.

Finally, Dr. Klaassen notes that the University of Kansas School of Medicine has defended multiple causes of action in federal court without drawing a technical line between the University and the School of Medicine that it oversees.  *McCulley v. University of Kansas School of Medicine*, No. 12-2587, 2012 WL 9490568 (D. Kan. Oct. 31, 2013); *Baker v. Board of Regents of State of Kansas*, 721 F.Supp. 270 (D. Kan. 1989) (identifying School of Medicine as a defendant).  The School of Medicine has even filed motions to dismiss it as a "state agency." *See Semchyshyn v. University of Kansas*, *et. al.* No. 08-2627 ECF 14 (filed June 05, 2009) (motion to dismiss filed on behalf the School of Medicine and other state agencies because School of Medicine immune from suit pursuant to the Eleventh Amendment).  The School of Medicine's argument creates a distinction without any difference.

## CONCLUSION

Dr. Klaassen's well-pleaded First Amended Complaint states valid claims for multiple constitutional torts stemming from years of mistreatment.  Each one of Dr. Klaassen's claims is

plausible on its face.  The First Amended Complaint stands up to any *Twombly* challenge.  This

Court should deny the University of Kansas, the University of Kansas's School of Medicine, and

each of the individual defendants' motions to dismiss.


Respectfully Submitted,


**s/ Alan L. Rupe**
Alan L. Rupe #08914
Jeremy K. Schrag #24164
KUTAK ROCK LLP
1605 N. Waterfront Parkway, Suite 150
Wichita, Kansas 67206
Telephone: (316) 609-7900
Facsimile:  (316) 630-8021
alan.rupe@kutakrock.com
jeremy.schrag@kutakrock.com

*Attorneys for Plaintiff*


## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing **Consolidated Response to
Defendants Motion to Dismiss** using the CM/ECF system, which will send electronic notices to
the following counsel of record:

Sara Trower
Associate General Counsel & Special Assistant Attorney General
Room 245 Strong Hall
1450 Jayhawk Blvd
Lawrence, KS 66045
strower@ku.edu

and

Stephen Phillips
Assistant Attorney General
Memorial Bldg, 2nd Floor

120 SW 10th Ave
Topeka, KS 66612-1597
Stephen.Phillips@ks.ag.gov

*Attorneys for Defendants*

this 7th day of May, 2014.

**s/ Alan L. Rupe**
Alan L. Rupe   #08914

- 37