**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **CURTIS KLAASSEN, Ph.D.,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 13-CV-2561-DDC-KGS** |
| **UNIVERSITY OF KANSAS** **SCHOOL OF MEDICINE, ET AL.,** | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

The University of Kansas fired plaintiff Dr. Curtis Klaassen, a longtime medical professor at the school, on January 24, 2014.  Plaintiff filed this lawsuit against the University of Kansas, the University of Kansas School of Medicine, and the University of Kansas Medical Center (collectively, "KUMC").  Plaintiff also sued various KUMC officials in their official and individual capacities.  Plaintiff alleges that defendants retaliated against him and violated various federal and state laws after he criticized KUMC for financial mismanagement, misuse of grant funds, and other misconduct.

Defendants filed an Answer (Doc. 79) and then filed two Motions for Judgment on the Pleadings (Docs. 80, 82) on June 17, 2014.  On January 26, 2015, plaintiff filed a Motion for Leave to Amend the Complaint (Doc. 101).  This Memorandum and Order addresses plaintiff's Motion for Leave to Amend and both Motions for Judgment on the Pleadings.  For the following reasons, the Court grants plaintiff's Motion for Leave to Amend and grants defendants' Motions for Judgment on the Pleadings in part and denies them in part.  Specifically, the Court dismisses all claims asserted by plaintiff's Second Amended Complaint *except*:

1

- Counts 1, 6, and 7 – First Amendment Retaliation, Procedural Due Process, and Substantive Due Process against defendant Girod in his official capacity;

- Count 1 – First Amendment Retaliation against the Individual Defendants in their individual capacities;

- Count 6 – Procedural Due Process against defendants Stites and Girod in their individual capacities;

- Count 12 – Tortious Interference with a Prospective Business Relationship against defendants Terranova, Kopf, Jaeschke, Carlson, and Hagenbuch in their individual capacities;

- Count 13 – Conversion against defendant Stites in his individual capacity;

- Count 14 – Tortious Interference with Contract against defendant Stites in his individual capacity; and

- Count 15 – Violations Pursuant to the Kansas Judicial Review Act against KUMC.

## I.   Motion for Leave to Amend

Plaintiff seeks leave amend his Complaint by filing the Second Amended Complaint (Doc. 101-1).  The Second Amended Complaint is substantially similar to the Amended Complaint.  However, it makes two sets of relevant changes:  (1) it adds allegations to Counts 1, 6, 8, 9, and 11; and (2) it adds Count 15, a claim under the Kansas Judicial Review Act.  Fed. R. Civ. P. 15(a)(2) instructs that the Court "should freely give leave [to amend the complaint] when justice so requires."  The Court has not entered a scheduling order in this case, and the litigation is still in its early stages.  Plaintiff asserts that he seeks to add allegations based on facts he discovered in a parallel state court lawsuit and to update the Court that he has exhausted his administrative remedies on his Kansas age discrimination claim.  The Court concludes that this explanation is reasonable and therefore grants plaintiff's Motion for Leave to Amend.

The Second Amended Complaint supersedes the Amended Complaint.  Nevertheless, the Court will still rule on defendants' two Motions for Judgment on the Pleadings—which attack

the *Amended* Complaint—because the Second Amended Complaint is in large part identical to

the Amended Complaint. However, where plaintiff had modified or added allegations in a way

that prevents the Court from ruling on defendants' motions on a particular claim, defendants may

file additional motions for judgment on the pleadings because they have not had a chance to

challenge plaintiff's pleading of his Second Amended Complaint.

## II. Factual Background

The following facts are taken from plaintiff's Second Amended Complaint and viewed in

the light most favorable to him. *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014).

Plaintiff served as a professor at KUMC from 1968 until the school fired him in 2014.

Plaintiff's duties as a tenured KUMC medical professor involved applying for and winning

research grants. Research grants funded not only his research, but also part of his salary and the

salaries of the graduate students who worked with him. When plaintiff won a grant, he became

the "principal investigator" for that grant. The principal investigator is responsible for the

scientific and technical direction of a project funded by a research grant. During his time at

KUMC, plaintiff was particularly successful at winning grants from the National Institutes of

Health ("NIH"). However, whenever plaintiff won an NIH grant, the NIH actually awarded the

grant to KUMC, not plaintiff. In other words, KUMC always was the actual recipient of NIH

grants.

The dispute that led to this lawsuit started in 2010, when plaintiff became dissatisfied

with then-Dean of the School of Medicine Barbara Atkinson's leadership at KUMC. Plaintiff

helped form a "Committee of Eight," made up of the Chairs of the basic sciences departments,

which met with the University of Kansas' Chancellor to express concerns about KUMC's

financial situation and lack of shared governance. In March 2011, the Committee of Eight met

with Atkinson, during which plaintiff accused her and KUMC of taking money from the basic sciences programs to pay for other KUMC programs.  In April 2011, one month after their meeting, Atkinson removed plaintiff from his position as Chair of the Pharmacology/Toxicology Department, a position he had held for nine years.

In October 2011, plaintiff met with members of the Pharmacology/Toxicology Department to discuss one of plaintiff's NIH grants.  During the meeting, plaintiff accused KUMC and two KUMC officials of mismanaging federal grant money.  On November 1, 2011, plaintiff also spoke with Dr. Gregory Kopf, Associate Vice Chancellor of Research Administration and Executive Director of the KUMC Research Institute, Inc. ("KUMCRI") about KUMC's mismanagement of federal grant money.

Following those meetings, Paul Terranova, Vice Chancellor for Research, directed KUMC to place plaintiff on administrative leave with pay from November 1, 2011 through December 15, 2011, citing his "belligerent behavior" and "mishandling [of] grant funds."  Doc. 101-1 at ¶¶ 11, 55.  Plaintiff asserts that the allegations of misconduct against him were pretextual and that KUMC placed him on administrative leave because he complained about KUMC's mismanagement of federal grant money, lack of shared governance, and financial mismanagement.

On November 21, 2011, at Terranova's direction, KUMC submitted requests to the NIH to remove plaintiff as the principal investigator for two grants and replace him with two other KUMC researchers.  On January 10, 2012, KUMC reassigned plaintiff from the Department of Pharmacology/Toxicology to the Internal Medicine department and notified him it was moving his assigned office and research laboratory space to another building away from the Department of Pharmacology/Toxicology.  That same day, KUMC administration told plaintiff he had

overspent on his remaining NIH grants.  Plaintiff maintains that the grants were overspent because Terranova and Kopf took money out of the accounts without plaintiff's permission.

In November 2011, while plaintiff was on leave, Terranova asked Allen Rawitch, Vice Chancellor for Academic Affairs at KUMC, to investigate plaintiff.  Following his investigation, Rawitch prepared an Inquiry Report.  This report outlined a number of incidents that KUMC officials considered evidence of plaintiff's unprofessional behavior.  Plaintiff contends the Inquiry Report was a pretext and KUMC actually placed him on leave because he had criticized the school.

On May 29, 2012, Rawitch convened an ad hoc faculty committee to hear the allegations described in the Inquiry Report.  The hearing committee recommended that KUMC publicly censure plaintiff and asked plaintiff to issue a general apology.  Steven Stites, Chair of the Department of Internal Medicine and Vice Chancellor for Clinical Affairs, adopted the committee's recommendation.

In December 2012, plaintiff sent an e-mail to Stites, who was then Interim Dean and Executive Vice Chancellor of KUMC, and to another Internal Medicine department professor.  This e-mail complained that KUMC had misappropriated NIH grant funds by transferring money from accounts for which plaintiff served as principal investigator to accounts not related to the grant's research.  On May 1, 2013, plaintiff met with Stites and others in the Internal Medicine department to discuss the grants.  Plaintiff told Stites during the meeting that KUMC had misappropriated $200,000 in grant funds for which plaintiff then served or previously had served as principal investigator.  Plaintiff alleges Stites improperly suggested using money from new grants to cover deficits in old existing grants, which plaintiff said was unethical conduct.

On May 8, 2013, Stites placed plaintiff back on administrative leave.  According to plaintiff, Stites did so because plaintiff objected to KUMC's handling of grant money.  In September 2013, while plaintiff remained on administrative leave with pay, KUMC asked the NIH to remove plaintiff as principal investigator on another grant.

On November 13, 2013, KUMC held a hearing before a faculty committee at which it charged plaintiff with professional misconduct and requested his termination.  Plaintiff alleges that Stites and other employees received promotions from KUMC for their testimony against him at this hearing.  After the hearing, the faculty committee recommended that KUMC reinstate plaintiff immediately and give him only a written warning.  However, Executive Vice Chancellor Douglas Girod rejected the committee's recommendation and instead terminated plaintiff, effective January 24, 2014.

Plaintiff brings fifteen counts of federal and state claims against KUMC and eleven current and former KUMC employees (the "Individual Defendants").  Defendants seek judgment on the pleadings on all of plaintiff's federal claims and five of his seven state law claims.

### III. Legal Standard – Motion for Judgment on the Pleadings

Defendants seek judgment on the pleadings under Fed. R. Civ. P. 12(c).  Courts evaluate a Rule 12(c) motion under the same standard as a Rule 12(b)(6) motion to dismiss.  *See Turner v. City of Tulsa*, 525 F. App'x 771, 772 (10th Cir. 2013).

The Court will grant a motion for judgment on the pleadings only when the factual allegations in the complaint fail to "state a claim for relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), or when an issue of law is dispositive, *Neitzke v. Williams*, 490 U.S. 319, 326 (1989).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Under this standard, 'the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims.'" *Carter v. United States*, 667 F. Supp. 2d 1259, 1262 (D. Kan. 2009) (quoting *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007)).

## IV. Claims Against KUMC and the Individual Defendants in their official capacities

### A. Defendants Are Entitled to Judgment on the Pleadings on Plaintiff's Federal Law Claim Against KUMC

#### 1. Title 31 U.S.C. § 3730(h) Does Not Authorize Suits Against States

Defendants seek judgment on all federal claims asserted against the three institutional defendants, who this order collectively refers to as KUMC.[1]  Defendants argue plaintiff asserts just one federal claim against KUMC, for violating the federal False Claims Act (Count 8). However, Count 1 asserts §§ 1983 and 1988 claims against "All of the Individually Named Defendants."  Doc. 101-1 at 20.  While "Individually Named Defendants" arguably includes KUMC—each institution is individually named in the Second Amended Complaint—plaintiff concedes he has not sued KUMC on Count 1.  In plaintiff's Opposition to Defendants' Motion for Judgment on the Pleadings (Doc. 91), plaintiff defends only its False Claims Act count against KUMC and devotes none of his arguments to saving Count 1.  As a result, the Court concludes plaintiff brings just one federal law claim against KUMC, under the False Claims Act.

The False Claims Act ("FCA") serves to attack fraud in government-funded programs. Title 31 U.S.C. §§ 3729(a) and 3730(b) authorize individuals (called "relators") to file a lawsuit

---

[1] Defendants argue that the Court should dismiss the University of Kansas School of Medicine and the University of Kansas Medical Center from the case because they are not entities capable of being sued. However, the Court dismisses all claims against the institutional defendants, except for Count 15, which plaintiff alleges for the first time in his Second Amended Complaint.  Defendants may renew this argument if they file a motion seeking to dismiss Count 15, but the Court will not reach it here.

in the name of the United States against "any person" who has defrauded federal government programs. The relator receives a share of any proceeds recovered in the action—generally ranging from 15 to 30 percent, depending on whether the government intervenes in the lawsuit—plus attorney's fees and costs. §§ 3730(d)(1)-(2).

To prevent an employer from retaliating against an employee for investigating potential fraud or initiating an FCA action, the FCA contains an anti-retaliation provision. This provision, § 3730(h) of the FCA, provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

Relief for violating § 3730(h) includes reinstatement, two times the amount of back pay, costs, and attorney's fees. § 3730(h)(2).

Plaintiff argues that KUMC violated § 3730(h) by placing him on administrative leave, transferring him to a different department, removing his status as a principal investigator on several NIH grants, preventing him from conducting research, and terminating his employment after he complained that defendants had misused federal grant funds. Plaintiff asserts that the Eleventh Amendment does not bar this claim because KUMC waived its sovereign immunity.

In response, defendants argue that the Court need not reach the sovereign immunity issue because the three KUMC institutions are considered states, and the statutory text of § 3730(h) does not provide for suits against states. In the alternative, defendants argue that even if § 3730(h) provided for such suits, the Eleventh Amendment nevertheless bars the claims because KUMC did not waive its sovereign immunity.

There is no dispute that the three institutional defendants are "arms of the State" and therefore are considered "states" here.  Doc. 91 at 3-4 ("KUMC is an arm of the state . . . ."); *Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186, 1195 (10th Cir. 1998) (holding that under Kansas law the University of Kansas and the University of Kansas Medical Center are arms of the State of Kansas).  As a result, the Court must consider whether § 3730(h) creates a cause of action against states.

The Supreme Court has indicated that a federal court, when confronted with the question of whether a statute authorizes suits against states, should decide the statutory question before deciding whether the Eleventh Amendment bars the claim.  *Vt. Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 780 (2000).  "When these two questions are at issue, not only is the statutory question logically antecedent to the existence of the Eleventh Amendment question . . . but also there is no realistic possibility that addressing the statutory question will expand the Court's power beyond the limits that the jurisdictional restriction has imposed."  *Id.* at 779 (internal citations omitted).  Thus, the Court will first determine whether the text of § 3730(h) provides for a claim against states (and state agencies, like KUMC).

Courts do not determine whether a statute authorizes claims against states using the "ordinary method of statutory construction."  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 72 (1989) (Brennan, J. dissenting).  Rather, two Supreme Court cases—*Will*, 491 U.S. 58 (1989), and *Stevens*, 529 U.S. 765 (2000)—make it clear that the Eleventh Amendment significantly influences the analysis.

In *Will*, the Supreme Court considered whether 42 U.S.C. § 1983 authorized suits against states or state officials acting in their official capacities.  491 U.S. at 60.  The Court held that "[t]he language of § 1983 [] falls far short of satisfying the ordinary rule of statutory construction

9

that if Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'" *Id.* at 65 (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985)). The Court continued, holding that "Congress should make its intention 'clear and manifest' if it intends to pre-empt the historic powers of the States"—namely, the power to be free from facing lawsuits in federal courts. *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). The Court also noted that the scope of the Eleventh Amendment and the scope of § 1983 are "[c]ertainly" separate issues, but concluded that "in deciphering congressional intent as to the scope of § 1983, the scope of the Eleventh Amendment is a consideration, and we decline to adopt a reading of § 1983 that disregards it." *Id.* at 66-67.

In *Stevens*, the Supreme Court applied *Will*'s general scheme of analysis to evaluate whether a different provision of the FCA—§ 3729(a)—provides for suits against states. 529 U.S. at 779. At the time the Supreme Court decided *Stevens*,[2] § 3729(a) imposed liability on "[a]ny person" who, among other things, "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." The plaintiff in *Stevens* brought a *qui tam* action under § 3729(a) against the Vermont Agency of Natural Resources, a state agency. *Stevens*, 529 U.S. at 768. The Court wrote that the question in the case is whether § 3729(a) "itself *permits* the cause of action it creates to be asserted against States (which it can only do by clearly expressing such an intent)." *Id.* at 779 (emphasis in original). The Court concluded that the text of § 3729(a) contained nothing to overcome the "longstanding interpretive presumption that 'person' does not include the sovereign." *Id.* at 780, 782. Furthermore, the Court, citing *Will*, held that Congress failed to "make its intention . . . unmistakably clear" that § 3729(a) authorized suits against states. *Id.* at

---

[2] Congress amended the FCA in 2009, but made only minor changes to § 3729(a).

10

787.  For those reasons, among others, the Court concluded that the defendant Vermont Agency of Natural Resources was not liable under § 3729(a).  *Id.* at 787-88.

Plaintiff argues that *Will* and *Stevens* are inapposite because the statutes at issue in those cases differ from § 3730(h).  These two cases evaluated whether the word "person" in two statutes—§§ 1983 and 3729(a)—authorized lawsuits against states.  Plaintiff points out that § 3730(h) never uses the word "person."  However, the Court finds *Will* and *Stevens* valuable for the scheme of analysis they employ, not because the statutes in those cases are identical to the one at issue here.  Together, they instruct that the text of § 3730(h) must make it "unmistakably clear" that Congress intended to authorize suits against states.  *Stevens*, 529 U.S. at 787.

Section 3730(h) provides that private party "shall be entitled to all relief necessary" if that private party "is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment . . . ."  The subsection does not limit whom the private party may sue as a defendant.  However, such silence about who may be a defendant does not satisfy the requirement for a clear statutory statement of congressional intent waiving state sovereign immunity.  *Accord Bell v. Dean*, No. 2:09-CV-1082-WKW, 2010 WL 1856086, at *4 (M.D. Ala. May 4, 2010).  Furthermore, §3730(h) gives employees a right to relief if their employer retaliates against them "in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter."  It is anomalous, in the Court's view, to allow plaintiff to recover for retaliation against KUMC under § 3730(h) of the FCA when *Stevens* bars him from bringing an FCA claim against KUMC on behalf of the government under § 3729(a).

The Court's conclusion that § 3730(h) does not authorize suits against states is buttressed by decisions in other courts that have considered this precise issue.  "Multiple federal courts have

concluded that subsection 3730(h) does not reflect the requisite congressional intent to waive

state sovereign immunity . . . ." *Bell*, 2010 WL 1856086, at *3; *U.S. ex rel. Paris v. Trs. of Ind.*

*Univ. & its Sch. of Dentistry*, No. 1:11-cv-1029-JMS-DKL, 2012 WL 2376088, at *1 (S.D. Ind.

June 22, 2012) ("[T]he Court will follow the multiple other courts that have refused to find that

individuals can make anti-retaliation actions against state entities."); *Huang v. Rector & Visitors*

*of the Univ. of Va.*, No. 3:11-cv-50, 2011 WL 6329755, at *6 (W.D. Va. Dec. 19, 2011) (holding

the plaintiff "has not demonstrated that Congress intended to waive state sovereign immunity in

§ 3730(h).").

Only one court has held to the contrary.  In an unpublished per curiam opinion, the Fifth

Circuit held that the 2009 amendments to § 3730(h) "prevent[ed]" it from holding that § 3730(h)

does not cover suits against states.  *U.S. ex rel. King v. Univ. of Tex. Health Sci. Ctr.-Hous.*, 544

F. App'x 490, 499 (5th Cir. 2013).  Before the 2009 amendments, § 3730(h) stated that "[a]ny

employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner

discriminated against in the terms and conditions of employment *by his or her employer* . . . shall

be entitled to all relief necessary to make the employee whole" (emphasis added).  The new

version deleted the language that limited recovery to those discriminated against by "his or her

employer."  As a result, the current § 3730(h) is broader than the pre-2009 version.  Even so, the

Court fails to see how this change expresses a clear congressional intent to hold states liable for

retaliation under the FCA.  Consequently, the Court is not persuaded by *King* and declines to

follow its approach.  Instead, the Court follows those courts that have held § 3730(h) does not

authorize suits against states, even after 2009.  *E.g.*, *Bell*, 2010 WL 1856086, at *4 ("[The

plaintiff's] general assertion that the amendment was intended to broaden the statute cannot

overcome the requirement for a clear statement that Congress meant to override states' sovereign

12

immunity by permitting subsection 3730(h) suits against official-capacity defendants."); *Huang*, 2011 WL 6329755, at *6 (rejecting argument that 2009 amendments to § 3730(h) subject states to liability).

In sum, the Court concludes that § 3730(h) does not authorize a retaliation cause of action against states. Because the three KUMC institutions are considered states, plaintiff cannot state a § 3730(h) claim against KUMC.[3] The Court dismisses Count 8's claim against KUMC.[4]

In addition, Count 8 asserts a claim against the Individual Defendants in their official capacities for violating § 3730(h). A suit against a state official in his official capacity is treated as a suit against the government entity he represents. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978))). Because § 3730(h) does not provide for retaliation claims against states, the Court also dismisses plaintiff's § 3730(h) claim against the Individual Defendants in their official capacities.

---

[3] In *Will* and *Stevens*, after concluding that the statutes did not cover the suits against states, the Court stopped its analysis and did not consider whether the Eleventh Amendment barred suits against the States. *Will*, 491 U.S. at 71; *Stevens*, 529 U.S. at 787. The Court will follow this approach here. Because it finds that § 3730(h) does not cover suits against states, the Court need not, and does not, consider whether the Eleventh Amendment also bars plaintiff's FCA claims. *Stevens*, 529 U.S. at 788 ("Concluding that Congress did not authorize such suits, the Court has no cause to engage in an Eleventh Amendment inquiry, and appropriately leaves that issue open.") (Ginsburg, J. concurring).

[4] In his Second Amended Complaint, plaintiff added the following allegation in Count 8: "KUMC accepts federal grant money through the University of Kansas Medical Research, Inc. [or "KUMCRI"], a not-for-profit corporation. Therefore, KUMC is a person under the False Claims Act because it accepts the NIH monies as a corporate entity and not a state entity." Doc. 101-1 at ¶ 191. This paragraph does not change the Court's decision to dismiss Count 8 against KUMC. Plaintiff pleads no facts to support his bare allegation that KUMC is somehow no longer a state entity simply because it receives grant funds through an affiliated not-for-profit corporation.

**B.   The Eleventh Amendment Bars Plaintiff's State Law Claims Against KUMC and the Individual Defendants in Their Official Capacities**

Plaintiff asserts five state law claims against KUMC and the Individual Defendants in their official capacities:  violation of the Kansas Age Discrimination in Employment Act (Count 9), violation of the Kansas False Claims Act (Count 10), unlawful retaliation (Count 11), conversion (Count 13), and violations pursuant to the Kansas Judicial Review Act (Count 15).  If the Eleventh Amendment did not exist, the supplemental-jurisdiction statute, 28 U.S.C. § 1367, would give the district court jurisdiction to hear plaintiff's state law claims.  Section 1367(a) provides that a federal court with original jurisdiction over one claim may exercise "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III or the United States Constitution."  "A claim is part of the same case or controversy if it derives from a common nucleus of operative fact."  *Price v. Wolford*, 608 F.3d 698, 702-03 (10th Cir. 2010) (internal citations omitted).  Plaintiff's state law claims satisfy this standard because plaintiff premises his state law claims on the same acts relied on by his § 1983 claims.

But the Eleventh Amendment does exist, and it bars federal-court jurisdiction over private suits against a state by citizens of the state.  *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267-68 (1997).  The bar extends to state law claims filed against states in federal court: "a claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment."  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984).  "[T]his principle applies as well to state-law claims brought into federal court under pendent jurisdiction."  *Id.*  Because supplemental jurisdiction under § 1367 does not override the Eleventh Amendment's bar on suing a state in federal court, the Eleventh Amendment generally bars plaintiff's state law claims against KUMC

14

and the Individual Defendants in their official capacities.  *Pettigrew v. Okla. ex rel. Okla. Dep't of Pub. Safety*, 722 F.3d 1209, 1213 (10th Cir. 2013).

An exception exists to the Eleventh Amendment's bar on federal court suits against states:  a state may waive its immunity and consent to be sued in federal court.  *Atascadero State Hosp.*, 473 U.S. at 238.  "[A] State may effectuate a waiver of its constitutional immunity by a state statute or constitutional provision, or by otherwise waiving its immunity to suit in the context of a particular federal program."  *Id.* at 238 n.1.  Both means of waiving immunity "require an unequivocal indication that the State intends to consent to federal jurisdiction that otherwise would be barred by the Eleventh Amendment"  *Id.*  "The test for determining whether a State has waived immunity from federal-court jurisdiction is a stringent one."  *Id.* at 241.  A state is deemed to have waived its immunity "only where stated by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction."  *Edelman v. Jordan*, 415 U.S. 651, 673 (1974) (internal citation omitted).

As the Court mentioned previously, plaintiff contends that KUMC waived sovereign immunity against plaintiff's FCA claim; however, the Court did not reach that argument in the FCA context because it concludes that the FCA's retaliation provision does not authorize suits against states.

Plaintiff also argues that KUMC waived sovereign immunity against his state law claims. Doc. 91 at 13.  Specifically, plaintiff asserts that KUMC, by accepting NIH grants (for which plaintiff applied), "agreed" to be bound by regulations governing NIH grants.  Doc. 91 at 6.

15

Plaintiff asserts that KUMC agreed to abide by 2 C.F.R. § 215.41 which, when KUMC received

the NIH grants,[5] provided that the grant recipient is:

> [T]he responsible authority, without recourse to the Federal awarding agency
> regarding the settlement and satisfaction of all contractual and administrative
> issues arising out of procurements or other matters of a contractual nature.
> Matters concerning violation of statute *are to be referred to such Federal, State or*
> *local authority as may have proper jurisdiction*.

(emphasis added).  Plaintiff argues that the portion of this regulation referring "violation[s] of

statute . . . to such Federal, State or local authority as may have proper jurisdiction," waives

sovereign immunity because it is similar to language constituting a waiver in *Pettigrew v. State*

*of Oklahoma ex rel. Oklahoma Dep't of Pub. Safety*, 722 F.3d at 1211.  The provision in

*Pettigrew*, part of a Settlement Agreement between the plaintiff and the State of Oklahoma, said

that litigation to enforce the terms of "the [Settlement] Agreement . . . will be brought in the

appropriate Oklahoma court having jurisdiction, *either state or federal*."  *Id.* (emphasis added).

The Tenth Circuit concluded that the state of Oklahoma had waived sovereign immunity by

entering into an agreement that permitted litigation in a court "either state or federal" because

that language has "no reasonable construction except as a waiver."  *Id.* at 1211, 1215.  According

to plaintiff, the similarity between the language in *Pettigrew* and § 215.41—"such Federal, State

or local authority as may have proper jurisdiction"—compels the Court to find a waiver here.

Plaintiff's argument fails for two reasons.  First, unlike in *Pettigrew*, plaintiff alleges no

agreement by which KUMC expressed a clear intent to be bound by § 215.41.  The state of

Oklahoma in *Pettigrew* explicitly agreed to a settlement agreement with the plaintiff which

contained language that waived sovereign immunity.  *Id.* at 1211.  Here, plaintiff asserts that

"KUMC accepted federal money and agreed to be bound by statutes, rules, and regulations

---

[5] Section 215.41 has been replaced and thus is no longer on the books.  However, plaintiff asserts that
§ 215.41 was in force during all times relevant to this lawsuit.  The Court will assume plaintiff is correct
for purposes of this motion.

accompanying NIH grants monies."  Doc. 91 at 6.  However, a state does not waive sovereign immunity simply by receiving federal grant funds.  *In re Innes*, 184 F.3d 1275, 1279 (10th Cir. 1999) ("[N]either receipt of federal funds, participation in a federal program, nor an agreement to recognize and abide by federal laws, regulations, and guidelines is alone sufficient to waive Eleventh Amendment immunity."); s*ee also Duke v. Dep't of Agric.*, 131 F.3d 1407, 1408 (10th Cir. 1997) ("Plaintiffs' assertion that the state waived Eleventh Amendment immunity by engaging in activities and entering contracts subject to federal regulation is incorrect.").  Rather, the "State plainly must be on notice that by electing to participate in [a] federally funded program it accepts affirmative obligations to pursue or defend claims in federal court . . . ." *Innes*, 184 F.3d at 1283.  Plaintiff has alleged no facts sufficient to show that KUMC was "plainly on notice" that it waived sovereign immunity by receiving NIH grant funds.

The Tenth Circuit's decision in *Innes* is instructive because it shows the kind of evidence—absent here—that a plaintiff must invoke to establish a plausible basis for waiver to exist.  There, the Tenth Circuit examined a contract between Kansas State University, a state entity, and the United States Department of Education that controlled Kansas State's participation in several student loan programs.  *Id.* at 1281.  The contract provided "*explicitly*" that Kansas State "agrees to perform the functions and activities set forth in 34 [C.F.R. §] 674," a regulation the court held waived sovereign immunity.  *Id.* at 1281-82 (emphasis in original).  The Tenth Circuit concluded that "[*b*]*ecause* the contract explicitly states that [Kansas State] agrees to perform the obligations imposed by 34 C.F.R. § 674," Kansas State had waived sovereign immunity.  *Id.* at 1282 (emphasis added).  Put differently, Kansas State's "entry into a contract which specifically requires it to abide by 34 C.F.R. § 674 means that [Kansas State] has unequivocally subjected itself" to federal jurisdiction.  *Id.* at 1283.

17

Unlike the state of Oklahoma in *Pettigrew* and Kansas State in *Innes*, plaintiff in this case has alleged no facts to support a plausible argument that KUMC expressly agreed to be bound by § 215.41.  As a result, plaintiff has failed to satisfy the "stringent" test governing waiver assertions, and thus his waiver argument fails.  *Atascadero*, 473 U.S. at 241.

Even if plaintiff had expressly agreed to adopt § 215.41, his waiver argument fails for a second reason:  § 215.41 does not, by its terms, waive sovereign immunity on the claims plaintiff asserts.  Section 215.41 provided, in part, that a grant recipient is "the responsible authority . . . regarding the settlement and satisfaction of all contractual and administrative issues arising out of procurements or other matters of a contractual nature."  Plaintiff asserts that the regulation applies to him because he possessed some "administrative" duties and responsibilities under § 215.41 in his role as principal investigator for various NIH grants.

2 C.F.R. §§ 215.40-215.48 were subtitled, "Procurement Standards."  Section 215.40 provided that the "purpose" of § 215.41 is to "set forth standards for use by [grant] recipients in *establishing procedures for the procurement of supplies and other expendable property, equipment, real property, and other services with Federal funds*" (emphasis added).  To say it simply, the regulation plaintiff claims to waive sovereign immunity governs how grant recipients acquire research supplies with federal grant money.  The regulation does not govern plaintiff's status as the grant's principal investigator, nor do any of plaintiff's state law claims relate to procurement of supplies for use in plaintiff's grants.  The Court concludes that § 215.41 does not waive defendants' sovereign immunity.

In sum, plaintiff's waiver argument fails for two reasons.  First, KUMC did not manifest a clear intent to adopt the regulation plaintiff claims waived sovereign immunity.  Second, even if KUMC has expressly adopted the regulation, it does not waive KUMC's sovereign immunity

18

on the claims plaintiff asserted.  For those reasons, the Eleventh Amendment bars plaintiff's official capacity state law claims.[6]  The Court dismisses Counts 9-14 against KUMC and the Individual Defendants in their official capacities.

### C.  The Eleventh Amendment Does Not Bar All Federal Claims Against the Individual Defendants in their Official Capacities

Although plaintiff's waiver argument fails, there is another exception to the Eleventh Amendment:  it does not prohibit a suit in federal court to enjoin a state official prospectively from violating federal law.  *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1232 (10th Cir. 2004); *see generally Ex parte Young*, 209 U.S. 123 (1908).  "In *Ex Parte Young*, the [Supreme] Court held that the Eleventh Amendment generally will not operate to bar suits so long as they (i) seek only declaratory and injunctive relief rather than monetary damages for alleged violations of federal law, and (ii) are aimed against state officers acting in their official capacities, rather than against the State itself."  *Hill v. Kemp*, 478 F.3d 1236, 1255-56 (10th Cir. 2007).  "[T]o come within the *Ex Parte Young* exception, 'a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'"  *Rounds v. Clements*, 495 F. App'x 938, 940 (10th Cir. 2012) (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).

The only remaining claims against the Individual Defendants in their official capacities are Counts 1-7 of the Second Amended Complaint, each of which asserts a violation of § 1983.

---

[6] Plaintiff also argues that "KUMC waived its sovereign immunity stemming from issues involving the administrative handling of NIH grants because KUMC relies in part on KUMCRI, a private not-for-profit corporation, to administer and process its NIH grants."  Doc. 91 at 10-11.  Again, a state must make an "unequivocal indication" of intent to consent to federal jurisdiction before a court can find waiver. *Atascadero State Hosp.*, 473 U.S. at 238 n.1.  The mere fact that KUMC received grant funds through an affiliated not-for-profit corporation does not satisfy the "stringent" waiver test, so plaintiff has failed to sufficiently plead waiver on this ground.  *Id.* at 241.

Plaintiff argues that Counts 1-7 fall in the *Ex Parte Young* exception to sovereign immunity because those claims allege ongoing violations of federal law and seek prospective relief.

Plaintiff is correct that Counts 1-7 of the Second Amended Complaint allege ongoing violations of federal law.  Count 1 alleges that the Individual Defendants retaliated against plaintiff in violation of the First Amendment; Counts 2, 4, and 6 allege that certain Individual Defendants violated plaintiff's procedural due process rights; and Counts 3, 5, and 7 allege that certain Individual Defendants violated plaintiff's substantive due process rights.  Defendants argue that these are not ongoing violations because they happened in the past.  For instance, according to defendants, Count 1 alleges no ongoing violation because plaintiff "contends he has already been retaliated against for speaking out."  Doc. 96 at 16.  The problem with this argument is that plaintiff's Second Amended Complaint alleges that he is currently, on an ongoing basis, being denied his position as a tenured professor at KUMC, in violation of his First Amendment and due process rights.  These allegations plead sufficient facts of an ongoing violation of federal law to survive a motion for judgment on the pleadings in the Tenth Circuit. *Rounds*, 495 F. App'x at 940 (holding that plaintiff's allegations that "he is currently, on an ongoing basis, being denied his previous prison placement and many other privileges in retaliation for exercising his First Amendment rights" satisfy *Ex Parte Young's* "ongoing violation" requirement).

Plaintiff next argues that Counts 1-7 seek prospective relief against the Individual Defendants in their official capacities for their ongoing violations of his constitutional rights.  According to plaintiff, he requests two forms of prospective relief.[7]  First, plaintiff seeks reinstatement "as a full-time University Distinguished Professor at KUMC."  Doc. 101-1 at 72.

---

[7] Plaintiff concedes that he seeks no monetary damages from the Individual Defendants in their official capacities.  Doc. 91 at 19.

"Reinstatement of employment is a form of prospective equitable relief that is within the doctrine of *Ex Parte Young*." *Meiners*, 359 F.3d at 1232. However, "[i]n *Ex Parte Young*, the Supreme Court noted that the state official must have the power to perform the act required in order to overcome the jurisdictional bar of the Eleventh Amendment." *Klein v. Univ. of Kan. Med. Ctr.*, 975 F. Supp. 1408, 1417 (D. Kan. 1997) (citing *Ex Parte Young*, 209 U.S. at 157). In *Klein*, our Court looked to Kansas statutes to determine which state officials possessed the authority to reinstate KUMC employees. *Id.* Under K.S.A. § 76-714, the chief executive officer of the University of Kansas is the Chancellor. As the chief executive officer, the Chancellor "shall appoint such employees as are authorized by the board of regents," and those employees "shall serve at the pleasure of the chief executive officer . . . ." K.S.A. § 76-715. Based on those statutes, our Court concluded "that the current Chancellor is the only person with the authority to reinstate Klein to his former position if so ordered." *Klein*, 975 F. Supp. at 1417. Defendants argue, based on *Klein*, that plaintiff's claim for reinstatement relief is barred because plaintiff did not name the current Chancellor of the University of Kansas as a defendant.

In response, plaintiff argues that defendant Douglas Girod, the Executive Vice Chancellor of the University of Kansas, has authority to reinstate plaintiff. To support this argument, plaintiff attaches KUMC's Handbook, which he claims authorizes Girod to reinstate him.[8]

---

[8] Plaintiff did not attach the KUMC Handbook to any of the Complaints he has filed in this lawsuit. When considering a Rule 12(c) motion for judgment on the pleadings, courts generally must confine the record to allegations in the pleadings and exhibits attached to them. Fed. R. Civ. P. 12(d). However, "if a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss." *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997). Plaintiff references the Handbook throughout his Second Amended Complaint. Although plaintiff was the party who submitted a copy of the Handbook, defendants did not object or dispute its authenticity. Therefore, the Court may review the Handbook without converting this motion into a Rule 56 motion for summary judgment.

The relevant portion of the Handbook states:

> State law places the responsibility for the administration of the University on the Chancellor, who is the chief executive officer of the institution and who is enjoined to act in accordance with the policies established by the Board of Regents.  Therefore, chairs, deans, vice chancellors and other administrative officers are legally accountable to the Chancellor and serve at his or her pleasure.  In turn, the *Chancellor has designated the Executive Vice Chancellor as the principal administrative and academic officer of the Kansas City and Wichita campuses of the University of Kansas Medical Center*."

Doc. 91-1 at 40 (emphasis added).

By appointing the Executive Vice Chancellor as the "principal administrative and academic officer" of KUMC, the Court concludes that the Chancellor has delegated authority to make KUMC faculty appointments to the Executive Vice Chancellor.  Thus, plaintiff has named a proper defendant who can provide prospective relief.

This ruling does not conflict with *Klein*.  In *Klein*, the plaintiff did not name the Executive Vice Chancellor of the University of Kansas as a defendant.  975 F. Supp. at 1416-17.  As a result, the *Klein* plaintiff presented no alternative to the Chancellor, and our Court properly dismissed those claims for reinstatement.  In contrast, plaintiff here has named a proper substitute for the Chancellor.  Because "[r]einstatement of employment is a form of prospective equitable relief that is within the doctrine of *Ex parte Young*," the Court declines to dismiss plaintiff's claims that seek reinstatement from defendant Girod.[9]  *Meiners*, 359 F.3d at 1222.

Counts 1, 6, and 7 assert § 1983 claims against defendant Girod in his official capacity, so the Court denies defendants' motion for judgment on those Counts as they relate to Girod.

---

[9] Defendants assert one other argument—that plaintiff has failed to allege an official policy or custom by which defendants deprived plaintiff of his rights, and "state entities . . . cannot be held responsible for the alleged deprivations committed by their employees absent an official policy or custom."  Doc. 96 at 18.  This argument fails because plaintiff is suing state officials in their official capacity in Counts 1-7.  "'[O]fficial-capacity actions for prospective relief are not treated as actions against the State.'"  *Will*, 491 U.S. at 71 n.10 (quoting *Kentucky*, 473 U.S. at 167 n.14).

However, Girod is the only defendant plaintiff has sued who possesses the power to reinstate plaintiff, and thus plaintiff may pursue his reinstatement claims only against Girod. Nevertheless, if plaintiff can properly allege facts that make it plausible that the other Individual Defendants had the power to reinstate him, the Court will consider a motion to amend the pleadings.

Plaintiff's second request for prospective relief is "to retain or regain his status as [principal investigator]" on various NIH grants.  Doc. 101-1 at 72.  This request runs afoul of *Klein*'s requirement that "the state official must have the power to perform the act required in order to overcome the jurisdictional bar of the Eleventh Amendment."  975 F. Supp. at 1417. Plaintiff asserts that defendant Paul Terranova "is believed to possess remedial authority" to reinstate plaintiff as principal investigator on the NIH grants.  Doc. 91 at 15.  However, as plaintiff's Second Amended Complaint makes clear, the NIH must receive a request and approve any change in the principal investigator for grants.  Doc. 101-1 at ¶ 59 ("KUMC requested that Hagenbuch be the new [principal investigator] on the T32 training grant.  The NIH later granted KUMC's request.").  As a result, Terranova and the other Individual Defendants—all of whom are KU administrators—can only *request* that the NIH reinstate plaintiff as principal investigator. They cannot unilaterally grant reinstatement however, which is relief plaintiff seeks.  For that reason, plaintiff's request for reinstatement as principal investigator on his NIH grants does not fall within *Ex Parte Young*.

* * *

Counts 1-7 of plaintiff's Second Amended Complaint allege § 1983 violations against the Individual Defendants in their official capacities.  As discussed above, the majority of these claims are barred by the Eleventh Amendment.  However, the Court concludes that defendant

Girod has authority to reinstate plaintiff to his position as a KUMC professor, a claim for prospective relief that falls within the *Ex Parte Young* exception to sovereign immunity. Counts, 1, 6, and 7 assert § 1983 claims against defendant Girod in his official capacity, and plaintiff requests reinstatement on each of those Counts. As a result, the Court denies defendants' motion for judgment on the pleadings on Counts 1, 6, and 7 against defendant Girod.[10] The Court dismisses the other federal claims against the Individual Defendants in their official capacities: Counts 1, 6, and 7 against Individual Defendants other than Girod in their official capacities and Counts 2-5 against all named Individual Defendants in their official capacities. As stated above, the Court will consider a motion to amend the pleadings if plaintiff properly can allege facts rendering it plausible that other Individual Defendants had authority to reinstate him.

## V.  Claims Against the Individual Defendants in Their Individual Capacities

### A.  Federal Law Claims

Counts 1-7 of plaintiff's Second Amended Complaint assert claims against the Individual Defendants in their individual capacities under 42 U.S.C. § 1983. Section 1983 creates liability for *any* person, acting under color of state law, who violates the Constitution and laws of the United States. The statute references no exceptions to this liability. Thus, by its terms, § 1983 seems to permit lawsuits (and recovery of damages) from state officials who violate federal law. The Supreme Court has recognized, however, "the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion." *Scheuer v. Rhodes*, 416 U.S. 232, 240 (1974). As a result, the Supreme Court has consistently held that state officials are protected by the doctrine of "qualified immunity" on § 1983 claims. *Id.* at 239-40.

---

[10] Count 6 of plaintiff's Second Amended Complaint adds allegations against defendants. However, plaintiff does not change the nature of the relief he seeks in Count 6, so the new allegations do not affect the Court's analysis on Count 6 against the Individual Defendants in their official capacities.

When the defendants assert a qualified immunity defense, a plaintiff must satisfy a two-pronged test to avoid dismissal. *Comprehensive Addiction Treatment Ctr. v. Leslea*, 552 F. App'x 812, 815 (10th Cir. 2014). Qualified immunity shields federal and state officials from money damages unless a plaintiff establishes (1) that the official violated a statutory or constitutional right and (2) that right was "clearly established" at the time of the challenged conduct. *Id.*; *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

In considering a motion to dismiss based on qualified immunity, "all well-pleaded factual allegations in the . . . complaint are accepted as true and viewed in the light most favorable to the nonmoving party." *Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006) (quoting *Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999)). However, the Court must "examine whether the plaintiff has met [his] burden of 'coming forward with sufficient facts to show that the defendant's actions violated a federal constitutional or statutory right.'" *Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ.*, 232 F.3d 1334, 1337 (10th Cir. 2000) (quoting *Baptiste v. J.C. Penney Co., Inc.*, 147 F.3d 1252, 1255 (10th Cir. 1998)). Whether plaintiff has alleged a violation of his clearly established constitutional rights to overcome the Individual Defendants' qualified immunity defense is an issue of law. *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation." *Comprehensive Addiction Treatment Ctr.*, 552 F. App'x at 815-16 (quoting *McBeth v. Himes*, 598 F.3d 708, 716 (10th Cir. 2010)). "Ordinarily, in order for the law to be clearly established, there must be a relevant Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other circuits must have found the law to be as the plaintiff

25

maintains, . . . such that existing precedent has placed the statutory or constitutional question beyond debate." *Id.* at 816 (internal citations omitted).  "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior caselaw to clearly establish the violation." *Id.* (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004)).

District courts have discretion to decide which of the two prongs of the qualified-immunity analysis to tackle first. *Aschcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011).  "Courts should think carefully before expending scarce judicial resources to resolve difficult and novel questions of constitutional or statutory interpretation that will have no effect on the outcome of the case." *Id.* (internal citation omitted).

"Although qualified immunity defenses are typically resolved at the summary judgment stage, district courts may grant motions to dismiss on the basis of qualified immunity." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014).  Asserting a qualified immunity defense in a Rule 12(b)(6) or Rule 12(c) motion, however, "subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Id.* (quoting *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004)).  This is so because at the motion to dismiss stage, the Court scrutinizes defendants' conduct *as alleged in the complaint* for "objective legal reasonableness." *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).  On summary judgment, the plaintiff no longer can rest on the pleadings, and the Court considers the evidence in the summary judgment record when conducting the qualified immunity inquiry. *Id.*

### 1.   Count 1 – First Amendment Retaliation

In Count 1 of his Second Amended Complaint, plaintiff alleges that the Individual Defendants violated his First Amendment rights by retaliating against him for statements he

made criticizing KUMC.  To state a claim for First Amendment retaliation, plaintiff must

identify constitutionally-protected speech that he contends caused the Individual Defendants to

retaliate against him.  *See Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014).  After

reviewing the briefing and the Second Amended Complaint, the Court has identified the

following statements as ones, according to plaintiff, the First Amendment protects:

- On January 4, 2010, plaintiff and the "Committee of Eight" met with the Chancellor of the University of Kansas to "explain[] their concerns about KUMC's financial situation and lack of shared governance."  Doc. 101-1 at ¶ 38.

- During meetings in March 2011, plaintiff accused Dean Atkinson of "inappropriately siphoning money from the basic sciences to pay for other KUMC programs, including the remodeling of facilities."  Doc. 101-1 at ¶ 40.

- At an October 28, 2011 meeting with members of the Pharmacology/Toxicology Department, plaintiff accused KUMC and two KUMC officials of "financial mismanagement of federal grant monies . . . ."  Doc. 101-1 at ¶ 51.

- On November 1, 2011, plaintiff spoke with defendant Kopf about "KUMC's mismanagement of federal grant monies."  Doc. 101-1 at ¶ 52.

- In December 2012, plaintiff sent an e-mail to defendant Stites and a professor in the Internal Medicine department in which he accused KUMC officials of continuing "to misappropriate NIH grant monies . . . ."  Doc. 101-1 at ¶ 83.

- On May 1, 2013, plaintiff met with defendant Stites and others to discuss plaintiff's NIH grant accounting.  The participants discussed a $250,000 deficit on one of the grants, and Stites suggested using monies from new grants to cover the deficit.  Plaintiff told Stites "it would be unethical to use new grant money to pay for past expenses."  Plaintiff further explained that KUMC had "misappropriated approximately $200,000 worth of grant monies" from grants on which plaintiff served as principal investigator.  Doc. 101-1 at ¶¶ 85, 87-88.

Thus, the purportedly protected statements fall into two categories:  (1) criticism of

KUMC's governance and financial situation; and (2) criticism about mismanagement and

misappropriation of grant money.

### a. State of the Law – *Garcetti v. Ceballos*

Before the Supreme Court's 2006 decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), two cases—*Pickering v. Board of Education*, 391 U.S. 563 (1968) and *Connick v. Myers*, 461 U.S. 138 (1983)—governed First Amendment retaliation claims made by public employees.  To qualify as protected speech under the old test the employee had to show (1) that his speech addressed "matters of public concern" and (2) that his interest "in commenting upon matters of public concern" outweighed "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  *Pickering*, 391 U.S. at 568. *Garcetti*, however, changed the law.

The plaintiff in *Garcetti* was a deputy district attorney who had written a memorandum concluding that a police affidavit used to support a search warrant application contained serious misrepresentations.  *Garcetti*, 547 U.S. at 413-14.  The plaintiff contended that the district attorney's office retaliated against him in violation of the First Amendment for writing and then defending the memorandum.  *Id.* at 415.  The Supreme Court rejected the plaintiff's claim, however, holding that the memorandum was not protected speech.  *Id.* at 421.  "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Id.*  *Garcetti* thus imposed a threshold inquiry, one requiring courts to determine whether a public employee was speaking "pursuant to his official duties."  When a public employee plaintiff spoke "pursuant to his official duties," the plaintiff's speech is unprotected, and a court need not conduct the *Pickering-Connick* balancing test.

However, *Garcetti* left open the possibility of an exception in cases involving academic freedom.  In his dissent, Justice Souter expressed concern about the scope of the Court's

28

decision, writing, "I have to hope that today's majority does not mean to imperil First

Amendment protection of academic freedom in public colleges and universities, whose teachers

necessarily speak and write 'pursuant to . . . official duties.'"  *Id.* at 438 (Souter, J., dissenting)

(alteration in original).  The majority opinion acknowledged Justice Souter's concerns, but

ultimately declined to address them on the facts presented there:

> Justice Souter suggests today's decision may have important ramifications for
> academic freedom, at least as a constitutional value.  There is some argument that
> expression related to academic scholarship or classroom instruction implicates
> additional constitutional interests that are not fully accounted for by this Court's
> customary employee-speech jurisprudence.  We need not, and for that reason do
> not, decide whether the analysis we conduct today would apply in the same
> manner to a case involving speech related to scholarship or teaching.

*Id.* at 425.

This caveat has inspired consternation about whether (and if so, when) to apply

*Garcetti*'s official duty test to university professors.  Neither the Supreme Court nor the Tenth

Circuit has provided guidance on the issue.  The Fourth and Ninth Circuits have both held that

*Garcetti* does not apply in certain academic situations.  *Adams v. Trs. of the Univ. of N.C.-

Wilmington*, 640 F.3d 550, 563-65 (4th Cir. 2011) (holding *Garcetti* does not apply when speech

consisted of newspaper columns intended for national audience on issues unrelated to university

professor's teaching duties); *Demers v. Austin*, 746 F.3d 402, 415 (9th Cir. 2014) (holding

*Garcetti* does not apply when speech is a proposal by a university professor "that, if

implemented, would have substantially altered that nature of what was taught at the school, as

well as the composition of the faculty that would teach it.").

On the other hand, the Seventh Circuit has applied *Garcetti* in an academic setting, as has

our Court.  *Renken v. Gregory*, 541 F.3d 769, 773-75 (7th Cir. 2008) (granting summary

judgment to a public university because a professor's complaints about "the proper

administration of an educational grant fell within the scope of [his] teaching duties"); *Lee v. Kan. State Univ.*, No. 12-cv-2638, 2013 WL 2476702, at *9 (D. Kan. June 7, 2013) (holding that statements from graduate teaching assistant about academic fraud were made "pursuant to her official duties" and thus were not protected by the First Amendment).

### b. Defendants Are Entitled to Qualified Immunity on Plaintiff's First Amendment Claim

Plaintiff argues that the Court should follow the Fourth and Ninth Circuit approach and not apply *Garcetti* here because plaintiff made his allegedly protected statements as a university professor in an academic setting. However, the uncertain state of the law operates to defendants' advantage here. Courts may grant qualified immunity because a purported right was not "clearly established" by prior law, without resolving the often more difficult question whether the purported right exists at all. *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). It is not "clearly established" whether *Garcetti* or *Connick-Pickering* applies to plaintiff's speech. For that reason, qualified immunity protects the Individual Defendants from plaintiff's First Amendment claim if the Court decides plaintiff's speech was not protected under either *Garcetti* or *Connick-Pickering*.

The Court concludes plaintiff made the statements at issue here pursuant to his official duties, so the First Amendment does not protect them. The Tenth Circuit takes a "broad" view of the meaning of speech that is "pursuant" to an employee's "official duties." *Thomas v. City of Blanchard*, 548 F.3d 1317, 1324 (10th Cir. 2008). "[S]peech may be made pursuant to an employee's official duties even if it deals with activities that the employee is not expressly required to perform." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1203 (10th Cir. 2007) (holding that speech could be considered within the scope of an employee's official duty even if "the speech concerns an unusual aspect of an employee's job that is not part

30

of his everyday functions."). If speech "reasonably contributes to or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duties." *Id.*

Plaintiff's purportedly protected statements criticized (1) KUMC's governance and financial situation and (2) KUMC's mismanagement and misappropriation of grant money. He made all of the statements internally to colleagues or KUMC officials. Plaintiff alleges that he "applied for and received, as a principal investigator, an average of three NIH grants per year over the course of his career" and that his "financial compensation from KUMC was directly tied to his ability to successfully obtain NIH grants as a [principal investigator]." Doc. 101-1 at ¶¶ 25, 27. For those reasons, plaintiff had an active interest in ensuring proper grant administration, proper use of KUMC funds, and prudent governance at KUMC. Those things affected his ability to keep receiving NIH grants, and thus plaintiff's statements "reasonably contribute[d] to" the performance of his official duties. *Garcetti* does not protect them.

Plaintiff argues that he did not make his statements "pursuant to his official duties." First, citing to the Tenth Circuit's decision in *Brammer-Hoelter*, he contends that his criticism of "the administration and its handling of money oversight" was not employee speech. Doc. 90 at 14. In *Brammer-Hoelter*, the Tenth Circuit held that some speech by two charter school teachers was not made pursuant to their official duties. 492 F.3d at 1204. The Tenth Circuit gave three reasons for this holding: (1) the speech involved supervisory matters like staffing levels, teacher salaries, and bonuses, but the plaintiffs had no supervisory duties or duty to report the problems discussed; (2) the discussions occurred after hours and outside of the school; and (3) the discussions included ordinary citizens and parents who did not work for the school. *Id.* at 1205. Plaintiff's statements here are quite different.

Plaintiff made his statements internally, and no person besides KUMC employees heard them.  Furthermore, as principal investigator, plaintiff had supervisory and technical authority over several grants, so he had an interest in seeing that grant funds were used properly.  The Court finds the Seventh Circuit's decision in *Renken v. Gregory* more directly on point.  541 F.3d at 770.

The plaintiff in *Renken* was a tenured professor at the University of Milwaukee-Wisconsin who alleged that the school retaliated against him after he criticized the university's proposed use of grant funds.  *Id.* at 770, 773.  The Seventh Circuit held that plaintiff "was speaking as a faculty employee, and not as a private citizen, because administering the grant as a [principal investigator] fell within the teaching and service duties that he was employed to perform."  *Id.* at 774.  Like the plaintiff in *Renken*, plaintiff's job involved applying for, obtaining, and administering NIH grants.  By criticizing KUMC's use of grant funds, he was acting pursuant to his official duties, not as a private citizen.

Plaintiff next contends that complaints about use of NIH grant funds after December 2011 cannot be "employee speech" because plaintiff no longer served as the principal investigator for the grants at issue after that date.  First, plaintiff remained as the principal investigator on three other grants until May 2013.  Doc. 101-1 at ¶ 90.  As defendants point out, the later complaints—which occurred in December 2012 and May 2013—related to those grants.  Doc. 101-1 at ¶¶ 83, 87-88.  Furthermore, plaintiff attempts to narrow the relevant inquiry too much.  Plaintiff admits that part of his job as a KUMC professor involved applying for and receiving NIH grants.  As a result, even if they were about grants on which he no longer served as principal investigator, plaintiff's internal comments that KUMC was misusing grant funds "reasonably contribute[d]" to his ability to receive future grants from NIH.  The focus ultimately

is whether the speech "stemmed from and [was of] the type . . . that [the employee] was paid to do, regardless of the exact role of the individual or entity to which the employee had chosen to speak." *Rohrbrough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 747 (10th Cir. 2010) (citation and internal quotation marks omitted).  The Court concludes that plaintiff still was acting pursuant to his official duties when he criticized defendants for misusing grant funds, even after the NIH removed him as the principal investigator for those grants.

Finally, plaintiff argues that the Supreme Court's decision in *Lane v. Franks*, 134 S. Ct. 2369 (2014), shows plaintiff's speech was not made pursuant to his official duties.  In *Lane*, an employee alleged that his employer had retaliated against him for testifying under subpoena against a former co-worker.  *Id.* at 2378.  The Supreme Court held that "testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen [and not as an employee] for First Amendment purposes."  *Id.*  Here, plaintiff's testimony was not public and involved matters related to his official job duties.

The Court concludes that plaintiff's statements at issue in this case were not made in a public or testimonial setting.  Instead, the statements concerned (1) financial mismanagement and lack of shared governance at KUMC and (2) mismanagement and misappropriation of grant money.  Plaintiff's expressions about these subjects were made pursuant to his "official duties" as a KUMC employee.  Because a "reasonable officer" could conclude, based on the state of the law, that the *Garcetti* test applied to plaintiff's speech, the Individual Defendants are entitled to qualified immunity on plaintiff's First Amendment retaliation claim.  *Comprehensive Addiction Treatment Ctr.*, 552 F. App'x at 815-16.

### c. Plaintiff's Statements to News Outlets and PowerPoint Presentations

In his Second Amended Complaint, plaintiff alleges new facts that defendants discriminated against him based on statements (1) he gave to news outlets and (2) he made in various PowerPoint presentations. Defendants have not had a chance to argue whether plaintiff has stated a claim for relief based on these new allegations because plaintiff filed his motion for leave to amend after defendants filed their motions for judgment on the pleadings. For that reason, defendants in their discretion may file another motion for judgment on the pleadings on Count 1 based on these new allegations. As discussed above, the Court concludes that the majority of plaintiff's allegations in Count 1 fail to state a claim for relief. Thus, defendants' motion for judgment on the pleadings, if they file one, should focus only on the new allegations that the Second Amended Complaint adds to Count 1—namely, the allegations about plaintiff's statements to news outlets and PowerPoint presentations. For now, the Court denies defendants' motion for judgment on the pleadings on Count 1 against the Individual Defendants in their individual capacities.

### 2. Counts 2, 4, and 6 – Procedural Due Process

In Counts 2, 4, 6 of his Second Amended Complaint, plaintiff alleges that certain Individual Defendants deprived him of his Fourteenth Amendment procedural due process rights. "Procedural due process imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the . . . Fourteenth Amendment." *Brown*, 662 F.3d at 1167 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 322 (1976)). An alleged procedural due process violation requires a two-step inquiry: (1) whether the plaintiff had a constitutionally protected interest and (2) whether the process

afforded was adequate to protect that interest. *Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 748 (10th Cir. 2013).

### a. Plaintiff's Alleged Constitutionally Protected Interests

In the procedural due process context, state law determines whether a plaintiff has a constitutionally protected property or liberty interest. *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 577 (10th Cir. 1996). "[P]roperty interests . . . are not created by the Constitution but rather . . . by existing rules or understandings that stem from an independent source such as state law." *Fisher Sand & Gravel, Co. v. Giron*, 465 F. App'x 774, 779 (10th Cir. 2012) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). Thus, statutes, ordinances, contracts, implied contracts, and rules and understandings developed by state officials create and define constitutionally protected property interests. *Id.* "Valid contracts may constitute a property interest for purposes of due process." *Id.* at 779-80.

In his Opposition to defendants' Motion for Judgment on the Pleadings, plaintiff alleges five constitutionally protected interests. The Court evaluates each in turn.

First, plaintiff alleges a property interest in continued employment. Defendants do not dispute that this is a viable and protectable interest. *See also Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 517 (10th Cir. 1998) ("Because [the plaintiff] was a tenured professor, he possessed a property interest deserving of procedural due process protections.").

Second, plaintiff alleges a protected liberty interest in his reputation. The only liberty interest plaintiff pleads explicitly is "his ability to make and/or earn a living, *i.e.*, to serve as a Distinguished Professor of [T]oxicology by working in a research laboratory, teaching, obtaining and working on grants, publishing peer reviewed journal articles, and participating in professional activities critical for career advancement." Doc. 101-1 at ¶¶ 120, 133. This

allegation does not suggest that any Individual Defendants harmed plaintiff's reputation. However, plaintiff has pleaded new facts in Count 6—and only Count 6—of his Second Amended Complaint that perhaps allege a liberty interest in his reputation. *See* Doc. 101-1 at ¶¶ 170, 173. Defendants have not had a chance to challenge these new allegations in a motion for judgment on the pleadings, and they may file another motion to do so. For now, the Court concludes that plaintiff has pleaded a liberty interest in his reputation in Count 6.

Third, plaintiff alleges a property interest in the right to conduct research. Specifically, plaintiff argues that the policies and procedures in KUMC's Handbook and KUMC's course of conduct created an implied contract between plaintiff and KUMC which granted plaintiff a property interest in his right to conduct research. The KUMC Handbook states that plaintiff is entitled to "full freedom in research and in the publication of the results." Doc. 90-1 at 44. Plaintiff also asserts that he has obtained NIH grants for nearly 45 years and KUMC had never requested the NIH to remove him as principal investigator until 2011.

"It is well established that an implied-in-fact contract is a source of state law that can potentially create" a cognizable property interest. *Kingsford v. Salt Lake City Sch. Dist.*, 247 F.3d 1123, 1133 (10th Cir. 2001). However, plaintiff has not met his burden to plead facts that make an implied contract "plausible" here. *Twombly*, 550 U.S. at 570. The KUMC Handbook states explicitly that the "policies in the handbook are not intended to create a contract between the University of Kansas and its employees." Doc. 90-1 at 17. While a disclaimer does not determine the issue as a matter of law, plaintiff must plead other facts to show a contract was implied in Kansas. *See Stover v. Superior Indus. Int'l*, 29 P.3d 967, 971 (Kan. Ct. App. 2000) (discussing implied-in-fact contracts under Kansas law). Plaintiff's sole argument on this point is that KUMC had never sought to strip plaintiff of his principal investigator status on any grant

36

in his 45 years at KUMC before 2011.  Crucially, however, plaintiff alleges this for the first time in his Opposition to defendants' Motion for Judgment on the Pleadings.  Plaintiff does not allege this course of conduct in his Second Amended Complaint.  A motion for judgment on the pleadings tests the sufficiency of a complaint and a Court cannot consider allegations not made in the pleadings.  *See Childers v. Indep. Sch. Dist. No. 1 of Bryan Cnty. State of Okla.*, 676 F.2d 1338, 1340 (10th Cir. 1982) ("[O]rder of dismissal . . . is proper only if the complaint, taking all the allegations therein as true, fails to state a claim without consideration of any material outside the pleadings.").  Thus, plaintiff's implied contract theory relies solely on a Handbook that, by its terms, is not a contract.  As a result, plaintiff has not sufficiently pleaded a property interest in a right to conduct research.  *Compare Williams v. Evogen*, No. 12-2620-JWL, 2013 WL 969808, at *4 (D. Kan. Mar. 12, 2013) (denying motion to dismiss breach of implied contract claim because the plaintiff alleged in his complaint that the defendant had a "policy and practice of progressive discipline; that policy modified [his] at-will status and created a contract; and that employer breached that contract by violating policy and providing progressive discipline; allegations gave defendant fair notice of the claim and plausibly gave rise to entitlement to relief.").

Fourth, plaintiff alleges a property interest in employment free from arbitrary discipline.  As with his alleged right to conduct research, plaintiff argues that the KUMC Handbook and defendants' course of conduct created an implied contract which established a property interest in employment free from arbitrary discipline.  Again, plaintiff has alleged no facts that make his implied contract theory plausible.  The Handbook by its terms is not a contract, and plaintiff has alleged no course of conduct to establish an implied contract in his Second Amended Complaint.  As a result, plaintiff has not sufficiently alleged a property right to employment free from arbitrary discipline.

Fifth and finally, plaintiff alleges a property interest in a position within his field and department. "The general rule is that no protected property interest is implicated when an employer reassigns or transfers an employee absent a specific statutory provision or contract term to the contrary." *Hulen v. Yates*, 322 F.3d 1229, 1240 (10th Cir. 2003) (quoting *Anglemyer v. Hamilton Cnty. Hosp.*, 58 F.3d 533, 539 (10th Cir. 1995)). "[T]he general rule is not absolute if an employee can point to a specific contractual provision and surrounding circumstances establishing a property interest." *Id.* In *Hulen*, the Tenth Circuit found a property interest in the plaintiff's position as a professor in the Accounting Department of Colorado State University based in part on a provision in the Faculty Manual. *Id.* at 1243-44. However, all parties in that case conceded that the Faculty Manual had "contractual force." *Id.* at 1241. Here, plaintiff has not met his burden to plead a plausible basis for the assertion that the KUMC Handbook was a contract between the parties. As a result, plaintiff cannot identify any "specific statutory provision or contract term" displacing the general rule that "no protected property interest is implicated when an employer . . . transfers an employee . . . ." *Id.* at 1240.

* * *

Thus, for these reasons, the Court concludes that plaintiff has successfully pleaded two constitutionally protected interest: his property interest in continued employment and a liberty interest in his reputation.

### b.  Was Plaintiff Afforded Adequate Process?

Counts 2 and 4 of the Second Amended Complaint rest on property or liberty interests that plaintiff has failed to plead adequately, so the Court dismisses Counts 2 and 4. However, in Count 6, plaintiff alleges that defendants Klein, Stites, and Girod violated plaintiff's procedural due process rights by firing him after a disciplinary hearing on November 13, 2013. Firing

plaintiff affected a constitutionally protected property right, so the Court must move on to the

second prong of the procedural due process inquiry:  whether the process defendants Klein,

Stites, and Girod afforded plaintiff adequately protected that interest.  *Koessel*, 717 F.3d at 748.

The Court will start with Count 6's claim against defendant Stites.  Plaintiff's Second

Amended Complaint alleges that Stites violated plaintiff's due process rights in two ways:  (1)

by testifying falsely against plaintiff at the November 13, 2013 hearing and (2) by harming

plaintiff's ability to present a defense by banning him from campus and forbidding him from

contacting or speaking with potential witnesses.

Stites argues that absolute immunity bars liability for testimony he gave at the November

13, 2013, hearing.  Generally, a witness who testifies at a trial or other judicial proceedings is

absolutely immune from liability for his testimony.  *Rehberg v. Paulk*, 132 S. Ct. 1497, 1505-06

(2012).   While this principle would provide Stites immunity if he had testified at a formal trial, a

question remains:  did the November 13, 2013, hearing "possess[] enough of the characteristics

of the judicial process" that Stites is immune from suits for damages arising out of his testimony

at this particular hearing.  *Lentsch v. Marshall*, 741 F.2d 301, 304 (10th Cir. 1984).  While

neither plaintiff nor defendants raise this question, the Court concludes that it should consider

this question.  After reviewing the record properly presented by the current motion, the Court

determines that the hearing was sufficiently similar to a judicial hearing, and thus immunity

principles protect Stites from his participation in it.  The Court bases this determination on the

hearing's transcript.[11]  This transcript establishes that plaintiff cross-examined Stites.  The

hearing therefore possessed a key procedural safeguard of the judicial process.  *See id.*  Plaintiff

---

[11] Plaintiff did not attach the November 13, 2013, hearing transcript to any of the Complaints he has filed
in this lawsuit.  However, plaintiff refers to the hearing in his Second Amended Complaint and it is
central to his claims, so the Court may consider the transcript here without converting defendants' motion
into a Rule 56 motion for summary judgment.  *GFF Corp.*, 130 F.3d at 1384.

argues that Stites is a "complaining witness" and therefore not entitled to absolute immunity. However, the Supreme Court recently confirmed that a "complaining witness" is someone who brings formal charges against a defendant. *Rehberg*, 132 S. Ct. at 1507. Plaintiff never alleges that Stites brought charges against plaintiff. Stites is entitled to absolute immunity for his hearing testimony.

Plaintiff also alleges that Stites violated his procedural due process rights by banning him from campus and forbidding him from contacting or speaking with potential witnesses. Defendants do not argue that Stites is entitled to absolute immunity for these actions. Nevertheless, plaintiff cites no clearly established law Stites violated by restricting plaintiff's access to potential witnesses in the fashion he allegedly did so. Plaintiff does cite *Watson v. Univ. of Utah Med. Ctr.*, but that case involved a situation in which the defendant hospital improperly pressured a state agency to change its decision, after the state agency had concluded that the plaintiff had not violated the hospital's nursing practices. 75 F.3d at 580. The Tenth Circuit held that because the defendant agreed to allow the state agency to conduct an investigation and then actively interfered with that investigation, the defendant had violated a clearly established right. *Id.* at 580-81. Stites' conduct here—banning plaintiff from campus and forbidding him from contacting potential witnesses—is not sufficiently analogous to *Watson* to vitiate the qualified immunity defense. Thus, the Court concludes that qualified immunity bars liability on the allegations that Stites deprived plaintiff of a property interest in Count 6 of the Second Amended Complaint.

However, Count 6 of the Second Amended Complaint adds allegations that Stites harmed plaintiff's reputation—a liberty interest—when he testified that plaintiff "lost control and was 'screaming' at him for somewhere between 5 and 10 minutes during the May 1, 2013 meeting."

40

Doc. 101-1 at ¶¶ 169, 170.  Defendants have not had a chance to argue that these allegations fail to state a claim for a procedural due process violation, and they may file another motion for judgment on the pleadings on this claim.  For now, the Court declines to dismiss Count 6 against defendant Stites in his individual capacity.

Moving to defendant Klein, plaintiff alleges that Klein failed to follow the KUMC Handbook at the hearing because he did not notify plaintiff's witnesses in a timely manner of their right to testify, he introduced post-hearing evidence, and he compelled KUMC's witnesses to testify on its behalf, among other things.  Defendants argue that Klein is entitled to absolute and qualified immunity on this claim.  The Court need not reach the absolute immunity issue because plaintiff has failed to cite clearly established law that defendant Klein violated his procedural due process rights.  Indeed, the established law in our Circuit is to the contrary.  "[A] university's failure to follow its established guidelines in overseeing a grievance does not in and of itself implicate constitutional due process concerns." *Tonkovich*, 159 F.3d at 522 (internal citation omitted).  Defendant Klein is immune from liability for these actions, so the Court dismisses Count 6's claim against Klein in his individual capacity.

This leaves defendant Girod.  Plaintiff argues that "Girod violated [plaintiff's] right to procedural due process at the November 13, 2013 hearing by terminating [plaintiff's employment] based on evidence that was not presented at the *ad hoc* committee hearing."  Doc. 101-1 at ¶ 174(c).  At the November 13, 2013, hearing, KUMC charged plaintiff with professional misconduct and requested his termination.  After the hearing, the committee recommended that KUMC immediately reinstate plaintiff and issue him a written warning.  However, defendant Girod decided to fire plaintiff.  He sent a letter to plaintiff that included the following:

> The Committee recommended a sanction of a written warning for your unprofessional conduct . . . .  However, *the Committee did not have full access to, and was not asked to consider, the totality of the circumstances in your situation*. Having considered the Committee's findings and recommendations, and having also considered the totality of the circumstances surrounding your conduct the last few years, I have concluded that . . . termination of your employment and faculty appointment with the University is the only acceptable outcome.[12]

Doc. 90-3 at 1 (emphasis added).  Plaintiff argues that Girod violated his due process rights by terminating him on evidence that was not presented to the Committee.

"As a general rule, the Due Process Clause requires 'some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.'"  *Montgomery v. City of Ardmore*, 365 F.3d 926, 935 (10th Cir. 2004) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985)).  The purpose of a pretermination hearing is to determine whether reasonable grounds exist to believe that the charges against the employee are true and support the proposed action.  *Id.*  Thus, the pretermination hearing, though necessary, need not be elaborate.  *Id.*  Due process requires: (1) oral or written notice of the charges, (2) an explanation of the evidence, and (3) an opportunity to respond.  *Koessel*, 717 F.3d at 748.  In his termination letter, Girod conceded that "the Committee did not have full access to, and was not asked to consider, the totality of the circumstances in your situation."  Doc. 90-3 at 1.  By deciding to fire plaintiff based on evidence not presented at the hearing, Girod deprived plaintiff of a full explanation of the evidence and the opportunity to respond to it.  *See Singfield v. Akron Metro. Housing Auth.*, 389 F.3d 555, 566 (6th Cir. 2004) (denying summary judgment on procedural due process claim when Housing Authority terminated the plaintiff without giving him the opportunity to address newly gathered

---

[12] Plaintiff did not attach the termination letter to his any of the Complaints he has filed in this lawsuit. However, plaintiff refers to the letter in his Second Amended Complaint and it is central to his claims, so the Court may consider the letter here without converting defendants' motion into a Rule 56 motion for summary judgment.  *GFF Corp.*, 130 F.3d at 1384.

evidence before terminating him); *Carmody v. Bd. of Trs. of Univ. of Ill.*, 747 F.3d 470, 477 (7th Cir. 2014) ("Relying on a new charge without providing a meaningful opportunity to respond violates due process."). The standard for adequate process at a pretermination hearing is clearly established. *Koessel*, 717 F.3d at 748. As a result, plaintiff has pleaded enough facts to state a clearly established due process violation. The Court denies defendants' motion for judgment on the pleadings on Count 6 of plaintiff's Second Amended Complaint against defendants Stites and Girod in their individual capacities.

### 3.   Counts 3, 5, and 7 – Substantive Due Process

In Counts 3, 5, and 7 of his Second Amended Complaint, plaintiff alleges that defendants deprived him of his Fourteenth Amendment substantive due process rights. A Fourteenth Amendment substantive due process violation arises when a plaintiff alleges the government deprived him of a fundamental right. *Koessel*, 717 F.3d at 749. This framework extends due process protections primarily "to matters relating to marriage, family, procreation, and the right to bodily integrity." *Williams v. Berney*, 519 F.3d 1216, 1220 (10th Cir. 2008) (quoting *Albright v. Oliver*, 510 U.S. 266, 272 (1994)). An action violates substantive due process when it is "arbitrary, capricious, or without rational basis." *Tonkovich*, 159 F.3d at 528. Substantive due process claims are not based on violations of state law; instead, they are founded upon "deeply rooted notions of fundamental personal interests derived from the Constitution." *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1256 (10th Cir. 1998) (quoting *Mangels v. Pena*, 789 F.2d 836, 839 (10th Cir. 1986)). The standard for judging these claims is whether the challenged action "shocks the conscience." *Koessel*, 717 F.3d at 749. To satisfy this standard, "a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the

plaintiff by abusing or misusing government power." *Tonkovich*, 159 F.3d at 528 (quoting *Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995)).

In Count 3, plaintiff claims eight Individual Defendants violated his substantive due process rights by:  (1) stripping him of his principal investigator status on NIH grants, (2) removing him from the Pharmacology/Toxicology department, (3) denying his students access to equipment, and (4) forcing him to move to a different office.  The Court concludes that defendants are entitled to qualified immunity on Count 3.  Plaintiff has failed to provide any support from our Circuit's case law (or elsewhere) holding that these actions, or analogous ones, are so egregious that they "shock the conscience."  Thus, no "clearly established" law shows plaintiff is entitled to relief, and the Court dismisses Count 3 against the Individual Defendants in their individual capacities based on qualified immunity.

In Count 5, plaintiff claims that seven Individual Defendants violated his substantive due process rights because KUMC paid them in the form of raises in exchange for providing testimony against plaintiff at the May 29, 2012, hearing.  The implication from the Second Amended Complaint is that plaintiff alleges defendants testified falsely against him in exchange for the raises.  However, plaintiff has failed to show any clearly established law that such conduct, even if it occurred, violates plaintiff's substantive due process rights.  Substantive due process primarily protects "matters relating to marriage, family, procreation, and the right to bodily integrity." *Williams*, 519 F.3d at 1220.  In fairness, plaintiff does cite to our Court's opinion in *Robinson v. City of Ark. City, Kan.*, 912 F. Supp. 2d 1045, 1064 (D. Kan. 2012), as support.  But that case differs materially from plaintiff's claim here.  *Robinson* involved repeated and prolonged conduct organized to deny the plaintiff pay increases and promotion. *Id.* Furthermore, *Robinson* is not Tenth Circuit or Supreme Court precedent which, in general, is

required to render a violation of a "clearly established" right.  Finally, plaintiff has failed to allege any specific false testimony by any of the seven named Individual Defendants.  Because plaintiff has not met his burden on qualified immunity, the Court dismisses Count 5 against the Individual Defendants in their individual capacities.

In Court 7, plaintiff claims that defendants Klein, Girod, and Stites violated his substantive due process rights when Girod terminated his employment after the November 13, 2013 hearing.  Plaintiff alleges that Stites violated his due process rights by testifying falsely against plaintiff and impairing plaintiff's ability to defend himself.  Plaintiff alleges that Klein violated his due process rights by improperly overseeing and preparing the November 13, 2013 hearing.  Finally, plaintiff theorizes that Girod violated his due process rights by terminating him for reasons not discussed at the hearing.  The Court fails to see how this conduct "shocks the conscience."  *Koessel*, 717  F.3d at 749.  More to the point, plaintiff has identified no clearly established law that this conduct, even if it occurred, supports a substantive due process violation.  Again, plaintiff cites our Court's decision in *Robinson*.  But as noted previously, that case involved materially different conduct than that at issue here.  *Robinson*, 912 F. Supp. 2d at 1064.  As a result, the Court dismisses Count 7 against the Individual Defendants in their individual capacities based on qualified immunity.

### 4.  Count 8 – Federal False Claims Act

Count 8 of plaintiff's Second Amended Complaint asserts a claim against the Individual Defendants in the individual capacities for retaliation under 31 U.S.C. § 3730(h) of the False Claims Act.  Defendants argue that the FCA whistleblower provision does not brook liability against individuals.  Congress amended 31 U.S.C. § 3730(h) in 2009, and the statute now provides:

Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, or agent or associated others in furtherance of other efforts to stop 1 or more violations of this subchapter.

For the reasons Judge Lungstrum explained in *Lipka v. Advantage Health Grp., Inc.*, the Court concludes that the FCA does not authorize claims against individuals.  No. 13-CV-2223, 2013 WL 5304013, at *10-12 (D. Kan. Sept. 20, 2013) ("[T]he 2009 amendment to § 3730(h) was not intended to provide for individual liability and, that, consistent with the way in which the vast majority of courts resolved the issue prior to the amendment, § 3730(h) does not contemplate individual liability for FCA whistleblower retaliation.").  Because the federal FCA does not provide for recovery against individuals, the Court dismisses Count 8 of plaintiff's Second Amended Complaint against the Individual Defendants in their individual capacities.

### B.   State Law Claims

Plaintiff asserts six claims arising under Kansas state law against the Individual Defendants in their individual capacities.  Defendants ask the Court to decline supplemental jurisdiction over plaintiff's state law claims if the Court dismisses all of plaintiff's federal claims.  However, the Court has concluded that some of the federal claims survive defendants' two Motions for Judgment on the Pleadings, so defendants' request is moot.  In the alternative, defendants ask the Court to grant judgment on the pleadings for defendants on five of plaintiff's six state law claims.  The Court addresses each claim in turn, below.

### 1.   Count 9 – Kansas Age Discrimination in Employment Act

In Count 9, plaintiff alleges that defendants Stites and Girod violated the Kansas Age Discrimination in Employment Act, K.S.A. § 44-1111 *et seq* ("KADEA").  The KADEA requires a plaintiff to exhaust the administrative remedies prescribed in the Act before filing a

46

lawsuit.  *See Simmons v. Vliets Farmers Coop. Assoc.*, 861 P.2d 1345, 1347 (Kan. Ct. App. 1993).  "If exhaustion [of administrative remedies] is a jurisdictional requirement, the district court *must* always dismiss if there has been a failure to exhaust."  *McQueen v. Colo. Springs Sch. Dist. No. 11*, 488 F.3d 868, 873 (10th Cir. 2007) (emphasis in original).  Plaintiff's Second Amended Complaint alleges that he has exhausted his administrative remedies; therefore the Court may move on to determine if he has otherwise pleaded a plausible claim for relief.

Defendants argue that the KADEA does not provide for individual liability.  K.S.A. § 44-1113 prohibits an "employer" from taking an adverse employment action against any person because of that person's age.  K.S.A. § 44-1112 defines "employer" to mean "any person in this state who employs four or more persons and any person acting directly or indirectly for such a person, and includes the state and all political subdivisions of the state."  Our Court twice has concluded that the KADEA's definition of "employer" does not include individuals working for state agencies.  *Ditch v. Bd. of Cnty. Comm'rs. of Shawnee Cnty., Kan.*, 650 F. Supp. 1245, 1252 (D. Kan. 1986); *Long v. City of Kan. City, Kan.*, Civ. A. No. 93-2073-EEO, 1994 WL 327796, at *4 (D. Kan. June 30, 1994).  Those cases concluded that the KADEA did not provide for suits against individuals who that state of Kansas employs because the KADEA incorporates virtually the same definition of "employer" as the federal Age Discrimination in Employment Act ("ADEA") and courts hold overwhelmingly that the ADEA does not provide for liability against state employees.  *Ditch*, 650 F. Supp. at 1252.  The Court finds this reasoning persuasive and therefore concludes that the KADEA does not authorize suits against the Individual Defendants. As a result, the Court dismisses Count 9's claim against the Individual Defendants in their individual capacities.

### 2.   Count 10 – Kansas False Claims Act

In Count 10, plaintiff alleges that the Individual Defendants violated the Kansas False

Claims Act ("KFCA"), K.S.A. § 75-7506, by unlawfully retaliating against him after he

complained that defendants were misusing government funds.  The KFCA prescribes penalties

for a "person" who "[k]nowingly presents or causes to be presented to any employee, officer or

agent of the state or political subdivision thereof . . . a false or fraudulent claim for payment or

approval."  K.S.A. § 75-7503(a).  Like its federal counterpart, the KFCA also contains an anti-

retaliation provision to protect whistleblowers.  Section 75-7506 provides:

> Any employee who is discharged, demoted, suspended, threatened, harassed or in
> any other manner retaliated against in the terms and conditions of employment *by*
> *such employee's employer* because of lawful acts undertaken in good faith by the
> employee on behalf of the employee or others, in furtherance of an action under
> this act, including investigation for, initiation of, testimony for, or assistance in an
> action filed or to be filed under this act, shall be entitled to all relief necessary to
> make the employee whole. An employee may bring an action in the appropriate
> district court for the relief provided in this section.

K.S.A. § 75-7506 (emphasis added).

Defendants argue that the provision does not authorize recovery against individuals

because it protects only retaliation "by such employee's employer."  Neither party has cited any

authority, and the Court has not located any case law addressing whether the KFCA authorizes

recovery against an individual.  In other provisions within the Act, the KFCA uses the word

"person," which it defines as "any natural person, corporation, firm, association, organization,

partnership, business or trust."  K.S.A. § 75-7502(d).  The Court concludes that § 75-7506's use

of the word "employer" instead of "person" manifests the legislature's intention to limit a

plaintiff's recovery to his employer.

Furthermore, Kansas enacted the KFCA in 2009, and it closely resembles the federal

FCA as it existed in 2009.  Congress amended the federal FCA shortly after Kansas enacted the

KFCA.  However, the pre-amendment FCA had a similar anti-retaliation provision which provided a right to recovery for an employee who was retaliated against "by his or her employer."  31 U.S.C. § 3730(h) (2009).  Courts considering the federal provision have generally held that retaliation claims could be brought only against an "employer."  *See U.S. ex rel. Golden v. Ark. Game & Fish Comm'n*, 333 F.3d 867, 870-71 (8th Cir. 2003).  The Court finds the interpretation of the federal provision instructive here.

Based on the text of the KFCA's retaliation provision and the interpretation of the similar federal FCA retaliation provision, the Court concludes that a plaintiff may recover for retaliation only against his "employer."  Plaintiff does not allege that any of the Individual Defendants were his "employer."  As a result, K.S.A. § 75-7506 provides no cause of action against the Individual Defendants, and the Court dismisses Count 10 against the Individual Defendants in their individual capacities.

### 3.   Count 11 – Unlawful Retaliation

In Count 11, plaintiff asserts a common law unlawful retaliation claim against defendants Stites, Girod, and Terranova.  Plaintiff alleges that Stites and Girod retaliated against plaintiff by "placing him on administrative leave, transferring him to a different department, removing his status as [principal investigator] on several lucrative NIH grants, preventing him from conducting research, preventing him from working with graduate students, and terminating him."  Doc. 101-1 at ¶ 222.  Plaintiff makes no specific allegation against defendant Terranova, other than saying that he, along with Stites and Girod, "possessed individual discretion" to retaliate against plaintiff.  Doc. 101-1 at ¶ 223.

Kansas recognizes a common law cause of action for retaliatory discharge.  To state a claim, plaintiff must allege that:  (1) he exercised a statutory or constitutional right recognized as

a basis for a retaliatory discharge claim; (2) the employer had knowledge of plaintiff's exercise of that right; (3) the employer terminated the plaintiff's employment; and (4) a causal connection existed between the protected activity and the termination.  *Hart v. U.S.D. #244 Bd. of Educ.*, 327 P.3d 1052, 2014 WL 3020476, at *6 (Kan. Ct. App. June 27, 2014) (unpublished table opinion).  The parties cite no Kansas case recognizing a common law claim of retaliation based on actions other than discharge from employment, and the Court has located no such case.  As a result, the Court considers whether the Second Amended Complaint has stated a claim for retaliatory discharge by an employer.

Defendants argue that Kansas law does not support individual liability for a retaliatory discharge claim.  In *Rebarchek v. Farmers Coop. Elevator*, 35 P.3d 892, 904 (Kan. 2001), the Kansas Supreme Court held that "only the employer is liable for retaliatory discharge."  Our Court has expressed competing views about what *Rebarchek* means.  In *Ruisinger v. HNB Corp.*, No. 10-2640-KHV, 2012 WL 3758656, at *2 (D. Kan. Aug. 29, 2012), Judge Vratil focused on the amount of authority possessed by the employee who fired the plaintiff, holding that *Rebarchek* bars individual liability only when the firing supervisor lacks a role in the corporation beyond his managerial position.  In contrast, in *Ragsdale v. Amsted Rail Co., Inc.*, No. 13-2257-EFM, 2013 WL 6729788, at *3 (D. Kan. Dec. 19, 2013), Judge Melgren held that the status of the supervisor is "irrelevant" and that "*only the employer* is liable for retaliatory discharge."  The Court concludes that Judge Melgren's opinion in *Ragsdale* best predicts the rule that the Kansas Supreme Court would adopt if circumstances required it to harmonize *Ruisinger* and *Ragsdale*.  Two reasons lead the Court to draw this conclusion.

First, and as *Ragsdale* points out, "the Kansas Supreme Court [in *Rebarchek*] reversed the Kansas Court of Appeals' decision in which the Court of Appeals limited the potential

liability in accordance with the status of the supervisor." *Id.*  Second, the Kansas Court of Appeals agrees that individuals, regardless of their status, may not be sued for retaliatory discharge.  *E.g.*, *Hart*, 2014 WL 3020476, at *6 (holding "only an *employer* is liable for retaliatory discharge" for all protected rights); *Kerns v. City of Dodge City*, 313 P.3d 105, 2013 WL 6164586, at *3 (Kan. Ct. App. Nov. 22, 2013) (holding "[o]nly an employer is liable for the common-law tort of retaliatory discharge" in context of Kansas statutory violation) (unpublished opinion).  A federal court presiding over a diversity action is not required to "follow the dictates of an intermediate state appellate court."  *Sellers v. Allstate Ins. Co.*, 82 F.3d 350, 352 (10th Cir. 1996).   But in such a case, a federal court properly may view such decisions as persuasive about how the state's supreme court might rule.  *Id.*  Consistent with this principle, the Court follows *Ragsdale* and decides that the Kansas Supreme Court would recognize a common law cause of action for retaliatory discharge against only an employer.  Because none of the three named individuals were plaintiff's employer, plaintiff has failed to state a claim for common law retaliatory discharge.

Based on its decision to follow *Ragsdale*, the Court also concludes that the Kansas Supreme Court would not recognize a common law claim for retaliation against individuals for actions other than discharge from employment.  As a result, plaintiff has failed to state a claim on his allegations of retaliation other than discharge.

Given these conclusions, the Court need not address defendants' second argument, *i.e.*, that plaintiff has an existing and adequate remedy under the state and federal False Claims Act.

The Court dismisses Count 11's claim against defendants Stites, Girod, and Terranova in their capacity as individuals.[13]

### 4.  Count 12 – Tortious Interference with a Prospective Business Relationship

In Count 12, plaintiff alleges that defendants Terranova, Kopf, Jaeschke, Carlson, and Hagenbuch tortiously interfered with plaintiff's prospective business relationship with the NIH by requesting that the NIH remove plaintiff as principal investigator on certain NIH grants.

To state a claim for tortious interference, a plaintiff must allege:  (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) the defendant knew of the relationship or expectancy with the probability of future economic benefit to the plaintiff; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have realized the expectancy; (4) intentional misconduct by the defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of the defendant's misconduct.  *Turner v. Halliburton*, 722 P.2d 1106, 1115 (Kan. 1986).

First, defendants argue that plaintiff cannot satisfy the first element of the cause of action because the NIH awards grants to KUMC, not individual professors, so he lacked a business relationship with the NIH outside of his employment with KUMC.  To support this argument, defendants cite—without pin citation or explanatory parenthetical—to *Turner v. Halliburton*, 722 P.2d at 1106.  The Court fails to see how *Turner* supports defendants' argument, and has found no other case law holding that an employee lacks a business relationship with a third party simply because his employer also has a relationship with that third party.

---

[13] Plaintiff's Second Amended Complaint adds allegations to Count 11, but they are immaterial to the Court's decision here because Kansas law does not abide an unlawful retaliation claim against individuals.

Second, defendants argue that an "employee acting within the scope of his duties cannot be held liable for tortious interference with a *contract* to which the employer is a party." Doc. 95 at 30 (emphasis added). Count 12 brings a claim for tortious interference with a prospective business relationship, so defendants' argument that plaintiff is immune from a tortious interference with *contract* claim does not help them. Accordingly, the Court denies defendants' motion for judgment on the pleadings on Count 12 as against defendants Terranova, Kopf, Jaeschke, Carlson, and Hagenbuch in their individual capacities.

### 5. Count 14 – Tortious Interference with Contract

In Count 14, plaintiff alleges that defendants Stites, Girod, and Klein tortiously interfered with plaintiff's rights under the KUMC Handbook by terminating him without complying with Handbook procedures.[14] A corporate agent, acting within the scope of his employment, cannot be held liable for tortious interference with a contract to which the corporation is a party. *Diederich v. Yarnevich*, 196 P.3d 411, 418 (Kan. Ct. App. 2008).

Plaintiff argues that defendants were not acting within the scope of their employment because they were motivated by "either personal financial gain or a desire to accomplish an unlawful purpose—silence a whistleblower." Doc. 90 at 44. Generally, if "an employee is motivated entirely by personal reasons such as malice or spite or by a desire to accomplish some unlawful purpose and does not have for its purpose the furtherance of the employer's business," that employee is acting outside the scope of his employment and can be held personally liable. *Williams v. Cmty. Drive-In Theater, Inc.*, 520 P.2d 1296, 1301-02 (Kan. 1974).

One can fairly read the Second Amended Complaint to assert that defendant Stites acted out of a desire for personal gain by testifying falsely against plaintiff in exchange for a

---

[14] Count 14 of plaintiff's Second Amended Complaint is the first (and only) time plaintiff alleges that the KUMC Handbook was a contract between him and KUMC.

promotion and higher salary.  That allegation is sufficient, at this stage of the proceedings, for

the claim against Stites to survive a motion for judgment on the pleadings.  In contrast, plaintiff

never asserts that defendants Girod and Klein acted outside the scope of their employment.  As a

result, the Court dismisses Count 14 as against defendants Girod and Klein in their individual

capacities on Count 14 of plaintiff's Second Amended Complaint, but denies defendants' motion

for judgment on the pleadings on Count 14's claim against defendant Stites in his individual

capacity.

### V. Conclusion

In their first Motion for Judgment on the Pleadings (Doc. 80), defendants sought

judgment on all claims against KUMC and the Individual Defendants in their official capacities.

In their second Motion for Judgment on the Pleadings (Doc. 82), defendants sought judgment on

13 of plaintiff's 14 claims against the Individual Defendants in their individual capacities.  For

the reasons explained above, the Court grants in part and denies in part defendants' motions.

Specifically, the Court dismisses all claims in plaintiff's Second Amended Complaint *except*:

- Counts 1, 6, and 7 – First Amendment Retaliation, Procedural Due Process, and Substantive Due Process against defendant Girod in his official capacity;

- Count 1 – First Amendment Retaliation against the Individual Defendants in their individual capacities;

- Count 6 – Procedural Due Process against defendants Stites and Girod in their individual capacities;

- Count 12 – Tortious Interference with a Prospective Business Relationship against defendants Terranova, Kopf, Jaeschke, Carlson, and Hagenbuch in their individual capacities;

- Count 13 – Conversion against defendant Stites in his individual capacity;

- Count 14 – Tortious Interference with Contract against defendant Stites in his individual capacity; and

54

- Count 15 – Violations Pursuant to the Kansas Judicial Review Act against KUMC.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion for Judgment on the Pleadings (Doc. 80) is granted in part and denied in part, as explained in this Order.

**IT IS FURTHER ORDERD BY THE COURT THAT** defendants' Motion for Judgment on the Pleadings (Doc. 82) is granted in part and denied in part, as explained in this Order.

**IT IS FURTHER ORDERD BY THE COURT THAT** plaintiff's Motion for Leave to Amend (Doc. 101) is granted.

**IT IS SO ORDERED.**

**Dated this 2nd day of February, 2015, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**