**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

**CURTIS KLAASSEN, Ph.D.,**

Plaintiff

v.                                                          Case No.: 13-CV-2561

**BARBARA ATKINSON,** *et. al.,*

Defendants.

**THIRD AMENDED AND SUPPLEMENTAL COMPLAINT**

Plaintiff Dr. Curtis Klaassen, Ph.D. files this Third Amended and Supplemental Complaint against Barbara Atkinson, Douglas Girod, Gerald Carlson, Paul Terranova, Bruno Hagenbuch, Steven Stites, and Hartmut Jaeschke.

**NATURE OF ACTION AND JURISDICTION**

1.      This is a civil action arising pursuant to the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §§ 1983 and 1988, as amended and the Kansas common law.

2.      Dr. Klaassen seeks damages and prospective relief, including relief against all Defendants for committing acts, under color of law, with the intent and for the purpose of depriving Dr. Klaassen of his rights secured under the Constitution and laws of the United States; retaliating against Dr. Klaassen for his exercise of constitutionally protected speech; for depriving Dr. Klaassen of his constitutional rights without due process of law; for retaliating against Dr. Klaassen for complaining about KUMC's misappropriation of federal monies; for interfering with his prospective business relationships; and, for conversion.

3.      This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343. The declaratory and injunctive relief sought is authorized by 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and Rule 57 of the Federal Rules of Civil Procedure.

4.      This Court has supplemental jurisdiction over the state law causes of action pursuant to 28 U.S.C. § 1367.

5.      This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391.   The actions complained of took place in this judicial district and evidence and employment records relevant to the allegations are maintained in this judicial district.

## THE PARTIES AND RELATED ENTITIES

6.      Plaintiff Curtis Klaassen is a University Distinguished Professor and employee of the University of Kansas School of Medicine, where he has served as a professor since 1968.  He is a citizen and resident of Kansas. He worked at the campus known as the University of Kansas Medical Center.

7.      The University of Kansas and the University of Kansas School of Medicine are state-supported public institutions.  The University of Kansas Medical Center is a state-supported public institution and a campus for University of Kansas.  The University of Kansas, its School of Medicine, and its Medical Center are collectively referred to as KUMC.

8.      Barbara Atkinson was the Dean and Executive Vice Chancellor of KUMC from 2002 until April 2012.  She is sued for damages in her individual capacity.

9.      Douglas Girod is the current Executive Vice Chancellor of KUMC.  He is sued for damages in his individual capacity and for declaratory, injunctive, and prospective relief in his official capacity.

10.      Gerald Carlson is a professor and chair of the Department of Biochemistry and Molecular Biology for KUMC. He is sued for damages in his individual capacity.

11.      Paul Terranova is a former professor and Vice Chancellor for Research in the Department of Molecular and Integrative Physiology for KUMC.  He is sued for damages in his individual capacity.

12.     Bruno Hagenbuch is a professor for KUMC.  He works in the Pharmacology, Toxicology & Therapeutics Department at KUMC.  He is sued for damages in his individual capacity.

13.     Gregory Kopf is a professor, Associate Vice Chancellor for Research Administration, and Executive Director of KUMC Research Institute for KUMC.

14.     Steven Stites is a professor and Chair of the Department of Internal Medicine at KUMC.  He is also the Vice Chancellor for Clinical Affairs. He served as interim Dean and Executive Vice Chancellor following Atkinson's resignation.    He is sued for damages in his individual capacity.

15.     Hartmut Jaeschke is a professor and Chair of the Pharmacology, Toxicology & Therapeutics Department at KUMC.  He is sued for damages in his individual capacity.

16.     Cody Tully is a finance director at KUMC and works in the Pharmacology, Toxicology, & Therapeutics Department at KUMC.

17.     Robert Klein is the Vice Chancellor for Academic Affairs at KUMC.

18.     Allen Rawitch was the Vice Chancellor for Academic Affairs at KUMC for times relevant to the Complaint.

19.     At all times relevant, Defendants acted pursuant to the color of state law.

## FACTS

20.     Dr. Klaassen has a bachelor's degree in biology from Wartburg College in Waverly, Iowa.  He received his Ph.D. in pharmacology from the University of Iowa in 1968.

21.     Since 1968, Dr. Klaassen has worked for KUMC and he has served as a tenured professor for KUMC since 1974.  He has served as a University Distinguished Professor since 2002.

22.     Among the particular highlights of Dr. Klaassen's distinguished 40-year career are his service as president of the Society of Toxicology (1990-1991) and the International Union of Toxicology (1992-1995) and as editor of Casarett and Doull's "Toxicology: The Basic Science of Poisons," considered the premier textbook in the field. He has twice been named a "Highly Cited Researcher" (2002, 2007) by the Institute for Scientific Information, a designation held by less than one half of one percent of all researchers.

23.     Over the course of his 40-year career, Dr. Klaassen established a business relationship with the National Institute of Health (NIH).  The NIH, a subordinate agency within the Department of Health of Human Services, is the United States' principal administrative body for medical research and provides billions of dollars each year to fund scientific and medical research.

24.     Dr. Klaassen possesses a constitutionally-recognized property right to conduct unimpeded and unfettered research established by both KUMC's adoption of the American Association of University Professor's *1940 Statement of Academic Freedom and Tenure* and KUMC's custom and practice created over the course of Dr. Klaassen's 40-year career.

25.     Dr. Klaassen, pursuant to his tenure rights to conduct unimpeded and unfettered research, applied for and received, as a principal investigator, an average of three NIH grants per year over the course of his career.

26.     A principal investigator (PI) initiates a research project by writing a grant proposal.  Once the NIH or other governmental agency funds the grant, the PI is responsible for the scientific and technical direction of the research project.

27.     Dr. Klaassen's financial compensation from KUMC was directly tied to his ability to successfully obtain NIH grants as a PI.

28.     Grant proceeds from the NIH help pay for professors' salaries, laboratories, lab equipment, and employees' salaries, including research assistants to conduct research.  Federal grant monies help fund the basic sciences departments at KUMC, including the Pharmacology/Toxicology Department and Internal Medicine Department.

29.     In addition, for over 35 years, Dr. Klaassen possessed an endowment account comprised of funds given to him by his friends, students, and corporations to fund his research students' stipends and research.  Over the years, the endowment earmarked for Dr. Klaassen's research totaled approximately 1 million dollars.

30.     As of 2010-2011, Dr. Klaassen served as PI on 5 NIH grants.

31.     First, in 2006, Dr. Klaassen, as PI, received a NIH grant titled "Nuclear Receptors in Liver Health and Disease" that was funded by the NIH for $10,632,518.  The grant is commonly known as the COBRE grant and, subject to certain terms, is renewable.  Due to the underhanded and tortious actions of Defendants beginning in November 2011, Dr. Klaassen no longer serves as the PI on the COBRE grant, although KUMC continues to receive the grant proceeds.

32.      Second, in 1979, Dr. Klaassen, as PI, received a NIH grant titled "Training Program in Environmental Toxicology."  This grant has been renewed every 5 years, and in 2011 was funded by the NIH for $1,541,170 for another 5 years.  The grant is commonly known as the T32 Training grant and, subject to certain terms, is renewable.  Due to the underhanded and tortious actions of Defendants beginning in November 2011, Dr. Klaassen no longer serves as the PI on the T32 Training grant, although KUMC may continue to receive the grant proceeds.

33.      Third, in 2009, Dr. Klaassen, as PI, received a NIH grant titled "DK-081461 (1-4), Nrf2 as a Master Regulator in Liver Disease Prevention and Therapy.  The grant is commonly

known as the NRF2 Liver grant.  The grant was for approximately $995,631 and ran through 2013.

34.     Fourth, in 2010, Dr. Klaassen, as PI, obtained an NIH grant titled "ES-019487 (1-5) Developmental Regulation of Drug Processing Genes.  The grant is commonly known as the Drug Processing Gene grant.  The grant was for approximately $2,114,968 and ran until 2015.

35.     Fifth, in 2010, Dr. Klaassen, as PI, obtained an NIH granted titled "ES-009649 (8-12), Regulation of Hepatic Uptake of Endogenous Signaling Molecules and Xenobiotics.  The grant is commonly known as the Hepatic Update grant.  The grant was for approximately $1,125,000 and ran until 2015.

36.     In 2002, Barbara Atkinson, M.D., was appointed Dean and Executive Vice Chancellor of KUMC.  Atkinson asked Dr. Klaassen to serve as the Chair of the Pharmacology/Toxicology Department.

37.     Dr. Klaassen became concerned that Atkinson was not making appropriate decisions regarding the basic sciences departments at KUMC and that there was a breakdown of shared governance—a hallmark of academia.

38.     Because of his concerns, Dr. Klaassen helped form the "Committee of Eight." The Committee of Eight included the chairs of various basic sciences departments including Anatomy, Biochemistry, Physiology, Pharmacology/Toxicology, and Microbiology.   The Committee of Eight's goal was to help Atkinson make more informed decisions regarding the basic sciences departments. To that end, the Committee of Eight met with the University of Kansas Chancellor Bernadette Gray-Little, on January 4, 2010 and explained their concerns about KUMC's financial situation and lack of shared governance.

39.     The Chancellor wrote a stern letter to Atkinson informing her that there should be more shared governance at KUMC.

40.     Atkinson began meeting with the Committee of Eight every few weeks.  During meetings in March 2011, Dr. Klaassen accused Atkinson and KUMC of inappropriately siphoning money from the basic sciences to pay for other KUMC programs, including the remodeling of facilities.

41.     One month later, in April 2011, Atkinson dismissed Dr. Klaassen as Chair of the Toxicology/Pharmacology Department.  In addition to the stigma associated with the removal, Dr. Klaassen's annual salary was also reduced by $40,000.

42.     Just months before Atkinson terminated Dr. Klaassen as Chair of the Toxicology/Pharmacology Department, in October 2010, Dr. Klaassen was anonymously evaluated by 21 faculty members.  Greatly summarized, the faculty members were asked to evaluate Dr. Klaassen by answering 20 questions.  The questions asked the evaluators to rank Dr. Klaassen from a range of 1-5, with 1 being poor and 5 being excellent on various criteria.  On the first 19 questions, Dr. Klaassen received an average score of 4.28.  The 20th question was scored from 0-4 and asked if Dr. Klaassen should be retained as Chair of the Toxicology/Pharmacology Dept.  Dr. Klaassen received a 4.07 average score on the 20th question.

43.     Following Atkinson's arbitrary removal of Dr. Klaassen as Chair, defendant Gerald Carlson was appointed by Atkinson to Dr. Klaassen's former position and became Interim Chair of the Pharmacology/Toxicology Department.

44.     KUMC and Carlson reduced Dr. Klaassen's administrative support staff, whose wages were paid in part by the proceeds of the COBRE grant in which Dr. Klaassen oversaw as the PI.  Dr. Klaassen complained to Carlson about his lack of support staff.  Carlson refused to

take Dr. Klaassen's complaints seriously and instead replied, "Curt, Curt, Curt, you silly lug, you," "XOXO, Gerry," and "cuz pipples is pipples, Loves and kisses, Gerry."

45.     In July 2011, issues arose with the renewal of the COBRE grant.

46.     At the time, Cody Tully was the financial manager of the COBRE grant.

47.     At the direction or guidance of Carlson and KUMC, Tully misappropriated funds from the COBRE grant and from an endowment fund earmarked for Dr. Klaassen's research.

48.     Tully, at the direction of Carlson, threatened and harassed Dr. Klaassen, his support staff, and his students.  In particular, Carlson and Tully banned employee members of the Pharmacology & Toxicology department from working with Dr. Klaassen and thereby misappropriated NIH grant monies.  Dr. Klaassen's NIH grants paid portions of the salaries of these employees.  As a consequence of Carlson and Tully's actions, Dr. Klaassen's NIH grants, however, were used to pay for items and employees' salaries unrelated to the grants in violation of NIH regulations.

49.     Despite repeated requests for the grant's financial accountings, KUMC, Tully, and Carlson refused to provide Dr. Klaassen with an accounting of the COBRE grant's financials.

50.     Despite the resistance and lack of cooperation from KUMC's administration, the COBRE grant was eventually renewed

51.     On October 28, 2011, Dr. Klaassen still served as a PI for the COBRE grant and held a meeting with members of the Pharmacology/Toxicology Department to discuss the COBRE grant.  At the meeting Dr. Klaassen accused KUMC, Carlson, and Tully of financial mismanagement of federal grant monies – including the COBRE grant.

52.     On November 1, 2011, Dr. Klaassen spoke with the Associate Vice Chancellor of Research Administration and Executive Director of the KUMC Research Institute, Gregory Kopf, about the COBRE grant and about KUMC's mismanagement of federal grant monies.

53.     Several hours later that same day, Dr. Klaassen personally met with a representative of the NIH.  Tully interrupted the meeting and directed the NIH representative to a different meeting.   Several minutes later Paul Terranova, Dean of Research, entered Dr. Klaassen's office with two armed policemen and escorted him off campus.

54.     Dr. Klaassen was later informed that he was being placed on administrative leave and was not allowed to set foot on campus, contact his students, the NIH, or any other KUMC employee.

55.     By letter dated October 31, 2011, Terranova accused Dr. Klaassen of "belligerent" behavior and mishandling grant funds, stating that "several discrepancies regarding your allocation of grant funding have been reported."  The letter was a pretext; Dr. Klaassen was placed on administrative leave because he had complained about KUMC's mismanagement of federal grant monies, lacked of shared governance, and financial mismanagement.

56.     KUMC, at the direction of Terranova, placed Dr. Klaassen on administrative leave from November 1 to November 30, 2011.  KUMC confiscated Dr. Klaassen's computer and removed his name from their website.  People who tried to contact Dr. Klaassen thought he was dead.

57.     While on administrative leave Dr. Klaassen was completely cut off from his students, his work, his research, and the NIH.

58.     During Dr. Klaassen's leave, KUMC, without prior notice to Dr. Klaassen, stripped him of his status as PI on the lucrative T32 Training and COBRE grants.

59.     On November 21, 2011 Bruno Hagenbuch and Kopf, at the direction of Terranova, wrote the NIH and requested a change in PI for the T32 grant.  KUMC requested that Hagenbuch be the new PI on the T32 training grant.  The NIH later granted KUMC's request. Hagenbuch is unqualified to be a PI on the T32 training grant because he is not an environmental toxicologist.  However, after becoming the PI on the T32 training grant, Hagenbuch's annual salary increased 15% from approximately $150,000 to $175,000.

60.     On the same day, Kopf and Hartmut Jaeschke, at the direction of Terranova, wrote the NIH and requested a change in PI for the COBRE grant.   KUMC requested that Jaeschke be the new PI on the COBRE grant.  The NIH granted KUMC's request.  The COBRE grant was titled "Nuclear receptors in liver health and disease." Jaeschke is not an expert on nuclear receptors and is unqualified to serve as a PI on the COBRE grant.  After becoming PI on the COBRE grant, Jaeschke's annual salary increased approximately 25% from $205,000 to $267,000.

61.     While awaiting a response from the NIH regarding a change in the PI, two days later, on November 23, 2011, Terranova notified Dr. Klaassen that his 30-day administrative leave was extended until December 15, 2011.

62.     While Dr. Klaassen was on leave in November 2011, Terranova notified Rawitch that Dr. Klaassen had been placed on administrative leave and requested that Rawitch conduct a broad and opened ended investigation regarding Dr. Klaassen. Rawitch began preparing an report containing trumped up charges of misconduct known as the January 31, 2012 Inquiry Report.  The January 31, 2012 Inquiry Report outlined a list of incidents that Terranova, Rawitch, and Carlson allegedly considered evidence of Dr. Klaassen's unprofessional behavior. Those incidents included:

a.      An October 15, 2010 meeting with Chancellor Bernadette Gray-Little in which Dr. Klaassen complained of the "colossal mismanagement" of KUMC;

b.      A March 29, 2011, Basic Sciences planning meeting in which Dr. Klaassen complained about the reduction in budget, forecasted the end of the basic sciences departments, and argued for more transparency in the government of KUMC;

c.      The incidents previously described at the October 28, 2011, meeting.

63.     Carlson, Terranova, Hagenbuch, Tully, and Jaeschke provided testimony against Dr. Klaassen in the January 31, 2012 Inquiry Report.   Terranova and Rawitch oversaw the creation of the report.

64.     The Inquiry Report was a pretext; the real reason that Dr. Klaassen was placed on administrative leave was because he had complained about KUMC's mismanagement of federal grant monies and criticized the administration, its management, organization, and operation.   In fact, most of the incidents listed in the Inquiry Report involve Dr. Klaassen's complaints to KUMC's administration members including Atkinson, Terranova, Carlson, and Jaeschke about the mismanagement of federal grant monies, lack of oversight and administration, failure to appropriately manage KUMC, and the organization's lack of transparency and shared governance.

65.     Dr. Klaassen returned to work on December 16, 2011.   On that day, he was informed by Carlson that he had to move offices.   While Dr. Klaassen was on administrative leave, Tully rekeyed and locked his old office.   Carlson told Dr. Klaassen that he would only have between 8 a.m. and 5 p.m. on weekdays to move his materials to his new office. Dr. Klaassen was given until January 3, 2012 to move offices.

66.     On December 16, the same date he returned to work, Dr. Klaassen requested a meeting at 3:00 p.m. regarding the status of the COBRE grant. At 2:46 p.m., Terranova notified Dr. Klaassen via e-mail that he was no longer the PI on the T32 and COBRE grants.

67.     On January 4, 2012, Dr. Klaassen began work in his new office.  Dr. Klaassen was then called into a meeting with Terranova and Carlson.  Terranova and Carlson informed Dr. Klaassen that he was to move offices again. Dr. Klaassen was forced to move to an office without a window in 1000 Hixon, the oldest research building on campus.  The location was less desirable than his previous office and was basically a furnace room.

68.     Atkinson oversaw and participated in Dr. Klaassen's transition to the Internal Medicine department, the removal of his COBRE and T32 grants, and the improper investigation spearheaded by Terranova and Rawitch into trumped up allegations of misconduct.

69.     Dr. Klaassen's laboratory was also moved to the less desirable 1000 Hixon location.  The 1000 Hixon space is inadequate for Dr. Klaassen to perform his research.

70.     Dr. Klaassen and his students and staff were instructed that the office and laboratory move was to be completed by February 1, 2012.  But on January 23, 2012, Tully and Jaeschke rekeyed the locks to Dr. Klaassen's new office and his laboratory forcing him and his students to move immediately.

71.     Beginning on January 10, 2012, KUMC's administration informed Dr. Klaassen that he had overspent on his remaining 3 NIH grants (Heptic Uptake/Drug Processing Gene/NRF2 Liver).  Dr. Klaassen was overspent on the grants because Terranova and Kopf took money out of his NIH grant accounts without his permission. Atkinson also informed Dr. Klaassen on that date that he was being moved from the Pharmacological/Toxicology

Department to the Internal Medicine Department.  Dr. Klaassen requested that Terranova and Kopf replenish the funds they took out of NIH grant accounts without his permission.

72.     On January 25, 2012, students and staff of Dr. Klaassen's laboratory met with KUMC representatives Atkinson, Terranova, Jaeschke, Rawitch, and Tully. At the meeting, the KUMC representatives promised the students and staff that they would have access to necessary laboratory equipment after they were moved into the Internal Medicine Department.

73.     In February 2012, Carlson, Terranova, and Jaeschke became concerned about the behavior of Dr. S, a tenured faculty member in the Pharmacology department.[1]  Carlson, Jaeschke, and Terranova were aware of facts that Dr. S engaged in abusive and threatening behavior and created a hostile work environment.  In particular, Dr. S would yell at subordinate employees threatening to alter their immigration status if they did not comply with his demands. Instead of banning Dr. S from campus and prosecuting him for personal misconduct, Terranova, Carlson and Jaeschke wrote Dr. S a letter and asked him to complete a "fit-for-duty" evaluation. Terranova, Carlson, and Jaeschke also asked Dr. S to undergo "workplace violence" and "manager" training to improve his management skills.

74.     From October 2011 through February 2012, Dr. S and Klaassen were both faculty members of the University of Kansas under the supervision of Terranova, Carlson, and Jaeschke.

75.     Terranova, Carlson, and Jaeschke did not ask Klaassen to undergo management or workplace violence training.  Instead, Terranova, Carlson, and Jaeschke suspended Klaassen from campus, transferred his NIH grants to other individuals, and initiated personal misconduct proceedings against him.

---

[1] The documents produced in this case regarding Dr. S are designated confidential. Therefore, out of an abundance of caution and respect for third parties, Klaassen refers to this individual by an initial only.

76.     In April 2012, Atkinson, Stites, Terranova, Jaeschke, Rawitch, and Tully reneged on their prior promise and denied Dr. Klaassen's students and staff access to critical equipment necessary for them to conduct their research.  Tully changed the locks to the rooms where the equipment was located. Dr. Klaassen's students and staff could only use the equipment when Tully would unlock a door for them; thus, they could no longer use the equipment in the evenings or on weekends.  Eventually, Dr. Klaassen's students were completely denied access to the common equipment room.

77.     Dr. Klaassen sent correspondences on behalf of his students and staff to numerous KUMC administrators, including Stites.  Instead of assisting Dr. Klaassen and his students and staff, Stites took money out of Dr. Klaassen's remaining NIH grants without his permission in violation of NIH procedures, policies, and regulations.  Stites also barred Dr. Klaassen's students and staff from accessing and using the equipment.

78.     Dr. Klaassen's students and staff filed complaints with the Internal Medicine Department and Human Resources.  No help came.  Their requests were ignored.

79.     Tully would scream at Dr. Klaassen's students and staff telling them they were unwanted.  KUMC professors told Dr. Klaassen's students and staff that they were like the "band playing on the Titanic."

80.     At the direction of Rawitch, on May 29, 2012, an *ad hoc* committee hearing was held on the allegations outlined in the Inquiry Report created by Rawitch at the direction of Terranova.  Rawitch also oversaw the creation of the *ad hoc* committee.  Klein was present at the hearing and, along with KUMC's general counsel, served as a prosecutor at the hearing.

81.     Dr. Klaassen requested three days to present his defense at the May 29, 2012, hearing due to the number of witnesses identified by both Dr. Klaassen and KUMC as containing

relevant information regarding the allegations of misconduct.  KUMC overruled Dr. Klaassen's request and limited him to four hours to present his case at the May 29, 2012, hearing.

82.     Tully, Rosa Meagher, Ken McCarson, Beth Levant, Jaeschke, Hagenbuch, and Gregory Reed either testified against Dr. Klaassen at the May 29, 2012 hearing or contributed to the Inquiry Report by making unfounded allegations against Dr. Klaassen.  These individuals received raises believed to be in the amount of 45%, 61%, 15%, 25%, 30%, 25%, and 32% respectively in exchange for their testimony against Dr. Klaassen.

83.      After the hearing, the *ad hoc* committee recommended that KUMC publically censure Dr. Klaassen and asked that Dr. Klaassen issue a general apology.  Stites adopted the recommendation of the *ad hoc* committee hearing and enforced its recommendation.

84.     Dr. Klaassen provided a written apology and Stites publically censured Dr. Klaassen describing Dr. Klaassen's conduct (*i.e.*, complaints of the administration's misappropriation of money, organization, and structure) as unprofessional and unacceptable.

85.      In August 2012, Dr. Klaassen continued to complain to KUMC's administration, including Terranova, Carlson, Stites, and Jaeschke, about his students' lack of access to necessary laboratory equipment. However, these members of KUMC's administration along with others denied pharmacological students and staff that studied under Dr. Klaassen access to laboratories, lab equipment, freezers, meeting rooms, and even break rooms.

86.     In September 2012, a group of students and graduate assistants wrote to KUMC's administration including Stites, Terranova, and Rawitch complaining that their access to necessary shared laboratory equipment had been completely denied without any previous warning.  To date, Stites, Girod, Terranova, Rawitch, and Jaeschke have not granted those

students that study under Dr. Klaassen access to necessary equipment.  In fact, they fired most of the students and staff.

87.     In December 2012, Dr. Klaassen sent an e-mail correspondence to Interim Dean Stites and Buddhadeb Dawn, Professor of Medicine and Director of Research for the Internal Medicine Department. In the e-mail, Dr. Klaassen contends that professors of Pharmacology Toxicology Department, including Carlson, Jaeschke, and Terranova, continued to misappropriate NIH grant monies by transferring grant money from accounts in which Dr. Klaassen served as a PI to other accounts not related to the grant's research.  Dr. Klaassen complained that KUMC was using grant money to fund work in other areas unrel.

88.     Around this time, the leaders of the Pharmacology and Toxicology department, including Jaeschke, Kopf, and Terranova, sent letters to people who had contributed money to the endowment earmarked for Dr. Klaassen's research and, without Dr. Klaassen's permission, had the money transferred to the Pharmacological/Toxicology Department. At this time, Dr. Klaassen was advised that he was no longer a member of the Pharmacological/Toxicology Department and was instead a member of the Internal Medicine Department.

89.     On May 1, 2013, Dr. Klaassen met with Stites, Buddhadeb Dawn, Amy O'Brien-Ladner, Professor of Medicine, and KUMC employees Christina Hopkins and Dustin Carrillo to discuss Dr. Klaassen's NIH grant accounting.  The meeting was set up at Stites request.

90.     Stites began the meeting by asking Dr. Klaassen "How are you, young man?" Stites then asked Dr. Klaassen, in front of the others, to come up with a plan to transition his remaining endowment funds and responsibilities to a younger faculty member "because you're not a spring chicken anymore."

91.     At the meeting, the parties discussed Dr. Klaassen's NIH grant funds on his 3 remaining NIH grants and a $250,000 deficit.  Dr. Klaassen informed Stites that he was writing two new grants.  Stites suggested using the monies from the new grants to cover the deficit.  Dr. Klaassen informed Stites that it would be unethical to use new grant money to pay for past expenses.  Dawn confirmed Dr. Klaassen's position, stating, "we can't go back . . . we have to go back and pay from the slush fund."

92.     Dr. Klaassen further explained to Stites that the administration had misappropriated approximately $200,000 worth of grant monies from grants in which Dr. Klaassen either presently or previously served as a PI.  Stites refused to discuss the topic and ordered Dr. Klaassen to "get out!" of the room.  The meeting abruptly ended.

93.     One week later, on May 8, 2013, Stites placed Dr. Klaassen on administrative leave again due to his objections about the administrations mishandling of grant monies.

94.     At the time of Dr. Klaassen's second administrative leave, Dr. Klaassen served as PI on two NIH grants:  the Hepatic Uptake and Drug Processing Gene.  The NRF2 Liver grant expired in the summer of 2013.

95.     In July 2013, with Dr. Klaassen away on administrative leave and unable to acquire grant funding for his department and students, Stites fired nearly all the students and staff that worked on research projects under the direction of Dr. Klaassen. In addition, Stites killed important laboratory animals used by students and staff to conduct their research.  As a direct result, Stites destroyed the careers of nearly all the graduate assistants, researchers, and students that worked with Dr. Klaassen.

96.     Stites alleged that the dire financial situation of Dr. Klaassen's laboratory was the reason given by the administration for the firings.  In contrast to Stites's excuse to the students,

however, the NIH awarded Dr. Klaassen a new $1.8 million grant while he was banned from campus. Stites obstructed the acceptance of this lucrative grant by banishing Dr. Klaassen from KUMC. This federal grant would have been more than sufficient to pay the salaries and research of all of Dr. Klaassen's students beginning in August, 2013.

97.    In September 2013, Stites and Terranova contacted NIH and requested that it remove Dr. Klaassen as the PI on this Drug Processing Gene and Heptic Uptake grants leaving Dr. Klaassen with no remaining NIH grants.   Sometime in January or February 2014, Stites and Terranova completed the transfer of Dr. Klaassen's Drug Processing Gene and Heptic Uptake NIH grants to other KUMC employees.

98.    On November 13, 2013, six months after he was banned from campus, KUMC held another hearing at which it charged Dr. Klaassen with professional misconduct and requested his termination.  The hearing was held before a committee of Dr. Klaassen's peers and a voice recording of the May 1, 2013 meeting was played.

99.    Dr. Klaassen again requested more than one day to present his defense at the November 13, 2013 hearing.  KUMC overruled Dr. Klaassen's request and limited him to four hours.

100.    The committee recommended that Dr. Klaassen be immediately reinstated and receive only a written warning.  However, despite the committee's recommendation, KUMC's new Executive Vice Chancellor, Douglas Girod, informed Dr. Klaassen on January 6, 2014 by email that he was fired after 45 years of outstanding service. Dr. Klaassen's date of termination was January 24, 2014.

101.    On that same day, January 24, 2014, Stites and O'Brien-Ladner received promotions and additional pay from KUMC in exchange for their testimony against Dr.

Klaassen.  Nearly every professor that has testified against Dr. Klaassen has been rewarded with additional pay and promotions. The KUMC students and staff who supported and worked with Dr. Klaassen have been unceremoniously fired.

102.    Pursuant to KUMC's Faculty Handbook, Dr. Klaassen appealed Dr. Girod's termination decision and exhausted his administrative remedies under the Kansas Judicial Review Act.

103.    On December 23, 2014, Dr. Girod upheld the prior decision to terminate Dr. Klaassen.  Dr. Girod's termination letter states that it is a "final agency action.

104.    On January 23, 2015, Dr. Klaassen appealed Girod's "final agency action" letter to the Wyandotte District Court for the State of Kansas Case No. 15-CV-78 pursuant to the Kansas Judicial Review Act.

105.    The Wyandotte District Court held on a hearing on Klaassen's Kansas Judicial Review Act appeal on September 21, 2015.

106.    At the September 21, 2015 hearing, Dr. Klaassen argued KUMC violated its own policies and procedures and terminated him in violation of his due process rights.

107.    On September 21, 2015, after full briefing, Judge Daniel Duncan of the Wyandotte District Court held that KUMC violated its own policies and Dr. Klaassen's due process rights and ordered KUMC to provide Dr. Klaassen with a new hearing.

108.    On October 20, 2015, Girod sent Dr. Klaassen a new termination letter. The new letter restated old reasons and provided new reasons for his termination.

109.    On December 4, 2015, Dr. Robert Klein, Vice-Chancellor for Academic Affairs, sent Dr. Klaassen a letter advising him that rather than a new hearing regarding his termination he could appeal his October 20, 2015 termination again. Klein's letter states, "As before, the

appeal will proceed in accordance with the provisions of KUMC's Handbook for Faculty and Other Unclassified Staff, Part 6.J."

110.    Klein also asked Dr. Klaassen to "supplement" his earlier internal administrative appeal. Dr. Klaassen objected to Klein's request as inconsistent with and in violation of the Wyandotte District Court's remand order.

111.    Dr. Klaassen objected to the remand hearing because the October 20, 2015 termination letter did not provide Dr. Klaassen with any notice of the charges of misconduct. In addition, the October 20, 2015 termination letter was based on the November 13, 2013 and the November 19, 2014 appeal hearings, which the Wyandotte District Court had previously ruled were unconstitutional.

112.    KUMC overruled Dr. Klaassen's objections and required Dr. Klaassen to argue his positions at a proceeding on March 29, 2016.  The March 29, 2016 proceeding was not *de novo*.

113.    At the March 29, 2016 proceeding, Dr. Klaassen was not allowed to call any of the following important witnesses: Steven Stites, Doug Girod, Hartmut Jaeschke, Cody Tully, Rosa Meagher, Gerald Carlson, and Paul Terranova. Pursuant to Rule 4.2 of the Kansas Rules of Professional Conduct Dr. Klaassen was not allowed to contact these witnesses directly because of ongoing litigation. Counsel for KUMC refused to make these witnesses available at the March 29, 2016 proceeding.

114.    On April 8, 2016, the March 29, 2016 appeal hearing committee sent Dr. Klaassen and KUMC's Executive Vice Chancellor Girod a letter recommending that Dr. Klaassen's termination be affirmed.

115.    On April 22, 2016, University of Kansas Chancellor Dr. Bernadette Gray-Little sent Dr. Klaassen a letter stating that she will provide "final agency action" notice.

116.    KUMC's Faculty Handbook states that Executive Vice-Chancellor Douglas Girod is responsible for providing final agency action notice. It states:

a.    "Within 14 working days from receipt of the *ad hoc* Hearing Committee's decision and recommendation, the Executive Vice Chancellor shall respond in writing to the recommendations of the committee documenting the reasons for agreeing or disagreeing. This response will be sent to the Vice Chancellor for Academic Affairs, the chairperson of the *ad hoc* Hearing Committee and the appellant. It is understood that the final administrative authority resides with the Executive Vice Chancellor, who is the appointed representative of the Board of Regents."

117.    On May 9, 2016, Dr. Gray-Little sent Dr. Klaassen "Final-Agency Action Notice" affirming his termination.  Gray-Little had never involved herself in a termination of a tenured faculty member from the University of Kansas' medical center campus before she intervened in Klaassen's termination.

## CAUSES OF ACTION
### Count 1:  First Amendment Retaliation

**Constitutional and Civil Rights Violation Pursuant to 42 U.S.C.
§§ 1983, 1988; Violation of First Amendment Speech Rights
Against Douglas Girod (official and individual capacity),
Barbara Atkinson (individual capacity), Paul Terranova
(individual capacity), Gerald Carlson (individual capacity), and
Steven Stites (individual capacity)**

118.    Dr. Klaassen realleges and incorporates by reference the foregoing allegations of the Complaint as if they were fully set forth herein.

119.   Dr. Klaassen's objections and complaints regarding KUMC's lack of shared governance, misappropriation of federal grant monies, lack of transparency, and overall mismanagement are speech protected by the First Amendment to the U.S. Constitution.

120.   Beginning in April 2011, Dr. Klaassen shared his objections and complaints regarding KUMC with The Lawrence-Journal World.  Beginning in April 2011, The Lawrence-Journal World ran a series of stories regarding Dr. Klaassen's criticism of the University and the Dean.

121.   KUMC had knowledge of Dr. Klaassen's comments to The Lawrence-Journal World after The Lawrence-Journal World contacted KUMC for comment regarding the stories. And days after Dr. Klaassen was terminated as Chair, an e-mail from "kumcalumni@yahoo.com" was circulated to (based on information and belief) all of KUMC's faculty regarding KUMC's mismanagement and included hyperlinks to the Lawrence-Journal World stories which included Dr. Klaassen's criticism.  Dr. Atkinson wrote a rebuttal to the e-mail from "kumcalumni@yahoo.com."

122.   Dr. Klaassen's objections and complaints never infringed upon or otherwise affected KUMC's ability to efficiently operate.

123.   Dr. Klaassen never engaged in speech inconsistent with the educational mission of KUMC.

124.   At all times, Dr. Klaassen's speech about misappropriation of federal grant monies, lack of transparency, lack of shared governance, and mismanagement of KUMC was speech of a private citizen on a matter of public concern.

125.    Dr. Klaassen's free speech right to expose socially important issues such misappropriation and conversion of federal monies outweighs any interest of the Defendants in suppressing that speech.

126.    Dr. Klaassen gave various PowerPoint presentations that, among other things, referenced the negative news articles and included statements about contacting the press regarding his grievances.  Dr. Klaassen was suspended on November 1, 2011, in part because of these PowerPoint presentations.  A copy of the PowerPoint presentations were used by KUMC as evidence against Dr. Klaassen at both the May 2012 and November 2013, *ad hoc* hearings.

127.    In one of Dr. Klaassen's PowerPoint presentations, Dr. Klaassen criticized KUMC's decisions to build or purchase a Cancer Center and obtain National Cancer Institute accreditation at any cost.  Dr. Klaassen felt that KUMC's direction was harming the Basic Science Departments at KUMC. Dr. Klaassen's presentation was widely circulated and published in the Kansas City area.

128.    KUMC had knowledge of the content and publication of Dr. Klaassen's PowerPoint presentations.

129.    Defendants retaliated against Dr. Klaassen because of his speech including the content of his PowerPoint presentations.

130.    Defendants' retaliatory actions including placing Dr. Klaassen on administrative suspension, transferring him to a different department, removing his status as a PI on several lucrative NIH grants, preventing him from conducting research and working with his graduate students, Dr. Klaassen's research through elimination of his access to necessary equipment and terminating his staff and students violated Dr. Klaassen's right to free speech. Defendants' combined activities culminated in the destruction of Dr. Klaassen's career.

a.      Among other actions, Terranova retaliated against Dr. Klaassen in violation of his right to free speech by bringing false allegations of personal misconduct resulting in the January 29, 2012 Inquiry Report and the May 29, 2012 *ad hoc* hearing, overseeing the removal of his NIH COBRE and T32 grants, testifying against Dr. Klaassen at his May 29, 2012 and November 13, 2013 *ad hoc* committee hearing, participating in Dr. Klaassen's transfer to the Internal Medicine Department, and participating in the coordinated effort to deny Dr. Klaassen and his students access to necessary laboratory equipment.

b.      Among other actions, Atkinson retaliated against Dr. Klaassen in violation of his right to free speech by participating in the creation of January 29, 2012 Inquiry Report, which contained false and trumped up charges of personal misconduct, removing Dr. Klaassen as chair of the Pharmacology and Toxicology Department, participating in Dr. Klaassen's transfer to the Internal Medicine Department, and participating in the coordinated effort to deny Dr. Klaassen and his students access to necessary laboratory equipment.

c.      Among other actions, Carlson retaliated against Dr. Klaassen in violation of his right to free speech by bringing false allegations of personal misconduct contained within the January 29, 2012 Inquiry Report, testifying at the May 29, 2012 *ad hoc* hearing, participating in Dr. Klaassen's transfer to the Internal Medicine Department, stripping Dr. Klaassen of administrative support staff, misappropriating NIH grant monies, and participating in the coordinated effort to deny Dr. Klaassen and his students access to necessary laboratory equipment.

d.      Among other actions, Jaeschke retaliated against Dr. Klaassen and violated Dr. Klaassen's right to free speech by bringing false allegations of personal misconduct contained within the January 29, 2012 Inquiry Report, testifying at the May 29, 2013 *ad hoc*

hearing, participating in Dr. Klaassen's transfer to the Internal Medicine Department, participating in the removal of his NIH COBRE and T32 grants, misappropriating NIH grant monies, and participating in the coordinated effort to deny Dr. Klaassen and his students access to necessary laboratory equipment.

e.     Among other actions, Stites retaliated against Dr. Klaassen and violated Dr. Klaassen's right to free speech by enforcing the recommendations of the *ad hoc* committee hearing, participating in Dr. Klaassen's transfer to the Internal Medicine Department, misappropriating NIH grant monies by directing that money be taken out of Dr. Klaassen's NIH grant accounts, participating in the coordinated effort to deny Dr. Klaassen and his students access to necessary laboratory equipment, preventing Dr. Klaassen from conducting research, suspending Dr. Klaassen on May 8, 2013, terminating Dr. Klaassen's staff and destroying important laboratory animals in the summer and fall of 2013, testifying against Dr. Klaassen on November 13, 2013, and facilitating Dr. Klaassen's termination.

f.     Among other actions, Girod retaliated against Dr. Klaassen by terminating him for continuing to be critical of KUMC's administration.

131.   Terranova, Stites, Jaeschke, Carlson, Atkinson, and Girod acted under color of state law intentionally and with callous disregard for Dr. Klaassen's clearly established constitutional rights.

132.   Defendants' actions are a direct and proximate cause of Dr. Klaassen's severe and substantial damages.  These damages include lost back pay, front pay, employee benefits, lost raises, lost salary, diminished earning capacity, lost career and business opportunities, litigation expenses, including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience,

mental and emotional anguish and distress and other compensatory damages in an amount to be determined by a jury and the Court.

133.    The ongoing actions of the defendants acting in their official capacity in adopting, endorsing, and carrying out a policy of retaliation for the exercise of free speech rights of Dr. Klaassen violate the First Amendment of the United States Constitution on its face and as applied.

134.    The defendants are liable in their personal capacities for their actions in adopting, endorsing, and carrying out a policy of retaliation for the exercise of the free speech rights of Dr. Klaassen, in violation of the First Amendment of the United States Constitution.

## Count 2:  Procedural Due Process Taking of NIH grants

**Constitutional and Civil Rights Violation Pursuant to 42 U.S.C.
§§ 1983, 1988; Violation of Procedural Due Process Rights
Against Defendants Paul Terranova (individual capacity),
Barbara Atkinson (individual capacity), Gerald Carlson
(individual capacity), Hartmut Jaeschke (individual capacity),
and Steven Stites (individual capacity).**

135.    Dr. Klaassen realleges and incorporates by reference the foregoing allegations of the Complaint as if fully set forth herein.

136.    Dr. Klaassen possessed a property interest in his tenure right to conduct unfettered and unimpeded research established by both KUMC's adoption of the American Association of University Professor's *1940 Statement of Academic Freedom and Tenure* and KUMC's custom and practice established over the course of Dr. Klaassen's forty-year career.  This included the right to seek, obtain, and maintain NIH grant funding to conduct the unfettered research.

137.    Over the course of Dr. Klaassen's forty-five-year career, not a single faculty member was stripped of status as principal investigator of an NIH grant.

138.    During Klaassen's tenure as a KUMC faculty member, Girod and Atkinson occasionally removed tenured faculty members from their position as department chair or suspended them for allegedly committing personal misconduct. Faculty members that are removed as Chair or suspended for personal misconduct are allowed to retain their status as PI on NIH Grants.

139.    Girod removed P.T., a tenured faculty member as department chair for misconduct. After removing P.T. as chair, P.T. maintained her status as PI on her NIH grants.

140.    Girod removed P.K, a tenured faculty member as department chair for misconduct. After removing P.K as chair, P.K. maintained his status as PI on his NIH grants. P.K. later voluntarily resigned his status as PI on NIH grants as part of a severance package. KUMC paid P.K. to resign his status as PI.

141.    Tenured faculty that are suspected of committing personal misconduct are allowed to maintain their status as PI on NIH grants.

142.    After Atkinson removed Klaassen as Chair of Pharmacology, KUMC stripped Klaassen as PI on multiple NIH grants including the T32 and COBRE grants.

143.    After Stites placed Klaassen on suspension in May 2013 for allegedly committing personal misconduct, KUMC stripped Klaassen as PI on multiple NIH grants including the Drug Processing Gene and Hepatic Uptake grant.

144.    KUMC's policies and practice, established over the course of Dr. Klaassen's forty-give-year career, established a contract between KUMC and Dr. Klaassen that Dr. Klaassen would have to the right to conducted unfettered research, which includes the right to serve as a principal investigator on NIH grants, even if suspected of committing personal misconduct.

145.    KUMC's policies and practice established a contract that no faculty member would be removed as principal investigator of NIH grants unless the faculty member left the institution.

146.    Dr. Klaassen did not leave the institution and was stripped of his status as principal investigator of NIH in violations of KUMC's policies and course of conduct and violated Dr. Klaassen's property interest in the tenure right to conduct research.

147.    Because Dr. Klaassen served as a PI on multiple NIH grants, his total income as a tenured professor was increased.  Dr. Klaassen possessed a property interest in his remuneration because he is a tenured faculty member.

148.    Defendants, acting under color of state law, deprived and continue to deprive Dr. Klaassen of his property and liberty interests without notice or chance to be heard by stripping him of his status as PI on multiple NIH grants, including the T32, COBRE, Drug Processing Gene, and Heptic Uptake grants, spending money from Dr. Klaassen's NIH grant accounts without authorization, spending money from Dr. Klaassen's endowment account without authorization, transferring him to a different department, and denying him and his students access to necessary laboratory equipment.

a.    Among other actions, Terranova retaliated against Dr. Klaassen and violated Dr. Klaassen's due process rights by banning Dr. Klaassen from campus without notice or a hearing, participating in the transfer of Dr. Klaassen's T32, COBRE, Heptic Uptake, and Drug Processing Gene grants to other KUMC employees, spending money out of Dr. Klaassen's NIH research accounts without permission, transferring money out of Dr. Klaassen's endowment accounts without authorization, and transferring Dr. Klaassen to the Internal Medicine department.

b.      Among other actions, Atkinson retaliated against Dr. Klaassen and violated Dr. Klaassen's due process rights by participating in the banning of Dr. Klaassen from campus without notice or a hearing, participating in the transfer of Dr. Klaassen's T32 and COBRE grants to other KUMC employees, participating in the transfer of money out of Dr. Klaassen's endowment accounts without authorization, and participating in Dr. Klaassen's transfer to the Internal Medicine Department.

c.      Among other actions, Carlson retaliated against Dr. Klaassen and violated Dr. Klaassen's due process rights by participating in the transfer of Dr. Klaassen's T32 and COBRE grants to other KUMC employees, spending money out of Dr. Klaassen's NIH research accounts without permission, participating in the transfer of money out of Dr. Klaassen's endowment accounts without authorization, and by participating in the transfer of Dr. Klaassen to the Internal Medicine department.

d.      Among other actions, Jaeschke retaliated against Dr. Klaassen and violated Dr. Klaassen's due process rights by participating in the transfer of Dr. Klaassen's T32 and COBRE grants to other KUMC employees, spending money out of Dr. Klaassen's NIH research accounts without permission, participating in the transfer of money out of Dr. Klaassen's endowment accounts without authorization, and by participating in the transfer of Dr. Klaassen to the Internal Medicine department.

e.      Among other actions, Stites retaliated against Dr. Klaassen and violated Dr. Klaassen's due process by spending money out of Dr. Klaassen's NIH research accounts without permission, participating in the transfer of money out of Dr. Klaassen's endowment accounts without authorization, participating in the transfer of Dr. Klaassen's Heptic Uptake, and

Drug Processing Gene grants to other KUMC employees, and by participating in the transfer of Dr. Klaassen to the Internal Medicine department.

149.     As a result of the policy and practice of the Defendants, Dr. Klaassen was unable to conduct research.

150.     Defendants' decision to deprive Dr. Klaassen of his due process rights was arbitrary, capricious, and without a rational basis.

151.     Defendants' hearing on May 29, 2012 failed to provide Dr. Klaassen with a meaningful opportunity to be heard in a meaningful manner.

152.     Defendants' ongoing actions constitute a continuing unlawful deprivation of Dr. Klaassen's property and liberty rights without procedural due process of law in violation of the Fourteenth Amendment to the United States Constitution.

153.     Defendants' actions are a direct and proximate cause of Dr. Klaassen's severe and substantial damages.  These damages include lost front pay, back pay, employee benefits, lost raises, lost salary, diminished earning capacity, lost career and business opportunities, litigation expenses, including attorney's fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages in an amount to be determined by a jury and the Court.

154.     Defendants, acting in their official capacity, adopted, endorsed, and carried out a policy in order to deprive Dr. Klaassen of his constitutionally protected due process rights.  Dr. Klaassen is entitled to prospective relief as a result of Defendants conduct including reinstatement as PI on the COBRE, T32, Heptic Uptake, and Drug Processing Gene grants.

155.    Defendants are liable in their personal capacities for their actions in adopting, endorsing, and carrying out policies that violate Dr. Klaassen's constitutionally protected due process rights.

### Count 3:  Procedural Due Process:  January 2014 Termination
**Constitutional and Civil Rights Violation Pursuant to 42 U.S.C.
§§ 1983, 1988; Violation of Procedural Due Process Rights
Against Defendants Douglas Girod (official and individual
capacity) and Steven Stites (individual capacity)**

156.    Dr. Klaassen realleges and incorporates by reference the foregoing allegations of the Complaint as if they were fully set forth herein.

157.    On May 1, 2013, Dr. Klaassen was banned from KUMC's campus and not allowed to contact any existing KUMC employee.  On November 13, 2013, six months after his banishment, KUMC held another hearing at which it charged Dr. Klaassen with professional misconduct and requested his termination.  The hearing was held before a committee of Dr. Klaassen's peers and a voice recording of the May 1, 2013 meeting was played.

158.    The committee recommended that Dr. Klaassen be immediately reinstated and receive only a written warning.

159.    Despite the committee's recommendation, KUMC's Executive Vice Chancellor, Douglas Girod, fired Dr. Klaassen.

160.    False testimony was offered during the administrative November 13, 2013, *ad hoc* hearing that damaged Dr. Klaassen's reputation.  Dr. Stites testified that Dr. Klaassen lost control and was "screaming" at him for somewhere between 5 and 10 minutes during the May 1, 2013, meeting.  Dr. Dawn testified that Dr. Klaassen was "clearly belligerent" during the meeting. These statements were false and were made to damage Dr. Klaassen's career and reputation.

161.    Based on information and belief, KUMC publicized the false comments and testimony to the greater academic community.   Consequently, false accusations against Dr. Klaassen were made during a termination hearing and damaged Dr. Klaassen's liberty interest in his reputation.   As a result of the false comments, citations to Dr. Klaassen's publications decreased from nearly 1,400 citations a year in 2013 to less than 200 in 2014.

162.    In addition, as a result of the false accusations against Dr. Klaassen, Dr. Klaassen has been unable to find salaried employment.   In addition, he is no longer retained to serve as an expert witness or to work as a pharmacology consultant because of the false testimony presented at the November 13, 2013, *ad hoc* hearing.

163.    KUMC has not provided Dr. Klaassen with an opportunity to clear his name.

164.    Dr. Klaassen served as a tenured professor for KUMC for over 40 years.   Dr. Klaassen possessed a property interest in his continued employment with KUMC and a liberty interest in his reputation.

165.    Defendants, acting under color of state law, deprived and continue to deprive Klaassen of his property interest.

a.    Among other actions, Stites violated Dr. Klaassen's right to procedural due process by testifying falsely against Dr. Klaassen at the November 13, 2013 hearing and destroyed Dr. Klaassen' ability to present a defense by banning him from campus and forbidding him from contacting or speaking with potential witnesses.

b.    Among other actions, Girod violated Dr. Klaassen's right to procedural due process at the November 13, 2013 hearing by terminating Dr. Klaassen based on evidence that was not presented at the *ad hoc* committee hearing.   Girod also violated Klaassen's right to due process when he relied on the unconstitutional hearings of May 29, 2012, and November 13,

2013, to justify Klaassen's termination. Girod further violated Klaassen's due process rights when he refused to comply with the Wyandotte District Court's order and denied Klaassen the right to an evidentiary "rehearing" regarding his termination.

166.   Defendants deprived Dr. Klaassen of his property rights by failing to provide him with a meaningful opportunity to be heard and by depriving Dr. Klaassen of his right to appeal the Defendants' decision to terminate him.

167.   Dr. Klaassen's hearing on November 13, 2013 was a sham hearing.  Despite the Committee's recommendation, Girod terminated Dr. Klaassen based on unknown evidence and allegations of misconduct that Dr. Klaassen had no opportunity to respond at the November 13, 2013 hearing.

168.   Defendants Stites and Girod  actions include testifying falsely at the November 13, 2013, hearing, terminating Dr. Klaassen based on information and evidence not presented at the November 13, 2013, hearing, failing to provide Dr. Klaassen with notice of the charges of misconduct at the November 13, 2013, hearing, failing to comply with Wyandotte District Court's remand order, basing Klaassen's termination on the unconstitutional hearings of May 29, 2012 and November 13, 2013, and terminating Dr. Klaassen based on the "totality of the circumstances," along with other reasons unknown to Dr. Klaassen to which he had no opportunity to respond.

169.   Girod notified Dr. Klaassen on January 6, 2014 that he was terminated effective January 24, 2014.   Defendants' ongoing actions, including refusing to comply with the Wyandotte District Court order, constitute a continuing unlawful denial of Dr. Klaassen's procedural due process rights in violation of the Fourteenth Amendment to the United States Constitution.

170.    Defendants acted with a callous and reckless indifference to Dr. Klaassen's constitutional rights.

171.    Defendants, acting in their official capacity, adopted, endorsed, and carried out a policy in order to deprive Dr. Klaassen of his constitutionally protected due process rights.  Dr. Klaassen is entitled to prospective relief as a result of Defendants' conduct.

172.    Defendants are liable in their personal capacities for their actions in adopting, endorsing, and carrying out policies that violate Dr. Klaassen's constitutionally protected due process rights.

### Count 4:  Substantive Due Process:  January 2014 Termination
### Constitutional and Civil Rights Violation Pursuant to 42 U.S.C. §§ 1983, 1988; Violation of Substantive Due Process Rights Against Defendant Douglas Girod (official capacity)

173.    Dr. Klaassen realleges and incorporates by reference the foregoing allegations of the Complaint as if they were fully set forth herein.

174.    Dr. Klaassen served as a tenured professor for KUMC for approximately 40 years. Dr. Klaassen possessed a substantive property interest in his continued employment with KUMC.

175.    Girod, acting under color of state law, deprived and continue to deprive Klaassen of his property interest.

176.    Girod deprived Dr. Klaassen of his property rights by terminating him based on unknown and improper evidence.

177.    Girod violated Klaassen's substantive due process rights by refusing to comply with Wyandotte District Court's order and refusing to allow Klaassen a termination "rehearing."

178.    Girod's decision to deprive Dr. Klaassen of his property interest was arbitrary, capricious, and without a rational basis.

179.    Girod's ongoing actions constitute a continuing unlawful denial of Dr. Klaassen's substantive due process rights in violation of the Fourteenth Amendment to the United States Constitution.

180.    Among other actions, Girod's actions include terminating Dr. Klaassen based on information and evidence not presented at the November 13, 2013 hearing, failing to provide Dr. Klaassen with notice of the charges of misconduct at the November 13, 2013 hearing, failing to comply with Wyandotte District Court's remand order, basing Klaassen's termination on the unconstitutional hearings of May 29, 2012 and November 13, 2013, and terminating Dr. Klaassen based on the "totality of the circumstances," along with other reasons unknown to Dr. Klaassen to which he had no opportunity to respond.

181.    Girod acted with a callous and reckless indifference to Dr. Klaassen's constitutional rights.

182.    Girod, acting in his official capacity, adopted, endorsed, and carried out a policy in order to deprive Dr. Klaassen of his constitutionally protected due process rights.   Dr. Klaassen is entitled to prospective relief as a result of Girod's conduct.

183.    Defendants are liable in their personal capacities for their actions in adopting, endorsing, and carrying out policies that violate Dr. Klaassen's constitutionally protected due process rights.

## Count 5:  Tortious Interference

### Kansas Common Law Cause of Interference with a Prospective Business Relationship against Terranova, Jaeschke, Carlson, and Hagenbuch in their Individual Capacity

184.    Dr. Klaassen realleges and incorporates by reference the foregoing allegations of the Complaint as if they were fully set forth herein.

185.    Over the course of Dr. Klaassen's 40-year career, he averaged 3 NIH grants per year.

186.    Dr. Klaassen had an established business relationship with the NIH.  As a result of his relationship with the NIH, Dr. Klaassen received grant funding from NIH on more than 100 grants.

187.    As a result of obtaining NIH grant funding, Dr. Klaassen's salary and remuneration was increased.  In addition, obtaining the NIH grant funding allowed Dr. Klaassen to perform his job, *i.e.*, conduct valuable research and work with graduate students.

188.    Dr. Klaassen reasonably expected his good working relationship with the NIH to continue and to provide him future economic benefit.

189.    Defendants, as colleagues of Dr. Klaassen, were aware of Dr. Klaassen's relationship with the NIH.

190.    The defendants interfered with Dr. Klaassen's relationship with the NIH by requesting Dr. Klaassen be removed from the PI position on NIH grants, including the COBRE and T32 grants.

       a.    Among other actions, Terranova tortiously interfered with Dr. Klaassen's relationship with the NIH by banning him from campus without notice or a hearing, participating in the transfer of Dr. Klaassen's T32 and COBRE grants to other KUMC employees, and spending money out of Dr. Klaassen's NIH research accounts without permission.

       b.    Among other actions, Carlson tortiously interfered with Dr. Klaassen's relationship with the NIH by banning him from campus without notice or a hearing, participating in the transfer of Dr. Klaassen's T32 and COBRE grants to other KUMC employees, and spending money out of Dr. Klaassen's NIH research accounts without permission.

c.      Among other actions, Hagenbuch tortiously interfered with Dr. Klaassen's relationship with the NIH by banning him from campus without notice or a hearing, participating in the transfer of Dr. Klaassen's T32 and COBRE grants to other KUMC employees, and spending money out of Dr. Klaassen's NIH research accounts without permission.

d.      Among other actions, Jaeschke tortiously interfered with Dr. Klaassen's relationship with the NIH by banning him from campus without notice or a hearing, participating in the transfer of Dr. Klaassen's T32 and COBRE grants to other KUMC employees, and spending money out of Dr. Klaassen's NIH research accounts without permission.

e.      Among other actions, Stites tortiously interfered with Dr. Klaassen's relationship with the NIH by banning him from campus without notice or a hearing, and participating in the transfer of Dr. Klaassen's Drug Processing Gene and Heptic Uptake grants to other KUMC employees.

191.    But for the Defendants' actions, Dr. Klaassen's business relationship with the NIH would have continued fostering consulting opportunities with pharmaceutical and chemical companies or potential employment with other universities.  Dr. Klaassen lost a job opportunity with a west coast university because of Defendants' tortious interference.

192.    Defendants' ongoing actions were a direct and proximate cause of Dr. Klaassen's severe and substantial damages.  These damages include lost employee benefits, back pay, front pay, lost raises, lost salary, diminished earning capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages in an amount to be determined by a jury and the Court.

**Count 6:  Conversion[2]**

**Kansas Common Law Cause of Conversion asserted against**

**Steven Stites in his Individual Capacity**

193.    Dr. Klaassen realleges and incorporates by reference the foregoing allegations of the Complaint as if fully set forth herein.

194.    Dr. Klaassen's computer located at KUMC contained Dr. Klaassen's personal manuscripts, notes, correspondences with colleagues, family pictures, and other documents. Based on information and belief, Dr. Klaassen's computer contains personal information that is Dr. Klaassen's exclusive property pursuant to KUMC's informational systems policies, the Board of Regents policy, and the Kansas common law.

195.    Dr. Klaassen's office located at KUMC contains his personal property, including office equipment, pictures, plaques, awards, and furniture.

196.     Stites refused to provide Dr. Klaassen with access to some of his personal property.

197.    Without Dr. Klaassen's authorization, Defendant Stites assumed exercise, control, and ownership of the personal property of Dr. Klaassen.  Defendant Stites intends to dispose of or use the property despite actual knowledge that property belongs to Dr. Klaassen.

198.    Stites, as Chair of the Internal Medicine Department, directs and oversees the department's use of property and its inventory.  Upon information and belief, Stites is directing KUMC to continue to withhold Dr. Klaassen's property.

---

[2] After seeking leave to file this Third Amended and Supplemental Complaint, Plaintiff filed a stipulation of dismissal dismissing Count 6 against Steven Stites.  [ECF 289.] Plaintiff files this Complaint pursuant to the Court's order of December 7, 2016 directing Plaintiff to file the Third Amended and Supplemental Complaint that Plaintiff submitted to the Court on August 24, 2016 pursuant to Local Rule 15.1. [ECF 290.] Plaintiff does not seek to revive Count 6 by filing this Complaint but includes it to ensure compliance with this Court's order.

199.    Defendant Stites's actions are a direct and proximate cause of Dr. Klaassen's severe and substantial damages, including the lost value and use of the property and other compensatory damages in an amount to be determined at trial.

## Count 7:  Tortious Interference with Contract
### Kansas Common Law Cause of Action for Tortious Interference asserted against Steven Stites in his Individual Capacity.

200.    Dr. Klaassen realleges and incorporates by reference the foregoing allegations of the Complaint as if fully set forth herein.

201.    KUMC disciplinary proceedings instituted against Dr. Klaassen were brought pursuant to the KUMC's Handbook for Faculty and Unclassified Staff.

202.    Pursuant to KUMC's Handbook for Faculty and Unclassified Staff, Dr. Klaassen had the right to be heard at a one-day administrative hearing.   The Handbook was a contract between Dr. Klaassen and KUMC.

203.    Pursuant to KUMC's Handbook for Faculty and Unclassified Staff, KUMC would present its evidence in support of its charges against Dr. Klaassen.

204.    Dr. Klaassen spent great time and energy preparing for the administrative hearing and incurred substantial attorneys' fees in preparation for the hearing.

205.    Dr. Klaassen acted in reasonable reliance on the terms of the KUMC's Handbook for Faculty and Unclassified Staff, which state that any recommendation for discipline would be based solely on the evidence received during the administrative hearing.

206.    Defendant Stites further tortuously interfered with Klaassen's contract with KUMC by denying  Dr. Klaassen a chance to present evidence at the hearing by suspending Dr. Klaassen from KUMC's campus and by preventing him from speaking with witnesses at the hearing.  Stites prevented Dr. Klaassen from executing his Handbook right to present a defense.

207.   The November 13, 2013 administrative hearing was an irrelevant sham. Girod wholly ignored its results in violation of the Handbook.

208.   Defendant Stites ongoing actions were a direct and proximate cause of Dr. Klaassen's severe and substantial damages.   These damages include administrative hearing preparation expenses including attorney's fees and expenses, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages in an amount to be determined by a jury and the Court.

## PRAYER FOR RELIEF

Plaintiff Dr. Curtis Klaassen requests judgment against Defendants as follows:

a.   For appropriate declaratory, injunctive, and prospective relief including front pay regarding the unlawful and unconstitutional acts and practices of Defendants;

b.   For appropriate prospective and injunctive relief including reinstatement of Dr. Klaassen as a full-time University Distinguished Professor at KUMC and to retain or regain his status as PI on the COBRE, T32, Hepatic Uptake, and Drug-Processing Gene NIH grants.

c.   For appropriate prospective relief, including prospective compensation from the date of judgment for salary he would have received had he not been terminated, demoted, and otherwise retaliated against unlawfully;

d.   For appropriate compensatory damages including back pay in an amount to be determined at trial;

e.   For appropriate punitive damages in an amount to be determined at trial;

f.   For appropriate equitable relief against all Defendants as allowed by 42 U.S.C. § 1983, including the enjoining and permanent restraining of these violations, and direction to Defendants to take such affirmative action as necessary to ensure that the effects of

the unconstitutional and unlawful employment practices are eliminated and do not continue to affect Plaintiff's or others' employment opportunities;

g.     For an award of reasonable attorney's fees and costs to the maximum extent allowed by law, including available attorney's fees and costs  pursuant to 42 U.S.C. § 1988;

h.     For a final judgment which grants Dr. Klaassen such other and further legal and equitable relief as may be just and proper under the circumstances.

Respectfully Submitted,

**s/ Alan L. Rupe**
Alan L. Rupe #08914
Jeremy K. Schrag #24164
LEWIS BRISBOIS BISGAARD &
SMITH LLP
1605 N. Waterfront Parkway, Suite 150
Wichita, Kansas 67206
Telephone: (316) 609-7900
Facsimile:  (316) 462-5746
alan.rupe@lewisbrisbois.com
jeremy.schrag@lewisbrisbois.com

*Attorneys for Plaintiff*

4811-7306-9623.1

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38 and D. Kan. Rule 40.2, Plaintiff respectfully requests a jury

trial on all matters so triable in Kansas City, Kansas.

<u>**s/ Alan L. Rupe**</u>_____
Alan L. Rupe #08914

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing **Third Amended and Supplemental Complaint** using the CM/ECF system, which will send electronic notices to the following counsel of record:

> Anthony F. Rupp, KS #11590
> Tara S. Eberline, KS #22576
> FOULSTON SIEFKIN LLP
> 32 Corporate Woods, Suite 600
> Overland Park, KS 66210
> (913) 498-2100
> (913) 498-2101 (fax)
> trupp@foulston.com
> teberline@foulston.com
>
> *Attorneys for Defendants*

this 5th  day of January, 2017.

**s/ Alan L. Rupe**
Alan L. Rupe   #08914
