**UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

**CURTIS KLAASSEN, Ph.D.,**

Plaintiff,

vs.                                                           **CASE NO. 13-2561-DDC**

**BARBARA ATKINSON,** *et. al.*

Defendants.

<u>**AMENDED PRETRIAL ORDER**</u>

A pretrial conference was conducted in this case on August 17, 2016, by U.S. Magistrate Judge K. Gary Sebelius.  The plaintiff, Curtis Klaassen, Ph.D., appeared through counsel, Alan L. Rupe and Jeremy K. Schrag of Lewis Brisbois Bisgaard & Smith, LLP.  The defendants, Barbara Atkinson, Gerald Carlson, Paul Terranova, Bruno Hagenbuch, Gregory Kopf, Steven Stites, Hartmut Jaeschke, Cody Tully, Robert Klein, Alan Rawitch, and Douglas Girod appeared through counsel, Anthony F. Rupp and Tara S. Eberline of Foulston Siefkin LLP.  All other prior Defendants have been dismissed.

On September 6, 2016, Plaintiff filed a Stipulation of Dismissal of Defendants Gregory Kopf, Cody Tully, Robert Klein, and Alan Rawitch. And on November 22, 2016, Plaintiff filed a Stipulation of Dismissal of Count 6, Conversion, against Defendant Steven Stites. On December 7, 2016, the Court ordered the parties to file this Amended Pretrial Order.

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice. Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(b).

## 1. PRELIMINARY MATTERS.

**a.** **Subject-Matter Jurisdiction.** Subject-matter jurisdiction is invoked under 28 U.S.C. §§ 1331 and 1343. Supplemental jurisdiction is invoked under 28 U.S.C. § 1367, and is disputed. Defendants assert Eleventh Amendment immunity to the claims against the individual defendants in their official capacities. Defendants assert qualified immunity to Plaintiff's claims under 42 U.S.C. § 1983. Defendants deny that any due process claim under 42 U.S.C. § 1983 may be asserted while the administrative process is in process. Defendants deny that supplemental jurisdiction is appropriate if the federal claims are denied.

**b.** **Personal Jurisdiction.** The court's personal jurisdiction over the parties is not disputed.

**c.** **Venue.** Venue in this court is not disputed.

**d.** **Governing Law.** Subject to the court's determination of the law that applies to the case, the parties believe and agree that the substantive issues in this case are governed by the following law:

Plaintiff's First Amendment Retaliation, Substantive Due Process, and Procedural Due Process claims are governed by 42 U.S.C. § 1983 and 1988, the First Amendment to

the United States Constitution, the Fourteenth Amendment to the United States Constitution, and the federal common law. Plaintiff's tortious interference with contract, and tortious interference with prospective business relationship, claims are governed by Kansas common law.

Defendants' KJRA exclusive-remedy affirmative defense is governed by the Kansas Judicial Review Act, K.S.A. 77-606, *et. seq.* and the doctrine of abstention.

Defendants' qualified immunity defenses are governed by 42 U.S.C. § 1983 and the common law as established by the United States Supreme Court and other binding precedent.

Defendants' Kansas Tort Claims Act immunity defense is governed by the Kansas Tort Claims Act, K.S.A. 75-6104, et. seq.

Defendants' other affirmative defenses are governed by Kansas common law.

## 2.    STIPULATIONS.

   **a.**    The following facts are stipulated for purposes of summary judgment:

     1.    Dr. Klaassen is an individual and resident of Kansas.

     2.    The University of Kansas is a state-supported public institution.

     3.    Dr. Barbara Atkinson is an individual and resident of Nevada.

     4.    Dr. Paul Terranova is an individual and resident of Kansas.

     5.    Dr. Douglas Girod is an individual and resident of Kansas.

     6.    Dr. Steven Stites is an individual and resident of Kansas.

     7.    Dr. Hartmut Jaeschke is an individual and resident of Kansas.

8. Dr. Bruno Hagenbuch is an individual and resident of Kansas.

9. The University of Kansas employed Curtis Klaassen as a professor from 1968 to 2014.

10. Dr. Klaassen became a tenured member of the University of Kansas faculty in 1974.

11. The University of Kansas bestowed upon Dr. Klaassen the title of Distinguished University Professor.

12. Barbara Atkinson promoted Dr. Klaassen to Chair of the University of Kansas's Department of Pharmacology, Toxicology, and Therapeutics in 2002.

13. Barbara Atkinson removed Dr. Klaassen as Chair of the University of Kansas's Department of Pharmacology, Toxicology, and Therapeutics in 2011.

14. In January 2014, Dr. Douglas Girod, Executive Vice-Chancellor for the University of Kansas, terminated Dr. Klaassen's employment.

**b.** The parties have stipulated to the authenticity only of the following documents:

1. Those documents marked as deposition exhibits;

2. Documents admitted into evidence at trial in the case in Wyandotte County District Court captioned *Klaassen v. University of Kansas*, Case No. 14-CV-603.

4

3.      The Agency Record in the case pending in Wyandotte County District Court, *Klaassen v University of Kansas*, No. 2015-CV-78.

## 3.      FACTUAL CONTENTIONS.

### a.      Contentions of Plaintiff.

University Distinguished Tenured Professor, Curtis Klaassen, Ph.D, the seventh most cited toxicologists in the world, was promoted to chair University of Kansas's Medical Center ("KUMC") Pharmacology Department in 2002. At that time, Defendant Barbara Atkinson, KUMC's former Executive Vice-Chancellor and the Chancellor in charge of KUMC, felt strongly that Klaassen was "the right person" to revitalize that department. Klaassen was lauded for his hard work, scientific prowess, and his numerous accomplishments.  At the same time, Defendants Atkinson and Paul Terranova recognized that he had a reputation for being passionate and occasionally having "outbursts"; Klaassen would use loud language, pound on tables in staff meetings, turn red in the face, and sometimes shake. He has always talked loudly, and he was perceived by his peers and administration as passionate and a little idiosyncratic and eccentric. Nonetheless, KUMC recognized him for what he was – a loud, boisterous, passionate professor, whose talents could launch their Pharmacology Department into the top half of programs in the country. His behavior did not change when Atkinson promoted him to Chair. His passionate behavior and intolerance for those that did not work as hard as he did continued. His often-peculiar behavior continued when he became chair.  No disciplinary action was ever taken against Klaassen when anyone complained about his behavior. He was never counseled, reprimanded, nor received any negative evaluation

based on his acting out or "outbursts." No one ever asked Dr. Klaassen to have a mental and physical examination to determine if he was fit-for-duty; KUMC never had him evaluated. And the Department of Pharmacology excelled.  Klaassen catapulted KUMC's department into one of the top Pharmacology research programs in the country.

Klaassen's eccentric behavior did not change after he became the Chair, but circumstances changed.  At Atkinson's direction, KUMC's driving focus turned to development of its newly developed Cancer Center in order to obtain National Cancer Institute ("NCI") designation.  KUMC's push to obtain NCI designation began with a very public active fundraising push in 2008 and 2009 highlighted by a $20 million donation from Annette Bloch and a combined $16.2 million from the Kauffman Foundation and University of Kansas Endowment.   In September 2011, KUMC submitted its NCI designation application and obtained the NCI designation later in 2012. Atkinson pushed KUMC to obtain NCI designation at any and all costs.

 Long-standing academic principles, including shared governance and freedom of speech including academic freedom, were set aside in pursuit of NCI designation. KUMC's pursuit came at great financial cost as the University spent millions of dollars to renovate buildings, hire new faculty, and obtain grants from well-known Kansas City philanthropic corporations, including the Kauffman Foundation.

In 2010, Klaassen, concerned about the Dean Atkinson's pursuit of the Cancer Center at all costs, formed the "Committee of Eight" – an unofficial group of KUMC faculty that voiced concern regarding KUMC's financial situation and lack of shared governance.

On March 31, 2011, Klaassen for the first time publicly accused Atkinson of financial mismanagement and voiced opposition to the KUMC's expensive Cancer Center.   One week later, on April 6, 2011, Atkinson fired Klaassen as Chair of Pharmacology.   She explained that she terminated him because of the "extremely inappropriate things he has said to his faculty, the administration (sic) and to the public." A few days later, on April 9, 2011, a PowerPoint prepared by Klaassen regarding the lack of shared governance and Atkinson's financial management was widely distributed across campus, the University of Kansas Endowment, and the Kauffman Foundation. Shortly thereafter, on April 29, 2011, - with Klaassen's help - the Lawrence–Journal World began a series of articles about Atkinson's lack of joint governance and poor financial mismanagement.

In July 2011, immediately after one of the Lawrence Journal-World articles regarding Atkinson's failed leadership, Defendants Terranova, Gerald Carlson, and Atkinson devised a "plan" to silence Dr. Klaassen and ruin his career. Throughout the summer and early fall of 2011, this group conspired to remove Dr. Klaassen from lucrative and prestigious National Institute of Health ("NIH") grants and demote him from the Department of Pharmacology to the Internal Medicine department to be placed under the direct supervision of Defendant Steven Stites.

Three days after the Lawrence Journal-World ran an article titled "Leadership Issues coming to light KU Medical Center," on November 1, 2011, Terranova, Carlson, and Atkinson executed their plan.   Armed police officers walked into his office and escorted Klaassen off campus.   Terranova banned Klaassen from campus for 45 days.

7

During that time, Terranova secretly wrote the NIH and transferred Klaassen's grants to other KUMC employees. When he returned to campus, Carlson locked Klaassen out of his office.  Terranova, Atkinson, and Carlson forced Dr. Klaassen to move offices yet again from the newest building on campus to the basement of the oldest building on campus.  Atkinson and Terranova charged Dr. Klaassen with personal misconduct at an administrative hearing in May 2012. Shortly before the hearing, after news of her "shockingly bad" evaluation leaked to media outlets, Atkinson resigned as Executive Vice-Chancellor.

Following the May 2012 hearing, KUMC hired Douglas Girod to replace Atkinson as Executive Vice-Chancellor. Meanwhile, Klaassen – forced to work out of a basement laboratory – continued his faithful service to KU and continued his ground-breaking and internationally well-respected research as best he could.  But he remained concerned about KUMC's practices.  He noticed that KUMC was spending money from one of his NIH grant accounts without his permission – a violation of federal regulations – and that his students were being denied access to necessary research equipment.  Throughout 2012, he wrote several e-mails asking for a face-to-face meeting at his home with his superiors to address his concerns. He never heard back until May 2013.

On May 1, 2013, the chair of internal medicine called Klaassen into a meeting at KUMC in a small conference room.  At the meeting, Klaassen stood up, advocated for his students and his research, accused KUMC of taking NIH grant monies without permission, and asked Stites to provide his students with access to necessary research equipment.  Stites abruptly ended the meeting and told Klaassen to leave.  Stites had

armed police officers (again) escort Klaassen out the building.  Stites banned Klaassen from campus forever.  Stites charged Klaassen with personal misconduct at a November 13, 2013 hearing.

While Klaassen waited on suspension at home for his November 2013 hearing, KUMC officials permanently transferred his remaining NIH grants to other KUMC faculty.  At the November 13, 2013 hearing, the University of Kansas' administration asked a jury of KUMC professors to terminate Dr. Klaassen.  Instead, the jury recommended that Dr. Klaassen be immediately reinstated and afforded all rights and privileges reserved for University Distinguished Tenured faculty members.  On January 6, 2014, Douglas Girod fired him anyway because of unexplained "totality of the circumstances."

After Girod fired Klaassen following the ad hoc committee hearing, Klaassen exhausted his internal administrative proceedings at KUMC when he appealed to an appellate hearing panel without the opportunity to present new evidence; the panel found for KUMC.  Girod sent Klaassen "Final Agency Action Notice" on December 23, 2014.  Klaassen appealed his termination pursuant to the Kansas Judicial Review Act to the Wyandotte District Court.  There, Judge Daniel Duncan held that Girod's termination violated Klaassen's right to due process and remanded the matter back to KUMC for a "rehearing."  After remand, on October 20, 2015, Girod sent Klaassen another final action termination letter.  Instead of a "rehearing," on March 29, 2016, KUMC allowed Klaassen six hours to present argument to the same group of faculty who heard no new evidence on appeal.  Klaassen tried to present new witnesses and KUMC denied Klaassen

the opportunity.  Without the ability to present new witnesses including Dr. Douglas Girod, the same group of faculty who heard the previous appeal hearing, decided the same way again.  In a surprise move for the first time in KU history, the Chancellor of the University of Kansas Dr. Bernadette Gray-Little sent Klaassen a third "final" agency action notice.

Defendants used Klaassen's long-standing, unusual, and idiosyncratic behavior as pretext to demote and fire him. The exact same conduct that he engaged in when he became chair of the Department and that was previously ignored (the use of loud language, matters of fact often insensitive, pounding on tables, turning red in the face, and shaking) now warranted suspension and, ultimately, termination. Defendants will claim they fired Klaassen because of his bad behavior, but Defendants had tolerated that behavior for years. Klaassen's behavior was the same when Atkinson promoted him to chair the Pharmacology Department and was the same when he received great reviews. Curt Klaassen has always been Curt Klaassen.  Klaassen's alleged bad behavior had nothing to do with why he was fired. Klaassen was fired unfairly because he exercised free speech and tried to make KUMC a better place for his students, faculty, and the public.

To assist the Court with this case's important events, Plaintiff provides the following timeline:

| Date | Event |
|---|---|
| 2010 | Klaassen forms the Committee of eight |
| March 31, 2011 | Klaassen criticizes Atkinson at a public vendor meeting |
| April 6, 2011 | Klaassen removed as Chair/Meeting notes circulate Kauffman |
| April 30, 2011 | Lawrence Journal-World article re: Atkinson |

| July 2011 | Lawrence Journal-World article re: Atkinson |
| August - October 2011 | Terranova/Atkinson/Carlson plot removal of COBRE |
| October 2011 | KUMC investigates Klaassen's grants |
| October 28, 2011 | Klaassen COBRE meeting – PowerPoint presentation |
| October 29, 2011 | Another Lawrence Journal-World article re: Atkinson |
| November 1, 2011 | Klaassen suspended by Terranova |
| December 15, 2011 | T-32 training grant transferred to Hagenbuch |
| December 16, 2011 | Klaassen returns – finds out NIH grants are transferred |
| January – February 2012 | Klaassen moved to IM (Internal Medicine) |
| January – February 2012 | Klaassen told he would have research access |
| February – September 2012 | Klaassen denied research access; charged for equipment |
| May 29, 2012 | Klaassen hearing # 1 |
| June 13, 2012 | Stites Censures Dr. Klaassen |
| December 2012 | Klaassen asks for meeting to discuss NIH budget concerns |
| February 2013 | Girod assumes role as Executive Vice Chancellor |
| May 1, 2013 | Budget meeting with Stites |
| May 8, 2013 | Stites bans Klaassen from campus indefinitely |
| September 2013 | KUMC contacts NIH about removing Klaassen from his remaining NIH grants |
| November 13, 2013 | Klaassen hearing # 2 |
| January 6, 2014 | Girod "Totality of Circumstances" Termination |
| November 2014 | Klaassen exhaust KUMC Administrative Remedies |
| December 23, 2014 | Girod sends Klaassen "Final Agency Action Notice" |
| September 21, 2015 | Wyandotte District Court remands the lawsuit back to KUMC for "rehearing" |
| October 20, 2015 | Girod sends Dr. Klaassen a second termination letter |
| March 29, 2016 | Klaassen presents argument regarding his termination |
| May 9, 2016 | Gray-Little sends Klaassen a "Final Agency Action Notice" |

In Wyandotte District Court Case No. 14-CV-603, Dr. Klaassen brought a lawsuit against State of Kansas entity University of Kansas for age discrimination, common-law whistleblower retaliation, Kansas False Claims Act retaliation, and conversion. Dr. Klaassen previously brought these same claims against the University of Kansas in this lawsuit. This Court dismissed those claims and the University of Kansas as a defendant for lack of subject-matter jurisdiction. [ECF No. 102.] This lawsuit now proceeds against only individual defendants who are not in privity with their current or former government employer.

During trial on December 12, 2016, after the Plaintiff's evidence concluded, the Wyandotte District Court granted the University of Kansas' K.S.A. 60-250(a) motion on Dr. Klaassen's whistleblower retaliation claim.  The Court had previously dismissed Dr. Klaassen's age and Kansas False Claims Act claim.  The parties settled the conversion claim during trial.  The Wyandotte District Court's erroneous ruling will be appealed.

In Wyandotte County District Court Case No. 15-CV-78, Dr. Klaassen argued, pursuant to the Kansas Judicial Review Act, that the University's final agency action in terminating his employment was unconstitutional, that the University engaged in an unlawful procedure or failed to follow prescribed procedure, that the University's action was based on a determination of fact that was not supported by the appropriate standard of proof, and that the University's action were otherwise unreasonable, arbitrary, or capricious. On November 28, 2016, the Wyandotte District Court denied Dr. Klaassen's Petition for Judicial Review.  The Wyandotte District Court's erroneous ruling is currently under appeal.

### b. Contentions of Defendant(s).

Curtis Klaassen, Ph.D., was a toxicologist, department chair, and distinguished professor at the University of Kansas Medical Center. Unfortunately, his behavior was such that he would bully faculty and staff and was unable to self-monitor his unprofessional, abusive conduct. After multiple opportunities for Klaassen to correct his behavior, Klaassen was terminated in January of 2014. Dr. Klaassen has had four

hearings before ad hoc hearing committees. He has filed four lawsuits. Three of those lawsuits have been resolved in the University's favor.

In Wyandotte County District Court Case No. 14CV602, the Plaintiff brought claims of age discrimination, retaliation under the Kansas False Claims Act, retaliatory discharge under Kansas common law, and conversion. The Plaintiff identified the same damages expert as has been identified in this case and sought the same relief and damages that he has requested here. The University of Kansas and the individually named defendants in this lawsuit are in privity with one another. On October 11, 2016, the Wyandotte County District Court granted summary judgment in favor of the University of Kansas and against the Plaintiff on Plaintiff's claims of age discrimination and retaliation under the Kansas False Claims Act. The claims for retaliatory discharge under Kansas common law and conversion went to trial. After 11 trial days, the Plaintiff rested. During trial, the parties reached a settlement of the conversion claim. The Court thereafter granted judgment in favor of the University and against Plaintiff on the retaliatory discharge claim. Every claim Plaintiff brought in this lawsuit could have been brought in the Wyandotte County District Court lawsuit.

In Wyandotte County District Court Case No. 15CV78, Dr. Klaassen argued, pursuant to the Kansas Judicial Review Act, that the University's final agency action in terminating his employment was unconstitutional, that the University engaged in an unlawful procedure or failed to follow prescribed procedure, that the University's action was based on a determination of fact that was not supported by the appropriate standard of proof, and that the University's action were otherwise unreasonable, arbitrary, or

capricious. On November 28, 2016, the Wyandotte County District Court denied Dr. Klaassen's Petition for Judicial Review and found that the University complied with the Court's remand order.

In April 2011, Dr. Barbara Atkinson, then the KUMC Executive Vice Chancellor and Dean of the School of Medicine, exercised her discretion to remove Klaassen from the position of Chair of the Department of Pharmacology, Toxicology and Therapeutics, a "serve at the pleasure of the Dean" position.  In response, Klaassen engaged in self-described "acting out." After an interim chair (Dr. Gerald Carlson) was appointed, Klaassen threatened and disparaged the interim chair. When Dr. Hartmut Jaeschke applied for the permanent chair position, Klaassen threatened Jaeschke.  When Jaeschke received the formal appointment as department chair, Klaassen threatened to ruin Jaeschke's career. Klaassen also disparaged his bosses. He was insubordinate at a May 1, 2013, departmental meeting and was abusive and threatening to a young employee of the University a few days later.

Four faculty committees found that Klaassen engaged in unprofessional behavior. Yet, Klaassen refuses to acknowledge that he has ever done anything wrong. He refers to those who are intimidated by him as "losers." He testifies that those involved as witnesses, decision-makers, fact-gatherers, or participants in the University's ad hoc hearing process are part of a "mob of bad guys." He has testified that he will not reform his behavior because he denies he has acted unprofessionally.

After months of abusing Dr. Carlson and the faculty within the department, Klaassen called a Pharm/Tox meeting on October 28, 2011, purportedly to discuss a

grant. Carlson was not invited. In a prepared presentation, Klaassen referred to Carlson as a "Ford chair trying to be a Mercedes chair," accused Carlson of "doing everything he can to destroy the department," and stated that Klaassen's future cooperation with the department "will largely be dependent on the new Chair's respect" of Klaassen.

On Monday, November 1, 2011, Defendant Terranova placed Klaassen on administrative leave with pay.   An investigation into accusations of personal and professional misconduct against Klaassen was conducted.   On November 21, 2011, KUMC submitted requests to NIH to change the principal investigator on the two institutional grants (the COBRE Grant and the T32 Training Grant) from Klaassen to KUMC faculty members Hagenbuch and Jaeschke.   On December 15, 2011, the NIH approved the changes in PI.

Klaassen returned from administrative leave on December 16, 2011, with the following certain expectations which Klaassen acknowledged in writing.   On December 16, 2011, Klaassen interrupted a meeting in Jaeschke's office, repeatedly pounded his fists on file cabinets, and yelled that the COBRE and Training Grants were Klaassen's grants and that he would only give them up when he was dead.

In May 2012, a faculty ad hoc hearing committee convened to hear the allegations described in the January 2012 Inquiry Report.   The faculty ad hoc hearing committee consisted of five of Klaassen's faculty peers, one of whom Klaassen selected.   Klaassen testified at the hearing and was represented by counsel.   On May 31, 2012, the faculty ad hoc hearing committee, after hearing evidence and the arguments of counsel, unanimously condemned Klaassen's behavior and concluded that Klaassen committed

misconduct by engaging in abusive and unprofessional treatment of faculty and staff and substantially disrupting the proper operations of the academic unit.

Interim Executive Vice Chancellor of KUMC Stites adopted the recommendation of the committee and publicly censured Klaassen on or around June 13, 2012.

On May 1, 2013, Stites convened a meeting in his conference room with Klaassen, Dr. O'Brien-Ladner, Dr. Dawn, Dustin Carillo, and Christina Hopkins to review Klaassen's laboratory budget numbers. Late in the meeting Dr. Klaassen began writing in an agitated and barely decipherable manner, all the while becoming increasingly visibly agitated, louder, and more shrill to the point where the others present became concerned he was unstable and a threat. He accused the department chair of being a liar. He called the department chair a "big shot." When the department chair adjourned the meeting, Klaassen stated that the department chair had no ethics. As a result of the threatening nature of the behavior, Stites had to ask Klaassen to "step back." In the course of the May 1, 2013, meeting, Klaassen was visibly angry and agitated, his face was red, his hands were shaking, and he came very close to Stites physically in a threatening and challenging manner, pointing his finger very close to Stites's face.

Less than one week later, Klaassen arrived in a staff person's small and confined office unannounced at around 11:00 a.m. on May 7, 2012. Klaassen complained to the staffer about what he described as her way of accounting. She told Klaassen that his complaints were out of her control. She described that Klaassen was waving his pen in his hand within an inch of her face and that his proximity and volume was clearly an

attempt to intimidate her.  Klaassen was loud and angry and shaking.  She felt scared and helpless.

In response to the staffer's statement that she felt intimidated, Klaassen testified: "Hey, most people when they're around me they feel intimidated, so, I don't doubt that she felt intimidated. I don't try to intimidate anybody, but when people know I'm so successful, they automatically are intimidated by me, just like a president would come into this room right now, we'd all be intimidated of the president of the United States." The following day, on May 8, 2013, Stites sent Klaassen a letter placing him on administrative leave with pay.  On May 13, 2013, Klaassen sent an email to O'Brien-Ladner, Stites, and Dawn, copying others and apologizing for his statements during the May 1, 2013, meeting.  Klaassen testified that his apology was insincere.  Klaassen never apologized to Hopkins.

On November 12, 2013, KU held a second ad hoc hearing based on a charge of professional misconduct.  The second ad hoc committee, again comprised of Klaassen's faculty peers, concluded that Klaassen was guilty of professional misconduct.

As the Executive Vice-Chancellor, Dr. Girod was authorized to accept, reject, or modify the recommendation of the Second Ad Hoc Hearing Committee.   Girod concluded that Klaassen's employment should be terminated.

Dr. Klaassen exercised his right to appeal the agency decision under the Kansas Judicial Review Act. In September of 2015, the District Court of Wyandotte County remanded the matter for further hearing with additional notice and opportunity to be heard. That hearing occurred in March, 2016. The hearing committee on remand found in

17

favor of the termination of Dr. Klaassen. The Chancellor of the University, in her role as the University's CEO, took final agency action and accepted the recommendation of the ad hoc hearing committee. Dr. Klaassen filed a Petition on Remand in the Wyandotte County District Court case, and on November 28, 2016, the Court found in favor of the University and against Dr. Klaassen, holding that the University had complied with the Court's order on remand.

Atkinson resigned as dean and EVC in April of 2012. She has not been associated with any decisions involving Dr. Klaassen since her resignation. On April 5, 2011, she asked Carlson to take over as the interim chair of the Pharm/Tox Department. She advised Klaassen of her decision the next day, offering Klaassen the opportunity to resign. The department chair position is a "serve at the pleasure of the dean" position.

Girod is the current EVC. He was not involved in any of the decisions at issue in this lawsuit until his decision to terminate Klaassen in January of 2014. The decision followed two unanimous decisions of faculty hearing decisions finding that Klaassen had engaged in unprofessional behavior. Girod's decision to terminate has been supported by two subsequent ad hoc hearing committees and the decision of the Chancellor, who took final agency action.

Carlson served as the interim chair of the Pharm/Tox Department for less than a year following Klaassen's removal as department chair. Klaassen threatened Carlson, was insubordinate to him, and continually engaged in abusive and unprofessional behavior within the department.

Terranova, now retired, placed Klaassen on administrative leave on November 1, 2011, following complaints of unprofessional behavior. This included the events of the previous Friday, October 28, 2011, when Klaassen had engaged in unprofessional behavior at a purported "COBRE" meeting. Terranova also worked with the NIH regarding the proper procedure to reassign the principal investigator on two grants issued by the NIH to the University of Kansas Medical Center Research Institute. Terranova asked for an investigation into Klaassen's behavior to determine whether there were reasonable grounds to convene a faculty ad hoc hearing committee.

Hagenbuch was a faculty member in the Pharm/Tox Department. At the request of the University, he was reassigned as the PI on the Training Grant when Klaassen was relieved of that position. Klaassen testified that he felt sorry for Hagenbuch but sued him because "that's the American way, and we have to teach the University of Kansas how not to do things and I have to get some money to pay these students whose lives have been ruined."

Stites was the acting EVC when the first ad hoc hearing committee condemned the behavior of Klaassen and recommended sanctions. Stites accepted the recommendation of the committee. Stites took steps to assist Klaassen, including accepting him into the department of which Stites was chair. Rather than accepting that assistance, Klaassen engaged in abusive and unprofessional behavior. Stites appropriately served as a complainant with regard to that behavior.

Jaeschke was a faculty member in the Pharm/Tox department. At the request of the University, Jaeschke was assigned to be the PI of the COBRE Grant when Klaassen

was removed from that position. Jaeschke was named chair of the Pharm/Tox department in 2012. Jaeschke was initially supportive of Klaassen when Klaassen was removed as chair. However, Jaeschke then observed the work environment created by Klaassen, including threats and abusive and unprofessional behavior aimed toward Jaeschke. Jaeschke did not make the decisions at issue in this lawsuit.

**4.     LEGAL CLAIMS AND DEFENSES.**

     **a.**  Legal Claims of Plaintiff.

Dr. Klaassen asserts that he is entitled to recover upon the following alternative theories:

    1.     **Count 1**: First Amendment Retaliation pursuant to 42 U.S.C. §§ 1983 and 1988.

       (a)     Individual Defendants, acting under color of state law, terminated Plaintiff's employment and retaliated against Plaintiff in violation of his rights under the First Amendment of the United States Constitution to speak out on a matter of public concern.

       (b)     Defendants' retaliatory actions include terminating Dr. Klaassen, placing Dr. Klaassen on suspension, terminating Dr. Klaassen as chair of Pharmacology, transferring Dr. Klaassen to a different department and basement offices and laboratory, removing Dr. Klaassen as principal investigator from NIH grants, preventing Dr. Klaassen from conducting

20

research and working with his research students, and denying Dr. Klaassen and his laboratory members access to necessary research equipment.  **[Defendants submit that the Court ruled by Memorandum and Order dated February 3, 2015 (ECF No. 102, p. 34) that Plaintiff's First Amendment Retaliation claim is limited to a claim that he was retaliated against for his statements to news outlets and in PowerPoint presentations. Defendants object to any broader version of this claim.]**

**[Plaintiff's Response to Defendants' Objections: Defendants misstate this Court's prior ruling.  This Court did not rule that Dr. Klaassen's First Amendment claims were limited to certain statements, but instead held that some of the individual defendants were entitled to qualified immunity because some of Dr. Klaassen's speech was not protected under *Garcetii*.  [ECF No. 102, pp. 32-34.] After entering its ruling, this Court granted Dr. Klaassen leave to file his Third Amended Complaint. [ECF No. 120.]  Dr. Klaassen is entitled to pursue his First Amendment claim as pled in his Third Amended Complaint.]**

(c)    Count 1 is asserted against Douglas Girod (individual and official capacity), Barbara Atkinson (individual capacity), Paul Terranova (individual capacity), Gerald Carlson (individual capacity), Hartmut Jaeschke (individual capacity), and Steven Stites (individual capacity).

2.    **Count 2**: Procedural Due Process Taking of NIH Grants pursuant to 42 U.S.C. §§ 1983 and 1988.

(a)    The Individual Defendants, acting under color of state law, removed Dr. Klaassen of his property interest in his tenure right to conduct research, which included the right to serve as a principal investigator on NIH grants, without notice and a chance to be heard.

(b)    Defendants actions include depriving Dr. Klaassen of his property interests by stripping him of his status as PI on multiple NIH grants without notice and opportunity to be heard, including the T32, COBRE, Drug Processing Gene, and Heptic Uptake grants, spending money from Dr. Klaassen's NIH grant accounts without authorization, spending money from Dr. Klaassen's endowment account without authorization, transferring him to a different department, and denying him access to necessary laboratory equipment.

22

(c)     Count 2 is asserted against Barbara Atkinson (individual capacity), Paul Terranova (individual capacity), Gerald Carlson (individual capacity), Hartmut Jaeschke (individual capacity), and Steven Stites (individual capacity).

3.      **Count 3**: Procedural Due Process:  Dr. Klaassen's Termination of January 2014 pursuant to 42 U.S.C. §§ 1983 and 1988.

(a)     The Individual Defendants, acting under color of state law, terminated Dr. Klaassen's employment with the University of Kansas in violation of his property interest, secured by his status as University Distinguished Tenured Professor, in continued employment.

(b)     Defendants actions include testifying falsely at the November 13, 2013, hearing, terminating Dr. Klaassen based on information and evidence not presented at the November 13, 2013, hearing, failing to provide Dr. Klaassen with notice of the charges of misconduct at the November 13, 2013, hearing, and terminated Dr. Klaassen based on the "totality of the circumstances," along with other reasons unknown to Dr. Klaassen to which he had no opportunity to respond.

(c)     Count 3 is asserted against Douglas Girod (official and individual capacity), and Steven Stites (individual capacity).

23

4.     **Count 4**: Substantive Due Process:  Dr. Klaassen's Termination of

January 2014 pursuant to 42 U.S.C. §§ 1983 and 1988.

(a)     The Individual Defendants, acting under color of state law,

terminated Dr. Klaassen's employment with the University of

Kansas with callous and reckless indifference to Dr.

Klaassen's Constitutional rights.  The Individual Defendants'

decision to deprive Dr. Klaassen of his property interest in

continued employment was arbitrary, capricious, and without

a rational basis and shocked the conscious of the community.

(b)     Girod's actions terminating Dr. Klaassen based on

information and evidence not presented at the November 13,

2013, hearing, failing to provide Dr. Klaassen with notice of

the charges of misconduct at the November 13, 2013, hearing,

and terminated Dr. Klaassen based on the "totality of the

circumstances," along with other reasons unknown to Dr.

Klaassen to which he had no opportunity to respond.

(c)     Count 4 is asserted against Douglas Girod (official capacity).

5.     **Count 5**: Kansas Common Law Cause of Interference with a

Prospective Business Relationship.

(a)     Defendants tortiously interfered with Klaassen's business

relationship with the National Institute of Health by removing

Dr. Klaassen as principal investigator from NIH grants,

24

transferring the NIH grants to other University faculty members, and by spending money of Dr. Klaassen's NIH grant accounts without Dr. Klaassen's permission.

(b)　Count 5 is asserted against Paul Terranova (individual capacity), Hartmut Jaeschke (individual capacity), Bruno Hagenbuch (individual capacity), and Gerald Carlson (individual capacity).

6.　**Count 7**: Kansas Common Law Cause of Tortious Interference with Contract.

(a)　Defendant acted in a reckless, willful, and wanton manner and tortiously interfered with Dr. Klaassen's contract of employment with the University of Kansas by participating in the decision to terminate Dr. Klaassen in violation of University of Kansas' policies and procedures including the University of Kansas's faculty handbook, and by testifying falsely at administrative hearings.

(b)　Count 7 is asserted against Steven Stites (individual capacity).

**[Defendants object to the inclusion of "testifying falsely at administrative hearings," as that allegation is not in the Third Amended Complaint, and the Court ordered that Plaintiff could not add allegations to his Amended and Supplemental Complaint that Defendant Stites "acted out of personal**

animosity," "acted out of a desire for personal gain," and "wanted to silence Klaassen's whistleblowing complaints regarding KUMC's misappropriation of NIH monies."]

[Plaintiff's Response to Defendants' Objection:  This Court has already rejected Defendants' argument.  *See Klaassen v. Univ. of Kan. Sch. of Med.*, 84 F. Supp. 3d 1228, 1265 (D. Kan. 2015) ("One can fairly read the Second Amended Complaint to assert that defendant Stites acted out of a desire for personal gain by testifying falsely against plaintiff in exchange for a promotion and higher salary.").]

b.    Defenses of Defendant(s).

Defendants deny the allegations asserted by the plaintiff and deny any damage to plaintiff and the nature and extent of damages claimed.  Defendants dispute the plaintiff's attempt to add claims in the Pretrial Order that were dismissed by Court Order (ECF No. 102).  Defendants dispute that plaintiff may add additional damages claims after the close of discovery.  Defendants assert the following defenses:

1.    Plaintiff's Third Amended & Supplemental Complaint and the plaintiff's claims in the Pretrial Order fail to state a claim upon which relief can be granted.

2.    The Third Amended & Supplemental Complaint and the Plaintiff's claims in the Pretrial Order do not and cannot provide a basis for liability against the Individual Defendants in their official capacities.

3.     Pursuant to K.S.A. 77-606, the Kansas Judicial Review Act establishes the exclusive means of judicial review of agency action.  Plaintiff has filed an action for judicial review in the District Court of Wyandotte County, Kansas, Case No. 2015-CV-78.  That action was decided in favor of the University of Kansas on November 28, 2016 at a hearing in which the Court found that the University did comply with the Wyandotte County District Court's remand order.  Any further challenge to whether the University complied would be a collateral attack on the Kansas process for judicial review, and should be dismissed.

4.     The federal court should abstain from any action involving the issues pending in the Kansas Judicial Review Act case brought by Plaintiff regarding these same issues.

5.     Liability on 42 U.S.C. § 1983 may not be based on *respondeat superior*.

6.     The Individual Defendants are entitled to qualified immunity because the Individual Defendants did not act in knowing violation of the law, and the Individual Defendants were not plainly incompetent.

7.     The Plaintiff does not state a "wrongful associational retaliation" claim.

8.     The Plaintiff does not set forth a basis for a claim for tortious interference.

9.     The Plaintiff's tortious interference claims fail because of the lack of actual malice.

10.    The Plaintiff's tortious interference claims fail because all actions taken by Defendants, or any of them, were justified.

11.     Defendants are immune from liability under the Kansas Tort Claims Act, K.S.A. 75-6104, *et. seq.*

12.     Plaintiff has failed to mitigate damages.

13.     The Individual Defendants are entitled to absolute immunity, including, but not limited, to their conduct of presiding over and/or testifying at any hearing.

14.     The two-year statute of limitations bars any claims arising before October 31, 2011.

15.     The Court should decline to exercise supplemental jurisdiction because Plaintiff's federal claims are all subject to dismissal.

16.     The Court lacks jurisdiction to hear Plaintiff's Complaint in whole or in part because the Kansas Judicial Review Act (KJRA), K.S.A. 77-606, *et. seq.* is the exclusive means of review of agency action.

17.     Plaintiff's Third Amended Complaint and the Pretrial Order assert claims that were dismissed by the Court's order of February 3, 2015, including:

   a.   In Count I, paragraph 114, Plaintiff asserts official capacity claims against all Defendants.  The Court dismissed such claims against all Defendants, other than Dr. Girod;

   b.   In Count III, the Court ordered all claims to be dismissed against all Defendants other than Dr. Stites in his individual capacity and Dr. Girod in official and individual capacities;

   c.   In Count IV, all claims were dismissed other than the claim against Dr. Girod in his official capacity; and

28

d.  Dr. Stites is not identified in Count V as a person against whom a claim is brought under this Court.

18.     Plaintiff's claims are or may become barred by claim preclusion, issue preclusion, or principles of res judicata. In particular, on November 28, 2016, the Wyandotte County District Court ruled in favor of the University of Kansas on Plaintiff's Kansas Judicial Review Act Petition for Review, and on December 12, 2016, the Wyandotte County District Court ruled in favor of the University of Kansas on Plaintiff's claim for retaliatory discharge under Kansas common law. The relief sought in Plaintiff's retaliatory discharge case was precisely the same relief sought in this lawsuit, and Plaintiff identified one damages expert, who provided a single damages report, for use in the retaliatory discharge case and this case. Plaintiff could have raised every claim in this case in that Wyandotte County lawsuit.

19.     Plaintiff has failed to exhaust administrative remedies.

## 5.    DAMAGES AND NON-MONETARY RELIEF REQUESTED.

### A.          Plaintiff Dr. Klaassen seeks the following relief:

1.    Plaintiff seeks  declaratory relief that Defendants violated his constitutional rights, tortiously interfered with his business expectancies, and converted his property;

2.    Plaintiff seeks prospective and injunctive relief including reinstatement as a University Distinguished Tenured Professor;

3.    Plaintiff seeks prospective and injunctive relief including reinstatement as principal investigator on National Institute of Health grants;

4.    Plaintiff seeks punitive damages in an amount to be determined at trial;

5.    Plaintiff seeks appropriate equitable relief against all Defendants as allowed by 42 U.S.C. § 1983, including the enjoining and permanent restraining of these violations, and direction to Defendants to take such affirmative action as necessary to ensure that the effects of the unconstitutional and unlawful employment practices are eliminated and do not continue to affect Plaintiff's or others' employment opportunities;

6.    Plaintiff seeks actual damages against the Individual Defendants in the following amounts:

(a)    For his lost wages, benefits, and retirement income, Plaintiff has sustained actual damages in an ongoing amount currently valued at approximately $2,454,622.

7.    Plaintiff seeks damages for garden variety emotional distress in the amount of $500,000;

8.    Plaintiff seeks compensation for loss reputation in the amount of $500,000; and,

9.      Plaintiff seeks to recover his reasonable attorneys' fees and expenses as provided by 42 U.S.C. § 1988, which are ongoing but currently in excess of $350,000.

**B.      Defendants seek the following damages:**

1.      Defendants seek to recover their reasonable attorneys' fees and expenses as provided by 42 U.S.C. § 1988. Those fees continue to accrue.

**6.      AMENDMENTS TO PLEADINGS.**

Plaintiff filed a Third Amended and Supplemental Complaint on January 5, 2017, pursuant to the Court's order. Defendants shall answer or otherwise respond to the Third Amended Supplemental Complaint by January 19, 2017.

**7.      DISCOVERY.**

Discovery is complete. The parties will continue to supplement their production pursuant to the Federal Rules of Civil Procedure.

Unopposed discovery may continue after the deadline for completion of discovery so long as it does not delay the briefing of or ruling on dispositive motions or other pretrial preparations.  Although discovery may be conducted beyond the deadline for completion of discovery <u>if</u> all parties are in agreement to do so, under these circumstances the court will <u>not</u> be available to resolve any disputes that arise during the course of such extended discovery.

**8.      MOTIONS.**

**a.      Pending Motions.**

31

None.

**b.      Additional Pretrial Motions.**

Plaintiff may file a motion for summary judgment and will file motions in limine.

Defendants will file a joint motion for summary judgment as to all Defendants and individual summary judgment motions on issues applicable to Individual Defendants based on their own situations.  Defendants will file a single statement of material facts, applicable to all summary judgment motions. The Court has granted Defendants' motion to exceed the page limits on their joint motion for summary judgment, granting Defendants permission to file an arguments and authorities section of up to 40 pages. The argument and authorities section of each of the separate individual motions may not exceed 15 pages, absent further order of the Court.

The dispositive-motion deadline, as established in the scheduling order and any amendments, is **February 21, 2017**.

The parties should follow the summary-judgment guidelines available on the court's website:

http://www.ksd.uscourts.gov/summary-judgment/

Defendants will also file motions in limine.

**c.      Motions Regarding Expert Testimony.**

All motions to exclude testimony of expert witnesses pursuant to Fed. R. Evid. 702-705, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), or similar case law, must be filed no later than 42 days before trial.

9.     **TRIAL.**

The trial docket setting, as established in the scheduling order and any amendments, is **November 28, 2017, at 9:00 a.m., in Kansas City, Kansas.**  This case will be tried by jury.  The parties estimate that trial will take approximately 20 days. **The court advises that it intends to schedule a conference with the parties after it decides the dispositive motions but before the trial date to determine the appropriate length of time to allot for the trial.** The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial.  If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge will convene another pretrial conference to discuss, among other things, the setting of deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

IT IS SO ORDERED.

Dated January 18, 2017, at Topeka, Kansas.


s/ K. Gary Sebelius
K. Gary Sebelius
U. S. Magistrate Judge

Respectfully submitted by:

FOULSTON SIEFKIN LLP

By: */s/ Anthony Rupp*
Anthony F. Rupp, KS #11590
Tara S. Eberline, KS #22576
32 Corporate Woods, Suite 600
9225 Indian Creek Parkway
Overland Park, KS 66210
Telephone:  (913) 498-2100
Facsimile:  (913) 498-2101
Email:  trupp@foulston.com
Email:  teberline@foulston.com

ATTORNEY FOR DEFENDANTS

And

LEWIS BRISBOIS BISGAARD & SMITH LLP

By:  **/s Alan L. Rupe**
Alan L. Rupe #08914
Jeremy K. Schrag #24164
LEWIS BRISBOIS BISGAARD & SMITH LLP
1605 N. Waterfront Parkway, Suite 150
Wichita, KS 67206
Telephone: (316) 609-7900
Facsimile: (316) 630-8021
Email:  alan.rupe@lewisbrisbois.com
Email: jeremy.schrag@lewisbrisbois.com

ATTORNEYS FOR PLAINTIFF