## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CURTIS KLAASSEN, Ph.D.                     )
                    Plaintiff,       )        Case No. 13-CV-2561
                                )
v.                                         )
                                )
BARBARA ATKINSON, et al.                   )
                  Defendants.      )

## DEFENDANTS' CONSOLIDATED MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

By: *Anthony F. Rupp*

ANTHONY F. RUPP, KS #11590
TARA S. EBERLINE, KS #22576
Foulston Siefkin LLP
32 Corporate Woods, Suite 600
Overland Park, KS 66210
(913) 498-2100
(913) 498-2101 (fax)
trupp@foulston.com
teberline@foulston.com

ATTORNEYS FOR DEFENDANTS

## TABLE OF CONTENTS

I.     STATEMENT OF MATERIAL FACTS.................................................................1

II.    ARGUMENTS AND AUTHORITIES......................................................................77

    A.    Introduction.................................................................................77

    B.    Summary Judgment Standard..................................................77

    C.    All of Dr. Klaassen's Claims Are Barred by Principles of Res Judicata..................................................................................78

        1.    Dr. Klaassen's official capacity claims are barred by claim preclusion.....................................................................80

        2.    Dr. Klaassen's individual capacity § 1983 and state law claims are barred. ................................................................80

            a.    Claim preclusion bars Dr. Klaassen's individual capacity § 1983 and state law claims.............................81

                (i)    District of Kansas decisions are split, but suggest privity exists......................................82

                (ii)    Kansas courts would find privity exists for individual capacity § 1983 and state law claims. ...........................................................82

                (iii)    Dr. Klaassen's individual capacity § 1983 and state law claims are barred by claim preclusion...........................................................84

            b.    The rule against claim splitting bars all of Dr. Klaassen's claims..................................................84

        3.    Issue preclusion bars Dr. Klaassen's due process claims. .........................86

    D.    Dr. Klaassen's First Amendment Retaliation Claim Fails..............................88

        1.    Dr. Klaassen's First Amendment retaliation claim, if any, is limited to his communications with the Lawrence Journal-World and in PowerPoint presentations....................................90

        2.    Dr. Klaassen's statements were made pursuant to his official duties. ...................................................................90

        3.    Dr. Klaassen's alleged speech was not on a matter of public concern.....................................................................94

4. The employer's interests outweigh any free speech interest of Dr. Klaassen...........................................................................97

5. Several of Dr. Klaassen's alleged acts of retaliation are not adverse employment actions..................................................100

6. The Individual Defendants are entitled to qualified immunity because they did not act in knowing violation of the law...............................................................................................102

  a. Governing standard....................................................102

  b. The Individual Defendants are entitled to qualified immunity on Dr. Klaassen's First Amendment retaliation claims...........................................................103

E. Dr. Klaassen's "Procedural Due Process Taking of NIH Grants" Claim Fails as a Matter of Law. ........................................106

1. Dr. Klaassen does not have a constitutionally protected property interest in a right to research or a right to serve as principal investigator on NIH grants......................................106

  a. Dr. Klaassen had no judicially recognized right to serve as a principal investigator..................................107

  b. Dr. Klaassen was not entitled to notice and a hearing before being removed as PI...............................112

  c. Dr. Klaassen had no judicially recognized right to money in University accounts......................................112

  d. Dr. Klaassen has no judicially recognized right to be employed in a particular department.......................113

  e. Dr. Klaassen has no judicially recognized right to particular laboratory equipment...................................113

2. The Individual Defendants are entitled to qualified immunity on this claim. ...........................................................114

F. Punitive Damages Are Not Appropriate on Any of Dr. Klaassen's Claims. ..............................................................................114

G. This Court Should Decline to Exercise Supplemental Jurisdiction over Dr. Klaassen's State Law Claims. .......................115

III. CONCLUSION .............................................................................................116

## GLOSSARY

Defendants offer the following glossary of terms used in this Memorandum in Support as well as the Memoranda in Support of each Individual Defendant's Motions for Summary Judgment. *Cf.* 10th Cir. R. 28.2(C)(6).

**Consolidated Brief**: This Memorandum in Support of Motion for Summary Judgment, filed on behalf of all Defendants.

**Dr. Klaassen**: Plaintiff Dr. Curtis Klaassen.

**Individual Defendants**: Collectively, all Defendants named in their individual capacities, including Drs. Barbara Atkinson, Douglas Girod, Gerald Carlson, Paul Terranova, Bruno Hagenbuch, Steven Stites, and Hartmut Jaeschke.

**KU, KUMC, or the University**: The University of Kansas, which includes its campus, the University of Kansas Medical Center.

**KUMCRI**: University of Kansas Medical Center Research Institute. KUMCRI is 501(c)(3) non-profit organization that was established to support research grant administration at the University of Kansas Medical Center.

**NIH**: The National Institutes of Health, which is the nation's medical research agency supporting scientific studies through grant funding awarded to academic institutions like KU.

**Principal Investigator ("PI")**: A Principal Investigator is an individual designated by the applicant organization (KU, in this case) to have the appropriate level of authority and responsibility to direct the project or program supported by a grant awarded to the applicant organization by the NIH.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**


CURTIS KLAASSEN, Ph.D.    )
       Plaintiff,  )  Case No.: 13-CV-2561
           )
v.          )
           )
BARBARA ATKINSON, et al.   )
       Defendants. )


**CONSOLIDATED MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I. STATEMENT OF MATERIAL FACTS[1]

### The University of Kansas

1. The University of Kansas is a state educational institution. K.S.A. 76-711(a). The Kansas University Medical Center ("KUMC") includes the University's School of Medicine, School of Nursing, and School of Health Professions. (Ex. 209, KUMC Handbook, 19.)

2. The University's chief executive officer is the Chancellor, who is named by and serves at the pleasure of the Kansas Board of Regents. (Ex. 700, Kansas Board of Regents Manual, 52; Ex. 209, KUMC Handbook, 19, 40.) The Chancellor is responsible for all operations of the University. (Ex. 209, KUMC Handbook, 19; Ex. 700, Kansas Board of Regents Manual, 52.)

---

[1] To maintain consistency and avoid confusion in the concurrent lawsuits involving Dr. Klaassen, the Defendants are identifying those exhibits that were originally deposition exhibits by their deposition exhibit numbers and those exhibits that were originally trial exhibits by their trial exhibit numbers. All other exhibits have been assigned a number beginning with Ex. 700. An index identifying all attached exhibits is attached. References to these facts throughout the Individual Defendants' memoranda in support of their motions for summary judgment are referenced as "SOF _." All references to prior pleadings in this case are cited as "Doc. _."

3. The primary administrative and academic officer for the KUMC campus is the Executive Vice Chancellor ("EVC"), who is appointed by and serves at the pleasure of the Chancellor. (Ex. 209, KUMC Handbook, 20, 40.)

4. The chief administrator of each school at KUMC is a dean, who is appointed by and serves at the pleasure of the EVC and the Chancellor. (Ex. 209, KUMC Handbook, 20.)

5. KUMC faculty adopted a Handbook for Faculty and Other Unclassified Staff ("KUMC Handbook") in 2005. (Ex. 209, KUMC Handbook, 1, 2.)

6. The KUMC Handbook states that the policies described therein "are not intended to create a contract between the University of Kansas and its employees." (Ex. 209, KUMC Handbook, 17.)

**Curtis Klaassen, Ph.D.**

7. Dr. Klaassen began his University employment in 1968. (Doc. 296, Third Amended and Supplemental Complaint, ¶ 21; Doc. 299, Answer to Third Amended and Supplemental Complaint, ¶ 21.)

8. Dr. Klaassen achieved tenure as an associate professor in 1974, and he was named a University Distinguished Professor in 2002. (Ex. 302, Klaassen Curriculum Vitae.)

9. In 2003, Dr. Atkinson, Executive Dean of the School of Medicine, named Dr. Klaassen to serve as Chair of the Department of Pharmacology and Toxicology ("Pharm/Tox"), which was an appointment that served at her pleasure. (Ex. 302, Klaassen Curriculum Vitae; Ex. 209, KUMC Handbook, 21.)

10. On April 6, 2011, Dr. Atkinson informed Dr. Klaassen that she was removing him from his appointment as Chair of Pharm/Tox, and instructed him that he was not "to direct or

lead the faculty and may no longer call department faculty meetings," and was "not to interfere with the financial management of the department in any way." (Ex. 108, Apr. 12, 2011 letter.)

11.     Dr. Atkinson stated she had lost confidence in his leadership, and it was clear to her that Dr. Klaassen was "reluctant or unwilling as chair to lead [the] department in a manner consistent with [Dr. Atkinson's] goals for the School of Medicine." (Ex. 701, Aug. 2, 2011 letter.)

12.     On January 6, 2014, the University of Kansas terminated Dr. Klaassen's employment. (Ex. 33, Jan. 6, 2014 letter from Girod to Klaassen.)

**Overview of Dr. Klaassen's Behavior**

13.     The KUMC Handbook defines "Personal and Professional Misconduct" to include an expectation that faculty "act professionally in their interactions with students, faculty and staff" and "conduct themselves in a manner that by normal standards would be considered as morally and professionally acceptable conduct." (Ex. 209, KUMC Handbook, 90.)

14.     Four faculty hearing committees found that Dr. Klaassen engaged in unprofessional conduct that disrupted the workplace. (Ex. 18, May 31, 2012 letter; Ex. 638, December 9, 2013 letter; Ex. 609, Dec. 5, 2014 letter; Ex. 748, April 18, 2016 letter.)

15.     Dr. Klaassen has acknowledged both his disruptive conduct in the workplace and his responsibility for it. (Ex. 773, Klaassen letter to Jaeschke.)

16.     In January 2012, Dr. Klaassen acknowledged in an email to Dr. Jaeschke, newly appointed Pharm/Tox Department Chair, "I think the [Pharm/Tox] Department has become de-unified the last few months, and I am probably the reason for most of that splintering, and I will take full responsibility for it." (Ex. 773, Klaassen letter to Jaeschke.)

17.     Dr. Klaassen's own counsel has acknowledged that "sometimes even a good lawyer through God or the devil can't change the way somebody is...[Dr. Klaassen] has been that way clear back to 2005 where he was using PowerPoints that showed guns to illustrate a point. He had a loud voice. He's always had a loud voice . . . And Curt is what he is. They know Curt becomes agitated, they know Curt raises his voice, they know Curt Klaassen." (Ex. 740, March 29, 2016 Transcript, 234:23-235:15.)

18.     Dr. Klaassen displayed images of guns, discussed before faculty whether he should commit suicide, and became uncontrollably angry. (Ex. 709, Klaassen Depo., 154:7-14.)

19.     Members of his own faculty and staff were afraid of and were intimidated by him. (Ex. 709, Klaassen Depo., 154:7-14.)

20.     Dr. Klaassen continues to deny any actions against him could be associated with his own behavior and has stated he would not change his behavior if he were to go to another university. (Ex. 709, Klaassen Depo., 353:12-15; 403:8-10.)

21.     As to the multiple findings that Dr. Klaassen has engaged in abusive and threatening behavior, Dr. Klaassen testified: "It's only abusive and threatening to the losers because they don't want to have passion and succeed and to make this a good university." (Ex. 709, Klaassen Depo., pg. 364:12-20.)

22.     Dr. Klaassen has referred to his colleagues and superiors as "losers," "perjurers," and a "mob of bad guys." (Ex. 709, Klaassen Depo., 291:18-292:10; 361; 364.)

23.     He called his boss, Dr. Atkinson, a "slumlord." (Ex. 709, Klaassen Depo., 138:2-5.)

24.     He angrily exclaimed at a faculty meeting, in reference to Dr. Atkinson, that "the bitch must go." (Ex. 712, Jaeschke Depo., 130:12-21.)

25.     There was testimony that Dr. Klaassen told Dr. Jaeschke, "If you fuck me over, I'm going to fuck you over." (Ex. 712, Jaeschke Depo., 138:2-5.)

26.     Dr. Klaassen has acknowledged intentionally "acting out" in order to try to get Dr. Atkinson's attention. (Ex. 709, Klaassen Depo., 458:7-20.)

27.     Dr. Klaassen has acknowledged that he engaged in professional misconduct. (Ex. 767, Dec. 12, 2016 Jury Trial Transcript, Vol. X, Klaassen testimony, 64:8-11.)

**Dr. Barbara Atkinson**

28.     Dr. Atkinson began serving as Executive Dean of the School of Medicine in 2002. (Ex. 702, Atkinson Depo. 38:12-25.)

29.     Dr. Atkinson began serving as EVC of KUMC in 2005. (Ex. 702, Atkinson Depo. 39:8-11.)

30.     On April 9, 2012, Dr. Atkinson resigned as EVC and Executive Dean of the School of Medicine. (Ex. 703, Apr. 9, 2012, University Broadcast regarding Dr. Atkinson Retirement.)

31.     Dr. Atkinson had no involvement with any of the ad hoc hearings, as she had resigned from the University in April 2012. (Ex. 702, Atkinson Depo., 40:21-41:4; 271:17-272:8; Ex. 714 May 2012 hearing transcript.)

32.     Dr. Atkinson had no personal involvement in placing Dr. Klaassen on administrative leave in May 2013. (Ex. 702, Atkinson Depo, 49:8-20.)

33.     Dr. Atkinson had no personal involvement in terminating Dr. Klaassen's employment in 2014. (Ex. 702, Atkinson Depo, 49:8-20.)

**Dr. Gerald Carlson**

34.     Dr. Carlson is, and at all relevant times was, the Chair of the Biochemistry Department. (Ex. 702, Atkinson Depo. 124:4-125:24; Ex. 704, Carlson Depo. 26:21-27:2.)

35.     Dr. Carlson served as Interim Chair of the Pharm/Tox Department following Dr. Klaassen's removal from that position from April 2011 until January 9, 2012, when Dr. Hartmut Jaeschke was named Chair of the Department. (Ex. 704, Carlson Depo. 34:9-15; 35:5-8.)

36.     Prior to becoming Interim Chair of the Pharm/Tox Department, Dr. Carlson did not supervise Dr. Klaassen. Rather, he and Dr. Klaassen were each a department chair in a basic science department. (Ex. 764, Dec. 1, 2016 Jury Trial, Volume III, Carlson testimony, 182:12-18.)

37.     After January 9, 2012, Dr. Klaassen did not report to Dr. Carlson, and since then, Dr. Carlson has not been in a decision-making role with regard to Dr. Klaassen. (Ex. 764, Dec. 1, 2016 Jury Trial, Volume III, Carlson testimony, 181:14-21; 182:12-18.)

38.     Dr. Carlson was not involved in the decision to remove Dr. Klaassen as Pharm/Tox Department Chair. (Ex. 764, Dec. 1, 2016 Jury Trial, Volume III, Carlson testimony, 182:16-18.)

39.     Dr. Carlson was not involved in the decision to terminate Dr. Klaassen's employment. (Ex. 764, Dec. 1, 2016 Jury Trial, Volume III, Carlson testimony, 181:14-21; 200:24-201:9; Ex. 713, Nov. 30, 2016 Jury Trial, Volume II, Terranova testimony, 50:6-7.)

**Dr. Douglas Girod**

40.     Dr. Girod was named Dean of the School of Medicine and EVC of KUMC on February 1, 2013. (Ex. 705, 2012-12-26 University Broadcast; Ex. 768, Dec. 6, 2016 Jury Trial, Volume VI, Girod testimony, 7:9-13.)

41.     Dr. Girod succeeded Dr. Steven Stites, who had served as Acting EVC. (Ex. 768, Dec. 6, 2016 Jury Trial, Volume VI, Girod testimony, 7:14-16.)

42.     Dr. Girod remained the EVC until he became Chancellor in July 2017. (Ex. 774, May 25, 2017 KU Broadcast.)

43.     The first decision of Dr. Girod that is challenged is Dr. Girod's decision to terminate Dr. Klaassen's employment. (Doc. 298, p. 9.)

**Dr. Paul Terranova**

44.     Dr. Terranova served as Vice Chancellor for Research beginning in 2007. (Ex. 707, Terranova Depo., 32:12-33:2.)

45.     Dr. Terranova retired January 2, 2015. (Ex. 708, Nov. 29, 2016 Jury Trial Transcript, Vol. I, Terranova testimony, 175:15.)

46.     Dr. Terranova placed Dr. Klaassen on administrative leave on November 1, 2011, following complaints of unprofessional behavior. This included the events of the previous Friday, October 28, 2011, when Dr. Klaassen had engaged in unprofessional behavior at a purported COBRE[2] meeting. (Ex. 84, Nov. 1, 2011 letter.)

47.     Dr. Terranova also worked with the NIH in 2011 regarding the proper procedure to reassign the PI on two grants issued by the NIH to the University of Kansas Medical Center Research Institute ("KUMCRI"). (Ex. 708, Nov. 29, 2016 Jury Trial, Vol. I, Terranova testimony, 148:2-19.)

48.     Dr. Terranova did not make the decision to terminate Dr. Klaassen's employment. (Ex. 713, Nov. 30, 2016 Jury Trial Transcript, Vol. II, Terranova testimony, 50:6-8.)

---

[2] See SOF 341-350 for an explanation of the COBRE Grant.

**Dr. Bruno Hagenbuch**

49.     Dr. Hagenbuch was and remains a faculty member in the Pharm/Tox Department. (Doc. 296, ¶ 12; Doc. 299, ¶ 12.)

50.     At the request of the University, Dr. Hagenbuch was reassigned as the PI on the Training Grant[3] when Dr. Klaassen was relieved of that position in 2011. (Ex. 89, Dec. 15, 2011 Letter.)

51.     Dr. Klaassen testified that he sued Dr. Hagenbuch because Dr. Hagenbuch signed a letter asking the NIH for Dr. Hagenbuch to be Dr. Klaassen's replacement as PI on the Training Grant:

> Q: The next person who is listed is Doctor Hagenbuch. Why did you sue Dr. Hagenbuch?

> A: Well, he wrote to the NIH and asked for my, my training grant.

> Q: And did the NIH agree and transfer your training grant?

> A: Yes.

> Q: That's within the – that's within the ultimate authority of the NIH to do so, is that correct?

> A: They can do that, but they don't do it except in this crazy case. This is a, kind of a first time.

> Q: Doctor Hagenbuch, is he a member of the mob?

> A: Well, in a way he was forced into it. He is from Switzerland, he's a very good scientist. He doesn't understand the American system and he probably didn't understand that he was becoming a part of the mob by doing what he did. I feel sorry for him.

> Q: Sorry enough to sue him, is that correct?

---

[3] See SOF 351-357 for an explanation of the Training Grant.

A: Well, that's the American way and, you know, some way we have to teach the University of Kansas how not to do things and I need to get some money to pay these students whose lives have been ruined.

(Ex. 709, Klaassen Depo. 259:4-260:5.)

**Dr. Steven Stites**

52.    From 2007 through 2014, Dr. Stites was Chair of the Department of Internal Medicine. (Ex. 367, Nov. 12, 2013 Hearing Transcript, Stites testimony, 148:13-15; Ex. 710, Dec. 5, 2016 Jury Trial Transcript, Vol. V, Stites testimony, 7:2-18.)

53.    Dr. Stites accepted Dr. Klaassen into the Internal Medicine Department in January 2012. (Ex. 367 Transcript of Nov. 12, 2013 Hearing Transcript, Stites testimony, 150:21-151:18.)

54.    Dr. Stites did not receive a raise by accepting Dr. Klaassen into the Internal Medicine Department. (Ex. 710, Dec. 5, 2016 Jury Trial, Stites testimony, 201:11-202:8.)

55.    In April 2012, Dr. Stites was named Acting EVC and Acting Executive Dean of the School of Medicine, and he served in those positions until Dr. Girod assumed those positions on February 1, 2013. (Ex. 367 Nov. 12, 2013 Hearing Transcript, Stites testimony, 148:13-21.)

56.    Dr. Stites had no personal involvement in Dr. Jaeschke's decision to begin charging for use of the mass spectrometer in 2012. (Ex. 720, Dec. 2, 2016 Jury Trial, Volume IV, Tully testimony, 120:11-19.)

57.    Dr. Stites placed Dr. Klaassen on paid administrative leave on May 8, 2013. (Ex. 7, May 8, 2013 letter.)

58.    Dr. Stites was named Vice Chancellor for Clinical Affairs in 2015. That position was not open at the time of Dr. Stites's testimony in November 2013. (Ex. 710, December 5, 2016 Jury Trial Transcript, Vol. V, Stites testimony, 174:19-175:3.)

**Dr. Hartmut Jaeschke**

59.     Dr. Jaeschke was a faculty member in the Pharm/Tox Department from 2006 until becoming Department Chair on January 9, 2012. He continues to serve as the Pharm/Tox Department Chair. (Ex. 121, Jan. 9, 2012 Announcement; Ex. 712, Jaeschke Depo. 69:14-18; Ex. 769, Dec. 7, 2016 Jury Trial Transcript, Vol. VII, Jaeschke testimony, 183:2-6.)

60.     Dr. Jaeschke was initially supportive of Dr. Klaassen when Dr. Klaassen was removed as Chair of Pharm/Tox. However, Dr. Jaeschke then observed the work environment created by Dr. Klaassen, including threats and abusive and unprofessional behavior aimed toward Dr. Jaeschke. (Ex. 712, Jaeschke Depo. 57:7-58:8.)

61.     At the request of the University, Dr. Jaeschke was assigned to be the PI of the COBRE Grant when Dr. Klaassen was removed as PI. (Ex. 88, Nov. 21, 2011 Letter.)

62.     Dr. Jaeschke did not place Dr. Klaassen on administrative leave. (Ex. 770, December 8, 2016 Jury Trial, Vol. VIII, Jaeschke testimony, 53:1-8.)

63.     Dr. Jaeschke did not make the decisions to remove Dr. Klaassen as Department Chair, to transfer Dr. Klaassen to the Internal Medicine Department, to place him on administrative leave, or to terminate Dr. Klaassen's employment. (Ex. 713, Nov. 30, 2016 Jury Trial, Vol. II, Terranova testimony, 50:6-7; Ex. 770, December 8, 2016 Jury Trial, Vol. VIII, Jaeschke testimony, 63:6-14; 64:8-11.)

**Position of Department Chair**

64.     The position of Department Chair serves at the pleasure of the Dean. (Ex. 209, KUMC Handbook, 41.)

65.     Dr. Klaassen understands that he served at the pleasure of the Dean in his role as Department Chair. (Ex. 709, Klaassen Depo., 174:6-9.)

66.     Dr. Klaassen acknowledges there are no due process requirements applicable to removals from a serve-at-the-pleasure position. (Ex. 709, Klaassen Depo., 175:2-8.)

67.     As Chair of the Pharm/Tox Department, Dr. Klaassen was a manager of the faculty in the Pharm/Tox Department. (Ex. 709, Klaassen Depo., 173:14-22.)

68.     Part of Dr. Klaassen's role as Pharm/Tox Chair was to host department meetings in which he would lead the Pharm/Tox faculty in the department's philosophy of success, set a positive tone for the department, and share information about what was occurring in the department and around campus. (Ex. 709, Klaassen Depo. 171:12-172:9; 451:8-452:6.)

69.     Faculty and administration in universities often engage in disputes or disagreements about the percentage of salaries that are attributable to grants, and faculty and administration usually work together to come to some agreement on the issue. (Ex. 709, Klaassen Depo., 452:21-453:7.)

70.     Dr. Klaassen shared information about sources of money and use of grant funds with his department in his role as Department Chair. (Ex. 709, Klaassen Depo., 452:12-453:6.)

**Behavior Before Removal as Chair**

71.     On at least one occasion in 2010, while part of Dr. Atkinson's leadership team in the role of Chair of the Pharm/Tox Department, Dr. Klaassen asked his faculty members to sign a "no-confidence" vote against Dr. Atkinson and deemed anyone who dared to disagree with him a "traitor." (Ex. 12, Oct 1, 2010 PowerPoint; Ex. 728, Levant Depo., 68:22-69:16.)

72.     In February 2011, Dr. Terranova invited Dr. Klaassen to dinner with Ann Bonham, an outside speaker from the American Association of Medical Colleges. In front of Dr. Bonham, Dr. Klaassen accused the University administrators of being "liars" who were taking money away from him and putting it into a cancer center, and accused the University of being

"slumlords." (Ex. 713, Nov. 30, 2016 Jury Trial Transcript, Vol. II, Terranova testimony, 82:9-84:24.)

73.     Dr. Terranova reported to Dr. Atkinson that Dr. Bonham told him she had never been exposed to such inappropriate behavior from a high level administrator. (Ex. 713, Nov. 30, 2016 Jury Trial Transcript, Vol. II, Terranova testimony, 84:6-25.)

74.     Dr. Terranova considered Dr. Klaassen's behavior, as Chair of a department, to be unprofessional. (Ex. 713, Nov. 30, 2016 Jury Trial Transcript, Vol. II, Terranova testimony, 84:13-25.)

75.     On March 31, 2011, the University held a stakeholders meeting on campus for department chairs and similarly situated individuals from KUMC to see a demonstration of a software product that was being considered for the KUMC campus. (Ex. 714, May 29, 2012 hearing, Terranova testimony, 48:22-52:19; 61:18-62:25; Ex. 709, Klaassen Depo., 127:21-24.)

76.     Dr. Klaassen was there in his role as department chair. (Ex. 714, May 29, 2012 hearing, Terranova testimony, 61:18-62:25.)

77.     Dr. Klaassen "acted out" at the meeting and demeaned the Dean and the University. (Ex. 714, May 29, 2012 hearing, Terranova testimony, 48:22-52:19; Ex. 186, April 7, 2011 Faculty Meeting PowerPoint.)

78.     Dr. Klaassen alleged that his purpose in speaking at the meeting was to notify other department chairs (referred to by Dr. Klaassen as "big shots") about his criticisms of Dr. Atkinson. (Ex. 771, Dec. 9, 2016 Jury Trial Transcript, Vol. IX, Klaassen testimony, 210:17-211:8.)

79.     During the meeting, Dr. Klaassen accused Dr. Atkinson of engaging in "slumlord economics." (Ex. 714, May 29, 2012 hearing, Terranova testimony, 48:22-52:19; Ex. 186, April 7, 2011 Faculty Meeting PowerPoint.)

80.     The outside vendor was not a governmental authority and was not in a position to do anything in response to Dr. Klaassen's complaint. (Ex. 709, Klaassen Depo., 123:16-22.)

81.     Dr. Terranova testified that Dr. Klaassen came late to the meeting and disrupted the meeting, accusing the University of spending frivolous dollars that should go to the basic science departments. The purpose of the meeting was to hear how a software product would work. (Ex. 713, Nov. 30, 2016 Jury Trial Transcript, Vol. II, Terranova testimony, 85:1-86:6.)

82.     Dr. Terranova considered Dr. Klaassen's behavior at the meeting to be insulting and embarrassing and directed to individuals who could do nothing about his complaints. (Ex. 713, Nov. 30, 2016 Jury Trial Transcript, Vol. II, Terranova testimony, 87:2-8.)

83.     Dr. Brooks, a faculty member in attendance, submitted a complaint to Dr. Atkinson regarding the "embarrassing incident at yesterday's KUMC Stakeholders—Faculty Reporting System presentation." He noted that the behavior was inappropriate in that setting and that the reference to the University as a "slum lord institution" was inflammatory. Dr. Brooks reported that the behavior was unprofessional and inappropriate. (Ex. 57, April 1, 2011 Letter.)

84.     Another attendee, Dr. Carl Weiner similarly noted, "He was attacking this guy (the vendor) over something that had nothing to do with his product." (Ex. 196, Jan. 31, 2012 Inquiry Report, 7.)

85.     Another witness, Judy Otey noted, "Discussion? Is that what you call that? I'll be happy to give you my take/my point of view regarding this. It was extremely inappropriate. The vendor was presenting his product, and people were asking questions. Dr. Klaassen said what's

13

the point of this? I don't get it. Then he went off on a trip about administration being a slumlord and why were we spending money to get a system when we're asking his department to take cuts." (Ex. 196, Jan. 31, 2012 Inquiry Report, 7.)

**Removal of Dr. Klaassen as Chair**

86.    On April 5, 2011, Dr. Atkinson asked Dr. Carlson if he would agree to serve as the Interim Chair of the Pharm/Tox Department. (Ex. 702, Atkinson Depo. 124:11-12; Ex. 704, Carlson Depo. 27:13-28:4.)

87.    Although Dr. Carlson's wife had been diagnosed with cancer the same day, Dr. Carlson agreed to serve in that interim position. (Ex. 702, Atkinson Depo. 124:13-17.)

88.    On April 6, 2011, Dr. Atkinson met with Dr. Klaassen and gave him the option to resign or be terminated as Chair of the Pharm/Tox department. (Ex. 108, Apr. 12, 2011 Letter.)

89.    Dr. Klaassen had a PowerPoint printout with him during his April 6 meeting with Dr. Atkinson. (Ex. 702, Atkinson Depo., 122:19-123:20.)

90.    Dr. Atkinson told Dr. Klaassen that she wished he would remain as a really superb researcher with the same grants and programs, but he would no longer serve as department chair. (Ex. 702, Atkinson Depo., 127:1-11.)

91.    Following his meeting with Dr. Atkinson, Dr. Klaassen made it clear to Dr. Carlson that he would not accept Dr. Carlson's authority over him. When Dr. Carlson was asked whether it was his understanding that as interim chair, he was Dr. Klassen's supervisor, Dr. Carlson testified:

A. Yes. One of us understood that at least.

Q. Are you suggesting that Curt didn't understand that?

A. Absolutely. In fact, it was made clear to me on the 6th that it would be a joint thing, only that I would pretend to be head and he would continue being head and I was to be the titular head, but he would keep running everything.

Q. Who made that clear to you?

A. Curt. Then on the 7th he began an e-mail pointing that out as well.

Dr. Klaassen admits this conversation occurred. (Ex. 704, Carlson Depo., 112:17-113:4; Ex. 709, Klaassen Depo. 465:22-466:7.)

92.     The majority of Dr. Klaassen's faculty told Dr. Carlson that they were surprised Dr. Klaassen lasted as long as he did as Chair and that Dr. Atkinson had no choice but to remove him from the position. (Ex. 764, Dec. 1, 2016 Jury Trial Transcript, Vol. III, Carlson testimony, 99:4-15.)

**Behavior after Removal as Chair**

93.     On April 7, 2011, having been advised of Dr. Atkinson's decision the day before, Dr. Klaassen called a meeting of the Pharm/Tox faculty during which he informed the Pharm/Tox faculty that (contrary to what Dr. Atkinson had decided) he would continue serving as Chair and have Dr. Carlson, whom Dr. Atkinson had just named Interim Chair, act merely as the titular chair, signing papers and talking to the administration. (Ex. 186, Apr. 7, 2011 Faculty Meeting PowerPoint; Ex. 709, Klaassen Depo., 197:13-15; Ex. 771, Dec. 9, 2016 Jury Trial Transcript, Vol. IX, Klaassen testimony, 209:20-210:6.)

94.     Dr. Klaassen also gave a PowerPoint presentation at the April 7 faculty meeting. Slides 14 and 15 describe Dr. Klaassen's criticisms of Dean Atkinson, including that the "Dean said I was not on the 'KUMC Planning Committee' because I was not in her future plans. (Feb. 5, 2011)," and that Dean Atkinson fired him as Chair of Pharm/Tox. (Ex. 186, Apr. 7, 2011 Faculty Meeting PowerPoint.)

95.     Slides 16-25 are slides Dr. Klaassen prepared for his meeting with Dean Atkinson on April 6, 2011, and then shared with the faculty on April 7. (Ex. 186, Apr. 7, 2011 Faculty Meeting PowerPoint; Ex. 702, Atkinson Depo., 122:19-123:20.)

96.     On slide 16, Dr. Klaassen acknowledged that he was "acting out" to get the Dean's attention. (Ex. 186, Apr. 7, 2011 Faculty Meeting PowerPoint.)

97.     Slide 17 of the presentation (addressing Dr. Atkinson) stated: "My statements, which you apparently don't like, are comments as a University Distinguished Professor that has spent many years at KUMC, not as a Chair." (Ex. 186, Apr. 7, 2011 Faculty Meeting PowerPoint, 17.)

98.     The slides that follow criticize KUMC based upon perceived internal grievances such as allegations of alleged lack of shared governance, lack of communication, and the administration's decision to decrease the budgets of the basic science departments (of which the Pharm/Tox Department was one). (Ex. 186, Apr. 7, 2011 Faculty Meeting PowerPoint.)

99.     Dr. Klaassen's allegations within the presentation advocate for additional money for him and his department. (Ex. 710, Dec. 5, 2016 Jury Trial Transcript, Vol. V, Stites testimony, 190:20-191:5.)

100.    In the April 7 PowerPoint presentation, Dr. Klaassen mentions decisions to establish a cancer center and open medical school campuses in Wichita and Salina. (Ex. 186, April 7, 2011 Faculty Meeting PowerPoint.)

101.    Dr. Klaassen acknowledges that the University's decision to establish a cancer center, a Wichita campus, and a Salina campus are not illegal. (Ex. 709, Klaassen Depo., 143:4-16.)

102.    In the PowerPoint, Dr. Klaassen purported to give the faculty seven options for his response to being removed as Chair: (1) commit suicide, (2) retire, (3) move to a new university, (4) move to another location on campus, (5) stay in the department, but "put tinfoil over [his door] and not attend any departmental functions," (6) stay in the department and attend faculty functions, or (7) continue acting as if he were chair and have Dr. Carlson sign papers and talk to the administration. (Ex. 186, Apr. 7, 2011, Faculty Meeting PowerPoint; Ex. 709, Klaassen Depo., 197:22-198:2; Ex. 767, Dec. 12, 2016 Jury Trial Transcript, Vol. X, Klaassen testimony, 48:10-13.)

103.    Dr. Klaassen was insubordinate and disrespectful to the Dean, stating, "The bitch must go." He admitted in open court that, at the April 7, 2011, faculty meeting, he called Dr. Atkinson, a "bitch" in front of the Pharm/Tox faculty. (Ex. 767, Dec. 12, 2016 Jury Trial Transcript, Vol. X, Klaassen testimony, 47:21-48:2-9; Ex. 196, Inquiry Report, 6; Ex. 712, Jaeschke Depo., 130:8-21.)

104.    In the days following, Dr. Klaassen falsely portrayed himself and one of his lab members as "Students for Democracy at the University of Kansas Medical Center." Dr. Klaassen wrote and circulated an email and a flyer containing false information, including that Dr. Atkinson forced each of the basic science faculty to take a 50% salary cut. (Ex. 709, Klaassen Depo., 483:7-485:13; Ex. 188, Students for Democracy Flyer.)

105.    It is unusual for a University Distinguished Professor to portray himself as a group called "Students for Democracy." (Ex. 710, Dec. 5, 2016 Jury Trial Transcript, Vol. V, Stites testimony, 190:11-19.)

106.    The Students for Democracy flyer argued for more money to go to basic sciences, where Dr. Klaassen was a faculty member. (Ex. 710, Dec. 5, 2016 Jury Trial Transcript, Vol. V, Stites testimony, 190:20-191:17.)

107.    Contrary to the information in the Students for Democracy flyer, no one in the basic science faculty took a 50% salary cut. (Ex. 710, Dec. 5, 2016 Jury Trial Transcript, Vol. V, Stites testimony, 191:18-23.)

108.    The Students for Democracy flyer describes Dr. Klaassen as a commonly recognized well-qualified Chair of the Pharm/Tox Department and, without attribution, implies that a prior medical school declared bankruptcy because of Dean Atkinson. (Ex. 710, Dec. 5, 2016 Jury Trial Transcript, Vol. V, Stites testimony, 192:14-193:6.)

109.    The University of Kansas would not have hired Dr. Atkinson to run KUMC if she had been the source of financial problems at her prior medical school. (Ex. 710, Dec. 5, 2016 Jury Trial Transcript, Vol. V, Stites testimony, 192:22-193:6.)

110.    Having acknowledged in his deposition his role in writing the email and flyer, Dr. Klaassen denied such a role at trial and argued about how one interprets the words "to write." He said it is "complicated" and that he could answer "a hundred percent yes, and . . . a hundred percent no." (Ex. 771, Dec. 9, 2016 Jury Trial Transcript, Vol. IX, Klaassen testimony, 142:2-144:14.)

111.    Dr. Klaassen received formal confirmation of the termination of his role as Chair by letter from Dr. Atkinson on April 12, 2011. (Ex. 108, Apr. 12, 2011 Letter.)

112.    Dr. Klaassen has acknowledged in writing that Dean Atkinson's decision to remove him as Chair was legal. He wrote, "I agree she had the legal authority to do so." (Ex. 17, Dec. 28, 2012 email.)

113.    Following his removal as Department Chair, Dr. Klaassen remained a member of the faculty in the Pharm/Tox Department and remained PI on the COBRE and Training Grants. (Ex. 702, Atkinson Depo, 126:10-127:11.)

114.    On May 20, 2011, Dr. Klaassen's behavior toward a staff member was such that he apologized for being overly aggressive. (Ex. 412, May 20, 2011 email.)

115.    Dr. Terranova continued receiving reports from within the Pharm/Tox Department about Dr. Klaassen's deteriorating relationships within the Department. Dr. Terranova explained that the disruption slows the progress the department is making and disrupts the ability of the faculty to do their jobs carrying out research, teaching, and performing administrative duties. (Ex. 713, Nov. 30, 2016 Jury Trial Transcript, Vol. II, Terranova testimony, 94:24-95:13.)

116.    There were several emails that discussed the "interrelated issues" of removal of Dr. Klaassen from the COBRE Grant, removal of Dr. Klaassen from the Training Grant, a new permanent Chair being put into place in the Pharm/Tox Department, and the move of Dr. Klaassen's laboratory from the Hemenway building to the Hixson building. (Ex. 77, Oct. 14, 2011 Email; Ex. 79, Oct. 20, 2011 Email; Ex. 80, Oct. 28, 2011 Email.)

117.    Dr. Terranova testified that "planning and preparation related to those interrelated events is a 'good thing' because there were guidelines to be followed, hiring committees to be formed, contact with the NIH to occur, etc." (Ex. 713, Nov. 30, 2016 Jury Trial Transcript, Vol. II, Terranova testimony, 92:23-93:16; Ex. 412, May 20, 2011 email.)

118.    The timing that Dr. Terranova was referring to in Exhibit 79 was the coordination of moving Dr. Klaassen's lab from Hemenway to Hixson as well as the change in the PI status. (Ex. 707, Terranova Depo., 210:2-14.)

119.    On Friday, October 28, 2011, Dr. Klaassen called a meeting, purportedly to discuss the COBRE Grant. (Ex. 187, Oct. 28, 2011 COBRE Meeting Presentation.)

120.    Dr. Klaassen did so in his capacity as PI of the COBRE Grant, and he invited people who were associated with the COBRE grant. (Ex.  709, Klaassen Depo., 466:16-21; 469:23-470:11; Ex. 712, Jaeschke Depo., 54:11-55:17; Ex. 13, COBRE Grant.)

121.    The Interim Chair of the Pharm/Tox Department, Dr. Carlson, was not invited by Dr. Klaassen to the COBRE meeting. (Ex. 709, Klaassen Depo, 469:21-470:2; Ex. 770, Dec. 8, 2016 Jury Trial Transcript, Vol. VIII, Jaeschke testimony 68:5-12.)

122.    In a prepared PowerPoint presentation, Dr. Klaassen called Dr. Carlson a "Ford chair trying to be a Mercedes chair – major conflict of interest," accused Dr. Carlson of "doing everything he can to destroy the department," and stated that Dr. Klaassen's future cooperation with the department "will largely be dependent on the new Chair's respect" of Dr. Klaassen. (Ex. 187, Oct. 28, 2011, COBRE Meeting Presentation; Ex. 709, Klaassen Depo., 478:4-8.)

123.    Dr. Klaassen told the faculty that he would not allow the new department chair to become the PI of the COBRE Grant, a major source of the Pharm/Tox Department funding. (Ex. 187, Oct. 28, 2011 COBRE Meeting Presentation.)

124.    The presentation again included a slide in which Dr. Klaassen states that his statements "are comments as a university distinguished professor." (Ex. 187, Oct. 28, 2011 COBRE Meeting Presentation.)

125.    Members of the department walked out of this meeting, disgusted with Dr. Klaassen's behavior (Ex. 196, 2012 Inquiry Report, 6.; Ex. 764, Dec. 1, 2016 Jury Trial Transcript, Vol. III, Carlson testimony, 194:23-25.)

126.    Also on October 28, 2011, Dr. Klaassen personally threatened Dr. Carlson. (Ex. 712, Jaeschke Depo., 56:18-58:11.)

127.    Also on October 28, 2011, upon learning that Dr. Jaeschke had applied to become Chair of the Pharm/Tox Department, Dr. Klaassen threatened Dr. Jaeschke, stating, "[If] you fuck me over, I'm going to fuck you over." (Ex. 712, Jaeschke Depo., 57:7- 58:1.)

128.    Dr. Klaassen's own counsel has acknowledged that Dr. Klaassen used "loud language," "pounds on tables in staff meetings," and would "turn red in the face and sometimes shake." (Doc. 298, p. 5.)

129.    Dr. Klaassen displayed images of guns and discussed suicide in PowerPoint presentations. (Ex. 709, Klaassen Depo., 188:2-19; 197:16-198:8; Ex. 765, Feb. 10, 2006 PowerPoint, Ex. 766 April 7, 2011 PowerPoint.)

130.    Dr. Klaassen repeatedly became uncontrollably angry. (Ex. 764, Dec. 1, 2016 Jury Trial Transcript, Vol. III, Carlson testimony, 189:19-190:8.)

131.    As a result of the events of October 28, 2011, Dr. Carlson and Dr. Jaeschke reported Dr. Klaassen's behavior to Dr. Terranova. (Ex. 713, Nov. 30, 2016 Jury Trial Transcript, Vol. II, Terranova testimony, 94:8-12.)

132.    The complaints Dr. Terranova received involved disruptive behavior in the Department by Dr. Klaassen. (Ex. 713, Nov. 30, 2016 Jury Trial Transcript, Vol. II, Terranova testimony, 94:13-20.)

133.    Dr. Terranova considered Dr. Klaassen's description of Dr. Carlson as a "Ford chair trying to be a Mercedes chair" to be "insulting" and insubordinate and not relevant to the COBRE Grant. (Ex. 713, Nov. 30, 2016 Jury Trial Transcript, Vol. II, Terranova testimony, 89:18-90:2.)

134.    Dr. Terranova considered Dr. Klaassen's presentation to the Pharm/Tox and COBRE team that claimed "Gerald [Carlson] is doing everything he can to destroy the department" to be insubordination. (Ex. 713, Nov. 30, 2016 Jury Trial Transcript, Vol. II, Terranova testimony, 116:21-25; 117:1-13.)

135.    Dr. Terranova considered Dr. Klaassen's behavior to be seriously inflammatory and beyond the bounds of what is expected in a university environment. (Ex. 713, Nov. 30, 2016 Jury Trial Transcript, Vol. II, Terranova testimony, 118:3-24.)

136.    Dr. Atkinson described that people were "frightened of Dr. Klaassen at that point in time." (Ex. 84, Nov. 1, 2011 Letter; Ex. 702, Atkinson Depo., 246:18-22.)

**First Administrative Leave**

137.    On Tuesday, November 1, 2011, the University placed Dr. Klaassen on administrative leave with pay. Dr. Klaassen's duties were suspended, meaning that he was not to carry on any duties while on administrative leave. (Ex. 713, Nov. 30, 2016 Jury Trial Transcript, Vol. II, Terranova testimony, 120:11-23; Ex. 84, Nov. 1, 2011 Letter.)

138.    Dr. Terranova provided Dr. Klaassen with a detailed letter setting forth the basis for the paid administrative leave:

> It has been reported to me that you have exhibited behavior and engaged in statements that were belligerent and frightening to other University faculty and staff. You made these statements and engaged in this behavior in meetings related to the COBRE grant, in administrative meetings with faculty and staff related to budget uses, and in a one-to-one meeting with a faculty member in your department. I understand that these were not simply disagreements on a professional basis, but were seriously inflammatory and frightening to several individuals concerned and completely beyond the bounds of what is expected in a University environment.

(Ex. 84, Nov. 1, 2011 Letter.)

139.    Dr. Klaassen was advised that his leave would be paid and that he was not to be on campus except for specified circumstances. (Ex. 84, Nov. 1, 2011 Letter.)

140.    Dr. Terranova told Dr. Klaassen that the future direction of Dr. Klaassen's programs—including the grants for which Dr. Klaassen was PI—would be considered while his duties were suspended:

> During your suspension from duties, KUMC administration will decide the future direction and continuation of all programs that you direct at KUMC. This determination will include consultation with appropriate faculty, other administrators at KUMC, and the NIH. Any adverse or unacceptable behavior on your part, including any activities by you to inappropriately undermine this action and any transition that may be directed, will be dealt with expeditiously and in accordance with the Handbook for Faculty and Other Unclassified Staff.

(Ex. 84, Nov. 1, 2011 Letter.)

141.    On November 15, 2011, Dr. Terranova requested that an investigation into accusations of personal and professional misconduct against Dr. Klaassen be conducted to determine whether there were reasonable grounds to convene a faculty Ad Hoc Hearing Committee. (Ex. 196, Inquiry Report, 2.)

142.    Dr. Terranova believed, based on Dr. Klaassen's inappropriate, belligerent, offensive, and threatening behavior, that Dr. Klaassen could not fulfill the duties of the PI on the COBRE and Training Grants. (Ex. 707, Terranova Depo., 187:7-21; 188:23-189:17.)

143.    On November 21, 2011, KUMCRI wrote to the NIH and requested that the NIH change the PI on the COBRE and Training Grants from Dr. Klaassen to other KUMC faculty members. (Ex. 88, November 21, 2011 letter.)

**Behavior upon Return from Leave**

144.    Dr. Klaassen returned from administrative leave on December 16, 2011, with the following expectations, which Dr. Klaassen acknowledged in writing:

- Dr. Klaassen would comply with all University policies, including those prohibiting abusive and unprofessional treatment of students or faculty;

- Dr. Klaassen would treat all faculty, staff, vendors, visitors, and others with whom he interacted with respect and dignity, refrain from engaging in insulting, demeaning, disruptive, hostile, aggressive, or threatening conduct, including yelling and storming out of meetings;

- Dr. Klaassen would refrain from using illustrations of guns in presentations;

- Dr. Klaassen would refrain from retaliating against those who participated in the inquiry; and

- Dr. Klaassen would complete a program for distressed physicians.

(Ex. 86, Dec. 15, 2011, Return to work letter.)

145.    Dr. Terranova believed it was important for Dr. Klaassen's expectations upon his return to work to include treating others with respect and dignity because Dr. Klaassen had not done so in the past, and this was in part the reason for his administrative leave. (Ex. 713, Nov. 30, 2016 Jury Trial Transcript, Vol. II, Terranova testimony, 123:12-20.)

146.    Dr. Terranova also believed it was important for Dr. Klaassen's expectations to include refraining from using guns in presentations because Dr. Klaassen's use of guns had been reported as something that was concerning to faculty members. (Ex. 713, Nov. 30, 2016 Jury Trial Transcript, Vol. II, Terranova testimony, 123:21-25.)

147.    As of December 16, 2011, Dr. Klaassen was no longer the PI on either the Training Grant or the COBRE Grant. (Ex. 715, Notice of Award; Ex. 89, Notice of Award.)

148.    On December 16, 2011, Dr. Klaassen's first day back to work after having promised to treat all faculty with respect and dignity, Dr. Klaassen interrupted a meeting in Dr. Jaeschke's office, repeatedly pounded his fists on file cabinets, and yelled that the COBRE and Training Grants were his grants and that he would only give them up when he was dead. Dr.

Klaassen yelled at Dr. Jaeschke, "You want to be chair of this department! How do you think our relationship will be after that?" (Ex. 191, Jan. 9, 2012, Letter.)

149.    When Dr. Klaassen was a faculty member in the Pharm/Tox Department, the laboratory he supervised was located in the Pharm/Tox Department in the Hemenway Building. (Ex. 720, Dec. 2, 2016 Jury Trial, Volume IV, Renaud testimony, 12:5-14.)

150.    On December 31, 2011, while Dr. Stites was Chair of Internal Medicine, he received a call from Shelley Gebar, Chief of Staff for Dr. Atkinson, asking Dr. Stites to accept Dr. Klaassen into the Internal Medicine Department. (Ex. 710, Dec. 5, 2016 Jury Trial Transcript, Vol. V, Stites testimony, 200:13-201:10.)

151.    On January 4, 2012, Dr. Terranova notified Dr. Klaassen that the University was moving his office and laboratory space out of KUMC's Hemenway Building, where Pharm/Tox was located, and into the Hixson Building, on February 1, 2012. (Ex. 716, Jan. 4, 2012, Letter.)

152.    Although Dr. Terranova was involved in discussions about the transfer, Dean Atkinson made the final decision. (Ex. 702, Atkinson Depo., 278:13-22.)

153.    When Dr. Klaassen was transferred out of the Pharm/Tox Department, his laboratory was moved into available laboratory space in the Hixson Building. (Ex. 720, Dec. 2, 2016 Jury Trial, Volume IV, Renaud testimony, 12:5-14.)

154.    Later on January 4, 2012, Dr. Klaassen entered Dr. Jaeschke's office uninvited and harangued Dr. Jaeschke for approximately one hour, blaming Dr. Jaeschke for Dr. Klaassen's impending laboratory move. Dr. Jaeschke described the event in a letter to Dr. Klaassen as follows:

> On January 4, 2012, you again entered my office uninvited and proceeded to engage in a heated conversation and harangue for approximately an hour. You were clearly upset about the pending move of your laboratory to Hixson. You blamed the move on me. You repeatedly asked in a very agitated tone of

> voice: "How can you throw me out of this building after all I have done for you? What will this do to your reputation? What will I do when I get the COBRE grant and the training grant back and I am across the street? If I am here, I will hand it over to you, if I am across the street, I will not support you or the department. My move will destroy the department. I am your biggest asset over here but I will work against you if I am across the street." In addition, you repeatedly pointed out that fifty-percent of the Society of Toxicology council are your former students, then proceeded to state: "What do you think this will do to your career? What do you want me to say about you and this place when I get my merit award in 2 months? That you kicked me out and destroyed my career after 43 years, just 2 years before I will leave? What do you think that will do to your career in toxicology or hepatology?" Your comments made it very clear to me that you would work against me if I became chair, that you would tell everyone that I had destroyed your career and in so doing, you would actively work to destroy my career and reputation in toxicology and the liver field.

(Ex. 191, Jan. 9, 2012, Letter.)

155.    On January 9, 2012, Dr. Jaeschke was named Chair of the Pharm/Tox Department. (Ex. 121, Jan. 9, 2012, Announcement.)

156.    Dr. Jaeschke believed that the relationship between Dr. Klaassen and the Pharm/Tox Department was irretrievably broken. (Ex. 770, Dec. 8, 2016 Jury Trial Transcript, Vol. VIII, Jaeschke testimony, 60:5-10.)

157.    On January 10, 2012, Dr. Atkinson met with Dr. Klaassen for approximately one hour, during which she delivered a letter to him informing him that she was contemplating transferring him from the Pharm/Tox Department to the Department of Internal Medicine as a result of his having created a hostile environment within Pharm/Tox. Dr. Atkinson gave Dr. Klaassen one week to provide information to her regarding the proposed transfer. (Ex. 717, Jan. 10, 2012 Letter.)

158.    In her January 10, 2012, letter to Dr. Klaassen, Dr. Atkinson stated Dr. Klaassen's conduct had "irretrievably damaged relationships with the faculty and staff in Pharm/Tox" and

had led her to conclude that his "continued presence in Pharm/Tox would only serve to continue to disrupt the department's effective and orderly operations." (Ex. 717, Jan. 10, 2012 Letter.)

159.    Dr. Klaassen sent an email to Dr. Jaeschke on January 11, 2012, recognizing, "I can understand why you might not have much confidence in me at the present time. If I did not have graduate students and post-doctoral students, I would have retired 9 months ago." (Ex. 192, Jan. 11, 2012 email.)

160.    The next day, on January 12, 2012, Dr. Klaassen acknowledged, "I think the Department has become de-unified the last few months, and I am probably the reason for most of that splintering, and I will take full responsibility." (Ex. 418, Jan. 12, 2012 email.)

161.    On January 20, 2012, Dr. Klaassen wrote that he had met with Dr. Stites and Dr. Dawn from Internal Medicine and "all parties are optimistic that the transfer can and will occur," and that he "will conduct [himself] in a professional manner as [he had] sought professional help to further understand [his] behavior." (Ex. 718, Jan. 20, 2012 letter.)

162.    Dr. Stites, Chair of Internal Medicine, had agreed to take Dr. Klaassen into the department in an effort to provide Dr. Klaassen an opportunity to rehabilitate himself and return to being a successful faculty member. (Ex. 367, Nov. 12, 2013 Ad Hoc Committee hearing transcript, Stites testimony, 151:3-19.)

163.    When asked why he accepted Dr. Klaassen into the Department, Dr. Stites testified as follows:

> A: Multi-factorial. Of course, Barbara was my boss, and she asked me to do it, so I felt a little bit of obligation to try and help. Second of all, Dr. Klaassen is a Distinguished Professor, and one of the investigators at KU over many years. And we thought if we can help transition him, and he could be in a safer place, because then he could help mentor some of our faculty and people of the Department of Medicine. So we had the best intentions. There was nothing to try to hurt him or hurt his lab or students whatsoever. And that just would be dumb, that's dumb. So we really were

there to try to be helpful. And all those things - - we knew there was a risk, and this controversy in Pharmacology. I didn't know all the specifics about it, and that that was fine, because I don't know that I should know that. But we were there to try and be helpful.

Q: So are you saying to this jury that you weren't part of some big plan to run him out of the University for some reason?

A: No. Those kind of things take forever, they are hard, and there's no way we would do that. No. Absolutely not.

Q: If he were willing to accept the home that you were offering, were there potential advantages to Dr. Klaassen and his students from this?

A: I think so. I think the[y] would be in an environment that things could have gone well, and they could have prospered under that roof. And knowing that Pharmacology was no longer a choice, because it would have been great if he could have stayed there, but knowing that that was no longer a choice, that was the next best choice. In the Department of Medicine, we had a large department, and had a very good hepatic research program in the department. And the sense was that maybe that would be a good fit, and we could offer him supportive advice.

(Ex. 710, Dec. 5, 2016 Jury Trial Transcript, Vol. V, Stites testimony, 205:9-206:22.)

164.    On January 20, 2012, Dr. Atkinson notified Dr. Klaassen that he was being transferred to the Internal Medicine Department because his conduct had "irretrievably damaged relationships with faculty and staff in Pharm/Tox and created a hostile work environment, thereby interfering with the operations of the department and jeopardizing the ability of the department to succeed." (Ex 124, Jan. 20, 2012 Letter.)

165.    Dr. Atkinson believed Dr. Klaassen would be a good fit in the Internal Medicine Department. (Ex. 702, Atkinson Depo., 280:15-281:5.)

166.    Dr. Klaassen's office was moved on January 23, 2012. (Ex. 719, Jan. 23, 2012 Email.)

167.    In the State Court Jury Trial, Dr. Klaassen called Dr. Helen Renaud as a witness. Dr. Renaud is a former graduate student who came to the University of Kansas to study with Dr. Klaassen. (Ex. 720, Dec. 2, 2016 Jury Trial Transcript, Vol. IV, Renaud testimony, 7:21-23.)

168.    Dr. Renaud had complained that a staff member in the Pharm/Tox Department, Cody Tully, was not cooperative with the lab members. (Ex. 720, Dec. 2, 2016 Jury Trial Transcript, Vol. IV, Renaud testimony, 16:3-25.)

169.    Dr. Renaud testified, however, that the Internal Medicine Department was welcoming to the lab members, and Dr. Stites was very friendly and helpful. (Ex. 720, Dec. 2, 2016 Jury Trial Transcript, Vol. IV, Renaud testimony, 23:11-18, 23:23.)

170.    Mr. Tully's behavior was investigated, and Mr. Tully was counseled for his actions. Mr. Tully had no more interaction with the students in Dr. Klaassen's lab. (Ex. 720, Dec. 2, 2016 Jury Trial Transcript, Vol. IV, Tully testimony, 86:6-19.)

**First Inquiry Report**

171.    KUMC's "Personal and Professional Misconduct Complaint Procedure" is used to receive and process formal allegations of faculty misconduct. (Ex. 209, KUMC Handbook, 97.)

172.    The Vice Chancellor for Academic Affairs is delegated the responsibility for responding to allegations of faculty misconduct. (Ex. 209, KUMC Handbook, 97-98.)

173.    If the Vice Chancellor for Academic Affairs has reason to believe that misconduct may have occurred, he initiates an "Inquiry . . . into the allegations in order to determine whether the allegation has substance and if an investigation is warranted." (Ex. 209, KUMC Handbook, 90, 97.)

174.    The faculty member is notified that an inquiry has been initiated and is provided a copy of the written Inquiry Report and is given an opportunity to respond. (Ex. 209, KUMC Handbook, 98-99.)

175.    If the Vice Chancellor for Academic Affairs determines that the allegation has substance, then the matter proceeds to an "investigation," which is defined as: "The formal examination and evaluation of all relevant facts to determine if there exists a reasonable basis for the allegation or complaint, and if so, to determine the responsible person, the seriousness of the misconduct and the appropriate administrative response." (Ex. 209, KUMC Handbook, 90.)

176.    At the investigation stage, an Ad Hoc Hearing Committee is assembled, which is comprised of faculty members—one chosen by the aggrieved party, one chosen by the faculty member, and four selected by the Faculty Assembly Steering Committee with the approval of the Vice Chancellor for Academic Affairs. (Ex. 209, KUMC Handbook, 93.)

177.    After the ad hoc hearing, the Ad Hoc Hearing Committee makes a recommendation to the EVC as to whether personal or professional misconduct occurred and what discipline, if any, is appropriate. (Ex. 209, KUMC Handbook, 93-95.)

178.    After receiving the Ad Hoc Hearing Committee's recommendation, the EVC, as the deciding official, issues the "final administrative response to findings of misconduct." (Ex. 209, KUMC Handbook, 89-90.)

179.    Sanctions available under the Handbook are warning, restitution, censure, suspension without pay, and dismissal. (Ex. 209, KUMC Handbook, 100.)

180.    The sanction of dismissal may be appealed, with any such appeal being heard by another Ad Hoc Hearing Committee. On appeal, the Ad Hoc Hearing Committee "shall make its determination as to the validity of the appellant's claims," and shall issue a written opinion

"delineating its decision, the reasons therefore, and its recommendation for disposition," which shall be forwarded to the EVC. (Ex. 209, KUMC Handbook, 122-125.)

181.    After receiving the Ad Hoc Hearing Committee's decision and recommendation with respect to termination, the EVC "shall respond in writing to the recommendations of the committee documenting the reasons for agreeing or disagreeing." The EVC's decision as the final administrative authority exhausts the KUMC internal administrative process and constitutes a final agency action. (Ex. 209, KUMC Handbook, 125.)

182.    The Vice Chancellor for Academic Affairs, Dr. Rawitch, with the assistance of two other professors (collectively, the "inquiry team"), conducted nineteen witness interviews during the first Inquiry. (Ex. 196, Jan. 31, 2012 Inquiry Report, 27.)

183.    In addition, the inquiry team met with Dr. Klaassen and Dr. Klaassen's counsel. (Ex. 196, Jan. 31, 2012 Inquiry Report, 1.)

184.    On January 31, 2012, Dr. Rawitch provided Dr. Klaassen with an Inquiry Report, with text and exhibits totaling 145 pages, that concluded that there were reasonable grounds to believe that Dr. Klaassen engaged in personal and professional misconduct warranting further investigation by the Ad Hoc Hearing Committee. (Ex. 196, Jan. 31, 2012 Inquiry Report.)

185.    The Inquiry Report detailed the results of the investigation with regard to multiple incidents involving Dr. Klaassen. (Ex. 196, Jan. 31, 2012 Inquiry Report.)

**First Ad Hoc Hearing**

186.    In May 2012, a faculty ad hoc hearing committee ("First Hearing Committee") convened to hear the allegations described in the January 2012 Inquiry Report. (Ex. 18, May 31, 2012, Letter.)

187.    The First Hearing Committee consisted of five of Dr. Klaassen's faculty peers, one of whom Dr. Klaassen selected. (Ex. 709, Klaassen Depo., 225:16-19.)

188.    The hearing lasted approximately seven hours. The Committee heard from nine witnesses. It received and reviewed hundreds of pages of exhibits, including 234 exhibits presented by Dr. Klaassen and 24 exhibits presented by KUMC Administration. Dr. Klaassen was represented by counsel, and his counsel called and cross-examined witnesses, including Dr. Klaassen. (Ex. 714, May 29, 2012 Transcript of proceedings; Ex. 18, May 31, 2012 letter.)

189.    Dr. Klaassen's counsel acknowledged at that hearing:

> And I think the evidence here today has been pretty clear that Dr. Klaassen could have handled himself better after he was terminated as chair of the department until the time that he was asked to leave the department. But you've got to put that also in the context of what was going on around him. Clearly, being fired as chair was a traumatic event for him. And he came back to work with Dr. Carlson. And, frankly, things didn't go very well.

(Ex. 714, May 29, 2012 Transcript of Proceedings, 311:5-15.)

190.    Dr. Klaassen's counsel stated to the First Hearing Committee, "But it's my understanding that this hearing today has been longer than what committees normally have, and you received quite a bit of information obviously." (Ex. 714, May 29, 2012 Transcript of Proceedings, 308:12-16.)

191.    The First Hearing Committee was presented with testimony that faculty members in the Pharm/Tox Department were concerned for their own safety. Dr. Ken McCarson, a member of the Pharm/Tox faculty, testified:

> Well, because with the reoccurrence of the imagery of the guns, it was very clear to those of us who had been around long enough - - you have to keep in mind that at the time, in 2010, 2011, most of the members of the faculty had been recruited since 2006. There was really very little institutional memory in the room. So many of them had not seen the initial go-round with the images of the guns and the pillorying of faculty peers and anger directed out at other members of the faculty and the university.

And so seeing the life is hell litany and the gun - - the firearm imagery return, to me, was a very clear signal that Curt's agitation level was rapidly escalating and in what I perceived to be a threatening manner.

And I know that on several occasions in early 2011, especially immediately before he was removed from the chair position, I expressed concern about his agitated, erratic behavior to peers within the institution and then ultimately to administration within the institution.

So, for example, right around the time that he was let go and Gerry Carlson became chair, I know that I and I think several other members of the faculty expressed our concerns about potentially threatening behavior at those meetings.

(Ex. 714, May 29, 2012 Transcript, McCarson testimony, 105:19-106:22.)

192.    Dr. Beth Levant, a member of the Pharm/Tox faculty testified as follows:

Q: What impact has Dr. Klaassen's conduct and behavior had on you?

A: Yeah, it has certainly caused me a great deal of anxiety. I have been afraid to be at work. It has decreased my dissatisfaction with my job. It has interfered with my performance at my job.

(Ex. 728, Levant Dep. 22:21-25; 23:1-6.)

193.    On May 31, 2012, the First Hearing Committee unanimously condemned Dr. Klaassen's behavior and concluded that Dr. Klaassen committed misconduct by engaging in abusive and unprofessional treatment of faculty and staff and substantially disrupting the proper operations of the academic unit. Among other conclusions, the Committee stated:

- Dr. Klaassen engaged in unprofessional conduct during meetings with people from both inside and outside the University.

- Dr. Klaassen's behavior towards colleagues and subordinates was unprofessional, abusive, disruptive and unacceptable.

- Some colleagues and staff quite reasonably felt threatened and intimidated as a result of his actions.

- Dr. Klaassen's own testimony revealed that he is blind to his own behavior and its impact and that he remains largely in denial.

33

- Dr. Klaassen's blindness to the facts damaged his credibility in the eyes of the committee.

- The University tolerated his conduct for too long.

- Research excellence is not a license for unprofessional conduct.

- Dr. Klaassen's removal as Pharm/Tox Chair and transfer to the Department of Internal Medicine were "entirely appropriate and necessary."

- The Committee recommended a formal censure and swift and increased punishment should any further episodes of unprofessional conduct occur.

(Ex. 18, May 31, 2012 Letter.)

194.    KUMC   Interim   Executive   Vice   Chancellor   Dr.   Stites   adopted   the recommendation of the Committee and publicly censured Dr. Klaassen on or around June 13, 2012:

Formal Censure. The following statement of formal censure will be sent via broadcast e-mail to all KUMC faculty and will appear in the News Archive section of the KUMC News website.

Formal Censure--Curtis D. Klaassen, Ph.D., University Distinguished Professor, has been found by a faculty hearing committee to have engaged in abusive and unprofessional treatment of faculty and staff and substantially disrupted the proper operations of the academic unit, specifically the Department of Pharmacology, Toxicology and Therapeutics. Dr. Klaassen's conduct was found to be unprofessional, abusive, disruptive, and unacceptable. These findings were accepted and approved by Acting Executive Vice Chancellor Steven Stites. This announcement represents formal censure of Dr. Klaassen for his actions.

(Ex. 721, June 13, 2012 Censure letter.)

195.    In response to questions from his own counsel, Dr. Klaassen acknowledged that he accepted the formal censure. (Ex. 771, Dec. 9, 2016 Jury Trial Transcript, Vol. IX, Klaassen testimony, 55:24-56:23.)

196.    Dr. Stites also directed Dr. Klaassen to submit a general apology, explaining to him the rationale for it, stating: "Your abusive and unprofessional behavior caused substantial

disruption to the academic unit that also adversely impacted the KU Medical Center community. I believe that an apology from you will assist both you and the KU Medical Center community in bringing closure to this matter and will be an important first step in repairing the damages your actions have caused." (Ex. 721, June 13, 2012 Censure letter.)

197.    In accepting the recommendation of the First Hearing Committee, Dr. Stites sought to send a message to Dr. Klaassen that, "you can't abuse people. You can't be disruptive. You can't be unprofessional. Those are not how we treat each other. And it doesn't matter how many NIH grants you've had. It doesn't matter how many papers you've published." (Ex. 768, Dec. 6, 2016 Jury Trial Transcript, Vol. VI, Stites testimony, 161:6-162:18.)

198.    On June 13, 2012, Dr. Klaassen apologized "for any actions that may have embarrassed the University and Medical Center community and colleagues or caused colleagues to feel abused or harassed," and he stated he would do his best "to represent the University of Kansas Medical Center professionally in all regards." (Ex. 20, June 13, 2012 Apology letter.)

199.    When Dr. Stites met with Dr. Klaassen on June 13, 2012, to deliver to him the sanction decision, Dr. Stites reiterated the message that he had given Dr. Klaassen when he transferred to Internal Medicine—that he was being given an opportunity for "a fresh start" and that to be successful, Dr. Klaassen needed to focus on looking forward, not backward on past issues. (Ex. 722, August 1, 2012 email.)

**Behavior after the First Ad Hoc Hearing**

200.    When Dr. Klaassen was transferred to Internal Medicine, Dr. Buddhadeb Dawn, Vice Chairman for Research, Internal Medicine, was tasked with supervising Dr. Klaassen's conduct as well as helping him to reestablish his career and work with Internal Medicine faculty. (Ex. 367, Nov. 12, 2013 Hearing Transcript, Dawn testimony, 108:17-109:2.)

201.    Because Dr. Klaassen had persisted in disruptive, accusatory, and antagonistic communications with faculty and staff in Pharm/Tox, Dr. Dawn was designated as the point person to whom Dr. Klaassen was to bring his issues, and if those issues involved Pharm/Tox, Dr. Dawn was to be the intermediary to work with that department. (Ex. 367, Nov. 12, 2013 Hearing Transcript, Dawn testimony, 109:3–110:4.)

202.    Dr. Dawn's May 26, 2012, e-mail to Dr. Klaassen reaffirmed the direction that Dr. Klaassen was not to communicate directly with Pharm/Tox, stating: "[P]lease do not send such accusatory emails to P&T dept members in the future. Instead, direct your questions/comments to me/Brenda. I will be happy to discuss if you have any question[s]." (Ex. 724, May 26, 2012 email.)

203.    When Dr. Klaassen was reassigned to Internal Medicine, Dr. Dawn looked at Dr. Klaassen's available funding and his monthly expenses and saw that the projected expenses would result in a future deficit, so he instructed Christina Hopkins, Internal Medicine Department Research Administrator, to provide Dr. Klaassen with periodic printouts of his grant accounts, and he worked with Dr. Klaassen to identify solutions to right size his research operation and bring its spending into positive balance. (Ex. 367, Nov. 12, 2013 Hearing Transcript, Hopkins testimony, 50:15-17; Dawn testimony, 110:24–112:5.)

204.    Meetings were held with Dr. Dawn, Dr. Klaassen, and Christina Hopkins to review the financial records relating to Dr. Klaassen's research program and laboratory operations on December 19, 2012, March 6, 2013, and May 1, 2013. (Ex. 725, Scheduled Meetings.)

205.    At a December 19, 2012, meeting with Dr. Klaassen, he was shown that his research laboratory's expenses were too high for the funding available and options to cut

expenses were discussed with him. (Ex. 367, Nov. 12, 2013 Hearing Transcript, Hopkins testimony, 52:22–53:10.)

206.    In that December 19, 2012, meeting, Dr. Klaassen became upset and angry—his hands were visibly shaking, he was repeatedly standing up and sitting down and moving around the office. Rather than focusing on the information presented and possible solutions, he digressed into an irrational dialogue about how he wouldn't have been in this situation except for what was done to him. (Ex. 367, Nov. 12, 2013 Hearing Transcript, Hopkins testimony, 53:11–54:20.)

207.    After the December 19, 2012, meeting, Dr. Klaassen did not make any changes to reduce the deficit spending pattern, so at a March 6, 2013, meeting with Dr. Klaassen, Dr. Dawn reiterated to Dr. Klaassen that his spending was unsustainable and suggested to him that he consider reducing payroll expenses on his research projects. (Ex. 367, Nov. 12, 2013 Hearing Transcript, Hopkins testimony, 55:6–17.)

208.    In the March 6, 2013, meeting, rather than engaging in a serious discussion with Dr. Dawn to resolve the unsustainable rate of spending, Dr. Klaassen instead pulled his checkbook from his pocket while sarcastically asking what he had to do. (Ex. 367, Nov. 12, 2013 Hearing Transcript, Hopkins testimony, 55:18–56:5.)

209.    On March 7, 2013, Christina Hopkins provided Dr. Klaassen with all of the monthly financial reports for grants for which he was PI for the period March 1, 2012, through February 28, 2013. (Ex. 726, Monthly Financial Reports; Ex. 8, March 7, 2013 Email.)

210.    Ms. Hopkins answered Dr. Klaassen's questions about the account information she provided him. (Ex. 727, April 12, 2013 Hopkins correspondence.)

211.    Following the March 7, 2013, meeting, Dr. Klaassen did nothing to reduce his rate of spending. (Ex. 367, Nov. 12, 2013 Hearing Transcript, Hopkins testimony, 56:6–22, 60:4-21.)

**May 1, 2013 Incident**

212.    On May 1, 2013, Dr. Klaassen was invited to a meeting with Dr. Stites, Chair of the Department of Internal Medicine, and others from Internal Medicine. Dr. Stites was no longer Acting EVC at that time. (Ex. 711, May 8, 2013, Statement of Dr. Stites regarding May 1, 2013 meeting; Ex 710, Dec. 5, 2016 Jury Trial Transcript, Vol V, Stites testimony, 7:4-8; 11:4-12.)

213.    Dr. Stites convened the meeting in his conference room with Dr. Klaassen, Dr. O'Brien-Ladner (Vice Chair of the Internal Medicine Department), Dr. Dawn, Dustin Carrillo, and Christina Hopkins to review Dr. Klaassen's laboratory budget numbers, which showed Dr. Klaassen was continuing to spend in excess of available funds, and to identify possible solutions to sustain his laboratory operations. (Ex. 711, May 8, 2013, Statement of Dr. Stites regarding May 1, 2013 meeting.)

214.    Dr. Stites wanted to see if there was a way the department might be able to help bridge some part of Dr. Klaassen's funding gap until Dr. Klaassen found out about further NIH grants. (Ex. 367, Nov. 13, 2013 hearing, Stites testimony, 154:25-155:10.)

215.    The three grants being discussed at the May 1, 2013, meeting were R01 grants that were in the Department of Internal Medicine. (Ex. 711, May 8, 2013, Statement of Dr. Stites regarding May 1, 2013 meeting.)

216.    At the time of the May 1, 2013, meeting, Dr. Klaassen was not the PI of the COBRE Grant or the Training Grant, each of which remained in the Pharm/Tox Department and

each of which had been reassigned to other PIs more than a year earlier. (Ex. 88, Nov. 21, 2011 Letter.)

217.    Dr. Klaassen secretly tape recorded the May 1, 2013, meeting. He claims to have done so because he considered the five persons in the meeting to be part of a "mobbing scheme" to get rid of him. (Ex. 709, Klaassen Depo., 104:21-24; 105:17-106:1.)

218.    At the time he did so, there were no inquiry reports pending against Dr. Klaassen. (Ex. 709, Klaassen Depo., 108:6-17; Ex. 768, Dec. 6, 2016 Jury Trial Transcript, Vol. VI, Stites testimony, 167:13-17.)

219.    There was nothing about that meeting that was intended to provoke Dr. Klaassen. The meeting was for the purpose of assisting Dr. Klaassen because Dr. Klaassen's expenditures were exceeding available funds by $52,000 per month. (Ex. 768, Dec. 6, 2016 Jury Trial Transcript, Vol. VI, Stites testimony, 167:24-170:1.)

220.    At approximately seventeen minutes into the meeting—after reviewing the budget reports and discussing ways the Internal Medicine Department could provide additional monies short-term, Dr. Klaassen's endowment funds, and Dr. Klaassen's prospects for obtaining additional grant funding—Dr. Klaassen started becoming agitated. He argued he was $250,000 in the red and proceeded to the white board where he began writing in an agitated and barely decipherable manner, all the while becoming increasingly visibly agitated, louder, and more shrill to the point where the others present became concerned he was unstable and a threat. (Ex. 729, May 1, 2013 Witness Statements; Ex. 367, Nov. 12, 2013 Hearing Transcript, O'Brien-Ladner testimony, 20:17-21:7, Hopkins testimony, 61:23–63:4, 64:3–65:3, Dawn testimony, 113:1–114:1; Ex. 371, May 1, 2013 Audio Recording, 23:35–26:36.)

221.    Dr. Stites described the scene as follows:

What we have done for other investigators in the department, and we were hoping that we could find a solution recognizing that there would have to be a combination of some cost savings as well as some departmental bridge funds to see if he could get to the next potential funding from the NIH. We had confidence in his abilities as a scientist.

But the meeting rapidly deteriorated.

Curt -- Dr. Klaassen while sitting at the table began to flush, his voice started getting angry as he started talking about the $250,000 that I had personally taken from him. He called me a liar. He moved to the white board where he wanted to try and write out all the information that he had said, all the while his behavior was clearly becoming more agitated. He was -- starting to shake his -- his face continued to turn red and it became clear that he was getting angrier and angrier when his voice continued to rise. At that point I asked him to sit down, that we didn't want to use the white board. He did not do that, and instead his behavior continued to escalate in a fashion that I find unacceptable for a faculty member, and frankly, was both scary and concerning to me and, I think, the other people in the room.

(Ex. 367, Nov. 12, 2013 Hearing Transcript, Stites Testimony, 155:22-156:22.)

222.     At 26:35 in Dr. Klaassen's secret audio recording of the meeting, Dr. Stites, in a calm voice, is heard telling Dr. Klaassen: "So I'm not going to get into this right now," to which Dr. Klaassen in a raised voice cries, "Why not?" Dr. Stites responds, in a calm voice: "Because I have to be at a different place right now. So if you can put that in a piece of paper I'd be happy to look at it. I know you said you sent it to me but send it again. But as I told you, things have happened on the University level. Things that happened before you joined the Department. We are not going to get into." (Ex. 371, May 1, 2013 Audio Recording, 26:35–26:53.)

223.     At 26:54 in the audio recording, Dr. Klaassen, in a raised, angry, and stressed voice is heard to begin ranting: "Okay. I know you're not going to touch it. I want . . . Okay then tell me what's going to the future. What does it mean to be a member of this department? I haven't the slightest idea. Everything you told to my lab, you lied to them." Dr. Stites is heard in a calm voice replying: "Curt, Curt, no I didn't Curt." Professor Klaassen responded: "Yes." Dr.

Stites, continuing in a calm voice, responds: "At that level, right now this meeting is adjourned. I'm not going to go into that. If you are going to say something like that and get angry and this worked up, then we're not going to meet. So this meeting is over." Dr. Klaassen, continuing in an angry, shrill voice, responds: "Sure, it's very easy to do it when you're a bigshot. You don't want to know the facts. Why did you charge me $200,000 a year from now on. Why?" Dr. Stites, in a calm, subdued voice responds: "Curt, the meeting's over." Dr. Klaassen responds angrily: "I know it's over. Why, because you have no ethics." (Ex. 371, May 1, 2013 Audio Recording 26:54-27:40.)

224.    At 28:00 in the audio recording, Dr. Stites is heard in a startled and fearful voice to say: "Step back now. Step back away from me right now. You stay there. Stay there. Leave the room. The meeting's done, Curt." Dr. Klaassen responds: "May I get my coffee?" Dr. Stites responds: "Get out. Get out." Professor Klaassen again asks: "May I get my coffee?" Dr. Stites responds: "Get out. And if you ever pull that again, you will be out of this Department." Dr. Klaassen responds: "Pull what?" Dr. Stites responds: "Curt, get out. You don't walk in a meeting and call me a liar and unethical. Get out, get out." (Ex. 371, May 1, 2013 Audio Recording, 28:00–28:38.)

225.    In the course of the May 1, 2013, meeting, Dr. Klaassen was visibly angry and agitated, his face red, his hands shaking, and he came very close to Dr. Stites physically in a threatening and challenging manner pointing his finger very close to Dr. Stites's face. (Ex. 367, Nov. 12, 2013 Hearing Transcript, O'Brien-Ladner testimony, 25:1-26:13; Hopkins testimony, 67:24-68:13; Dawn testimony, 114:24-116:6; Stites testimony, 156:2-157:20.)

226.    Dr. Stites felt threatened by Dr. Klaassen's conduct in the meeting, and Dr. Klaassen's conduct also made Dr. Stites concerned about the safety of the other people in the room. (Ex. 367, Nov. 12, 2013 Hearing Transcript, Stites testimony, 158:4-15.)

227.    Over the course of his 23 years as a faculty member at KUMC, Dr. Stites had never had an encounter with a faculty member like the one he had with Dr. Klaassen on May 1, 2013, in which he felt personally threatened. (Ex. 367, Nov. 12, 2013 Hearing Transcript, Stites testimony, 158:2-3.)

228.    Dr. Dawn has never seen a faculty member engage in the kind of threatening, physically intimidating, and dangerous behavior Dr. Klaassen engaged in in the May 1, 2013, meeting. (Ex. 367, Nov. 12, 2013 Hearing Transcript, Dawn testimony, 115:21-116:12.)

229.    Dr. O'Brien-Ladner had never been in a setting in which someone had been as angry and physically active as Dr. Klaassen was in the May 1, 2013, meeting, nor had she witnessed conduct from a faculty member that prompted her to contemplate calling security. (Ex. 367, Nov. 12, 2013 Hearing Transcript, O'Brien-Ladner testimony, 25:3-14; 26:1-27:3.)

230.    Dr. O'Brien-Ladner said that once Dr. Klaassen's angry outburst began, it destabilized the meeting and prompted the meeting to have to be concluded prematurely. She said:

> I think the reality in retrospect was in the example of the inability to recognize the offer of -- of a success strategy for the individual who is -- whose anger interferes with being able to recognize opportunity, but also then demonstrates disregard for the safety or at least the sense of safety in the individuals also involved that are trying to partner. I found it to be a dangerous situation.

(Ex. 367, Nov. 12, 2013 Hearing Transcript, O'Brien-Ladner testimony, 26:14-18; 31:2-10.)

231.    Christina Hopkins described Dr. Klaassen's conduct in the May 1, 2013, meeting as making her "nervous, I didn't know what to expect next." His conduct scared her:

"[P]ersonally my heart [was] beating, you know, rapidly. I'm not sure what to do with it, escalated. You know, thinking about, well, the door's behind me, the phone's in the corner, those kinds of things if it, you know – what would happen next. I know that the loud tone of his voice, it was scary. Yeah." (Ex. 367, Nov. 12, 2013 Hearing Transcript, Hopkins testimony, 66:14-19; 67:7-15.)

232.    The Internal Medicine Department ended up having to pay expenses because of Dr. Klaassen's over-expenditures. (Ex. 768, Dec. 6, 2016 Jury Trial Transcript, Vol. VI, Stites testimony, 170:2-8.)

**May 7, 2013 Incident**

233.    Less than one week later, on May 7, 2013, Dr. Klaassen had another encounter with staff member Christina Hopkins. (Ex. 767, Dec. 12, 2016 Jury Trial Transcript, Vol. X, Klaassen testimony, 49:7-16.)

234.    On May 7, 2013, Dr. Klaassen came to Christina Hopkins and Jennifer Bean's office unannounced and initially inquired of Ms. Bean about a receipt. (Ex. 367, Nov. 12, 2013 Hearing Transcript, Hopkins testimony, 70:5-15.)

235.    After speaking with Ms. Bean, Dr. Klaassen came to Ms. Hopkins's desk and asked: "Did Stites come back to bully anybody else after the meeting the other day?" to which Ms. Hopkins responded: "No. He went off to his next meeting pretty much right away." (Ex. 367, Nov. 130, 2013 Hearing Transcript, Hopkins testimony, 77:16-25.)

236.    Dr. Klaassen then told Ms. Hopkins that he needed to explain to her the difference between her way of accounting and his way of accounting and asked for a blank piece of paper, which Ms. Hopkins handed to him. Dr. Klaassen then started to scribble on the paper becoming increasingly agitated, loud, and leaning into Ms. Hopkins's small work space until he was very

close to her face, telling her: "You wouldn't handle your personal finances this way;" and claiming "his money" was "stolen from him." (Ex. 730, picture of work space; Ex. 10, Hopkins Statement; Ex. 367, Nov. 12, 2013 Hearing Transcript, Hopkins testimony, 71:12-72:3.)

237.    Dr. Klaassen complained to Ms. Hopkins about what he described as her way of accounting. (Ex. 367, Nov. 12, 2013 Hearing Transcript, Hopkins testimony, 71:3-72:14.)

238.    Ms. Hopkins told Dr. Klaassen that his complaints were out of her control. She said that Dr. Klaassen was waving his pen in his hand within an inch of her face and that his proximity and volume was clearly an attempt to intimidate her. (Ex. 10, May 7, 2013, Hopkins Statement.)

239.    Dr. Klaassen's loud, angry tone of voice and physical proximity to her "startled her and upset [her]" and made her feel "scared and helpless." (Ex. 367, Nov. 12, 2013 Hearing Transcript, Hopkins testimony, 70:8-74:7; 74:21-75:3.)

240.    In response to Ms. Hopkins's statement that she felt intimidated, Dr. Klaassen testified: "Hey, most people when they're around me they feel intimidated, so, I don't doubt that she felt intimidated. I don't try to intimidate anybody, but when people know I'm so successful, they automatically are intimidated by me, just like a president would come into this room right now, we'd all be intimidated of the President of the United States." (Ex.709, Klaassen Depo., 154:5-14.)

241.    Although Dr. Klaassen testified that he was explaining to her that she does the accounting wrong, Dr. Klaassen can't point to any specific document showing how Ms. Hopkins was doing anything wrong in the grant accounts. (Ex. 709, Klaassen Depo., 155:21-156:21.)

242.    Dr. Klaassen never gave Ms. Hopkins a specific example of any account that was improperly accounted for. (Ex. 709, Klaassen Depo., 156:22-157:2.)

243.     Dr. Klaassen doesn't know that there were inaccuracies in the COBRE Grant accounting. (Ex. 709, Klaassen Depo., 108:18-25.)

244.     Dr. Klaassen describes Ms. Hopkins as "a very nice young lady right out of college, trying to do her best." (Ex. 709, Klaassen Depo., 151:21-23.)

245.     Ms. Hopkins was not in a position to make Dr. Klaassen the PI on any grant. (Ex. 709, Klaassen Depo., 155:21-156:3.)

246.     Paula Daugherty, who worked across the hall from Ms. Hopkins, witnessed the events of May 7. Ms. Daugherty observed Dr. Klaassen standing in front of Ms. Hopkins's desk as Ms. Daugherty passed the office. She observed Dr. Klaassen in close proximity to Ms. Hopkins stooped over her desk. Ms. Daugherty could hear Dr. Klaassen's voice getting louder before she heard Ms. Hopkins say, "There's nothing I can do about it," which prompted Ms. Daugherty to leave her desk, cross the hall, and look in Ms. Hopkins's office, where she saw Dr. Klaassen was behind Ms. Hopkins's desk. Alarmed by Dr. Klaassen's conduct, Ms. Daugherty asked Dr. Dawn and Dustin Carillo to intervene. (Ex. 731, May 7, 2013 Daugherty Statement.)

247.     When called on May 7, Dr. Dawn ran upstairs to Ms. Hopkins's office, where he observed Ms. Hopkins visibly shaken and close to tears with Dr. Klaassen standing in front of her desk, visibly angry and agitated. (Ex. 367, Nov. 12, 2013 Hearing Transcript, Dawn testimony, 116:15 – 117:12.)

248.     Dr. Dawn directed Dr. Klaassen to leave the room and come with him, but Dr. Klaassen said he was running late for a conference and left. (Ex. 367, Nov. 12, 2013 Hearing Transcript, Dawn testimony, 117:2–12.)

249.     Ms. Hopkins, as a result of Dr. Klaassen's conduct in the May 1 and May 7, 2013, incidents, concluded she would not meet with him in person and could not work with him

because she did not want to end up in another incident where she was "left helpless without a response and cornered in my office." (Ex. 367, Nov. 12, 2013 Hearing Transcript, Hopkins testimony, 76:16-22.)

250.    Ms. Bean felt very uncomfortable and scared at the volume Dr. Klaassen was using, and did not want to leave Ms. Hopkins alone in the office with Dr. Klaassen. (Ex. 367, Nov. 12, 2013 Hearing Transcript, Bean testimony, 146:11-18.)

251.    Ms. Bean has never encountered another faculty member act as Dr. Klaassen did on May 7, 2013. (Ex. 367, Nov. 12, 2013 Hearing Transcript, Bean testimony, 146:19-21.)

252.    Dr. Dawn described Dr. Klaassen's conduct and behavior in the May 1, 2013, and May 7, 2013, incidents as "accusatory, belligerent, disobedient, [and] insubordinate," and stated such behavior "should not be tolerated, cannot be tolerated," and said he "would condemn those behaviors on both occasions in the strongest fashion or in the strongest manner." (Ex. 367, Nov. 12, 2013 Hearing Transcript, Dawn testimony, 119:16-24.)

**Second Administrative Leave**

253.    On May 8, 2013, Dr. Stites sent Dr. Klaassen a letter placing him on administrative leave with pay and suspending his duties at the University while he was on administrative leave. (Ex. 7, May 8, 2013, Letter; Ex. 709, Klaassen Depo., 163:24-164:2.)

254.    The reasons Dr. Klaassen was placed on administrative leave are set forth at Exhibit 7. In the letter, Dr. Stites states: "It has been observed by me and reported to me by others that you have engaged in behavior and made statements that were belligerent and abusive to other faculty and staff. You made these statements and engaged in this behavior in a meeting involving departmental leadership and subsequently with a department staff member. These

interactions were frightening to the individuals and witnesses concerned and totally unacceptable in our University work environment." (Ex. 7, May 8, 2013 Letter.)

255.    The letter explains that Dr. Klaassen was being placed on administrative leave in order to fully review and investigate these incidents, and to provide for the safety of others. (Ex. 7, May 8, 2013 Letter.)

256.    The letter further informed Dr. Klaassen that he was not "permitted to administratively direct anyone at KUMC, travel for business-related purposes, or appear or present at any meeting or conference," except in his personal capacity unrelated to his work at KUMC. It further stated that during his suspension from duties, KUMC administration would decide the future direction and continuation of all programs Dr. Klaassen directed at KUMC. (Ex. 7, May 8, 2013 letter.)

257.    Despite being prohibited from directing anyone at KUMC, Dr. Klaassen began holding class at his home within a week after his administrative leave began. (Ex. 708, Nov. 29, 2016 Jury Trial Transcript, Vol. II, Cheri Klaassen testimony, 125:24-126:7.)

258.    Dr. Rawitch wrote to Dr. Klaassen and advised him that administrative leave is not a disciplinary sanction. He noted that administrative leave with pay is not an adverse personnel action and is within the inherent authority of the administration. This is consistent with the Board of Regents policy on Interference with Conduct of Institution, Section II(G)(17). (Ex. 203, May 20, 2013 Letter; Ex. 732, Board of Regents Policy.)

259.    Dr. Klaassen is aware that under the State of Kansas Work Place Violence Policy, any person that makes threats, exhibits threatening behavior, or engages in violent acts on State owned or leased property may be removed from the premises pending the outcome of the investigation. (Ex. 709, Klaassen Depo., 164: 3-12; Ex. 733, Work Place Violence Policy.)

260.     On May 13, 2013, Dr. Klaassen sent an email to Dr. O'Brien-Ladner, Dr. Stites, and Dr. Dawn, copying others and apologizing for his statements during the May 1, 2013, meeting. (Ex. 11, May 13, 2013, Dr. Klaassen Apology email.)

261.     Dr. Klaassen did not apologize to Ms. Hopkins. (Ex. 709, Klaassen Depo., 160:2-4.)

262.     Dr. Klaassen testified that his May 13, 2013, email apology was insincere. (Ex. 709, Klaassen Dep. 162:3-10.)

**Second Inquiry Report**

263.     In accordance with the KUMC Handbook, the University conducted an inquiry into Dr. Klaassen's conduct. (Ex. 602, June 10, 2013 Inquiry Report, 1.)

264.     Dr. Rawitch received witness statements and emails and conducted telephone interviews. (Ex. 602, June 10, 2013 Inquiry Report, 2.)

265.     After conducting the investigation, Dr. Rawitch concluded:

In light of the unanimous agreement by the witnesses to the recent behavior that Dr. Klaassen's behavior was overtly threatening, and considering Dr. Klaassen's prior discipline and censure by KUMC in June 2012, as a result of a prior complaint where he was found to have engaged in abusive and unprofessional treatment of faculty and staff, and of behavior that was disruptive and unacceptable (*see* June 2012 censure letter attached hereto as Exhibit E), I recommend a full investigation by an ad hoc committee as defined in the KUMC Handbook**.**

(Ex. 602, June 10, 2013 Inquiry Report, 2.)

266.     The Inquiry Report was six pages long and attached multiple exhibits pertaining to the events for which Dr. Rawitch recommended a full investigation. (Ex. 602, June 10, 2013 Inquiry Report.)

267.     On June 10, 2013, Dr. Rawitch provided the Inquiry Report to Dr. Klaassen. (Ex. 602, June 10, 2013 Inquiry Report, 1.)

268.     Dr. Klaassen, through his counsel, provided a written response to the June 10, 2013, Inquiry Report. (Ex. 778, June 26, 2013 Response to 2013 Inquiry Report.)

269.     In August 2012, Dr. Klaassen emailed his students and encouraged them to spend money freely in his absence. (Ex. 653, Aug. 14, 2013 Klaassen email.)

270.     On November 1, 2013, before the Second Ad Hoc Hearing Committee ("Second Hearing Committee") convened, Dr. Klaassen advised his students:

> I talked to my lawyer and asked if you guys should or should not talk to a news reporter. He said it was OK. If you do, say positive things about me and negative things about the university. Try not to say anything bad about me (I realize you probably have a list of 1000 bad things), and when it comes to the university, emphasize the bad – especially in regard to education.

(Ex. 657, Nov. 1, 2013 email.)

**Second Ad Hoc Hearing**

271.     On November 13, 2013, the Second Hearing Committee, a committee of Dr. Klaassen's faculty peers including one professor selected by Dr. Klaassen, convened to hear the allegations regarding Dr. Klaassen's personal and professional misconduct. (Ex. 367, Nov. 12, 2013 Hearing Transcript.)

272.     Dr. Klaassen was represented by counsel at the hearing, which lasted a full day and included the introduction of hundreds of exhibits. (Ex. 367, Nov. 12, 2013 Hearing Transcript.)

273.     The University called as witnesses Dr. O'Brien-Ladner, Ms. Hopkins, Dr. Dawn, Ms. Bean, Dr. Stites, and Dr. Terranova. Counsel for Dr. Klaassen was permitted to cross-examine each of these witnesses. (Ex. 367, Nov. 12, 2013 Hearing Transcript.)

274.     Counsel for Dr. Klaassen called Dr. Klaassen and Julie Cui as witnesses. (Ex. 367, Nov. 12, 2013 Hearing Transcript.)

275. On direct examination, Dr. Stites did not offer any testimony regarding the specific duration of the May 1 confrontation. (Ex. 367, Nov. 12, 2013 Hearing Transcript.)

276. When asked by Dr. Klaassen's counsel on cross examination how long Dr. Klaassen was screaming during the May 1 meeting, Dr. Stites, stated: "I don't remember how long it was." When Dr. Klaassen's counsel asked a further question about whether the confrontation lasted more than five minutes, Dr. Stites—having acknowledged he didn't know the answer—offered the speculation that "it was probably somewhere between five and ten minutes." (Ex. 367, Nov. 12, 2013 Hearing Transcript, Stites testimony, 168:14-21.)

277. Following the testimony of Dr. Stites, counsel for Dr. Klaassen played the tape recording for the Hearing Committee. (Ex. 367, Nov. 12, 2013 Hearing Transcript, 251:7.)

278. On December 12, 2013, Dr. Klaassen asked the members of his lab to be untruthful with the Administration. In particular, in all capital letters at the last entry in a long line of communications with his lab members, Dr. Klaassen told the members of his lab:

> Helen et al. ALL KNOW THAT WE HAVE NOT COMMUNICATED TODAY OR ANY DAY SINCE MAY 8

(Ex. 666, Dec. 12, 2013 email.)

279. At the time that Dr. Klaassen sent the December 12, 2013, email (Ex. 666) to his lab members, he was awaiting a decision from the EVC on his future at the University. (Ex. 771, Dec. 9, 2016 Jury Trial Transcript, Vol. IX, Klaassen testimony, 129:3-8; 130:15-132:6.)

280. The Second Hearing Committee found Dr. Klaassen guilty of professional misconduct in his treatment of faculty and staff. It stated: "Dr. Klaassen's passion and agitation could be interpreted by others as abusive and threatening. During the May 1 meeting and in the separate incident on May 7, 2013, he conducted himself in a fashion which could be interpreted as unprofessional toward other faculty and staff. This conduct appears to flow from his inability

50

to self-monitor his behavior, and sometimes shows little respect for others." The Committee concluded Dr. Klaassen's behavior "was not appropriate" and found him "guilty of professional misconduct as defined by the [KUMC] handbook, in his treatment of fellow faculty and staff." (Ex. 638, Dec. 9, 2013 Second Ad Hoc Hearing Decision.)

281.    The Committee recommended that Dr. Klaassen be sanctioned with a written warning and returned to work. It also recommended that "continuation and repetition of the conduct found wrongful here within the next year (12 months) may be cause for more severe disciplinary action." (Ex. 638, Dec. 9, 2013 Second Ad Hoc Hearing Decision.)

**Termination Decision**

282.    Dr. Girod, exercising the discretion vested in him under the KUMC Handbook, determined that dismissal from employment was the proper sanction for Dr. Klaassen's personal and professional misconduct. (Ex. 33, Jan. 6, 2014 Letter; Ex. 713, Nov. 30, 2016 Jury Trial Transcript, Vol. II, Terranova testimony, 50:6-7.)

283.    By letter dated January 6, 2014, Dr. Girod explained his rationale for imposing the sanction of dismissal, noting that this misconduct was precisely the kind of conduct that Dr. Klaassen had been warned in 2012 would not be tolerated, and yet it had escalated in a year. In addition, Dr. Girod noted Dr. Klaassen's repeated failure to recognize and understand the seriousness of his misconduct, which led him to conclude that it was more likely than not that similar misconduct and volatile behavior would be repeated in the future. Dr. Girod concluded that placing Dr. Klaassen back in the workplace was "a risk that the University is unwilling to take." (Ex. 33, Jan. 6, 2014 Letter.)

284.    Dr. Girod's January 6, 2014, decision letter informed Dr. Klaassen that his dismissal would be effective January 10, 2014. By agreement, the parties extended that date to January 24, 2014. (Ex. 33, Jan. 6, 2014 Letter; Ex. 734, Jan. 24, 2014 Letter.)

285.    Under the KUMC Handbook, dismissal is recognized as "a for-cause disciplinary sanction" that may result from a finding of personal misconduct. (Ex. 709, Klaassen Depo. 368:19-369:9; Ex. 209, Handbook, 44.)

286.    Dr. Klaassen admits that the Second Hearing Committee's recommendation to censure him was merely a recommendation, and that Dr. Girod was entitled to select another sanction if he found it appropriate. (Ex. 367, Klaassen Depo. 369:6-9.)

**Third Ad Hoc Hearing**

287.    Dr. Klaassen appealed under the KUMC Handbook. (Ex. 775, March 7, 2014 Letter to Girod.)

288.    In an appeal from dismissal, the faculty member bears the burden of proving the grounds for appeal. The KUMC Handbook identifies the following grounds for appeal: "(a) that the Executive Vice Chancellor had no reasonable basis in fact for selecting the appellant for dismissal, (b) that improper procedures were followed in dismissing the appellant, or (c) the selection of the appellant was based on age or on constitutionally impermissible reasons." (Ex. 209, KUMC Handbook, p. 123.)

289.    On November 19, 2014, the Third Ad Hoc Hearing Committee ("Third Hearing Committee"), a faculty committee of Dr. Klaassen's peers, including one professor selected by Dr. Klaassen (Ex. 735, Sept. 18, 2014 email), heard Dr. Klaassen's appeal. Dr. Klaassen was present and represented by counsel. Dr. Klaassen submitted records, exhibits and transcripts from the Second Ad Hoc Hearing and had the opportunity to speak to the Committee. He played

the secret tape recording of the May 1, 2013, meeting for the Committee. (Ex. 736, Nov. 19, 2014 Hearing Transcript, 24:16-17.)

290.    On December 5, 2014, the Third Hearing Committee submitted its decision and recommendation, concluding that Dr. Klaassen had failed to prove any of the grounds for appeal and that Dr. Girod had acted within his administrative capacity in terminating Dr. Klaassen's employment. (Ex. 609, Dec. 5, 2014 Letter.)

291.    The Committee's conclusions include the following:

We note that all State of Kansas employees are required to undergo annual compliance training programs, one module of which covers the State of Kansas Policy on Workplace Violence and clearly states "Workplace Violence includes any incident in which an employee, student, or other person is abused, threatened, intimidated, or assaulted, including any other disruptive behavior which unreasonably interferes with work performance by fellow employees, students or by a member of the public" and that verbal abuse includes "Threats, Verbal Intimidation, Harassment."

Dr. Klaassen, as a long-standing and senior faculty member and as a past Chair of a School of Medicine Department, should have been knowledgeable about the KU Medical Center's Human Resources policy on workplace violence.

Dr. Stites placed Professor Klaassen on administrative leave with pay, a specifically authorized administrative action that is not a disciplinary sanction. Dr. Stites's response is consistent with preserving a safe work environment as required by the Kansas State Policy on Workplace Violence and with the Human Resources policies for KU Medical Center.

Professor Klaassen's claim neglects the rights of his peers, co-workers, and subordinates to expect a safe work setting free of intimidation and disruptive behavior.

(Ex. 609, Dec. 5, 2014 letter.)

292.    The Committee's conclusion including the following:

Based on Dr. Klaassen's 2012 censure and for the reasons outlined in 1.B. above, the Appeal Committee concludes Dr. Klaassen should have been aware of the unacceptability of the behavior in which he engaged on May 01 and May 07, and of the potential serious consequences stemming from such behavior.

(Ex. 609, Dec. 5, 2014 letter.)

293.    The Committee's conclusion also included the following:

Dr. Klaassen claimed several times that his termination was in retaliation for his outspoken views on KUMC policies and administration.

The Appeal Committee was not provided with any evidence that Dr. Girod's dismissal decision was related to a violation of Dr. Klaassen's First Amendment rights.

(Ex. 609, Dec. 5, 2014 letter.)

294.    The Third Hearing Committee:

- Considered and rejected the argument that the witnesses were promoted or awarded for their testimony,
- Considered and rejected the argument that the factual basis of Dr. Girod's decision was unclear,
- Considered and rejected the idea that Dr. Klaassen had been disciplined without notice with regard to administrative leave,
- Considered and rejected that Dr. Klaassen was terminated without authority,
- Considered and rejected that the University failed to follow the KUMC Handbook,
- Considered and rejected the idea that KU forced any witnesses to appear at the hearing, and
- Addressed the four-hour time limitation.

(Ex. 736, Nov. 19, 2014 Hearing Transcript, 69:13-70:7.)

295.    On December 23, 2014, Dr. Girod issued his final decision on the appeal, accepting the Third Hearing Committee's determination that Dr. Klaassen's appeal had not met any of the required criteria to warrant a different outcome and that the dismissal decision should stand. (Ex. 237, Dec. 23, 2014 Letter.)

**KJRA Case in Wyandotte County**

296.    On January 23, 2015, Dr. Klaassen filed a Petition for Judicial Review in Wyandotte County, Kansas District Court pursuant to the Kansas Judicial Review Act ("KJRA Matter"). (Ex. 737, Petition for Judicial Review.)

297.    The allegations in Dr. Klaassen's KJRA Petition came directly from Dr. Klaassen's First Amended Complaint from this case, with only minor changes and a couple of additional paragraphs. (Ex. 737, Petition for Judicial Review; Doc. 66, First Amended Complaint.)

298.    On June 19, 2015, Dr. Klaassen filed his brief in Support of Judicial Review in the KJRA Matter. His arguments were based on alleged due process violations. His first argument was:

> The University acted arbitrarily, failed to follow its policies, and took actions based on determinations of fact not supported by substantial evidence when it terminated Dr. Klaassen in violation of his due process rights.

(Ex. 738, Petitioner's Brief in Support for Judicial Review, 12.)

299.    Dr. Klaassen argued that he was fired "without notice or an opportunity to be heard in violation of his constitutionally protected due process rights." (Ex. 738, Petitioner's Brief in Support for Judicial Review, 12.)

300.    On September 21, 2015, after hearing oral arguments in the KJRA Matter, Wyandotte County District Judge Duncan remanded the matter to the University "for re-hearing with additional notice and opportunity to be heard." (Ex. 739, Sept. 21, 2015 Order.)

301.    In ordering remand, the court expressed concern that Dr. Girod's use of the phrase "totality of the circumstances" may have referred to charges of which Dr. Klaassen had not previously received notice. (Ex. 776, September 15, 2015 Transcript, 55:9-56:21.)

302.    In compliance with the court's Order, Dr. Girod issued a letter to Dr. Klaassen providing additional notice and clarifying any misunderstanding Dr. Klaassen may have had. Dr. Girod's letter stated, in part:

> I concluded that the sanction of written warning was inadequate to address the very serious nature of your misconduct and failed to recognize the

repeated and continuing nature of your conduct, for which there is no excuse
and for which you were disciplined previously…

Because the record demonstrated that severe discipline like that imposed in
2012 did not succeed in compelling you to correct your misconduct, I had to
consider that future misconduct and volatile behavior by you was more likely
than not. The University cannot tolerate a continuing pattern of escalating,
unprofessional and disruptive conduct from any faculty or staff member,
particularly when, as here, it led to other faculty and staff feeling physically
threatened, regardless of the passion that you feel about your situation or the
perceived mistreatment you believe that you have experienced. Placing you
back into the workplace was a risk that the University was unwilling to take.
Therefore, I have concluded that your dismissal was the proper sanction and
write to reaffirm my January 6, 2014 Decision, as clarified in this letter.

(Ex. 41, October 20, 2015 letter from Girod.)

**Fourth Ad Hoc Hearing**

303.    On March 29, 2016, the Fourth Ad Hoc Hearing Committee ("Fourth Hearing

Committee"), a faculty committee of Dr. Klaassen's peers, considered Dr. Klaassen's appeal on

remand. Dr. Klaassen was present and represented by counsel. (Ex. 740, March 29, 2016 Hearing

Transcript, 1-5.)

304.    The March 29, 2016, hearing lasted approximately six hours. Dr. Klaassen's

counsel did not call any live witnesses, including Dr. Klaassen, who was in the room during the

hearing. Dr. Klaassen did not use the full six hours that Dr. Klein, Vice Chancellor for Academic

Affairs, allotted for Dr. Klaassen to submit his case. (Ex. 740, March 29, 2016 Hearing

Transcript, 1-5, 239.)

305.    Both parties made oral arguments, submitted additional briefing, and submitted

new evidence. (Ex. 740, March 29, 2016 Hearing Transcript, 11, 129.)

306.    The University showed the Committee videotaped deposition clips. (Ex. 740,

March 29, 2016 Hearing Transcript.)

307.    Dr. Klaassen was permitted to submit:

- The hearing transcript and all testimony provided in the First, Second, and Third Ad Hoc Committee Hearings;
- The entire KJRA Agency Record, which is comprised of nearly 8,000 pages of documents and the tape recording of the May 1, 2013 meeting;
- The complete depositions of seven witnesses, including Dr. Klaassen;
- All 186 deposition exhibits that existed at the time; and
- A PowerPoint setting forth Dr. Klaassen's arguments.

(Ex. 740, March 29, 2016 Hearing Transcript; Ex. 777, March 29, 2016 Klaassen Administrative Appeal PowerPoint.)

308.    While the Committee allotted him six hours to present his argument and evidence, Dr. Klaassen completed his presentation in approximately two and a half hours. (Ex. 740, March 29, 2016 Hearing Transcript.)

309.    On April 8, 2016, the Fourth Hearing Committee stated that it "specifically considered arguments and evidence presented by Dr. Klaassen on March 29, 2016 in reaching" its decision, and it found in favor of the University: "This Appeals Panel concludes Dr. Girod's termination of Dr. Klaassen was within Dr. Girod's authority as EVC, and was an appropriate sanction for Dr. Klaassen's misconduct." The Committee considered and rejected each of Dr. Klaassen's challenges to the termination decision. (Ex. 610, April 8, 2016 Letter.)

310.    The Committee found, "the adverse personnel actions against Dr. Klaassen were imposed for legitimate reasons, based on Dr. Klaassen's professional and continued personal misconduct rather than an intentional retaliation for his criticism of KUMC administration." (Ex. 610, April 8, 2016 Letter.)

311.    The Committee rejected Dr. Klaassen's argument that Dr. Girod's termination decisions were inconsistent fabrications and held that "Dr. Girod's termination letter of 01/06/14 clearly states the termination is based on a pattern of unacceptable conduct. Dr. Klaassen had

previously been censured for this conduct and had been warned . . . that any repetition would not be tolerated. Those reasons were stated in the letter of 10/20/15." (Ex. 610, April 8, 2016 Letter.)

312.    The Fourth Hearing Committee rejected Dr. Klaassen's arguments that KUMC retaliated against Dr. Klaassen for being a critic of the Administration or in violation of Dr. Klaassen's First Amendment rights. The Committee noted that "while Dr. Klaassen certainly is entitled to express his opinion in public venues, we do not believe he can then assert that adverse actions must necessarily be in retaliation for so doing." (Ex. 610, April 8, 2016 Letter.)

313.    The Committee ended its decision by stating:

> Our Appeals Panel has taken seriously our responsibility to render a fair decision, both for Dr. Klaassen as a colleague and for the wider community of KU Medical Center. We have been deliberate and careful in considering the events leading up to Dr. Klaassen's dismissal as presented by both parties. We acknowledge contributions made by Dr. Klaassen to our academic and scientific communities, while recognizing the negative effects of his actions on other members of these same communities. After hearing the evidence provided on March 29th, 2016 and deliberating, the Appeals Panel was unanimous in concluding the termination of Dr. Klaassen was within Dr. Girod's authority as EVC, and was an appropriate sanction for Dr. Klaassen's misconduct.

(Ex. 610, April 8, 2016 Letter.)

**Decision by Chancellor**

314.    On April 11, 2016, Dr. Girod forwarded the Fourth Hearing Committee's decision to Chancellor Bernadette Gray-Little, the CEO of the University of Kansas, for her consideration. (Ex. 741, April 11, 2016 Email.)

315.    On April 22, 2016, Chancellor Gray-Little notified Dr. Klein and the parties' counsel that she would take final action on the matter in her role as CEO of the University. (Ex. 232, April 22, 2016 Letter.)

316.    Chancellor Gray-Little reviewed the entire record related to Dr. Klaassen's conduct and discipline and affirmed the termination decision. She found that Dr. Klaassen "repeatedly engaged in unprofessional and personal misconduct." (Ex. 230, May 9, 2016 Letter.)

317.    On May 9, 2016, Chancellor Gray-Little notified Dr. Klaassen of the documents she reviewed in consideration of his case and notified him of her decision that termination of his employment was appropriate. (Ex. 230, May 9, 2016 Letter.)

**KJRA Remand Proceedings**

318.    On June 10, 2016, Dr. Klaassen filed a Petition for Judicial Review on Remand in the KJRA Matter. (Ex. 742, Petition for Judicial Review on Remand.)

319.    In that Petition, Dr. Klaassen contended:

- KUMC's Appeal Hearing of March 29, 2016, violated the KJRA Court's Remand Order of September 21, 2015. (Ex. 742, Petition for Judicial Review on Remand, 25.)

- Dr. Girod's shifting termination explanations lack a factual basis supported by the evidence, are unreasonable and arbitrary and in violation of the remand order. (Ex. 742, Petition for Judicial Review on Remand, 28.)

- KUMC violated Dr. Klaassen's constitutional rights by having the prosecuting attorney serve as Dr. Klaassen's adjudicator. (Ex. 742, Petition for Judicial Review on Remand, 30.)

- KUMC terminated Dr. Klaassen in violation of his First Amendment rights. (Ex. 742, Petition for Judicial Review on Remand, 32.)

- KUMC violated its procedures and policies on remand. (Ex. 742, Petition for Judicial Review on Remand, 35.)

320.    In the KJRA Case, Dr. Klaassen argued that the University's Final Agency Action in terminating his employment was unconstitutional, that the University engaged in an unlawful procedure or failed to follow prescribed procedure, that the University's action was based on a determination of fact that was not supported by the appropriate standard of proof, and that the

University's actions were otherwise unreasonable, arbitrary, or capricious. (Ex. 744, KJRA Brief on Remand, 10.)

321.    In his prayer for relief, Dr. Klaassen sought reinstatement, front pay, compensatory damages, back pay, and attorney fees. (Ex. 742, Petition for Judicial Review on Remand, 37; Ex. 760, Transcript of Judicial Review Hearing, 39:10-11.)

322.    On September 6, 2016, Dr. Klaassen filed an Amended Petition for Judicial Review on Remand. (Ex. 743, First Amended Petition for Judicial Review on Remand.)

323.    Each party submitted briefs, exhibits, and deposition transcripts. The Court had access to a record consisting of more than 7,400 pages, including full transcripts of each hearing below. The Court held a half-day hearing. (Ex. 744, KJRA Brief on Remand; Ex. 745, Response in Opposition to Petitioner's Brief on Remand.)

324.    The administrative record was 14 notebooks thick. (Ex. 760, Transcript of Judicial Review Hearing, 52:10-14.)

325.    On November 28, 2016, after the KJRA Court heard oral arguments, it ruled in favor of the University, finding that the concerns the Court raised when remanding the matter were remedied, that there was "substantial competent evidence to support the decision of the University," and that the administrative appeal was denied. (Ex. 746, Nov. 28, 2016 Hearing Transcript, 117-118; Ex. 761, KJRA Order.)

326.    Dr. Klaassen has appealed the KJRA ruling. (Ex. 762, Dec. 23, 2016 Notice of Appeal.)

**Lawrence Journal-World**

327.     Although he does not recall precisely when, at some point in 2011, Dr. Klaassen called the Lawrence Journal-World ("LJW") on the telephone and then went over and talked with them. (Ex. 709, Klaassen Depo., 128:11-14.)

328.     Dr. Klaassen spoke with Dolph Simons, Jr., who worked at the LJW and wrote editorials, but he does not know what he told Mr. Simons. (Ex. 709, Klaassen Depo., 128:24-129:10; 142:14-16.)

329.     Dr. Klaassen did not discuss his removal as PI on any of the NIH Grants with Mr. Simons because that had not yet happened. (Ex. 709, Klaassen Depo., 141:14-18.)

330.     The first LJW article involving Dr. Klaassen is a news story written by Andy Hyland, dated April 28, 2011, which is headlined, "Department chairman at Kansas University Medical Center asked to step down." The story, pertaining to the decision to remove Dr. Klaassen from the Department Chair position, includes no comment from Dr. Klaassen. The article indicates he had "no comment." (Ex. 27, April 28, 2011 Lawrence Journal-World article.)

331.     Dr. Klaassen denies ever having spoken with Mr. Hyland. (Ex. 709, Klaassen Depo., 336:4-7.)

332.     Two days later, the LJW published a column reflecting Mr. Simons's editorial opinion that "Dr. Klaassen's firing reveals broader concerns at the University's medical center." Once again, Dr. Klaassen is not quoted. (Ex. 26, April 30, 2011 Lawrence Journal-World article.)

333.     On October 29, 2011, Mr. Simons published a Saturday column with the headline, "Leadership issues coming to light at KU Medical Center." The gist of the editorial opinion is that there were organizational changes to be made at KUMC. There are no comments attributed

to Dr. Klaassen. Mr. Simons briefly referred again to Dr. Klaassen's removal as department chair. (Ex. 747, Oct. 29, 2011 Lawrence Journal-World article.)

334.    On November 5, 2011, Mr. Simons published another editorial, noting his editorial opinion that there were problems of leadership at the athletic department and in the medical school at KU. The column was critical of Dr. Atkinson for "firing" Dr. Klaassen as chair of the Pharm/Tox Department. Again, there are no comments attributed to Dr. Klaassen. (Ex. 28, Nov. 5, 2011 Lawrence Journal World article.)

335.    Dr. Klaassen claims that he spoke to the LJW to help the University make a better medical school. (Ex. 709, Klaassen Depo., 353:20-354:10.)

336.    In particular, Dr. Klaassen wanted more money to be spent on his department rather than on other functions in the University, such as the development of campuses in Salina and Wichita and the development of a National Cancer Center Designation. (Ex. 709, Klaassen Depo., 140:14-141:6; 143:4-11.)

337.    Dr. Klaassen agrees that the decisions he described as mismanagement as to all of the bigger picture items – the Salina Campus, the Wichita Campus, the building of buildings, and the remodeling of buildings – were not illegal. Rather, he believed the decisions were unethical and that the faculty should have been involved in the decision-making process. (Ex. 709, Klaassen Depo., 143:4-144:20.)

338.    To the best of Dr. Klaassen's recollection, he did not accuse the University of any illegal acts when he spoke with Mr. Simons. (Ex. 709, Klaassen Depo., 144:8-16.)

**NIH Grants**

339.    KUMCRI is a 501(c)(3) non-profit organization that was established to support research grant administration for the University. There are various divisions, including legal and

finance, and it makes sure grant funds are spent according to the guidelines and wishes of the sponsor. (Ex. 713, Nov. 30, 2016 Jury Trial Transcript, Vol. II, Terranova testimony, 57:24-59:4.)

340.    At the time Dr. Klaassen was placed on his first administrative leave in 2011, Dr. Klaassen was the principal or co-principal investigator ("PI") on several NIH grants, including the COBRE Grant and the T32 Training Grant, both of which are large institutional grants. (Ex. 13, COBRE Grant; Ex. 14, Training Grant.)

341.    The purpose of the COBRE grant funding is to provide mentoring opportunities for junior faculty members. In addition to Dr. Klaassen, a co-investigator is identified on the grant application. The grant references an Internal Advisory Committee and an External Advisory Committee. (Ex. 13, COBRE Grant; Ex. 69, May 15, 2007 Notice of Award.)

342.    According to the NIH, "The objective of the COBRE initiative is to strengthen an institution's biomedical research infrastructure through the establishment of a thematic, multi-disciplinary center to enhance the ability of investigators to compete independently for National Institute of Health (NIH) individual research grants or other external peer-reviewed support. COBRE awards are supported through the Institutional Development Award (IDeA) Program, which aims to foster health related research by increasing the competitiveness of investigators at institutions located in states with the historically low aggregate success rates for grant awards from the NIH." (Ex. 193, Grant Overview.)

343.    Exhibit 13 is a copy of the Application submitted by the University for Phase 1 of the COBRE Grant on October 20, 2004. (Ex. 13, COBRE Grant.)

344.    The "Applicant Organization" and Grantee is KUMCRI. (Ex. 13, COBRE Grant; Ex. 709, Klaassen Depo., 42:2-7.)

345.    The Administration Official to be notified if the award is made is Mei-Shya Chen with KUMCRI. (Ex. 13, COBRE Grant.)

346.    The Official Signing for the Applicant Organization is Thomas Noffsinger with KUMCRI. (Ex. 13, COBRE Grant.)

347.    The PI is identified as Dr. Klaassen. (Ex. 13, COBRE Grant.)

348.    The University of Kansas authorized four persons to sign research and sponsored programs, grants and contracts. The list did not include Dr. Klaassen. (Ex. 13, COBRE Grant, 2.)

349.    The description of the program states, in relevant part:

Five years of funding are requested to develop a Center of Biomedical Research Excellence at Kansas University Medical Center with a focus on Nuclear Receptor and their Role in Liver Health and Disease. Five talented new faculty who share this research interest were selected with the goal of helping them become funded, independent researchers. A PI, a CO-PI, and internal advisory committee of experienced senior faculty and an external advisory committee of prominent scientists have been assembled to mentor them to this goal.

(Ex. 13, COBRE Grant.)

350.    On May 15, 2007, KUMCRI was notified that its application for a COBRE Grant was awarded. (Ex. 69, May 15, 2007 Notice of Award; Ex. 709, Klaassen Depo., 41:16-21.)

351.    Exhibit 14 is an application for a Training Grant to help train graduate and post-graduate doctoral toxicology students to do research at KUMC. (Ex. 14, Training Grant; Ex. 709, Klaassen Depo., 202:16-23.)

352.    The Training Grant was awarded to KUMCRI, not to Dr. Klaassen personally. Dr. Klaassen is identified as the PI. Dr. Paul Terranova was identified as the co-PI. (Ex. 14, Training Grant; Ex. 70, July 4, 2011 Notice of Award.)

353.    The "Applicant Organization" and "Grantee" for the Training Grant is KUMCRI. (Ex. 14, Training Grant.)

354.    The Administration Official to be notified if the award is made is Mei-Shya Chen with KUMCRI. (Ex. 14, Training Grant.)

355.    The Official Signing for the Applicant Organization is Ted R. Knaus with KUMCRI. (Ex. 14, Training Grant.)

356.    The description of the program states in relevant part:

> During the past 25 years, over 200 students have received instruction in the Toxicology Training Program at the University of Kansas Medical Center…Contained in this proposal is a request for five additional years of funding for the program.

(Ex. 14, Training Grant.)

357.    On July 4, 2011, the Training Grant was awarded to the KUMCRI. (Ex. 70, July 4, 2011 Notice of Award.)

358.    The NIH has a number of rules pertaining to the use of its grant money. (Ex. 709, Klaassen Depo., 43:8-10.)

359.    The NIH Grants Policy Statement defines the role of the Principal Investigator as "an individual designated by the applicant organization to have the appropriate level of authority and responsibility to direct the project or program supported by the award." It further explains that the PI is "responsible and accountable to the recipient organization or, as appropriate, to a collaborating organization, for the proper conduct of the project or program, including the submission of all required reports." (Ex. 752, NIH Grants Policy Statement, Section 2.1.2.)

360.    Dr. Klaassen acknowledges the authority of the NIH to approve a change in PI. (Ex. 709, Klaassen Depo., 259:8-16.)

361.    In the role of PI on a grant, the PI reports to the University and is responsible to the University. (Ex. 713, Nov. 30, 2016 Jury Trial Transcript, Vol. II, Terranova testimony, 56:15; Ex. 768, Dec. 6, 2016 Jury Trial Transcript, Vol. VI, Girod testimony, 84:8-17.)

362.     It is the Grantee organization, the University, that receives the money, and the PI is responsible to the University. (Ex. 713, Nov. 30, 2016 Jury Trial Transcript, Vol. II, Terranova testimony, 55:21-56:14.)

363.     The PI of a grant provides leadership and direction of the grant and has primary responsibility for administering the program. (Ex. 709, Klaassen Depo., 500:6-14.)

364.     Dr. Klaassen testified that it was within his role as PI to host meetings of the grant team, make hiring decisions related to the grant team, and to use the grant money as indicated in the grant. (Ex. 709, Klaassen Depo. 466:16-21; 471:8-472:2.)

365.     Before any expenditure is submitted to the NIH, there is a process at the Research Institute to check all of the expenses. (Ex. 768, Dec. 6, 2016 Jury Trial Transcript, Vol. VI, Girod testimony, 84:18-23.)

366.     KUMCRI has a policy referenced as "Principal Investigator Changes or Absences." It states, "When the Principal Investigator who has been granted a sponsored award or is participating in other funded research including privately funded clinical trials is unavailable to fulfill his or her obligation to the award agreement, the sponsoring agency or the project sponsor, in collaboration with the University of Kansas Medical Center (KUMC) will decide the course of action for the remaining terms of the award." (Ex. 16, PI Changes Policy.)

367.     The KUMC Handbook does not require any sort of due process procedure before changing a PI. (Ex. 209, KUMC Handbook.)

368.     The University has removed other individuals as PI from grants. (Ex. 753, Girod Depo., 77:17-78:9; 80:22-81:1, 101:24-102:12.)

369.     As a result of Dr. Klaassen's insubordinate behavior as a member of the Pharm/Tox Department in 2011, various individuals within KUMC discussed whether it

continued to make sense to have Dr. Klaassen serve as the PI of the COBRE and Training Grants. (Ex. 79, October 20, 2011 Email.)

370.    Dr. Terranova consulted with the NIH about its process regarding changing out the PI. (Ex. 80, Oct. 28, 2011 Email.)

371.    On November 1, 2011, Dr. Terranova advised Dr. Klaassen that while he was on leave, "KUMC administration will decide the future direction and continuation of all programs that you direct at KUMC. This determination will include consultation with appropriate faculty, other administrators at KUMC, and the NIH." (Ex. 84, Nov. 1, 2011 Letter.)

372.    As Vice Chancellor for Research, Dr. Terranova made the decision to request that the NIH change the PI on the COBRE and Training Grants from Dr. Klaassen to other KUMC professors on November 21, 2011, and requested that the NIH change the PI on three R01 grants in August 2013. (Ex. 94, August 30, 2013 email; Ex. 88, Nov. 21, 2011 Letter to NIH.)

373.    Dr. Terranova made the final decision to change the PI on the COBRE and Training Grants after Dr. Klaassen's actions at the October 28, 2011 "COBRE" meeting. Dr. Terranova had lost faith in Dr. Klaassen's ability to lead those grants and had become concerned that Dr. Klaassen's unprofessional behavior was compromising the goals of the grants. (Ex. 714, May 29, 2012 Hearing Transcript, Terranova testimony, 72:16-73:1; 83:1-22; Ex. 708, Nov. 29, 2016 Jury Trial Transcript, Vol. 1, 148:1-16.)

374.    On November 21, 2011, KUMCRI wrote to the NIH proposing to replace Dr. Klaassen as PI for the COBRE grant with Dr. Jaeschke. (Ex. 88, Nov. 21, 2011 Letters.)

375.    On November 21, 2011, KUMCRI also wrote to the NIH requesting to replace Dr. Klaassen as PI for the T32 Training Grant with Dr. Hagenbuch as the new PI. (Ex. 88, Nov. 21, 2011 Letters.)

376.    From July 1, 2011 until July 20, 2013, Dr. Klaassen's annual salary was $293,646. Dr. Klaassen's salary increased to $294,296 on July 21, 2013. It continued at that rate until the date of his termination on January 25, 2014. (Ex. 754, Affidavit of Mike Keeble.)

377.    On December 15, 2011, the NIH approved the change in PI on the Training Grant from Dr. Klaassen to Dr. Hagenbuch. (Ex. 89, Dec. 15, 2011, Notice of Revised Award.)

378.    On December 16, 2011, the NIH approved the change in PI on the COBRE Grant from Dr. Klaassen to Dr. Jaeschke. (Ex. 715, Dec. 16, 2011 Notice of Award.)

379.    Dr. Klaassen has acknowledged that it is "absolutely" within the authority of the NIH to change the PI on a grant. (Ex. 767, Dec. 12, 2016 Jury Trial Transcript, Vol. X, Klaassen testimony 88:14-20.)

380.    The NIH has not criticized the University in association with the change in PI on the COBRE or Training Grants. (Ex. 768, Dec. 6, 2016 Jury Trial Transcript, Vol. VI, Girod testimony, 79:18-22.)

381.    The NIH has not criticized the University for the fact that Dr. Klaassen did not make all decisions regarding the grants while he was on administrative leave. (Ex. 768, Dec. 6, 2016 Jury Trial Transcript, Vol. VI, Girod testimony, 79:23-80:4.)

382.    In May 2012, the First Hearing Committee considered evidence regarding the removal of Dr. Klaassen from the COBRE and Training Grants and concluded ". . . it was not inappropriate to remove him as the PI on the COBRE and Training Grants." (Ex. 18, May 31, 2012 Letter.)

383.    In 2013, Dr. Klaassen was the PI on three R01 grants that had been awarded by the NIH. (Ex. 627, Drug Processing Genes Notice of Award; Ex. 723, Nrf2 Notice of Award; Ex. 706, Hepatic Uptake Notice of Award.)

384.    On August 30, 2013, while Dr. Klaassen was on administrative leave, the KUMCRI requested a permanent change in the PI on the Hepatic Uptake grant from Dr. Klaassen to one of the post-doctoral students in his lab, Dr. Julia Y. Cui. (Ex. 94, Aug. 30, 2013 email.)

385.    The University also requested that the NIH make a permanent change in the PI on the Drug Processing Gene grant on or around August 30, 2013. (Ex. 94, Aug. 30, 2013 email.)

386.    The NIH granted KUMCRI's request and assigned Dr. Julia Cui as PI of the Hepatic Uptake grant on April 20, 2014. (Ex. 750, Notice of Award-Hepatic Uptake Grant.)

387.    The NIH granted KUMCRI's request and assigned Dr. Ivan Csanaky as PI of the Drug Processing Gene grant on April 3, 2014. (Ex. 749, Notice of Award – Drug Processing Gene.)

388.    When asked if the NIH has "expressed any unwillingness to recognize [him] as a principal investigator" after his removal as PI, Dr. Klaassen responded, "No." (Ex. 709, Klaassen Depo., 396:12-14.)

389.    Dr. Klaassen testified that since his termination from KU, he has applied for and received one NIH grant at the University of Washington and that he intends to continue to apply for more grants. (Ex. 709, Klaassen Depo., 396:1-8.)

**The Kansas University Endowment Association**

390.    The Kansas University Endowment Association is the nonprofit corporation statutorily authorized to act as the investing agent for endowments to the University. *See* K.S.A. 76-156a.

391.    Funds in endowment accounts are for the benefit of the University, not any individual. (Ex. 768, Dec. 6, 2016 Jury Trial Transcript, Vol. VI, Stites testimony 182:25-184:16; Ex. 710, Dec. 5, 2016 Jury Trial Transcript, Vol. V, Stites testimony 64:14-25.)

**Charges for the Use of the Mass Spectrometer**

392.    As PI of the COBRE grant beginning in November 2011 and Chair of the Pharm/Tox Department beginning in January 2012, Dr. Jaeschke had the responsibility to manage the core equipment held by the department, including the mass spectrometer, a several-hundred-thousand-dollar piece of equipment. (Ex.712, Jaeschke Depo., 84:2-85:12.)

393.    In the fall of 2012, as PI of the COBRE Grant, Dr. Jaeschke implemented user fees for the mass spectrometer to align that piece of equipment with the University's other core facilities, all of which charged user fees. (Ex. 712, Jaeschke Depo., 86:5-16.)

394.    This was important for the sustainability of the program built with COBRE funds because if all costs of the mass spectrometer and other core equipment were indefinitely borne by the COBRE grant, the equipment would not be sustainable after the COBRE grant funds were discontinued. (Ex. 712, Jaeschke Depo., 86:5-16.)

395.    Long after Dr. Klaassen and his students have been gone from the University, the Pharm/Tox Department continues to charge for the use of the mass spectrometer. (Ex. 770, Dec. 8, 2016 Jury Trial Transcript, Vol. VIII, Jaeschke testimony, 101:15-104:17.)

396.    Dr. Stites was not involved in the decision to institute the charge for the use of the mass spectrometer. (Ex. 768, Dec. 6, 2016 Jury Trial Transcript, Vol. VI, Stites testimony, 195:17-19.)

397.    Dr. Stites had not told the students anything about whether there would be charges associated with the use of the mass spectrometer when Dr. Klaassen and his lab moved to

Internal Medicine. (Ex. 768, Dec. 6, 2016 Jury Trial Transcript, Vol. VI, Stites testimony, 195:7-10.)

398.    There was no advantage to Dr. Stites or the Internal Medicine Department that the Pharm/Tox Department was sending a bill to the Internal Medicine Department for the use of the mass spectrometer. (Ex. 768, Dec. 6, 2016 Jury Trial Transcript, Vol. VI, Stites testimony, 195:11-16.)

399.    Although Dr. Klaassen's lab members were initially told in January 2012 that they would be able to continue to use the equipment for free, Dr. Jaeschke changed course several months later due to his understanding of his obligation to move the COBRE grant in the direction that it could be sustained for the long term. (Ex. 712, Jaeschke Depo., 86-87.)

400.    The decision to charge for the use of the mass spectrometer was made by Dr. Jaeschke without consultation with Dr. Atkinson (who was gone from the University), Dr. Terranova, Dr. Stites, or Dr. Carlson. (Ex. 770, Dec. 9, 2016 Jury Trial Transcript, Vol. VIII, Jaeschke testimony, 104:18-106:9.)

401.    During the confrontation at the meeting on May 1, 2013, when Dr. Klaassen accused Dr. Stites of lying to the students, Dr. Stites was unaware of what Dr. Klaassen was talking about. (Ex. 768, Dec. 6, 2016 Jury Trial Transcript, Vol. VI, Stites testimony, 195:6-196:25.)

402.    Students are not charged personally for the use of the mass spectrometer. All of the costs of the mass spectrometer were borne by grant funds or other University funds, rather than any individual's personal funds. (Ex. 713, Nov. 30, 2016 Jury Trial Transcript, Vol. II, Terranova testimony, 69:19–70:13.)

**The "Right to Research"**

403.    Dr. Klaassen has told his faculty that research is not an entitlement, research is a privilege. "That's darn right." (Ex. 709, Klaassen Depo., 193:18-21.)

404.    Dr. Klaassen agrees that the AAUP Guidelines do not create a contract between any employee and the University. Rather, it is a set of guidelines. (Ex. 709, Klaassen Depo., 210:13-19; Ex. 779, AAUP Guidelines.)

405.    Dr. Klaassen agrees "the concept behind the AAUP Guidelines with regard to freedom to do research relates to someone not coming in and, or universities not challenging the subject matter of the research." (Ex. 709, Klaassen Depo., 211:1-6.)

406.    Dr. Klaassen was never criticized or reprimanded for anything associated with his research or the types of research he was doing. (Ex. 768, Jury Trial Transcript, Vol. VI, Girod testimony, 76:2-6.)

407.    Dr. Klaassen was given academic freedom as to the types of research he was doing. (Ex. 768, Jury Trial Transcript, Vol. VI, Girod testimony, 76:7-9.)

408.    Nobody has challenged, on the basis of academic freedom or otherwise, the propriety of doing the type of research that is in these grants. (Ex. 709, Klaassen Depo., 212:6-12.)

**2012 Federal Court Lawsuit**

409.    On May 25, 2012, Dr. Klaassen filed a Verified Complaint in the United States District Court for the District of Kansas seeking Declaratory and Injunctive Relief against the Kansas Board of Regents, the University of Kansas Medical Center, and the members of the First Ad Hoc Hearing Committee. (Doc. 1, Complaint in Case No. 12-CV-2326) (The first federal case is hereinafter referred to as the "Injunction Case.")

410.    Within four days, Judge Marten dismissed the Injunction Case for lack of subject matter jurisdiction. (Doc. 7, Order and Judgment dated May 29, 2012.)

**2014 Wyandotte County Lawsuit**

411.    In June 2014, while this case was pending, Dr. Klaassen filed some, but not all, of the same claims asserted here in a state court lawsuit in Wyandotte County, Case No. 14 CV 603. (The state court damages case is hereinafter referred to as the "State Case.") (Ex. 755, Petition in Case No. 14CV603.)

412.    All 78 paragraphs in the "Facts" section of Dr. Klaassen's State Court Petition came directly from Dr. Klaassen's First Amended Complaint in this case. (Doc. 66; Ex. 755, State Court Petition.)

413.    On October 11, 2016, the District Court of Wyandotte County granted summary judgment in favor of the University and against Dr. Klaassen on Plaintiff's claims of age discrimination and retaliation under the Kansas False Claims Act in the State Case. (Ex. 756, Oct. 16, 2016 Judge's Notes.)

414.    In the State Case Pretrial Order, Dr. Klaassen's allegations included: "On March 31, 2011, Klaassen publicly accused Atkinson of financial mismanagement. He accused her of acting as a "slumlord," someone who raises rent on the poor in less than adequate rental facilities to fund the landlord's expensive habits. One week later Atkinson fired Klaassen as Chair of Pharmacology. She explained that she terminated him because of the 'extremely inappropriate things he has said to his faculty, the administration and to the public.' A few days later, on April 9, 2011, a PowerPoint prepared by Klaassen regarding the lack of shared governance and Atkinson's financial management was widely distributed among folks on campus, the University

of Kansas Endowment, and the Kauffman Foundation." (Ex. 772, State Case Pretrial Order, p. 3.)

415.    In the State Case Pretrial Order, Dr. Klaassen also alleged: "Dr. Klaassen's oral and written reports to KUMC of its misappropriation of NIH grants monies were made within the following correspondence or at the following events:

- October 28, 2011 COBRE meeting (Ex. 187; Ex. 12);
- Correspondence between Drs. Klaassen and Terranova in January 2012 (Ex. 332);
- Correspondence between Drs. Klaassen and Jaeschke in February 2012 (Ex. 342);
- Correspondence between Drs. Klaassen and Terranova in March 2012 (Ex. 346);
- Correspondence between Drs. Klaassen and Stites in July and August 2012 (Ex. 351);
- Correspondence between Drs. Klaassen and Dawn in September 2012 (Ex. 353);
- Correspondence between Drs. Klaassen and Stites and Dawn in December 2012 (Ex. 357);
- May 1, 2013 Budget Meeting (Exs. 360, 371);
- May 7, 2013 Meeting with Ms. Hopkins (Ex. 361); and
- November 2013 Ad Hoc Hearing (Ex. 367)."

(Ex. 772, State Case Pretrial Order, p. 5.)

416.    In the State Case Pretrial Order, Dr. Klaassen also alleged:

In particular, on May 1, 2013, the chair of Internal Medicine Steven Stites called Klaassen into a meeting at KUMC in a small conference room. At the meeting, Klaassen stood up, advocated for his students and his research, accused KUMC of stealing NIH grant monies, and asked Stites to provide his students with access to necessary research equipment. Stites abruptly ended the meeting and told Klaassen to leave. One week later, on May 7, 2013, Dr. Klaassen approached Christina Hopkins who provided grant accounting services for KUMC. Klaassen explained to Ms. Hopkins that KUMC's grant accounting practices were improper. The next day, Dr. Stites had armed police officers (again) escort Klaassen out off campus. Stites then banned Klaassen from campus forever and charged Klaassen with personal misconduct at a November 13, 2013 hearing.

(Ex. 772, State Case Pretrial Order, p. 5.)

417.    The damages Dr. Klaassen sought in the State Case included:

a.  Plaintiff seeks declaratory relief that Defendant terminated his employment and converted his personal property in violation of the Kansas common law;

b.  Plaintiff seeks prospective and injunctive relief including reinstatement as a University Distinguished Tenured Professor and return of his personal property that KUMC continues to unlawfully withhold;

c.  Plaintiff seeks actual damages against Defendant in the following amounts:

i. For his lost wages, benefits, and retirement income, Plaintiff has sustained actual damages in an ongoing amount currently valued at approximately $2,454,622 plus interest;

ii. Plaintiff seeks damages for emotional distress in the amount of $500,000; and,

iii. Plaintiff seeks compensation for loss reputation in the amount of $500,000.

(Ex. 772, State Case Pretrial Order, p. 7.)

418.    The following Parties to this case testified in the State Case:

- Dr. Curtis Klaassen
- Dr. Barbara Atkinson
- Dr. Doug Girod
- Dr. Steven Stites
- Dr. Gerald Carlson
- Dr. Paul Terranova
- Dr. Hartmut Jaeschke

(Nov. 28-Dec. 12, 2016 Jury Trial Transcripts, Vols. I-X.)

419.    During the course of the trial in the State Case, the plaintiff called as a witness Gary Baker, the plaintiff's expert economist. (Ex. 713, Nov. 30, 2016 Jury Trial, Vol. II, Baker testimony, 98:7-116:8.)

420.    Dr. Baker has been identified as plaintiff's expert economist in this case. (Ex. 647, Nov. 30, 2015 email.)

421.    Dr. Baker prepared only one expert report to be used in both this case and the State Case. (Ex. 402, Expert Disclosure; Ex. 647, Nov. 30, 2015 email; Ex. 713, Nov. 30, 2016 Jury Trial, Vol. II, Baker testimony, 98:7-116:8.)

422.     The Plaintiff's alleged damages include reinstatement, back pay, front pay, and attorney fees in each of the three cases. (Doc. 1; Ex. 755 Petition; Ex. 737 Petition for Judicial Review.)

423.     Following 11 trial days in the State Case, the Plaintiff rested. (Ex. 767, Dec. 12, 2016 Jury Trial, Vol. X, 149:11.)

424.     On December 12, 2016, the Court considered Defendant's motion for judgment under K.S.A. 60-250. The Court granted Defendant's motion for judgment in favor of the University and against Dr. Klaassen. (Ex. 757, Dec. 15, 2016 Judge's notes; Ex. 767, Dec. 12, 2016 Jury Trial Transcript, Vol. X, 199:1-200:13.)

425.     The Court considered Dr. Klaassen's presentation of evidence, including evidence that the University improperly spent money out of "Dr. Klaassen's" grants, and found that "nothing the University of Kansas did was wrong." (Ex. 767, Dec. 12, 2016 Jury Trial Transcript, Vol. X, 199:17-19.)

426.     The State Court held that Dr. Klaassen did not have a good faith belief that any wrongdoing with respect to the NIH grants had occurred at the University, specifically stating, "I find that he did not have a good faith belief." (Ex. 767, Dec. 12, 2016 Jury Trial Transcript, Vol. X, 199:1-200:13.)

427.     Dr. Klaassen has appealed the ruling of the State Case. (Ex. 758, Jan. 9, 2017 Notice of Appeal.)

## II.    ARGUMENTS AND AUTHORITIES

### A.  Introduction

Curtis Klaassen, Ph.D., was a toxicologist, department chair, and distinguished professor at the University of Kansas Medical Center ("KUMC"). Unfortunately, he bullied faculty and staff and was unable to self-monitor his unprofessional, abusive conduct. Some members of the faculty and staff were concerned for their own safety around him. After multiple opportunities for Dr. Klaassen to correct his behavior, Dr. Klaassen's employment was terminated in January 2014. Dr. Klaassen has had four administrative hearings before his faculty peers, each of which concluded that he engaged in unprofessional conduct. He has filed four lawsuits arising from these transactions and occurrences. One was dismissed for lack of jurisdiction, and two have resulted in judgments against Dr. Klaassen.

Defendants jointly submit that Dr. Klaassen's claims fail for the reasons set forth in this Consolidated Memorandum. In addition, pursuant to Section 8b of the Amended Pretrial Order, each of the Individual Defendants submits a separate brief in support of his or her individual motion for summary judgment. The Individual Defendants adopt and incorporate those motions and briefs here.

### B.  Summary Judgment Standard

Summary judgment is required if the moving party demonstrates that "no genuine dispute" about "any material fact" exists and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, the Court views the evidence and draws inferences in the light most favorable to the non-moving party. *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.*

For the moving party to meet its burden, it "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010). If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'" *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)).

### C.  All of Dr. Klaassen's Claims Are Barred by Principles of Res Judicata.

Principles of res judicata enforce the public policy that there be an end to litigation. There have been judgments or a dismissal in three prior lawsuits brought by Dr. Klaassen, all of which have been in favor of the University. SOF 324, 410, 425.

The two state court cases against the University arose out of the same transactions and occurrences at issue here. Final judgment was granted in favor of the University in both of those cases. Both are currently on appeal. SOF 326, 427. Dr. Klaassen filed one of those cases pursuant to the Kansas Judicial Review Act and challenged the constitutionality of the action terminating Dr. Klaassen's employment.[4] He sought the same relief he is seeking here, including reinstatement, front pay, back pay, and attorneys' fees. SOF 321, 422. The other state case went to trial on a retaliatory discharge claim, again seeking the same relief for the same termination of employment. He offered the testimony of Drs. Atkinson, Girod, Stites, Carlson, Terranova, and

---

[4] Dr. Klaassen also contended in the KJRA Case that Dr. Klaassen was terminated in violation of his First Amendment rights. Dr. Klaassen voluntarily withdrew that claim.

Jaeschke, among others. Each of Dr. Klaassen's claims here could have been presented in the State Case. Dr. Klaassen chose to inappropriately split his causes of action.

"Res judicata is 'a rule of fundamental and substantial justice that enforces the public policy that there be an *end* to litigation. . . . [R]es judicata avoids unnecessary expense and vexation for parties, conserves judicial resources, and encourages reliance on judicial action.'" *Kester v. Shawnee Mission Unified Sch. Dist. No. 512*, 252 F. Supp. 2d 1180, 1185 (D. Kan. 2003) (quoting *May v. Parker–Abbott Transfer & Storage, Inc.*, 899 F.2d 1007, 1009 (10th Cir.1990)).[5] Claim preclusion applies "to issues that the litigant could have raised but did not raise in the earlier state court proceeding," and issue preclusion applies to "issues actually litigated in state court." *Carter v. City of Emporia*, 815 F.2d 617, 619 (10th Cir. 1987).

Whether issue or claim preclusion applies is a question of law. *In re Application of Fleet for Relief*, 272 P.3d at 589. "Federal courts must give a state court judgment the same preclusive effect as would its originating state." *Campbell v. City of Spencer*, 777 F.3d 1073, 1077-78 (10th Cir. 2014); *see also* 28 U.S.C. § 1738; *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 83-85 (1984) (§ 1983 claims barred by preclusion).

The "one-action rule," or rule against claim splitting, is a similar but separate doctrine recognized by Kansas courts. *Diederich v. Yarnevich*, 196 P.3d 411, 421 (Kan. Ct. App. 2008). Like res judicata, the rule "is based upon varied and justifiable concerns; preserving judicial economy and convenience; avoiding repetitive or fragmented litigation; and protecting a party from multiple harassment and expense over the same claim." *Id.* (quoting *Home State Bank v.*

---

[5] The term "res judicata" may encompass both claim and issue preclusion, though "[t]he modern trend is to more precisely refer to claim preclusion as res judicata and issue preclusion as collateral estoppel." *In re Application of Fleet for Relief from a Tax Grievance in Shawnee Cty.*, 272 P.3d 583, 589 (Kan. 2012).

*P.B. Hoidale Co.*, 718 P.2d 292, 295 (Kan. 1986)). Unlike res judicata, it does not require a final judgment in another action and does not have the same privity rules. *Id.*

### 1.     Dr. Klaassen's official capacity claims are barred by claim preclusion.

The official capacity claims in the Amended Pretrial Order are asserted against Dr. Girod only and are addressed in Dr. Girod's Individual Brief.

### 2.     Dr. Klaassen's individual capacity § 1983 and state law claims are barred.

"Kansas law is explicit and harsh in invoking claim preclusion to bar splitting a cause of action." *Carter*, 815 F.2d at 622. "'[A] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or *could have been raised* in the prior action.'" *Campbell*, 777 F.3d at 1077 (quotations omitted) (emphasis added). Kansas state court decisions are "final" for purposes of res judicata, even if an appeal is pending. *Rhoten v. Dickson*, 223 P.3d 786, 798 (Kan. 2010) ("[F]ederal and Kansas courts have held a pending appeal does not suspend the finality of the lower court's judgment for claim preclusion purposes."). Kansas courts invoke the doctrine of claim preclusion when the following conditions are satisfied: (1) Identity in the things sued for; (2) Identity of the cause of action; (3) Identity of persons and parties to the action; and (4) Identity in the quality of the persons for or against whom the claim is made. *Carter*, 815 F.2d at 619-20. A plaintiff must also have a "full and fair opportunity to litigate their claims before a court with the authority to adjudicate the merits of those claims." *Id.* at 621.

The only portion of the res judicata analysis that differs between Dr. Klaassen's official capacity claims against Dr. Girod and his claims against other Defendants is whether the Individual Defendants stand in privity with the University under the facts and circumstances present here. The State Case judgment is final for purposes of res judicata, Dr. Klaassen received

a full and fair opportunity to litigate his claims in the State Case, and the each of the other elements are clearly met. *See Dickson*, 223 P.3d at 798 (res judicata applies where first claim is on appeal); *Carter*, 815 F.2d at 620 (identity in the quality of parties is present when their alignment as adversaries is the same in both suits); 621-22 (failure to assert a § 1983 claim in state court does not mean party did not have full and fair opportunity to litigate claims and failure to foresee legal consequences of splitting a cause of action does not affect this analysis); *Yapp v. Excel Corp.*, 186 F.3d 1222, 1228 (10th Cir. 1999) (actions arising out of a plaintiff's employment are considered part of the same transaction or occurrence for preclusion purposes).

> **a.      Claim preclusion bars Dr. Klaassen's individual capacity § 1983 and state law claims.**

The Kansas Supreme Court has not addressed whether a government official sued in his individual capacity is in privity with his government employer, and authorities disagree on this matter. Privity exists under these circumstances. "There is no generally prevailing definition of 'privity' which can be automatically applied to all cases." *State v. Parson*, 808 P.2d 444, 444 Syl. 2 (Kan. Ct. App. 1991). Both the Tenth Circuit and Kansas courts recognize that privity is determined on a case-by-case basis. *Id*. (determining "who are privies requires careful examination into the circumstances of each case"); *Lowell Staats Min. Co. v. Philadelphia Elec. Co.*, 878 F.2d 1271, 1276 (10th Cir. 1989) (citations omitted) ("The 'determination of identity between litigants for . . . establishing privity is a factual question, and the District Court should not be reversed unless its determination is clearly erroneous.'"). "Kansas follows the general rule that 'a judgment binds not only the parties to the action but also those who are in privity with them.'" *Carter*, 815 F.2d at 620.

(i)      **District of Kansas decisions are split, but suggest privity exists.**

Decisions in the District of Kansas are split. In *Spielman*, the Court found that principles of res judicata applied to bar plaintiff's § 1983 individual capacity claims against an individual defendant. *Spielman v. City of Newton*, 1997 WL 534468, at *4 n.7, *10 (D. Kan. July 25, 1997) (barring § 1983 and state law claims). The Court favorably cited to a District of Massachusetts case "applying principles of res judicata to preclude subsequent claims against individual defendants not named in prior suit who were acting as ultimate decision makers for city." *Id.* at *4 n.7 (citing *Cohen v. Shea*, 788 F. Supp. 66, 68 (D. Mass. 1992)). The Court found that in analyzing the res judicata and collateral estoppel issues, "plaintiff's claims against the City need not be addressed separately from his claims against [the City official]," *id.*, and "there [was] clearly identity of the parties and the quality of persons for and against whom the claim is made," *id.* at *5.

There are two distinguishable cases that have held otherwise. *See Cosgrove v. Kansas Dep't of Soc. & Rehab. Servs.*, 744 F. Supp. 2d 1178, 1185 (D. Kan. 2010), (recognizing Kansas courts had not addressed the issue and refraining from finding privity out of "an abundance of caution") *aff'd*, 485 F. App'x 290 (10th Cir. 2012); *Spiess v. Meyers*, 483 F. Supp. 2d 1082, 1089 (D. Kan. 2007) (finding individually named officials were not in privity with previously sued individually named officials).

(ii)     **Kansas courts would find privity exists for individual capacity § 1983 and state law claims.**

Defendants submit that it is likely the Kansas Supreme Court would find that privity exists between the Individual Defendants and their government employer under the circumstances here for all claims because (a) privity is determined on a case-by-case basis under Kansas law, (b) Kansas is harsh in invoking claim preclusion, (c) Kansas has a robust history of

disfavoring multiple lawsuits addressing the same events, and (d) the sole Kansas case addressing the topic found privity to exist.

Kansas courts generally recognize that employees and employers are in privity for purposes of preclusion. *Midwest Crane & Rigging, LLC v. Schneider*, No. 113,725, 2016 WL 1391805 (Kan. Ct. App. 2016) (unpublished) (finding res judicata barred subsequent claim against individual employees and stating "an employee, acting in furtherance of his or her employer's interests, is in privity with his or her employer for the purpose of any disputes that should arise regarding those actions, even if the employee did not have actual authority to act"); *Parson*, 808 P.2d at 447 ("With no hesitation we find the requisite privity existing here insofar as . . . —an employer and its employee—are concerned.").

One Kansas state court case is on point. *See Rhoten v. Hren*, No. 101,826, 2010 WL 2977939 (Kan. Ct. App. 2010) (unpublished). The case was Rhoten's third lawsuit against various City officials and the City after the plaintiff's vehicle was hit by a police car pursuing another driver. *Id*. Rhoten filed suit against several law enforcement officers, alleging they "did not follow proper procedures in investigating the collision, committed fraud in official reports, concealed key facts, and destroyed evidence." *Id*. at *3. The court held that although the petition named the defendants in both their individual and official capacities, the substantive claims revealed "that all acts and omissions complained of were performed in these defendants' official capacities" and accordingly, concluded that the individual defendants were in privity with the City for purposes of res judicata. *Id*. at *5.

Kansas courts "broadly apply the doctrine of *res judicata*." *Home State Bank*, 718 P.2d at 294. Thus, Kansas is more likely to side with those jurisdictions that have found privity to exist between government officials sued in their individual capacity and their government

employers. *See, e.g.*, *Cohen*, 788 F. Supp. at 68; *Kirkhart v. Keiper*, 805 N.E.2d 1089 (Ohio 2004); *Williams v. City of Allentown*, 25 F. Supp. 2d 599, 604 (E.D. Penn. 1998). Additionally, Kansas has a long history of barring claims that could have previously been brought, even where privity or other res judicata elements do not exist. Kansas adheres to the "one-action rule," or the rule against claims splitting. *See generally*, *Bouton v. Byers*, 321 P.3d 780, 791 (Kan. Ct. App. 2014); *King v. Am. Family Ins. Co.*, 874 P.2d 691, 694 (Kan. Ct. App. 1994); *Pretz v. Lamont*, 626 P.2d 806, 810 (Kan. Ct. App. 1981); *see also infra*, Section C.2.b. Kansas's rules regarding both claim splitting and res judicata are meant to avoid multiplicity of suits "as a matter of public policy." *Pretz*, 626 P.2d at 810.

### (iii)   Dr. Klaassen's individual capacity § 1983 and state law claims are barred by claim preclusion.

Dr. Klaassen asserts individual capacity claims under § 1983 against six of the seven Individual Defendants (all except Dr. Hagenbuch). For liability to attach, Dr. Klaassen must establish that such an individual personally participated in the alleged wrong. *Worrell v. Henry*, 219 F.3d 1197, 1214 (10th Cir. 2000). Because Dr. Klaassen proceeded to judgment against the University on two cases, however, the claims are barred by res judicata if the defendants were decision-makers. Dr. Klaassen also asserts state law tortious interference claims against five of the seven Individual Defendants. These claims fail under principles of res judicata. Like the *Rhoten* and *Spielman* cases, the Defendants are sued for actions taken in the course of their employment, and there is no reason to distinguish between Plaintiff's official capacity, individual capacity, and state law claims. All of Plaintiff's claims should be dismissed.

### b.   The rule against claim splitting bars all of Dr. Klaassen's claims.

Dr. Klaassen's claims should all be dismissed under the one-action rule, also known as the rule against splitting a cause of action. "[T]he rule requires a plaintiff suffering a legal injury

to join all theories of recovery for that harm in a single action against all of the appropriate defendants." *Bouton*, 321 P.3d at 791. A plaintiff "may not split off some theories of recovery or some defendants in separate suits." *Id*. The rule prevents "serially suing defendants for a single wrong." *Id.*

The rule against claim splitting is similar to and an aspect of res judicata. *Hartsel Springs Ranch of Colo., Inc. v. Bluegreen Corp.*, 296 F.3d 982, 986 (10th Cir. 2002). "While similar in many respects to the doctrine of res judicata, . . . the rule against splitting causes of action is not solely effectuated by the application of res judicata." *King*, 874 P.2d at 694. "Res judicata requires identical parties to apply, but the one-action rule does not." *Diederich*, 196 P.3d at 421 (citing *Home State Bank*, 718 P.2d at 295) (upholding dismissal based on rule against claim splitting).

"The rule against splitting a cause of action does not prevent a plaintiff from suing for a part of a single cause of action; it merely precludes him from thereafter maintaining another action for the other portion." *Pretz*, 626 P.2d at 808 (quoting *Fiscus v. Kansas City Pub. Serv. Co.*, 112 P.2d 83 (Kan. 1941)). Where a plaintiff has no legal impediment to asserting his entire cause of action in the other lawsuit, it does not matter that he "did not foresee the legal consequence of splitting [his] cause of action." *Id*. at 810; *see also Fiscus*, 112 P.2d at 83.

Dr. Klaassen's legal claims all arise out of the same alleged actions as the claims in his state court actions, where he alleged he was unlawfully retaliated against when he was placed on administrative leave, transferred to a different department, removed as PI on several NIH grants, prevented from conducting research and working with his students, and terminated from his

employment with the University.[6] SOF 414-416. These are the same actions Dr. Klaassen challenges here. *Id*. The damages he seeks are the same, (SOF 321, 417, 422), his damages expert is the same (SOF 419-422) and the damages report is the same (SOF 421).

Dr. Klaassen elected to split his claims. He must now accept the consequences of his decision.

### 3.  Issue preclusion bars Dr. Klaassen's due process claims.

Dr. Klaassen's substantive and procedural due process claims are barred by issue preclusion. When the KJRA Court denied Dr. Klaassen's constitutional violation claims, it determined that the actions complained of there—the same actions at issue here—did not deprive Dr. Klaassen of his constitutional rights. Issue preclusion "prevents relitigation of an issue by a party against whom the issue has been conclusively determined in a prior action." *Hall v. Doering*, 997 F. Supp. 1445, 1459 (D. Kan. 1998). Issue preclusion may be invoked when three elements are present:

> (1) a prior judgment on the merits which determined the rights and liabilities of the parties on the issue based upon ultimate facts as disclosed by the pleadings and judgment, (2) the parties must be the same or in privity, and (3) the issue litigated must have been determined and necessary to support the judgment.

*Parson*, 808 P.2d at 446 (quoting *Jackson Trak Group, Inc. v. Mid States Port Authority*, 242 Kan. 683, 690, 751 P.2d 122 (1988)). Additionally, the party against whom preclusion is asserted must have had a full and fair opportunity to litigate. *Hall*, 997 F. Supp. at 1460.

In the issue preclusion context, "'strict privity' is not required for application of the bar of collateral estoppel." *Parson*, 808 P.2d at 448. "[A] person who was not a party to a prior case can

---

[6] He also alleged age discrimination, violations of the Kansas False Claims Act, conversion, that his constitutional rights were violated, that the University acted unreasonably, arbitrarily, or capriciously, and that the University failed to follow prescribed procedures. The Court addressed and denied each of these claims. SOF 424-425.

raise a judgment in that prior case as a bar to a subsequent action if the liability of that person is dependent upon the liability in the first case." *Hall*, 997 F. Supp. at 1462. Likewise, "a judgment in favor of a principal is conclusive between the plaintiff and an agent of the principal." *Id*.

In *Goetz v. Bd. of Trustees*, the Kansas Supreme Court allowed a party to use defensive issue preclusion and in doing so recognized that "collateral estoppel does not require mutuality of parties." 454 P.2d 481, 489 (Kan. 1969).[7] There, a firefighter filed an action for a disability pension as provided by statute, and it was determined that his disability was not a service-connected disease and he was not entitled to a disability pension. After his death, his widow initiated an action for a widow's pension, as separately provided for by statute. Collateral estoppel barred the widow's claim because the issue of whether her husband's condition was contracted by reason of his occupation was already decided against her husband, and the widow could not relitigate that issue. *Id*. at 489-91.

Dr. Klaassen has litigated whether his constitutional rights were violated. SOF 319-320, 325. The KJRA Court denied Dr. Klaassen's claims and found that any procedural deficits had been remedied. *Id*. This issue was necessary to the Court's final judgment. For the KJRA Court to have found in favor of the University, it had to find the alleged actions of the Individual Defendants did not violate Dr. Klaassen's due process rights. The KJRA Court found that they did not. SOF 325. Whether the Individual Defendants' actions violated Dr. Klaassen's due process rights has already been finally adjudicated on the merits against Dr. Klaassen.

---

[7] The Kansas Supreme Court has declined to allow *offensive* use of issue preclusion, *see Jones v. Bordman*, 759 P.2d 953, 965 (Kan. 1988); but here, Defendants seek to utilize *defensive* issue preclusion. Accordingly, *Jones* and similar cases are not on point.

**D.  Dr. Klaassen's First Amendment Retaliation Claim Fails.**

Dr. Klaassen's First Amendment retaliation claim fails under each of the five elements of the applicable *Garcetti/Pickering* test. *See Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cty., Ill.*, 391 U.S. 563 (1968). In analyzing First Amendment Retaliation claims, the Court asks: (1) whether the speech was made pursuant to an employee's official duties; if not, (2) whether the speech was on a matter of public concern; if so, (3) whether the government's interests, as an employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; if not, (4) whether the protected speech was a substantial motivating factor in an adverse employment action; and if so, (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct. *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009). The first three elements are issues of law for the Court to decide. *Id.* The last two are factual issues sometimes decided by a jury, but the Court may award summary judgment on either of those elements if any reasonable jury would reach just one conclusion on the issue, *see Trant v. Oklahoma*, 754 F.3d 1158, 1167 (10th Cir. 2014); *Rohrbough v. Univ. of Colorado Hosp. Auth.*, 596 F.3d 741, 750 (10th Cir. 2010). Additionally, to establish individual liability under 42 U.S.C. § 1983, Dr. Klaassen must establish that each Individual Defendant "(1) promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010). For liability to attach, that individual must have personally participated in the alleged constitutional wrong. *Id.* at 1195. Dr. Klaassen must satisfy each element to survive summary judgment, so the Court may consider the elements in any order. *See Coomes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1260 (9th Cir. 2016).

Dr. Klaassen alleges Defendants retaliated against him in violation of his First Amendment rights for making the following four categories of statements:

- During a March 31, 2011, stakeholders' meeting with a software vendor who was pitching a product to KUMC, Dr. Klaassen accused Dr. Atkinson of financial mismanagement, referred to her as a "slum lord," and voiced his opposition to the University of Kansas Cancer Center (Doc. 298, p. 7.)

- On or around April 9, 2011[8], Dr. Klaassen presented and later distributed a PowerPoint presentation that criticized Dean Atkinson's decision to remove Dr. Klaassen as Chair, espoused Dr. Klaassen's view that that there was inadequate joint governance at KUMC, and criticized KUMC's decision to build the Cancer Center and obtain NCI designation because Klaassen thought it was harming the basic science departments. (Doc. 298, p. 7; Ex. 766).

- Dr. Klaassen criticized KUMC and Dean Atkinson by anonymously sharing unidentified information with the Lawrence Journal-World, on April 28, 2011, (Ex. 27), April 30, 2011 (Ex. 26), October 29, 2011 (Ex. 81), and November 5, 2011 (Ex. 28). (Doc. 298, p. 7-8.)

- On or around October 28, 2011, Dr. Klaassen presented a PowerPoint presentation to members of the Pharm/Tox Department that criticized Dean Atkinson's decision to remove Dr. Klaassen as Chair, referred to the Interim Chair of Pharm/Tox as a "Ford chair trying to be a Mercedes chair," accused Interim Chair Dr. Carlson of "doing everything he can to destroy the department," and stated that Klaassen's "long-term cooperation will largely be dependent on the new Chair's respect" of Dr. Klaassen. (Doc. 298, p. 11; Ex. 187.)[9]

Dr. Klaassen fails on each element of his First Amendment Retaliation claim.[10]

---

[8] The presentation described occurred on April 7, 2011. SOF 94.

[9] Many or all of these allegations were litigated in the State Case as alleged whistleblowing. That Court found that Klaassen "did not have a good faith belief" that the University did anything wrong. SOF 426. Thus, issue preclusion precludes the litigation of this claim.

[10] Defendants are addressing the first three elements of the analysis in this brief and the last two elements in the Individual Defendants' briefs. Because of the large number of elements and separate claims by Dr. Klaassen related to alleged First Amendment retaliation, Defendants have provided decision trees that walk the Court through each of the elements of these claims. The decision trees are provided as Exhibits to the Individual Defendants' Memoranda in Support.

1.      **Dr. Klaassen's First Amendment retaliation claim, if any, is limited to his communications with the Lawrence Journal-World and in PowerPoint presentations.**

Dr. Klaassen's Second Amended Complaint asserted First Amendment retaliation claims based on a list of eight statements made more than two years before his termination. This Court described those statements as falling into two categories: "statements concerning (1) financial mismanagement and lack of shared governance at KUMC, and (2) mismanagement and misappropriation of grant money." Doc. 102, p. 27. This Court ruled that Dr. Klaassen's expressions about those subjects were "made pursuant to his 'official duties,'" and Dr. Klaassen therefore receives no First Amendment protection for making them. Doc. 102, p. 33.

This Court only permitted Dr. Klaassen's First Amendment retaliation claim to proceed because he amended his Complaint to add new allegations that Dr. Klaassen made statements to news outlets and in PowerPoint presentations. Doc. 102, p. 34. Dr. Klaassen has now included not only allegations made to news outlets and in PowerPoint presentations in 2011, but also Dr. Klaassen's statements at the March 31, 2011 stakeholder's meeting, which he claims were allegations of "lack of shared governance, misappropriation of federal grant monies, lack of transparency, and overall mismanagement." Doc. 102, p. 27; Doc. 296, p. 22. Dr. Klaassen should not be permitted to revive this claim based on facts already rejected by this Court. *McIlravy v. Kerr-McGee Coal Corp.*, 204 F.3d 1031, 1034-36 (10th Cir. 2000); *Cubie v. Bryan Career Coll., Inc.*, 244 F. Supp. 2d 1191, 1200 (D. Kan. 2003).

2.      **Dr. Klaassen's statements were made pursuant to his official duties.**

Government employment prescribes some restriction on the freedom of speech otherwise enjoyed by citizens. *See Garcetti*, 547 U.S. at 418; *Hale v. Emporia State Univ.*, 265 F. Supp. 3d 1236, 1244 (D. Kan. 2017). When a Court concludes that an individual is speaking as an employee pursuant to his official duties, rather than as a private citizen, the individual enjoys no

First Amendment protection.[11] *Hesse v. Town of Jackson*, 541 F.3d 1240, 1249 (10th Cir. 2008); *Garcetti*, 547 U.S. at 421. This is "because the restriction on speech 'simply reflects the exercise of employer control over what the employer itself has commissioned or created.'" *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 (10th Cir. 2007) (quoting *Garcetti*, 547 U.S. at 411). "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti*, 547 U.S. at 418.

The Tenth Circuit takes a broad view of what speech is pursuant to an employee's official duties. *Thomas v. City of Blanchard*, 548 F.3d 1317, 1324 (10th Cir. 2008). It uses a practical case-by-case approach "looking both to the content of the speech, as well as the employee's chosen audience, to determine whether the speech is made pursuant to an employee's official duties." *Rohrbough*, 596 F.3d at 746 (citations omitted). Speech directed at an individual or entity within the employee's chain of command is typically within an employee's duties. *Id.* at 747. If the speech involves "the type of activities that [the employee] was paid to do," the speech is pursuant to the employee's official duties. *Chavez-Rodriguez v. City of Santa Fe*, 596 F.3d 708, 713 (10th Cir. 2010). "[S]peech may be made pursuant to an employee's official duties even if it deals with activities that the employee is not expressly required to perform." Doc. 102, p. 30 (quoting *Brammer-Hoelter*, 492 F.3d at 1203). It may also be pursuant to an employee's official duties even if it concerns "an unusual aspect of an employee's job that is not part of his everyday functions," *id.*, or is not "frequent, usual, or customary," *Holub v. Gdowski*, 802 F.3d 1149, 1156

---

[11] This Court previously noted that neither it nor the Tenth Circuit had opined yet on whether *Garcetti* applies in the University setting. Doc No. 102, pp. 28-29. Since then, both courts have applied *Garcetti* in cases brought by professors against universities. *See Hale*, 265 F. Supp. 3d at 1244; *Moore v. Univ. of Kansas*, 118 F. Supp. 3d 1242, 1259 (D. Kan. 2015); *Bird v. Regents of New Mexico State Univ.*, 619 F. App'x 733, 743 (10th Cir. 2015).

(10th Cir. 2015). "If speech 'reasonably contributes to or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duties.'" Doc. 102, p. 31 (quoting *Brammer-Hoelter*, 492 F.3d at 1203).

The Amended Pretrial Order refers to two PowerPoint presentations as alleged First Amendment protected speech: one on April 9, 2011, "regarding the lack of shared governance and Atkinson's financial management," Doc. 298, p. 7, and one on October 28, 2011, at a COBRE grant meeting, Doc. 298, p. 11. Dr. Klaassen said himself that those PowerPoint presentations were prepared and presented pursuant to his official duties as a University Distinguished Professor. SOF 97, 124. They are unprotected by the First Amendment.

The April 2011 presentation[12] is a 29-slide presentation entitled "Faculty Meeting, April 7, 2011,"—a clear indication that he was giving the presentation pursuant to his official duties. Slide 17 of the presentation (addressing Dr. Atkinson) acknowledges that the presentation falls outside of any First Amendment protection: "**My statements, which you apparently don't like, are comments as a University Distinguished Professor that has spent many years at KUMC, not as a Chair**." SOF 97 (emphasis added).[13] Each of the statements in the April 7 PowerPoint addressed matters related to Dr. Klaassen's work as Chair of the Pharm/Tox Department and University Distinguished Professor for the University. SOF 67-70, 94-103.

The October 28, 2011 PowerPoint falls into the same category. It consists of 29 slides, the last nine of which are copies of slides that also appeared in the April 7 PowerPoint presentation. This presentation also includes a slide in which Dr. Klaassen states that his

---

[12] Klaassen refers to this presentation in his Pretrial Order as the "April 9, 2011" presentation, but it is dated April 7, 2011, was used by him at a Faculty meeting on that date, and was sent by email on April 9, 2011.

[13] Dr. Klaassen presented a portion of this presentation to Dr. Atkinson at his April 6, 2011, meeting with her only after he had been told that he was no longer going to be the Chair of the Department, and then presented it to the Pharm/Tox faculty on April 7, 2011. SOF 88, 89, 93-102.

statements "are comments as a university distinguished professor." SOF 124. The other slides include Dr. Klaassen's criticisms of Dr. Atkinson, Dr. Carlson, and others within the University, as well as general news related to the COBRE faculty. Each of these matters contributed to or facilitated Dr. Klaassen's performance of his official duties. SOF 119-124, 364. They related to the COBRE grant, including hiring of COBRE faculty. SOF 119-124, 364. The reason Dr. Klaassen could give a presentation to this group was in his capacity as PI of the COBRE grant. SOF 120, 364.

The audience at the April 2011 presentation was the Pharm/Tox Department (SOF 93), and the audience at the October 2011 presentation was the COBRE faculty (SOF 120). These were not presentations made to the public. *See* Doc. 102 p. 32-33; *Zimmerman v. Univ. of Utah*, No. 213-CV-01131, 2017 WL 3491843, at *8 (D. Utah Aug. 14, 2017) (reports of mismanagement by PI to entities within plaintiff's chain of command not protected). They addressed issues within and pursuant to Dr. Klaassen's role as Department Chair and as PI on the COBRE grant and are therefore not entitled to any First Amendment protection. *Id.*; *Renken v. Gregory*, 541 F.3d 769, 773-75 (7th Cir. 2008) (professor who complained to university officials about the difficulties he encountered in administering a grant was speaking as an employee because the grant was "for the benefit of students" and therefore "aided in the fulfillment of his teaching responsibilities"); *Kalderon v. Finkelstein*, 495 F. App'x 103, 107-08 (2d Cir. 2012) (PI's complaints about mishandling of grant funds were pursuant to official duties and therefore unprotected); *Dunn v. Morse*, No. 16-4164-SAC, 2017 WL 1197649, at *5 (D. Kan. Mar. 31, 2017) (speech related to alleged wrongdoing impacting plaintiff's ability to carry out his official duties is unprotected).

Dr. Klaassen's second category of alleged protected speech consists of anonymous contributions to the LJW commentaries. Dr. Klaassen is not quoted in these opinion pieces, and Dr. Klaassen cannot recall what he told the author. SOF 327-334. Without corroborating evidence, Dr. Klaassen claims his confidential and unattributed contributions to the articles led to retaliation against him two years later. But Dr. Klaassen's testimony claims that his purpose in sharing information with the author was to "help" the University make a better medical school. SOF 335, 336. Dr. Klaassen testified that he sought to address the allocation of University resources affecting his department and the basic sciences: a role that falls squarely within what he describes as faculty members' right to joint governance with administration. *See Hurst v. Lee Cty., Miss.*, 764 F.3d 480, 485 (5th Cir. 2014) (officer who spoke to media without authorization from his superiors nevertheless spoke within the scope of his official duties and was entitled to no First Amendment protection). These reports of alleged wrongdoing related to his ability to carry out his official duties were made pursuant to his official duties as a University Professor and are therefore entitled to no First Amendment protection. *See Dunn*, 2017 WL 1197649, at *5.

Dr. Klaassen's comments at the March 31, 2011 Stakeholder's Meeting were within his job duties for the reasons this Court recognized in its February 2015 Order. Doc. 102. The meeting was for department chairs to see a demonstration of a software product the University was considering purchasing. SOF 75. Dr. Klaassen spoke to other department chairs and center directors there in his role as department chair, SOF 75, 76.

### 3.    Dr. Klaassen's alleged speech was not on a matter of public concern.

The gist of Dr. Klaassen's speech is to refer to his boss, the Dean and Executive Vice Chancellor, as a "slumlord" and to push for Dr. Atkinson's termination as Dean and EVC. He angrily exclaimed in front of faculty that "the bitch must go." SOF 24. The PowerPoints criticize

the allocation of resources elsewhere in the University, rather than to the basic sciences, where he worked. SOF 99. This speech was not on a matter of public concern.

Speech is on a matter of public concern "if it involves a matter of interest to the community." *Nixon v. City & Cty. of Denver*, 784 F.3d 1364, 1367 (10th Cir. 2015) (citation omitted). That determination is made based on the "content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983). "[T]he motive of the speaker and whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's interest" are factors in the consideration. *Nixon*, 784 F.3d at 1367 (citation omitted); *see also Denton v. Yancey*, 661 F. App'x 933, 937 (10th Cir. 2016) (finding speech was not on a matter of public concern when the speaker's motive was to regain his job – not expose some wrongdoing or malfeasance). "In particular, speech that exposes official impropriety generally involves matters of public concern, while speech that simply airs grievances of a purely personal nature typically does not." *Nixon*, 784 F.3d at 1367–68 (quotations and citation omitted); *Cvancara v. Reams*, 676 F. App'x 774, 778 (10th Cir. 2017). "[I]t is not sufficient that the topic of the speech be of general interest to the public; in addition, *what is actually said* must meet the public concern threshold." *Cvancara*, 676 F. App'x at 778 (citation omitted).

To receive First Amendment protection, speech must sufficiently inform an issue as to be helpful to the public. *Lee v. Nicholl*, 197 F.3d 1291, 1295 (10th Cir. 1999). Simply speculating about possible wrongdoing, rather than providing an informed opinion on a topic of public concern, is insufficient. *Cvancara*, 676 F. App'x at 780. And deliberately false or reckless statements receive no protection. *Dill v. City of Edmond, Okl.*, 155 F.3d 1193, 1202 (10th Cir. 1998). This is because the "interest at stake is as much the public's interest in receiving *informed*

opinion as it is the employee's own right to disseminate it." *City of San Diego v. Roe*, 543 U.S. 77, 82 (2004) (per curiam) (emphasis added). "[S]peech relating to internal personnel disputes and working conditions ordinarily will not be viewed as addressing matters of public concern." *Morris v. City of Colorado Springs*, 666 F.3d 654, 661 (10th Cir. 2012) (citation omitted); *see also Leverington v. City of Colorado Springs*, 643 F.3d 719, 727 (10th Cir. 2011) (personal disputes or grievances not protected). An employee's right to free speech "is not a right to transform everyday employment disputes into matters for constitutional litigation." *Morris*, 666 F.3d  at 663 (quoting *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 399 (2011)).

Denigrating or defamatory remarks receive no First Amendment protection. *See Thayer v. City of Holton*, 515 F. Supp. 2d 1198, 1202, 1206–07 (D. Kan. 2007) (dispatcher calling Chief of Police "dumber than a fucking . . . ," and calling the City Manager a "prick" and a "gutless piece of shit" not protected by First Amendment); *Taylor v. Carmouche*, 214 F.3d 788, 793 (7th Cir. 2000) (calling a superior a racist is defamatory speech, unprotected by the First Amendment); *Brenner v. Brown*, 36 F.3d 18, 20 (7th Cir. 1994) (defamatory remarks unprotected); *Waters v. Churchill*, 511 U.S. 661, 672 (1994) ("we have never expressed doubt that a government employer may bar its employees from using [an] offensive utterance to members of the public or to the people with whom they work" and "we have never suggested that the Constitution bars the governor from firing a high-ranking deputy for" being robustly critical of the governor). Finally, even if Dr. Klaassen engaged in some protected speech, he is not immunized from discipline for his unprotected speech merely because he made other protected comments. *Id.* at 681; *Thayer*, 515 F. Supp. 2d at 1206.

Dr. Klaassen's speech was not on a matter of public concern. His comments at the stakeholder's meeting were simply his personal opinions about University resource allocation.

He did not identify government misconduct or unlawful behavior; rather, he was denigrating Dean Atkinson as a "slumlord" in a meeting with fellow department chairs and a vendor who was presenting on a wholly unrelated topic. SOF 79. These abusive attacks are not protected.

The April 7, October 28, and any other PowerPoints fail for the same reason. Dr. Klaassen's individual attacks of Dr. Atkinson's decisions, unsupported by facts or evidence to inform anyone, are unprotected personal gripes.

The final category—the LJW newspaper articles and commentaries—similarly fails. No statements are attributed to Dr. Klaassen on any topic, and it's unclear (even to Dr. Klaassen) what information he provided. To the best of his knowledge, he did not accuse the University of any illegal acts when he spoke with the editorials' author. SOF 338. Dr. Klaassen cannot establish that he engaged in First Amendment speech within those articles.

### 4.    The employer's interests outweigh any free speech interest of Dr. Klaassen.

Under the third *Garcetti/Pickering* element, Dr. Klaassen's First Amendment retaliation claim fails because the Defendants' interest in promoting the efficiency of public service outweigh Dr. Klaassen's alleged free speech interest. In conducting this analysis, the Court may examine "whether the government had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer." *Helget v. City of Hays, Kansas*, 844 F.3d 1216, 1222 (10th Cir. 2017) (internal quotation marks omitted) (quoting *Lane v. Franks*, 134 S. Ct. 2369, 2380 (2014)). The primary question is the impact of the speech on the "effective functioning of the public employer's enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

The University is a workplace. Four faculty committees recognized that Dr. Klaassen's unprofessional conduct disrupted the workplace. SOF 14. Dr. Klaassen has acknowledged both

the disruption in the workplace and his responsibility for it. SOF 15. And he acknowledged he engaged in professional misconduct. SOF 27. Dr. Klaassen's own counsel has acknowledged that Dr. Klaassen would use "loud language," "pound[] on tables in staff meetings," and "turn red in the face and sometimes shake." SOF 128. Dr. Klaassen displayed images of guns, discussed committing suicide, and became uncontrollably angry. SOF 128, 129. Members of his own faculty and staff were afraid of and were intimidated by him. SOF 19. And Dr. Klaassen has testified that he will not change his behavior. SOF 20. Dr. Klaassen has referred to his colleagues and superiors as "losers," "perjurers," and members of a "mob of bad guys." SOF 22. He directed the members of his lab to lie to administration on his behalf. SOF 278. Prior to his removal as Department Chair, he referred to his boss, Dr. Atkinson, as a "slum lord." SOF 23, 79. Dr. Klaassen stood in front of a faculty meeting and angrily exclaimed (in reference to Dr. Atkinson) that "the bitch must go." SOF 24, 103. He worked with one of his lab members to draft an inaccurate and offensive email under the fictitious name of "Students for Democracy," making additional false claims. SOF 104, 106-110. The Court in the State Case held that Dr. Klaassen did not have a good faith belief that any wrongdoing with respect to the NIH grants had occurred at the University. SOF 426. When Dr. Carlson was named interim Department Chair, Dr. Klaassen immediately was insubordinate. SOF 133, 134. When Dr. Jaeschke applied to become the Chair of the Pharm/Tox Department, Dr. Klaassen threatened to ruin Dr. Jaeschke's career, telling him: "If you fuck me over, I'm going to fuck you over." SOF 25, 217.

The University need "only to establish that the speech could *potentially* become so disruptive to [its] operations as to outweigh [Klaassen's] interest in the speech." *Trant*, 754 F.3d at 1166; *Rock v. Levinski*, 791 F.3d 1215, 1217, 1220 (10th Cir. 2015) (holding that plaintiff's interest in publicly expressing her policy views did not overcome employer's "concern that those

holding high-ranking policy positions speak publicly with a single voice on policy matters," and noting that the Court "will generally defer to a public employer's reasonable predictions of disruption . . ."). One factor in this consideration is whether the employee's chosen form of speech is "unnecessarily disruptive." *Helget*, 844 F.3d at 1223 (quoting *Lytle v. City of Haysville, Kan.*, 138 F.3d 857, 865 (10th Cir. 1998)). An employee's interest in speaking is given "little weight if a reasonable person in his shoes would not have believed that there was government corruption or wrongdoing." *Lytle*, 138 F.3d at 866 (citing *Moore v. City of Wynnewood,* 57 F.3d 924, 933 (10th Cir. 1995)).

The speech must be considered in conjunction with the manner, time, and place of the employee's expression and the context in which the dispute arose. *Rankin*, 483 U.S. at 388. Considerations include whether the speech "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id*. Government employers need not tolerate disloyalty from high-ranking employees, such as department chairs. *Levinski*, 791 F.3d at 1221-22 ("The management of a public institution, such as a university, . . . is not required to retain in a management or policymaking position a person who publicly opposes its policies. . . Rather, such an institution is entitled, for the sake of effective implementation of its policies, to have in management positions, . . . persons who will support its policies, rather than persons who will undermine its goals by voicing public opposition to them.") (citation and alterations omitted). On balance, the University's interests in maintaining a well-regulated school outweighed any interest Dr. Klaassen had in his self-described "acting out." *See* SOF 14, 16, 18, 24, 25, 26, 27, 71-85, 93-97, 102-109, 114, 119-130, 148, 154, 160, 164, 191-193, 212-239, 249, 278.

5. **Several of Dr. Klaassen's alleged acts of retaliation are not adverse employment actions.**

The fourth element of Plaintiff's claim is that the First Amendment protected speech must be a "substantial motivating factor" in an "adverse employment action." *Couch v. Bd. of Trustees of Mem'l Hosp. of Carbon Cty.*, 587 F.3d 1223, 1236 (10th Cir. 2009). Dr. Klaassen cannot establish either that any protected speech was a "substantial motivating factor" in the termination, or that any action other than his termination was an "adverse employment action." [14]

To constitute an "adverse employment action," Dr. Klaassen must establish that "the defendant[s'] actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity." *Couch*, 587 F.3d at 1237 (citation omitted). Not every perceived slight is an adverse employment action on which a party may base a claim of retaliation. *Id*. In making this determination, "context matters." *Id.* at 1238. For example, conducting an investigation of employees who are in a dispute and following up that investigation with a letter regarding the individuals' conduct was not actionable retaliation. *Id.* at 1238-39. Similarly, non-reappointment of a physician to a medical staff committee was not actionable retaliation when there was no evidence that removal would be comparable to a demotion. *Id.* at 1239-1240.

Dr. Klaassen alleges that Defendants' retaliatory acts include: (1) terminating Dr. Klaassen's employment, (2) placing Dr. Klaassen on "suspension," (3) removing Dr. Klaassen as chair of Pharmacology[15], (4) transferring Dr. Klaassen to a different department and laboratory,

---

[14] Defendants will address the causation question in each individual's separate summary judgment brief, but will address the sufficiency of the alleged adverse employment actions here, as that analysis applies universally to all Defendants.

[15] Dr. Klaassen's claim related to the removal as chair of the department is solely against Dr. Atkinson and is addressed in Dr. Atkinson's separate brief.

(5) removing Dr. Klaassen as PI from NIH grants, (6) preventing Dr. Klaassen from conducting research and working with his research students, and (7) denying Dr. Klaassen and his laboratory members access to necessary research equipment. Dr. Klaassen unsuccessfully accused the University of committing each of these same acts in his Wyandotte County case. Termination of employment had economic consequences, and these economic consequences have gone to final judgment in two prior lawsuits. The remaining alleged retaliatory acts against the Individual Defendants do not meet the standard.

Dr. Klaassen's administrative leave with pay was not an adverse action. As well-stated by a faculty ad hoc hearing committee: "Dr. Stites placed Professor Klaassen on administrative leave with pay, a specifically authorized administrative action that is not a disciplinary sanction. Dr. Stites's response is consistent with preserving a safe work environment as required by the Kansas State Policy on Workplace Violence and with the Human Resources policies for KU Medical Center. SOF 291.

Dr. Klaassen's transfer to the Internal Medicine Department from a laboratory in the Pharm/Tox Department was done after he caused dysfunction in the Pharm/Tox Department. SOF 157, 158, 164. The First Ad Hoc Committee agreed that move was necessary. SOF 193. The change did not impact his salary. SOF 376. The lab in the Hixson Building remains in use today, years after Dr. Klaassen's termination. Dr. Klaassen has no legal right to work in any particular department or any particular lab, and the fact that he would have preferred not to move his lab to Hixson or change departments does not establish an actionable detrimental employment action.

Dr. Klaassen's removal as PI from the NIH grants similarly had no impact on his salary. SOF 376. That action was taken by the NIH, which Dr. Klaassen acknowledges it had full

authority to do. SOF 360. Finally, categories (6) and (7) are so vague as to not support a claim, and category (7) appears to be an alleged wrong against Dr. Klaassen's students (who are not parties to this lawsuit), rather than to Dr. Klaassen himself. There are no identified damages associated with such allegations.

### 6. The Individual Defendants are entitled to qualified immunity because they did not act in knowing violation of the law.

#### a. Governing standard.

Qualified immunity shields an individual government official from liability so long as the official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable official would have known. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Whether an official is protected by qualified immunity turns upon the objective legal reasonableness of the official's actions in light of clearly established law at the time the official acted. *See Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). There is a presumption in favor of qualified immunity for public officials acting in their individual capacities, unless the plaintiff proves otherwise. *See Hidahl v. Gilpin Cty. Dep't of Soc. Servs.*, 938 F.2d 1150, 1155 (10th Cir. 1991). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *See Malley v. Briggs*, 475 U.S. 335, 341 (1986); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

A court must determine whether a plaintiff has demonstrated both (i) that the defendants' actions violated the plaintiff's federal constitutional or statutory rights and, if so, (ii) that the right was clearly established at the time the conduct occurred. *District of Columbia v. Wesby*, 583 U.S. __; No. 15-1485, slip op. at 13 (S. Ct. Jan. 22, 2018). The court may address either question first. *Pearson*, 555 U.S. at 236.

Discerning whether the relevant legal rule was clearly established is a narrowly tailored exercise that is context specific. The precise contours of the right must have been sufficiently clear that every reasonable official would have understood that what he or she was doing violated that right, leaving no debate as to the lawfulness of the conduct. *See Reichle v. Howards*, 566 U.S. 658, 664 (2012); *al-Kidd*, 563 U.S. at 741. "It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Wesby*, slip op. at 13. When it is debatable whether a violation has occurred, the law by definition cannot be clearly established, and qualified immunity applies. *See Reichle*, 566 U.S. at 668–69. The "dispositive inquiry," according to the Supreme Court, "is whether it would [have been] clear to a reasonable" professor or administrator in the individual's position "that [his or her] conduct was unlawful in the situation [they] confronted." *Wood v. Moss*, 134 S. Ct. 2056, 2067 (2014) (citation omitted). This requires a "high degree of specificity." *Wesby*, slip op. at 13. "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (citation and quotations omitted).

> **b.      The Individual Defendants are entitled to qualified immunity on Dr. Klaassen's First Amendment retaliation claims.**

The Individual Defendants did not violate clearly established law. Dr. Klaassen cannot identify a case with sufficiently similar facts that put a reasonable professor or administrator on clear notice that his or her actions were unlawful.

The first question is whether there was clearly established law that the statement Dr. Klaassen alleges making were made as a private citizen rather than as an employee. As noted earlier, these statements related to his job duties and administrative issues related to his work, his

departments, and the University. Doc. 66, §§ 6, 36; *see, e.g.*, *Demers v. Austin*, 746 F.3d 402, 417 (9th Cir. 2014) (granting qualified immunity because the contours of professor's rights were not "sufficiently clear that every reasonable official would have understood" that the conduct alleged violated those rights); *Mpoy v. Fenty*, 901 F. Supp. 2d 144, 158 (D.D.C. 2012) (contours of teachers' First Amendment rights are not clearly established). Dr. Klaassen has established no facts suggesting that he put the Individual Defendants on notice that he was speaking as a private citizen (quite the contrary, in fact) or any binding law clearly establishing that Klaassen's comments were made in his capacity as a private citizen.

Next, there is no clearly established law in Kansas that offensive comments about one's boss, such as calling Dr. Atkinson a "slumlord," were matters of public concern. Defendants were not aware of any binding law that would have clearly established that the topics Dr. Klaassen raises were so clearly a matter of public concern that any reasonable University administrator would have been on notice. The same is true of Dr. Klaassen's anonymous, unidentified contributions to the LJW commentaries.

Moreover, the uncertainty involved with the Court's balancing of interests in element three makes qualified immunity particularly appropriate. This Court recently stated:

> Differences in the nature of the competing interests from case to case make it difficult for a government official to determine, in the absence of case law that is very closely analogous, whether the balance that he strikes is an appropriate accommodation of the competing individual and governmental interests. We must remember that **government officials are not expected to be prescient and are not liable for damages simply because they legitimately but mistakenly believed that the balancing of interests tipped in the State's favor.**

*Ditter v. City of Hays, Kansas*, No. 15-9083, 2016 WL 81226, at *8 (D. Kan. Jan. 7, 2016) (emphasis added) (citations omitted); *see also Eaton v. Harsha*, 505 F. Supp. 2d 948, 972–73 (D. Kan. 2007) (granting qualified immunity because the plaintiff could not show that the supervisor

violated a clearly established right when he disciplined plaintiffs for engaging in speech that caused disruption, when a determination of liability requires balancing the interests of the parties); *Melton v. City of Oklahoma City*, 879 F.2d 706, 730 (10th Cir. 1989); *Wulf v. City of Wichita*, 883 F.2d 842, 865 (10th Cir. 1989) ("where supervisors, in a reasonable and good-faith exercise of their duties, discipline employees without the direction that would come through analogous cases, a determination that the law is clearly established will be precluded by the fact-specific nature of the *Pickering* balancing."); *Dartland v. Metro. Dade Cty.*, 866 F.2d 1321, 1323 (11th Cir. 1989).

In *Thayer,* the Court noted that the question of public concern and the *Pickering* balance "shows at the very least that the law is not clearly established as to whether plaintiff's speech touched on matters of public concern under circumstances such that a reasonable official would understand that it was impermissible to discipline plaintiff because of his speech." *Thayer*, 515 F. Supp. 2d at 1209 (granting qualified immunity to law enforcement officers who disciplined officer for calling supervisor inappropriate names). These balancing tests are highly fact-specific, which leaves it nearly impossible for University employees and officials to know precisely where the Court might land on whether a given statement is entitled to First Amendment protection, weighing each element and balancing the numerous factors at play. This is precisely the scenario for which qualified immunity exists.

The viability of Dr. Klaassen's First Amendment Retaliation claim requires Dr. Klaassen to establish that the Individual Defendants violated law that was so clearly established that no reasonable official in their shoes would have believed their conduct was lawful. This Dr. Klaassen cannot do.

### E.  Dr. Klaassen's "Procedural Due Process Taking of NIH Grants" Claim Fails as a Matter of Law.

Dr. Klaassen claims Drs. Atkinson, Terranova, Carlson, Jaeschke, and Stites have deprived him of his procedural due process rights secured by the Fourteenth Amendment.[16] U.S. CONST. amend. XIV, § 1. Procedural due process requires that the procedures provided by the state in effecting deprivation of liberty or property are adequate. *Hulen v. Yates*, 322 F.3d 1229, 1247 (10th Cir. 2003). A procedural due process claim requires "(1) a constitutionally cognizable liberty or property interest, (2) a deprivation of this interest, and (3) a lack of constitutionally adequate notice and a hearing." *Martin Marietta Materials, Inc. v. Kansas Dept of Transp.*, 810 F.3d 1161, 1171-72 (10th Cir. 2016) (citation omitted). The court asks two questions: "(1) Did the plaintiff possess a protected property or liberty interest to which due process protections apply? And if so, (2) was the plaintiff afforded an appropriate level of process?" *Id*. at 1172. Dr. Klaassen's procedural due process claim regarding NIH grants fails as a matter of law because it does not satisfy the two-step inquiry employed by the Tenth Circuit in procedural due process cases. Dr. Klaassen did not possess a protected property interest that would have triggered the University's obligation to provide notice and a hearing.

### 1.  <u>Dr. Klaassen does not have a constitutionally protected property interest in a right to research or a right to serve as principal investigator on NIH grants.</u>

Dr. Klaassen alleges that certain of the Individual Defendants (a) "removed Dr. Klaassen of his property interest in his tenure right to conduct research, which included the right to serve as a PI on NIH grants, without notice and a chance to be heard;" and (b) "depriv[ed] Dr.

---

[16] The Amended Pretrial Order does not state which acts are attributed to each of the five defendants. Doc No. 298, p. 22-23. The Third Amended and Supplemental Complaint attributes nearly identical allegations to each of the five. Doc No. 296, p. 28-30. For the purposes of this issue, the five defendants are addressed collectively.

Klaassen of his property interests by stripping him of his status as PI on multiple NIH grants without notice and opportunity to be heard . . . spending money from Dr. Klaassen's NIH grant accounts without authorization, spending money from Dr. Klaassen's endowment account without authorization, transferring him to a different department, and denying him access to necessary laboratory equipment." Doc. 298, p. 22.

Each of these claims fail:

- There is no judicially recognized tenure right to conduct research that includes any "right" to serve as PI on NIH grants.

- There is no judicially recognized right to notice and a hearing before being removed as a PI on any NIH grants.

- The allegation that the University spent money from "his" accounts does not implicate a property right. The accounts were University accounts.

- There is no judicially recognized right to be employed in a particular department.

- There is no judicially recognized right to particular laboratory equipment.

- The five individual defendants are entitled to qualified immunity on these claims.

> **a.    Dr. Klaassen had no judicially recognized right to serve as a principal investigator.**

A PI is "an individual *designated by the applicant organization* to have the appropriate level of authority and responsibility to direct the project or program supported by the award." SOF 359. The NIH Grants Policy Statement explains that the PI "is responsible and accountable to the recipient organization or, as appropriate, to a collaborating organization, for the proper conduct of the project or the program, including the submission of all required reports." SOF 359. The awards are made to the institution, and the PI is "designated" by the University and responsible to the University. SOF 362.

This Court has correctly concluded that "the NIH awards grants to institutions, not individuals." Doc. 120, p. 3; *see* 42 C.F.R. § 52.2 (defining Grantee as the *institution* designated

in the grant award document as the responsible legal entity); SOF 344, 362. A PI does not have a property interest in maintaining a position as a PI on an NIH grant absent some source of law bestowing such a right. *See Abbs v. Sullivan*, 756 F. Supp. 1172, 1182 (W.D. Wis. 1990) *vacated on jurisdictional grounds*, 963 F.2d 918 (7th Cir. 1992) (grant funding "does not constitute a constitutionally protected property interest unless [plaintiff's] claim to it is legally enforceable by contract or under state or federal law"); *Kalderon v. Finkelstein*, No. 08 Civ. 9440, 2010 WL 9488933, at *13–14 (S.D.N.Y. Mar. 10, 2010) ("That a PI does not have a property interest in a grant is made clear by the governing regulations and the limited relevant caselaw that exists. It is the grantee institution (the College), and not the PI, that is the legal recipient of the grant."), *report and recommendation adopted in part, rejected in part on other grounds*, No. 08 CIV. 9440, 2010 WL 3359473 (S.D.N.Y. Aug. 25, 2010), *aff'd*, 495 F. App'x 103 (2d Cir. 2012); *Finkelstein*, 495 F. App'x at 106–07 (rejecting argument that professor/PI had a property interest in a federal research grant).

The grants were awarded by the NIH to the KUMC Research Institute (KUMCRI). SOF 350, 357. KUMCRI was responsible to the NIH for performance of the terms of the grants. Dr. Klaassen admits that it is "absolutely" within the authority of the NIH to change the PI on a grant. SOF 379. He has acknowledged that the NIH has not criticized the University for its request that the PI be changed on the COBRE or Training grants. SOF 380. Dr. Klaassen has failed to identify any law or contractual provision establishing a right to continue as PI on NIH grants. Nothing "places substantive restrictions" on KUMC's ability to remove plaintiff as PI. *See Hennigh v. City of Shawnee*, 155 F.3d 1249, 1254 (10th Cir. 1998).

The requirements of due process "apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents of State*

*Colleges v. Roth*, 408 U.S. 564, 569 (1972). The Constitution does not define those liberty and property interests deserving of Fourteenth Amendment protection. *Anglemyer v. Hamilton Cty. Hosp.*, 58 F.3d 533, 536 (10th Cir. 1995). Rather, such interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Farthing v. City of Shawnee, Kan.*, 39 F.3d 1131, 1135 (10th Cir. 1994) (quoting *Roth*, 408 U.S. at 577).

Whether a public employee has a constitutionally protected right in any aspect of employment, including job responsibilities, benefits, pay, a particular position, or continued employment, depends on whether these rights have been established by an independent source such as state law. *See Hennigh*, 155 F.3d at 1253-54. "An individual has a property interest in a benefit for purposes of due process protection only if he has a 'legitimate claim of entitlement' to the benefit, as opposed to a mere 'abstract need or desire' or 'unilateral expectation.'" *Teigen v. Renfrow*, 511 F.3d 1072, 1078-79 (10th Cir. 2007) (quoting *Roth*, 408 U.S. at 577) (employee's right to be considered for promotion or transfer was discretionary and thus not a protected interest for purposes of due process). "A benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Schulz v. City of Longmont, Colo.*, 465 F.3d 433, 444 (10th Cir. 2006) (citation and internal quotations omitted). The relevant inquiry is whether the public employee is entitled to the benefit; an entitlement deserving of due process protection exists if substantive restrictions have been placed on the employer's discretion to take away the benefit. *Hennigh*, 155 F.3d at 1253.

Dr. Klaassen's testimony contradicts his theory. He has testified that research is a privilege and not an entitlement. SOF 403. He has agreed that the AAUP Guidelines do not create a contract between any employee and the University, and instead are a set of guidelines.

SOF 404. Dr. Klaassen agrees that the concept behind the AAUP Guidelines with regard to freedom to do research relates to challenging the subject matter of the research. SOF 405. Nobody has challenged on the basis of academic freedom or otherwise the propriety of doing the type of research that is in these grants. SOF 406-408.

The Court dismissed this claim in 2015 for failure to sufficiently plead a plausible property interest and failure to establish an implied contract based on the KUMC Handbook. Doc. 102, p. 37. The Court denied Klaassen's motion for reconsideration but allowed him to amend his complaint to allege more facts to establish a property interest created by an implied contract. Doc. 120, p. 8. Klaassen's Third Amended and Supplemental Complaint alleges 10 additional facts not considered by the Court in its earlier ruling. Doc. 296, p. 26-28.

Dr. Klaassen inaccurately asserts that two sources establish his property right: (1) KUMC's statement of support of concepts of academic freedom as reflected by certain paragraphs of the 1940 Statement of Principles on Academic Freedom and Tenure or University Professors and the American Association of Colleges; and (2) KUMC's custom and practice created over the course of his career at the school. Doc. 296, p. 26.

Dr. Klaassen's reliance on the AAUP's 1940 Statement of Academic Freedom and Tenure is flawed. *See* SOF404-408 and Ex. 779. The AAUP Guidelines are referenced in the KUMC Handbook solely as they relate to academic freedom, and include a strong reminder to the faculty member as follows: "As scholars and educational officers, [University professors] should remember that the public may judge their profession and their institution by their utterances. Hence they should at all times be accurate, should exercise appropriate restraint, should show respect for the opinions of others, and should make every effort to indicate that they are not speaking for the institution." Ex. 779. No action was taken against Dr. Klaassen for his

research or the types of research he was conducting. SOF 408. There is nothing about the AAUP Guidelines that purports to guarantee that any PI cannot be removed from his position as PI. Nothing about the University's reference to the Guidelines suggests otherwise.

The policies described in the KUMC Handbook are not intended to create a contract between the University of Kansas and its employees. SOF 6. This Court has determined that KUMC's adoption of the 1940 Statement of Academic Freedom and Tenure—by itself—does not establish a protected property interest. Doc. 120, pp. 6-7. The Court declined to address Dr. Klaassen's custom and practice argument because it was not pled. The KUMC Handbook states that "the policies described in this handbook are not intended to create a contract between the University of Kansas and its employees." SOF 6. There is a policy specifically giving KUMCRI the discretion to remove a PI. SOF 366. Dr. Klaassen acknowledges the authority of the NIH to approve a change in PI. SOF 379. The University has removed other individuals as PIs from grants. SOF 368. Where the University has established a policy giving itself the discretion to remove a PI, one cannot claim that there is mutual understanding to the contrary. KUMC has not "fostered a custom or mutual understanding that its faculty and administration would not interfere with a tenured professor's research." *See Hamid v. John Jay Coll. of Criminal Justice*, No. 99 CIV 8669, 2000 WL 666344, at *6 (S.D.N.Y. May 19, 2000).

The NIH approved the University's requests to change the PI on the COBRE and Training Grants, which it had full authority to do. SOF 377-79. The policy expressly states that KUMC "will decide the course of action," SOF 366, which indicates KUMC has the discretionary choice to recommend removal as a PI. *See Schulz*, 465 F.3d at 444. Nothing in the policy places any substantive restrictions on KUMC's discretion to act. *See Hennigh*, 155 F.3d at 1253. Simply put, KUMC's policy and course of conduct show KUMC can (and did) decide to

remove an unavailable professor as PI. As a result of this discretion, the agreed upon course of action was to replace Dr. Klaassen as PI on four NIH grants.

Dr. Klaassen also suffered no loss of property rights because he suffered no economic consequences as a result of being replaced as PI. There is no direct correlation of Dr. Klaassen's salary to any grant. SOF 376.  Dr. Klaassen's salary remained the same after he was removed as PI. SOF 376. This claim fails for failure to establish a property interest.

> **b.     Dr. Klaassen was not entitled to notice and a hearing before being removed as PI.**

Because Dr. Klaassen fails to prove a property interest in a right to conduct research or a right to serve as a PI on NIH grants, he was not entitled to notice and an opportunity to be heard before the University used its discretion to request a change in the PIs. *See Martin Marietta*, 810 F.3d at 1171 ("To be entitled to procedural due process, [the plaintiff] must prove it has either a protected property interest or liberty interest."). Further, the KUMC Handbook, agreed to by the faculty and administration, does not require any sort of due process procedure before a PI is removed from an NIH grant. SOF 367. The University nevertheless provided him with an opportunity to state his case to the first ad hoc faculty hearing committee, which concluded that "it was not inappropriate to remove [Dr. Klaassen] as the PI on the COBRE and training grants." SOF 382. For these reasons, Dr. Klaassen's procedural due process claim must fail.

> **c.     Dr. Klaassen had no judicially recognized right to money in University accounts.**

Dr. Klaassen also loosely alleges that the Individual Defendants deprived him of property interests by spending money from "Dr. Klaassen's NIH grant accounts" and "Dr. Klaassen's endowment account" without his authorization. Doc. 298, p. 22. He alleges no facts to support these conclusory claims. NIH grant accounts belong to the University. SOF 344, 349, 350, 352,

353, 356, 357. He has no constitutionally recognized interest in the University's distribution and management of the federal grant funds that were expressly awarded to the University.

The same applies to the endowment funds. The Kansas University Endowment Association is the nonprofit corporation statutorily authorized to act as the investing agent for endowments to the University. *See* K.S.A. 76-156a. It is a 501(c)(3) tax-exempt organization that exists to support the University, and as such, tax-exempt contributions (like those alleged by Dr. Klaassen) given to the Association must be used exclusively for that purpose. *See* 26 U.S.C. § 501(c)(3). Endowment funds belong, as a matter of Kansas law, to the Association, not to Dr. Klaassen. SOF 391. The Association is responsible for maintaining those funds. The allegations pertaining to spending money from "Dr. Klaassen's" accounts were the subject of both the KJRA case and the state court retaliatory discharge case, both of which found in favor of the University and against Dr. Klaassen on those issues. SOF 325, 425, 426.

> **d.    Dr. Klaassen has no judicially recognized right to be employed in a particular department.**

Dr. Klaassen next alleges that the Individual Defendants deprived him of a property interest by transferring him to a different department, but this Court already decided this issue and need not address it again. *See* Doc. 102, p. 38. "The general rule is that no protected property interest is implicated when an employer reassigns or transfers an employee absent a specific statutory provision or contract term to the contrary." *Hulen*, 322 F.3d at 1240. Dr. Klaassen has not met his burden to show a statutory or contractual term to the contrary. *See* Doc. 102, p. 38. And he has not alleged any new facts in the Amended Pretrial Order to change this decision.

> **e.    Dr. Klaassen has no judicially recognized right to particular laboratory equipment.**

Dr. Klaassen vaguely asserts that the Individual Defendants denied access to necessary laboratory equipment, another purported property interest. He did not allege which of the five

Individual Defendants supposedly denied such access, so the pleading is deficient. *See Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008). Furthermore, Dr. Klaassen cannot show that access to lab equipment rises to the level of a constitutional right.

### 2. **The Individual Defendants are entitled to qualified immunity on this claim.**[17]

There was no robust consensus of federal law in 2011 (when Dr. Klaassen was removed as the PI on the COBRE and Training Grants) or in 2013 (when Dr. Klaassen was removed as the PI on two smaller R01 grants) that alerted any reasonable KUMC official that removing Dr. Klaassen as PI of NIH grants was unlawful. There is no Supreme Court or Tenth Circuit authority that clearly established that the KUMC officials' alleged conduct violated the law. Dr. Klaassen has not pointed to any Supreme Court or Tenth Circuit decisions clearly supporting his position. In the briefing on the motion for judgment on the pleadings, Dr. Klaassen cited one unpublished, out-of-jurisdiction, district court opinion that permitted a plaintiff to survive a motion to dismiss. *See Hamid*, 2000 WL 666344. But that's insufficient to constitute clearly established law. *See al-Kidd*, 563 U.S. at 741-42 (district court's holding is not controlling authority in any jurisdiction, much less in the entire United States). In addition, the court in *Hamid* only allowed the plaintiff's claim based on a property interest to survive a motion to dismiss, giving the plaintiff "the chance to show" a custom or mutual understanding. 2000 WL 666344, at *6. Dr. Klaassen has failed to do so.

### F. Punitive Damages Are Not Appropriate on Any of Dr. Klaassen's Claims.

A jury may assess punitive damages in a Section 1983 action only when the defendant's conduct is shown to be motivated by "evil motive or intent, or when it involves reckless or

---

[17] The standard governing qualified immunity is set forth in section III(C)(6)(a) and is incorporated here by reference.

callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). A similar standard applies to punitive damages based on tortious interference claims. *See Burrowwood Assocs., Inc. v. Safelite Glass Corp.*, 853 P.2d 1175, 1178 (Kan. Ct. App. 1993) (explaining that "punitive damages are awarded to punish the wrongdoer for his malicious, vindictive, or willful and wanton invasion of another's rights, with the ultimate purpose being to restrain and deter others from the commission of similar wrongs" (citation omitted)). In each instance, the focus is on whether the defendant's actions call for deterrence and punishment beyond that provided by compensatory damages. *Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1308 (10th Cir. 2003). Liability for actual damages does not automatically create a basis for punitive damages. *Melton*, 879 F.2d at 733.

Four faculty committees and two Wyandotte County courts have found that Defendants' actions were lawful and appropriate. SOF 14, 325, 425. Two years elapsed between Dr. Klaassen's alleged First Amendment activities and his termination. Dr. Klaassen was afforded extraordinary notice and multiple opportunities to be heard. SOF 184, 188, 266, 272, 289, 296, 304-07, 314-317, 318, 323. Finally, Dr. Klaassen's tortious interference claims do not support a punitive damages award because no evidence suggests Defendants acted with the requisite malice or vindictiveness. All claims for punitive damages fail as a matter of law.

### G.  This Court Should Decline to Exercise Supplemental Jurisdiction over Dr. Klaassen's State Law Claims.

Pursuant to 28 U.S.C. § 1367(c)(3), this Court is empowered to refrain from exercising jurisdiction over state-law claims, should it dismiss Plaintiff's federal claims. When making this discretionary decision, courts weigh case-specific considerations in light of "the values of judicial economy, convenience, fairness, and comity." *See Merrifield v. Bd. of Cty. Comm'rs for Cty. of Santa Fe*, 654 F.3d 1073, 1085 (10th Cir. 2011) (quoting *Carnegie–Mellon Univ. v.*

*Cohill*, 484 U.S. 343, 350 (1988)); *see also Coleman v. Gen. Motors LLC*, No. 12-2305-CM, 2014 WL 3955327, at *2 (D. Kan. Aug. 13, 2014) ("The law is crystal clear that when all federal claims in a case have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state law claims. . . . 'Notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary.'") (internal citations omitted). Dr. Klaassen's state-law claims are devoid of any independent basis for federal subject-matter jurisdiction, and Defendants request that the Court decline to exercise supplemental jurisdiction over these claims.

## III.   CONCLUSION

Defendants respectfully request that summary judgment should be granted in favor of Defendants and against Dr. Klaassen on all issues for the reasons set forth herein.

Respectfully submitted,

By: *Anthony F. Rupp*
  Anthony F. Rupp, KS #11590
  Tara S. Eberline, KS #22576
FOULSTON SIEFKIN LLP
32 Corporate Woods, Suite 600
Overland Park, KS 66210
(913) 498-2100
(913) 498-2101 (fax)
trupp@foulston.com
teberline@foulston.com

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of January, 2018, I electronically filed the above and foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to the following:

Alan L. Rupe #08914
Jeremy K. Schrag #24164
LEWIS BRISBOIS BISGAARD & SMITH LLP
1605 N. Waterfront Parkway, Suite 150
Wichita, KS 67206
Telephone: (316) 609-7900
Facsimile: (316) 630-8021
Email: alan.rupe@lewisbrisbois.com
Email: jeremy.schrag@lewisbrisbois

ATTORNEYS FOR PLAINTIFF

*Anthony F. Rupp*
Anthony F. Rupp