**Corrections Posted**

## Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

CURTIS KLAASSEN, Ph.D.,

    Plaintiff,

    vs.    Case No. 13-CV-2561-DDC/KGS

THE UNIVERSITY OF KANSAS

SCHOOL OF MEDICINE, et al.,

    Defendants.

------------------------------------------

    IN THE TWENTY-NINTH JUDICIAL DISTRICT

    DISTRICT COURT, WYANDOTTE COUNTY, KANSAS

CURTIS KLAASSEN, Ph.D.,

    Plaintiff,

    vs.    Case No. 14-CV-603

UNIVERSITY OF KANSAS,

UNIVERSITY OF KANSAS SCHOOL

OF MEDICINE, and the UNIVERSITY

OF KANSAS MEDICAL CENTER,

    Defendants.

    VOLUME 1

    VIDEOTAPED DEPOSITION OF

    CURTIS KLAASSEN, Ph.D.,

## Page 2

1   taken on behalf of the Defendants, pursuant to
2   Notice to Take Deposition, beginning at 9:35 a.m.
3   on the 15th day of October, 2015, at the law
4   offices of Lewis, Brisbois, Bisgaard & Smith, LLP,
5   1605 N. Waterfront Parkway, Suite 150, in the City
6   of Wichita, County of Sedgwick, and State of
7   Kansas, before Barbara J. Hoskinson, Certified
8   Court Reporter, Kansas License No. 0434.
9   .
10  .
11  .
12  .
13  .
14  .
15  .
16  .
17  .
18  .
19  .
20  .
21  .
22  .
23  .
24  .
25  .

## Page 3

1                    APPEARANCES
2   .
3   .
4   ON BEHALF OF THE PLAINTIFF:
5   .
6     Mr. Alan L. Rupe
7     Mr. Jeremy K. Schrag
8     Lewis, Brisbois, Bisgaard & Smith, LLP
9     1605 N. Waterfront Pkwy, Suite 150
10    Wichita, Kansas, 67206
11    316-609-7900
12    alan.rupe@lewisbrisbois.com
13    jeremy.schrag@lewisbrisbois.com
14  .
15  .
16  ON BEHALF OF THE DEFENDANTS:
17  .
18    Mr. Tony F. Rupp
19    Ms. Tara Eberline
20    Foulston Siefkin, LLP
21    9225 Indian Creek Parkway, Suite 600
22    Overland Park, Kansas, 66210
23    913-498-2100
24    trupp@foulston.com
25    teberline@foulston.com

## Page 4

1     Ms. Sara L. Trower
2     Office of the General Counsel
3       University of Kansas
4     1450 Jayhawk Blvd., Room 245
5     Lawrence, Kansas, 66045
6     785-864-3276
7     strower@ku.edu
8   .
9   .
10  ALSO PRESENT:
11  .
12    Ms. Rhonda Wills
13    Mr. Brett Bazzelle, Videographer
14  .
15  .
16  .
17  .
18  .
19  .
20  .
21  .
22  .
23  .
24  .
25  .

Page 41

1  So, let's start with that allegation. You would
2  agree that as to the computer part, and right now
3  I'm going to focus on your work computer and I'm
4  going to get to other personal property in a few
5  minutes, okay? So, right now we're talking about
6  the information that was on your work computer,
7  all right?
8      A. Okay.
9      Q. You understand that the computer that you
10 are referring to was owned by the University of
11 Kansas, correct?
12     A. I guess, legally it was. I think it
13 probably was paid out of my grants. It didn't
14 cost the university anything, but they put their
15 sticker on it.
16     Q. Well, let's talk about how grants are
17 paid, first of all. The money that comes from a
18 grant goes to the University of Kansas or the
19 University of Kansas research institute, is that
20 correct?
21     A. That's correct.
22     Q. You do not pay income tax on that money,
23 correct?
24     A. No.
25     Q. That is correct?

Page 42

1      A. That's correct.
2      Q. The, the grant is made -- and we're going
3  to go through this in a little more detail later
4  -- but the grant is made, the grantee under the
5  grant is the University of Kansas research
6  institute, correct?
7      A. Correct, I guess.
8      Q. And the property of the University of
9  Kansas if it is paid for by the grant doesn't
10 become your property, correct?
11     A. Well, yes and no. Generally, what
12 happens, if I buy a piece of equipment on a grant
13 and I move to another university that equipment
14 goes with me.
15     Q. Are you -- do you pay income tax on the
16 value of that piece of equipment?
17     A. No.
18     Q. Do you -- are you ever granted ownership
19 of that piece of equipment?
20     A. Well, in a way. I mean, it's mine to use
21 and when I move from university to university it
22 comes with me; so, as far as I am concerned, for
23 all practical purposes it's there for me to use
24 wherever I am at and therefore, you know, you can
25 split hairs and try to make a big deal out of who

Page 43

1  really owns it, but in the practical sense of
2  science and what NIH wants to do is to do science
3  and the equipment goes with the scientist usually.
4      Q. In order for a grant to be transferred
5  from one university to another does the university
6  have to authorize that to take place?
7      A. Correct.
8      Q. NIH has a number of rules pertaining to
9  the use of its grant money, correct?
10     A. Correct.
11     Q. Do any of those rules suggest that grant,
12 or that, that property purchased with grant money
13 becomes the personal property of any of the
14 faculty members included on the grant?
15     A. No, but it is my right as a principal
16 investigator to use that equipment. That's my
17 right.
18     Q. In terms of the allegation here that
19 Kansas University Medical Center holds the
20 personal property located on the work computer
21 hostage, at any point in time did anyone
22 associated with the University of Kansas suggest
23 to you that they were holding the work computer
24 hostage and to release it upon some specific
25 terms?

Page 44

1      A. Well, they wouldn't give it to us. We
2  asked many times.
3      Q. What authorization do you believe Kansas
4  University has to give to you property that it
5  owns?
6      A. Things that I created, I have the right
7  to see what I created.
8      Q. What specific property, or what
9  specifically on your work computer is it your
10 contention that you have not been provided?
11     A. Oh, there's been millions of things. You
12 know, I can't identify them all. I mean, most of
13 my PowerPoints that I've used were not provided to
14 me. You know, it -- I mean, everything that I've
15 done for 45 years is either on my computer or
16 before I had my computer it's in my file cabinets,
17 the most important things, and they don't provide
18 that to me.
19     Q. What specific items personal to you can
20 you identify were on your computer that haven't
21 been provided?
22     A. As I said again, there are many things --
23 the PowerPoints for one thing I can tell you. You
24 know, I don't know exactly what has been given to
25 me and what hasn't been given to me 'cause I can't

Page 101

1   Doctor Stites other than what you tape recorded on
2   May 1 with regard to age as applies to you, is
3   that correct?
4       A.   No.  There was another event experienced
5   by myself and all of my students when, quote, we
6   were welcomed into the Department of Medicine.  We
7   met in the room and it was the same kind of tone
8   of my, you know, my age, my retirement, a soft
9   landing until I retired and it was very, very
10  uncomfortable.  So, it seemed to me that it was a
11  hang-up that he has, is age, and, you know, I was
12  the oldest chairman in the -- at the medical
13  school and some people have a problem with age
14  and, and, so, this is my interpretation of his
15  actions and words.
16      Q.   And as you indicated, you aren't able to
17  get inside the mind of Doctor Stites, correct?
18      A.   That's correct.
19      Q.   You would have to speculate or engage in
20  conjecture inside the mind of Doctor Stites,
21  correct?
22          MR. RUPE:  Object to the form of the
23  question.
24  BY MR. RUPP:
25      Q.   Is that correct?

Page 102

1       A.   State that a little clearer.
2       Q.   You would have to speculate or engage in
3   conjecture to get inside the mind of Doctor
4   Stites, correct?
5           MR. RUPE:  Same objection.
6       A.   Yes, I can't get in to his mind, but the
7   reason given here is belligerent and abusive
8   activity and it was shown that that's not true, so
9   then what is true?
10  BY MR. RUPP:
11      Q.   Doctor, in terms of -- strike that.
12  Let's go to the meeting on May 1, 2013.  What was
13  the purpose of that meeting?
14      A.   It was supposed to have been about what
15  happened to my finances the last two years.
16      Q.   What -- you made a decision to tape
17  record that meeting, is that correct?
18      A.   Yes.
19      Q.   You didn't tell anyone else in the room
20  that they were being tape recorded, is that
21  correct?
22      A.   That's correct.
23      Q.   What was it about that meeting that
24  caused you to decide that you should, in advance,
25  that you were going to tape record that meeting?

Page 103

1       A.   I had been retaliated against so many
2   times at K.U. Med Center and when I was going to
3   be in a room with five people on one side of the
4   table and one person on the other side of the
5   table, I thought I needed to have some evidence
6   because if five people said what happened and I
7   said what happened in this retaliatory meeting I
8   would be a dead duck and thus I taped it and the
9   faculty agreed, in essence, that I didn't do what
10  they are charging me with.  So, what was the
11  issue?  The issue must not have been the issue.
12      Q.   When you say that it was five against
13  one, what, what is it about Dustin Carrillo or
14  Christina Hopkins that would cause you to believe
15  as you enter into a meeting on May 1, 2013, that
16  this is going to be five against one?
17      A.   I've seen how they retaliate against me,
18  how they have this mobbing scheme at K.U. Med
19  Center to get rid of me, so, I have to protect
20  myself the best I know.
21      Q.   Who was, in your view, part of this
22  mobbing scheme?
23      A.   Oh, very clear.  It's Barbara Atkinson,
24  Gerald Carlson, Paul Terranova, Stites, ~~Jaesche,~~ Jaeschke,
25  Rosa ~~Meugher,~~ Meagher, that come to mind right offhand and I

Page 104

1   would actually add to that also Ken McCarson and
2   ~~Lavant,~~ Levant, Beth ~~Lavant.~~ Levant.  I might have forgot someone,
3   but that's most of them.
4       Q.   Okay.  Was Dustin Carrillo part of the
5   mobbing scheme?
6       A.   Apparently, because everyone that was,
7   that wrote a comment about what happened in that
8   meeting on the tape didn't have, didn't happen at
9   that meeting.  How could that be?  Five people
10  come up with the same conclusion that's not true.
11      Q.   Was Christina Hopkins part of the mobbing
12  scheme?
13      A.   I think so, yes.
14      Q.   What was Christina Hopkins -- from your
15  point of view, what would have been Christina
16  Hopkins' motivation to be part of a mobbing scheme
17  against you?
18      A.   Same with everybody.  It's money and job
19  security.  She would not give me any of my, in
20  essence, grant reports.  We're supposed to get
21  grant re -- find -- funding reports every month,
22  every month, every month, just like you get from
23  your bank, your canceled checks every month.  She
24  would not give them to me.  Why not?  She was
25  apparently a part of the mob.

Page 105

1    Q.  Did anyone suggest to you that you tape
2  record the May 1 meeting?
3    A.  No.
4    Q.  Was there anything that in particular you
5  were attempting to accomplish with the May 1 tape
6  recording?
7    A.  Yes.
8    Q.  What was that?
9    A.  Justice.
10    Q.  And, how were you going to, to establish
11  justice by tape recording the meeting?
12    A.  By playing it at that, at that faculty
13  hearing where it was played and, in essence, the
14  people that heard it said, in essence, you're
15  innocent, go back to work.
16    Q.  In terms of the May 1 meeting, was there
17  an ad hoc committee scheduled to be hearing any
18  issues at the time of your May 1 hearing?
19    A.  No.
20    Q.  There hadn't -- there was not a pending
21  inquiry report against you on May 1, is that
22  correct?
23    A.  This is correct, and I did not know what
24  would happen, but you have to realize this was the
25  first time basically that I talked to any

Page 106

1  administrat -- that any administrator would talk
2  to me for the previous two, three years and, so,
3  other than, you know, throwing me out of the
4  department, and I didn't -- I don't trust them at
5  that time and now that I know more I still don't
6  trust them.
7    Q.  This is the part of the deposition where
8  I get to be enlightning my briefcase.
9        (THEREUPON, Doctor Klaassen Deposition
10  Exhibit No 8 was marked for identification.)
11        MR. RUPP:  Same thing as that.  I need to
12  have something to wrap it around it.
13        MR. RUPE:  Is this all one?
14        MR. RUPP:  That's all one.
15  BY MR. RUPP:
16    Q.  Doctor, I have handed you what has been
17  marked as Exhibit No. 8 and it is a chain of E-
18  mails, but I want to -- beginning on the first
19  page of it, page 8887, and the one I want to
20  direct you to -- well, let's, let's start with the
21  second page of that.  The first E-mail is an E-
22  mail from you to Christina Hopkins regarding grant
23  accounting dated March 6, 2013.  Do you see that?
24    A.  Correct.
25    Q.  And she responds, no problem, it will

Page 107

1  take about a day to run all the reports, but I
2  will send them to you.  Is that correct?
3    A.  I believe so.
4    Q.  So, she indicated to you that she'd be
5  happy to be cooperative and it was going to take
6  about a day to run them all, but she would do it
7  for you, is that right?
8    A.  Correct.
9    Q.  And, then, you thanked her, correct?
10    A.  Correct.
11    Q.  And, then, she sent you an entire year's
12  worth of grant accounting for, for your five
13  grants, is that correct?
14    A.  Correct.
15    Q.  And she did that within a day of the
16  request by you to do so, is that correct?
17    A.  Right.
18    Q.  And the grant accounting that she sent
19  you was detailed and is attached to this exhibit,
20  correct?
21    A.  Correct.
22    Q.  And it runs from page 8889 to page 9201,
23  is that correct?
24    A.  Correct.
25    Q.  And, that is the grant accounting for

Page 108

1  your five grants, correct?
2    A.  Correct.
3    Q.  So, when you say Christina Hopkins was
4  part of a mob and part of her basis, your basis
5  for believing that was that she was not providing
6  you with your grant accounting, she had within a
7  day of your request provided you detailed grant
8  accounting, correct?
9    A.  Right.
10    Q.  Did you ever at any point in time point
11  out any inaccuracies in the hundreds of pages to
12  that grant accounting that were attached?
13    A.  No, not this grant, but I did
14  specifically about the COBRE grant.
15    Q.  And did you do that in writing or
16  elsewhere?
17    A.  Writing to many people and many times.
18    Q.  Okay, what specifically is inaccurate
19  about the COBRE grant accounting?
20    A.  The COBRE grant accounting -- well, I
21  don't know for sure because I still haven't seen
22  it and I was the PI of that grant and but I still
23  know some things that have been done
24  inappropriately and illegally, but you want to ask
25  me some more specific questions?

1    Cadillac or Lincoln during the middle of the year
2    and then at the end of the year he raises the rent
3    for his people that are renting his, his property
4    and I said, you basically do the same thing in
5    that we have to at the end the year get another
6    cut in the amount of money that we have to run our
7    department. So, that was that. You know, you
8    would might think that she would come and talk to
9    me and say something. Nothing happened.
10       Q.  Well, Doctor --
11       A.  So, the next time.
12       Q.  At this point in time I'm going to object
13   that you're giving a narrative answer that is not
14   responsive to the question?
15           MR. RUPE:  You asked him a narrative
16   question, counsel.
17           MR. RUPP:  I said how were you a whistle-
18   blower.
19           MR. RUPE:  And he's giving you the
20   answer.
21           MR. RUPP:  He hasn't spoken about
22   whistle-blowing yet. He's gone on for several
23   paragraphs.
24           MR. RUPE:  He tells her she's running
25   slum lord economics and --

1            MR. RUPP:  He's telling her, he hasn't
2    spoken outside of the university.
3            MR. RUPE:  And he's telling a story and
4    you're cutting him off.
5            BY MR. RUPP:
6        Q.  Okay, so --
7        A.  Nothing happened. You know, you would
8    think if you were a good administrator you'd bring
9    the people and talk. So, nothing happened, so, I
10   had to go outside. So, there was a meeting at the
11   university with some salesman there and I wasn't
12   planning originally of saying something until Paul
13   Terranova stopped the guy in mid sentence and
14   said, well, how are we going to do this with Curt
15   Klaassen? He can't provide all of this
16   information because he does so much more than
17   other people and then I said, well, why are we
18   really even having this meeting? I said, there
19   are 20, 30 people of department chairs sitting in
20   here to see how we can buy a computer program to
21   see how many papers we publish. I said, any chair
22   of a department knows that information. This is a
23   waste of our money and this again is this
24   administration playing slum landlord economics.
25       Q.  Doctor, on what date did you become a

1    whistle-blower?
2        A.  Well, that day.
3        Q.  The day?
4            MR. RUPE:  Doctor, are you finished with
5    your answer on what you did to whistle blow? Does
6    your, does your whistle-blowing end with that.
7        A.  No, that's where it starts.
8            MR. RUPE:  Salesman conversation?
9        A.  No, it starts.
10           BY MR. RUPP:
11       Q.  Well, let me take it a piece at a time
12   here. The first whistle-blowing that you are
13   referring to is a conversation with an outside
14   vendor, is that correct?
15       A.  Right.
16       Q.  Is an outside vendor a governmental
17   authority?
18       A.  No.
19       Q.  Is an outside vendor in a position to do
20   anything in response to a complaint of whistle-
21   blowing?
22       A.  I don't know.
23       Q.  Did you ever take any complaints of
24   financial mismanagement to a governmental
25   authority whatsoever?

1            MR. RUPE:  He said Terranova was at the
2    meeting.
3            BY MR. RUPP:
4        Q.  Was Terranova outside of the University
5    of Kansas?
6        A.  It seemed that way, but he was paid by
7    the university.
8        Q.  All right. So, in terms of whistle-
9    blowing let me help with this answer. I'm going
10   to ask you for our purposes to discuss whistle-
11   blowing in the context of taking the complaint
12   outside of the university. All right?
13           MR. RUPE:  So, external whistle-blowing.
14           MR. RUPP:  External whistle-blowing, yes.
15           BY MR. RUPP:
16       Q.  So, so, I would assume that on a day-to-
17   day basis there are disagreements within the
18   university about a number of issues, is that fair?
19       A.  Sure.
20       Q.  And -- and, there is debate and
21   disagreement about, with -- between the deans and
22   between the faculty members, correct?
23       A.  Yes.
24       Q.  And, in fact, you have referenced a
25   committee of seven or a committee of eight who had

Page 125

1  discussions with, with Dean Atkinson that led to
2  what you consider to be mobbing of you, correct?
3      A.  Correct.
4      Q.  And those were internal discussions
5  within the University of Kansas, correct?
6      A.  Yeah, that's what we were trying to do
7  was to keep it within.  We even went to the
8  chancellor and she met with us twice.
9      Q.  Okay.  Now, in terms of the meetings with
10 the chancellor, she's part of the University of
11 Kansas as well, correct?
12     A.  That's not a part of University of Kansas
13 Medical Center, so -- but she is a part of the
14 University of Kansas.
15     Q.  Now, in terms of the other members of
16 this committee of seven or eight, was there
17 academic mobbing of those other members as well?
18     A.  No.
19     Q.  Why is it that there was, in your view,
20 academic mobbing of you, but no academic mobbing
21 of the other members of your committee of eight?
22     A.  Because Dean Atkinson knew that I was the
23 most powerful person at K.U. Med Center and I had
24 talked about, to her about this slum landlord and,
25 and, so, she, you know, in essence, went for me

Page 126

1  and the idea is in this whole business of mobbing,
2  is this is a way to get other people to work with
3  the, with the chancellor or dean and if you get
4  rid of the most powerful person it scares the rest
5  so they become part of her team.
6      Q.  What made you more powerful than any of
7  the other chairs of departments at the University
8  of Kansas Medical School?
9      A.  Well, it probably went back to when I was
10 born, but you probably don't want to know about
11 that.
12     Q.  I'd like a shorter answer than that.
13     A.  Well, I have very high ethics, very high
14 morals, and very high expectations of myself and
15 other people and as a result of that if you want
16 to look at -- I don't like to brag, but if you
17 want to look at some statistics, I have had more
18 RO-1 grants than anyone has ever had at K.U. Med
19 Center.  I've published more papers than anybody
20 at K.U. Med Center.  I have had more higher
21 citation of my research than anybody else.  I've
22 been president of national and international
23 societies.  I've been asked to give lectures at
24 500 different places around the world, et cetera,
25 et cetera, and I just have worked hard and expect

Page 127

1  my people to work hard and the department excelled
2  like no other department has excelled while I was
3  chairman.  So, the facts stand.
4      Q.  Was it recognized by the dean in any way,
5  shape or form that you were more powerful than any
6  other department chair?
7      A.  Yes.  She told me, at least, a half a
8  dozen times, you are the best chair that K.U. Med
9  Center has probably ever had.  And, also, being
10 the best scientist that maybe K.U. ever had.
11     Q.  In terms of the whistle-blowing
12 externally I want to go back to that because
13 that's where we were talking and, and, you were
14 giving an answer and you, first of all, spoke, or
15 you indicated that the first example of that that
16 you can think of is complaints that you made to an
17 outside vendor at a, at a dinner, is that correct?
18     A.  That's correct.
19     Q.  And what was the date of that?
20     A.  I don't know.
21     Q.  Okay.  That particular outside vendor was
22 there for the purpose of implementing some new
23 software, is that correct?
24     A.  Correct.
25     Q.  He was not there for, to be taking up

Page 128

1  complaints of how the university was managing its
2  funds, is that correct?
3      A.  Well, I didn't think so, no, but if you
4  read the letters that the administration asked the
5  people to be at that meeting, I thought it was, it
6  was very outside.
7      Q.  What is the next circumstance of a
8  complaint of whistle-blowing outside of the
9  University of Kansas?
10     A.  Well, Lawrence Journal World.
11     Q.  And when -- how did you first come in
12 contact with the Lawrence Journal World?
13     A.  I called them on the telephone and went
14 over and talked to them.
15     Q.  And when was that?
16     A.  Oh, shortly after the dean -- well, yeah,
17 shortly -- well, I don't remember exactly when it
18 was, but yeah, shortly -- so, when -- I don't
19 know.  It's not on my time sheet.  Well, when you
20 started to see those articles in the Lawrence
21 Journal World was some information that I had and
22 I thought that the taxpayers of the state of
23 Kansas should know about.
24     Q.  Who did you speak with at the Lawrence
25 Journal World?

Page 129

1    A.  Oh, number one, whatever his name is.
2  Can't remember.
3    Q.  Well, I believe there are a couple
4  different people on various articles.  One is Mr.
5  Dolph Simons?
6    A.  Yeah, Dolph Simons.
7    Q.  There's another Mr. Highland, I think
8  that --
9    A.  I don't know Highland.  It's Dolph
10  Simons.
11    Q.  Now, you indicated earlier that you
12  thought Dean Atkinson might be concerned that you
13  were going to take something to the newspaper?
14    A.  Time out.
15    MR. RUPP:  Sure.  Should we go off --
16    MR. RUPE:  Can we take a break?
17    MR. RUPP:  Yeah.  Let's take off; let's
18  go off the record.
19    (THEREUPON, a recess was taken.)
20    THE VIDEOGRAPHER:  We are back on the
21  record at 2:45.
22  BY MR. RUPP:
23    Q.  Doctor, a moment ago you had a little bit
24  of a medical or other issue and I just want to
25  make sure as we're sitting here today you are now

Page 130

1  able to answer questions?
2    A.  Yes, I believe so.
3    Q.  All right.  Under the rules we have a
4  total of 14 hours to take your deposition.  We
5  will go on over today and tomorrow as long as we
6  can to try to get as much of that covered as we
7  possibly can, but once again, if during the course
8  of this deposition you are unable to go on for any
9  reason we will accommodate that and we can pick it
10  up at another time.  You understand that?
11    A.  I understand.
12    Q.  So, you're not, you're not going to be
13  forced to answer questions if you're unable to
14  move on.  We -- when we broke, I believe, that I
15  had asked you a question that was, you indicated
16  earlier that you thought Dean Atkinson might be
17  concerned that you were going to take something to
18  the newspaper, is that correct?
19    A.  Yes.
20    Q.  Why might she have that concern?
21    A.  Well, because she was mismanaging K.U.
22  Med Center.
23    Q.  Now, as I basically understand the
24  circumstances, you were at the time a department
25  chair, is that correct?

Page 131

1    A.  Correct.
2    Q.  And the responsibility as chair of the
3  Department of Pharmacology and Toxicology was to
4  that department, correct?
5    A.  Right.
6    Q.  And, Dean Atkinson was in the role of
7  executive vice chancellor, correct?
8    A.  And dean.
9    Q.  And dean, and her responsibilities were
10  different from yours, correct?
11    A.  Yes.
12    Q.  She had a bigger pictures in terms of her
13  management responsibilities, correct?
14    A.  She had a larger responsibility, yes.
15    Q.  Her responsibilities included reporting
16  to the chancellor of the university, correct?
17    A.  Yes.
18    Q.  And reporting to the Board of Regents,
19  correct?
20    A.  Right.
21    Q.  And the ultimate decisions as to issues
22  such as the development of the Cancer Center, for
23  example, those fell outside of your
24  responsibilities of chair of a specific
25  department, correct?

Page 132

1    A.  I agree.  That was not my responsibility
2  or the committee of eight's responsibility, but we
3  -- there is supposed to be joint governance at a
4  university and we wanted to help her to do it
5  better so it would have a good foundation.
6    Q.  But at the end of the day decisions as to
7  proceeding with the Cancer Center are ultimately
8  not, not your decision, correct?
9    A.  Correct.  It's not our decision and
10  ultimately, you know, a year after, quote, I was
11  fired from chair.  She was basically forced to
12  leave the university, so, they probably should
13  have listened to me at the time.
14    Q.  But regardless, she wasn't obligated to
15  adopt your position on everything, correct?
16    A.  No.
17    Q.  She was allowed to disagree with you,
18  correct?
19    A.  Well, the committee of eight.
20    Q.  She was allowed to disagree with the
21  committee of eight, correct?
22    A.  Right.
23    Q.  And, in fact, the decision -- I mean, I
24  believe many years ago chancellor Hemenway had
25  made it a commitment of the University of Kansas

Page 137

1   endowment association of a building, a new medical
2   school in Wichita and Salina, and a research
3   incubator -- those are decisions that are not made
4   by the Department of Pharmacology and Toxicology,
5   correct?
6       A.  No, but administrator at a university
7   should seek interaction with the department chairs
8   and have -- we never had a say in any of this and
9   we were not against the classic building.  That
10  was a good decision.  Of course, it was made
11  before she came.  The remodeling of this old space
12  was, quite frankly, stupid, and she wouldn't let
13  us change that and, you know, again, nine minds
14  are better than one.  Listen to those other eight
15  brains and see what they have to say and then if
16  you disagree tell us why you disagree, fine.  We
17  knew she had the last word.  We just wanted to
18  have joint governance, which is what this means.
19  This is not a corporation.  This is a university.
20      Q.  What did you tell -- or strike that.
21  When you went to the Lawrence Journal World did
22  you announce to the university that you had gone
23  to the Lawrence Journal World?
24      A.  No.  Not directly, no.
25      Q.  Let me go back for a moment.  I want to

Page 138

1   -- before I get to the Lawrence Journal World
2   let's go back for a moment.  You referred to Dean
3   Atkinson as operating, and help me with the word
4   you used slum lord?
5       A.  Slum landlord.
6       Q.  Slum landlord?
7       A.  You know what a slum landlord is?  I had
8   a friend at the University of Minnesota who was
9   proud, he was a slum landlord, except his
10  financial advisor said you're not a very good slum
11  landlord because when there's something wrong you
12  fix it and you don't charge the people more money,
13  like if the water isn't working or the hot water
14  isn't working.  He said, so, his financial advisor
15  said, you don't do those things.  You just
16  increase the price.  So, what a slum landlord is,
17  which he wasn't, is a person that takes advantage
18  of other people and, you know, just doesn't have
19  any ethics.
20      Q.  In a -- in a context of working with
21  other professionals within an organization do you
22  consider it appropriate to refer to those
23  professionals as slum landlords and liars and
24  unethical in your conversations with them to their
25  face?

Page 139

1       A.  Of course.  You tell the truth.  I mean,
2   if you know someone is lying why wouldn't you say,
3   you're lying?  I mean, that's not the culture I
4   was raised in.  I didn't call her a slum landlord.
5   I think I called it slum landlord economics.
6       Q.  What was your purpose in going to Dolph
7   Simons at the Lawrence Journal World?
8       A.  I could not make progress originally at
9   K.U. Med Center working, trying to interact with
10  Barbara Atkinson.  In fact, she would never meet
11  with me one-on-one.  Went to the chancellor, she
12  basically agreed with us, but nothing ever
13  happened and things just kept getting worse and
14  worse and worse.  So, I tried to speak out
15  directly at one of these meetings of ten people
16  with Atkinson, had no effect, so, then, I started
17  to go slowly outside, what she considered outside
18  of talking, making it available to the top 40
19  people maybe at K.U. Med Center so everybody could
20  hear a little bit what's going on as well as
21  outside these two people.  Okay, so, then, she
22  fires me.  Only place I can go that I knew I could
23  go, first of all, was to the newspaper, sent --
24  talked to many people, went to -- told everybody I
25  could think of, even went to the governor of the

Page 140

1   state of Kansas.
2       Q.  Which governor was that?
3       A.  The present one.  What happened?  ZILCH.
4       Q.  Now, let's talk about the, the items that
5   you consider mismanagement.  Have you identified
6   them for us here?
7       A.  Oh, I could.  I mean, it's -- I mean,
8   there's so many.  I mean, why -- you know, just
9   give us the report on why she was fired and then
10  we'd know, or dismissed.
11      Q.  What I'm talking about is not what
12  somebody else did, but what you considered in
13  mismanagement as you described it to let's start
14  with Dolph Simons.  You're talking about the
15  building of buildings and the development of the
16  Cancer Center, correct?
17      A.  I have no problem with the building of a
18  new building.  Of renovating that old building and
19  having something that they could have built a new
20  building for the same price, that was
21  mismanagement of funds, state funds.  That's
22  number one.  Building this -- spending money on
23  this incubator when we don't have enough money to
24  pay the faculty is another mismanagement.
25  Subtracting 22 percent of the basic sciences

Page 141

1    monies over four years I would consider
2    mismanagement.  The spending money out of my NIH
3    grants is mismanagement.  Taking people off of my
4    NIH grant and not telling me about it is
5    mismanagement.  Paying people off of my NIH grants
6    is mismanagement.
7         Q.  Now, I'm going to interrupt you just for
8    a second 'cause none of that had happened when you
9    went to Dolph Simons, correct?
10        A.  You're right on some of that.
11        Q.  Right, so, let me go back to the question
12   that, if I didn't ask it I intended to.
13        A.  Okay.
14        Q.  In terms of the mismanagement of funds
15   that you discussed with Dolph Simons, you were not
16   discussing the NIH grants or you having been taken
17   off the NIH grants because that hadn't happened?
18        A.  That's correct.
19        Q.  Okay.  What you were discussing with him
20   in terms of mismanagement was your views with
21   regard to the big picture management decisions
22   that were being made at Kansas University Medical
23   Center, correct?
24        A.  Yes.  Some of those, but it's larger than
25   just, you know, the buildings, et cetera, that I'm

Page 142

1    talking about.  The Board of Regents says, for
2    example, that everybody has to be evaluated on a
3    yearly basis by your boss, annual evaluation, so,
4    as a chairman I had to evaluate and write a
5    written report on all of the faculty.  Then, the
6    dean is supposed to do that with all of the
7    chairs.  Well, I was chair for, I don't know, ten
8    years, never got one letter.  The day that I got
9    fired I thought I was perfect.
10        Q.  Well, Doctor, right now --
11        A.  That's mismanagement.
12        Q.  -- I am discussing what you told Dolph
13   Simons.
14        A.  You think I know exactly what I told him
15   when I met with him six years ago or whatever it
16   was?
17        Q.  Well --
18        A.  I didn't take a tape.
19        Q.  You could not have told him about
20   mismanagement in association with your firing as
21   department chair because it had not happened yet,
22   correct?
23        A.  Yes, it had.  It was about the same time.
24        Q.  Okay.  I thought you said in timing it
25   had not yet happened.

Page 143

1         A.  It's -- you know, I can't tell you exact
2    date, but it's very -- right around the time that
3    I was fired, definitely.
4         Q.  Now, in terms of the mismanagement items
5    that we have, that you have mentioned here today,
6    the decisions as to all of the bigger picture
7    items, the Salina campus, the Wichita campus, the
8    building of buildings, the remodeling of
9    buildings, those decisions are not illegal, are
10   they?
11        A.  No.  Unethical.
12        Q.  You may disagree -- you may disagree with
13   the ethics of building a new building on campus or
14   funding an incubator, a research incubator, but
15   they're not illegal decisions, correct?
16        A.  No.
17        Q.  And they are decisions that a lot of
18   people have a hand in from the legislature to the
19   Board of Regents to the endowment association to
20   the governor to others, correct?
21        A.  Correct, but one group you've failed to
22   mention and that is the faculty.  That is what a,
23   how a university differs from a corporation.
24   There is supposed to be joint discussions and we
25   were not told about these things until they were

Page 144

1    done.  For example, the education of the first two
2    year schools at the other campuses is done by the
3    basic science departments.  We didn't even know
4    about it.  That is not joint governance.  That's
5    the point.  She can make the decision, but we are
6    supposed to be able to discuss it with her and
7    that is the complaint.
8         Q.  In any of your discussions with Dolph
9    Simons did you accuse the University of any
10   illegal acts?
11        A.  Well, I have again, being with my
12   background, my parents didn't make a decision
13   between illegal, immoral and unethical and, so,
14   I'm more concerned about immoral and unethical
15   things than I am illegal; but I suspect many of
16   these things are probably not illegal.
17        Q.  Thank you.  Was it your intent to subject
18   Barbara Atkinson to ridicule and degradation?
19        A.  Oh, no.  We were trying to help the
20   university, trying to help her.
21        Q.  Were you attempting to get her terminated
22   from her position as executive vice chancellor?
23        A.  I think if she would have listened to us
24   and interacted with us she could have gone down as
25   an excellent administrator, but she had that one

1    A.  Yeah, that's what I said.
2    Q.  Okay, who is Brenda?
3    A.  Brenda Stevens was the predecessor of
4  Christina Hopkins and she also could not give me
5  monthly reports.
6    Q.  I want to take you back now to May 7,
7  2013.
8       (THEREUPON, Doctor Klaassen Deposition
9  Exhibit No 10 was marked for identification.)
10   BY MR. RUPP:
11   Q.  And, I would -- I will represent to you
12 this is a statement from Christina Hopkins about
13 an event on May 7 of 2013, and as we did before
14 I'm going to ask you to read that statement and,
15 then, I'm going to ask you to identify those, that
16 information about that statement that is
17 incorrect.
18       MR. RUPE:  What number is this?
19       MR. RUPP:  This is Exhibit No. 10.
20       MR. RUPE:  Thank you.  How many lawyers
21 did it take to count.
22       MR. SCHRAG:  I was told there would be no
23 math.
24       MS. TROWER:  At least, not beyond our
25 fingers.

1       MR. RUPP:  We may get beyond our fingers.
2       MR. RUPE:  So far so good.
3       MR. RUPP:  Got a little while to go.
4       MS. TROWER:  Have to take our shoes off.
5    A.  Okay.
6  BY MR. RUPP:
7    Q.  All right, have you had the opportunity
8  to read this?
9    A.  Yes, rapidly.
10   Q.  And, let's go top, from the beginning to
11 the end, tell me what statements in there you
12 disagree with.
13   A.  Okay.  Not that this is completely wrong,
14 his visit was completely unannounced.  I mean, so,
15 whenever I had bills that needed to be paid I
16 would bring them over to her, which is what I was
17 doing that day, so, that was all.  So, I think,
18 it's an exaggeration to say that my visit was
19 completely unannounced because all of my visits
20 were unannounced and I went over there a couple
21 times a week.  I greeted him like normal, how are
22 you, that's probably true.  First, he asked
23 Jennifer if he mistakenly left a hotel receipt
24 with his other invoices which they exchanged the
25 day before.  So, you can see I went there more

1  than once a year, two days in a row.  She said no.
2  He, then, came over and leaned and sat on the file
3  cabinet perpendicular to my desk and crossed his
4  arms.  He asked me if anything had happened since
5  last Wednesday, which was the May 1st meeting.  I
6  told him no and if that was true or not I don't
7  know.  Did Stites come back to bully anyone else.
8  So, you notice my statement there?  Did Stites
9  come back to bully anyone else, because on May 1st
10 he had bullied me.  I told him Doctor Stites had
11 another meeting after ours, okay, which probably
12 means that he told them what to say and what to do
13 and to write these comments and how to interpret
14 that meeting, which didn't agree with the tape.
15   Q.  Well, let me, let me stop.  She said that
16 Doctor Stites had another meeting immediately
17 after ours.  She doesn't say she was part of that
18 meeting, does she?
19   A.  Not necessarily.  He then told me he
20 needed to explain the -- okay, so, that's me now.
21 Okay.  So, it turns out that Christina Hopkins is
22 a very nice young lady right out of college,
23 trying to do her best, but they acquired her to be
24 an accountant and she hasn't taken Accounting 101.
25 So, me as a professor, what I do is I educate

1  people.  So, I sat down with a piece of paper and
2  tried to educate her the way what was happening in
3  that Monday meeting and how grants are looked at.
4  I mean, you can tell from that Monday meeting that
5  Stites knows nothing and that he can take money
6  from next year's grant to pay for that thing, et
7  cetera, and, so, I had to explain to her even if
8  her bosses tell her that, you can't do that and,
9  so, I was trying to explain on a blank piece of
10 paper as I would with any of my students how this
11 should be done.  He put the piece of paper on the
12 desk and leaned over to me and began drawing on it
13 and explaining that my way of calculating my
14 finances was wrong, and it was.  Any accountant
15 would tell you it was wrong, so I told her how it
16 should be done, you know, being the nice guy that
17 I am.  I tried to explain -- she tried to explain
18 -- or whatever.  Let's go to the next sentence.  I
19 told him that this is out of my control, which is
20 probably true.  You know, her bosses don't know
21 what to do so how is she going to learn how to do
22 it 'cause she hasn't had an education in
23 accounting.
24   Q.  Okay, let me -- I'm going to continue on
25 through the rest of this.  I think you are now at

Page 153

1    the part of this, part of this where she says, I
2    told him that this is out of my control and she's
3    referring there to the accounting.
4        A.  Right.
5        Q.  And if I am hearing this correctly, you
6    have not disagreed with anything in her written
7    statement up to this point, is that correct?
8        A.  Probably not.
9        Q.  Okay.  Let's go to -- I'm going to take
10   it from here on a line-by-line basis.  Next
11   sentence says, he was waving the pen in his hand
12   within an inch of my face.
13       A.  That's absolutely not true.
14       Q.  What were you doing?
15       A.  I was writing on this piece of paper.
16       Q.  And, she then said, his proximity and
17   volume was clearly an attempt to intimidate me.
18       A.  That's her interpretation.  It was my
19   interpretation as I was trying to educate her like
20   I educate my students.
21       Q.  You were close in proximity to her?
22       A.  Well, yeah.  I had a piece of paper.  She
23   was standing on one side of the desk, I think I
24   was on the other side of the desk and I was
25   drawing graphs and show you what you can do and

Page 154

1    you can't do.
2        Q.  And you were loud?
3        A.  I'm always loud.  My father could not
4    hear.
5        Q.  The -- and she felt intimidated, you
6    agree with that?
7        A.  Hey, most people when they're around me
8    they feel intimidated, so, I don't doubt that she
9    felt intimidated.  I don't try to intimidate
10   anybody, but when people know I'm so successful
11   they automatically are intimidated by me, just
12   like a president would come into this room right
13   now, we'd all be intimidated of the president of
14   the United States.
15       Q.  She told you that this discussion was
16   over, is that correct?
17       A.  She might have.  I don't know.  I don't
18   remember that at all.
19       Q.  According to her, you put your face
20   within an inch of hers and said, you wouldn't
21   handle your personal finances this way.  Is that a
22   true statement?
23       A.  That is not a true statement.  I have
24   never, other than my wife, put my nose within an
25   inch of their nose, and, you know, she lied on the

Page 155

1    other one.  We know she lied.  How can we put any
2    trust into this statement?
3        Q.  She then says, I leaned back away from
4    him so he stood back up and continued to shout
5    about how this wouldn't be happening if he had the
6    millions that were owed to him and that his money
7    was stolen from him.  Is that a true statement?
8        A.  I think that's exaggerated.  I didn't
9    shout at all when I was in that room and, you
10   know, we wouldn't have to talk about my negative
11   account if they -- there's no question about, I
12   don't know if I said this, but if the university
13   wouldn't take, wouldn't have taken the 13 million
14   dollars from me I would have no financial problems
15   and we wouldn't have to talk about if I'm a little
16   bit in the red or a little bit in the black.
17       Q.  And, she continued to tell you that this
18   was out of her control?
19       A.  Well, she might have said again, yeah,
20   and I -- fine.
21       Q.  You would agree, she certainly wouldn't
22   be a person who is able to make you a principal
23   investigator again, correct?
24       A.  No, but what, what, what is, what is
25   being said here is she kind of understood when I

Page 156

1    was explaining to her that what she was doing was
2    wrong, but her bosses tell her to do it wrong, so,
3    she does the accounting wrong.
4        Q.  What specifically was she doing wrong?
5        A.  Well, she's taking money from one grant,
6    things that I said should be bought on this grant,
7    they charged to this grant.  Money that I was
8    spending this year they said, well, you're going
9    to have money coming in next year, we'll take it
10   out of there, et cetera, et cetera.
11       Q.  Can you point to any specific grant
12   document, for example, within the exhibit that had
13   all of Christina Hopkins' attachments to it, which
14   was number 8, and point to what specifically Ms.
15   Hopkins was doing wrong in that grant accounting?
16       A.  Well, you can't tell from this.  You
17   don't even know what was purchased.  It's just the
18   name of a company.  She would charge things to
19   this grant and her, her reason was, and she even
20   said this, is well there's money in that grant,
21   I'll pay for it out of that.
22       Q.  And, what I'm looking for is -- let me
23   ask it a different way.  Did you give her a
24   specific example of some account that was
25   improperly accounted for?

Page 157

1    A.  Not that day, no, but she knew it was --
2  that that's what was happening.
3    Q.  Let me ask it a different way.  On any
4  date did you give Ms. Hopkins an example of an
5  account that was improperly paid?
6    A.  No, probably not.
7    Q.  The next sentence in this exhibit says,
8  he had moved back around the opposite side of the
9  desk when I saw Doctor Dawn appear in the doorway.
10  Doctor Dawn said, Curt, and waved him out of the
11  room.  Doctor Klaassen left with him.  I got up
12  and shut the door behind them.  Is there anything
13  about that that is -- those statements that are
14  untrue?
15    A.  Yes, I was out of the room before -- when
16  I went out of the room Doctor Dawn was coming up
17  the hallway and he never waved at me out of the
18  room 'cause I was already out of the room and we
19  went down the hall and Doctor Dawn and I talked
20  about the unethical behavior of Stites on the 1st.
21    Q.  So, is it your contention that Doctor
22  Dawn made a statement that Doctor Stites' behavior
23  on May 1st was unethical in some fashion?
24    A.  That's what I said to him and he didn't
25  disagree.

Page 158

1    Q.  So, you made a statement to Doctor Dawn
2  and he remained quiet?
3    A.  Yeah, I think, as I recall.
4    MR. RUPE:  Is it time for a short break?
5    MR. RUPP:  We do, let's go off the
6  record.
7    MR. RUPE:  How much left on the tape?
8    THE VIDEOGRAPHER:  73 minutes.
9    MR. RUPP:  We haven't gone very far.
10    A.  Could we take a five minute?
11    MR. RUPP:  We can.  Let's talk off the
12  record just about timing.
13    (THEREUPON, a recess was taken.)
14    THE VIDEOGRAPHER:  We are back on the
15  record at 3:47.
16    BY MR. RUPP:
17    Q.  Doctor, it is now 3:47.  During the break
18  we agreed that given kind of the timing of things
19  today we will break today at about 5 o'clock,
20  we'll go tomorrow as long as you're comfortable
21  going, and it's fairly clear that we won't have
22  accomplished the 14 hours and we will reconvene at
23  a later date that's convenient for you to finalize
24  the, the deposition.  And, in that regard we will
25  try to go till a convenient breaking point around

Page 159

1  5 o'clock today, but I understand it is a long day
2  and if at some point in time once again you're too
3  tired to accurately answer the questions, if you
4  would let us know that.  All right?
5    A.  All right.
6    (THEREUPON, Doctor Klaassen Deposition
7  Exhibit No 11 was marked for identification.)
8    BY MR. RUPP:
9    Q.  I'm now handing you what is Exhibit 11.
10  This is,  in pertinent part, an E-mail from you to
11  Amy O-Brien-Ladner, Steven Stites and Buddhadeb
12  Dawn regarding the meeting of May 13, 2013, is
13  that correct?
14    A.  Right.
15    Q.  And, I guess, my first question is: By
16  this point in time you have been placed on
17  administrative leave by Doctor Stites, correct?
18    A.  Correct.
19    Q.  And this -- and there are a couple of
20  events cited in there, including the May 1 and the
21  May 7 events, correct?
22    A.  Yeah.
23    Q.  And, and, your being escorted from campus
24  followed the May 7 event with Christina Hopkins,
25  correct?

Page 160

1    A.  Right.
2    Q.  Did you at any point in time send an
3  apology E-mail to Christina Hopkins?
4    A.  No.
5    Q.  Why not?
6    A.  Because the real purpose of this E-mail
7  was to help my students.
8    Q.  In terms of Christina Hopkins, you were
9  in a situation where you were loud with her,
10  correct?
11    A.  No.  I wasn't loud.  My normal voice.
12    Q.  You were in a situation where she felt
13  intimidated, correct?
14    A.  That could be.
15    Q.  She felt intimidated to the extent that
16  the next day you were escorted from the campus,
17  correct?
18    MR. RUPE:  Object to the form of the
19  question.
20    A.  Well, I don't think I was escorted off of
21  the campus because of what happened in that room
22  with her.
23    BY MR. RUPP:
24    Q.  If you're in a situation as a faculty
25  member and a member of the staff is so

Page 161

1  significantly intimidated that you are placed on
2  administrative leave in part because of that
3  encounter, would you contemplate apologizing to
4  that person?
5      A.  Oh, I would, I would contemplate it,
6  sure.
7      Q.  And, did you contemplate it in this
8  situation?
9      A.  I don't recall contemplating it.  As I
10 mentioned, the reason I wrote this letter was for
11 the career of my students and the university again
12 and it should be noted that this was May 13th.  I
13 have never walked on campus since then to help my
14 students and this was -- I realized that this was
15 another step in, in the terrible situation that
16 the university was putting on to me, that I tried
17 this so I could get back on campus to help my
18 students and make them feel better.
19     Q.  Was there ever any contemplation of
20 making Christina Hopkins feel better?
21     A.  Well, I wrote this to the faculty.
22     Q.  At any point in time did you do anything
23 to attempt to make Christina Hopkins feel better?
24     MR. RUPE:  Objection, asked and answered.
25     A.  I thought about it, but I don't think I

Page 162

1  acted on it.
2      BY MR. RUPP:
3      Q.  Now, in the first line of this E-mail you
4  say, I apologize, I apologize, I apologize to the
5  Department of Internal Medicine and Kansas
6  University Medical Center for my statements at the
7  meeting a week ago Wednesday.  Was that a sincere
8  apology?
9      A.  No.  This is so I could get back on
10 campus and help my students.
11     Q.  Okay.  So, you were not being truthful in
12 this E-mail, is that correct?
13     A.  Well, if someone felt hurt by what I said
14 I apologize to them, but after reading what they
15 said happened, which were all lies, I stretched my
16 word apologize in regard to the way I could
17 normally apologize.
18     Q.  In your mind, Doctor Klaassen, do you
19 bear any responsibility whatsoever for, for what
20 happened to you in terms of your position at the
21 university?
22     A.  Absolutely none.
23     Q.  And, do you believe that you had any role
24 in the fact that the principal investigator on
25 these grants that these students were brought in

Page 163

1  to work on -- or strike that.  Do you believe you
2  bear any responsibility whatsoever for the
3  consequences of being moved out of the principal
4  investigator role?
5      A.  No.  It was, it was an unethical thing
6  that the university did to me for no reason and
7  this is an academic institution and they ruined
8  the career of a dozen people.
9      Q.  And you bear zero responsibility for that
10 yourself, is that your testimony?
11     A.  Because I'm not there to help them, yes.
12     Q.  And, you have -- it is your testimony
13 that you have no responsibility for the fact that
14 you are not there to help them, is that correct?
15     A.  That's the university's reason.  I would
16 have been there.  I was there every Saturday as
17 well as Monday through Friday, there to help my
18 students and my faculty, and when they kick you
19 out of the building with two armed policemen it's
20 hard to do that.  Giving these people three weeks
21 to find a new job.  Talk about unethical behavior,
22 when there's still millions of dollars left there
23 to spend.
24     Q.  When you were placed on administrative
25 leave you were placed on administrative leave with

Page 164

1  pay, is that correct?
2      A.  Yes.
3      Q.  You are aware that under the State of
4  Kansas workplace violence policy any person who
5  makes threats, exhibits threatening behavior or
6  engages in violent acts on state-owned or leased
7  property may be removed from the premises pending
8  the outcome of an investigation?
9      A.  I did not know that until recently 'cause
10 that's not a part of our handbook for the faculty;
11 but it's kind of irrelevant because I did not do
12 any of those things.
13     Q.  Let's talk about, just so we make sure
14 who we're talking about in terms of your students.
15 Within the department, whether it be pharmacology
16 or toxicology and then later Internal Medicine
17 there would be certain graduate students and post-
18 docs, is that correct?
19     A.  Correct.
20     Q.  How many persons were graduate students
21 at the time you were transferred from the
22 Department of Pharmacology and Toxicology to
23 Internal Medicine?
24     A.  Well, I really had people at three
25 different categories which I considered my

Page 169

1    Exhibit No 12 was marked for identification.)
2        BY MR. RUPP:
3        Q.  Doctor, I have handed you what has been
4    marked as Exhibit No. 12, which I will represent
5    to you to be a series of PowerPoints from --
6        MR. RUPE:  These are not Bates?
7        MR. RUPP:  They do not -- yeah, they are
8    Bates.  They're in the lower right-hand corner of
9    each PowerPoint there's a Bates number on them.
10       MR. RUPE:  There is, but you can barely
11   see on -- 'cause it's on the picture.
12       MR. RUPP:  It's on the pictures, so, they
13   do have Bates numbers.
14       MR. RUPE:  Got it.
15       MR. RUPP:  Some of those Bates numbers
16   are because they're on a blue background
17   difficult, difficult to see.
18       MR. RUPE:  Yeah.
19       BY MR. RUPP:
20       Q.  And, I guess, that for purposes of
21   identification, first of all --
22       A.  Okay.
23       Q.  -- you would agree with me that these are
24   PowerPoints that you, Doctor Klaassen, put
25   together, is that correct?

Page 170

1        A.  Correct, and these were some of the
2    PowerPoints that I had been asking for years and,
3    and now I get to see them.
4        Q.  Well, as a practical matter, and I don't
5    choose to be argumentative, but these have been
6    produced to you before?
7        A.  When?
8        Q.  Well, as part of this lawsuit certainly.
9        A.  Before a month ago?
10       Q.  I don't know.
11       A.  I asked for them four years ago, three
12   years ago, two years, one year ago.
13       Q.  Okay.  These are not -- these do not
14   intend --
15       A.  Sorry, I'm not trying to be
16   argumentative, but this is what I was asking and
17   asking and asking for, just so you know.
18       Q.  Doctor, in that regard, these do not
19   contain any intellectual property, do they?
20       A.  I created them.  Yes.  By my definition.
21       Q.  These are certainly created in your role
22   as department chair?
23       A.  Yeah.  I think it's right that the
24   university has a copy, but, I think, I should have
25   a copy.  That's all I have ever asked.

Page 171

1        Q.  I'm going to go now and because the Bates
2    number on the page that I'm looking at is hard to
3    read I'm going to direct you to one that is K.U.
4    12,107 and it's maybe a quarter of the way in,
5    and, then, once you get there I'm going to direct
6    you somewhere else that's harder to read.
7        A.  Okay.
8        Q.  All right, and having found that page I'm
9    going to direct you to the next page, faculty
10   meeting Friday, February 10, 2006.
11       A.  Okay.
12       Q.  All right.  So, now, we are on -- we are
13   on, in the same PowerPoint.  So, let's start with
14   the concept of the faculty meeting.  What is a
15   faculty meeting in your department as of this time
16   frame of these E-mails, 2005-2006?
17       A.  Okay.  This is the time that I'm really
18   trying to build this department and my role in
19   having a faculty meeting was educating the faculty
20   on the philosophy that we want to have in this
21   department so we can not only succeed, but excel.
22   It was also a purpose to tell people what was
23   going on around campus 'cause I didn't want them
24   to be out spending time by the water fountain,
25   that I would find out with my role what I saw

Page 172

1    going around on campus and tell them, and tell
2    them, you know, some good news.  I tried to be
3    very positive.  I often started out with kind of a
4    little joke or something and, and, then, some
5    things that were going on.  So, that was, you
6    know, in general, it.
7        Q.  So, the concept of all of this was to set
8    a tone in the department?
9        A.  Right.  This was kind of -- yes, and it
10   was also kind of like the pictures in the hallway,
11   that these had a meaning, a purpose.
12       Q.  And the purpose you're describing is to
13   set a positive tone in the department, is that
14   correct?
15       A.  That's correct.
16       Q.  And why would you want as a department
17   chair to set a positive tone?
18       A.  Because to be a good scientist you have
19   to be extremely, extremely positive and because
20   the only, the only replies that you ever get from
21   anyone is negative.  It's a very, very, very
22   difficult profession.  Every manuscript you
23   submit, the only thing they say is the bad things
24   about it.  You submit a grant, you only hear about
25   the bad things.  Only 10 percent are funded, and,

Page 173

1    so, you need to keep encouraging and being very
2    positive and this was one thing that I had to
3    learn because my parents went through the
4    depression and we lived on a farm, so, everything
5    was very negative; that if it rained my mother was
6    worried that the crops would drown out.  If it
7    didn't rain she worried about that it was too dry.
8    So, I had to dislearn all of those things to be
9    successful in science and I wanted the faculty to
10   realize how important this is; that we work
11   together, we work as a family.  Each one of us
12   succeeds, will help the other one succeed.  So, it
13   was very philosophical.
14        Q.   Now, Doctor, in the position that you
15   were in you were a manager of people, correct?
16        A.   Correct.
17        Q.   And just as Doctor Atkinson was a manager
18   of you, correct?
19        A.   (Nods head up and down.)
20        Q.   You were a manager of the faculty in your
21   department, correct?
22        A.   Correct.
23        Q.   And just as Doctor Atkinson's position
24   was a serve at the pleasure position, you were in
25   a serve at the pleasure position, correct?

Page 174

1        A.   Correct.
2        Q.   And as a department chair, just to be
3    clear, you understood you were in a serve at the
4    pleasure position?
5        A.   Right.
6        Q.   That means that unlike a tenured faculty
7    position, in your role as department chair you
8    served at the pleasure of the dean, correct?
9        A.   That's correct.
10       Q.   And, and, by way of example, cabinet
11   positions with the federal government we're all
12   familiar with, those are serve at the pleasure
13   positions and the president can remove a cabinet
14   member for any reason, good, bad or indifferent,
15   correct?
16       A.   That's correct.
17       Q.   And that's the position that Dean
18   Atkinson was in as the EVC and the Dean, correct?
19       A.   Correct.
20       Q.   And that's the position that your
21   predecessor Sam Anna was in as the department
22   chair, correct?
23       A.   Correct.
24       Q.   And, that's the position that you were in
25   in this context, correct?

Page 175

1        A.   Correct.
2        Q.   In association with the serve at the
3    pleasure role of a department chair as opposed to
4    a tenured faculty type of position, the due
5    process requirements of the faculty handbook are
6    not applicable to serve at the pleasure positions,
7    correct?
8        A.   I think you're right.
9        Q.   So, just as Dean Atkinson would not be
10   entitled to a due process hearing with regard to
11   the removal from, assuming that there would be a
12   removal, to any -- let me put it differently.
13   Just as an executive vice chancellor if terminated
14   would not be entitled to a due process hearing
15   from that position, the department chair would not
16   be entitled to a due process hearing from a
17   removal from that position, correct?
18       A.   That's correct, but I did have the right
19   as a departmental chair to be, have a written
20   evaluation each year and to be told if I wasn't
21   doing something correct so I could correct my
22   weaknesses.  Everything that she told me was that
23   I was the best chairman ever and, so, there was no
24   -- if she had a reason to fire me or say that I
25   wasn't doing a good job, that was a requirement by

Page 176

1    the university and Board of Regents regulations
2    and there is not one written evaluation that I
3    know of.
4        Q.   Let's deal with your own evaluation here
5    a little bit.  The faculty meeting of Friday,
6    February 10, 2006, you -- on the next page you
7    have a presentation that is called good news bad
8    news.  You see that?
9        A.   Right.
10       Q.   And, then, you have several items of good
11   news, several pages, and, then, a section that is
12   called bad news.  You see that?
13       A.   I -- yes.
14            MR. RUPE:  Are you there yet?
15            MR. SCHRAG:  Can I get a Bates?
16            MR. RUPP:  It is very --
17       A.   Okay.
18   BY MR. RUPP:
19       Q.   All right, so, this is a presentation
20   that you in your direction in your faculty meeting
21   have presented to your faculty members within the
22   Department of Pharmacology and Toxicology, is that
23   correct?
24       A.   Correct.
25       Q.   And what you say is, from my vantage

Page 185

1    Q.  And, then, it says, the faculty didn't go
2  off campus to discuss how incompetent I am, but
3  did it right in front of the graduate students.
4    A.  Yep.
5    Q.  And, it says, the graduate students were
6  speaking for some faculty, correct?
7    A.  Yeah.  Guess which two faculty that was
8  again.  The low achievers.
9    Q.  The next page you said, appoint a faculty
10  committee of four to educate me about my
11  incompetence.  What are you referring to there?
12    A.  So, I did that.  You know, talk about
13  somebody open.  I did the most open things that I
14  could to try to improve the department.  So, early
15  on at this time I had what turns out to be the low
16  achievers.  I appointed them as a faculty to
17  figure out how I was failing.
18    Q.  Okay.  Who were the low achievers that
19  you appointed to this faculty committee?
20    A.  Well, I'm pretty sure it was McCarson and
21  Levant.  There might have been another person.
22    Q.  Okay, and let's go through each of these
23  things.  It says ten major failures.  Are these,
24  in fact, what they reported back to you?
25    A.  Yes.

Page 186

1    Q.  So, this faculty committee of low
2  achievers reported back to you that as a problem
3  that you required faculty to give to charity.
4    A.  Which isn't true.
5    Q.  You didn't require faculty to give to
6  charity?
7    A.  Of course not.
8    Q.  The next one dealt with confidentiality
9  of faculty evaluations.  Did you consider faculty
10  evaluations to be confidential?
11    A.  Absolutely, and that's false.
12    Q.  As an aside, did you provide any
13  documents to Dolph Simons when you met with him?
14    A.  Yes.
15    Q.  What documents did you provide to him?
16    A.  I don't remember.
17    Q.  Did you provide to him any evaluations of
18  Dean Atkinson?
19    A.  Well, there weren't any.
20    Q.  There hadn't been any evaluations
21  performed of Dean Atkinson?
22    A.  No, even though the Board of Regents says
23  that you have to, they didn't.  You know, she was
24  -- it was very clever, you know.  She was EVC and
25  Dean, so, as EVC she evaluated herself as Dean and

Page 187

1  she kept telling herself she was perfect, although
2  she never wrote it down either.
3    Q.  The sixth, or the 5th item says lack of
4  respect for others.  Have you ever shown lack of
5  respect for other people?
6    A.  No, I don't think so.  Now, I am very
7  business-oriented and do I spend a lot of time by
8  the water fountain talking about the basketball
9  games, no.  Some people refer to that as lack of
10  respect.  I respect everybody.  No question about
11  it.  No matter color, gender, if they're smart or
12  dumb or whatever.
13    Q.  You'd never call anybody a low achiever,
14  for example?
15    A.  I said that -- no, not to them.  I'm just
16  doing that to you.
17    Q.  Okay.  The next item was motivation by
18  example flaunting of your personal history.  Is
19  that something that you do?
20    A.  Apparently, they, you know -- you know,
21  my, my -- you know, one thing is my life is an
22  example for them and they don't like that example.
23  They like to come in at 10 and leave at 3.  They
24  don't like to work on Saturday and I say that, you
25  know, that's probably not good.  You should

Page 188

1  probably do like I do.
2    Q.  Let's go to the next page and it's two
3  diagrams, one with guns pointed out and guns
4  pointed in.  If I understand that diagram, you are
5  pointing out the difference between the Department
6  of Physiology and the Department of Pharmacology
7  and Toxicology, is that correct?
8    A.  Yeah, and this is an over-exaggeration.
9    Q.  And, if I interpret it correctly, you are
10  showing that the Department of Physiology is
11  positive and in your department every gun is
12  pointed at you.
13    A.  Well, every gun is pointed at me, but
14  what the message is here is physiology sticks
15  together, helps each other, and don't worry about
16  what color of carpet is on the floor, but try to
17  do good science and good teaching and there are
18  some people in our department that are not trying
19  to help me develop it.
20    Q.  Now, on the last page of that particular
21  PowerPoint there's a slide that says, if you want
22  me to resign?
23    A.  Yeah.
24    Q.  So, what's the reason you are threatening
25  to resign before 10 o'clock that night?

Page 193

1    were mine?
2        Q.   Were quite a few of them yours?
3        A.   Almost all of them.
4        Q.   So, the rest of your department isn't
5    turning out much, is that --
6        A.   No, that -- oh, no, I was talking about
7    before I was chair.
8        Q.   Let's go on to page 12218.
9        A.   I mean, 218?
10       Q.   Yes.
11       A.   I mean, the point is, is that while I
12   said publish and perish on that one slide, what my
13   normal comment was, publish and flourish, which is
14   a positive way and if you talk to my students they
15   will say that.
16       Q.   On page 12218, are you there?
17       A.   Yeah.  118.
18       Q.   What, what you told your faculty is
19   research is not an entitlement, research is a
20   privilege, is that correct?
21       A.   That's darn right.
22       Q.   Now, let's go to page 12220.
23       A.   Okay.
24       Q.   This is a faculty meeting on Friday,
25   August 28, 2009, is that correct?

Page 194

1        A.   Correct.
2        Q.   Under -- on the slide on the bottom left
3    it says, my expectations for faculty, and you
4    said, be a team player.  What do you mean by that?
5        A.   Be a team player.  Be a family.  Be a
6    team.  Work together, help each other.  Don't
7    speak against each other.  Do like the Royals are
8    doing.  Do as the basketball team at Lawrence.
9    That's a family team, that's -- you know, that's
10   what hopefully life is fun if you can play as a
11   team.
12       Q.   On page 3 of the PowerPoint that has a
13   slide in the lower right-hand corner with a fleet
14   admiral in the upper left-hand corner, it's on
15   Bates number 12222.  Do you see that?
16       A.   Yes.
17       Q.   You have a diagram there on the left, it
18   has fleet admiral down to admiral down to vice
19   admiral and onward.  What are you trying to show
20   there?
21       A.   What I'm trying to show there is the
22   normal order that the military has kind of figured
23   out that works.  That you can't have everybody at
24   the bottom rung going automatically to the top
25   rung.  That just doesn't work in, in, in a, in a

Page 195

1    system.  So, I said in a department it's kind of
2    the same thing.  You know, the graduate students
3    first of all should talk to the mentor and see if
4    they can solve it.  If they can't solve it then
5    they can go to the graduate committee and if the
6    graduate committee can't solve it then maybe the
7    chair should get involved.  If the chair can't get
8    involved they should go to the graduate school
9    dean, et cetera.
10       Q.   So, that's the way you're telling your
11   department that they ought to operate?
12       A.   Yeah.  I mean, this is the way
13   universities should operate overall.
14       Q.   Let's go to the next page, there is a
15   slide that you have prepared and CD K refers to
16   you, correct?
17       A.   That's correct.
18       Q.   And it says, CD K often personally
19   attacks a faculty member at faculty meetings.
20   What's that about?
21       A.   Someone had told me this indirectly and I
22   just put it up there to say, you know, as far as I
23   know I personally attack no one within this
24   department and if I do, please provide me with the
25   example.

Page 196

1        Q.   Okay.  Let's go to the next faculty
2    meeting on the next page, which is dated October
3    1, 2010.  Do you see that?
4        A.   Yes.
5        Q.   And I want to go to the second page of
6    that.  At the bottom there are -- on the bottom of
7    the second page there are once again militaristic
8    diagrams with guns pointed outward and inward.  Do
9    you see that?
10       A.   Yes.
11       Q.   The diagram on the bottom left is meant
12   to illustrate what?
13       A.   Well, again, it's this whole thing of
14   working together.  This is a difficult thing for
15   some faculty at universities to really understand
16   and, so, I have used this kind of symbol a few
17   times to indicate that we need to work together.
18   I'm not -- I don't own a gun.  You know, it has
19   nothing to do with the guns, but when was this
20   date?  And, so, that's all it means.  I mean, you
21   know, anybody with a fourth grade education and
22   had heard my talk so many times that we work
23   together, we play as a team, this is how an
24   organization works, if they don't know what's
25   going on and what these pictures mean, they should

Page 197

1  have gone -- or come to me on October 1st and said
2  that bothers them or two years earlier when I used
3  the same diagram, no one came to me and says that
4  bothers them.  If it did, I'd have made a
5  different picture.  I mean, these people are
6  people with Ph.D.s and if they can't understand
7  what this is an analogy of, then tell, tell me,
8  tell somebody to tell me.
9     Q.   Now, I want to go to the slides that
10  begin on K.U. 12236.  I think it's the last set of
11  slides.
12     A.   Right.
13     Q.   This refers to a faculty meeting dated
14  April 7, 2011, is that correct?
15     A.   Right.
16     Q.   And where I want to go is to the slide
17  that bears the Bates number 12264.  Do you see
18  that?
19     A.   I will in just a minute.
20     Q.   All right.
21     A.   Okay.
22     Q.   And that slide begins, before we get a
23  new chair what do you want me to do, and the first
24  comment you are making there is commit suicide.
25  Why do you have that statement in a faculty

Page 198

1  presentation?
2     A.   To know what they want me to do.
3     Q.   Do you believe that your faculty would
4  want you to commit suicide?
5     A.   I don't know.  The dean fired me at this
6  stage.  What do they want?  I was there to help my
7  faculty and my students and these are different
8  possibilities.
9     THE VIDEOGRAPHER:  Have about ten minutes
10  left.
11     MR. RUPP:  And, you know, we are kind of
12  at the end of this exhibit.  Let's go off the
13  record and talk about how long we want to go on.
14     THE VIDEOGRAPHER:  Off the record at
15  4:50.
16     (THEREUPON, a recess was taken.)
17     THE VIDEOGRAPHER:  We are back on the
18  record at 4:58.
19     (THEREUPON, Doctor Klaassen Deposition
20  Exhibit No 13 was marked for identification.)
21  BY MR. RUPP:
22     Q.   Doctor, I have handed you what is marked
23  as Exhibit No. 13.  Can you identify what that is?
24     A.   This is what we called the COBRE grant
25  and this is a grant that I wrote in I guess 2004-

Page 199

1  2005 and this is a grant to the NIH for funds to,
2  to do research in this area of nuclear receptors
3  and liver health and disease.
4     Q.   Okay, and we've talked a lot today about
5  the COBRE grant and I think you've referred at
6  various points in time to the university stealing
7  13.5 million dollars from you.  Is the COBRE grant
8  a part of that 13.5 million dollars?
9     A.   Yes, it is.
10     Q.   And how much of the 13.5 million dollars
11  is it?
12     A.   Oh, approximately ten, ten million -- ten
13  and a half million, approximately.
14     Q.   This grant has in paragraph 3 A a, or
15  under section 3 there a listing of who the
16  principal investigator is and it identifies you,
17  is that correct?
18     A.   That's correct.
19     Q.   And then it identifies under paragraph 9
20  the applicant organization.  Do you see that?
21     A.   Right.
22     Q.   And that's because the application is
23  submitted on behalf of an organization, is that
24  true?
25     A.   That's correct.

Page 200

1     Q.   And the organization that is listed there
2  is the University of Kansas Medical Center
3  research institute, Inc., correct?
4     A.   Correct.
5     Q.   And paragraph 12 then says the
6  administrative official to be notified if the
7  award is made and it identifies an individual who
8  is director of sponsored programs administration
9  for the University of Kansas Medical Center
10  research institute, Inc., correct?
11     A.   Correct.
12     Q.   The next page is a letter from the office
13  of the executive vice chancellor and at the
14  time of this it was not Barbara Atkinson, but it was a
15  predecessor of Doctor Atkinson, is that correct?
16     A.   Correct.
17     Q.   And that letter provides authority for
18  certain persons to sign research and sponsored
19  programs and grants and contracts on behalf of the
20  university, is that correct?
21     A.   Correct.
22     Q.   And it identifies four individuals, none
23  of whom are you, is that correct?
24     A.   That's correct.
25     Q.   And then the rest of this application

1  walks through in substantial detail who is to be
2  paid what under -- who is to do what and who is to
3  be paid what under this COBRE grant for the
4  following year, is that correct?
5      A.  Yes, in general.
6      Q.  And if you'd turn, for example, to -- to
7  page 10779, it has an initial budget period direct
8  cost only and it has a salary there for you.  Do
9  you see that?
10     A.  Yes.
11     Q.  And it has a salary for other
12 individuals, one, two, three, four, five, six,
13 seven, eight, nine other individuals, do you see
14 that?
15     A.  Right.
16     Q.  And those are all individuals employed by
17 the University of Kansas, is that correct?
18     A.  Yes, they are all faculty, I think.
19     Q.  All right, and then if you go a couple
20 pages later to page 10781 you have, in addition
21 you have certain costs for personnel, including
22 not only faculty members, but staff, is that
23 correct?
24     A.  That's correct.
25     Q.  And all of those staff are employed by

1  the University of Kansas, correct?
2      A.  Right.
3      Q.  To be clear, the applicant for the grant
4  is not Curtis Klaassen, correct?
5      A.  But the person responsible for writing
6  the entire thing was Curtis Klaassen.
7      Q.  But the award of the grant to the
8  University of Kansas, correct?
9      A.  Correct.
10     Q.  See, it's important to do these exhibits
11 right now 'cause it lightens my load going back to
12 the hotel?
13         (THEREUPON, Doctor Klaassen Deposition
14 Exhibit No 14 was marked for identification.)
15     BY MR. RUPP:
16     Q.  Exhibit No. 14 is what?  What is Exhibit
17 14?
18     A.  This is a training program in
19 environmental toxicology for which I am the
20 principal investigator and the program director.
21 It is money to help train graduate and post-
22 doctoral students to do research basically in
23 toxicology.
24     Q.  And when you referred earlier to the
25 university having stolen your money to the tune of

1  13.5 million dollars, in addition to COBRE grant
2  you are referring to this training grant, is that
3  correct?
4      A.  Right.
5      Q.  And the -- once again, the grant
6  application in Exhibit 14 is quite similar to the
7  grant application in Exhibit 13, is that correct?
8      A.  Yes, as far as the front page is
9  concerned.
10     Q.  And internally it will say different
11 things because it's a different type of grant, but
12 that, that deals with the type of research that's
13 going to be done under the grant, correct?
14     A.  Correct.
15     Q.  Under number, or in Exhibit No. 14 once
16 again under paragraph 9 the applicant organization
17 is the University of Kansas Medical Center
18 Research Institute, Inc., correct?
19     A.  Correct.
20     Q.  And the applicant, or the administrative
21 official to be notified if an award is made is
22 associated with the University of Kansas Medical
23 Center Research Institute, is that correct?
24     A.  Correct.
25     Q.  Doctor Klaassen, I want to go back.  A

1  little bit earlier in the day we were talking
2  about the May 1 meeting and some of Doctor Stites'
3  comments about, or related to age, and wanted --
4  you cited some of that as your evidence of age
5  discrimination.  I believe the tape that you have
6  referred to has Doctor Stites making a comment
7  somewhere in the room to the effect of how are you
8  doing, young man.  Is that your recollection?
9      A.  Yeah.  I don't remember if it was young
10 man or old man, but I interpreted it definitely to
11 be old man.
12     Q.  Now, in terms of greetings, is it -- do
13 you consider it to be discriminatory on the basis
14 of age for someone to give a friendly greeting to
15 someone else when they enter the room?
16     A.  No, that's not appropriate.
17     Q.  So, saying how are you doing, young man,
18 is inappropriate in your view?
19     A.  To an old man.
20     Q.  And we aren't able to see in the tape who
21 Doctor Stites says, how are you doing, young man,
22 in the room, correct?
23     A.  You mean if it was said to me or someone
24 else?
25     Q.  Correct.

Page 209

1    A.  Yes, unless there is a real, a positive
2  reason for doing it.
3    Q.  Well, would it be a positive reason for
4  recognizing age to discuss business planning as
5  one moves forward?
6    A.  Well, I wasn't planning on moving
7  forward.  I was planning on keeping the same path
8  as I am today.
9    Q.  Have you ever discussed with anyone the
10  possibility of retirement?
11    A.  No.  In fact, all my friends know, my
12  close friends all know that I'll probably never
13  retire.
14    Q.  Have you ever put in an E-mail that you
15  anticipated retiring within two years?
16    A.  No, not that I -- no.
17    Q.  Now, with regard to research, are you --
18  well, strike that.  Your lawsuit makes reference
19  to the AAUP's 1940 statement of academic freedom
20  and tenure.
21    A.  Yes.
22    Q.  Are you familiar with that standard, or
23  with that publication?
24    A.  Yes.
25    Q.  How is it that you are familiar with that

Page 210

1  publication?
2    A.  Well, I'm a, a university professor and I
3  belong to the AAUP.  I'm a member.
4    Q.  Now, the AAUP has certain comments about,
5  about academic freedom, is that correct?
6    A.  Right, and joint governance.
7    Q.  The AAUP guidelines do not create a
8  contract right to be employed in any particular
9  position, is that correct?
10    MR. RUPE:  Object to the form.
11    A.  Say that again.
12  BY MR. RUPP:
13    Q.  Is it your contention that the AAUP
14  guidelines create a contract between any
15  particular employee and the university?
16    A.  No.  It's, it's basically, you know --
17    Q.  It's a set of guidelines, isn't it?
18    A.  It's a set of guidelines the way
19  universities should behave.
20    Q.  It doesn't create a right in the position
21  of principal investigator, is that correct?
22    A.  Well, only in regard to, you know, my
23  right to do what I want to do for research and in
24  that regard I guess I would say yes, it has
25  something to say about that.

Page 211

1    Q.  The content or the concept behind the
2  AAUP guidelines with regard to freedom to do
3  research relates to someone not coming in and, or
4  universities not challenging the subject matter of
5  the research, is that correct?
6    A.  Yeah, that's, that's a large part of it.
7    Q.  Right.  So, the idea is there are going
8  to be unpopular topics of research in a university
9  setting, correct?
10    A.  Right.  You know, so, it doesn't really
11  even matter if it's popular or not popular.  You,
12  as a -- and in fact, to be promoted and to
13  maintain your job we are supposed to be
14  independent thinkers, do research, and create new
15  knowledge; but the University of Kansas Medical
16  Center took that away from me and I wrote these
17  things and I can't do these things.  So, that is
18  my right.
19    Q.  The content, the COBRE grant and the
20  training grant, those things still exist at the
21  University of Kansas, correct?
22    A.  So do my RO-1s.  They stole it all.
23    Q.  The subject matter of those, the academic
24  freedom to exercise, to be involved in the COBRE
25  grant or the training grant, nobody ever

Page 212

1  challenged the content of doing that kind of
2  research, correct?
3    A.  No one ever challenged it.  No, this is
4  never -- these grants -- no one has ever taken
5  grants away from principal investigators.
6    Q.  Right now I'm dealing with the subject
7  matter of the grants, working on liver, doing a
8  training grant.  Nobody has challenged on the
9  basis of academic freedom or otherwise the
10  propriety of doing the type of research that is
11  there, correct?
12    A.  Oh, I don't think so.
13    MR. RUPP:  I have no further questions
14  this evening.  We will see you in the morning at
15  9:15.
16    THE VIDEOGRAPHER:  We are off the record
17  at 5:22.
18  .
19  .
20  .
21  .
22  .
23  .
24  .
25  .

Page 222

INDEX

1        INDEX
2   .
3   .
4   Certificate----------------------------- 410
5   .
6   .
7        WITNESS
8   ON BEHALF OF DEFENDANTS:          PAGE
9   CURTIS KLAASSEN, Ph.D., Vol. 2
10  Direct-Examination by Mr. Rupp       224
11  .
12  .
13        EXHIBITS
14  DEPO EXHIBIT NO.:              MARKED
15  No 15  Third Amended Complaint       227
16  No 16  PI Changes policy             241
17  No 17  E-mail chain 12/29/12         243
18  No 18  Ad hoc comm. conclusions 5/31/12   285
19  No 19  Stites decision on ad hoc
20         committee hearing            298
21  No 20  6/13/12 Klaassen apology      301
22  No 21  Electronic statement of
23         substantial interest form    302
24  No 22  2010 statement of substantial
25         interest                     306

Page 223

1   No 23  2011 tax return info         311
2   No 24  Handwritten drawing          321
3   No 25  E-mail & PowerPoint slides   328
4   No 26  Dolph Simons LJ World article
5         4/30/11                       334
6   No 27  Hyland LJ World article 4/28/11   335
7   No 28  Simons article 11/5/11       344
8   No 29  Hyland article 6/14/12       348
9   No 30  Hyland article 6/9/12        348
10  No 31  LJ World editorial 6/19/12   349
11  No 32  2nd ad hoc comm. hearing report   355
12  No 33  Letter from Girod re: termination   355
13  No 34  E-mail to Carlson 6/11/12    377
14  No 35  Plaintiff responses to First
15         Interrogatories              380
16  No 36  Plaintiff's Rule 26 disclosures   386
17  .
18  .
19  .
20  .
21  .
22  .
23  .
24  .
25  .

Page 224

1   THE VIDEOGRAPHER:  Good morning.  My name
2   is Tim Faulhaber, the videographer.  The court
3   reporter is Barb Hoskinson.  We are with Appino &
4   Biggs Reporting Service.  Today is the 16th day of
5   October, 2015, and the time is approximately 9:14
6   a.m.  We're at the law offices of Lewis, Brisbois,
7   Bisgaard & Smith, LLP, to take the continuation
8   deposition of Doctor Curtis Klaassen in the matter
9   of Curtis Klaassen, Ph.D., vs. Barbara Atkinson,
10  et al., Case No. 13-CV-2561 DDC/KGS.  Would
11  counsel please state your appearances for the
12  record.
13      MR. RUPE:  Alan Rupe and Jeremy Schrag
14  for the plaintiff.
15      MR. RUPP:  Tony Rupp, Tara Eberline and
16  Sarah Trower for the defendants in both the
17  federal and state lawsuit.
18      CURTIS KLAASSEN, Ph.D.,
19  called as a witness on behalf of the Defendants,
20  was sworn and testified as follows:
21      DIRECT-EXAMINATION  (Continued)
22  BY MR. RUPP:
23      Q.  Doctor, the University of Kansas Medical
24  Center has an ad hoc committee hearing process, is
25  that correct?

Page 225

1       A.  Correct.
2       Q.  That process was written by the faculty,
3   correct?
4       A.  Together with the administration, yes.
5       Q.  And voted on by the faculty?
6       A.  Yes.
7       Q.  And it calls for an inquiry when there
8   has been a complaint?
9       A.  Correct.
10      Q.  And it appoints someone to conduct that
11  inquiry?
12      A.  Correct.
13      Q.  And it calls for a hearing process before
14  fellow faculty members, is that correct?
15      A.  Correct.
16      Q.  And it allows for you to appoint a
17  faculty member to that committee when you are a
18  party to that process, is that correct?
19      A.  Correct.
20      Q.  And as written by the faculty hearing
21  committee there is, or as written as part of the
22  faculty handbook there is no subpoena power
23  associated with, with that process, you understand
24  that, correct?
25      A.  Correct.

Page 258

1    A.  No, and there's many E-mails about this,
2  probably 20, and that's misappropriating federal
3  funds and, you know, I should have fired him at
4  the time but I was kind of a nice guy and he was
5  my employee.  I was paying his salary.
6    Q.  So, when, when -- the university was
7  paying his salary, wasn't it?
8    A.  Off of my grant.
9    Q.  You didn't write him a check?
10    A.  No, but he reported to me.
11    Q.  And he had responsibilities to the
12  university, correct?
13    A.  He had more responsibilities to me.  He
14  would not have a job if it wasn't for me.  The
15  university had no money except pass-through money
16  and you realize, this NIH money is really pass-
17  through money.
18    Q.  So, it's not -- the COBRE grant is not an
19  institutional grant, but is pass-through money, is
20  that what you're saying?
21    A.  It is money that NIH gives to the, quote,
22  gives to the university and for me to use on this
23  project.  In accounting this is often called pass-
24  through money.  They don't give it to the
25  university to buy Cadillacs.  It's given to the

Page 259

1  university as pass-through money for me to do what
2  my intellectual ideas said and that's true for all
3  of these grants.
4    Q.  The next person who is listed is Doctor
5  Hagenbuch.  Why did you sue Doctor Hagenbuch?
6    A.  Well, he wrote to the NIH and asked for
7  my, my training grant.
8    Q.  And did the NIH agree and transfer your
9  training grant?
10    A.  Yes.
11    Q.  That's within the -- that's within the
12  ultimate authority of the NIH to do so, is that
13  correct?
14    A.  They can do that, but they don't do it
15  except in this crazy case.  This is a, kind of a
16  first time.
17    Q.  Doctor Hagenbuch, is he a member of the
18  mob?
19    A.  Well, in a way he was forced into it.  He
20  is from Switzerland, he's a very good scientist.
21  He doesn't understand the American system and he
22  probably didn't understand he was becoming a part
23  of the mob by doing what he did.  I feel sorry for
24  him.
25    Q.  Sorry enough to sue him, is that correct?

Page 260

1    A.  Well, that's the American way and, you
2  know, some way we have to teach the University of
3  Kansas how not to do things and I need to get some
4  money to pay these students whose lives have been
5  ruined.
6    Q.  As to Doctor Jaesche, he's the next
7  individual who you've listed.  Doctor Jaesche is
8  somebody who you recruited to the University of
9  Kansas Pharm-Tox department, is that correct?
10    A.  That's correct.
11    Q.  He is, you thought he was capable of
12  pursuing excellence, is that correct?
13    A.  Yes.  I thought he was, he could do good
14  research but he -- but we realized early on that
15  he never would be probably a good administrator
16  because of his negativity.
17    Q.  In what way is Doctor Jaesche negative?
18    A.  In what way is he negative?  Because he
19  never says anything positive.  The only thing
20  that's good -- the only thing that's good is
21  himself, you know.  Even, even though I'm ranked
22  in the world as the sixth top toxicologist for
23  scientific impact, he says in his E-mail that my
24  research is worthless and he's just,
25  unfortunately, he is just a negative, negative

Page 261

1  person and that's -- you know, Tom Pasternak in
2  the department, you know, said, you know, he even
3  asked Jaesche, you know, why are you running for
4  this position as chair?  You know, that's not your
5  qualities, and part of the -- he definitely became
6  a part of the mobbing.  Man, all of the letters he
7  wrote and E-mails, almost as bad as Carlson to try
8  to get rid of me.  And, so, why did he do it?
9  Well, again, he got -- it was a way he could get
10  12 million dollars of, of my center grant, of my
11  COBRE grant.  He got not only -- you know, in
12  essence, the university now is paying him in
13  essence a hundred percent more than when I was
14  chair.  They, they gave him like, I don't know
15  what it was, 30 percent salary increase to be
16  chair.  They gave him 70,000 dollars to have
17  someone work in his laboratory and, I don't know,
18  maybe that's for his wife's salary who works in
19  his laboratory, I don't know that for sure, and
20  then they gave him another hundred thousand
21  dollars for his laboratory.  Man, if I could have
22  had that deal as a chair it would have been great,
23  but he gained a lot and, and, you know, the
24  faculty in the department, everything that I had
25  built is largely gone now because of his -- and

Page 290

1  testimony, then you don't get justice.  I mean,
2  anybody that knows me, I have these evaluations
3  and they say I am doing an excellent job and then
4  they get up and testify that I'm the devil and
5  they get paid, so, what's going on here?  And they
6  didn't ask, as I've called them before, the
7  underachievers aren't my peers.
8      Q.  The next line says, his behavior towards
9  colleagues and subordinates was unprofessional,
10  abusive, disruptive, and unacceptable.  Is that
11  what they concluded?
12      A.  That's what they concluded from the
13  people that were being paid to testify.
14      Q.  And then it says, some colleagues and
15  staff quite reasonably felt threatened and
16  intimidated as a result of his actions.
17      A.  From what those people, again I'd like to
18  emphasize, for those people that testified against
19  me were not honest, were not truthful, and were
20  part of the blogging committee.
21      Q.  The blogging committee?
22      A.  Well, or whatever you call it.  Whatever
23  I call it.  You know what I mean.
24      Q.  The next sentence says, his testimony
25  revealed that he is blind to his own behavior and

Page 291

1  its impact and that despite the effects leading up
2  and including the hearing in this matter, he
3  remains largely in denial.  Do you see that?
4      A.  Yes, and I still am in denial and all of
5  my students are in -- it's not denial.  There are
6  some of us that know the truth and this, this was
7  not -- this, this whole thing, I mean, when you
8  have the university lawyer go in in essence to the
9  jury room and help decide and write this piece of
10  paper, do you do that in your court, in any court
11  in the United States other than at K.U. Med Center
12  when you want to get rid of Doctor Klaassen?
13      Q.  Let's go on to the next line.  It says,
14  his conduct substantially interfered with the
15  proper university operations and particularly
16  disrupted the department.  That was the conclusion
17  of the ad hoc committee, correct?
18      A.  Yeah, but again, that goes against all
19  facts.  What happened to the department when I was
20  there?  It excelled except for the losers.
21      Q.  Who are the losers?
22      A.  Okay, the people that I earlier called
23  the underperformers.
24      Q.  What's the losers in the department, in
25  your view?

Page 292

1      A.  Well, definitely at that time Beth ~~Levant~~
2  and McCarson were in that category and in fact,
3  the dean even made me -- came to the same
4  conclusion and made me cut the salary of one of
5  them, McCarson.  So, that's what I mean by an
6  underachiever.  Underachievers do not like
7  achievers.  It makes them look bad.  Just like
8  Carlson.  Carlson is an underachiever.  One of the
9  things that makes him look good is to get rid of
10  me.
11      Q.  Then it says, most importantly, it has
12  harmed those he claims to care about most, his
13  students and post-doctoral fellows.  He expressed
14  no remorse and demonstrated no sense of
15  responsibility for bringing these actions upon
16  himself.  Is that what they concluded?
17      A.  That's what they concluded and I don't
18  disagree with their conclusion possibly from what
19  they heard from these people that were lying and
20  due to the fact that I wasn't able to tell my
21  story.  It was just a miscarriage of justice.
22      Q.  And then it says, Doctor Klaassen's
23  blindness to these facts damaged his credibility
24  in the eyes of the committee.
25      A.  There were no facts.  There were only

Page 293

1  perceptions, and the perceptions were made up
2  because these same people a year earlier said that
3  I was doing a superb job.
4      Q.  The next sentence says, K.U., or Kansas
5  University Medical Center administration, however,
6  is not blameless in this events, in these events.
7  You see that?
8      A.  Right.
9      Q.  And it bears some responsibility for the
10  handling of this matter, do you see that?
11      A.  Right.
12      Q.  And then their criticism comes next.  It
13  says, Doctor Klaassen's conduct was follow -- or
14  was tolerated for too long.  Do you see that?
15      A.  Yeah.
16      Q.  And, in fact, that is the criticism that
17  you got away with some of this stuff for too long?
18      A.  This is what that committee that were
19  told incorrect information concluded.  From the
20  information that they were given they concluded
21  this, but when you have only the bad guys lying
22  about me.  I mean, Gerald Carlson was a part of
23  this.  He gave an affidavit and said I was
24  stealing money, and we couldn't -- you know, what
25  they heard and without me being able to refute it,

1      A.  Well, reading some of these E-mails.  I
2   never heard the name before I read these E-mails.
3   But, in fact, you know, he is kind of a
4   whistleblower because he sent it to people that
5   were at Kauffman.
6      Q.  In terms of your reference that Barbara
7   Atkinson fired you because of this E-mail, what
8   evidence do you have of that?
9      A.  Well, I -- that's my problem, I don't
10  know why I've been fired.  Nobody will tell me.
11  This is one of my, one of my problems.  Here I am,
12  this has been going on for years and years and
13  years and I still don't know why I've been fired.
14  Every time she saw me she said I was the best
15  chairman ever.  The next thing I know I'm fired.
16  I don't get yearly evaluations and they won't tell
17  me why they fire me.  That's my concern.  She can
18  fire me, but please follow university regulations
19  of having annual written reports and then if you
20  fire me tell me why.
21          (THEREUPON, Doctor Klaassen Deposition
22  Exhibit No 26 was marked for identification.)
23      BY MR. RUPP:
24      Q.  I've handed you what's been marked as
25  Exhibit No. 26.  It's an article that appears in

1   the Lawrence Journal World, actually an editorial,
2   I believe, that appears in the Lawrence Journal
3   World on April 30, 2011, is that correct?
4      A.  Correct.
5      Q.  This is an article by, or an editorial by
6   Dolph Simons, correct?
7      A.  Right.
8      Q.  And you mentioned Dolph Simons yesterday?
9      A.  Correct.
10     Q.  And to the best of my knowledge, but
11  correct me if I'm wrong, there are no earlier
12  editorials that relate to you.  There may be, I
13  think there's one -- let's go ahead and mark that
14  as well just so that --
15          (THEREUPON, Doctor Klaassen Deposition
16  Exhibit No 27 was marked for identification.)
17     A.  Okay, thank you.
18     BY MR. RUPP:
19     Q.  Just to get the timing down correctly,
20  Exhibit 27 is an article by, or a copy of an
21  article by Andy Hyland two days earlier, is that
22  correct, on April 28?
23     A.  Correct.
24     Q.  Yesterday you were referencing a meeting
25  with Dolph Simons and I'm trying to get the timing

1   down correctly.  Do you believe that meeting took
2   place on or near April 30, 2011?
3      A.  Yes.
4      Q.  The article on Thursday, April 28, 2011,
5   did you talk to Andy Hyland at all?
6      A.  No.  I have never talked to Andy Hyland,
7   to the best of my knowledge.
8      Q.  Prior to April 28, 2011, or whatever day
9   in that time frame you spoke with Dolph Simons for
10  the first time, had you ever spoken with anybody
11  at the Lawrence Journal World about your position
12  as chair?
13     A.  Well, so, I am a Dolph Simons, Sr.
14  distinguished, I don't know what exactly it's
15  called, a distinguished Dolph Simons award that
16  K.U. gives out.  It's in the name of his father
17  who was very supportive of K.U. and K.U. endowment
18  and, so, one of the awards that they give is for
19  people that do excellent research in the
20  biomedical area and it's called the Dolph Simons,
21  Sr. award, I guess, and, so, through that I got to
22  know -- and Dolph Simons, Sr. was still alive when
23  I got that award and, so, I met his son, this
24  Dolph Simons at that event and Dolph Simons also
25  would put on get-togethers for his father's

1   awardees once in a while, so, he got to know me by
2   that, but I did not have a major interaction with
3   him; but he always welcomed information from his
4   father's fellows.
5      Q.  In terms of making any sort of complaint
6   about anything associated with the University of
7   Kansas Medical Center, first of all, did you
8   contribute to any articles before this, these two
9   articles of April 28 and April 30?
10     A.  Are you saying did I kind of write these
11  articles for him?
12     Q.  No, no, no, I'm sorry.  I'm just trying
13  to figure out whether you made any complaints or
14  anything that ended up in print in the Lawrence
15  Journal World at any time before these two
16  articles.
17     A.  No.
18     Q.  Now, as I would understand it, by the
19  time of the first article on April 28, 2011, you
20  had already been removed as chair of the
21  Department of Pharmacology and Toxicology by the
22  dean, is that correct?
23     A.  Yeah, that was on April 6th.
24     Q.  So, that, that action could not have been
25  in retaliation for going to the Lawrence Journal

1    signed by an individual; it says by JW editorial.
2        A.   Okay.
3        Q.   And I assume that this in some fashion --
4    well, did you have any conversation with Mr.
5    Simons or anyone else at the Journal World in
6    association with this?
7        A.   I don't believe so.
8        Q.   Okay.  In it --
9            MR. RUPE:  Which one you talking about?
10           MR. RUPP:  Number 31.
11       A.   The whistleblower.
12   BY MR. RUPP:
13       Q.   It refers to you as a whistleblower in
14   the lawsuit, is that -- or excuse me, in the
15   article.  Let me start that question again, it's
16   poorly phrased.  Exhibit No. 31 refers to you as a
17   whistleblower, is that correct?
18       A.   Yes.
19       Q.   But in the article itself there is no
20   reference to any misuse of federal funds, correct?
21       A.   No.
22       Q.   And there's no reference to any misuse of
23   state funds, correct?
24       A.   Well, kind of look at the first
25   paragraph, the second page.  Klaassen had the

1    commitment to the welfare of the school to speak
2    up about Atkinson and he paid the price, but he
3    also started the action that eventually forced
4    Atkinson to seek the required self-evaluation of
5    her leadership from the faculty and, so, I was
6    talking about the mismanagement of funds and as I
7    understand, the reason why she was originally, or
8    eventually fired was mismanagement of funds.
9        Q.   Do the words mismanagement of funds
10   appear in that editorial at all?
11       A.   Not as words, but that's what it's
12   talking about.
13       Q.   At any point in time did you get censured
14   by the university for speaking between the
15   Lawrence Journal World?
16       A.   Well, some of the retaliation was very
17   likely and quite clearly a retaliation against me.
18       Q.   Well, other than your own, in your own
19   mind as to what the reasons might have been for
20   other peoples' actions, you have not been told by
21   any person as a reason -- that the reason that
22   they were sanctioning you was for reporting
23   anything to the Lawrence Journal World, is that
24   true?
25           MR. RUPE:  Object to the form of the

1    question.
2    BY MR. RUPP:
3        Q.   Go ahead.
4        A.   No.  The university has not told me that
5    they were retaliating against me.
6        Q.   In all -- in all of the hearings, and
7    you've had three of them thus far before the ad
8    hoc committee, have you presented any evidence to
9    those committees that you were retaliated against
10   for speaking with the Lawrence Journal World about
11   any subject?
12           MR. RUPE:  Well, I'm going to object to
13       the form of that question.
14   BY MR. RUPP:
15       Q.   Go ahead.
16       A.   I guess I don't have anything written to
17   prove that that happened.
18       Q.   Okay.  So far I think we've seen that you
19   have accused the University of discriminating
20   against you on the basis of age, correct?
21       A.   Correct.
22       Q.   Of discriminating -- of discriminating
23   against you or retaliating against you for, under
24   the False Claims Act, correct?
25       A.   Correct.

1        Q.   For retaliating against you in some
2    fashion associated with the Lawrence Journal
3    World, correct?
4        A.   Correct.
5        Q.   You've described that you were retaliated
6    against for pursuing excellence, correct?
7        A.   Correct.
8        Q.   You've described that you were retaliated
9    against because others were jealous of you,
10   correct?
11       A.   Correct.
12       Q.   Is it possible that perhaps the reasons
13   for the actions that have been taken against you
14   were associated with your own behavior?
15       A.   No.
16       Q.   When you spoke with the Lawrence Journal
17   World you were a professor at the University of
18   Kansas?
19       A.   I think so, yes.
20       Q.   And you've described, I believe, that you
21   were trying to help the dean, is that correct?
22       A.   Definitely before that we were helping,
23   trying to help the dean.  I just presented to him
24   what was, what had happened.
25       Q.   And --

Page 354

1    A.  I just wanted to make a better medical
2  school.
3    Q.  So that in the context of being a
4  professor at the University of Kansas Medical
5  Center you wanted to make a better medical school,
6  is that the basis for your comments to the news
7  media?
8    A.  Yeah, and it was first my comments to the
9  dean, to the other faculty, and then to the
10  newspaper.  I tried to do it within.  She would
11  not have joint governance.  All of the top seven
12  faculty at K.U. Med Center had the same idea that
13  I did and I got punished for having a good idea,
14  and it's proven to be true.  She no longer is at
15  K.U. Med Center and I still have not been told why
16  I was fired.
17    Q.  Now, I get a little confused, I guess,
18  when I hear you haven't been told because you have
19  in fact received a number of letters, is that
20  correct?
21    A.  But they don't say anything.
22    MR. RUPP:  Why don't we take a short
23  break.
24    THE VIDEOGRAPHER:  It is 2:07 p.m., we're
25  going off the record.

Page 355

1    (THEREUPON, a recess was taken.)
2    THE VIDEOGRAPHER:  It is 2:21 p.m., we're
3  back on the record.
4    BY MR. RUPP:
5    Q.  Doctor, are you holding up all right?
6    A.  Sure.
7    MR. RUPP:  All right.  It is mid
8  afternoon, 2:22 on a Friday afternoon and we are
9  how many hours in?
10    THE VIDEOGRAPHER:  Three hours and 40
11  minutes.
12    BY MR. RUPP:
13    Q.  So, we're about nine hours and 40 minutes
14  into the allotted 14 hours for your deposition.
15  As we discussed yesterday, we aren't going to be
16  able to finish, finish the day, or finish
17  everything today and we'll have to reconvene.  Mr.
18  Rupe has kindly advised that whenever we break
19  later this afternoon will be fine and, so, we'll
20  find a convenient breaking point later and call it
21  a day and reconvene at a later date, but if at any
22  point in time before then you run out of energy
23  please let me know and we'll work with that.
24    (THEREUPON, Doctor Klaassen Deposition
25  Exhibit No 32 and No 33 were marked for

Page 356

1  identification.)
2    BY MR. RUPP:
3    Q.  This is a -- Exhibit No. 32 is a letter
4  regarding ad hoc committee findings with regard to
5  your second ad hoc hearing committee, is that
6  correct?
7    A.  Yes.
8    Q.  In it Doctor Chertoff as chairman of the
9  ad hoc hearing committee is, on this version it's
10  not signed, but on this -- but he is the person
11  identified, is that correct?
12    A.  Right.
13    Q.  The ad hoc hearing committee he notes
14  held a hearing on November 13, 2013, lasting
15  approximately nine hours, correct?  That's in his
16  second paragraph?
17    A.  That's what it says, yes.
18    Q.  Do you disagree with that?
19    A.  I guess not.
20    Q.  Said, both KUMC and Doctor Klaassen were
21  represented by counsel and both parties presented
22  evidence in the form of witnesses and exhibits and
23  were afforded the opportunity for cross-
24  examination.  That's a true statement, isn't it?
25    A.  We were afforded, afforded some

Page 357

1  opportunity.  Not sufficient opportunity.
2    Q.  What particularly was insufficient about
3  it?
4    A.  Well, there just wasn't time to -- I
5  mean, just like the first, the first hearing, we
6  still had people sitting in the warm-up chamber
7  waiting to come in and even those of us that did
8  get to -- I mean, you know, about the only thing I
9  got to do was to play my tape and then they
10  brought in one of my witnesses and she didn't get
11  to say what she wanted to say.
12    Q.  Who was that?
13    A.  Julia U-A Cui.
14    Q.  Okay.
15    A.  And then I had more people -- so, one
16  witness, and we had more people sitting in the
17  room ready to come in and they had to go home.
18  One of the, one of the people had to go home and
19  get her daughter from preschool, so, therefore
20  they called the meeting.  It wasn't, it wasn't --
21  I mean, first of all, it should never ever been
22  only eight, nine hours.  That wasn't -- I mean,
23  you're talking about killing a person's career and
24  you don't give them time to talk.  Insufficient
25  time to talk.

Page 358

```
 1      Q.  How familiar are you with due process
 2   hearings?
 3      A.  Well, I'm not a lawyer, but I have been
 4   told that the, one of the judges said that this
 5   was kind of unconstitutional about what was done
 6   as far as the time that I was afforded, so, I know
 7   that much.
 8      Q.  What is it in particular that Julia Cui
 9   wasn't able to say?
10      A.  Well, I don't know.  I can't get in to
11   her mind.
12      Q.  Well, you said she wasn't able to testify
13   to things -- you guys called her, right?
14      A.  Yeah.
15      Q.  What -- was there a reason you didn't ask
16   her the questions that she wanted to be asked?
17      A.  Wasn't enough time, I suppose.  He was
18   asking the question and she was super pissed at
19   the end of that meeting, but she had prepared and
20   the university was ruining her career as they did
21   seven other people in our lab.  She thought she
22   could stand up for me and they brought her in and
23   says, well, we only got a few minutes, let's hurry
24   up and ask you a few things.  Is that the way to
25   treat anybody?  Especially a student at a
```

Page 359

```
 1   university?  And the other students sitting next
 2   door were not given the opportunity to express
 3   what they wanted to express?
 4      Q.  Who was waiting in the anteroom that
 5   wasn't given the opportunity to testify?
 6      A.  Helen for one person.
 7      Q.  Helen's --
 8      A.  Helen Renaud, she was a post-doc.  Also,
 9   I think you asked me for names yesterday of
10   students.  I think I forgot to mention her name,
11   post-doctoral student, Helen Renaud, R-E-N-A-U-D.
12   In fact, she even wrote a number of letters even
13   to the chancellor I see and she had many things
14   she wanted to say.  I think Ivan was possibly
15   sitting out there.  You know, we -- you know, it
16   was a joke.
17      Q.  What did Julia Cui know about the events
18   of May 1, 2013?
19      A.  Well, she heard me talk about it within a
20   few minutes after the end of that meeting.  She
21   know -- she knows what's true about me and what's
22   false about me.
23      Q.  Now, the hearing dealt with May 1 and May
24   7, correct?
25      A.  Well, it should have, but again, that was
```

Page 360

```
 1   a miscarriage of justice and they kept -- they
 2   spent a lot of time talking about what happened at
 3   the first hearing, so I, you know, double
 4   jeopardy, even though the first one was an
 5   incorrect conclusion they spent probably at least
 6   a fourth of the time and even the report mentions
 7   the first hearing.  That's just not acceptable.
 8      Q.  What would Julia Cui be able to testify
 9   as to the events in the conference room on May 1,
10   2013?
11      A.  From what I had said when I came back
12   from that hearing, but there was a lot more on the
13   table between the lines and what was said than
14   what happened at the meeting that day.
15      Q.  What would Julia Cui have been able to
16   testify about regarding the events between you and
17   Christina Hopkins on May 7 of 2013?
18      A.  I don't know, but she knew both Christina
19   and she knew me.  I mean, the only way we really
20   know is to let her testify.
21      Q.  What would Helen Renaud know about the
22   events of May 1, 2013?
23      A.  I don't know.  If you would have given
24   her the opportunity to present the information we
25   would all know today.  I can't read her mind.
```

Page 361

```
 1      Q.  She wasn't present, she had no personal
 2   knowledge, correct?
 3      A.  Yeah.  Well, I was proven innocent of
 4   that whole thing, right?  After they heard the
 5   tape we realized that everybody that was
 6   testifying perjured themselves and, so, no, she
 7   couldn't have -- but, you know, so, it probably
 8   didn't in the end make a difference in the
 9   conclusion that they all perjured themselves.
10      Q.  The --
11      A.  And then I was fired because the other
12   faculty perjured themselves on the second
13   committee they were all on the first committee they were all
14   paid money to testify against me.
15      Q.  On the May 7 hearing, or with regard to
16   -- excuse me.  As to Helen Renaud, she wasn't
17   present in the events between you and Christina
18   Hopkins on May 7, correct?
19      A.  Correct.
20      Q.  She would not have been able to
21   contribute any personal knowledge as to those
22   events, correct?
23      A.  Not about exact event, but she knows me
24   and she knows Christina and there's a lot that she
25   might have been able to contribute to the overall
```

Page 362

1    picture of them having half a dozen people that
2    testified and I got to have a half a person.
3        Q.   Let's go down to Exhibit No. 32.  In the
4    second -- was Ivan also -- let me go back a
5    second.  Was Ivan Csansky also present and
6    waiting?
7        A.   He was in one of these hearings sitting
8    in the, in the room.  I can't remember if it was
9    one or both of these meetings.
10       Q.   He wouldn't know anything about the
11   events of May 1, correct?
12       A.   No, but again, could have given the
13   faculty a better flavor of how I teach students
14   and I was teaching her at that time.
15       Q.   Was the quality of your teaching at issue
16   in the hearing at all?
17       A.   Well, in the end -- I don't know what's
18   going on because in the end the new EVC says, in
19   the sum of everything, we're firing you.  Does
20   that mean my teaching's no good?  My research is
21   no good?  Is that part of the totality?  I mean,
22   this is not easy to be told that you're a complete
23   failure and everybody has lied, ruined your
24   career.
25       Q.   At what point has any ad hoc committee,

Page 363

1    dean, executive vice chancellor, criticized the
2    quality of your research?
3        A.   The totality of Curtis Klaassen is a
4    failure.  To me that means that my research and I
5    as a person am worthless and we're not going to
6    make -- we're going to make sure that you never do
7    anything worthwhile the rest of your life.
8        Q.   So, you're basing your conclusion that
9    evidence of the quality of your research would
10   have been valuable based on something in Doctor
11   Girod's letter, is that right?
12       A.   Well, I think even these other issues, it
13   should have been brought up of when you look at a
14   person you don't look at one little made up thing.
15   You should look up at the overall contribution
16   that a person makes to an institution, and others
17   feel the same way.
18       Q.   Doctor Klaassen, if you'd look on Exhibit
19   32 at the last paragraph on the first page it
20   says, Doctor Klaassen is clearly devoted to his
21   work and his dedication has helped him to become a
22   successful and respected scientist.  Nobody's
23   disputed that at any point, have they?
24       A.   It's never been -- it's never been put
25   into the big picture.  This has never been put

Page 364

1    into the big picture and that's what's so sad.  A
2    few little lies can overdo 45 years of credit to a
3    university.
4        Q.   Now, the letter goes on to say in the
5    next line, Doctor Klaassen's passion and agitation
6    could be interpreted by others as abusive and
7    threatening.  Do you see that?
8        A.   Yes.
9        Q.   Abusive and threatening is not a good
10   thing on a college campus, is it?
11       A.   And passion is pretty darn good.
12       Q.   Abusive and threatening is not good,
13   though, right?
14       A.   It's only abusive and threatening to the
15   losers because they don't want to have passion and
16   succeed and to make this a good university.  I was
17   not abusive and threatening.  My evaluation six
18   months before I was fired said I had, I was not
19   abusive or threatening.  This is all made up by
20   the muggers at the end.
21       Q.   Okay.
22       A.   This is a lie.
23       Q.   When you say -- or when Christina Hopkins
24   considered your behavior to be abusive and
25   threatening, are you suggesting that she's a

Page 365

1    loser?
2        A.   Well, she has been told by the muggers
3    what to say.  I think she's okay, but if you want
4    to keep your job what do you do?  You do what your
5    boss tells you to do.  When they all lie to the
6    same story which we know is wrong, you know that
7    they were out there behind you trying to get you.
8        Q.   In the report that you say found you
9    innocent, Exhibit No. 32, it says during the May 1
10   meeting and in the separate incident on May 7,
11   2013, he, that being Doctor Klaassen, conducted
12   himself in a fashion which could be interpreted as
13   unprofessional toward other faculty and staff.  Do
14   you see that?
15       A.   Yeah, but it could also be interpreted as
16   not being unprofessional.
17       Q.   It says, this conduct appears to flow
18   from his inability to self-monitor his behavior
19   and sometimes shows little respect for others.
20   You see that?
21       A.   Yeah, and that's probably the paragraph
22   that the lawyer wrote that was in here rather than
23   the committee, faculty committee.
24       Q.   So, in this letter which you say found
25   you innocent and found others to have been, to

Page 366

1  have perjured themselves, this seems to say quite
2  the opposite, doesn't it?
3      A.  No, not at all.  Got to read the whole
4  letter.
5      Q.  Says you can, your actions could be
6  interpreted as abusive and threatening and
7  unprofessional and you have very little ability to
8  monitor your behavior and little respect for
9  others.
10      A.  That's not true.  I'm a Christian.  And
11  let's read the next sentence.  And KUMC should
12  provide full and written answers in a timely
13  manner.  Have they ever done that?  No.
14      Q.  Doctor, I want to go on to Doctor Girod's
15  letter.  Let me go back to Exhibit 32 for just a
16  minute.  Let's read the paragraph you just were
17  referencing.  It says, the committee is
18  sympathetic to Doctor Klaassen's concerns
19  regarding grants and his students and finds that
20  KUMC should provide full and written answers in a
21  timely manner to the questions and complaints that
22  he has expressed.  Then it goes on.  Nevertheless,
23  the committee concludes that his behavior was not
24  appropriate and finds him guilty of professional
25  misconduct as defined by the faculty handbook in

Page 367

1  his treatment of his fellow faculty and staff, do
2  you see that?
3      A.  Yeah.
4      Q.  This committee did not exonerate you, did
5  they?
6      A.  Well, see, that's one of the problems
7  with this whole setup is if they want a salary
8  increase next year and if they don't do what the
9  administration wants they're out the door like
10  Curt Klaassen.  I mean, this is not an unbiased
11  system that we have.  I asked that we get a half a
12  dozen faculty from other universities to evaluate
13  me.  I mean, you just cannot have someone else
14  evaluate it when their boss, if they come down on
15  my side, that they probably will lose their salary
16  or possibly their job.
17      Q.  My question was --
18      A.  It's an -- it's -- but they go on to say
19  that this is not a continuous repetition of the
20  conduct.  You know, what, what's going on?
21      Q.  Well, Doctor --
22      A.  If they said the other one was not
23  professional and this one is not professional, why
24  isn't it all the same?  Did the lawyer forget what
25  happened in the other one?

Page 368

1      Q.  Doctor, my question was, you had
2  testified yesterday that this committee exonerated
3  you.  This committee did not exonerate you, did
4  it?
5      A.  This committee as we walked into the room
6  the person that set up the meeting was Bob Klein.
7  Bob Klein stood up, we are here today essentially
8  to fire Curtis Klaassen.  I was exonerated from
9  being fired.
10      Q.  You were found guilty of professional
11  misconduct, correct?
12      A.  Well, that's a whole lot different than
13  being fired.
14      Q.  It was the second time in two committees
15  that you had been found guilty of professional
16  misconduct by an ad hoc committee within the
17  university?
18      A.  But they weren't connected to each other.
19      Q.  Exhibit No. 33 is a letter from Doctor
20  Girod with regard to your termination on January
21  6, 2014.  You've read this letter before, is that
22  correct?
23      A.  Yes.
24      Q.  And he says he has carefully reviewed and
25  considered the December 8, 2013, recommendation of

Page 369

1  the ad hoc hearing committee regarding allegations
2  of personal and professional misconduct against
3  you and I am writing to communicate my decision to
4  you.  Correct?
5      A.  That's what it says.
6      Q.  Within your understanding of the faculty
7  handbook, this decision is ultimately his,
8  correct?
9      A.  Yes.  He gets the credit and the blame.
10      Q.  The -- he notes that the committee found
11  the evidence presented during the hearing
12  demonstrated that your passion and agitation could
13  be interpreted by others as abusive and
14  threatening and that you conducted yourself in a
15  fashion which could be interpreted as
16  unprofessional toward other faculty and staff.
17  That is a true statement of what they found,
18  correct?
19      A.  Yeah, and could be interpreted.  You're
20  going to fire someone on a perception.
21      Q.  The next sentence says, the committee
22  also noted that your conduct appears to flow from
23  your inability to self-monitor your behavior and
24  sometimes shows little respect for others.  That
25  is a true statement of what they said, correct?

Page 394

```
 1   psychologists and they also agreed that there was
 2   really nothing wrong with me, it was probably
 3   primarily a university problem and one of them was
 4   on the faculty at the University of Kansas.
 5        Q.  And do you know the names of those
 6   psychologists?
 7        A.  No, but the university sent me there, so,
 8   they should have the names.
 9        MR. RUPP:  Alan, in terms of -- I'm
10   assuming that in terms of attorney's fees your
11   position would be that that information be
12   attorney-client privileged at this stage, is that
13   what your position would be?
14        MR. RUPE:  Yeah, I think so.
15        MR. RUPP:  Okay, and I'm obviously not
16   going to push the point.  I just wanted to make
17   sure that that's -- I don't want to have waived
18   that question by not asking it.
19        MR. RUPE:  I respect that and I think
20   that would be our answer and then we can --
21        MR. RUPP:  Right.
22        MR. RUPE:  -- work that out at some later
23   time.
24        MR. RUPP:  Right.
25   BY MR. RUPP:
```

Page 395

```
 1        Q.  The -- your lawyers have listed as their
 2   claim for garden variety emotional distress
 3   ongoing but currently valued at 50,000 dollars, do
 4   you see that?
 5        A.  Yes.
 6        Q.  And are you claiming any out of pocket
 7   expenses as part of that?
 8        A.  Well, I -- you know -- you know, this is
 9   largely lawyer stuff, not my stuff.  I mean, you
10   can't pay me enough for what you've done for my
11   career and for my students' careers.  I also want
12   my NIH grants back.  Since the university thinks
13   that you can just take them from one person to
14   another person, give me 18 million dollars from
15   someone else so I can do that research, 'cause all
16   of the money goes to the university.  It has
17   nothing to do with the, apparently, to the person
18   that wrote the grant, and bring back this person
19   that got the grant minority fellowship so she can
20   make a living.
21        Q.  Are there any other elements of damages
22   that you believe that you are entitled to?
23        A.  You know, my job, my research space, and
24   an apology to the public for ruining my
25   reputation.
```

Page 396

```
 1        Q.  Now, in terms of your efforts to mitigate
 2   damages, if any, you indicated that you've been
 3   awarded one grant at the University of Washington
 4   and you've applied for another, is that correct?
 5        A.  Correct.
 6        Q.  Do you intend to continue to apply for
 7   grants?
 8        A.  Of course.
 9        Q.  Do you intend to continue to apply for
10   grants from the NIH?
11        A.  Yes.
12        Q.  Have they expressed any unwillingness to
13   recognize you as a principal investigator?
14        A.  No.  I'm a principal investigator.
15        Q.  Okay.  Is there any reason why you
16   couldn't apply for COBRE grants there?
17        A.  No, I couldn't, because COBRE grants only
18   go to the smaller states that have less research
19   money.
20        Q.  So, the state and the institution
21   actually play a part in those COBRE grants, I take
22   it.
23        A.  Well, it's only from some states that you
24   can apply.  Only let's say second class
25   universities, or second class states and Kansas
```

Page 397

```
 1   might not like to hear this, but it's a second
 2   class research state.
 3        Q.  What about the training grant, have you
 4   applied for a training grant?
 5        A.  No.  I can't apply for a training grant
 6   because there is one in the department of
 7   pathology for Environmental Health Sciences at the
 8   University of Washington.
 9        Q.  What other grants do you anticipate
10   applying for?
11        A.  Oh, I don't know.  There are some I would
12   really like to apply for on microbiome, how it
13   affects drugs and drug actions.  At my position at
14   the University of Washington I really can't have
15   more than two NIH grants.  Here at the K.U. Med
16   Center when I was chairman of the department I had
17   five RO-1 NIH grants, so, I can't get to the level
18   there, plus, you know, you have to remember that I
19   lost, in essence, five years of my career and
20   it'll probably take me, even if I come back to
21   K.U. Med Center and start up tomorrow, it would
22   take me a minimum of ten years to get back to
23   where I was the day that I was kicked off campus.
24   I mean, I'm basically a brand-new faculty person.
25   They've taken away all of my equipment, all of my
```

Page 402

1   terminated from the University of Kansas, not from
2   the chair position, but from the faculty position.
3   Have you sought any employment since then?
4       A.  Well, that's when I really got, you know,
5   actively involved because, you know, I never, I
6   never once thought that I would be fired and, so,
7   when I was fired then I had to get really serious
8   and that's definitely when I got very active at
9   the University of Washington.  That might have
10  been the same time that it was with Children's
11  Mercy that I, quote, went back to and also at
12  University of Missouri at Kansas City; but, you
13  know, I was poisoned at that time and my career
14  was over; but at the University of Washington, one
15  of my first graduate students is now one of the
16  leaders of the university and he knew that, that
17  it wasn't right and, so, he got me at least a job
18  without money.
19      Q.  What -- who is that?
20      A.  David Eaton.
21      Q.  Is there a reason that university of
22  Washington wouldn't offer you money that was, to
23  work in a paying position?
24      A.  Nobody's going to take a chance on me.
25  I'm poisoned.  K.U. Med Center poisoned me.  I

Page 403

1   can't do anything.
2       Q.  You're not poison to David Eaton, are
3   you?
4       A.  No, not to him, but he doesn't -- he's a
5   dean of the graduate school.  He's not the
6   president of the university, and I think he's also
7   the associate provost or something.
8       Q.  If you were to go to another university
9   would you change your behavior at all?
10      A.  No.
11      Q.  You would continue to deal with other
12  faculty and staff in the identical way for which
13  you have been sanctioned at K.U., is that what
14  you're testifying to?
15      A.  I would not do the things that they think
16  I did.  I would continue to do the things that I
17  have done for 45 years, which is most appropriate
18  for a university distinguished professor.
19      Q.  You had testified earlier in answer --
20  well, strike that.  Other than Children's Mercy
21  and University of Missouri-Kansas City, are there
22  any other positions in industry or otherwise that
23  you have applied for or sought out employment at
24  since your termination from the University of
25  Kansas?

Page 404

1       A.  No, that I can think of.
2       Q.  Is there a reason you haven't looked at
3   private industry since you've left K.U.?
4       A.  It's kind of like being an expert
5   witness.  It's not what I'm about.  I am about
6   training students, doing my research, my
7   intellectual property, testing my ideas, not
8   testing a company's idea.  I like the fact of
9   being a professor and being able to do what I want
10  to do and not -- and training students.  I mean,
11  that's just tremendously exciting.
12      Q.  You indicated earlier, changing topics
13  just a little bit, that you had entered into a
14  written agreement with Cody Tully at K.U. to use
15  the server.  Do you have a copy of that agreement?
16      A.  No.  Cody should.  He made the deal with
17  the university and there's no question that that
18  was done.  I think I paid 500 dollars, but I --
19  it's been more than three or four years ago again.
20  You can also ask Rosa and you can ask them if I
21  paid them 3,000 dollars each, and if I told them
22  please do it at work and use university property
23  because I did not.  I assume they were doing this
24  at home.  If they did, then they should be charged
25  and not me being charged.

Page 405

1           MR. RUPP:  I don't have any further
2   questions this afternoon.  We will resume this
3   deposition per our earlier discussions.  How much
4   time have we used now?
5           THE VIDEOGRAPHER:  We've been on the
6   record five hours and two minutes.
7           MR. RUPP:  Okay, so, we are at 11 hours.
8   All right, thank you very much.
9           THE VIDEOGRAPHER:  It is 4:03 p.m., we're
10  going off the record.
11          (THEREUPON, the deposition adjourned at
12  4:03 p.m.)
13  .
14  .
15  .
16  .
17  .
18  .
19  .
20  .
21  .
22  .
23  .
24  .
25  .

Page 451

1  short break.
2      THE VIDEOGRAPHER:  It's 11:32 a.m., we're
3  going off the record.
4      (THEREUPON, a recess was taken.)
5      THE VIDEOGRAPHER:  It's 11:43 a.m., we're
6  back on the record.
7  BY MR. RUPP:
8      Q.  As to this document 180 -- Exhibit 186 if
9  you could turn to the Bates numbered page that
10  ends in 244 and has salary information.
11     A.  Okay.
12     Q.  What is the purpose of the slide on
13  salary information?
14     A.  Oh, again, as I said I, you know, tried
15  to, you know, tell the faculty, you know, educate
16  the faculty on what goes on and -- and this just
17  says, you know, where your -- your salary is
18  coming from.  We get some money from the school of
19  medicine, we get -- we're paying part of our
20  salaries from -- oh, that's just money we get from
21  the school of medicine and then part of that we
22  have -- we pay for the secretaries.  And, so,
23  then, what's left over is money remaining for
24  faculty.  And, then, we are paying about a third
25  of our salaries from the grant as a whole.  And

Page 452

1  then there is this Excellence Fund.  And, so, I
2  put here is that kind of explaining this to them
3  so people know where the money is coming and where
4  it's going and, you know, everybody wants to be
5  paid more than they are, but this is what I have
6  to work with.
7      Q.  And in terms of the percentage of salary
8  that came from grants and that sort of thing was
9  that a subject of some disagreement that you may
10  have had with anybody?
11     A.  Well, at one time Dean Atkinson wanted to
12  increase it to 50 percent kind of like over night.
13  And I think our department is probably the only
14  department that was paying more faculty salaries
15  off of grants than any other department.  So, many
16  departments there was no way that they could even,
17  you know, pay for 25 percent or even maybe 10
18  percent.  We were paying, I guess, a third, but if
19  it went to 50 percent it was going to be -- it
20  would be a challenge.
21     Q.  And the -- the type of dispute about the
22  type of -- or disagreement, I guess, as between
23  faculty and administration over what percentage of
24  salaries have to be attributable to grants, that
25  that's a sort of dispute and disagreement I

Page 453

1  suspect that occurs in every university, is that
2  correct?
3      A.  Yeah.  Yeah.  And, usually the
4  administration and the faculty work together to
5  -- you know, to come to some agreement to try to
6  make it both an incentive as well as, you know, to
7  encourage people that it's not entirely working.
8      Q.  And in terms of this percentage of
9  faculty salaries from grants is that what your
10  issues associated with the committee of seven or
11  eight was about?
12     A.  No.  No, not too much.  I mean, we -- I
13  would say it was an issue.  It wasn't the -- one
14  of the major issues.
15     Q.  The -- there's reference there to the
16  Excellence Fund.  What is the Excellence Fund?
17     A.  The Excellence Fund, some -- some of us
18  that paid -- that got more than a third -- okay.
19  If we had money on -- were obtaining money from
20  NIH on grants to pay part of our salary and if we
21  had, you know, more than 35 percent, then, we
22  would put that extra money in this Excellence Fund
23  and, you know, use the state money and the student
24  tuition money to pay for two-thirds of our salary.
25  But, like, for example, myself when I was chair,

Page 454

1  you know, the university wanted me to bring in a
2  third of my salary.  I was really bringing in 90
3  percent of my salary from NIH.  So, the difference
4  between 35 percent and 90 percent of my salary I
5  put into this Excellence Fund.  And -- to help out
6  some of those people that weren't bringing in 35
7  percent of their salary.  So, for example, so this
8  extra money that I brought in I put into this
9  Excellence Fund, I was the only one that put in a
10  significant amount, some of the others put in, you
11  know, five or 10,000 I probably put in, at least,
12  100,000 and then that was the money, believe it or
13  not, that these two underachieving people in the
14  department that I used to pay their salary so they
15  wouldn't get a major cut in salary.
16     Q.  Now, in terms of these two
17  underachievers, I assume you are referring as you
18  did in the first deposition to Miss Lavan and
19  Doctor McCarson, is that correct?
20     A.  Correct.
21     Q.  Out of curiosity did you ever -- did your
22  faculty evaluations of them ever reflect that you
23  considered them to be underachievers?
24     A.  Well, the -- okay.  So there is a
25  promotion and tenure committee that evaluated them



800 E. 1st Street, Suite 305          5111 SW 21st Street          6420 W. 95th Street, Suite 101
Wichita, KS 67202          Topeka, KS 66604          Overland Park, KS 66212
316-201-1612          785-273-3063          913-383-1131
www.appinobiggs.com

Page 455

1  every year or every other year and -- and so they
2  were not promoting them, they were both associate
3  professors.  And, so, there is this promotion and
4  tenure committee that's separate from the chair.
5  Okay.  And so -- so the promotion and tenure
6  committee in our department would evaluate them
7  every year or every other year, I can't remember,
8  but definitely every other year for sure.  And
9  they would -- while I was chair for close to 10
10 years every time they came back and said they
11 don't deserve to be promoted to professor, which
12 means you really -- an average person goes from
13 associate professor to professor in four, five,
14 six years.  And, so, the fact that they had been a
15 dozen years meant that they were not normal
16 achievers.
17     Q.  Did you ever -- I think my question dealt
18 with your evaluations of Doctor McCarson and
19 Doctor Lavan, did you have indicate on those
20 evaluations that you considered them to be
21 underachievers?
22     A.  Yes, I think so.  And I had to do that
23 once a year and I did that once a year.
24     Q.  I want to go on to page -- the -- the
25 paragraph that says -- or the page that says some

Page 456

1  facts and it ends in a 249 on the Bates number.
2  And, I want to go back to the note there at the
3  bottom of it that is dated February 5, 2011, where
4  you indicated that the Dean said I was not on the
5  KUMC planning committee because I was not in her
6  future plans.  When -- tell me about that
7  conversation?
8     A.  Oh, well, she -- well, I don't -- this
9  she told me the day she fired me, but this whole
10 planning committee that, you know, we saw this
11 first page, that's what we're talking about and
12 she says you weren't on that committee that did
13 this job on page one because you weren't in my
14 future plans.
15     Q.  Well, this appears to be dated or you --
16 you're referring -- it appears that you're
17 referring to a conversation that's dated February
18 5, 2011, is that not right?
19     A.  No.  That was the day that they had this
20 plan committee -- planning committee and, I think,
21 if you go and look on the calendar in 2011,
22 February 5th was a Sunday and was actually Super
23 Bowl Sunday.
24     Q.  Okay.  So, why did you note this on -- on
25 this PowerPoint slide?  Why did you write Super

Page 457

1  Bowl Sunday on there?
2     A.  Oh, I don't know again these are just
3  some facts that...
4     Q.  But Doctor Atkinson didn't prepare this
5  slide, correct?
6     A.  No.
7     Q.  You prepared this slide and you noted
8  February 5, 2011, what is that in reference to?
9     A.  Oh, it has reference to the date that
10 this planning committee met and, you know, this
11 first page that you showed me page 237 that's what
12 they came up with that day, the people that were
13 on that committee and that meeting was on February
14 5th, 2011.
15     Q.  And you were not on that committee?
16     A.  I was not on that committee.
17     Q.  Is there any reason for you to disagree
18 with the comment that you were not on the
19 committee because you were not in her future
20 plans?
21     A.  Well, that's what she said after she
22 fired me.
23     Q.  You noted on the next page that ends in
24 250, the third line -- the third bullet point down
25 is the -- you had a meeting with Dean Atkinson on

Page 458

1  April 6 and that she had another female with her.
2  Who -- who was that?
3     A.  Oh, Marcia Nielsen or something like
4  that.
5     Q.  And what was her role?
6     A.  She had some title.  I don't know really
7  what she did do.  I think she was kind of a --
8  kind of a public relations person or a person to
9  try to figure out what the legislature was coming
10 up with and I -- I didn't know her well.
11     Q.  Did she participate in the meeting?
12     A.  Not really.  She might have said a couple
13 things.
14     Q.  Let's go to the page that ends -- the
15 slide that ends in 251.
16     A.  Okay.  Okay.  And your question?
17     Q.  My question is, down on the last bullet
18 point it says, I guess, my acting out finally got
19 your attention.  Were you purposefully acting out?
20     A.  Yeah.
21     Q.  And what did you mean by "acting out"?
22     A.  Talking to these salespeople about --
23 okay.  Well, you have to put this in perspective.
24 So for at least two, three years this committee of
25 eight is trying to really get her attention so we



800 E. 1st Street, Suite 305          5111 SW 21st Street          6420 W. 95th Street, Suite 101
Wichita, KS 67202                     Topeka, KS 66604            Overland Park, KS 66212
316-201-1612                          785-273-3063               913-383-1131
                              www.appinobiggs.com

Page 463

1 what you just said?
2     MR. RUPE:  Objection argumentative.
3     A.  I would say yes.
4 BY MR. RUPP:
5     Q.  Okay.  So, let's go to page 262.
6     A.  I guess, you also believe that's maybe
7 not good for a Kansas taxpayer.
8     Q.  Can you go to page 26 -- or the one that
9 ends in page 262 what might happen?  What are you
10 saying here?
11     A.  What I'm saying here I'm going to do more
12 whistleblowing.  This has to change.  I went and
13 tried to help her and I'm going to continue
14 whistleblowing and these are places I can go to.
15     Q.  And -- and, so, in essence, you're
16 threatening her, is that what you mean --
17     A.  No, no, no.  She's not here.  This now
18 we're going back to the faculty meeting.
19     Q.  Okay.
20     A.  Okay.
21     Q.  So, this was not -- she didn't see this
22 page?
23     A.  She did not see that, no.
24     Q.  Okay.  All right.
25     A.  My faculty all saw it.

Page 464

1     Q.  Okay.
2     A.  And, you know, this is, again, education
3 to them.  Here is what I could do and, in fact, I
4 basically did it all.
5     Q.  Let's go --
6     A.  And she's no longer -- it was effective,
7 she's no longer there.
8     Q.  Let's go to page 264.  You say what do
9 you want me to do and you're asking this of your
10 committee?
11     A.  Of my faculty.
12     Q.  Of your faculty.  And the first thing you
13 ask is whether you should commit suicide?
14     A.  Yeah.
15     Q.  Why did you ask your faculty, the pharm
16 -- the pharmacological -- or the department of
17 pharm/tox whether you should commit suicide?
18     A.  Well, this is the range of things that I
19 came up with from one extreme to the other that I
20 could see.  And, you know, these were my choices,
21 you know, and I had been given, you know, this is
22 like two days after I was fired, I guess.  And, at
23 that short period of time this put me in a spin,
24 to say the least, because I didn't -- I didn't
25 really think I was going to get fired.

Page 465

1     Q.  Let's --
2     A.  And --
3     Q.  Okay, go ahead.  I'm sorry.  I didn't
4 realize you were still answering.
5     A.  So -- so this was my last slide of the
6 day and I -- here I am this is my last talk to
7 you as a chair.  I was still chair, I think.  And
8 I said, you know, as I'm thinking about it these
9 are seven or eight different paths I could take.
10 Do any of you want to give me some advice?
11     Q.  Did any of them give you advice?
12     A.  No.
13     Q.  The last item on this slide says, do what
14 I am doing or -- do what I am doing, what I can,
15 have Carlson sign papers and talk to
16 administration.  What were you meaning there?
17     A.  Well, the department was doing so
18 fantastic that if Carlson wanted to he could have
19 come to me and said you run the department on a
20 day-to-day basis.  I'll be the titular head that
21 will talk to the Dean.
22     Q.  So, is that, in essence, what you chose
23 to do, you went in to Doctor Carlson on his first
24 day as the chair of the department and this last
25 item what you told him?

Page 466

1     A.  Okay.  That's what he remembers.  I also
2 -- since I had -- since I had this written down.
3 These are the things that I asked him.  What do
4 you want me to do and read these seven things but,
5 you know, he -- he -- you know, couldn't remember
6 very much that day and I was amazed he could
7 remember this one of the seven.
8     Q.  Was Doctor Carlson at your faculty
9 meeting --
10     A.  No.
11     Q.  -- on April 7?
12     A.  No, just members of our department.
13     (THEREUPON, Klaassen Deposition Exhibit
14 No 187 was marked for identification.)
15 BY MR. RUPP:
16     Q.  I'm going to hand you what's been marked
17 as Exhibit 187, is that right, 187?
18     A.  Yes, it is.
19     Q.  This is a COBRE meeting dated October 28,
20 2011, do you see that?
21     A.  Yes.
22     Q.  And there are several things about that
23 that I want to ask you about.  The first one is on
24 the upper right-hand corner it says, the Dean
25 fired Patricia Thomas and appointed Joshua



800 E. 1st Street, Suite 305        5111 SW 21st Street        6420 W. 95th Street, Suite 101
Wichita, KS 67202        Topeka, KS 66604        Overland Park, KS 66212
316-201-1612        785-273-3063        913-383-1131
www.appinobiggs.com

Page 467

1  Freeman.  What's that in reference to?
2      A.  Okay.  Patricia Thomas was previously a
3  chairman of pathology.  She was a Kansas native
4  from Leawood or not from Leawood.  From
5  Leavenworth who was an African-American who went
6  to Harvard.  So, you know, there's not too many
7  people from -- African-Americans from Leavenworth
8  that go to Harvard that eventually got an M.D., a
9  master's degree, and was nationally recognized.
10  And the Dean, I think, at this time took her -- it
11  says I said fired her.  I don't know if she fired
12  her at this time or took her grant away.  Anyhow,
13  she apparently did even more damage to Patricia
14  Thomas than she did to me.  And, in fact, Patricia
15  Thomas I've heard by the grapevine did exactly
16  what I suggested that I might do to myself and
17  that was to -- to commit suicide.
18      Q.  Is -- let's go down to the slide that
19  says World Series.  It says strike one the Dean
20  fired me.  What are you referring to there?
21      A.  Well, you know, I often use analogies, et
22  cetera.  Sometimes it's guns, sometimes it's
23  baseball, this happened to be in October and we
24  often talk about the boys of October which means
25  baseball.  It was World Series time so I used that

Page 468

1  as an analogy.  And, so, I was basically telling
2  them that I was -- I had two strikes and the third
3  strike I'd be out.  So, what's important here is
4  strike two.
5      Q.  Well, I'm -- I'm going to go to strike
6  two, but I just want to start with strike one
7  which is what I asked you about.  What are you
8  referring to as the strike one?
9      A.  Well, the Dean had fired me.
10      Q.  Okay.  I'm going to go to strike two in
11  just a second, but you're now referring to one of
12  the items there says, Carlson is a Ford chair
13  trying to be a Mercedes chair, major conflict of
14  interest.
15      A.  Okay.  So, what's going on here is that
16  he becomes the interim chair of the department.
17  Okay.  Jerry Carlson was widely recognized as the
18  least effective basic science chair that we had at
19  KU Med Center.  And, in fact, he and I were
20  appointed chairs of our respective departments
21  within two weeks of each other.  We both took over
22  two departments -- took over departments that were
23  very weak.  And, so, what happened over the next
24  eight, 10 years is his department remained weak,
25  whereas the pharmacology department by any way you

Page 469

1  want to measure it went like this (indicating).
2  Therefore, having him be in the chair of --
3  interim chair of this department he had a conflict
4  of interest because one of the things that he
5  wanted to do or what he did do was to ruin
6  everything that I had done to bring it down to
7  where it was before I was a chair and to bring it
8  down to his level.  That's one thing.
9      Also, he ran a department that didn't do
10  anything creative to bring in money.  I got a
11  COBRE grant and a training grant, so this is at a
12  whole different level of running an operation, you
13  know.  It's a Steve Jobs operation compared to Sam
14  Harrison.  You don't know who Sam Harrison is
15  because I don't either, he didn't make it.  And,
16  so, Carlson, in essence, was a Ford chair trying
17  to run a Mercedes department.  As you can see on
18  one of these other pages here, we were in the top
19  20 departments in the country.  He's in the bottom
20  20 --
21      Q.  All right.
22      A.  -- departments in the country.
23      Q.  So, now, let me -- let me ask this
24  question here.  This is a COBRE meeting in which
25  you have invited Doctor Carlson to be there?

Page 470

1      A.  Oh, no, no, no, no.  He wasn't a part of
2  the COBRE.  He was not there.
3      Q.  So, who -- who -- who is present at this
4  meeting in which you are slamming the -- the chair
5  of your department?
6          MR. RUPE:  Object to the form.
7      A.  Well, many of the people in the
8  department that were associated with the COBRE
9  grant.  So that included Jaeschke, Pasernick
10  (spelled phonetically).  Anyhow, it was 15 people
11  probably.
12          BY MR. RUPP:
13      Q.  Did you invite people who were not
14  associated with the COBRE grant?
15      A.  Maybe one person, John Doull who is kind
16  of the senior statesman in our department, who is
17  90 years old and so I had him come.  I think
18  everybody else was members of -- true members of
19  the department.  Okay.  So, you say why did I
20  bring this up is because Rosa and Cody as it says
21  right above in that bullet above that I was paying
22  their salary out of the COBRE grant.  Carlson
23  would not even let them do anything for me.  And,
24  in fact, there was a quite period of time I
25  couldn't send an e-mail to them and they were



800 E. 1st Street, Suite 305          5111 SW 21st Street          6420 W. 95th Street, Suite 101
Wichita, KS 67202          Topeka, KS 66604          Overland Park, KS 66212
316-201-1612          785-273-3063          913-383-1131
www.appinobiggs.com

Page 471

1 working for me. I was paying their salaries.
2 This is a federal crime.
3      **Q. Let me ask what is the major conflict of**
4 **interest that you're referring to there?**
5      A. My conflict of interest is that he wanted
6 this department to deteriorate, so he wouldn't
7 look so bad.
8      **Q. Now, at a meeting about the COBRE grant**
9 **what is the value to you of saying in a slide to**
10 **everyone present that the chairman of your**
11 **department is a Ford chair trying to be a Mercedes**
12 **chair?**
13      A. What this slide is saying is that he is
14 blocking the COBRE grant. He is blocking it. He
15 is blocking that grant. I can't do with this
16 money that I got from the federal government and I
17 have a responsibility to every taxpayer in the
18 United States to do what I said and he blocked it.
19 So, I'm giving the story. So, then, because Rosa
20 and Cody would do nothing for me it says here the
21 next bullet, I hired Lynn Harris so she could help
22 me. And, my question is, should I hire an
23 accountant. Cody was supposed to be the
24 accountant that -- who I was paying 80 percent of
25 his job, this would have taken 5 percent of his

Page 472

1 effort that I was asking for five months for him
2 to do. It's very, very, very, very typical.
3      **Q. Doctor, with regard to your history,**
4 **let's go back to -- prior to your appointment as**
5 **chair in 2002 you had been one of the two**
6 **candidates for chair when Sam Enna was selected,**
7 **is that correct?**
8      A. Yes.
9      **Q. And, would it be fair to say that you**
10 **were not happy when Sam Enna was selected as**
11 **chair?**
12      A. Well, you know, if you're looking for
13 the, yeah, I think that's fair to say that since I
14 applied for the job and I thought I was better
15 qualified. And later it has been proven that it
16 was a mistake to hire him, yes, I was.
17      **Q. During the entire period of time that Sam**
18 **Enna was chair would it be fair to say that you**
19 **worked to get him removed as the chair?**
20      A. No, that's not true.
21      **Q. Would it be fair to say that you made his**
22 **life very difficult?**
23      A. Not the first couple of years for sure.
24      **Q. After that?**
25      A. Well, I, then, started speaking up that I

Page 473

1 could see that the department was not doing well.
2 And, again, you know, I had been there at that
3 time 35 years and it was home to me and somebody
4 comes and further wrecks your home it doesn't make
5 you happy.
6      **Q. And, when Doctor Carlson is appointed**
7 **chair you considered him as someone who is going**
8 **to further wreck your home and you're going to try**
9 **to get rid of him, correct?**
10      A. No, not at first, you know. I mean, he
11 was -- I told many people in that -- in that time
12 when he -- after he came to the department how he
13 was harassing me. That this was the most
14 difficult time in my life. Was not being fired
15 but starting probably six weeks or so after
16 Carlson started. I wanted him to succeed and to
17 help and keep the department together and have me
18 run the COBRE and everything. But, no, I mean, he
19 -- he was so nasty to me it was just absolutely
20 unbelievable.
21      **Q. When -- when Dean Atkinson asked him to**
22 **be the interim chair, she did not ask him to have**
23 **Doctor Klaassen be the interim chair, correct?**
24      A. No.
25      **Q. She wanted him to take over the**

Page 474

1 **department?**
2      A. Right.
3      **Q. And you told him on the first day that it**
4 **would work fine as long as he was only the titular**
5 **head, correct?**
6      A. That is not true. I gave him the seven
7 choices. I said what are you going to do?
8      **Q. So, did you give him a choice that you**
9 **should commit suicide as one of the choices?**
10      A. I think so.
11      **Q. Then Doctor Jaeschke came in, correct?**
12      A. Yes.
13      **Q. And he testifies that on the first day of**
14 **his job as the chair you said to him, if you fuck**
15 **me, I will fuck you. You've heard that testimony,**
16 **correct?**
17      A. Yes.
18      **Q. And, I take it you don't recall whether**
19 **you said that or not based on your prior**
20 **testimony, correct?**
21      A. That's correct and I don't think I did.
22      **Q. But the point being that you still made**
23 **it clear to him that he had to go along with what**
24 **you say?**
25      A. No, I wouldn't say that.



800 E. 1st Street, Suite 305      5111 SW 21st Street      6420 W. 95th Street, Suite 101
Wichita, KS 67202      Topeka, KS 66604      Overland Park, KS 66212
316-201-1612      785-273-3063      913-383-1131
www.appinobiggs.com

Page 475

1    Q.  Now, as to Dean Atkinson several people
2  have testified as to -- well, you -- you've
3  certainly testified as to your substantial efforts
4  to have her removed as the Dean, correct?
5    A.  After I was fired.
6    Q.  Well, certainly even before you were
7  fired, correct?
8    A.  Well, my major goal and the whole goal of
9  the committee of eight was to let us help her make
10  us a better medical school, so that was the real
11  purpose.  But -- but, you know, after I was fired,
12  yeah, I thought, you know, there was no hope.
13    Q.  Would it --
14    A.  You know, the university lost -- lost me
15  to help them do that.  And she had proven to
16  everybody that if I can fire Curt Klaassen I can
17  fire anybody.
18    Q.  Would you agree with the testimony that
19  has been given that at faculty -- at a faculty
20  meeting you became angry and stated loudly, the
21  bitch must go, when you're referring to Dean
22  Atkinson?
23    A.  What faculty meeting was that?
24    Q.  I'm just -- did you ever say it?
25    A.  I don't recall saying it.

Page 476

1    Q.  Do you deny saying it?
2    A.  I mean, that's difficult to say if -- I
3  don't -- all I can say is I don't recall saying
4  it.  I have an extremely good memory and I don't
5  ever remember saying it.
6    Q.  Let's go to the page that starts 269.  In
7  the upper left-hand corner you're talking to your
8  faculty, to the COBRE committee and you say we
9  have to hang together.  We cannot spread rumors
10  about each other.  If you feel you need to say
11  something bad about others in the department don't
12  or have a meeting and let's discuss.  Why isn't it
13  free speech and academic freedom when your faculty
14  members have something bad to say about you?
15    A.  It is free speech.  I gave them that
16  opportunity.  In fact, six months before I was
17  fired the department evaluated me, completely
18  confidential, 100 percent confidential and what
19  bad things did they tell me.  The worst thing was
20  their salaries weren't as good as they should be.
21  Everything else was kind of ideal.  Also, what I
22  was trying to teach this group of people for the
23  10 years or whatever I was chair is that this
24  department should be like a baseball team or like
25  a family.  Let's try to solve problems within the

Page 477

1  family first.
2    Q.  So, in other words --
3    A.  There was no lack of freedom.  It was
4  just this is the proper approach if we want to be
5  great.  Just like if you work at Apple and you're
6  working on the new car you don't tell anybody that
7  you think it should be a different kind of a car
8  than what we're making.  You should talk about it
9  with us as the family first.  If -- if you can't
10  get a satisfactory answer from other people in the
11  department or from me then I will say go see the
12  Dean.  Just like when I started the Mid-America
13  toxicology course 40 years ago or whatever, what
14  did I do.  I went and talked to the chair.  I
15  wanted to do this.  He said, well, you should talk
16  to the Dean.  I said can you make me an
17  appointment to talk to the Dean and he did.  And,
18  that's kind of like it's done in the military.
19  You don't go running around and -- until we've had
20  time to talk about it.  And often, you know, the
21  person in charge doesn't even know what the
22  problem is.  And I was in charge of, you know, 140
23  people.
24    Q.  Doctor, in the lower right-hand slide
25  there you -- the last bullet point says your long-

Page 478

1  term cooperation will be largely dependant on the
2  new chair's respect to me.  Do you see that?
3    A.  Right.
4    Q.  Were you, in essence, saying that you
5  will only cooperate with the new chair as long as
6  you feel that you are being respected by the new
7  chair?
8    A.  I think so.
9    MR. RUPP:  Why don't we take our break.
10    THE VIDEOGRAPHER:  It's 12:32 p.m., we're
11  off the record.
12    (THEREUPON, a recess was taken.)
13    THE VIDEOGRAPHER:  It is 1:12 p.m., we're
14  back on the record.
15    BY MR. RUPP:
16    Q.  Doctor, you've mentioned Julia Cui
17  earlier, who is Julia Cui?
18    A.  She's a previous student of mine at KU
19  Med Center, both as a graduate student and as a
20  postdoctoral student.
21    Q.  When did she become a postdoctoral
22  student?
23    A.  Wow.
24    Q.  Approximately.
25    A.  I would guess 2011.



800 E. 1st Street, Suite 305          5111 SW 21st Street          6420 W. 95th Street, Suite 101
Wichita, KS 67202          Topeka, KS 66604          Overland Park, KS 66212
316-201-1612          785-273-3063          913-383-1131
www.appinobiggs.com

Page 483

1  Medical Center, dated April 11, 2011.  Do you see
2  that?
3      A.  Yeah.
4      Q.  Where -- or who -- did you write this?
5      A.  Uh.
6      Q.  It's a yes or no?
7      A.  I was -- I was definitely a part of
8  writing this.
9      Q.  Okay.  Who else wrote it?
10     A.  I think, it was basically by myself and
11  Julia.
12     Q.  Why didn't you attribute your name to it?
13     A.  Well, I -- who was this sent to -- Oread
14  KU -- because Julia really wrote it.  I provided
15  her the information and knew that she was going to
16  distribute it, but I just didn't have my name --
17  she didn't add her name.
18     Q.  Why didn't she add her name?
19     A.  I don't know.  You would have to ask her.
20     Q.  At the bottom of the first page there it
21  says two years ago Dean Atkinson forced a 50
22  percent salary cut on the basic science faculty.
23  Did you take a 50 percent salary cut?
24     A.  No.  It says there later adjusted to 35
25  percent.

Page 484

1      Q.  Did you take a 35 percent salary cut?
2      A.  Well, no, I didn't have to because I was
3  getting 90 percent of my salary from the federal
4  government.
5      Q.  Can you identify a single individual in
6  the basic science faculty who received a 50
7  percent salary cut?
8      A.  No.
9      Q.  Can you identify a single person in the
10  basic science faculty who took a 35 percent salary
11  cut?
12     A.  No.
13     Q.  The information that is in this e-mail is
14  information that Julia Cui got from you, is that
15  correct?
16     A.  Most of it.
17     Q.  What information in Exhibit No. 188 is
18  information that she would have had on her own
19  without it being provided by you?
20     A.  Well, as you can --
21     MR. RUPE:  Go through it and identify
22  from your recollection what you remember telling
23  her and what she got from somewhere else.
24     A.  Okay.
25     MR. RUPE:  Just...

Page 485

1      BY MR. RUPP:
2      Q.  Well, I tell you what, because we're
3  short on time and I don't want to spend an hour
4  doing it that way.  Would it be fair to say that
5  the bulk of the information in here is information
6  that you provided?
7      A.  Yes.  And, you know, this information
8  that I have here is, you know, information that I
9  had been presenting to the faculty over the years.
10  And so, you know, from those PowerPoints, et
11  cetera, she took that information and wrote this.
12  Other people in the department have the same
13  information.
14     (THEREUPON, Klaassen Deposition Exhibit
15  No 189 was marked for identification.)
16     BY MR. RUPP:
17     Q.  I'm going to hand you what's been marked
18  as Exhibit No. 189.
19     MR. RUPE:  Do you have a better copy?
20  Mine is dull --
21     MR. RUPP:  I don't.
22     BY MR. RUPP:
23     Q.  Exhibit No. 189 comes from a document
24  that I believe you all produced.  It's got an F
25  number in front of it.  This is a -- an e-mail

Page 486

1  that appears to be from Students for Democracy as
2  well.  Is this a document that you and Julia wrote
3  as well?
4      A.  Again, Julia did most of this.  She got
5  the information from -- from me.
6      Q.  All right.  And it appears largely to
7  contain the same information -- most of the same
8  information as in Exhibit 188, is that correct?
9      A.  That's correct.
10     Q.  And did Julia go around the university
11  and hand out this document on your behalf?
12     A.  Her and Jeiliu did it, as I understand.
13     Q.  In the middle of this there's a section
14  called Ability to Work With Faculty, do you see
15  that?
16     A.  Yes.
17     Q.  And it talks about promotion and tenure
18  committee information.  Do you see that?
19     A.  Right.
20     Q.  Within the University of Kansas is
21  promotion and tenure a confidential process?
22     A.  I guess, I would kind of say yes and no.
23     Q.  Would it be fair to say that promotion
24  and tenure is -- is -- whether somebody is
25  recommended to the Dean to be promoted or not



800 E. 1st Street, Suite 305          5111 SW 21st Street          6420 W. 95th Street, Suite 101
Wichita, KS 67202                    Topeka, KS 66604              Overland Park, KS 66212
316-201-1612                         785-273-3063                  913-383-1131
                                     www.appinobiggs.com

Page 499

1  4 of 23.
2      A.  Yes.
3      Q.  Okay.  It says the objectives of the
4  COBRE program are one, to strengthen an
5  institution's biomedical research infrastructure
6  through the establishment of a thematic
7  multidisciplinary center, correct?  The second or
8  the paragraph that begins the objectives?
9      A.  Oh, okay.
10     Q.  Sorry.  Are you there now?
11     A.  Yes.
12     Q.  I'm going to read that again just so you
13  can read it with me.  The objectives of the COBRE
14  program are, one, to strengthen an institution's
15  biomedical research infrastructure through the
16  establishment of a thematic multidisciplinary
17  center.  Correct?
18     A.  Yes.
19     Q.  And, two, to enhance the ability of
20  investigators to completely -- or to compete
21  independently for NIH individual research grants
22  or other external peer reviewed support.  Correct?
23     A.  Correct.
24     Q.  Anything that you disagree with about
25  that?

Page 500

1      A.  Correct, no.
2      Q.  Okay.  The -- going down there is a
3  paragraph that starts the leadership, do you see
4  that?
5      A.  Yes.
6      Q.  It says the leadership and direction of
7  the COBRE is provided by the principal
8  investigator, correct?
9      A.  Correct.
10     Q.  He or she has the primary responsibility
11  for administering the program and oversees the
12  development of the center and its associated core
13  facilities.  Do you see that?
14     A.  Right.
15     Q.  And, then, it says, the current PI may
16  continue to serve in this role or a new PI may be
17  appointed, correct?
18     A.  Yes.
19     Q.  Over the course, one of things that the
20  NIH looks at as to COBRE grants and training -- or
21  as to COBRE grants is what's called a sustainable
22  core, correct?
23     A.  Yes.
24     Q.  And, in fact, going back many years and
25  through 2008, at least, there had been discussion

Page 501

1  within the university about charging for the use
2  of the mass spectrometer, correct?
3      A.  Not when I was in charge.
4      Q.  Well, in fact, there was a -- you had
5  worked with Greg Reed to get charges adopted for
6  the use of the mass spectrometer, correct?
7      A.  For people outside of the department.
8      Q.  Well, actually, it was approved for
9  everyone, correct, at one point?
10     A.  I don't believe so.
11     Q.  And, in fact, what occurred is despite
12  the fact that there was supposed to be a
13  sustainable core and it was supposed to be
14  approved for everyone, you refused to allow any
15  charges to go against your grants for the use of
16  the mass spectrometer by your students, is that
17  correct?
18     A.  Okay.  There -- my philosophy on this and
19  I was in charge and I made the final decision and
20  everybody knew that I made the final decision.
21  So, what you have in this program is during the
22  first 10 years you need to get those cores
23  developed and show that people are using them.
24  From year 11 on it has -- you have to show
25  sustainability.  So, my philosophy was, and I told

Page 502

1  people this, my philosophy is I'm not going to
2  charge people to use this because if I -- if I
3  charge people to use this equipment, we don't
4  charge for anything else why should we charge for
5  this, we're No. 1.  But, No. 2, if we charge
6  people during this first 10 years for people to
7  use this equipment it will decrease the use.  So,
8  if I want people to use it in the 11th year I
9  entice them to use it the first 10 years and,
10  then, I record all of those times that they use
11  it.  At the end of 10 years they will be --
12  realize how important that instrument is and at
13  that time we will tell them NIH now says that we
14  have to charge you for it.  So, it was tremendous
15  business sense.  Now look what happened.  I
16  renewed this grant after five years.  Nothing was
17  said about not charging for these -- these cores.
18  We got brilliant, outstanding accomplishments the
19  first five years.  The university stole it from me
20  after the fifth year, gave it to Jaeschke and now
21  the thing is dead I understand.  He couldn't run
22  it.
23     Q.  As part of --
24         MR. RUPE:  Hang on, Counsel.  In request
25  for production No. 8 we had asked for any and all



Appino Biggs Reporting Service, Inc.
Technology Specialists in Today's Complex Litigation

800 E. 1st Street, Suite 305          5111 SW 21st Street          6420 W. 95th Street, Suite 101
Wichita, KS 67202                Topeka, KS 66604              Overland Park, KS 66212
316-201-1612                   785-273-3063                  913-383-1131
www.appinobiggs.com