# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| CURTIS KLAASSEN, Ph.D. | ) | |
|       Plaintiff, | ) | Case No. 13-CV-2561 |
| | ) | |
| v. | ) | |
| | ) | |
| BARBARA ATKINSON, et al. | ) | |
|       Defendants. | ) | |

## DEFENDANT DR. PAUL TERRANOVA'S MEMORANDUM IN SUPPORT OF HIS INDIVIDUAL MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

By: *Anthony F. Rupp*

ANTHONY F. RUPP, KS #11590
TARA S. EBERLINE, KS #22576
Foulston Siefkin LLP
32 Corporate Woods, Suite 600
Overland Park, KS 66210
(913) 498-2100
(913) 498-2101 (fax)
trupp@foulston.com
teberline@foulston.com

ATTORNEYS FOR DEFENDANTS

i

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................. 1

II. ARGUMENTS AND AUTHORITIES ................................................................. 2

    A. **Summary of the Facts Related to Dr. Terranova.** ............................................ 2

    B. **Dr. Klaassen cannot establish that Dr. Terranova retaliated against him for any First Amendment protected speech.** ............................. 5

        1. Dr. Klaassen cannot establish that his allegedly protected actions were a motivating factor in Dr. Terranova's decisions. ....................................................................................... 5

        2. Dr. Terranova would have taken the same action regarding Dr. Klaassen in the absence of any alleged protected conduct. ........................................................................................ 8

        3. Dr. Terranova is entitled to qualified immunity. ..................................... 9

    C. **Dr. Klaassen cannot establish a claim for tortious interference with a prospective business relationship against Dr. Terranova.** ................ 10

        1. Dr. Klaassen has identified no business relationship or expectancy with a probability of future economic benefit ..................... 11

        2. Dr. Klaassen cannot show that he was reasonably certain to have realized a business expectancy except for the conduct of Dr. Terranova. ................................................................................. 12

        3. Dr. Klaassen cannot show intentional misconduct or malicious conduct by Dr. Terranova. .................................................. 12

        4. Dr. Klaassen cannot identify any damages resulting from Dr. Terranova's alleged conduct. ........................................................... 13

        5. Dr. Terranova's actions were privileged. ............................................. 14

III. CONCLUSION ................................................................................................... 14

Case 2:13-cv-02561-DDC   Document 329   Filed 01/23/18   Page 3 of 18

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| CURTIS KLAASSEN, Ph.D. | ) | |
|            Plaintiff, | ) | Case No.: 13-CV-2561 |
| | ) | |
| v. | ) | |
| | ) | |
| BARBARA ATKINSON, et al. | ) | |
|            Defendants. | ) | |

**DEFENDANT DR. PAUL TERRANOVA'S MEMORANDUM IN SUPPORT**
**OF HIS INDIVIDUAL MOTION FOR SUMMARY JUDGMENT**

**I.     INTRODUCTION**

Dr. Paul Terranova served as Senior Associate Dean for Research for the KUMC School of Medicine, Vice Chancellor for Research at the University of Kansas, and President at the Kansas University Medical Center Research Institute ("KUMCRI") during the timeframe relevant to this lawsuit. SOF 44. Dr. Terranova, now retired, did not make the decision to terminate Dr. Klaassen's employment. SOF 48.

During Dr. Atkinson's administration (which ended with her resignation in 2012), Dr. Terranova was involved in several decisions that are the subject of claims by Dr. Klaassen. Dr. Terranova placed Dr. Klaassen on administrative leave with pay on November 1, 2011, following Dr. Klaassen's inappropriate acts on and before October 28, 2011. SOF 46, 138. As Dr. Klaassen's relationship with the Department of Pharmacology, Toxicology and Therapeutics ("Pharm/Tox") deteriorated through 2011 after he was removed as department chair, Dr. Terranova was involved in decisions regarding how to handle this disruption. This included working with the NIH to change the PI on the COBRE and Training Grants and transferring Dr. Klaassen to a lab in the Hixson Building. SOF 47.

1

The decisions that Dr. Terranova made were objectively reasonable and did not deprive Dr. Klaassen of any constitutional rights. Summary judgment should be entered in favor of Dr. Terranova on the grounds identified in the Consolidated Brief on behalf of all defendants as well as the following grounds specific to Dr. Terranova. Dr. Terranova adopts and incorporates herein the Consolidated Statement of Facts set forth in Section I of the Consolidated Brief, and all legal arguments contained in the Consolidated Brief applicable to claims made against Dr. Terranova. Doc. 326.

## II.    ARGUMENTS AND AUTHORITIES

### A.    Summary of the Facts Related to Dr. Terranova.

Dr. Terranova personally observed Dr. Klaassen's unprofessional behavior on numerous occasions. In February 2011, Dr. Terranova invited Dr. Klaassen to dinner with an outside speaker from the American Association of Medical Colleges. In front of the speaker, Dr. Klaassen went on a loud tirade, accusing the University administrators of being 'liars" who were taking money away from him and putting it into a cancer center and accused the University of being "slumlords." SOF 72.

On March 31, 2011, Dr. Klaassen had acted out at a stakeholders' meeting in which a vendor was presenting a product to department chairs on University premises during the business day. SOF 75, 77. Dr. Klaassen demeaned the Dean and the University in a manner entirely inappropriate for a presentation by a vendor. SOF 72-85.

On April 6, 2011, Dr. Atkinson asked Dr. Klaassen to resign or to be terminated from the "serve at the pleasure" position of Pharm/Tox Department Chair. SOF 88. Thereafter, Dr. Terranova received information about Dr. Klaassen's deteriorating relationships with the other faculty in the Pharm/Tox Department. SOF 115. As a result of these disruptions, there was a strong feeling within the Pharm/Tox Department that Dr. Klaassen should not remain in the

2

department and should not continue to serve as the PI on the COBRE Grant and Training Grant. Dr. Terranova was involved in planning regarding how to respond to these concerns, and in working with the NIH on changing the PI on the COBRE and Training Grants. SOF 116-118, 370.

On October 28, 2011, Dr. Klaassen exhibited particularly disruptive behavior. First, he called a meeting involving most of the Pharm/Tox faculty. He claimed the purpose of the meeting was to discuss the COBRE grant, and he came prepared with a PowerPoint presentation. SOF 119-120. Instead, he used the meeting to demean and discredit Dr. Carlson and other department members. In one of his slides, he bashed two Pharm/Tox staff members and claimed that Dr. Carlson "is a Ford chair trying to be a Mercedes chair – major conflict of interest." SOF 122. He told the faculty that he would not allow the new department chair to become the PI of the COBRE Grant, a major source of the Pharm/Tox Department funding. SOF 123.

He told the department that his long-term cooperation in the department will not be freely given, but will "largely be dependent on the new Chair's respect to me." SOF 122. Faculty members were quite disturbed by Dr. Klaassen's behavior at the "COBRE meeting" and walked out of the meeting. SOF 125.

Dr. Klaassen's unprofessional behavior continued through two other meetings that day. SOF 126-27. Dr. Klaassen learned that day that Dr. Jaeschke had applied to become the permanent chair of the department, and he threatened Dr. Jaeschke, stating, "[If] you fuck me over, I'm going to fuck you over." SOF 127. He then confronted and threatened Dr. Carlson. SOF 126.

3

On Tuesday, November 1, 2011, the University placed Dr. Klaassen on administrative leave with pay. SOF 137. Dr. Terranova provided Dr. Klaassen with a detailed letter setting forth the basis for the paid administrative leave:

> It has been reported to me that you have exhibited behavior and engaged in statements that were belligerent and frightening to other University faculty and staff. You made these statements and engaged in this behavior in meetings related to the COBRE grant, in administrative meetings with faculty and staff related to budget uses, and in a one-to-one meeting with a faculty member in your department. I understand that these were not simply disagreements on a professional basis, but were seriously inflammatory and frightening to several individuals concerned and completely beyond the bounds of what is expected in a University environment.

SOF 138.

Dr. Terranova made it clear that Dr. Klaassen was placed on administrative leave from his faculty and other University responsibilities. SOF 137. And he told Dr. Klaassen that the future direction of Dr. Klaassen's programs—including the grants for which Dr. Klaassen was PI—would be considered while his duties were suspended. SOF 140. On November 21, 2011, Dr. Terranova requested that the NIH change the PI on the COBRE and Training Grants from Dr. Klaassen to other professors within the Pharm/Tox Department. SOF 372, 374, 375. The NIH granted the University's request in mid-December 2011. SOF 377, 378. Dr. Klaassen has acknowledged that it is absolutely within the authority of the NIH to change the PI on a grant. SOF 379.

4

**B.    Dr. Klaassen cannot establish that Dr. Terranova retaliated against him for any First Amendment protected speech. [1]**

**1.    Dr. Klaassen cannot establish that his allegedly protected actions were a motivating factor in Dr. Terranova's decisions.**

Dr. Klaassen cannot establish a causal link between his alleged protected activity and Dr. Terranova's alleged retaliatory action. The fourth element in the *Garcetti/Pickering* analysis, which governs First Amendment Retaliation claims, is causation.[2] *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009); *see also Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cty., Ill.*, 391 U.S. 563 (1968). Although causation is often a question of fact, the Court must award summary judgment on this element if Dr. Klaassen cannot "show direct or indirect evidence from which a reasonable jury could find the required causal link between the protected activity and the allegedly retaliatory actions." *McDonald v. City of Wichita, Kan.*, 156 F. Supp. 3d 1279, 1307 (D. Kan. 2016). Temporal proximity is often a factor in these cases, but events intervening between the alleged protected act and the adverse employment action undermine evidence of retaliatory motive. *Deschenie v. Bd. of Educ. of Cent. Consol. Sch. Dist. No. 22*, 473 F.3d 1271, 1278 (10th Cir. 2007). In arguing motive, "speculation or hunches amidst rumor and innuendo will not suffice." *Id.* (citation omitted). In addition to some or all of these actions not qualifying as adverse employment actions, *see* Defendants' Consolidated Brief, Doc. 326, pp. 100-102, Dr. Klaassen cannot

---

[1] Dr. Terranova has attached as Exhibit A to this Brief two decision trees that, when reviewed together, provide the Court a visual description of the *Garcetti/Pickering* analysis applicable to the First Amendment retaliation claim against Dr. Terranova. Defendants' contend that Dr. Klaassen's claim fails at each stage of the analysis.

[2] The complete *Garcetti/Pickering* analysis is described in the Consolidated Brief (*see* Doc. 326, pp. 88–105). Dr. Terranova's arguments with respect to elements one through three are in the Consolidated Brief, and his arguments with respect to elements four and five are in this Brief.

establish a causal connection between these actions and any speech allegedly protected by the First Amendment.

**Participating in Transfer to Internal Medicine Department.**[3] Dr. Terranova was involved in planning for Dr. Klaassen's transfer to the Department of Internal Medicine in the Hixson Building from the Pharm/Tox Department in the Hemenway Building—an objectively reasonable move given the dysfunction Dr. Klaassen caused in Pharm/Tox. But Dr. Terranova was not the ultimate decision-maker regarding the transfer. That decision was made by Dean Atkinson. SOF 157, 158, 164. Accordingly, no claim against Dr. Terranova for Dr. Klaassen's transfer to Internal Medicine can survive. *Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011) (explaining that personal liability must be based on personal participation in the alleged constitutional violation).

Moreover, there is no question that the relationship between Dr. Klaassen and the Pharm/Tox Department faculty was irretrievably broken by the time of transfer. Dr. Klaassen's behavior following his removal as chair created significant disruption in the Pharm/Tox Department. The day after he was removed, on April 7, 2011, he offered up seven options to the Pharm/Tox department faculty during a faculty meeting, one of which was that he commit suicide. SOF 102. Then, falsely portraying himself and one of his lab members as "Students for Democracy at the University of Kansas Medical Center," Dr. Klaassen circulated an email and a flyer containing false information, including that Dr. Atkinson forced each of the basic science faculty to take a 50% salary cut. SOF 104-109. On May 20, 2011, Dr. Klaassen's behavior

---

[3] The Amended Pretrial Order does not specify which alleged retaliatory acts Dr. Klaassen alleges Dr. Terranova personally participated in. Regardless, Dr. Terranova had no personal participation in the termination of Dr. Klaassen's employment, placing Dr. Klaassen on administrative leave in May 2013, removing Dr. Klaassen as Chair of the Pharm/Tox Department, or allegedly preventing Dr. Klaassen from conducting research and working with students.

toward a staff member was such that he had to apologize for being overly aggressive. SOF 114. The series of events on October 28, 2011, described above, was also unacceptable.

Dr. Klaassen's department transfer and lab move occurred in January 2012, which was more than eight months after the March 2011 Stakeholder's Meeting and the April 2011 PowerPoint presentation, and just days shy of three months following the most temporally proximate LJW articles and Dr. Klaassen's October 28, 2011 PowerPoint presentation. There is no evidence linking the transfer decision to any of the editorials or any alleged First Amendment protected comments in the PowerPoint presentation.

**Removal as Principal Investigator.** As Vice Chancellor for Research, Dr. Terranova made the decision to request that the NIH change the PI on the COBRE and Training Grants from Dr. Klaassen to other KUMC professors on November 21, 2011, and requested that the NIH change the PI on three R01 grants in August 2013. SOF 372. Dr. Terranova made the final decision after Dr. Klaassen's actions at the October 28, 2011 COBRE meeting in which Dr. Klaassen referred to Dr. Carlson as a "Ford chair trying to be a Mercedes chair," accused Dr. Carlson of "doing everything he can to destroy the department," and stated that Dr. Klaassen's future cooperation with the department "will largely be dependent on the new Chair's respect" of Dr. Klaassen. SOF 373. The meeting included a number of individuals not associated with the COBRE grant, wasn't focused on the COBRE grant, and deteriorated very quickly. SOF 46, 119, 120, 364. The so-called COBRE meeting was a stage from which Dr. Klaassen could abuse KUMC administrators. Also, on the same date, Dr. Klaassen had separate threatening meetings with Dr. Carlson and Dr. Jaeschke. SOF 126, 127. Dr. Klaassen's actions on and around October 28, 2011, formed the basis of the Inquiry that ultimately resulted in the First Faculty Ad Hoc Committee finding that Dr. Klaassen committed personal and professional misconduct. SOF 184.

Dr. Klaassen may argue that Dr. Terranova's email to Dr. Atkinson and Dr. Carlson on October 20, 2011, in which Dr. Terranova states, "I do believe I have the plan. Timing must be coordinated," shows an improper motive on Dr. Terranova's part. Quite the contrary is true. As Dr. Terranova testified, he was referring to the need to coordinate moving Dr. Klaassen's lab from Hemenway to Hixson with the change in PI status. SOF 118. Making these changes without prior planning would have been careless.

Dr. Terranova requested that Dr. Klaassen be removed and replaced as PI on these grants because Dr. Terranova believed, based on Dr. Klaassen's inappropriate, offensive, and threatening behavior in 2011 that he could not fulfill the duties of those institutional grants. SOF 142. This was an objectively reasonable decision, and there is no evidence in the record that Dr. Klaassen's alleged First Amendment protected speech played any role in Dr. Terranova's decision-making.

**Denial of Access to Research Equipment.** Dr. Klaassen has made vague allegations about denying Dr. Klaassen and his students access to necessary research equipment. But Dr. Klaassen's students are not defendants, and there is no basis for any claim that Dr. Klaassen or any students were denied access to any necessary equipment, how any such denial could constitute adverse action sufficient to support a constitutional claim, or how Dr. Terranova personally participated in such alleged denial. *Brown*, 662 F.3d at 1163 (requiring personal participation in alleged constitutional violation for personal liability). This claim, too, therefore must fail.

> **2. Dr. Terranova would have taken the same action regarding Dr. Klaassen in the absence of any alleged protected conduct.**

The fifth and final element of the *Garcetti/Pickering* test favors Dr. Terranova, as well, as Dr. Klaassen cannot show that Dr. Terranova would not have taken the same actions absent the

8

conduct Dr. Klaassen alleges is protected by the First Amendment. This final factor is important because a "'rule of causation which focuses solely on whether protected conduct played a part' in an adverse employment decision 'could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing.'" *Trant v. Oklahoma*, 754 F.3d 1158, 1167 (10th Cir. 2014) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 285 (1977)); *see also Hartman v. Moore*, 547 U.S. 250, 260 (2006) (discussing *Mt. Healthy*) ("If there is a finding that retaliation was not the but-for cause of the discharge, the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind.").

Dr. Klaassen's own admissions of his role in disrupting the Department, as well as his own undisputed behavior, demonstrate that Dr. Terranova's actions were entirely appropriate. Dr. Terranova would have taken the same actions absent any alleged protected conduct, and for this reason, Dr. Klaassen's First Amendment retaliation claim against him fails.

### 3. Dr. Terranova is entitled to qualified immunity.

For Dr. Terranova to be held liable on Dr. Klaassen's First Amendment retaliation claim against him, Dr. Klaassen must establish that Dr. Terranova violated clearly established law. *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017). "A right is clearly established if, at the time of the conduct, existing precedent has 'placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Dr. Klaassen must establish that it should have been clear to a reasonable administrator that his conduct was unlawful in the situation he confronted. *See Wood v. Moss*, 134 S. Ct. 2056, 2067 (2014). Dr. Klaassen cannot meet this high standard. In addition to the lack of clarity in the application of the law to the facts described in the Defendants' Consolidated Brief, Dr. Terranova should be

9

granted qualified immunity because his actions were objectively reasonable in light of the facts he knew and the legal rules that were clearly established at the time Dr. Terranova took action. *See Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012).

### C. Dr. Klaassen cannot establish a claim for tortious interference with a prospective business relationship against Dr. Terranova.

The Kansas Supreme Court identifies the elements of tortious interference with a prospective business relationship to include:

(1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff;

(2) the defendant knew of the relationship or expectancy with the probability of future economic benefit to the plaintiff;

(3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have realized the expectancy;

(4) intentional misconduct by the defendant; and

(5) damages suffered by plaintiff as a direct or proximate cause of the defendant's misconduct.

Doc 102, p. 52 (citing *Turner v. Halliburton*, 722 P.2d 1106, 1115 (Kan. 1986)); *see also Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 424-25 (2003). Tortious interference with a prospective business relationship is also "predicated on malicious conduct by the defendant." *Burcham*, 276 Kan. at 424-25 (quoting *Turner*, 722 P.2d at 1115); *L&M Enter., Inc. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1288 (10th Cir. 2000).

Dr. Klaassen broadly asserts that Dr. Terranova, along with three other Defendants, interfered with his relationship with the NIH by (1) removing him as PI from NIH grants, (2) transferring NIH grants to other University faculty members, and (3) spending money out of his NIH grant accounts without permission. Doc. 298, pp. 24-25. Dr. Klaassen does not distinguish which Defendant allegedly engaged in which of these alleged actions.

Dr. Klaassen alleges that Dr. Terranova "conspired to remove Dr. Klaassen from lucrative and prestigious [NIH] grants," and "secretly wrote the NIH and transferred Klaassen's grants to other KUMC employees." *Id*. at 7-8. Dr. Terranova did not "secretly" contact the NIH; rather, he explicitly told Dr. Klaassen on the day he was placed on administrative leave that "KUMC administration will decide the future direction and continuation of all programs . . . . This determination will include consultation with appropriate faculty, other administrators at KUMC, and the NIH." SOF 256. Dr. Klaassen has failed to identify alleged facts sufficient to support his claim, and it should be dismissed.

### 1. Dr. Klaassen has identified no business relationship or expectancy with a probability of future economic benefit

"The first element of a claim for tortious interference with business expectancy requires an allegation of 'the existence of a business relationship or expectancy with the *probability* of future economic benefit to the plaintiff.'" *Neonatal Prod. Grp., Inc. v. Shields*, No. 13-CV-2601, 2014 WL 6685477, at *14 (D. Kan. Nov. 26, 2014) (quoting *Turner*, 722 P.2d at 1115). Likewise, Dr. Klaassen must show that a prospective business relationship actually existed. *Indep. Drug Wholesalers Grp., Inc. v. Denton*, No. 92-2164, 1993 WL 191393, at *6 (D. Kan. May 13, 1993).

Dr. Klaassen has not established he had a business relationship or expectancy with the NIH or that any such relationship had a probability of future economic benefit to him. Dr. Klaassen's "relationship" with the NIH is as an employee of the University that it designated as the PI—he does not allege the existence of a separate business relationship. The University is the grantee of the COBRE and Training grants and is the recipient of funds under the grants. SOF 344, 353. Dr. Klaassen has no legal right to serve as PI; rather, as recognized by the NIH Grants Policy Statement, the PI is "an individual *designated by the applicant organization* to have the

11

appropriate level of authority and responsibility to direct the project or program supported by the award." SOF 359. Dr. Klaassen has no ability to apply for the Training and COBRE grants on his own; rather only KUMCRI may do so.

Further, Dr. Klaassen has alleged no "future economic benefit" he would receive by serving as PI on the grants. Dr. Klaassen has not provided evidence that his salary would increase by remaining PI, and he has not provided evidence to suggest his salary was decreased as a result of his removal. In fact, his salary remained the same at all relevant times. SOF 376.

> **2. Dr. Klaassen cannot show that he was reasonably certain to have realized a business expectancy except for the conduct of Dr. Terranova.**

This element requires that "except for" Dr. Terranova's alleged tortious actions, Dr. Klaassen would have retained some identifiable business expectancy; this requires "but for" causation. *See Kendall State Bank v. Archway Ins. Servs.*, Nos. 11-2403-KHV, 10-2617-KHV, 2012 WL 3758647, at *4 (D. Kan. Aug. 29, 2012); *Cohen v. Battaglia*, 202 P.3d 87, 96 (Kan. Ct. App. 2009) ("Tortious interference with a prospective business advantage or relationship explicitly requires 'but for' causation."), *rev'd on other grounds*, 293 P.3d 752 (Kan. 2013). Dr. Klaassen has offered no evidence of a future economic benefit or expectancy that he would have obtained if Dr. Terranova had not, as alleged, spent funds out of his NIH grants without permission or removed Dr. Klaassen as PI on the COBRE and Training grants.

> **3. Dr. Klaassen cannot show intentional misconduct or malicious conduct by Dr. Terranova.**

"To establish the fourth element, a plaintiff must show that the alleged interference was both intentional and improper." *Altrutech, Inc. v. Hooper Holmes, Inc.*, 6 F. Supp. 2d 1269, 1277 (D. Kan. 1998); *see Reazin v. Blue Cross & Blue Shield of Kan.*, 899 F.2d 951, 977 (10th Cir. 1990). The "intentional misconduct" must be an "'interference' which either induces or causes a

12

third person not to enter into or continue a business relationship or which prevents plaintiff from acquiring or continuing a business relationship." *Braun v. Promise Reg'l Med. Cntr.-Hutchinson, Inc.*, No. 11-2180, 2011 WL 6304119, at *8 (D. Kan. Dec. 16, 2011). Dr. Klaassen has presented no evidence to suggest Dr. Terranova intentionally spent funds from Dr. Klaassen's NIH grants or removed him as PI to induce an unidentified third party not to enter or continue a business relationship with Dr. Klaassen.

Further, even if conduct is sufficient to establish intent, it must also be "of sufficient severity from which a reasonable jury might infer malice," *Rodriguez v. ECRI Shared Servs.*, 984 F. Supp. 1363, 1367 (D. Kan. 1997), as "malice is a predicate for tortious interference," *L&M Enter.*, 231 F.3d at 1288. Dr. Klaassen has presented no evidence of sufficient severity to infer malice.

### 4. Dr. Klaassen cannot identify any damages resulting from Dr. Terranova's alleged conduct.

"Claims for damages that are conjectural and speculative cannot form a sound basis for an award" in a tortious interference suit. *Byers v. Snyder*, 237 P.3d 1258, 1269 (Kan. Ct. App. 2010) (citations omitted). Not only did Dr. Klaassen's salary remain the same, but his post-removal interactions with the NIH further disprove his claim. Dr. Klaassen testified that he has applied for and received one grant at the University of Washington and intends to continue to apply for more grants. SOF 389. When asked if the NIH "expressed any unwillingness to recognize [him] as a principal investigator," Dr. Klaassen responded, "No." SOF 388. Thus, Dr. Klaassen has alleged no damage to his "relationship" with the NIH, let alone one relating to Dr. Terranova's alleged actions. Any damages are merely conjectural and speculative and do not satisfy the requirements of tortious interference with prospective business relationship. *Byers*, 237 P.3d at 1269. Further, any theoretical damages allegedly sustained by Dr. Klaassen were the

13

consequences of his own actions and unprofessional conduct, which ultimately led to his termination—they clearly do not arise out of Dr. Terranova's alleged actions.

### 5. Dr. Terranova's actions were privileged.

"[N]ot all interference in present or future contractual relations is tortious. A person may be privileged or justified to interfere with contractual relations in certain situations." *Turner*, 722 P.2d at 1115. Business or employment communications between individuals with a corresponding interest or duty in the subject matter are privileged. *Id.* at 1112–13. Agents of an employer may interfere with the employer's business relations "so long as they are acting on behalf of the corporation and do not employ wrongful means." *Curtright v. Ray*, No. 90-2034, 1991 WL 179385, at *5 (D. Kan. Aug. 23, 1991) (citing *May v. Santa Fe Trail Transp. Co.*, 370 P.2d 390, 395 (Kan. 1962)); *see also* Restatement (Second) of Torts, § 770 (1979). The question of privilege "is one of law to be determined by the court." *Higgins v. Johnson Cty. Med. Labs., Inc.*, No. 95-2295-JWL, 1996 WL 707102, at *6 (D. Kan. Nov. 15, 1996).

Here, even if Dr. Terranova spent the University's NIH funds without Dr. Klaassen's permission or caused him to be removed as PI, Dr. Terranova was acting in his capacity as an administrator for the University in order to further the University's educational purposes. The University has the right to request a reassignment of PI on NIH grants and exercised that right pursuant to University policy while Dr. Klaassen was on administrative leave. Dr. Terranova's conduct was proper, and his actions are privileged.

## III. CONCLUSION

Dr. Klaassen's claims against Dr. Terranova fail as a matter of law. Dr. Terranova acted with lawful motives, and Dr. Klaassen cannot identify facts sufficient for a reasonable jury to find in his favor on either claim raised against Dr. Terranova. For these reasons, Dr. Terranova respectfully requests that summary judgment be entered in his favor on all claims.

Respectfully submitted,

By: *Anthony F. Rupp*
Anthony F. Rupp, KS #11590
Tara S. Eberline, KS #22576
FOULSTON SIEFKIN LLP
32 Corporate Woods, Suite 600
Overland Park, KS 66210
(913) 498-2100
(913) 498-2101 (fax)
trupp@foulston.com
teberline@foulston.com


ATTORNEYS FOR DEFENDANTS

15

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of January, 2018, I electronically filed the above and foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to the following:

Alan L. Rupe #08914
Jeremy K. Schrag #24164
LEWIS BRISBOIS BISGAARD & SMITH LLP
1605 N. Waterfront Parkway, Suite 150
Wichita, KS 67206
Telephone: (316) 609-7900
Facsimile: (316) 630-8021
Email: alan.rupe@lewisbrisbois.com
Email: jeremy.schrag@lewisbrisbois

ATTORNEYS FOR PLAINTIFF

/s/ *Anthony F. Rupp*
ATTORNEY FOR DEFENDANTS