**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| CURTIS KLAASSEN, Ph.D. | ) | |
| Plaintiff, | ) | Case No. 13-CV-2561 |
| | ) | |
| v. | ) | |
| | ) | |
| BARBARA ATKINSON, et al. | ) | |
| Defendants. | ) | |

**DEFENDANT DR. HARTMUT JAESCHKE'S MEMORANDUM IN SUPPORT**
**OF HIS INDIVIDUAL MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted,

By: *Anthony F. Rupp*

ANTHONY F. RUPP, KS #11590
TARA S. EBERLINE, KS #22576
Foulston Siefkin LLP
32 Corporate Woods, Suite 600
Overland Park, KS 66210
(913) 498-2100
(913) 498-2101 (fax)
trupp@foulston.com
teberline@foulston.com

ATTORNEYS FOR DEFENDANTS

## TABLE OF CONTENTS

I.     INTRODUCTION.................................................................................................1

II.    ARGUMENTS AND AUTHORITIES.............................................................2

    A.    Dr. Klaassen cannot establish that Dr. Jaeschke retaliated
        against him for First Amendment protected speech............................2

        1.    Dr. Jaeschke did not personally participate in any
            constitutional violation..................................................................2

        2.    Dr. Klaassen cannot establish a causal link between his
            allegedly protected speech and Dr. Jaeschke's actions..............3

        3.    Dr. Klaassen's claim fails under the fifth element of the
            *Garcetti/Pickering* test. ..............................................................6

        4.    Dr. Jaeschke is entitled to qualified immunity...........................7

    B.    Dr. Klaassen cannot establish a claim for a procedural due
        process violation against Dr. Jaeschke for the alleged taking of
        the NIH grants.........................................................................................8

    C.    Dr. Klaassen cannot establish a claim for tortious interference
        with a prospective business relationship against Dr. Jaeschke.........8

        1.    Dr. Klaassen has identified no business relationship or
            expectancy with a probability of future economic benefit.......11

        2.    Dr. Klaassen cannot establish that he was reasonably
            certain to have realized a business expectancy except for
            the conduct of Dr. Jaeschke. ......................................................12

        3.    Dr. Klaassen cannot establish intentional misconduct or
            malicious conduct by Dr. Jaeschke.............................................12

        4.    Dr. Klaassen cannot establish damages. ....................................13

        5.    Dr. Jaeschke's actions were privileged.......................................14

III.   CONCLUSION ....................................................................................................14

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**


CURTIS KLAASSEN, Ph.D.                        )
                              Plaintiff,       )        Case No.: 13-CV-2561
                                               )
v.                                             )
                                               )
BARBARA ATKINSON, et al.                       )
                              Defendants.       )


**DEFENDANT DR. JAESCHKE'S MEMORANDUM IN SUPPORT OF**
**HIS INDIVIDUAL MOTION FOR SUMMARY JUDGMENT**

**I.      INTRODUCTION**

Dr. Hartmut Jaeschke was a faculty member in the Department of Pharmacology and Toxicology ("Pharm/Tox") at the University of Kansas Medical Center. Dr. Klaassen was his department chair until Dr. Atkinson removed Dr. Klaassen from that position on April 6, 2011. SOF 10. Dr. Jaeschke was named department chair on January 9, 2012, and was Dr. Klaassen's department chair for just about two weeks in January 2012 before Dr. Klaassen was transferred to the Department of Internal Medicine. SOF 155, 164. Dr. Jaeschke did not make the decision to terminate Dr. Klaassen's employment two years later, in January 2014. SOF 63.

Dr. Jaeschke's name is not mentioned in the several pages of factual contentions Dr. Klaassen submitted as Section 3a of the Amended Pretrial Order. Doc. 298. Dr. Klaassen has asserted claims for First Amendment Retaliation, Procedural Due Process Taking of NIH Grants, and Tortious Interference with a Prospective Business Relationship against Dr. Jaeschke, Doc. 298, pp. 20, 22, 24, but the Amended Pretrial Order fails to identify any specific actions by Dr. Jaeschke that meet the elements of those claims. Dr. Jaeschke incorporates by reference the

consolidated statement of facts in Section I of the Consolidated Brief, and all legal arguments

contained in the Consolidated Brief applicable to claims made against Dr. Jaeschke. Doc. 326.

## II.   ARGUMENTS AND AUTHORITIES

### A.   Dr. Klaassen cannot establish that Dr. Jaeschke retaliated against him for First Amendment protected speech.[1]

#### 1.   Dr. Jaeschke did not personally participate in any constitutional violation.

The Amended Pretrial Order is devoid of any allegations of personal wrongdoing or

retaliation by Dr. Jaeschke. Dr. Jaeschke finds himself in the untenable situation of having to

speculate as to the specific basis of the claims against him. Summary judgment should be entered

in favor of Dr. Jaeschke for that reason alone. *See, e.g.*, *Trujillo v. Uniroyal Corp.*, 608 F.2d 815,

817-18 (10th Cir. 1979) (noting that pretrial order represents "a complete statement of all the

contentions of the parties" and holding that trial court has discretion to exclude facts and

contentions not included in pretrial order); *D'Souza-Klamath v. Cloud Cty. Health Ctr., Inc.*, No.

07-4031, 2009 WL 902377, at *17–18 (D. Kan. Mar. 31, 2009*), aff'd sub nom.*, 363 F. App'x

658 (10th Cir. 2010). In reality:

- Dr. Jaeschke did not terminate Dr. Klaassen's employment. SOF 63.

- Dr. Jaeschke did not place Dr. Klaassen on administrative leave. SOF 62–63.

- Dr. Jaeschke did not transfer Dr. Klaassen to a different department. SOF 63.

- Dr. Jaeschke was named by the NIH, at the request of the University, to replace Dr. Klaassen as the PI on the University's COBRE Grant, but Dr. Jaeschke was not the decision-maker. SOF 61.

---

[1] Dr. Jaeschke has attached as Exhibit A to this brief two decision trees that, when reviewed together, provide the Court a visual description of the *Garcetti/Pickering* analysis applicable to the First Amendment retaliation claim against Dr. Jaeschke. Dr. Klaassen's claim fails at each stage of the analysis.

- There is no specificity in the Amended Pretrial Order regarding what the alleged denial of research equipment claims relates to, or any authority as to why Dr. Klaassen can assert any sort of a claim on behalf of unspecified "laboratory members." Doc. 298.

For the First Amendment retaliation claim against Dr. Jaeschke to survive summary judgment, Dr. Klaassen must show personal participation in the alleged constitutional violation. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir.2013); *see also Quint v. Cox*, 348 F. Supp. 2d 1243, 1249 (D. Kan. 2004). Dr. Jaeschke may not be held liable under a theory of *respondeat superior*, and he may not be held liable merely because of his brief supervisory position. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011). Rather, he is liable only if Dr. Klaassen can "show an 'affirmative link' between [Dr. Jaeschke] and the constitutional violation." *Schneider*, 717 F.3d at 767. Without evidence to support a claim that Dr. Jaeschke personally participated in any of the alleged wrongs, the claim against him must be dismissed. *See Brown v. Montoya*, 662 F.3d at 1163 (explaining that personal liability must be based on personal involvement in the alleged constitutional violation); *Conley v. Pryor*, No. 11-3200-DDC, 2015 WL 413638, at *16–17 (D. Kan. Jan. 30, 2015), *aff'd*, 627 F. App'x 697 (10th Cir. 2015).

### 2. Dr. Klaassen cannot establish a causal link between his allegedly protected speech and Dr. Jaeschke's actions.

The fourth element in the *Garcetti/Pickering* analysis[2], which governs First Amendment retaliation claims brought by public employees, is causation. *See Dixon v. Kirkpatrick*, 553 F.3d 1294, 1301-02 (10th Cir. 2009); *see also Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cty., Ill.*, 391 U.S. 563 (1968). Although causation

---

[2] The complete *Garcetti/Pickering* analysis is provided in the Consolidated Brief, Doc. 326, pp. 88-105. Dr. Jaeschke's arguments with respect to elements one through three are in the Consolidated Brief, and his arguments with respect to elements four and five are in this Brief.

is often a question of fact, the Court should award summary judgment on this element because there is no evidence from which a reasonable jury could find the required causal link between the alleged protected activity and the allegedly retaliatory actions. *McDonald v. City of Wichita, Kan.*, 156 F. Supp. 3d 1279, 1307 (D. Kan. 2016). Temporal proximity is often a factor in these cases, but events intervening between the alleged protected act and the adverse employment action undermine evidence of retaliatory motive. *Deschenie v. Bd. of Educ. of Cent. Consol. Sch. Dist. No. 22*, 473 F.3d 1271, 1278 (10th Cir. 2007). In arguing motive, "speculation or hunches amidst rumor and innuendo will not suffice." *Id.* (citation omitted).

There is nothing other than Dr. Klaassen's speculation to support that Dr. Jaeschke was motivated by Dr. Klaassen's alleged assertion of First Amendment rights. The record is replete with evidence of the threats and retaliation by Dr. Klaassen against Dr. Jaeschke. On December 16, 2011, Dr. Klaassen interrupted a meeting in Dr. Jaeschke's office, repeatedly pounded his fists on file cabinets, and yelled that the COBRE and Training Grants were Dr. Klaassen's grants and that he would only give them up when he was dead. SOF 148. Also during that incident, Dr. Klaassen yelled at Dr. Jaeschke, "You want to be chair of this department! How do you think our relationship will be after that?" SOF 148. Upon learning that Dr. Jaeschke had applied to become permanent chair of the Pharm/Tox Department, Dr. Klaassen threatened Dr. Jaeschke, stating, "[If] you fuck me over, I'm going to fuck you over." SOF 25, 127.

Thereafter, an event occurred as Dr. Jaeschke described in a letter to Dr. Klaassen:

On January 4, 2012, you again entered my office uninvited and proceeded to engage in a heated conversation and harangue for approximately an hour. You were clearly upset about the pending move of your laboratory to Hixson. You blamed the move on me. You repeatedly asked in a very agitated tone of voice: "How can you throw me out of this building after all I have done for you? What will this do to your reputation? What will I do when I get the COBRE grant and the training grant back and I am across the street? If I am here, I will hand it over to you, if I am across the street, I will not support you or the department. My

move will destroy the department. I am your biggest asset over here but I will work against you if I am across the street." In addition, you repeatedly pointed out that fifty-percent of the Society of Toxicology council are your former students, then proceeded to state: "What do you think this will do to your career? What do you want me to say about you and this place when I get my merit award in 2 months? That you kicked me out and destroyed my career after 43 years, just 2 years before I will leave? What do you think that will do to your career in toxicology or hepatology?" Your comments made it very clear to me that you would work against me if I became chair, that you would tell everyone that I had destroyed your career and in so doing, you would actively work to destroy my career and reputation in toxicology and the liver field.

SOF 154.   In response, Dr. Klaassen sent an email to Dr. Jaeschke on January 11, 2012, acknowledging, "I can understand why you might not have much confidence in me at the present time.   If I did not have graduate students and post-doctoral students, I would have retired 9 months ago. . ." SOF 159.   The next day, Dr. Klaassen acknowledged, "I think the Department has become de-unified the last few months, and I am probably the reason for most of that splintering, and I will take full responsibility." SOF 160.

There is no specificity to the allegation against Dr. Jaeschke regarding any alleged denial of access to research equipment. There is, therefore, no basis for a claim. As Chair of the Pharm/Tox Department and PI of the COBRE grant, Dr. Jaeschke had the responsibility to manage the core equipment held by the department, including the mass spectrometer. SOF 392. In the fall of 2012, Pharm/Tox implemented user fees for the mass spectrometer to align that piece of equipment with the University's other core facilities, all of which charged user fees. SOF 393. This charge was important for the sustainability of the program because if all costs of the core equipment were indefinitely borne by the COBRE grant, the equipment would not be sustainable after the COBRE grant funds were discontinued. SOF 394. The charges continue today, many years after Dr. Klaassen's departure from the University. SOF 395.

The charges were implemented more than six months after Dr. Klaassen's last alleged protected speech and after Dr. Klaassen had left the Pharm/Tox Department.  There is, therefore, no temporal proximity and no other evidence that the decisions are connected to one another. *See Conroy v. Vilsack*, 707 F.3d 1163, 1181 (10th Cir. 2013) (if adverse action occurs three or more months after protected activity, timing alone insufficient to establish causation).

### 3. Dr. Klaassen's claim fails under the fifth element of the *Garcetti/Pickering* test.

Dr. Klaassen cannot establish that any action purportedly taken by Dr. Jaeschke would not have been taken but for Dr. Klaassen's alleged First Amendment protected conduct. Under the applicable *Garcetti/Pickering* test, the final element is whether the defendant would have reached the same employment decision in the absence of the protected conduct. *Dixon*, 553 F.3d at 1302. "[A] 'rule of causation which focuses solely on whether protected conduct played a part' in an adverse employment decision 'could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing.'" *Trant v. Oklahoma*, 754 F.3d 1158, 1167 (10th Cir. 2014) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285 (1977)); *see also Hartman v. Moore*, 547 U.S. 250, 260 (2006) (discussing *Mt. Healthy*) ("If there is a finding that retaliation was not the but-for cause of the discharge, the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind.").

Dr. Jaeschke did not make any employment decisions that rise to the level of giving Dr. Klaassen a submissible case against him. Further, no conclusion can be reached other than that the same decisions would have been made as to Dr. Klaassen regardless of Dr. Klaassen's alleged protected activity. In closing argument at one of the ad hoc hearings, Dr. Klaassen's

counsel stated, "And sometimes even a good lawyer through God or the devil can't change the way somebody is. . . . And Curt is what he is. They know Curt becomes agitated, they know Curt raises his voice, they know Curt Klaassen." SOF 17. In a professional environment, one does not have to continually accept an employee who can't or won't change the way he is and becomes agitated. The actions taken by the University were objectively reasonable. No liability attaches to Dr. Jaeschke being supportive of any of those decisions.

Dr. Klaassen cannot show any connection between any alleged First Amendment protected action and any purported employment decision by Dr. Jaeschke. Dr. Klaassen's individual claim against Dr. Jaeschke must fail.

## 4.  Dr. Jaeschke is entitled to qualified immunity.

For Dr. Jaeschke to be held liable under Dr. Klaassen's First Amendment retaliation theory, Dr. Klaassen must establish that Dr. Jaeschke violated clearly established law. *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017). "A right is clearly established if, at the time of the conduct, existing precedent has 'placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "[A] plaintiff may satisfy this standard by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Cox v. Glanz*, 800 F.3d 1231, 1247 (10th Cir. 2015) (citation and internal quotations omitted). Dr. Klaassen cannot meet this high standard. Dr. Klaassen must establish that it should have been clear to a reasonable professor that Dr. Jaeschke's conduct was unlawful in the situation he confronted. *See Wood v. Moss*, 134 S. Ct. 2056, 2067 (2014).

There is no clearly established law that prohibits any action allegedly taken by Dr. Jaeschke. In fact, Dr. Klaassen does not allege in the Amended Pretrial Order any actions by Dr.

Jaeschke or how any such actions rise to a violation of clearly established law. Nor can Dr. Klaassen identify any clearly established law showing that Dr. Jaeschke's level of involvement in any of the alleged employment actions was sufficient to support individual liability. Dr. Klaassen was unprofessional and threatening to Dr. Jaeschke, and to the extent Dr. Jaeschke had any meaningful participation in any employment decisions related to Dr. Klaassen, his actions were objectively reasonable and would have been taken anyway. *See Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012).

**B.      Dr. Klaassen cannot establish a claim for a procedural due process violation against Dr. Jaeschke for the alleged taking of the NIH grants.**

This claim against Dr. Jaeschke must fail because Dr. Klaassen has not alleged and has not shown that Dr. Jaeschke personally participated in any alleged violation. *See Quint*, 348 F. Supp. 2d at 1249. Dr. Jaeschke's involvement with the NIH grants is limited to being named to replace Dr. Klaassen as the PI on the University's COBRE Grant. Dr. Jaeschke did not make the decision to request the change from the NIH, which had the authority to replace the PI. SOF 61, 360, 373. For this reason, in addition to those in the Consolidated Brief, this claim must fail.

**C.      Dr. Klaassen cannot establish a claim for tortious interference with a prospective business relationship against Dr. Jaeschke.**

The Amended Pretrial Order includes no allegation describing how Dr. Jaeschke tortiously interfered with any purported relationship between Dr. Klaassen and the NIH. The allegations related to the NIH grants were the subject of Dr. Klaassen's retaliatory discharge claim in the State Case. The Court entered a directed verdict on that claim following 11 days of the presentation of Dr. Klaassen's case. SOF 423–424. The allegations that the University improperly spent money out of "Dr. Klaassen's" NIH grants were considered and rejected. SOF 425. Moreover, the NIH grants were not Dr. Klaassen's. The grants were made to the University.

SOF 362. Dr. Klaassen owed obligations to the University with regard to the grants. To suggest that the money was "his" is to turn the purpose of the grants upside down.

The Applicant Organization for the COBRE Grant was the University of Kansas Medical Center Research Institute, Inc. ("KUMCRI"), which is not a defendant in this or any of Dr. Klaassen's multiple lawsuits. The Administrative Official to be notified if the award was made was Mei-Shya Chen (a KUMCRI employee), not Dr. Klaassen. SOF 345. The Official Signing for the Organization was Thomas Noffinger (a KUMCRI employee), not Dr. Klaassen. SOF 346. The University of Kansas authorized four people to sign research and sponsored programs, grants and contracts; the list did not include Dr. Klaassen. SOF 348. The description of the program clarifies that the Grant is not to benefit the PI; but rather, to benefit the University:

> Five years of funding are requested to develop a Center of Biomedical Research Excellence at <u>Kansas University Medical Center</u> with a focus on Nuclear Receptors and their Role in Liver Health and Disease.  Five talented new faculty who share this research interest were selected with the goal of helping them become funded, independent researchers.  A PI, a CO-PI, and internal advisory committee of experienced senior faculty and an external advisory committee of prominent scientists have been assembled to mentor them to this goal.

SOF 349. According to the NIH:

> The objective of the COBRE initiative is to strengthen an institution's biomedical research infrastructure through the establishment of a thematic, multi-disciplinary center to enhance the ability of investigators to compete independently for National Institute of Health (NIH) individual research grants or other external peer-reviewed support. COBRE awards are supported through the Institutional Development Award (IDeA) Program, which aims to foster health related research by increasing the competitiveness of investigators at institutions located in states with the historically low aggregate success rates for grant awards from the NIH.

SOF 342.

The Kansas Supreme Court identifies the elements of tortious interference with a prospective business relationship to include:

(1)     the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff;

(2)     the defendant knew of the relationship or expectancy with the probability of future economic benefit to the plaintiff;

(3)     that, except for the conduct of the defendant, plaintiff was reasonably certain to have realized the expectancy;

(4)     intentional misconduct by the defendant; and

(5)     damages suffered by plaintiff as a direct or proximate cause of the defendant's misconduct.

Doc 102, p. 52 (citing *Turner v. Halliburton*, 722 P.2d 1106, 1115 (Kan. 1986)); *see also Burcham v. Unison Bancorp, Inc.*, 77 P.3d 130, 151 (Kan. 2003). Tortious interference with a prospective business relationship is also "predicated on malicious conduct by the defendant." *Burcham*, 77 P.3d at 151 (quoting *Turner*, 722 P.2d at 1115); *L&M Enter., Inc. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1288 (10th Cir. 2000). The Amended Pretrial Order does not set forth a factual basis for any such claim against Dr. Jaeschke. There is nothing in the allegations or in the evidence that could cause a jury to find in favor of Dr. Klaassen.

At page 24 of the Amended Pretrial Order (Doc. 298), Dr. Klaassen broadly asserts that the Individual Defendants interfered with his relationship with the NIH by (1) removing him as PI from NIH grants, (2) transferring the NIH grants to other University faculty members, and (3) spending money out of NIH grant accounts without his permission. Dr. Klaassen does not distinguish which defendant allegedly engaged in which of these alleged actions and does not even mention Dr. Jaeschke in the factual contentions in the Amended Pretrial Order. He should be precluded from pursuing this argument. *See Trujillo*, 608 F.2d 815, 817-18; *D'Souza-Klamath*, 2009 WL 902377, at *17–18. Dr. Jaeschke's only involvement is via his signature appearing as one of two signators on a November 21, 2011 letter from KUMCRI letter to the

NIH requesting a change in PI status for the COBRE Grant. The other and first signator is Dr. Gregory Kopf, who signed as the Associate Vice Chancellor for Research Administration. Dr. Kopf is not a defendant. Dr. Jaeschke is proposed in the letter as the new proposed PI. SOF 374. The fact that Dr. Jaeschke accepted this invitation to serve as the new PI does not meet any of the elements required to state a claim against him.

        1.      **Dr. Klaassen has identified no business relationship or expectancy with a probability of future economic benefit.**

"The first element of a claim for tortious interference with business expectancy requires an allegation of 'the existence of a business relationship or expectancy with the *probability* of future economic benefit to the plaintiff.'" *Neonatal Prod. Grp., Inc. v. Shields*, No. 13-CV-2601, 2014 WL 6685477, at *14 (D. Kan. Nov. 26, 2014) (quoting *Turner*, 722 P.2d at 1115). Likewise, plaintiff must show that a prospective business relationship actually existed. *Indep. Drug Wholesalers Grp., Inc. v. Denton*, No. 92-2164, 1993 WL 191393, at *6 (D. Kan. May 13, 1993).

Dr. Klaassen has not established that he had a business relationship or expectancy with the NIH or that any such relationship had a probability of future economic benefit to him. The NIH awarded the COBRE Grant to KUMCRI, and KUMCRI was responsible to the NIH for the performance on the grant. The University had the right to assign work. Dr. Klaassen did not gain a property interest in the grants because he had been designated as the PI.

Dr. Klaassen's "relationship" with the NIH is as an employee of the University. The University is the grantee of the COBRE grant and is the recipient of funds under the grants. As recognized by the NIH Grants Policy Statement, the PI is "an individual *designated by the applicant organization* to have the appropriate level of authority and responsibility to direct the

project or program supported by the award." SOF 359. Dr. Klaassen has no ability to apply for the Training or COBRE grants on his own; rather, only KUMCRI could do so.

The University paid Dr. Klaassen a salary as a faculty member. That salary was not reduced from the time he was removed as the PI of the COBRE Grant in December of 2011 through the termination of his employment in January of 2014. SOF 376.

### 2. Dr. Klaassen cannot establish that he was reasonably certain to have realized a business expectancy except for the conduct of Dr. Jaeschke.

Dr. Klaassen has offered no evidence of a future economic benefit or expectancy that he would have obtained if Dr. Jaeschke had not requested a transfer of PI on the COBRE grant and accepted the role as PI on that grant. This element requires that "except for" Dr. Jaeschke's alleged tortious actions, Dr. Klaassen would have retained some identifiable business expectancy; this requires "but for" causation. *See Kendall State Bank v. Archway Ins. Servs.*, Nos. 11-2403-KHV, 10-2617-KHV, 2012 WL 3758647, at *4 (D. Kan. Aug. 29, 2012); *Cohen v. Battaglia*, 202 P.3d 87, 96 (Kan. Ct. App. 2009) ("Tortious interference with a prospective business advantage or relationship explicitly requires 'but for' causation."), *rev'd on other grounds*, 293 P.3d 752 (Kan. 2013). Dr. Klaassen simply cannot make this showing.

Additionally, Dr. Klaassen alleges that Dr. Jaeschke was merely acting at the direction of Dr. Terranova. Doc. 296, at ¶ 60. Thus, the action would have occurred regardless of Dr. Jaeschke's involvement.

### 3. Dr. Klaassen cannot establish intentional misconduct or malicious conduct by Dr. Jaeschke.

"To establish the fourth element, a plaintiff must show that the alleged interference was both intentional and improper." *Altrutech, Inc. v. Hooper Holmes, Inc.*, 6 F. Supp. 2d 1269, 1277 (D. Kan. 1998); *see Reazin v. Blue Cross & Blue Shield of Kan.*, 899 F.2d 951, 977 (10th Cir. 1990). The "intentional misconduct" must be an "'interference' which either induces or causes a

third person not to enter into or continue a business relationship or which prevents plaintiff from acquiring or continuing a business relationship." *Braun v. Promise Reg'l Med. Cntr.-Hutchinson, Inc.*, No. 11-2180, 2011 WL 6304119, at *8 (D. Kan. Dec. 16, 2011). Even if conduct is sufficient to establish intent, it must also be "of sufficient severity from which a reasonable jury might infer malice," *Rodriguez v. ECRI Shared Servs.*, 984 F. Supp. 1363, 1367 (D. Kan. 1997), as "malice is a predicate for tortious interference," *L&M Enter.*, 231 F.3d at 1288.

Dr. Klaassen has presented no evidence to show that Dr. Jaeschke intentionally engaged in misconduct or acted with malice in seeking Dr. Klaassen's removal. Rather, he claims that Dr. Jaeschke was directed to write the NIH to request a change in PI and that KUMC requested that Jaeschke be the new PI. Complying with a supervisor's requests does not rise to the level of malicious and intentional misconduct.

4.    **Dr. Klaassen cannot establish damages.**

Dr. Klaassen suffered no damages from having been removed as the PI on the COBRE Grant. "Claims for damages that are conjectural and speculative cannot form a sound basis for an award" in a tortious interference suit. *Byers v. Snyder*, 237 P.3d 1258, 1269 (Kan. Ct. App. 2010) (citations omitted). Not only did Dr. Klaassen's salary remain the same, but his post-removal interactions with the NIH further disprove his claim. Dr. Klaassen testified that he has applied for and received a grant at the University of Washington and intends to continue to apply for more grants. SOF 389. When asked if the NIH "expressed any unwillingness to recognize [him] as a principal investigator," Dr. Klaassen responded, "No." SOF 388. Thus, Dr. Klaassen has alleged no damage to his "relationship" with the NIH, let alone one relating to Dr. Jaeschke's alleged actions. Any damages are merely conjectural and speculative and do not satisfy the requirements of tortious interference with a prospective business relationship. *Byers*, 237 P.3d at

1269. Any theoretical damages allegedly sustained by Dr. Klaassen were the consequences of his own actions and unprofessional conduct, which ultimately led to his termination.

**5.      Dr. Jaeschke's actions were privileged.**

Dr. Jaeschke's signature on the letter to the NIH is as an agent of the University and does not employ wrongful means. "[N]ot all interference in present or future contractual relations is tortious. A person may be privileged or justified to interfere with contractual relations in certain situations." *Turner*, 722 P.2d at 1115. Business or employment communications between individuals with a corresponding interest or duty in the subject matter are privileged. *Id*. at 1112–13. Agents of an employer may interfere with the employer's business relations "so long as they are acting on behalf of the corporation and do not employ wrongful means." *Curtright v. Ray*, No. 90-2034, 1991 WL 179385, at *5 (D. Kan. Aug. 23, 1991) (citing *May v. Santa Fe Trail Transp. Co.*, 189 Kan. 419, 424–25, 370 P.2d 390 (1962)); *see also* Restatement (Second) of Torts, § 770 (1979). The question of privilege "is one of law to be determined by the court." *Higgins v. Johnson Cty. Med. Labs., Inc.*, No. 95-2295-JWL, 1996 WL 707102, at *6 (D. Kan. Nov. 15, 1996).

Dr. Jaeschke was acting in his capacity as an agent of the University when he requested a change in PI and accepted, at the University's request, the PI position on the COBRE grant. The University had the right to reassign the PI and Dr. Jaeschke merely complied with his employer's requests. Dr. Jaeschke did not engage in any improper conduct and his actions are privileged.

**III.      CONCLUSION**

Dr. Klaassen's claims against Dr. Jaeschke fail as a matter of law, as Dr. Klaassen cannot establish any of the elements of his claims. Dr. Jaeschke requests judgement in his favor.

Respectfully submitted,

By: *Anthony F. Rupp*
Anthony F. Rupp, KS #11590
Tara S. Eberline, KS #22576
FOULSTON SIEFKIN LLP
32 Corporate Woods, Suite 600
Overland Park, KS 66210
(913) 498-2100
(913) 498-2101 (fax)
trupp@foulston.com
teberline@foulston.com

ATTORNEYS FOR DEFENDANTS


## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of January, 2018, I electronically filed the above and foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to the following:

Alan L. Rupe #08914
Jeremy K. Schrag #24164
LEWIS BRISBOIS BISGAARD & SMITH LLP
1605 N. Waterfront Parkway, Suite 150
Wichita, KS 67206
Telephone: (316) 609-7900
Facsimile: (316) 630-8021
Email: alan.rupe@lewisbrisbois.com
Email: jeremy.schrag@lewisbrisbois

ATTORNEYS FOR PLAINTIFF

/s/ *Anthony F. Rupp*
ATTORNEY FOR DEFENDANTS