# UNITED STATES DISTRICT COURT
# DISTRICT OF KANSAS

**CURTIS KLAASSEN, Ph.D.,**

      Plaintiff,

CASE NO. 13-CV-2561-DDC

**BARBARA ATKINSON,** *et. al.*,

      Defendants.

## PLAINTIFF'S RESPONSE TO DEFENDANT'S CONSOLIDATED MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT

By: **/s/ Alan L. Rupe**
      Alan L. Rupe # 08914
      Jeremy K. Schrag # 24164
      LEWIS BRISBOIS BISGAARD & SMITH LLP
      1605 North Waterfront Parkway, Suite 150
      Wichita, Kansas 67206
      Telephone: 316.609.7900
      Facsimile: 316.462.5746
      alan.rupe@lewisbrisbois.com
      jeremy.schrag@lewisbrisbois.com

      *Attorneys for Plaintiff*

1

## Table Of Contents

INTRODUCTION ........................................................................................................ 6

RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS ......................... 8

ADDITIONAL STATEMENT OF MATERIAL FACTS ...................................................... 68

I.    Klaassen Faithfully Served The University Of Kansas For Over 40 Years Obtaining The Title Tenured University Distinguished Professor ....................................................... 68

II.   In 2002, Atkinson Promotes Klaassen To Chair Of Pharmacology To Rebuild The Crumbling Department ...................................................................................................... 71

III.  KUMC's Administration Was Well Aware Of Klaassen's Reputation For Having "Outbursts" At The Time They Promoted Him To Chair Of Pharmacology .............................. 71

IV.   Klaassen Obtains Unprecedented NIH Grant Funding During His Tenure As A KUMC Faculty Member ............................................................................................................... 75

V.    Klaassen Obtained NIH Grants Pursuant To Property Interests Identified And Protected By Kumc's Policies And Practices ................................................................................ 78

VI.   Beginning In 2010, Klaassen Served As Principal Investigator On Five NIH Grants. .... 81

VII.  Beginning In Early 2011 Klaassen Becomes A Vocal Critic Of KUMC ........................ 84

VIII. Klaassen Contributes To Lawrence Journal-World Articles That Run From April 2011 Through June 2012 Regarding KUMC's Financial Mismanagement .......................................... 90

IX.   KUMC's Administration Closely Monitored The Lawrence Journal-World Articles, Considered The Articles False And Damaging, And Believed That Klaassen Contributed To The Articles ............................................................................................................................. 92

X.    Klaassen's Removal Of Chair "Was Very Damaging" To The Pharmacology Department And "Destroyed A Tox" Program That Took 30 Years To Build. ............................................... 96

Xi.   After Being Removed As Chair, From April 2011 Through November 2011, Klaassen Continued To Professionally Perform His Job Responsibilities .................................................. 98

Xii.  Atkinson, Terranova, And Carlson Conspire To Destroy Klaassen's Career ................ 103

XIII.   Klaassen's Suspension Was In Violation Of KUMC's Faculty Handbook Policies ...... 108

XIV.   KUMC Strips Klaassen From His Status As Principal Investigator On The Cobre And T32 Grants And Charges Him With Professional Misconduct .................................................... 109

XV.   Atkinson, Terranova, And Stites Transfer Klaassen To Internal Medicine ................... 115

XVI.   Kumc Finds Klaassen Guilty Of Personal Misconduct At A Hearing On May 29, 2012 .... .................................................................................................................................. 120

XVII.   KUMC Tenured Faculty Demean Klaassen And His Students Without Repercussion.... .................................................................................................................................. 121

XVIII.   Klaassen Sends E-Mail Correspondence Asking For A Meeting To Discuss His Concerns ................................................................................................................................. 125

XIX.   Klaassen Accuses KUMC Administration Of Misappropriating NIH Funds At A May 1, 2013 Meeting ......................................................................................................................... 126

XX.   Klaassen Is Charged With Misconduct At Another *Ad Hoc* Committee Hearing .......... 130

XXI.   Klaassen Appeals His Termination And The Wyandotte County District Court Orders A New Hearing Finding KUMC Terminated Klaassen In Violation Of His Constitutional Rights .... .................................................................................................................................. 132

XXII.   Similarly Situated KUMC Professors Who Were Alleged To Have Engaged In Personal Misconduct Were Not Stripped Of Nih Grants, Placed On Administrative Leave, Or Terminated From Their Employment ....................................................................................... 135

**ARGUMENTS AND ANALYSIS** .............................................................................. **139**

**I.   THIS COURT'S SUMMARY JUDGMENT STANDARDS ARE WELL KNOWN. 138**

**II.   NONE OF KLAASSEN'S CLAIMS IN THIS SUIT AGAINST THE INDIVIDUAL DEFENDANTS ARE BARRED BY THE PRINCIPLES OF *RES JUDICATA*. ................ 138**

A.   Klaassen's individual capacity 1983 and state law claims are not barred by *res judicata*. 139

B.   The individual defendants named in this case are not in privity with the Kansas government. .................................................................................................................................. 139

C.   The State courts have not yet rendered final judgments on the merits ............................. 143

D.    The rule against claim splitting does not bar Klaassen's claims ........................................ 145

E.    Issue Preclusion does not bar Klaassen's due process claims ............................................ 146

**III.    KLAASSEN'S FIRST AMENDMENT RETALIATION CLAIMS. ...................... 148**

A.    The Defendants' Legal Framework Is Incorrect ................................................................ 149

B.    Klaassen engaged in protected speech outside of his official duties on three separate occasions. ................................................................................................................................ 151

　　1.    Klaassen engaged in protected speech outside of his official duties when he spoke with the Lawrence Journal-World ................................................................................................. 151

　　2.    Klaassen engaged in protected speech outside of his official duties when his PowerPoint presentations were disseminated to the university at large and to the Lawerence Journa-World. ................................................................................................................................................. 154

　　3.    Klaassen engaged in protected speech outside of his official duties on March 31, 2011.... ................................................................................................................................................. 155

C.    Klaassen's statements regarding the management of KUMC are of a legitimate public concern. ................................................................................................................................ 155

D.    Klaassen's free speech rights were not outweighed by his employer's interest in promoting efficiency or harmony in the workplace. .................................................................................. 159

E.    The fourth and fifth prongs of the *Pickering/Garcetti* analysis are questions of fact that should not be resolved pursuant to Defendants' Motion for Summary Judgment. .................... 161

F.    Defendants Subjected Klaassen to Adverse Job Actions .................................................... 162

G.    The Defendants are not entitled to qualified immunity for retaliating against Klaassen because the prohibition on retaliating against employees for exercising their First Amendment right to free speech is clearly established law .......................................................................... 164

**IV.    KLAASSEN POSSESSES A PROPERTY INTEREST IN THE RIGHT TO CONDUCT RESEARCH BECAUSE KUMC'S POLICIES PREVENT THE UNIVERSITY FROM INTERFERING WITH KLAASSEN'S RESEARCH TENURE RIGHTS. ................................................................................................................. 167**

A.    Defendants Cite No Law Supporting Their Argument ...................................................... 168

B.    Defendants' Reliance on the PI Change Policy Should Be Disregarded .......................... 173

C.    Defendants Concede that Klaassen's Research Program Was Protected By Principles of Academic Freedom and Tenure Because It Was Related to Klaassen's Job Duties as Pharmacology Research Professor ............................................................................................... 174

D.    Klaassen Received No Notice or Opportunity to Be Heard ................................................ 175

E.    Defendants are not entitled to Qualified Immunity on Klaassen's Due Process Claim ..... 176

**CONCLUSION** ...................................................................................................................... **178**

**CERTIFICATE OF SERVICE** .............................................................................................. **178**

## INTRODUCTION

Curtis Klaassen, Ph.D, the seventh most highly cited toxicologist in the world, was promoted to chair the University of Kansas' Medical Center ("KUMC") Department of Pharmacology, Toxicology and Therapeutics ("Pharmacology") in 2002. At that time, his superiors felt strongly that he was "the right person" to revitalize that department. Klaassen was lauded for his hard work, scientific prowess, and numerous accomplishments. At the same time, his superiors recognized that he had a reputation for being passionate and occasionally having acting out "outbursts." He would use loud language, pound on tables in staff meetings, turn red in the face, and sometimes shake. He always talked loudly. Nonetheless, KUMC recognized him for what he was – a loud, boisterous, passionate professor, whose talents could launch their Pharmacology Department into a top twenty-five program in the country. Nothing changed about Curt Klaassen at the time that KUMC promoted him to Chair. His passionate behavior and intolerance for those who did not work as hard as he did. Presumably acknowledging the value that Klaassen brought to the department, no disciplinary action was ever taken against Klaassen on any occasions when other staff members complained about his behavior. He was never counseled, reprimanded, or negatively evaluated based on his acting out or "outbursts."

While Klaassen's behavior did not change after he became the Chair, other things did. First, Klaassen formed the "Committee of Eight" – an unofficial group that voiced concern regarding important issues regarding KUMC's financial stability and lack of shared governance with faculty. Second, Klaassen publicly accused KUMC's Executive Vice-Chancellor Barbara Atkinson of gross financial mismanagement and voiced opposition to the KUMC's expensive Cancer Center. Third, the Lawrence-Journal World began running editorials on Saturdays that contained explicit references to Klaassen and criticized KUMC's Administration for the exact same things Klaassen criticized the Administration. KUMC's Administration knew Klaassen was working with the Lawrence Journal-

World newspaper, referred to the editorials criticizing KUMC's Administration as the "editorials about Klaassen," and were aware of the statements in the editorials to be "coming from Klaassen himself."

After these events, KUMC used Klaassen's long-tolerated behavior as a pretext to demote and then fire him. The exact same conduct that was previously accepted (the use of loud language, pounding on tables, turning red in the face, and shaking) now warranted suspension and, ultimately, termination. KUMC claims that it was solely motivated to terminate Klaassen because of his alleged bad behavior – the same behavior that KUMC had tolerated for years; the same behavior that Klaassen exhibited at the time that KUMC promoted him to chair the Pharmacology Department; the same behavior that had never warranted any disciplinary action. As KUMC acknowledges, "Curt has always been Curt." Because KUMC continuously tolerated this behavior before Klaassen's public complaints of matters of public concern a reasonable factfinder could determine that Klaassen's alleged bad behavior had nothing to do with the adverse employment actions he suffered including his termination. Summary judgment is inappropriate.

## RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS

**The University of Kansas**

1.      Uncontroverted that the University of Kansas is a state educational institution. K.S.A. 76-711(a).

2.      Uncontroverted.

3.      Uncontroverted that KUMC's Handbook states that the primary administrative and academic official for the KUMC campus is the Executive Vice Chancellor. Controverted to the extent Defendants argue that the EVC does not have general administrative and personal authority over KUMC and authority to discipline Klaassen or terminate his employment. [Ex. 1021, Girod Depo. 136:15 -138:7.][1]

4.      Uncontroverted.

5.      Uncontroverted.

6.      Controverted. KUMC's policy and practice show that the KUMC Handbook was contractual. The University of Kansas Human Resources in responsible for implementing "Human Resources" policies that include policies regarding discipline. [Ex. 1017, Deposition of Corporate Representative Snakenburg, 27:19-28:10.] The University of Kansas follows its "Human Resources" policies. [Ex. 1017, Deposition of Corporate Representative Snakenburg, 43:1-2; 56:4-12.] The University of Kansas employee should assume that he or she needs to follow KUMC's "Human Resources" policies. [Ex. 1017, Deposition of Corporate Representative Snakenburg, 42:2-7.] KUMC's Handbook allows for faculty grievances in the event the University is "not complying with its position on academic freedom." [Ex. 1015, Rawitch Depo. 150:13-20.] KUMC's failure to

---

[1] Klaassen's exhibit numbering follows the same format as the Individual Defendants.  See Exhibit 1061, Declaration of Schrag regarding exhibits.

comply with its Handbook policies provides the basis for a faculty grievance due process hearing. [Ex. 1015, Rawitch Depo. 150:3-12.] Further controverted for the reasons explained in SOAF § V.

**Curtis Klaassen**

7.      Uncontroverted.

8.      Uncontroverted.

9.      Objection. Ex. 209 states nothing about serving at the pleasure of Atkinson. Otherwise, uncontroverted.

10.      Uncontroverted that Ex. 108 states what it states. Controverted that Ex. 108 contains the true reasons for Klaassen's termination from his position as Chair. Atkinson explained the reason for Klaassen's termination from Chair, admitting that his public comments motivated her decision:

> Wednesday I met with Curt K and asked him to step down as chair. The issues don't relate to his science or mentoring of faculty. They are related to his lack of leadership relative to the goals of the whole university and some decisions and treatment of faculty in his department. There have also een extremely inappropriate things he jas said to his faculty, the adminisdtration and to the public.

[Ex. 62; *see also* SOAF 109-114.]

11.      Uncontroverted that Ex. 108 states what it states. Controverted that Ex. 108 contains the true reasons for Klaassen's termination from his position as Chair. Atkinson explained the reason for Klaassen's termination from Chair, admitting that his public comments motivated her decision. [SOAF 109-114.]

12.      Uncontroverted.

**Klaassen's Behavior**

13.      Uncontroverted that the KUMC Handbook (KU Ex. 209, p. 90) states what it states. Controverted to the extent KUMC attempts to "cherry pick" the provisions of the KUMC Handbook and rely on some provisions to support the justification to terminate Klaassen to the exclusion of other provisions, *i.e.*, the provisions of the Handbook prohibiting suspension from duties with pay

before receiving an administrative hearing. [Ex. 209, at pp. AR003731-3732, AR003673; Ex. 1015, Rawitch Depo. 158:7-13.]

14.     Controverted and misstates the record. Klaassen was charged with misconduct twice: May 2012 and November 2013. [ECF 196-36 (document charging Klaassen with misconduct that formed the basis for the May 2012 hearing); ECF 196-56 (document charging Klaassen with misconduct that formed the basis for the November 2013 hearing) .] The other hearings identified by Defendants – December 2014 and April 2016 – affirmed the prior findings of the November 2013 hearing. Neither the December 2014 nor the April 2016 made any independent factual findings regarding allegations of misconduct by Klaassen. [See SOAF 373, 381-382.]

15.     Uncontroverted that Klaassen apologized to Jaeschke in January 2012. Controverted that Klaassen's conduct caused the "splintering of the department" for the reasons explained in SOAF Sections X, XI ,XII. Defendants retaliatory conduct caused Pharmacology to splinter. [See SOAF § X, XI, XII.] Defendants fail to identify a single act of Klaassen from April 2011 through January 2012 that caused the Pharmacology to splinter. Uncontroverted that Klaassen's behavior did not change; the only thing that changed was KUMC's response to his behavior. Controverted that Klaassen's behavior caused damage to the Pharmacology for the Reasons explained in SOAF Sections X, XI, XII.

16.     Uncontroverted that Klaassen apologized to Jaeschke in January 2012. Controverted that Klaassen's conduct caused the "splintering of the department" for the reasons explained in Response to SOF 15 and SOAF §§ X,XI,XII.

17.     Uncontroverted.

18.     Uncontroverted.

19.     Controverted to the extent Defendants offer this fact to argue that Klaassen's behavior caused people to be intimidated. Uncontroverted that Klaassen's success caused individuals to be intimidated in his presence. [ECF 326-74, p. 11 (Klaassen Depo. 154:7-14).]

20.     Uncontroverted.

21.     Uncontroverted.

22.     Controverted that name-calling is grounds for discipline at KUMC. Tenured KUMC faculty members (including Jaeschke and Carlson) and employees (including Tully) slurred Klaassen (and his students) with names including "dirty Curty," "ass," "snake," "a malignant cancer," a "menace," a "slug that crawls around," a "lunatic," "Dr. Nobody from Leawood," referred to Klaassen's career as a "form of pollution of the scientific literature," and accused him of blackmail and perjury. [Exs. 116, 119, 135-142.] Not a single professor who mocked Klaassen or called Klaassen or his students any of the above-mentioned names has ever been counseled or disciplined for their reprehensible actions. [Ex. 1021, Girod Depo.: 248:2-249:24; see also SOAF § XVII (identifying the defendant's name calling actions.)].

23.     Controverted. The summary judgment record indicates that Klaassen referred to KUMC as a slumlord institution and not Atkinson personally. [See SOAF 103, 106.]

24.     Uncontroverted that Jaeschke testified that Klaassen said "the bitch must go." Klaassen admitted to stating, "We've got to rid of the bitch" the day after he was terminated as Chair. [Ex. 1051, Jury Trial Transcript Vol. 9 (Klaassen Testimony) 7:21 – 8:21.] Controverted that name calling is grounds for discipline. [See Response to SOF 22.]

25.     Uncontroverted that Jaeschke testified that Klaassen said, "If you fuck me over, I'm going to fuck you over." Controverted that Klaassen actually did. [Ex. 1051, Vol. 9, Jury Trial Transcript 27:3 – 29:15.]

26.     Uncontroverted.

27.     Controverted. Klaassen testified that the University bore responsibility for the harm it

caused its faculty and students. He stated:

> Q. In your mind, Klaassen, do you bear any responsibility whatsoever for what
> happened to you in terms of your position with the University?
>
> A. Yes. What I -- what I really feel bad about is in the end, by standing up for what I
> needed to do as a citizen of the United States, my students that were at a University,
> were hurt much, much more than I was hurt. And so, you know, basically what I've
> learned at the University of Kansas Medical Center, don't do what's right, not only
> you will be screwed, but many, many students and other faculty got hurt out of this.
>
> . . .
>
> Q: "Do you bear any responsibility at all?"
>
> A: In regard to the consequences, I do tremendously, but, you know, I'm just -- I am
> just so perplexed by this whole thing. When I did what was right, I get punished
> tremendously, absolutely. [Ex. 1053, Jury Trial Transcript Vol. X, 63:1-23.]

Controverted further that Klaassen has admitted to engaging in conduct that could be considered

professional misconduct. (Ex. 1010, Klaassen Depo., 353:12-15; 403:8-10.)

 **Barbara Atkinson**

28.     Uncontroverted.

29.     Uncontroverted.

30.     Uncontroverted.

31.     Controverted. Terranova directed Allen Rawitch to prepare an Inquiry Report

regarding the allegations of misconduct concerning Klaassen and provided him with a folder of

witness statements. [Ex.1015, Rawitch Depo. 41:20 – 42:15. ] At this time, Terranova acted at the

direction of Atkinson. [Ex. 1012, Terranova Depo. 84:16-85:25.]

32.     Uncontroverted.

33.     Uncontroverted.

**Gerald Carlson**

    34.    Uncontroverted.

    35.    Uncontroverted.

    36.    Uncontroverted.

    37.    Uncontroverted.

    38.    Uncontroverted.

    39.    Uncontroverted.

**Douglas Girod**

    40.    Uncontroverted.

    41.    Uncontroverted.

    42.    Uncontroverted.

    43.    Objection. Defendants' statement is not a statement of material fact but an identification of one of Plaintiff's allegations.

**Paul Terranova**

    44.    Uncontroverted.

    45.    Uncontroverted.

    46.    Controverted. Terranova and Atkinson either jointly decided to suspend Klaassen from duties on November 1, 2011 or the suspension was done at Atkinson's direction. [Exs. 83, 84; Ex. 1006, Atkinson Depo. 246:4-16; Ex. 1012, Terranova Depo. 231:23 – 232:3.] Regardless of who made the decision, both Terranova and Atkinson were personally involved in the execution of the plan to suspend Klaassen from campus.

    47.    Controverted that Terranova followed "proper procedure" to reassign the PI of the $13 million dollars in NIH Grants that Klaassen oversaw. No employee at KUMC had ever been removed from NIH COBRE or Training Grant unless the employee was unavailable. Terranova also

testified that he removed Klaassen from the grants because: "Klaassen was placed on administrative leave, and because he was on administrative leave he could not work and he could not administer those grants." [Ex. 1001, Nov. 2013 Admin Hearing, 214:23-215:5.] It is inappropriate to remove somebody from an NIH grant because the individual is on administrative leave. [Ex. 1021, Girod Depo. 276:3 – 277:5.] Further controverted that Klaassen was not entitled to an administrative hearing before being removed as PI from the NIH Grants for the reasons explained in Arguments and Analysis § IV.  Controverted that Terranova was the sole decision mater to remove Klaassen as PI from the COBRE and T32 Grants for the reasons explained in Response to SOF 372.

48.    Uncontroverted.

**Bruno Hagenbuch**

49.    Uncontroverted.

50.    Objection. Defendants' exhibit is silent as to whether Hagenbuch acted "at the request of the University." Controverted that Hagenbuch did not act out of personal animus. He received a raise because he took over Klaassen's role as PI of the T32 grant. [Ex. 1034, Salary Information (Under Seal).]

51.    Uncontroverted that Klaassen gave that testimony at his deposition.

**Steven Stites**

52.    Uncontroverted.

53.    Controverted as to the date of Klaassen's transfer into the Internal Medicine department. Klaassen's move to Internal Medicine was finalized on September 12, 2012. [Ex. 183.] Klaassen retained an adjunct appointment in Pharmacology. [Ex. 1030, KU058892-93.]

54.    Uncontroverted.

55.    Uncontroverted.

56.     Controverted. On September 28, 2012, Stites wrote Klaassen stating that he was billing Klaassen's NIH grant research accounts $25,286.26 for "[u]sage of the UPLC/Mass Spectrometer." [Ex. 128.] Stites then later denied under oath that he was responsible for the charges to Klaassen's accounts for his students' use of the Mass Spectrometer. [Ex. 1001, Nov. 2013 Admin Hearing, at 173:18-24.] The weight of the evidence does not support that denial. Ironically, Stites's e-mail arrived less than two-weeks after the students wrote him a letter complaining about their lack of access to the Mass Spectrometer machine and asking him to address the unfair charges. [Ex. 127.] Despite the fact that the Defendants allege that the students were members of the Internal Medicine Department, Stites testified at the November 2013 hearing that he did not investigate their complaints. [Ex. 1001, Nov. 2013 Admin Hearing, 173:9-174:10.]

57.     Uncontroverted that Stites sent Klaassen a letter stating that he was "suspend[e]d from duties" on May 8, 2013 in violation of KUMC's Handbook provisions on May 8, 2013. [ECF 326-1, p. 1.]

58.     Uncontroverted that Stites was promoted by Girod on January 24, 2014 – roughly two weeks after Klaassen's employment was terminated. [ECF 326-75, p. 6 (174:15-175:3).]

**Hartmut Jaeschke**

59.     Uncontroverted.

60.     Uncontroverted that Jaeschke was supportive of Klaassen at the time he was removed as Chair. He testified:

Q. Was it the first part of April 2011 that he was removed as chair by Atkinson?

A. Yes, that's correct.

Q. And did you say in the e-mail to Alex Lynch, "The lesson to be learned here, is that even if you do an excellent job as chair, it is unhealthy to criticize your boss too much." Is that what you said?

A. That's what I said, yes.

[Ex. 1008, Jury Trial Transcript Vol. 7 201:3-201:21.] Jaeschke also wrote Atkinson objecting to

his removal as Chair. Jaeschke stated:

Last week, Dr. Curtis Klaassen, Distinguished University Professor, was relieved of his
duties as chair of the Department of Pharmacology, Toxicology and Therapeutics. We,
the tenured faculty of this department, are seriously concerned about the impact of this
decision. Most of us came to KUMC because of Dr. Klaassen's reputation as an
internationally renowned toxicologist and the confidence in his leadership qualities to
build a world-class department and liver research enterprise. As can be seen by numerous
measures, this goal was achieved. However, at a time when several multi-million dollar
grants with Dr. Klaassen as principal investigator (COBRE renewal, Toxicology Training
grant renewal) are awaiting funding decisions by NIH and many universities are eager to
hire funded faculty, his removal as chair bears the risk of severe short-term and especially
long-term negative consequences. The decline of the most successful basic science
department at KUMC would also negatively impact the Medical Center and KU, and
certainly is opposite to your own goals as chancellor to "raise the scholarly stature of
KU". Therefore, we respectfully request that you consider appointing a person or a
committee from outside of KUMC to independently assess the severe damage both
financially and in reputation as a research university the dismissal of Dr. Klaassen as
chair of this department may cause. It would be in the interest and to the benefit of the
university to find an amicable solution.

[Ex. 419, Ex. 1002, Jury Trial Vol. 8 (Jaeschke Testimony) 142:8-16.]

     61.    Objection. KUMC's exhibit is silent as to whether Jaeschke acted "at the request of

the University." Controverted that Jaeschke did not act out of personal animus. He received a raise

because he took over Klaassen's role as PI of the COBRE grant. [Ex. 1034, Salary Information

(Under Seal).]

     62.    Uncontroverted.

     63.    Controverted. Jaeschke admitted to be involved in a conspiracy to give Klaassen a

"legal send off." [See SOAF 313.]

**Position of Department Chair**

     64.    Uncontroverted but irrelevant because at-will employees enjoy the same protections

as tenured professions with regards to First Amendment retaliations complaints.

65.    Uncontroverted but irrelevant because at-will employees enjoy the same protections as tenured professions with regards to First Amendment retaliations complaints.

66.    Uncontroverted but irrelevant because at-will employees enjoy the same protections as tenured professions with regards to First Amendment retaliations complaints.

67.    Uncontroverted.

68.    Objection. Defendants' record citations do not conform with its statement of facts. Klaassen's testimony is limited to a single meeting in 2005 regarding a PowerPoint presentation that he gave on. [ECF 326-74 (Klaassen Depo. 171:12 – 172:11).] Uncontroverted that this meeting occurred for the reasons Klaassen identified.

69.    Uncontroverted but irrelevant. Klaassen testified that the percentage of grant funding as a salary consideration was not a driving issue regarding his concerns with KUMC's administration and the Committee of Eight. [ECF 326-74 (Klaassen Depo. 453:8-14).]

70.    Uncontroverted but irrelevant. Klaassen testified that the percentage of grant funding as a salary consideration was not a driving issue regarding his concerns with KUMC's administration and the Committee of Eight. [ECF 326-74 (Klaassen Depo. 453:8-14).]

**Behavior Before Removal of Chair**

71.    Uncontroverted that Klaassen advised his faculty members that he was considering "going to the Newspapers" regarding Atkinson's mismanagement of KUMC. [Ex. 1011, Levant Depo. 68:22-69:16).] Uncontroverted that Levant reported multiple concerns about Klaassen's actions in faculty meetings to Atkinson. [Ex.1011, Levant Depo. 7:20-25; 8:18-21; 7:4-8:4, 39:21-40:16.]

72.    Controverted. Klaassen testified about the event at the May 2012 *ad hoc* hearing:

So now you specifically asked, and so this is kind of the background. So we go out to dinner this one evening with Ann Bonham. Well, the story isn't quite like Terranova says. So who was this lady? This lady got her Ph.D. from the same department that I

did, from the University of Iowa. And while she was a female and I'm a male, we kind of talked like you would with your old buddies that you meet at a scientific meeting.

Now, Terranova makes you believe that we were kind of sitting around this table and I was just so outlandish. If I was, and he said it went on for two and a half hours, why didn't he say something? Because it didn't happen. . . . We were kind of at two different bar tables. He didn't have the slightest idea what was said. And he didn't say anything today either, did he?

[Ex. 1007, May 2012 Hearing 225:6-226:1.]

73.     Uncontroverted Terranova testified to this fact. Controverted it actually occurred for the reasons stated in response to SOF ¶ 72.

74.     Uncontroverted that Terranova testified that Klaassen's public criticisms of KUMC's Administration were professional misconduct before the May 2012 hearing. In particular, Terranova testified that Klaassen's conduct was improper because all University employees are expected to work together and Klaassen's criticism was contrary to that expectation and therefore misconduct. [Ex. 1007, May 2012 Hearing 47:20-48:12; *see also* SOAF 103, 300.]

75.     Uncontroverted.

76.     Uncontroverted but irrelevant. Klaassen's use of the vendor forum to denounce the University's handling of financial resources was not related to his job duties. First, Klaassen had no input on whether the University should adopt the software program that was the subject of the vendor's program. [Ex. 1012, Terranova Depo. 145:21-146:1.] Second, Klaassen considered the meeting to be a "very outside" meeting. [Ex. 1010, Klaassen Depo. 127:25 – 128:6.] Third, Klaassen's reference to KUMC's administration's financial mismanagement, e.g., stating that the "administration was acting as if it were a slumlord," were not related to Klaassen's official job duties because Klaassen was not responsible for the financial management of KUMC. [Ex.1007, May 29, 2012 Hearing 50:5-8; Ex. 1010, Klaassen Depo. 130:20 – 132:13.]

77.      Uncontroverted that on March 31, 2011, Klaassen attended a large vendor meeting that Klaassen considered to be "very outside" that involved several members of the public and accused Atkinson of mismanagement of KUMC. Klaassen used the metaphor "slumlord economics" to describe Atkinson's financial management of KUMC and her push towards NCI accreditation of the Cancer Center. [Ex. 1007, May 2012 Hearing 50:5 – 51:6; Ex. 1022, Carlson Depo. 50:2-16; 51:14-23; ECF 326-17.] Meeting attendees stated he referred to KUMC as a "slumlord institution." [SOAF 103, 106.]

78.      Uncontroverted that Klaassen testified as follows regarding the March 31, 2011 meeting:

> Q. Is acting out another name for going in front of the stakeholder meeting and calling the dean of the University a slum landlord?

> A. Until someone would come in and look at the finances, and also -- so what the purpose of this was, was to spread this information. Because at this meeting were the Chairs of all the departments, 25 or 30 departments as well as center directors. The purpose of this was to make sure that a number of big shots at the University had an inkling how bad things were.

> Q. A number of these big shots actually submitted statements to the University indicating how inappropriate that behavior was, is that correct?

> A. Yes, they wanted to retain their jobs, and they were asked to write those letters.

[ECF No. 326-74, p. 20 (Klaassen Testimony 210:17-211:18).]

79.      Uncontroverted.

80.      Uncontroverted but irrelevant. The First Amendment prohibits government regulation of speech, it is not concerned who or what is listening. See Arguments and Analysis § III.

81.      Controverted that Klaassen's comments at the March 31, 2011, were limited to concerns regarding funding the basic science department or the financial management of KUMC. [See Response to Def's SOF ¶¶ 76-77; SOAF 102-106, 134 (slumlord economics phrase related to Cancer Center and KUMC's financial mismanagement.] Uncontroverted that KUMC's

administration, including Terranova, considered the public comments on the financial mismanagement of KUMC to be professional misconduct. [Ex. 1020, Jury Trial Transcript Vol. 2 (86:11-87:1); see also SOAF 103, 300.]

      82.    Uncontroverted.

      83.    Uncontroverted.

      84.    Uncontroverted.

      85.    Uncontroverted.

**Removal of Klaassen as Chair**

      86.    Uncontroverted.

      87.    Uncontroverted.

      88.    Uncontroverted.

      89.    Uncontroverted.

      90.    Uncontroverted.

      91.    Controverted. The day after Klaassen was terminated as Chair, he gave his final presentation as Chair to the Pharmacology Department and asked the department for advice on what his role should be in the department moving forward. [Ex. 1010, Klaassen Depo. 464: 15-25; Ex. 186, at Bates No. KU12264.] Klaassen then had a similar conversation with Carlson about his role as interim Department Chair. [Ex. 1010, Klaassen Depo. 465:22 – 466:7.] Klaassen denies that he ever demanded that Carlson serve as a "titular head." Klaassen stated:

> Q. And you told him on the first day that it would work fine as long as he was only the titular head, correct?
>
> A. That is not true. . . ..

[Ex. 1010, Klaassen Depo. 474:3-7.]

92.     Objection. Defendants' SOF ¶ 92 relies upon evidence from the unnamed and unidentified "majority of faculty" and is therefore inadmissible hearsay evidence, and therefore, may not be considered at summary judgment. See D. Kan. R. 56.1(d); see also *Bell v. City of Topeka, Kansas*, 496 F. Supp. 2d 1182, 1184-85 (D. Kan. 2007); *see also Foster v. AlliedSignal Inc.*, 98 F. Supp. 2d 1261, 1265, (D. Kan. 2000) *rev'd on other grounds*, 293 F.3d 1187 (10th Cir. 2002) (striking affidavit and documents referenced therein from the summary judgment record because such document were unauthenticated and constituted inadmissible hearsay testimony).

**Behavior after Removal of Chair**

93.     Controverted for the reasons stated in Response to SOF 91.

94.     Uncontroverted that Exhibit 186 speaks for itself.

95.     Uncontroverted.

96.     Uncontroverted that Exhibit 186 speaks for itself.

97.     Controverted. Klaassen testified regarding Exhibit 187 Bates No. KU12252:

Q. And, that was a true statement, you were speaking as a university distinguished professor on behalf of the basic science department?

A. Well, as a -- as -- even more than that. For the future -- not only for that. For the future of the medical school and for the taxpayers of the state of Kansas.

[Ex. 1010, Klaassen Depo. 461:12-18.]

98.     Controverted. Exhibit 186 speaks for itself and the "slides that follow" include slides regarding financial decisions regarding campus buildings (KU012255), Cancer Center physician salaries (KU012255), $350 million spent on a Cancer Center (KU012258), concerns about the NCI $1 million dollar grant regarding NCI recognition of the Cancer Center (KU012258). [Ex. 186.]

99.     Objection. Defendants' statement of facts is not supported by the testimony. Stites testified to the following regarding Exhibit 186:

Q. So does that look like Klaassen is arguing for more money for Klaassen?

A. It could certainly be interpreted that way.

[ECF 326-75, Jury Trial Transcript Vol. 5 (Stites Testimony 191:3-5).] Klaassen testified that he was speaking up for the benefit of Kansas taxpayers. [Ex. 1010, Klaassen Depo. 461:12-18.].

100.    Uncontroverted.

101.    Uncontroverted.

102.    Uncontroverted.

103.    Uncontroverted that KUMC has only charged Klaassen with misconduct for name calling. [ECF 326-36, Inquiry Report, p. 6.] KUMC does not discipline other similarly-situated professors for name calling. Tenured KUMC faculty members and Chairs of the Pharmacology Department (including Jaeschke and Carlson) and employees (including Tully) slurred Klaassen (and his students) with names including "dirty Curty," "ass," "snake," "a malignant cancer," a "menace," a "slug that crawls around," a "lunatic," "Dr. Nobody from Leawood," referred to Klaassen's career as a "form of pollution of the scientific literature," and accused him of blackmail and perjury. [Exs. 116, 119, 135-142.] Not a single professor who mocked Klaassen or called Klaassen or his students any of the above-mentioned names has ever been counseled or disciplined for their actions even after the administration was made aware of the actions. [Ex. 1021, Girod Depo.: 248:2-249:24; see also SOAF § XVII (identifying the defendant's name calling actions.)].

104.    Uncontroverted but incomplete. Klaassen testified that he neither wrote nor circulated an "e-mail and a flyer containing false information" but instead provided information to a student who circulated it. [Ex. 1010, Klaassen Depo. 486:6-12; 483:12-17.]

105.    Uncontroverted but incomplete. Unless Defendants' proffer this fact to show Klaassen's behavior regarding the "Students for Democracy" flyer was part of the "totality of the circumstances" identified by Girod as the basis for his termination, Defendants' SOF 105 is

irrelevant because Defendants did not charge Klaassen with professional misconduct regarding the "Students for Democracy" flyers at any administrative hearing. [ECF 326-36]

106.     Uncontroverted but irrelevant. Defendants' SOF 106 is irrelevant for the reasons explained in response to Defendants' SOF 105.

107.     Uncontroverted but irrelevant. Defendants' SOF 107 is irrelevant for the reasons explained in response to Defendants' SOF 105.

108.     Uncontroverted but irrelevant. Defendants' SOF 108 is irrelevant for the reasons explained in response to Defendants' SOF 105.

109.     Uncontroverted but irrelevant. Defendants' SOF 109 is irrelevant for the reasons explained in response to Defendants' SOF 105.

110.     Uncontroverted but irrelevant. Defendants' SOF 110 is irrelevant for the reasons explained in response to Defendants' SOF 105.

111.     Uncontroverted.

112.     Uncontroverted but immaterial. Defendants make no argument that Klaassen's removal as Chair was not an adverse employment action. Defendants also do not argue that the First Amendment protections do not apply to at-will employees in the same respect it applies to tenured professors. [See ECF 326 Argument and Analysis § III.D.]

113.     Uncontroverted.

114.     Uncontroverted.

115.     Uncontroverted that Terranova testified that he received complaints of an unidentified nature from unidentified individuals during an unidentified time period. [Ex. 1020, Nov. 30, 2016 Jury Trial Transcript Vol. 2 (Terranova testimony, 94:24-95:13).) Controverted that Klaassen's behavior interfered with the operation of the Pharmacology Department or KUMC. [See SOAF §§ X

– XII (explaining that Defendants retaliatory conduct splintered the Pharmacology Department and undermined Klaassen's ability to serve as PI on his NIH Grants).]

116.    Uncontroverted.

117.    Uncontroverted.

118.    Controverted for the reasons stated in SOAF 224.

119.     Uncontroverted.

120.    Uncontroverted.

121.    Uncontroverted.

122.    Uncontroverted but incomplete. Klaassen was also greatly concerned about "being stonewalled" by Carlson, Tully, and Meagher because Meagher, Tully, and Carlson "wouldn't do anything necessary for these grants" which could cause Klaassen to get into trouble with the NIH as the PI of the COBRE and T32 grants. Klaassen called to meeting to express his concerns that because he was being stonewalled the COBRE and T32 grants were being misappropriated. [See SOAF 226-230.] Controverted that Klaassen engaged in unprofessional conduct at the October 28, 2011, COBRE meeting or any other faculty meeting. [Ex. 1004, Jury Trial Transcript Vol. 3 (Guo Testimony 19:12-20:4.); Ex. 1007, May 2012 Hearing 290:17 - 291:9.] The only yelling and screaming at the October 28, 2011, COBRE meeting was done by Greg Reed. [Ex. 1007, May 2012 Hearing 236:2-7.]

123.    Uncontroverted but incomplete for the reasons explained in Response to SOF 122 and in SOAF 226-230.

124.    Uncontroverted but incomplete for the reasons explained in Response to SOF 122 and in SOAF 226-230.

125.     Objection that KUMC professors were "disgusted" with the meeting. Uncontroverted that the meeting ended early.

126.     Objection. Carlson never testified that Klaassen personally threatened him on October 28, 2011, and Defendants' record citation contains no statement regarding any threats made by Klaassen towards Carlson. [Ex. 1018, Jaeschke Depo. 56:18-58:11.]

127.     Controverted. Uncontroverted that Jaeschke testified that Klaassen said, "If you fuck me over, I'm going to fuck you over." Controverted that Klaassen actually did. [Ex. 1051, Jury Trial Transcript Vol. 9 27:3 – 29:15.]

128.     Uncontroverted.

129.     Uncontroverted.

130.     Objection. Defendants' record citation contains no support for the statement that "Klaassen repeatedly became uncontrollably angry." Defendants' record citation identifies a single instance of an unknown date and time in which Klaassen in Carlson's opinion lost control because "his knuckles were black" and his "neck was red." Carlson does not identify any unprofessional comments Klaassen made at this time. [ECF 1004, Jury Trial Transcript Vol. 3 (Carlson testimony, 189:19-190:8.)].

131.     Uncontroverted that Carlson and Jaeschke spoke with Terranova. Controverted that Klaassen engaged in unprofessional conduct at the October 28, 2011, COBRE meeting or any other faculty meeting. [Ex. 1004, Jury Trial Transcript Vol. 3 (Guo Testimony 19:12-20:4.); Ex. 1007, May 2012 Hearing 290:17 - 291:9.] The only yelling and screaming at the October 28, 2011, COBRE meeting was done by Greg Reed. [Ex. 1007, May 2012 Hearing 236:2-7.]

132.    Uncontroverted that Terranova received complaints. Controverted that Klaassen engaged in unprofessional conduct at the October 28, 2011 COBRE meeting for the reasons stated in response to Defendants' SOF ¶ 122 and 131.

133.    Uncontroverted that was how Terranova perceived the slide show. Controverted that it was unprofessional or false. Klaassen testified:

> Q. Now, in that context, please explain to the jury what you meant when you indicated to this group, that you thought Carlson was a Ford dealer trying to run a Mercedes dealership?
>
> A. Well, I don't know if I can say this nicely, but Carlson and I were appointed chairman within 30 days of each other. And he was the chair of biochemistry, and I was the chair of pharmacology as you've heard. And both departments were not doing well, especially in research, and that's why I became new chair. And so when I became the chair, I told you that we got this Cobre Grant, and the department went from maybe three R01's to maybe 20 R01's. Well, whereas in biochemistry, when he came in, there maybe was -- I don't know the exact number here – but it didn't do well. It maybe went from three R01's to five R01's, or maybe stayed three R01's. It didn't improve, and they didn't have all of these nice accessories, let's say, like the Cobre Grant. . . . .

[Ex. 1051, Jury Trial Transcript, Vol. 9 17:4-25.] Further uncontroverted that KUMC has only charged Klaassen with misconduct for name calling. [ECF 326-36, Inquiry Report, p. 6.] KUMC does not discipline other similarly-situated professors for name calling. Tenured KUMC faculty members and Chairs of the Pharmacology Department (including Jaeschke and Carlson) and employees (including Tully) slurred Klaassen (and his students) with names including "dirty Curty," "ass," "snake," "a malignant cancer," a "menace," a "slug that crawls around," a "lunatic," "Dr. Nobody from Leawood," referred to Klaassen's career as a "form of pollution of the scientific literature," and accused him of blackmail and perjury. [Exs. 116, 119, 135-142.] Not a single professor who mocked Klaassen or called Klaassen or his students any of the above-mentioned names has ever been counseled or disciplined for their actions even after the administration was

made aware of the actions. [Ex. 1021,Girod Depo.: 248:2-249:24; see also SOAF § XVII (identifying the defendant's name calling actions.)].

134.    Uncontroverted but irrelevant because KUMC did not allege that Klaassen was insubordinate at the May 2012 Hearing. [ECF 326-79 (generally); ECF 326-36.] Terranova's opinions regarding insubordination three years after Klaassen's employment was terminated is immaterial.

135.    Uncontroverted that Terranova believed Klaassen's behavior was "seriously inflammatory." Controverted that Klaassen's behavior was "seriously inflammatory" for the reasons stated in Response to SOF 122, 131, and 133.

136.    Uncontroverted that Atkinson testified that unknown and unidentified individuals were "frightened" of Klaassen. Controverted that Klaassen's behavior caused people to be fearful for the reasons stated in stated in Response to SOF 133 and Response to SOF 122.

**First Administrative Leave**

137.    Uncontroverted that Terranova (along with Atkinson) suspended Klaassen from campus on November 1, 2011. That suspension did not comply with KUMC policy. [See SOAF 237-244.] Controverted to the extent that KUMC mischaracterizes the suspension, which is a disciplinary action, as administrative leave. [See SOAF ¶¶ 237-244.] Controverted that the reason for the suspension was Klaassen's "belligerent and frightening behavior." Meagher told Rawitch that KUMC placed Klaassen on suspension because of the "results of [her] report" regarding Klaassen's financial handling of NIH grants and because he had criticized faculty the week before. [Ex. 1059, Transcript of Rawitch Interview.]

> **Rawitch**: The circumstances regarding under which he was put under, on administrative leave - how did you learn about that?

> **Meagher**: Oh well, I'm in the office that put him on leave. Ha – ha.
> So, ah, basically, ah, Terranova kept me informed. Um. So, you know
> what is going on with the training grant and the COBRE right?
>
> **Rawitch**: Yes, I do.
>
> **Meagher**: Okay, okay, so, I was asked to provide a report on, ah, the
> things I knew about the Training Grant and the COBRE and uh, and I
> believe as a result of those reports and the – and the – hearsay of the
> accusations that he made to some faculty, um you know, the week
> before he was put on leave. Um, basically, I knew about it.

[Ex. 1059, Transcript of Rawitch Interview; Ex. 1009, Meagher Depo. 53:1-4.] (indicating that the cited response was "truthful").

In addition, days before suspending Klaassen, Terranova stated that he "had a plan" to remove Klaassen as PI from the COBRE and T32 grant. [ECF 326-142.] During Klaassen's suspension, Terranova put his plan into action and asked the NIH to transfer the grants to other KUMC faculty. [SOAF § XII (explaining plan to remove Klaassen from NIH grants).] After being suspended, Klaassen wrote Terranova and stated, "I don't have the slightest idea of why the administration thinks that I should not be on campus mentoring my students and junior faculty. What is the real issue? Please explain to me." [Ex. 1060.] Terranova never responded.

138.    Uncontroverted that Terranova suspended Klaassen from duties. Controverted for reasons stated in Response to SOF ¶ 137 that the letter's reasons are true and correct.

139.    Uncontroverted that Terranova suspended Klaassen from duties. Controverted for reasons stated in Response to SOF ¶ 137 that the letter's reasons are true and correct.

140.    Uncontroverted that Terranova suspended Klaassen from duties. Controverted for reasons stated in Response to SOF ¶ 137 that the letter's reasons are true and correct.

141.    Uncontroverted.

142.    Controverted. Terranova, Atkinson, and Carlson had schemed to remove Klaassen as PI from the COBRE grants well before the October 28, 2011 COBRE meeting which is the event

that Terranova alleges caused him to lose faith in Klaassen's ability to manage the grant. Beginning in August 2011, Terranova, Atkinson, and Carlson engaged in discussions to remove Klaassen as PI from the COBRE and T32 grants, remove him from the department, and transfer him out of the building. [See SOAF § XII.] In addition, days before suspending Klaassen, Terranova stated that he "had a plan" to remove Klaassen as PI from the COBRE and T32 grant. [ECF 326-142.] During Klaassen's suspension, Terranova put his plan into action and asked the NIH to transfer the grants to other KUMC faculty. [See SOAF § XII.]

143.    Uncontroverted.

**Behavior on Return From Leave**

144.    Uncontroverted. Uncontroverted that Exhibit 86 identifies the reasons for Klaassen's administrative leave including calling Atkinson a slumlord and using the slumlord comment at the October 28, 2011 COBRE meeting. [Ex. 1013, Jury Trial Transcript Vol. 1 208:15 – 209:9; 210:7-12.]

145.    Controverted that Klaassen did not treat "others with respect and dignity" for the reasons explained in Response to SOF 122 and 131. Professor Grace Guo, Ph.D ("Guo") testified regarding Klaassen's conduct:

Q. Would you describe Klaassen as any of those words, abusive, threatening, inflammatory or belligerent?

A. I don't. The reason is, first, he is really a caring person. He considers like our success, junior faculty success to his own success. He really tried his best to help you. For example, so when they were obtaining NIH funding, he would try to advise those outside advisors to come to our department to talk to us, and show us how the funding process goes, and then to showcase our junior faculties research to the other faculties outside of Kansas, so they could know our research. So for many of those aspects that has not really been connected to his research, but would benefit our professional growth. And he's passionate, he would encourage you to do your best, but to achieve your best, not only just to get tenure promoted, to achieve your best as a scientist, and not to waste the taxpayers tax money. So to myself, I don't consider that's either abusive. I would consider that as an encouragement.

[Ex. 1004, Jury Trial Transcript Vol. 3 (Guo Testimony) 21:11 – 22:7.]

146.    Uncontroverted that Klaassen had been using images of firearms in PowerPoint presentations dating back to 2005. [SOAF § III.] Further uncontroverted that Atkinson knew about the images at the time she promoted him to Chair. [SOAF ¶¶ 29-30.]

147.    Controverted. KUMC has represented the date change on the COBRE grant as either December 16, 2011 or April 20, 2012. [Ex. 1055, Defendants State Court Motion for Summary Judgment SOF 33.] Uncontroverted that Klaassen was not aware of the change in application for either grant. [Ex. 1012, Terranova Depo. 237:1 – 238:17.]

148.    Uncontroverted.

149.    Uncontroverted.

150.    Uncontroverted.

151.    Uncontroverted.

152.    Uncontroverted.

153.    Uncontroverted that Klaassen was moved to the basement of Hixson Building. Further uncontroverted that the laboratory was inadequate space. [SOAF 274-275, 330.]

154.    Uncontroverted but incomplete. KUMC's lawyers prepared the correspondence for Jaeschke to send to Klaassen. Klaassen approached Jaeschke because he felt betrayed because Jaeschke did not advise him that he was part of taking "$13,00,000 from me without telling me when you were planning this two months – two months ago, three months ago, when I thought you were my best buddy?" [Ex. 1051, Jury Trial Transcript Vol. 9 (Klaassen Testimony 217:6-13.)].

155.    Uncontroverted.

156.     Uncontroverted as to Jaeschke's belief. Controverted to the extent KUMC uses this SOF to argue that Klaassen's behavior cause the relationship between himself and the Pharmacology Department to deteriorate. [SOAF 165-171, 172-208.]

157.     Uncontroverted as to the occurrence of the meeting between Klaassen and Atkinson. Controverted to the extent KUMC uses this SOF to argue that Klaassen's behavior cause the relationship between himself and the Pharmacology Department to deteriorate. [SOAF 165-171, 172-208; see also SOAF §§ X-XII..] Controverted to the extent Atkinson argues she was the sole decision-maker to move Klaassen to Internal Medicine. Terranova testified it was a joint decision stating "we moved him." [SOAF 272.] All paperwork effectuating the transfer was signed by Stites. [SOAF 273.]

158.     Uncontroverted as to the content of the January 10, 2012 correspondence. Controverted to the extent KUMC uses this SOF to argue that Klaassen's behavior caused the relationship between himself and the Pharmacology Department to deteriorate. [SOAF 165-171, 172-208; see also SOAF §§ X-XII.]

159.     Uncontroverted. Klaassen further explained at trial:

> But it's difficult for me to go to another University, because we built this nice house, and because my children and grandchildren live in Kansas City and Wichita. So my wife won't move, and I don't blame her. But if you have these students, what comes first, you or your students? It's like you and your children. These students to me, in fact, we call -- everybody calls us "The Klaassen Academic Family." I had to stay there. I wanted to stay there. I wanted to help them.

[Ex. 1051, Jury Trial Transcript Vol. 9 (Klaassen Testimony) 216:20 - 217:5.]

160.     Uncontroverted but incomplete. Klaassen explained further that the administration's interference with the operation of the COBRE and T32 Grant caused the splintering. He stated:

My main personal goal for the Department after I was fired as Chair was to maintain the Tox Training Grant and the Cobre Grant. While we were able to retain both of these major grants as they were refunded last summer, my greatest frustration in my entire life, was my inability to accomplish anything positive for the Cobre after being fired as chair.. Being PI of the Cobre, to me, was a huge responsibility to the Department, KUMC, and the taxpayers of the USA. In fact, the day before I was placed on administrative leave, I called a few full professors into my office because I had failed with the Cobre grant, and asked them to take over administering the Cobre. The day I came back from administrative leave, I called a meeting of a few Full Professors for 3:00 to find out what progress had been made on the Cobre grant the last 6.5 weeks. I think at 2:55 I was informed that the Cobre and TG had been reassigned to others. I should have been thrilled for taking that huge responsibility off my shoulders, and am thrilled now, but at the heat of the moment I told Hartmut and Bruno, with all honesty and without thinking, what I thought of that action. I apologize to both of you for that action, as well as to everyone in the Department. While my 13 graduate students, post-doctoral fellows, research faculty, and visiting scientists are not at this meeting, I also want to apologize to them as they have suffered tremendously as collateral injury, that is none of their fault, but my fault. In an attempt to learn how to better interact with people, in addition to apologizing to all the faculty, I also will be attending a course and am making an appointment with a psychiatrist.

[ECF 326-55; see also SOAF § X – XII (explaining that Defendants damaged Pharmacology and hurt the department).]

161.    Uncontroverted.

162.    Controverted. Steven Stites, Chair of Internal Medicine, supported the move because he wanted to give Klaassen a "face saving way to transition to retirement while increasing Internal Medicine's grant dollar numbers." [Ex. 184.] Stites received Klaassen into the Department of Medicine by offering Klaassen a "soft landing until [he] retired." [Ex. 1010, Klaassen Depo.101:4-15.] Controverted

163.    Controverted that was the real reason Stites accepted Klaassen into the department for the reasons stated in Plaintiff's Response to Defendants' SOF ¶ 162.

164.    Atkinson's January 20, 2012, letter speaks for itself. Controverted to the extent KUMC uses this SOF to argue that Klaassen's behavior interfered with the operation of the Pharmacology Department. [SOAF ¶¶ 165-171, 172-208; see also SOAF §§ X-XII.]

165.    Uncontroverted.

166.    Uncontroverted.

167.    Uncontroverted.

168.    Uncontroverted.

169.    Uncontroverted.

170.    Uncontroverted but incomplete. See SOAF § XVII for a further explanation of Tully's reprehensible behavior.

**First Inquiry Report**

171.    Uncontroverted.

172.    Uncontroverted.

173.    Uncontroverted.

174.    Uncontroverted.

175.    Uncontroverted.

176.    Uncontroverted.

177.    Uncontroverted.

178.    Uncontroverted.

179.    Uncontroverted but incomplete. Suspension with pay is punitive sanction subject to appeal. [ECF 326-38, p. 33.]

180.    Uncontroverted but incomplete. All "punitive sanctions" – suspension with pay, suspension without pay, and dismissal – may be appealed. [ECF 326-38, p. 33.]

181.    Uncontroverted.

182.    Uncontroverted.

183.    Uncontroverted.

184.    Uncontroverted.

185.    Uncontroverted.

**First *Ad Hoc* Hearing**

186.    Uncontroverted.

187.     Uncontroverted.

188.     Uncontroverted

189.     Objection. Defendants' SOF ¶ 189 relies on inadmissible evidence, and therefore, may not be considered at summary judgment. See D. Kan. R. 56.1(d). In particular, SOF ¶ 189 relies on the interpretative testimony of Klaassen's counsel John Wilcox. However, Defendants' did not disclose Attorney Wilcox as witness. [Ex. 1052, Supplemental Disclosure of Defendants.] As such, this Court may not consider Wilcox's statements that purport to provide testimony regarding Klaassen's behavior. Wilcox also was not under oath at the hearing, the statement is hearsay, and statements of counsel are not evidence.

190.     Objection. Defendants' SOF ¶ 189 is also improper for the reasons stated in Response to SOF ¶ 189.

191.     Uncontroverted.

192.     Uncontroverted.

193.     Uncontroverted but incomplete. The committee warned the University that placing Klaassen on an extended period of leave could jeopardize his research, his relationship with the NIH, and the productivity of his students. [ECF 326-10.]

194.     Controverted. The record is unclear whether Stites made the decision to adopt the recommendation of the Committee or did so at the direction of University of Kansas General Counsel Sara Trower. Trower advised Stites on how to rule and prepared the letter censuring and disciplining Klaassen. [Ex. 37, at PRIV1778-1790, 1805, 1806-1811, 1812-1817, 1824-1832, 1851-1864]. Klaassen prepared a written apology and Stites used Ms. Trower's letter to publically censured Klaassen, describing Klaassen's conduct (*i.e.*, complaints of the administration's

misappropriation of money, organization, and structure) as unprofessional and unacceptable. [ECF 326-86.]

195.    Uncontroverted.

196.    Uncontroverted.

197.    Uncontroverted.

198.    Uncontroverted.

199.    Uncontroverted.

**Behavior After the First *Ad Hoc* Hearing**

200.    Uncontroverted.

201.    Objection and controverted. Dawn was assigned to assist Klaassen not because Klaassen had engaged in "disruptive, accusatory, and antagonistic communications," but rather to help "make sure that [Klaassen's] concerns are addressed." [Ex. 1001, Nov. 2013 Hearing Transcript, Dawn testimony, 109:3–110:4.].

202.    Uncontroverted that Dawn instructed Klaassen not to object to mistreatment of his students by members of the Pharmacology department. [ECF 326-89.] Controverted that Dawn's May 26, 2012 e-mail correspondence, "reaffirmed the direction that Klaassen was not communicate directly with Pharmacology." The e-mail "reaffirms" no prior directive but instead directs Klaassen to send future e-mails to Dawn's attention. Defendants identify no document indicating Klaassen did not comply with Dawn's May 26, 2012, directive. [Defendants' SOF ¶¶ 203-211.]

203.    Uncontroverted that Klaassen's research accounts would result in a future deficit. Controverted that Klaassen was responsible for the deficient. Rather, Klaassen believed that the deficit was caused by the misappropriation of approximately NIH grants in which Klaassen either presently or previously served as a PI and removal of Klaassen from the COBRE and T32 grants.

[SOAF 293-297; 335-346.] On December 20, 2012, Klaassen recounted his explanation as to the reasons for the deficit. [Ex. 357.] Those reasons include:

- "KUMC administration has gone back on their promises to my students and we have to pay for equipment usage in the Pharmacology department . . .";

- "EVC took 12.5 million dollar from me. Thus I had to decrease my operation overnight from 2.5 to .5 million dollars per year.

- "Dean of Research spend $180 thousand dollars from my NIH grants."

- "The Pharmacology department misallocated by funds and used funds from my research accounts to pay for secretaries, centrifuges, rotors, cookies, cakes, dinners, computers, printers, etc."

[Ex. 357; Ex. 1051, Jury Trial Transcript Vol. 9 (Klaassen Testimony): 73:3-77:20 (discussing use of Mass Spectrometer and unaccounted costs); 78:2-80:4 (discussing Ex. 357).]

204.   Uncontroverted.

205.   Uncontroverted that a meeting occurred on December 19, 2012.

206.   Controverted. Klaassen sent an e-mail correspondence after the December 19, 2012, meeting identifying what he had done and will do to reduce his research deficient. His e-mail stated:

5. I also informed Christina and Buddha what I have done to try to decrease my expenses since I have been transferred to the IM department.

A. Decreased my staff as much as I can and still be ethical: Dr Youcai Zhang, Dr Connie Wu, Dr Judy Guo, Dr Jennifer Zhong, and Dr Tameo Fukishima.
B. Decreased the number of mice in animal care by about 2/3.
C. Decreased supplies by about 2/3.
6. To try to increase my grant funding, we have also tried to increase our budget by writing more grants.
A. NIH-RO1  The Mechanism of How TCDD decreases body weight and whether the mechanism might be useful for treating the obesity epidemic.
B. NIH-RO1  Prevention and treatment of liver disease via the Nrf2 receptor.
C. NIH-RO1  Mechanism of microbiota affecting drug metabolism.
D. NIH-RO1  Role of the PPARa receptor alteration by intestinal microbiota on decreasing fatty liver and obesity
E. In addition we have written about 4 smaller grants and fellowship applications
F. We "plan" to write 2 additional NIH grants before Feb 5.
7. I also informed Christina and Buddha that

[Ex. 357; Ex. 1051, Jury Trial Transcript Vol. 9 (Klaassen Testimony): 73:3-77:20 (discussing use of Mass Spectrometer and unaccounted costs); 78:2-80:4 (discussing Ex. 357).] Further controverted that Klaassen was "upset and angry" at the December 19, 2012, meeting. Dawn testified that nothing out of the ordinary occurred at that meeting. [Ex. 1001, November 2013 Admin Hearing 131: 15-21.]

207.    Controverted. Pursuant to his December 20, 2012, correspondence in which Klaassen states he is actively trying to increase his grant funding, Klaassen wrote and obtained an additional $1.8 million NIH grant that would have been more than sufficient to pay the salaries and research of all of Klaassen's students beginning in August 2013. [Ex. 1001, Nov. 2013 Hearing 312:1 - 313:12; Ex. 1032, Declarations of Klaassen Lab Members.] KUMC blocked the acceptance of the grant, used the lack of grant funding as an excuse to terminate Klaassen's lab members' employment, and later terminated Klaassen's employment. [SOAF ¶¶ 355-356.]

208.    Objection to the characterization that Klaassen's offer to personally offset the deficit was "sarcastic" or in bad faith.

209.    Uncontroverted that on March 7, 2013, Klaassen received for the first time since being moved to Internal Medicine a copy of the grant finances. [Ex. 1001, Nov. 2013 Admin Hearing 277:13 – 278:25.]

210.    Uncontroverted.

211.    Controverted for the reasons stated in Response to SOF ¶¶ 203-207.]

**May 1, 2013 Incident**

212.    Uncontroverted.

213.    Uncontroverted that Stites convened a meeting. Controverted that "Klaassen was spending in excess of available funds." Rather, the deficit was caused by the misappropriation of approximately $200,000 from grants in which Klaassen either presently or previously served as a PI. [SOAF 168-171.]

214.    Controverted. Klaassen requested the meeting to discuss his funding concerns and concerns regarding KUMC's misappropriation of NIH grant monies he identified on December 20, 2012. [Ex. 357.]

215.    Uncontroverted that at the time of the May 1, 2013, meeting, Klaassen was PI on the following three NIH R01 grants:

- NIH grant titled "DK-081461 (1-4), Nrf2 as a Master Regulator in Liver Disease Prevention and Therapy." The grant, commonly known as the NRF2 Liver grant, was for approximately $995,631 and ran through 2013.[SOAF 75-86]

- NIH grant titled "ES-019487 (1-5) Developmental Regulation of Drug Processing Genes." The grant, commonly known as the Drug Processing Gene grant, was for approximately $2,114,968 and ran until 2015. .[SOAF 75-86]

- NIH grant titled "ES-009649 (8-12), Regulation of Hepatic Uptake of Endogenous Signaling Molecules and Xenobiotics." The grant, commonly known as the Hepatic Update grant was for approximately $1,125,000 and ran until 2015. [SOAF 75-86]

Objection to the statement that the "grants were in the Department of Internal Medicine." Defendants' Exhibit 711 states nothing regarding the location or department within which the grants were located.

216.    Uncontroverted.

217.    Controverted. While Klaassen did tape-record the meeting and did not announce that he was tape recording the meeting, there is nothing in the cited testimony that suggests he was doing it "in secret." [See Response to SOF ¶ 220.]

218.    Uncontroverted.

219.    Uncontroverted but incomplete. Klaassen testified at his deposition as follows:

I had been retaliated against so many times at K.U. Med Center and when I was going to be in a room with five people on one side of the table and one person on the other side of the table, I thought I needed to have some evidence because if five people said what happened and I said what happened in this retaliatory meeting I would be a dead duck and thus I taped it and the faculty agreed, in essence, that I

didn't do what they are charging me with. So, what was the issue? The issue must not have been the issue.

[Ex. 1010, Klaassen Depo. 103:1-11.]

220.     Controverted. Before KUMC faculty knew the meeting had been recorded, they testified (under oath) falsely about Klaassen's conduct at the meeting. Stites' written statement contained within the Inquiry Report states that Klaassen "shout[ed] at [him]" during the meeting. [Ex. 338, at AR001962.] Later, at the November 13, 2013 hearing, he stated that Klaassen "scream[ed]" at him for somewhere between 5 and 10 minutes. [Ex.1001, Nov. 2013 Hearing: 166:6-23, 168:11-18.] Dawn largely agreed with Stites' assessment and stated that Klaassen was "clearly belligerent." [Ex. 1001, Nov. 2013 Admin Hearing: 116:5-6.] Dawn further stated that Klaassen was the loudest individual at the meeting. [Ex. 1001, Nov. 2013 Admin Hearing: 128:25-129:8.] When asked if he had any doubt about the loudest person at the meeting, Dawn stated, "No." [Ex. 1001, Nov. 2013 Hearing: 128:25-129:8.] Ms. Hopkins's written statement described Klaassen as "shout[ing]." [Ex. 326-56, p. 13.] And O'Brien-Ladner's written statement described Klaassen as making "claims at the highest decibel." [Ex. 326-56, p. 12.] O'Brien-Ladner further stated that Stites's voice did not raise "anywhere near what Klaassen had done." [Ex. 1001, Nov. 2013 Admin Hearing: 22:15-20.] She would later testify that there was "no question" that Klaassen's voice was the loudest. [Ex. 1001, Nov. 2013 Admin Hearing: 41:5-11.]

The version of events as recounted by Stites, Dawn, O'Brien-Ladner, and Ms. Hopkins simply did not occur. The recorded tape reveals that, while Klaassen spoke with passion and concern about his financial situation and the treatment of his students, the loudest individual at the meeting, and the only one that came close to yelling or screaming, was Stites when he yelled at Klaassen to "Get Out!" [ECF 336, Conventionally Filed Recording] Klaassen's conduct cannot be described as

yelling, screaming, "clearly belligerent," or "out-of-control." [Ex. 1001, Nov. 2013 Admin Hearing: 248:10-19.]

221.    Uncontroverted that KUMC faculty testified that Klaassen was agitated at the May 1, 2013, meeting. Controverted that the faculty members told the truth. [See Response to SOF 220; Ex. 336, May 1, 2013, Recording.] Klaassen has testified that the meeting did not go as described. He stated that he was not screaming and was not "clearly belligerent." [Ex. 1001, Nov. 2013 Admin Hearing: 248:10-19.] Klaassen did not threaten anybody at the meeting. [Ex. 1001, Nov. 2013 Admin Hearing: 253:13 - 254:1.] The November 2013 *Ad Hoc* Committee did not find that Klaassen was abusive or threatening, only that he was passionate and agitated. [Ex. 32; Ex. 32; Ex. 1010, Klaassen Depo. 356:3-7.]

222.    Objection to the characterization of Stites as speaking in a "calm voice" while Klaassen in a "raised voice cries." This Court has a copy of the recording and can draw its own interpretations without counsel's suggestive adjectives.

223.    Objection to the characterization of speech heard on the audio recording for the same reasons stated in Response to SOF ¶ 223.

224.    Objection to the characterization of speech heard on the audio recording for the same reasons stated in Response to SOF ¶ 223.

225.    Uncontroverted that KUMC faculty testified that Klaassen was visibly angry and agitated at the May 1, 2013, meeting. Controverted that the faculty members told the truth. [See Response to SOF 220.] Further Controverted that Klaassen approached Stites during the meeting. Klaassen testified that he was writing on the white board and turned around and Stites was standing within 6 inches of his nose. [Ex.1001, Nov. 2013 Admin Hearing: 247:23 - 248: 9.] Notably,

Klaassen had acted in a similar manner in the past and never encountered any discipline as a result. [See SOAF § III.]

226.    Controverted that Klaassen's behavior was threatening at the May 1, 2013, meeting or that KUMC thought that Klaassen was a threat. [Ex.1019, Gray-Little Depo. 151:2 – 18; Ex. 1021, Girod Depo. 364:20 – 365:5.] KUMC took no actions to remove Klaassen from campus the week following the May 1, 2013, meeting. Controverted that Klaassen was threatening, physically intimidating, or dangerous during the May 1, 2013 meeting. Klaassen testified that he never behaved that way during the meeting. [Ex.1001, Nov. 2013 Admin Hearing: 253:13 – 254:4.] The recording of the meeting supports Klaassen's testimony. [ECF 336, Conventionally Filed Recording.]

227.    Uncontroverted that Stites testified that he had never had an encounter with a faculty member like the one that Stites described having with Klaassen. Controverted that Stites told the truth. [See Response to SOF ¶ 220.] Klaassen testified that he never physically threatened Stites during the meeting and that Stites was abusive and threatening towards him. [Ex. 1001, Nov. 2013 Admin Hearing: 253:13 – 254:1; 255:24 – 256:24.]

228.    Uncontroverted that Dawn testified that he had never seen a faculty member engaged in the kind of conduct that she described. Controverted that Klaassen was threatening, physically intimidating, or dangerous during the May 1, 2013 meeting. Klaassen testified that he never behaved that way during the meeting. [Ex. 1001, Nov. 2013 Admin Hearing 253:13 – 254:4.] The recording of the meeting supports Klaassen's testimony. [ECF 336, Conventionally Filed Recording.]

229.    Uncontroverted that O'Brien-Ladner testified that she contemplated calling security. Controverted that O-Brien-Ladner told the truth. [See Response to SOF ¶ 41; Ex. 336, May 1, 2013, Recording.] Controverted that Klaassen was threatening, physically intimidating, or dangerous during the May 1, 2013 meeting. Klaassen testified that he never behaved that way during the

meeting. [Ex. 1001, Nov. 2013 Admin Hearing: 253:13 – 254:4.] The recording of the meeting supports Klaassen's testimony. [ECF 336, Conventionally Filed Recording.]

230.     Uncontroverted that O'Brien-Ladner testified that Klaassen destabilized the meeting. Controverted that O-Brien-Ladner told the truth. [See Response to SOF ¶ 220; ECF 336, Conventionally Filed Recording.] Controverted that Klaassen was threatening, physically intimidating, or dangerous during the May 1, 2013 meeting. Klaassen testified that he never behaved that way during the meeting. [Ex. 1001, Nov. 2013 Admin Hearing: 253:13 – 254:4.] The recording of the meeting supports Klaassen's testimony. [ECF 336, Conventionally Filed Recording.]

231.     Uncontroverted as to what Hopkins testified. Controverted that Klaassen's tone of voice was objectively "scary." [ECF 336, Conventionally Filed Recording.] Controverted that Klaassen was threatening, physically intimidating, or dangerous during the May 1, 2013 meeting. Klaassen testified that he never behaved that way during the meeting. [Ex. 1001, Nov. 2013 Admin Hearing: 253:13 – 254:4.]

232.     Uncontroverted but irrelevant.

## May 7, 2013 Incident

233.     Uncontroverted.

234.     Uncontroverted that Klaassen arrived at Hopkin's office unannounced. Klaassen explained:

> Yes. You know, as I mentioned on Friday, we bring bills to be paid, so I always came unannounced. So I'd like to make sure that this is put in context. Yes, I came completely unannounced, I always came unannounced.

[Ex. 1053, Jury Trial Transcript Vol. 10 (Klaassen Testimony 50:11-16).] Klaassen met with Hopkins "every two or three days." [Ex. 1051, Jury Trial Transcript Vol. 9 (Klaassen Testimony 95:12-17).]

235.     Uncontroverted.

236.    Controverted that anything out of the ordinary happened at the meeting. Klaassen initiated the meeting to ask Hopkins about some invoices and attempted to explain to Hopkins the difference between KUMC's accounting and the way he handled his NIH grant accounting over the last 46 years. [Ex.1001, Nov. 2013 Admin Hearing 70:7-15, 71:1-11.] Klaassen testified that he did not point his finger and stated that Hopkins' statement was exaggerated. [Ex. 1053, Jury Trial Transcript Vol. 10 (Klaassen Testimony 51:16-20).] Hopkins thought Klaassen was unnecessarily loud during the meeting. [Ex. 1001, Nov. 2013 Admin Hearing 73:1.] But the meeting was otherwise unremarkable. [Ex.1001, Nov. 2013 Admin Hearing Transcript 247:1-8.] Klaassen denies in engaging in any behavior that would have reasonably caused her to feel that way. Klaassen only used his normal voice with her and was not loud. [Ex. 1010, Klaassen Depo. 160:8-11.] He did not threaten Hopkins at the May 7, 2013, meeting. [Ex. 1001, Nov. 2013 Admin Hearing Transcript 254:2-4; Ex. 1053, Jury Trial Transcript Vol. 10 (Klaassen Testimony 52:15-24).]

237.    Uncontroverted that Klaassen attempted to explain NIH grant accounting to Hopkins. Klaassen explained:

> But to think that I was doing anything to intimidate anybody, was not true. I was trying to teach her. She did not have any accounting background, and she was doing the accounting on our grants, and so I was -- this is my teaching moment to help her. Why would I give her a bad time? She was a nice young lady. She needed to be taught. And we know that the Chair of the department never had an NIH Grant. He didn't know what to do. So this poor young lady is in charge of these grants, and her bosses can't teach her, because they don't know how to do it. And so I was trying to be the nice guy, telling her how this should be done. You can't run me way in debt without informing me, and you can't charge money from one grant to another grant.

[Ex. 1053, Jury Trial Transcript Vol. 10 (Klaassen Testimony) 52:15- 53:14.]

238.    Controverted that anything out of the ordinary happened at the May 7, 2013, meeting for the reasons stated in Response to SOF 236.

239.    Controverted that anything out of the ordinary happened at the May 7, 2013, meeting for the reasons stated in Response to SOF 236.

240.    Uncontroverted that Klaassen testified that he did "not try to intimidate anybody." Controverted that Klaassen was attempting to intimidate Hopkins and not teach her NIH grant accounting methods for the reasons stated in response to SOF ¶ 237.

241.    Controverted. During the meeting Klaassen took out a sheet a paper and drew graphs explaining to Hopkins how KUMC was misusing NIH grant funds and improperly doing NIH Grant accounting. [Ex. 1051, Jury Trial Transcript Vol. 9 (Klaassen Testimony) 95:4 – 98:24.]

242.    Uncontroverted but irrelevant. Defendants banned Klaassen from campus the next day and prohibited him from contacting Hopkins until the date of his termination. [See SOAF § XIX, and XX (describing Klaassen's suspension from campus and termination).]

243.     Uncontroverted but irrelevant. At the time of the meeting, Klaassen was PI only on his RO1 grant accounts and as explained in Response to SOF 236, Klaassen was discussing his RO1 grant accounting with Hopkins and not the COBRE account.

244.    Controverted, mistakes the testimony, and irrelevant. At his deposition, Klaassen was asked "what specifically is inaccurate about the COBRE grant accounting." He responded by asking for a more specific question. Counsel for Defendants did not ask a follow up question. [Ex. 1010, Klaassen Depo. 108:18-109:5).] The SOF is also irrelevant. No party has testified at any hearing or deposition that Hopkins/Klaassen meeting concerned the Pharmacology Department's handling of COBRE funds.

245.    Uncontroverted that Hopkins could not change Klaassen's PI status. Controverted to the extent this fact is offered to argue that KUMC's administration did not request Hopkins to assist the administration with misappropriating NIH funds. Klaassen testified:

Q. You would agree, she certainly wouldn't be a person who is able to make you a principal investigator again, correct?

A. No, but what, what, what is, what is being said here is she kind of understood when I was explaining to her that what she was doing was wrong, but her bosses tell her to do it wrong, so, she does the accounting wrong.

Q. What specifically was she doing wrong?

A. Well, she's taking money from one grant, things that I said should be bought on this grant, they charged to this grant. Money that I was spending this year they said, well, you're going to have money coming in next year, we'll take it out of there, et cetera, et cetera.

[Ex. 1010, Klaassen Depo. 155:21 -156:10.]

246.    Controverted that anything out of the ordinary happened at the May 7, 2013, meeting for the reasons stated in Response to SOF 236.

247.    Controverted that anything out of the ordinary happened at the May 7, 2013, meeting for the reasons stated in Response to SOF 236.

248.    Controverted that anything out of the ordinary happened at the May 7, 2013, meeting for the reasons stated in Response to SOF 236.

249.    Controverted that anything out of the ordinary happened at the May 7, 2013, meeting for the reasons stated in Response to SOF 236.

250.    Controverted that anything out of the ordinary happened at the May 7, 2013, meeting for the reasons stated in Response to SOF 236.

251.    Controverted that anything out of the ordinary happened at the May 7, 2013, meeting for the reasons stated in Response to SOF 236.

252.    Controverted that anything out of the ordinary happened at the May 7, 2013, meeting for the reasons stated in Response to SOF 236. Further controverted that Dawn's statements regarding the events of the May 1, 2013, and May 7, 2013 are accurate for the reasons stated in Response to SOF ¶ 220.

**Second Administrative Leave**

253.    Uncontroverted that Stites suspended Klaassen from campus with pay on May 8, 2013. [ECF 326-1] Controverted to the extent that Defendants contend that Klaassen was placed on administrative leave as opposed to a suspension with pay. [SOAF 346-347; see also SOAF § XIII explaining that administrative leave violations KUMC's policies).]

254.    Uncontroverted that Stites wrote a letter on May 8, 2013, suspending Klaassen from campus with pay. [ECF 326-1] Controverted that the reasons for the administrative leave and set forth in Exhibit 7. The veracity of the allegations within the May 8, 2013, letter are controverted. [Response to SOF 212-252.] Klaassen explained further:

> A. Okay. Let me say that one always has to, and one of the things that I teach my students is that the issue is often not the issue and while it says belligerent and abusive here, that's what it says, no question about it, but it went to the faculty hearing committee and they said it wasn't belligerent and abusive. So, if I go back and re-listen to that meeting that day the thing that comes up over and over again is how old I am. Now, what's really in his mind, and I suspect it's a number of issues and not just one issue, you know, I think it probably goes all the way back. You have to realize that Steve Stites was a close associate of Atkinson and, you know, I was a whistle-blower to Atkinson and, you know, there's been continual retaliation in regard to all of those remarks. You know, what role retaliation is playing and what role my age is playing I can't say with certainty.

[Ex. 1010, Klaassen Depo. 98:19 – 99:17.]

255.    Uncontroverted that Stites suspended Klaassen from campus with pay on May 8, 2013. [ECF 326-1] Controverted to the extent that Defendants contend that Klaassen was placed on administrative leave as opposed to a suspension with pay. [SOAF 346-347; see also SOAF § XIII explaining that administrative leave violations KUMC's policies).] The veracity of the allegations within the letter are controverted. [Response to SOF 212-252.]

256.    Uncontroverted.

257.    Uncontroverted that Klaassen had a passion for teaching. At trial, Cheri Klaassen testified:

Q. And did you ever watch him interact with the students in such a way that you determined whether or not he had a passion for teaching?

A. Well, I -- should -- there's a history. I was his first student. He taught me chemistry at my kitchen table when I was a senior in high school and he was a junior in college. And then when our children were young we -- he was sitting at the kitchen table helping them with their school work in grade school, high school, college. He was just a phone call away. Then when he got into his job, uh, and his students were here, his students – he just loved teaching. And then when he was dismissed from the KU Med Center, he was told not to, uh, contact his students, and his students were not to contact him. And that devastated him, because he knew that they were in the middle of a research project, because he was teaching them. They have these research projects going on, and if he couldn't be there to help them in those research projects, they were going to be destroyed because they -- they were working with animals and chemicals, so it had to be continued. And he – he was devastated. Also, you know, they were taking his -- he didn't know what was going on with his grants. He had no clue what was going on. And his grant money was paying for his student salaries, and for the research projects that they were doing. And so he was beside himself. You know, what do I do? How do I help them? My students are going to lose it. What can I do? And, uh, so the day that he was dismissed, and they sent him home, his students came to the house.

They weren't supposed to, but they did. And then days later, like one or two students would show up, and they would have their research projects and questions, and he would help them. And in a week or so, he was holding class in our house. And so in our -- in the lower level of our house, he was holding class.

[Ex. 1013, Jury Trial Transcript Vol. I (Cheri Klaassen Testimony 124:18 – 126:7).] KUMC never charged Klaassen with misconduct for holding class at his house. [ECF 326-56]

258. Uncontroverted that Rawitch wrote that e-mail. Controverted to the extent Defendants contend that that Klaassen was placed on administrative leave as opposed to suspended. [SOAF § XIII.] Further controverted to the extent that Defendants contend that this letter is evidence that a suspension is not an adverse employment action. Klaassen responded to the correspondence explaining how Rawitch's actions were adversely affecting his ability to operate his laboratory and harmed his students. He stated:

> Allen,
>    This e-mail is in regard to your stateent that an administrative leave is not an adverse personnel action. If being placed on administrative leave is not an adverse personnel action, what is it? The likely events described in the paragraph I sent you 36 hours ago seems pretty adverse to me. When I was placed on adinistrative leave a couple of years ago, the administration took $13,000,000 from me. Is that not adverse? It adversely effected my academic career. I suspect the administration is now taking the rest of my NIH grants from me. This is not adverse?

[Ex. 1033, A00513.] Klaassen's students also wrote letters stating that the suspension would destroy their careers. [Ex. 1054, A00471-72.] Klaassen's students were right. Most of them were fired as a result of Klaassen's suspension. [See SOAF 350, 360] At a minimum, there is a question of material fact as to whether the suspension was an adverse employment action. See Analysis and Argument § III.F.

259.    Uncontroverted that there is a State of Kansas policy. Controverted that Klaassen's behavior violated the workplace policy in any respect. See Response to SOF 212 – 252.

260.    Uncontroverted.

261.    Uncontroverted but incomplete. Klaassen spoke to Hopkins using his "normal voice" and did not feel an apology was necessary. [Ex. 1010, Klaassen Depo.160:2-11.]

262.    Controverted. Klaassen testified that his apology was sincere to the extent that he did not intend to make anyone feel hurt by what he said. Klaassen explained that the primary purpose of the e-mail was to "get back on campus" so he could help his students. [Ex. 1010, Klaassen Depo.162:3-22]. He further explained:

> [I]f someone felt hurt by what I said I apologize to them, but after reading what they said happened, which were all lies, I stretched my word apologize in regard to the way I could normally apologize.

*Id.*

**Second Inquiry Report**

263.    Uncontroverted.

264.     Uncontroverted that Rawitch prepared an Inquiry Report on June 10, 2013. The veracity of the allegations within the Inquiry Report are controverted. [Response to SOF 212-252.]

265.     Uncontroverted that Rawitch prepared an Inquiry Report on June 10, 2013. The veracity of the allegations within the Inquiry Report are controverted. [Response to SOF 212-252.]

266.     Uncontroverted.

267.     Uncontroverted that Rawitch prepared an Inquiry Report on June 10, 2013. The veracity of the allegations within the Inquiry Report are controverted. [Response to SOF 212-252.]

268.     Uncontroverted.

269.     Objection to Defendants' characterization of Klaassen's e-mail correspondence. Klaassen did not encourage them to "spend more freely," but encouraged his students "to do experiments," but counseled them to not "waste money." [ECF 362-62, p. 1.]

270.     Uncontroverted that Klaassen encouraged other KUMC employees to blow the whistle on KUMC's retaliatory and unconstitutional actions.

**Second _Ad Hoc_ Hearing**

271.     Uncontroverted.

272.     Uncontroverted.

273.     Uncontroverted.

274.     Uncontroverted.

275.     Uncontroverted.

276.     Uncontroverted that before KUMC faculty knew the meeting had been recorded, they testified (under oath) falsely about Klaassen's conduct at the meeting. Stites written statement contained within the Inquiry Report states that Klaassen "shout[ed] at [him]" during the meeting. [ECF 326-56, p. 11.] Later, at the November 13, 2013 hearing, he stated that Klaassen "scream[ed]"

at him for somewhere between 5 and 10 minutes. [Ex. 1001, Nov. 2013 Admin Hearing: 166:6-23, 168:11-18.] Neither statement finds factual support in the recording.

277.     Uncontroverted but irrelevant. KUMC never charged Klaassen with misconduct for any event occurring after May 7, 2013, including after the case was remanded to the KUMC for a new termination hearing. [ECF 326-602; SOAF 369-385; ECF 326-105]

278.     Uncontroverted but irrelevant. KUMC never charged Klaassen with misconduct for any event occurring after May 7, 2013, including after the case was remanded to the KUMC for a new termination hearing. [ECF 326-602; SOAF 369-385; ECF 326-105.]

279.     Uncontroverted.

280.     Uncontroverted but incomplete. After hearing the evidence, the committee recommended that Klaassen be immediately reinstated and receive only a written warning. [Ex. 32.] The Committee also expressed concern that KUMC failed to address Klaassen's complaints about the financial mismanagement of his grants. The Committee wrote, "The Committee is sympathetic with Klaassen's concerns regarding grants and his students, and finds that KUMC should provide full and written answers in a timely manner to the questions and complaints that he has expressed." [Ex. 32.] Finally, while the committee concluded that Klaassen's behavior could be interpreted a certain way, the committee never concluded that he actually behaved in an abusive, threatening, or unprofessional manner. [Ex. 32.]

281.     Uncontroverted but incomplete. Supra Response to SOF 280.

**Termination Decision**

282.     Uncontroverted that Girod terminated Klaassen's employment. Controverted that Girod's termination was because Klaassen engaged in constitutionally protected speech. See Response to SOF 283.

283.     Controverted that this letter states KUMC's reasons for Klaassen's termination. There is sufficient evidence on the record for this Court to conclude that Klaassen was terminated because of his constitutional protected speech. See Arguments and Analysis § III and Response to Girod's Individual Memorandum. Girod's termination letter further stated:

> The Committee recommended [a] sanction of a written warning for your unprofessional conduct towards colleagues and subordinates. However, the Committee did not have full access to, and was not asked to consider, the totality of the circumstances in your situation. Have considered the Committee's finding and recommendations, and having also considered the totality of the circumstances surrounding your conduct the last few years, I have concluded that a written warning does not address the serious nature of the situation . . . . Accordingly, after consultation with the Chancellor, I have determined that termination of your employment and faculty appointment with the University is the only acceptable outcome.

[Ex. 33.] As of January 6, 2014, Girod's stated reason for termination was the unknown and undefined "totality of the circumstances." That stated reason was merely a pretext for Girod's unlawful decision to terminate Klaassen because of constitutionally protected speech. See infra Arguments and Analysis § III and Response to Girod's Individual Memorandum. On October 20, 2015, Girod sent Klaassen a new termination letter which gave newly identified, similarly pretextual reasons for his termination: the results of the May 2012 *Ad Hoc* Committee Recommendation, the June 2012 Disciplinary Letter Signed by Stites, and the November 2013 *Ad Hoc* Committee Letter Recommending Reinstatement. [SOAF 377.]

284.     Uncontroverted.

285.     Uncontroverted.

286.     Controverted. Klaassen testified that the ultimate termination decision rested with Girod. [Ex. 1010, Klaassen Depo. 369:6-9.] He did not testify that Girod has the right to modify the opinion of the *Ad Hoc* Committee. Further controverted that the Handbook authorizes Girod to engage in any independent fact finding. It simply states that Girod has two weeks to make a decision.

[Ex. 209, at AR003727.] And the Handbook expressly limits the proceedings to the "evidence received during the hearing. [Ex. 209, at AR003726.]

**Third *Ad Hoc* Hearing**

287. Uncontroverted.

288. Uncontroverted.

289. The legal conclusions of the Third *Ad Hoc* Hearing Appeal Committee are irrelevant and uncontroverted. This court owes the "Third *Ad Hoc* Hearing" Appeal Committee no deference. The Third *Ad Hoc* Hearing Appeal Committee's conclusions are irrelevant.

290. Uncontroverted but irrelevant for the reasons stated in response to SOF 289.

291. Uncontroverted but irrelevant for the reasons stated in response to SOF 289.

292. Uncontroverted but irrelevant for the reasons stated in response to SOF 289.

293. Uncontroverted but irrelevant for the reasons stated in response to SOF 289.

294. Uncontroverted but irrelevant for the reasons stated in response to SOF 289.

295. Uncontroverted that Girod issued final agency action on December 23, 2014. [ECF 326-41.]

**KJRA Case in Wyandotte County**

296. Uncontroverted but incomplete. Defendants raised no *res judicata*, claim splitting, or issue preclusion defense in the KJRA case. [Ex. 1056, Answer to Petition March 2015.]

297. Uncontroverted.

298. Uncontroverted.

299. Uncontroverted.

300. Uncontroverted but incomplete. Wyandotte County District Court's ruling states:

THE COURT:  Well, I think we're all in
agreement that under this appellate process, I'm
not allowed to substitute my judgement for the
judgement below.  Okay.  And there's no trial de
novo.  The basic duty of the Court is to determine
that appropriate due process was fault.  Due
process means notice and opportunity to be heard.
I have problems with both aspects of that.

Totality of the circumstances.  If that
means the reports from previous committees, then he
should have been apprised that this is something
that we're going to consider when we make our
disciplinary judgement, not just the things that
are in front of this Committee today, alright.  So
I don't think you gave him notice.  And then I
don't think you gave him an opportunity to be heard
when you limited his testimony to four hours.
Opportunity to be heard means an opportunity to
present your evidence, not present a condensed form
of your evidence, not present one live witness in
declarations from the rest of the evidence.  It
means the opportunity to present your evidence.  So
I'm remanding this back to the University of Kansas
to give him appropriate notice of what the charges
are against him, and an opportunity to be heard.
Another hearing below.  That's a remand order.

[Ex. 1040, Sept. 21, 2015 Transcript 55:9-56:9.]

301.    Objection to Defendants' characterization of the ruling. The ruling, quoted above,
speaks for itself. [See Response to SOF 300.]

302.    Controverted. On October 20, 2015, Girod sent Klaassen a different and new
termination letter. The new letter restated old reasons and provided new reasons for his termination.
[ECF 326-16, Termination Letter of October 20, 2015.] In the January 6, 2014 termination letter,
Girod stated that he terminated Klaassen after considering the "totality of the circumstances." Girod

defined "totality of the circumstances" as the "entire episodes of the previous *Ad Hoc* Committee." [Ex 1021, Girod Depo. 277:14 - 278:4.]. The "entire episodes" included Klaassen's conduct dating to 2010. [ECF 326-36.] This included Klaassen conduct of contributing to the LJW editorials. [SOAF § VIII.] On October 20, 2015, Girod sent Klaassen a new termination letter and explained termination: the results of the May 2012 *Ad Hoc* Committee Recommendation, the June 2012 Disciplinary Letter Signed by Stites, and the November 2013 *Ad Hoc* Committee Letter Recommending Reinstatement. [ECF 326-16.]

Before the Wyandotte County District Court ordered remand, Girod said he reviewed the "totality of the circumstances" surrounding Klaassen and that the "totality of the circumstances" justified Klaassen's termination. After remand, Girod stated that his termination decision was based solely on three letters. The reason for Klaassen's termination changed from all of Klaassen's conduct since 2010 to three separate letters. That the termination reason changed after this Court ordered remand is suspicious by itself. This Court never ordered KUMC to "clarify" its reasons for termination. It ordered a new hearing before a new committee. Instead of complying with this Court's order, KUMC terminated Klaassen again, this time for new and different reasons. [ECF 326-16.]

**Fourth *Ad Hoc* Hearing**

303.    Uncontroverted but incomplete. Robert Klein, Vice-Chancellor for Academic Affairs, also asked Klaassen to "supplement" his earlier Administrative Notice of Appeal provided to Girod in March 2014. [SOAF 375.] Klaassen objected to Klein's request as inconsistent with and in violation of this Court's remand order. [SOAF 378-381.] Klaassen further objected to the remand hearing because the October 20, 2015 termination letter did not provide Klaassen with any notice of the charges of misconduct. [ SOAF 378-381.] In addition, the October 20, 2015 termination letter was based on the November 13, 2013 and the November 19, 2014 appeal hearings which the District

Court previously held unconstitutional. [Response to SOF 300; SOAF 376.] KUMC overruled Klaassen's objections and required Klaassen to argue his positions at a post-termination appeal on March 29, 2016. [SOAF 378-381.]

304.    Controverted. At the March 29, 2016 post-termination appeal, KUMC refused to allow Klaassen to call any of these key witnesses: Stites, Girod, Jaeschke, Tully, Meagher, Carlson, and Terranova. Under Rule 4.2 of the Kansas Rules of Professional Conduct, Klaassen could not contact these witnesses directly because of the ongoing state and federal lawsuit. Counsel for KUMC refused to make these witnesses available at the March 29, 2016 post-termination appeal. [See SOAF 382.]

305.    Uncontroverted.

306.    Uncontroverted.

307.    Uncontroverted.

308.    Uncontroverted.

309.    The legal conclusions of the Fourth *Ad Hoc* Hearing Appeal Committee are irrelevant and uncontroverted. This court owes the Fourth *Ad Hoc* Hearing Appeal Committee no deference. The Fourth *Ad Hoc* Hearing Appeal Committee's conclusions are irrelevant.

310.    The legal conclusions of the Fourth *Ad Hoc* Hearing Appeal Committee are irrelevant and uncontroverted for the reasons stated in Response to Defendants' SOF 309.

311.    The legal conclusions of the Fourth *Ad Hoc* Hearing Appeal Committee are irrelevant and uncontroverted for the reasons stated in Response to Defendants' SOF 309.

312.    The legal conclusions of the Fourth *Ad Hoc* Hearing Appeal Committee are irrelevant and uncontroverted for the reasons stated in Response to Defendants' SOF 309.

313.     The legal conclusions of the Fourth *Ad Hoc* Hearing Appeal Committee are irrelevant and uncontroverted for the reasons stated in Response to Defendants' SOF 309.

**Decision by Chancellor**

314.     Uncontroverted.

315.     Uncontroverted.

316.     Controverted that Gray-Little reviewed "the entire record." Gray-Little's letter identifies the documents she reviewed. [ECF 326-39.]

317.     Uncontroverted.

**KJRA Remand Proceedings**

318.     Uncontroverted.

319.     Controverted. After Klaassen filed his initial Petition for Review on Remand on June 10, 2016, Klaassen filed as a matter of a right an Amended Petition for Review on Remand on September 6, 2016, identifying different claims asserted against the Defendants. [See ECF 326-108.] The filing of the Amended Petition for Review on Remand relegated his initial Petition for Review on Remand void and without legal affect. No party submitted any evidence, briefing, or argument in support of the claims identified in Klaassen's claims submitted in in his initial Petition for Review on Remand. [See SOF 323-326 (all briefing and arguments limited to issues in Amended Petition.]

320.     Uncontroverted.

321.     Uncontroverted.

322.     Uncontroverted.

323.     Uncontroverted.

324.     Uncontroverted.

325.     Uncontroverted.

326.     Uncontroverted.

**Lawrence Journal World**

327.    Uncontroverted.

328.    Controverted. KUMC was concerned that Klaassen would go to the press to talk about "how she was handling the money and mismanaging state and federal money." [Ex. 1010, Klaassen Depo. 117:25 – 118:7.] Klaassen went to the LJW because it was the only remaining place he knew he could go to. [Ex. 1010, Klaassen Depo. 139:6 – 140:3.] Klaassen talked to the LJW about what he identified as KUMC's mismanagement. [Ex. 1010, Klaassen Depo. 140:11 – 142:9.] Klaassen talked to the Kansas City Star too, but the Kansas City Star did not want to run an article because it may interfere with KUMC's NCI Cancer Center Accreditation. [Ex. 1010, Klaassen Depo. 15:9 -17:23, 45:15-147:9.] Further controverted for the reasons explained in SOAF 132-133.

329.    Uncontroverted but incomplete. KUMC knew Klaassen was contributing the LJW editorials. [See SOAF § IX (explaining how KUMC's administration contributed the LJW articles to Klaassen and monitored the articles because KUMC was concerned they would lose money because of the articles).]

330.    Uncontroverted.

331.    Uncontroverted.

332.    Controverted to the extent Defendants attempt to argue that they did not know that Klaassen contributed to the editorials. Defendants were aware of Simon's editorial and knew Klaassen contributed to the editorial. [See SOAF ¶¶ 136-142.] Defendants also knew that Klaassen contributed to the article because the article quoted letters that Atkinson had personally provided to Klaassen. [Ex. 101.] Defendants knew Klaassen was contributing to the articles and anticipated receiving them after taking adverse employment action against Klaassen. [See SOAF ¶¶ 136-142.]

333.    Uncontroverted that Simon's published a Saturday on October 29, 2011, two days before Klaassen was suspended from duties. Controverted as to the "gist" of the article regarding organizational changes at KUMC. The article speaks for itself.

334.    Uncontroverted that Simon's published another article on November 5, 2011, several days before Defendants charged Klaassen with misconduct.

335.    Uncontroverted.

336.    Controverted. The selected portion of the deposition testimony does not state anything about Klaassen requesting additional money for his research. In addition, counsel for Defendants asked Klaassen to identify his complaints to the LJW and then repeatedly interrupted him never allowing him to explain his complaints. Klaassen was not afforded an opportunity to identify the **totality** of his concerns directed to the LJW. [Ex. 1010, Klaassen Depo. 140:14-143:11.] See *McBride v. Medicalodges, Inc.*, No. 06-2535-JWL, 2008 U.S. Dist. LEXIS 51699, at *31 (D. Kan. July 3, 2008) ("The record indicates, then, that defendant's counsel interrupted [plaintiff's] response and thereafter declined to permit [plaintiff] an opportunity to describe the totality of … alleged conduct or to elaborate on her testimony indicating that [her manager] allegedly used racial remarks 'quite a bit.' Thus, defendant has not shown that [plaintiff's] claim is limited to two remarks.").

337.    Controverted for the reasons stated in response to SOF 336.

338.    Controverted. Klaassen testified that he did not distinguish between "illegal, immoral, and unethical" and stated he did not know but suspected that "many of the things" he spoke with the LJW were probably not illegal. [Ex. 1010, Klaassen Depo. 144:8-16.] This fact is also irrelevant for the reasons explained in Klaassen's Consolidated Memorandum Arguments and Analysis § III.C.

**NIH Grants**

339.     Controverted. Terranova testified the purpose of KUMCRI or the Research Institute was to prevent grant funded dollars from coming into "State coffers." [Ex. 1012, Terranova Depo. 81: 24 - 82:18.]

340.     Uncontroverted.

341.     Controverted that was the sole purpose of the COBRE grant. Klaassen, as PI of the COBRE, was responsible for overseeing liver research programs. [ECF 326-6, p. 53 (identifying aims of COBRE grant), 10 (Klaassen as PI).] Klaassen responsibilities for the COBRE include overseeing three different COBRE liver research projects. [ECF 326-6, p. 53 (Projects 1, 4, and 5).] See SOAF 76-80.]

342.     Objection. Defendants' SOF 342 relies upon inadmissible hearsay evidence, and therefore, may not be considered at summary judgment. See D. Kan. R. 56.1(d); *see also Bell v. City of Topeka, Kansas*, 496 F. Supp. 2d 1182, 1184-85 (D. Kan. 2007); *see also Foster v. AlliedSignal Inc.*, 98 F. Supp. 2d 1261, 1265, (D. Kan. 2000) *rev'd on other grounds*, 293 F.3d 1187 (10th Cir. 2002) (striking affidavit and documents referenced therein from the summary judgment record because such document were unauthenticated and constituted inadmissible hearsay testimony). In addition, no NIH representative has been identified by Defendants to testify regarding Exhibit 193. Therefore, Defendants may not proffer this evidence at trial. Because it is inadmissible at trial, it is inadmissible at summary judgment.

343.     Uncontroverted.

344.     Uncontroverted.

345.     Uncontroverted.

346.     Uncontroverted.

347.     Uncontroverted.

348.    Uncontroverted.

349.    Uncontroverted that the Defendants' quoted paragraph appears in ECF 326-6. Controverted that was the sole purpose of the COBRE grant or that the COBRE grant was not an important part of funding Klaassen's individual research program. [Response to SOF ¶ 341; SOAF 76-80.]

350.    Uncontroverted.

351.    Uncontroverted.

352.    Uncontroverted.

353.    Uncontroverted.

354.    Uncontroverted.

355.    Uncontroverted.

356.    Uncontroverted.

357.    Uncontroverted.

358.    Uncontroverted.

359.    Uncontroverted.

360.    Uncontroverted.

361.    Controverted. The role of the PI is subject to a significant factual dispute. The PI is responsible to the University, the NIH, and the federal government. [Ex. 1003, Jury Trial Transcript Vol. 6 (Girod Testimony) 84:8-13.] The PI is responsible for the scientific and technical direction of the research project funded by the NIH grant. [Ex. 1012, Terranova Depo. 101:25 - 102:2.] The PI "is the person who manages the grant." [Ex.1008, Jury Trial Transcript Vol. 7 (Jaeschke Testimony 184:15-19).] The PI also financially directs the grant and ensures compliance with the financial and administrative aspects of the award. [Ex. 1012, Terranova Depo. 102:3-14.] The PI is also

responsible for proposing research hypothesis, proposing experiments to regarding the experiments, and then conducting the experiments subject to the NIH cost considerations. [Ex.1008, Jury Trial Transcript Vol. 7 (Jaeschke Testimony 184:15-185:19).] Pursuant to NIH regulations, the PI is responsible for the grant's financial management. [Ex. 1012, Terranova Depo. 102:3 - 112:14; Ex. 1006, Atkinson Depo. 202:5-11.] KUMC does not employ a financial manager of a grant other than the PI. [Ex. 107, Defendants' Responses to Request for Production No. 17. see also SOAF ¶¶ 39-47.]

362.    Controverted for the reasons stated in Response to SOF 361.

363.    Uncontroverted.

364.    Uncontroverted.

365.    Uncontroverted that Girod testified there was a process at the Research Institute. Controverted that Klaassen (or any individual defendant) has any idea what that policy is or was. No policy has ever been identified in any administrative hearing, trial, or deposition in this case in the last five years. The Defendants identify no such process or policy to support their SOF here. See SOF 365.

366.    Uncontroverted that KUMCRI has a PI Policy. Controverted that the policy applied or was relied upon by any KUMC employee in this case. The policy is not binding on the University or its faculty members but is, instead, a "flexible guideline[]." [Ex.1012 Terranova Depo. 123:15-25.] The policy only applies in the event in the event the faculty member is "dead or absence." [Ex. 1012, Terranova Depo. 124:16-20.]  Controverted that Klaassen was ever provided with a copy of the PI Change policy or knew of its existence  [Ex. 1010, Klaassen Depo. 30:7-31:2.]

367.    Controverted. Defendants' identified one faculty member, Dr. S., who was removed from his status as PI on an NIH Grant. KUMC stripped him of his status as PI after <u>following</u> a due process policy in KUMC's Handbook regarding academic freedom, research impropriety, and

scientific misconduct. Dr. S. was charged with research misconduct, plagiarism, investigated regarding the allegations pursuant to KUMC's due process policies, removed as PI from the NIH grants, and terminated from employment. [Ex. 1047 Girod Depo. 333:10 – 336:21.] There is no evidence in Dr. S.'s file that he was removed as PI before he was terminated from the University. [Ex. 1047, Girod Depo. 344:18 – 345:2; see also Response to SOF 368; SOAF 386-398.]

368.    Controverted. Girod, in his deposition, testified that Dr. T.'s grant status changed. [Ex. 1047, Girod Depo. 77:17-78:9; 80:22-81:1 (Under Seal).] Correspondence from Girod to Dr. T., however, states Dr. T. maintained her status as PI on the Grants. [See SOAF ¶¶ 400-402; Ex. 261 (Under Seal).] The factual record is unclear. The other instance Girod identified was regarding Dr. S.. KUMC stripped him of his status as PI after following a due process policy in KUMC's Handbook regarding academic freedom, research impropriety, and scientific misconduct. Dr. S. was charged with research misconduct, plagiarism, investigated regarding the allegations pursuant to KUMC's due process policies, removed as PI from the NIH grants, and terminated from employment. [Ex.1047 Girod Depo. 333:10 – 336:21.] There is no evidence in Dr. S.'s file that he was removed as PI before he was terminated from the University. [Ex. 1047, Girod Depo. 344:18 – 345:2.] After the due process inquiry into research misconduct occurred Dr. S. was placed on administrative leave and subsequently terminated from employment. [Exs. 270-272; Ex.1047 Girod Depo. 345:3-164:14.]

369.    Uncontroverted.

370.    Uncontroverted.

371.    Uncontroverted.

372.    Controverted that Terranova was the exclusive decision maker to remove Klaassen as PI from the COBRE and T32 Grant. Carlson and Terranova e-mailed each other regarding removing

Klaassen as PI from the grants. [Ex. 74.] E-mail correspondence in September and October 2011 indicate that it a group decision between Terranova and Carlson to remove Klaassen as PI from the grant that Terranova ultimately put into action. [Exs. 73A-80.]

373.    Controverted that Terranova made up his mind to remove Klaassen as PI **after** the October 28, 2011 COBRE meeting. Terranova testified that he already put a "plan" into motion to remove Klaassen as PI well before the October 28, 2011, meeting. [Ex. 1013, Jury Trial Transcript Vol. 1 (Terranova Testimony) 195:19 -197:12.] Putting a "plan" into motion presumes a decision has already been made. Terranova also testified that the purpose administrative leave was to allow him time to remove Klaassen from NIH grants. [Ex. 1013, Jury Trial Transcript Vol. 1 (Terranova Testimony) 204:18 – 205:8.] There is also testimony that the purpose of the administrative leave was to allow Meagher to continue her investigation into Klaassen's grant accounting practices. [Response to SOF ¶ 137.] Also controverted for the reasons stated in Response to SOF 372.

374.    Uncontroverted that letters contained within Exhibit 88 were sent by Jaeschke and Hagenbuch.

375.    Uncontroverted that letters contained within Exhibit 88 were sent by Jaeschke and Hagenbuch.

376.    Uncontroverted.

377.    Uncontroverted.

378.    Controverted. KUMC has made multiple representations as to the date of the PI COBRE Change. [Ex. 1055, KUMC Motion for Summary Judgment SOF ¶ 33.] Klaassen testified that the transfer officially occurred in April 2012. [Ex. 1010, Klaassen Depo. 109:23 - 110:2.]

379.     Uncontroverted.

380.    Uncontroverted.

381.    Uncontroverted.

382.    Uncontroverted.

383.    Uncontroverted.

384.    Uncontroverted.

385.    Uncontroverted.

386.    Uncontroverted.

387.    Uncontroverted.

388.    Uncontroverted.

389.    Uncontroverted.

**The Kansas University Endowment Association**

390.    Uncontroverted.

391.    Uncontroverted.

**Charges for the Use of the Mass Spectrometer**

392.    Controverted as to the date Jaeschke became PI of the COBRE grant. [See Response to SOF 378.]

393.    Controverted as to the date of the user fees. Klaassen's laboratory members were charged user fees throughout 2012. [See SOAF 276-288.] Klaassen's research accounts may have been officially billed in Fall 2012, but the user fees that were identified in the invoice were accumulated before that date. [Ex. 395.]

394.    Controverted. There is a factual dispute as to whether the COBRE fees were necessary to further the sustainability of the COBRE grant. Klaassen, who renewed the COBRE Grant as PI, testified that it was unnecessary and harmful to charge the user fees. [Ex. 1010, Klaassen Depo. 500:19 – 502:22.]

395.    Uncontroverted.

396.     Controverted. Stites sent the e-mail invoicing Klaassen's research accounts for the user fees. [See SOAF 282-285.]

397.     Uncontroverted that Klaassen's students wrote Stites advising them of the situation regarding Mass Spectrometer charges and that Stites refused to assist the students. [See SOAF 282-285.]

398.     Uncontroverted that Mass Spectrometer charges hurt Klaassen's research programs which were now under the Internal Medicine department. [See SOAF 282-285.]

399.     Uncontroverted that Jaeschke misled and misrepresented to Klaassen's laboratory members that they could continue to use the Mass Spectrometer for free. [See SOAF 280-288.]

400.     Uncontroverted.

401.     Uncontroverted.

402.     Uncontroverted.

**The Right to Research**

403.     Uncontroverted that on March 2, 2007, Klaassen gave a PowerPoint presentation to the Pharmacology Department in which he encouraged his faculty to publish more and obtain more NIH grants. [Ex. 1010, Klaassen Depo. 189:15 – 193:23.] Controverted, for the reasons identified in Plaintiff's SOAF 54-74 that faculty at KUMC did not have a contractual property right to pursue and utilize NIH grants. [See SOAF ¶¶ 54-74.]

404.     Controverted. Defendants' deposition excerpt is incomplete and inconsistent with Klaassen's deposition testimony. Klaassen testified:

Q. Is it your contention that the AAUP guidelines create a contract between any particular employee and the university?

A. No. It's, it's basically, you know --

Q. It's a set of guidelines, isn't it?

A. It's a set of guidelines the way universities should behave.

Q. It doesn't create a right in the position of principal investigator, is that correct?

A. Well, only in regard to, you know, my right to do what I want to do for research and in that regard I guess I would say yes, it has something to say about that.

Q. The content or the concept behind the AAUP guidelines with regard to freedom to do research relates to someone not coming in and, or universities not challenging the subject matter of the research, is that correct?

A. Yeah, that's, that's a large part of it.

Q. Right. So, the idea is there are going to be unpopular topics of research in a university setting, correct?

A. Right. You know, so, it doesn't really even matter if it's popular or not popular. You, as a -- and in fact, to be promoted and to maintain your job we are supposed to be independent thinkers, do research, and create new knowledge; but the University of Kansas Medical Center took that away from me and I wrote these things and I can't do these things. So, that is my right.

Q. The content, the COBRE grant and the training grant, those things still exist at the University of Kansas, correct?

A. So do my RO-1s. They stole it all.

[Ex. 1010, Klaassen Depo. 210:13 – 211:22.] Further controverted for the reasons explained in SOAF 54-74.

405.    Controverted for the reasons stated in Response to SOF 404.

406.    Uncontroverted for the reasons stated in Plaintiff's SOAF 54-74 that Klaassen's research excellence was beyond reproach and was fully protected by his right to pursue, procure, and utilize NIH Grant funding.

407.    Uncontroverted that Girod testified that Klaassen had "complete academic freedom as to the types of research he was doing."

408.    Controverted that "nobody has challenged . . . the propriety" of Klaassen's research. Klaassen alleges that the very taking of the NIH grants was a challenge to his research causing his constitutionally protected research program to be bankrupted. [See SOAF 54-74; 293-297.]

**2012 Federal Court Lawsuit**

    409.    Uncontroverted.

    410.    Uncontroverted.

**2014 Wyandotte County Lawsuit.**

    411.    Uncontroverted but incomplete. Klaassen's initial Complaint (ECF 1) brought claims against both state entity and individual defendants. By filing multiple motions to dismiss, the state entity defendants and individual defendants moved to dismiss Klaassen's claims. [ECFs 42-61.] In the motions to dismiss, state entity defendants requested dismissal on the basis of sovereign immunity. [E.g., ECF 43, pp. 8-10.] Klaassen filed a response memorandum and Amended Complaint arguing that the state entity defendants had waived sovereign immunity. [See ECF 67 (Response Memorandum) pp. 12-16.] The state defendants reasserted the sovereign immunity arguments in a motion for judgment on the pleadings in June 2014. [ECFs 82-83.] At the time, to preserve claims against statute of limitations defenses, Klaassen filed state entity claims only in state court ("State Case."). [ECF 326-119.] Klaassen also vigorously opposed the state entity defendant's motion for judgment on the pleadings in this case and argued that the state entity defendants waived their sovereign immunity by accepting federal funds. [ECF 91.] Klaassen lost that argument. [ECF 102.] In May 2015, several months after this Court's order finding that the state entity defendants were entitled to the protections of sovereign immunity, Klaassen then filed a Third Amended Complaint asserting only claims against the individual defendants. [ECF 121.]

    412.    Uncontroverted but incomplete. As explained in Response to SOF 411, in June 2014, Klaassen had pending claims against the state entity defendants [ECF 66] while state entity defendants had pending motions to dismiss raising sovereign immunity defenses. [ECFs 82-83.] It makes sense that Klaassen's state court petition would contain similar allegations as this case because the state court case was the split case.

413.     Uncontroverted.

414.     Uncontroverted. The State Case pretrial order speaks for itself.

415.     Uncontroverted.

416.     Uncontroverted.

417.     Uncontroverted.

418.     Uncontroverted.

419.     Uncontroverted.

420.     Uncontroverted.

421.     Uncontroverted.

422.     Uncontroverted.

423.     Uncontroverted.

424.     Uncontroverted. In Defendants' Motion for Judgment as a Matter of Law, Defendants raise no argument that Klaassen's state law claims against state entity defendants for wrongful termination or conversion are barred by the doctrine of *res judicata*, claim splitting, or issue preclusion defense. [Ex. 1057, Def's Motion for Directed Verdict.]

425.     Uncontroverted.

426.     Uncontroverted.

427.     Uncontroverted. The State Case remains on appeal today.

## ADDITIONAL STATEMENT OF MATERIAL FACTS

**I.    Klaassen Faithfully Served the University of Kansas For Over 40 Years Obtaining The Title Tenured University Distinguished Professor**

1.     The University of Kansas employed plaintiff Curtis Klaassen, Ph.D. ("Klaassen") as a professor from 1968 to 2014, where he attained the title of Distinguished University Professor. [Ex. 1001, Nov. 2013 Admin Hearing: 240:10-14.]

2.      Klaassen became a tenured faculty member in 1974. [Ex. 1002; Jury Trial Transcript Vol. 8 (Klaassen Testimony) 180:8 -180:18; ECF 296, at ¶¶ 20-21; ECF 299, at ¶¶ 20-21.]

3.      Klaassen later received the title of Distinguished University Professor. [Ex. 1002, Jury Trial Transcript Vol. 8 (Klaassen Testimony) 181:7 – 183:15.]

4.      The University of Kansas has approximately 1200 faculty members. [Ex. 1003, Jury Trial Transcript Vol. 6, (Girod Testimony) 13:10-18.]

5.      Of those 1200 faculty members, seven attained the title of University Distinguished Professor. [Ex. 1003, Jury Trial Transcript Vol. 6 (Girod Testimony) 13:10-18.]

6.      A Distinguished Professorship is awarded wholly on the basis of merit, according to exacting criteria; demographic factors and years of service are not taken into account. A nominee must be truly distinguished as a scholar, ranking among the top scholars in the United States within his or her particular field and possessing an international reputation for excellence. However, an exemplary scholarly record is not enough; a preeminent ability to teach must always complement it. [Ex. 1004, Jury Trial Transcript Vol. 3 (Carlson Testimony) 85:21-86:16; Ex. 1005, https://distinguishedprofessors.ku.edu/.]

7.      A Distinguished Professor serves not only the university, but the local community and state as well. [Ex. 1004, Jury Trial Transcript Vol. 3 (Carlson Testimony 85:21-86:16); Ex. 1005, https://distinguishedprofessors.ku.edu/.]

8.      According to former Executive Vice-Chancellor Barbara Atkinson, M.D. ("Atkinson") a distinguished professor title "means you're one of the top research scientists in the institution." [Ex. 1006, Atkinson Depo. 50:8-14.].

9.      From 1968 to November 2013, Klaassen obtained approximately $75 million in grant money for research he was undertaking at the University of Kansas. [Ex. 1001, Nov. 2013 Admin Hearing: 240:15-20.]

10.      From 1974 to 2012, Klaassen served as a tenured professor of toxicology in the University of Kansas's Department of Pharmacology, Toxicology, and Therapeutics ("Pharmacology"). [Ex. 302, Klaassen CV; Ex. 1002, Jury Trial Transcript Vol. 8 (Klaassen Testimony) 184:5-16.]

11.      Robert Klein, Ph.D., Vice-Chancellor for Academic Affairs, summarized Klaassen as follows:

> Klaassen is a distinguished toxicologist, a scientist, whose scientific prowess and education and training and accomplishments are well known and well documented, have been recognized with awards from our university nationally and internationally. He is the epitome of a basic science researcher. He works long hours writing grants, manuscripts, perfecting his work. He works tirelessly with graduate students and postdocs.

[Ex. 1007; May 2012 Hearing: 8:14 – 9:1.]

12.      Klaassen enjoyed international recognition and, as of 2002, was the seventh most highly cited toxicologist in the world. [Ex. 302, pp. AR3358-3359; Ex. 1008, Jury Trial Transcript Vol. 7 (Jaeschke Testimony 192:15-25).]

13.      As a research professor at the University of Kansas, Klaassen worked with graduate students, post-doctorate ("post docs"), and junior research faculty. [Ex. 1002. Jury Trial Transcript Vol. 8 (Klaassen Testimony) 160:20 – 165:20.] His job responsibilities including working with these individuals on his research programs; these programs were largely funded by his research grants. [*Id.*; Ex. 1002, Jury Trial Transcript Vol. 8 (Klaassen Testimony) 202:14-204:20.] Working in the laboratory with students is considered both teaching and research. [*Id.*] Klaassen, and his students, would then publish the results of their research. [*Id.*] During the course of his employment, Klaassen

received 68 outside research grants. [*Id.* at 206:10-14.] No KUMC professor has ever obtained more. [*Id.* at 202:14-204:20.]

## II.   In 2002, Atkinson Promotes Klaassen to Chair of Pharmacology To Rebuild The Crumbling Department

14.     In 2002, despite Klaassen's contribution, the Pharmacology department was "in critical need of rebuilding." [Ex. 154, at KU078088.]

15.     Barbara Atkinson, M.D., ("Atkinson") then the Executive Dean and Vice-Chancellor for Clinical Affairs, promoted Klaassen to Chair of the Pharmacology Department because he "was the right person to revitalize the department and move it to the next level." [Ex. 154, at KU078088-90.]

16.     Atkinson expected Klaassen to move Pharmacology "into the top half of the programs in the country." [Ex. 154, at KU078088-90.]

17.     Atkinson also recommended Klaassen for an appointment as "University Distinguished Professor." [Ex. 154, at KU078088.] A title Klaassen later received in 2002. [SOAF 3.]

## III.   KUMC's Administration Was Well Aware Of Klaassen's Reputation For Having "Outbursts" At The Time They Promoted Him To Chair of Pharmacology

18.     Rosa Meagher, longtime KUMC employee, worked closely with Klaassen in the Pharmacology Department from 1988 to 2012. [Ex. 1009, Meagher Depo. 24:21-24.]

19.     At the time of his promotion to Chair, Klaassen had a reputation for having passionate "outburst[s]," including the use of loud language, pounding on tables in staff meetings, turning red in the face, and shaking. [Ex. 1009, Meagher Depo. 25:16-24; 26:20 – 27:4.]

20.     According to Meagher, Klaassen "did have a lot of outbursts" before he was promoted to Chair. [Ex. 1009, Meagher Depo. 24:25-25:3.]

21.     Klaassen has "always been the same guy;" he has always been loud and boisterous. [Ex. 1009, Meagher Depo. 56:6-8.]

22.     After Atkinson promoted Klaassen to Chair, his outbursts towards other faculty members continued. Klaassen criticized professors he felt were "low achievers." [Ex. 1010, Klaassen Depo. 183:24-184:3.]

23.     Atkinson acknowledges that not all faculty members perform at the same level, and, according to Atkinson, at the time she promoted Klaassen to Chair, Klaassen had lacked respect for low performing faculty he felt did not work hard. [Ex. 1006, Atkinson Depo. 69:14 – 70:23.]

24.     Atkinson personally observed Klaassen showing what she characterized as a lack of respect towards certain faculty members and some faculty members complained to her about Klaassen. [Ex. 1006, Atkinson Depo. 69:24 – 70:5.]

25.     Two of the faculty members that Klaassen thought underperformed were Ken McCarson, Ph.D. ("McCarson") and Beth Levant, Ph.D. ("Levant"). [Ex. 1006, Atkinson Depo. 69:14 – 23.] Klaassen considered these faculty members "low achievers." [Ex. 1010, Klaassen Depo. 183:24-184:3.]

26.     Levant caused complaints to be made about Klaassen's outbursts in 2005 and 2006. [Ex. 1011, Levant Depo. 39:8-12, 40:7-13.]

27.     Atkinson was aware of the complaints made by Levant and McCarson. [Ex. 1006, Atkinson Depo. 69:24 – 70:5.]

28.     Levant and McCarson complained that Klaassen would yell at them, turn red, bang on tables, and use firearm images in PowerPoint presentations. [Ex. 1006, Atkinson Depo. 70:6-10; Ex. 1011, Levant Depo. 8:18-21; 7:4-8:4.] Levant also complained that Klaassen asked her to work too hard. [Ex. 1011, Levant Depo. 10:12 – 11:16.]

29.     In 2005 and 2006, Klaassen gave PowerPoint presentations at Pharmacology Department meetings that included the following gun images:



[Ex. 12, at KU01233; Ex. 1010, Klaassen Depo. 169:20-170:3.]

30.     Klaassen also gave a PowerPoint Presentation including a slide titled "Life is Hell":



[Ex. 12, at KU012166]

31.     Levant complained to the KUMC Administration about Klaassen's "Life is Hell" and firearm image slides. [Ex. 1006, Atkinson Depo. 70:6-10; Ex. 1011, Levant Depo. 7:20-25; 8:18-21; 7:4-8:4, 39:21-40:16.]

32.     Despite KUMC's administration's knowledge of the slides and Klaassen's passionate outbursts, Klaassen was never counseled, reprimanded, or negatively evaluated regarding any of his outbursts or the contents of his PowerPoint slides. [Ex. 1006, Atkinson Depo. 73:15-20.]

33.     Atkinson testified regarding her knowledge of Klaassen's behavior: "I've personally seen him have what I would call a temper tantrum with turning beat red and yelling and screaming and doing that in front of the whole group of basic science chairs on several occasions." [Ex. 1006, Atkinson Depo. 79:6-10.]

34.     Despite Atkinson's personal knowledge, Klaassen was never reprimanded or asked to seek counseling before his removal as Chair. [Ex. 1006, Atkinson Depo. 74:15-22.]

35.     In fact, Atkinson and Klaassen met annually and her evaluations of him "were in the good to excellent range." [Ex. 1006, Atkinson Depo. 68:13-15.]

36.     During the evaluations, Atkinson discussed with Klaassen "the way he treated the people in his department." [Ex. 1006, Atkinson Depo. 68:10-22.]

37.     Paul Terranova, Ph.D. ("Terranova") Vice-Chancellor for Research, also held annual meetings with Klaassen regarding Pharmacology's performance under Klaassen's leadership. Terranova reviewed with Klaassen the "whole gamut" of items including the productivity of the department, the faculty, and the course direction. Terranova described the evaluations as "excellent." [Ex. 1012, Terranova Depo. 59:17 – 60:9.]

38.     In October 2010, twenty-one faculty members anonymously evaluated Klaassen. Summarized, the evaluation asked faculty members to evaluate Klaassen by answering twenty questions. The questions asked the evaluators to rank Klaassen on various criteria from a range of 1-5, with 1 being poor and 5 being excellent. On the first nineteen questions, Klaassen received an average score of 4.28. The 20th question was scored from 0-5 and asked if Klaassen should be

retained as Chair of the Pharmacology Department. Klaassen received a 4.07 average score on the 20th question. [Ex. 210; Ex. Jury Trial Vol. 3 (Tully Testimony) 43:23-44:11.]

IV.   **Klaassen Obtains Unprecedented NIH Grant Funding During his Tenure as a KUMC Faculty Member**

39.    The National Institute of Health ("NIH"), a subordinate agency within the Department of Health of Human Services, operates as the United States' principal administrative body for medical research and provides billions of dollars each year to fund scientific and medical research. Through a competitive process, the NIH awards scientific grants to KUMC through the professors that write and prepare the grants known as principal investigators ("PI".). [Ex. 1002, Jury Trial Transcript Vol. 8 (Klaassen Testimony) 201:23-207:5.] When a principal investigator is awarded a grant, the NIH funds provide direct and indirect funds. Direct funds are the grant proceeds for the professor to complete the research goals in the grant. Indirect funds go to the University as overhead. [Ex. 1002, Jury Trial Transcript Vol. 8 (Klaassen Testimony) 204:1-16.]

40.    Klaassen prepared and wrote grant applications to serve as a PI on research projects funded by the NIH. [Ex. 305; Ex. 1013 Jury Trial Vol. 1 (Terranova Testimony) 151:1-152:11; Ex. 1002, Jury Trial Vol. 8 (Klaassen Testimony) 217:3-13.]

41.    At KUMC, the PI is responsible for the scientific and technical direction of the research project funded by the NIH grant. [Ex. 1012, Terranova Depo. 101:25 – 102:2.]

42.    At KUMC, the PI is the person who puts the grant together, whose idea it is, and whose name is on the grant, because that is very important. [Ex. 1002, Jury Trial Transcript Vol. 8 (Klaassen Testimony) 217:14-218:3.] The NIH makes funding decisions in part based on the PI applicant. [*Id.*]

43.    The PI "is the person who manages the grant." [Ex. 1008, Jury Trial Transcript Vol. 7 (Jaeschke Testimony) 184:15-19.]

44. The PI also financially directs the grant and ensures compliance with the financial and administrative aspects of the award. [Ex. 1012 Terranova Depo. 102:3-14; Ex. 1002, Jury Trial Transcript Vol. 8 (Klaassen Testimony) 218:9-13.]

45. The PI is responsible for proposing research hypotheses and experiments, and then conducting the experiments subject to the NIH's regulations regarding appropriate grant cost principles. [Ex. 1008, Jury Trial Transcript Vol. 7 (Jaeschke Testimony) 184:15-185:19.]

46. Pursuant to NIH regulations and KUMC's policies and practices, the PI is responsible for the grant's financial management. [Ex. 1012, Terranova Depo. 102:3 – 112:14; Ex. 1006, Atkinson Depo. 202:5-11.] KUMC does not employ a financial manager of a grant other than the PI. [Ex. 107, Defendants' Responses to Request for Production No. 17.]

47. The NIH's Grants Policy Statement provides the regulations and rules regarding how a PI may use grant money." [Ex. 1012, Terranova Depo: 110:22-25; Ex. 1013, Jury Trial Transcript Vol. 1 (Terranova Testimony) 149:3-20.]

48. Klaassen's financial compensation from KUMC was directly tied to his ability to successfully obtain NIH grants as a PI. [Ex. 1014, Declaration of Klaassen; Ex. 1007; May 2012 Hearing: 63:13 - 64:14; Ex. 305, Klaassen's Grant Accounts; Ex. 1008, Jury Trial Transcript Vol. 7 (Jaeschke Depo.) 206:16-19.]

49. Klaassen's salary, and the salary of the KUMC employees who worked on Klaassen's research grants, consisted of a combination of state and federal funds. [Ex. 1010, Klaassen Depo. 33:19-23; 201:6-10; 452:7-20; Ex. 1012, Terranova Depo. 204:18-25; 246:4-8; Ex. 1008, Jury Trial Transcript Vol. 7 (Jaeschke Testimony 187:10-15; 186:12-23.]

50. Grant proceeds from the NIH help pay for professors' salaries, laboratories, lab equipment, and employees who salaries who work on the grant including post-docs and junior

faculty. [Ex. 1010, Klaassen Depo. 33:19-23; 201:6-10; 452:7-20; Ex. 1012, Terranova Depo. 204:18-25; 246:4-8; Ex. 1008, Jury Trial Transcript Vol. 7 (Jaeschke Testimony) 187:10-15; 186:12-23.]

51.    KUMC considers there to be at least two types of NIH Grants – institutional grants and individual or personal research grant also known as a RO1 grant. [Ex. 1013, Jury Trial Transcript Vol. 1 (146:14-21); Ex. 1012, Terranova Depo. 68:3-9.]

52.    Institutional grants provide larger support to KUMC's departments. RO1 (or individual grants) further the personal research agenda of the professor. [Ex. 1013, Jury Trial Transcript Vol. 1 (146:14-21).]

53.    Klaassen explained RO1 Grants as follows:

That is a grant, it's called an investigator initiated grant. It is a grant that the purpose is to do some specific research in an area and again it's the scientist writes an idea that they have that they think would, has the possibility in the long run of improving the health of people in the United States and, so, we write that grant and then it goes to the NIH review committee and other scientists look at hundreds and thousands of these grants and these are other university professors other than at your own university or in your own state that review it, and they prioritize those and in essence, those best ideas or intellectually stimulating ideas the committee kind of stacks them the best ones on top and the less perfect let's say or less exciting, less enthusiastic go to the bottom of the pile and in essence then eventually the government, it goes to a council and the council looks at it and eventually about 10 percent of those get funded and it's due, just like all grants, to the person's ideas, his background, what he has done previously, his track record and then if it gets funded the money goes to the university as you say and they, and then the principal investigator, like myself, does the research. So, that's my intellectual involvement in writing that grant. As a professor I have the right to do the kind of research that I want and once that money comes to the university I have the right to spend it for that research for what it was given. Now, as you know, there have been five or six or seven grants that have been taken away from me at the University of Kansas and thus I can't do my research, my rights have been taken away from me, and this has never ever been done to the best of my knowledge, at the University of Kansas Medical Center and I have talked to many scientists around the country. They know of no examples of this. This again is part of the plot of the mobbing to get rid of me which first started with Barbara Atkinson being concerned about my -- probably started with Barbara Atkinson worried about my whistleblowing and, you know, this just goes on and on and on until they get rid of me.

[Ex. 1010, Klaassen Depo. 239:1 – 240:24.] The R01 grants are the results of the individual professors' research ideas. [Ex. 1002, Jury Trial Transcript Vol. 8 (202:14 – 204:20).]

## V.   Klaassen Obtained NIH Grants Pursuant to Property Interests Identified and Protected by KUMC's Policies and Practices

54.     Tenure, according to KUMC's Corporate Representative,[2] is a "guarantee for faculty members to freely pursue their research interests without criticism or restrictions within their areas of research." [Ex. 1015, Rawitch Depo. 13:16-22.] Tenure also includes employment protections that are articled in the Faculty Handbook. [Ex. 1019, Gray-Little Depo. 14:4 – 16:14.]

55.     Tenure includes "[f]reedom from the institution or other to restrict [a professor's] area of inquiry." [Ex. 1015, Rawitch Depo. 14:5-8.]

56.     This freedom from restriction applies to both academic research and academic instruction, *i.e.*, expressing opinions in a classroom. [Ex. 1015, Rawitch Depo. 14:9-23.]

57.     To successfully complete academic research, professors frequently seek outside funding for research. [Ex. 1015, Rawitch Depo. 15:6-10.]

58.     According to KUMC's Corporate Representative, tenure "guarantees [a faculty member's] ability to do research in the area that you wish." [Ex. 1015, Rawitch Depo. 16:23 – 17:7.]

59.     Without outside funding, it is nearly impossible to do academic research. [Ex. 1015, Rawitch Depo. 14:24-15:14.] Research professors at the University of Kansas must obtain grant funding or they "will basically be terminated." [Ex. 1018, Jaeschke Depo. 25:14: - 26:10.]

---

[2] In the state court case, Klaassen filed a Notice to take Corporate Representative Deposition. Klaassen also noticed up Allen Rawitch, Ph.D. for a separate deposition in both this case and the State Court case. [Ex. 1016, Rule 30(b) Depo Notice; ECFs 197, 210.] At the Corporate Representative Deposition, counsel for KUMC advised Klaassen that Rawitch was KUMC's Corporate Representative regarding matters concerning the "Faculty Handbook." [Ex. 1017, Snakenburg Depo. 27:1-17, 57:9-17.]

60.      So long as the research relates to the professor's field and complies with human subject and other requirements, tenured professors have the "right to seek funding through their institutions to do research that are in their field." [Ex. 1015, Rawitch Depo. 15:15 – 17:7.]

61.      Harmut Jaeschke, Ph.D. ("Jaeschke"), current Chair of Pharmacology, described KUMC's right to conduct research as follows:

> Well, academic freedom means that you can virtually do, scientifically do and pursue whatever research you want. Of course, the limitation of that is that, you know, you need to convince somebody to give you money for that. You know, without that you have -- you will not be successful in pursuing that.

[Ex. 1018, Jaeschke Depo. 37:11-22.]

62.      Tenure includes the right to seek, obtain, and work under a grant. Jaeschke explained further:

> Q. And, in terms of academic freedom, is there any restriction the University of Kansas can put on you in terms of your own ideas for application of a grant?

> A. Not that I know of, and I have never experienced any of that kind of – the administration of the School of Medicine and certainly is more than happy the more grants you kind of apply for and actually you get, you know --

> Q. The better it is?

> A. -- the better it is. I don't think the RI would reject any grant that is funded.

[Ex. 1018, Jaeschke Depo. 37:23 – 38:10.] KUMC would not reject a grant because the grant includes money that the University takes off the top known as "administrative" "indirect costs" or expenses. [Ex. 1002, Jury Trial Transcript Vol. 8 (Klaassen Testimony) 203:21 – 204:16.] The University likes receiving indirect costs. [Ex. 1022, Carlson Depo. 74:8-15.]

63.      In his 45 years as a tenured faculty member, Klaassen had never seen a PI removed from a NIH Grant and testified that in his experience he had the right to do the research he wanted to do. He stated:

Well -- well, it starts out that, you know, as I kind of said at the University of Washington, you know, I wrote for grants and obtained grants and at the University of Kansas I was, had been doing that for 35 -- 45 -- close to 45 years and, so, you know, one of my rights of a faculty member is the ability to have freedoms to do the kinds of research that I want to do; however, to do the kinds of research that I want to do it takes money and, so, therefore, I have the right to go outside of the University of Kansas to get the money to do that research and if I get grants to do that research then I have the right to do the research and the University of Kansas Medical Center didn't give, allow me that right. They took my grants away, didn't even talk to me about it, have the slightest idea why and, you know, this is just unheard of. This has never been done before at the University of Kansas Medical Center and I don't even know another example in the United States where this was done.

[Ex. 1010, Klaassen Depo. 30:7-31:2.]

64.      The COBRE , T32, and Klaassen's RO1 grants were related to Klaassen's work in pharmacology and toxicology and there are no allegations that Klaassen taught or researched any subject unrelated to his field. [Ex. 1019, Gray-Little Depo. 132:17-22.]

65.      Tenure at KUMC protects "the right of dissent to teach without unnecessary restraint for full freedom of research, of academic freedom." [Ex. 1019, Gray-Little Depo. 132:23- 133:6.]

66.      Terranova defined professors' academic freedom as the "freedom to research any topic that they so choose." [Ex. 1012, Terranova Depo. 40:24 – 41:8.]

67.      Academic freedom includes professors' right to go "out in the field in their individual area and conducting research by getting gift or grant money for that research." [Ex. 1012, Terranova Depo. 66:25-67:4.]

68.      Terranova, who worked for KUMC since 1977, does not recall a single instance in which a faculty member was denied the opportunity to obtain grant funding. [Ex. 1012, Terranova Depo. 68:19 – 69:1.]

69.      Terranova cannot identify a specific example of KUMC ever denying an individual an opportunity to obtain an RO1 grant. [Ex. 1012, Terranova Depo 67:24:-68:9.]

70.     It "would be very unusual" for KUMC to deny a professor the right to obtain a "grant in his or her specific research area or his or her individualized research program." [Ex. 1012, Terranova Depo. 69:11-18.]

71.     KUMC's Faculty Handbook states:

The University of Kansas has a long tradition of dedication to the principles of academic freedom and has sought to implement these principles as they are embodied in the 1940 Statement of Principles on Academic Freedom and Tenure of the American Association of University Professors and the American Association of Colleges. The University's position on academic freedom is therefore fully reflected by the following paragraphs from the AAUP statement:

> The teacher is entitled to full freedom in research and in the publication of the results, subject to the adequate performance of his other academic duties . . .

[Ex. 209, at AR003676; Ex. 1015, Rawitch Depo. 138:23-139:21]

72.     It is reasonable for faculty to rely on the provisions of KUMC's Handbook and there are no provisions in the Faculty Handbook that delineate between "aspirational and binding policies." [Ex. 1015, Rawitch Depo. 149:17 – 150:6.] University of Kansas faculty members should assume that they need to follow KUMC's policies and that KUMC will follow its own policies. [Ex. 1017, Snakenburg Depo, 42:2-7; 56:4-12.]

73.     KUMC's Handbook allows for faculty grievances in the event the University is "not complying with its position on academic freedom." [Ex. 1015, Rawitch Depo. 150:13-20.]

74.     KUMC's failure to comply with its Handbook policies provides the basis for a faculty grievance due process hearing. [Ex. 1015, Rawitch Depo. 150:3-12.]

## VI.     Beginning in 2010, Klaassen Served As Principal Investigator On Five NIH Grants.

75.     As of KUMC's 2010-2011 school year, Klaassen served as PI on five NIH grants. [Ex. 305.]

76.     Klaassen received the one of these grants in 2006. Klaassen, as PI, received a grant titled "Nuclear Receptors in Liver Health and Disease" funded by the NIH for $10,632,518. The grant is commonly known as the COBRE grant. [Ex. 1013, Jury Trial Transcript Vol. 1 (Terranova Testimony) 151:6-152:4; ECF 326-6; ECF 326-18; Exs. 71-73, 305.]

77.     The COBRE grant concerns research projects relating to Nuclear Receptors and Liver Health [ECF 326-6, p. 3]

78.     Klaassen, as PI of the COBRE, was responsible for overseeing liver research programs. [ECF 326-6, p. 53 (identifying aims of COBRE grant), p. 10 (Klaassen as PI).] Klaassen's responsibilities for the COBRE include overseeing three different COBRE liver research projects. [Ex. 326-6, pp. 10, 53-60 (Projects 1, 4, and 5).] Klaassen's responsibilities including coordinating "experimental approaches and procedures" and "establishing milestones for the research group." [ECF 326-6, p. 10.]

79.     Klaassen was involved in COBRE research projects and is identified as a collaborator on the COBRE research projects. [ECF 326-6, pp. 58-60.]

80.     At KUMC, tenure and academic freedom provide "full protection for the ability to do the work related to nuclear receptors and liver health" on the COBRE grant. [Ex. 1006, Atkinson Depo. 208:21-23.]

81.     A second NIH grant, which Klaassen received as PI in 1979, was titled "Training Program in Environmental Toxicology." This grant has been renewed every five years, and in 2011, the NIH funded $1,541,170 for another five years. The grant is commonly known as the T32 Training grant. [Ex. 1013, Jury Trial Transcript Vol. 1 (Terranova Testimony) 151:6-152:4; ECF 326-19; Ex. 305.]

82.     In 2009, Klaassen, as PI, received a third NIH grant titled "DK-081461 (1-4), Nrf2 as a Master Regulator in Liver Disease Prevention and Therapy." The grant, commonly known as the NRF2 Liver grant, was for approximately $995,631 and ran through 2013. The NRF2 Liver grant was a personal R01 research grant. [Ex. 1013, Jury Trial Transcript Vol. 1 (Terranova Testimony) 151:6-152:4; Ex. 305.]

83.     In 2010, Klaassen, as PI, obtained a fourth NIH grant, which was a RO1 grant titled "ES-019487 (1-5) Developmental Regulation of Drug Processing Genes." The grant, commonly known as the Drug Processing Gene grant, was for approximately $2,114,968 and ran until 2015. The Drug Processing Gene grant was a personal R01 research grant. [Ex. 1013, Jury Trial Transcript Vol. 1 (Terranova Testimony) 151:6-152:4; Ex. 305.]

84.     In 2010, Klaassen, as PI, obtained a fifth NIH grant, which was a RO1 grant titled "ES-009649 (8-12), Regulation of Hepatic Uptake of Endogenous Signaling Molecules and Xenobiotics." The grant, commonly known as the Heptic Update grant was for approximately $1,125,000 and ran until 2015. The Heptic Update grant was a personal R01 research grant. [Ex. 1013, Jury Trial Transcript Vol. 1 (Terranova Testimony) 151:6-152:4; Ex. 305.]

85.     Klaassen's RO1 grants were "specific research" for Klaassen's laboratory that "he had the ability to take with him" should Klaassen leave the University. [Ex. 1020, Jury Trial Transcript Vol. 2 (Terranova Testimony) 27:25 – 29:9; Ex. 1013, Jury Trial Transcript Vol. 1 (Terranova Testimony) 151:6-152:4.] "[I]t is a general rule that the University gives up that grant to the next institution where the faculty moves to. Because we also expect that if faculty moves to us, then they bring their own grants with them, and their institution releases their grants." [Ex. 1018, Jury Trial Transcript Vol. 7 (Jaeschke Testimony) 205:2-10.]

86.     The NIH held Klaassen and KUMC responsible and accountable to financially manage and direct the scientific research of each of the five NIH grants. [Ex. 1012, Terranova Depo. 102:3 – 112:14; Ex. 1006, Atkinson Depo. 202:5-11.]

## VII.   Beginning in Early 2011 Klaassen Becomes a Vocal Critic of KUMC

87.     In 2001, KUMC appointed Atkinson Dean and Executive Vice-Chancellor. [ECF 299, ¶ 8.]

88.     At Atkinson's direction, KUMC ramped up its push towards obtaining its Cancer Center National Cancer Institute ("NCI") designation. [Ex. 1006, Atkinson Depo. 43:2 – 44:9.]

89.     Obtaining NCI designation was a top priority for Atkinson. [Ex. 1006, Atkinson Depo. 43:2 – 44:9.] Atkinson explained:

> Well, when I first came in 2000, I would -- I was struck by the fact that there was no NCI designated cancer center in the whole region all the way from St. Louis to Denver, and when I was in Philadelphia before I think they had four NCI designated cancer centers in Philadelphia. So I was surprised it wasn't there.
>
> I'm -- I was a cancer researcher, and my specialty is cytopathology, which is looking at the cells for the diagnosis of cancer. So, for me, cancer is very important, having the very best cancer care possible for people that lived in the Kansas City region or Kansas was a very important goal, so once I became dean, it became one of my top priorities.

[Ex. 1006, Atkinson Depo. 43:6-22.]

90.     KUMC's Cancer Center was very important to the Kansas City area. [Ex. 1012, Terranova Depo. 138:20-25.]

91.     KU Endowment, a not-for-profit company dedicated to raising money for KUMC, obtained money from the Kauffman Foundation to support the NCI initiative. [Ex. 1021, Girod Depo. 88:8-15.]

92.     In particular, the Kauffman Foundation provided $8 million to start a program known as the "Institute for Advancing Medical Innovation" ("IAMI"). Lesa Mitchell, then Vice-President

for the Kauffman Foundation, donated this money to start the IAMI Center. The University of Kansas Foundation matched the Mitchell's donation at the direction of Stephanie Grinage, Vice-President for Medical Development for KU Endowment. [Ex. 1006, Atkinson Depo. 115:6-20.]

93.     KUMC designed the IAMI program to "build new business and new drug development out of the cancer center" and labeled the IAMI program a "[v]ery important program." [Ex. 1006, Atkinson Depo. 116:2-8.]

94.     The Kauffman Foundation is a "great partner" of KUMC. [Ex. 1021, Girod Depo. 91:6-12.]

95.     After observing Atkinson's management of KUMC and promotion of the Cancer Center's NCI designation, Klaassen became concerned that Atkinson was "ruining the future of the medical center" because of her irresponsible financial plans. [Ex. 1006, Atkinson Depo. 122:19-123:7; Ex. 156.]

96.     Klaassen formed an unofficial group known as the "Committee of Eight." The Committee of Eight included the chairs of various basic science departments including Anatomy, Biochemistry, Physiology, Pharmacology/Toxicology, and Microbiology. [Ex. 1022; Carlson Depo. 105:12-14.]

97.     The Committee of Eight became concerned about the lack of money, the lack of transparency regarding how Atkinson spent money, and the manner in which Atkinson made decisions without accountability. [Ex. 1022, Carlson Depo. 47:2-15.]

98.     Despite the Committee of Eight's concern about the financial appropriations directed towards the Cancer Center, the Committee (as a whole) decided not to oppose the Cancer Center because, if the Committee "fought the Cancer Center it would make us look absolutely stupid." [Ex. 1022, Carlson Depo. 47:15 - 48:1.]

99.     Klaassen did not share the Committee of Eight's concerns about fighting the Cancer Center. [Ex. 1010, Klaassen Depo. 12:4-19, 13:3-8, 15:9 - 17:23; ECF 326-30, pp. 20-23.]

100.     To that end, the Committee of Eight met with the University of Kansas Chancellor Bernadette Gray-Little in August 2010, and explained their concerns about KUMC's financial situation and lack of shared governance. [Ex. 1022, Carlson Depo. 43:4-45:13.]

101.     The Chancellor wrote a letter to Atkinson informing her that there should be more shared governance at KUMC. [Ex. 1023; Correspondence from Gray-Little to Atkinson.]

102.     On March 31, 2011, Klaassen attended a large public meeting and accused Atkinson of mismanagement of KUMC. Klaassen used the metaphor "slumlord economics" to describe the financial management of KUMC and KUMC's administration's push towards NCI accreditation of the Cancer Center. [Ex. 1007, May 2012 Hearing 50:5 – 51:6; Ex. 1022, Carlson Depo. 50:2-16; 51:14-23; ECF 326-17.]

103.     Klaassen referred to KU as a "slumlord institution;" he did not call Atkinson a "slumlord." [ECF 326-17.] Terranova considered the comments to be "very inappropriate" and "very unprofessional" because there were other places for Klaassen to voice his concerns and it is embarrassing to discuss the situation in public. [Ex. 1007, May 2012 Hearing 47:20 – 51:17; Ex. 1020, Jury Trial Transcript Vol. 2 (Terranova Testimony) 85:1-87:10.]

104.     After hearing about Klaassen's public complaints, Atkinson asked KUMC employees in attendance to provide summaries of Klaassen's public complaints. [ECF 326-17; Ex. 1058, Complaints Regarding Klaassen.]

105.     One commentator, William M. Brooks, Ph.D., stated that Klaassen acted inappropriately because Klaassen must keep his opinions "behind closed doors." [ECF 326-17.]

106.    Klaassen used the metaphor "slumlord institution" or "slumlord economics" to convey the message that Atkinson was irresponsibly spending money toward a financially useless goal – the NCI accreditation of the Cancer Center. Klaassen used the example of a slumlord buying a fancy expensive car and then raising the rent of his tenants without providing any improvements to the tenants' facility. [Ex. 1010, Klaassen Depo. 120:22 – 121:9.]

107.    According to Atkinson, Klaassen's outspoken concerns included the "way taxpayer money was being spent" and the "use of funds, taxpayer funds." [Ex. 1006, Atkinson Depo. 129:17-25.]

108.    Klaassen's use of the vendor forum to denounce the University's handling of financial resources was not related to his job duties. First, Klaassen had no power to give input into whether the University should adopt the software program that was the subject of the vendor's program. [Ex. 1012, Terranova Depo. 145:21-146:1.] Second, Klaassen considered the meeting to be a "very outside" meeting. [Ex. 1010, Klaassen Depo. 127:25 – 128:6.] Third, Klaassen's reference to KUMC's administration's financial mismanagement, *e.g.*, stating that the "administration was acting as if it were a slumlord," was not related to Klaassen's official job duties because Klaassen was not responsible for the financial management of KUMC. [Ex. 1007, May 2012 Hearing 50:5-8; Ex. 1010, Klaassen Depo. 130:20 – 132:13.]

109.    On April 6, 2011, less than a week after hearing of Klaassen's public "slumlord" comments, Atkinson advised him during a meeting she was going to terminate him as Chair of the Pharmacology, stripping him of $40,000 of salary. [Ex. 61; Ex. Atkinson Depo. 143:4-18.]

110.    During the meeting with Atkinson, Klaassen presented her with a PowerPoint presentation in which he criticized her lack of joint governance and push to obtain NCI accreditation, and accused her of harming the financial future of KUMC. [ECF 326-30.] This same

PowerPoint was later circulated to the Kauffman Foundation and KU Endowment. [Exs. 58-60; Ex. 114:3-119:5; Ex. 1012, Terranova Depo. 147:58 – 159:11.]

111. In an email, Atkinson explained the reason for Klaassen's termination from Chair, admitting that his public comments motivated her decision:

> Wednesday I met with Curt K and asked him to step down as chair. The issues don't relate to his science or mentoring of faculty. They are related to his lack of leadership relative to the goals of the whole university and some decisions and treatment of faculty in his department. There have also een extremely inappropriate things he jas said to his faculty, the adminisdtration and to the public.

[Ex. 62; Ex. 1006, Atkinson Depo. 138:15-140:14.]

112. Atkinson believes that e-mail "summarizes" her reasons for Klaassen's termination as Chair. [Ex. 1006, Atkinson Depo. 140:8-14.]

113. Atkinson explained further at her deposition that Klaassen was removed as Chair for making public comments:

> When you -- when you do things that are -- is unfortunate as this in public to a vendor, it's not the right place to do it. The right place to do it is to do it in -- if you're part of a leadership team, you need to do it to your leader, to your boss, and he may have said it, but saying that we're a slumlord institution doesn't -- doesn't make us one. I mean, it's ridiculous. And the -- to be telling the outside world things like this is just totally unfortunate, so I would have assumed that this was one of the triggering incidents to saying it's time to replace him as chair.

[Ex. 1006, Atkinson Depo. 114:4-18.]

114. According to Gerald Carlson, Ph.D., ("Carlson") Chair of Biochemistry, Klaassen was removed because his "pubic behavior" left Atkinson no choice. [Ex. 99; Ex. 1022, Carlson Depo. 147:11-14] Girod's considered Klaassen's actions to be "acting out." [Ex. 42; Ex.1021, Girod Depo. 205:3-6]

115. Atkinson's behavior contributed to the general feeling at KUMC that employees would be disciplined for blowing the whistle. For instance, tenured Professor Hartmut Jaeschke eventually replaced Klaassen as Chair of Pharmacology. He stated that the "lesson to be learned"

from Klaassen's termination is "that even if you do an excellent job as chair, it is still unhealthy to criticize your boss too much." [Ex. 120; Ex. 1018, Jaeschke Depo. 42:10-43:18.]

116.    On April 9, 2011, a PowerPoint presentation prepared by Klaassen regarding the lack of joint governance and Atkinson's poor financial management was widely circulated across campus, the University of Kansas Endowment, and the Kauffman Foundation. [Exs. 58-60.]

117.    The PowerPoint Presentations accused Atkinson of "bankrupting the future of KUMC" by inappropriately spending money on the Cancer Center, the Wichita Medical Campus, and the Salina Medical Campus. [Ex. 58.]

118.    Mitchell, "one of the primary people at the Kauffman Foundation," who was in charge of the IME program, received the PowerPoint and replied "Woah, what the heck?" [Ex. 58; Ex. 1006, Atkinson Depo. 115:6-11.]

119.    Stephanie Grinage (Vice-President for Medical Development for KU Endowment) wrote Atkinson and Terranova stating that receiving the PowerPoint from the Kauffman Foundation troubled her and that "spreading lies and inaccuracies throughout our network is intolerable." [Ex. 59.] The e-mails and PowerPoints that originated with Klaassen then was forwarded to Terranova. He wrote to Atkinson, "FYI – this really is upsetting." [Ex. 49; Ex. 1012, Terranova Depo. 147:58 – 159:11.]

120.    Two days later, on April 11, 2011, e-mail correspondence setting forth the same information contained within Klaassen's PowerPoint and prepared at the direction of Klaassen was widely distributed across the community and campus. [ECF 326-32; Ex. 1010, Klaassen Depo. 483:7-8; 485:7-13.]

**VIII.**   **Klaassen Contributes to Lawrence Journal-World Articles That Run From April 2011 Through June 2012 Regarding KUMC's Financial Mismanagement**

121.   On April 30, 2011, the Lawrence Journal-World ran an article titled "Dean's firing reveals broader concerns at KU Medical Center." The article accused Atkinson of heavy handed leadership and financial mismanagement. [Ex. 26.] Klaassen contributed to the content in the article. [Ex. 26; Ex. 1010, Klaassen Depo. 334:21-335:4.] Many of the critical editorials were written by Dolph Simons. [Exs. 26, 169, 81, 28, 1024.] The editorial and many pages of public comments can be read here: http://www2.ljworld.com/news/2011/apr/30/deans-firing-reveals-broader-concerns-ku-medical-c/. There is a section of the editorial titled "Related Documents" that contain documents Klaassen provided the editorial's author Dolph Simons including Atkinson's letter removing Klaassen as Chair. [See SOAF 128.]

122.   On July 17, 2011, two months after the Lawrence Journal-World ran its article regarding KUMC's poor treatment of Klaassen, the Lawrence Journal-World ran another article about Atkinson's failed leadership echoing Klaassen's concerns. [Ex. 1024, Lawrence Journal-World (July 17, 2011).]

123.   On September 22, 2011, the Lawrence Journal-World ran another article regarding the poor pass rate of KUMC's department of internal medicine residents. [Ex. 169; Ex. 1006, Atkinson Depo. 230:4-12.]

124.   On Saturday, October 29, 2011, the Lawrence Journal-World ran another article titled "Leadership Issues coming to light at KU Medical Center." [Ex. 81; Ex. 1006, Atkinson Depo. 231:10-232:13] With input from Klaassen, the Lawrence Journal-World article described Atkinson's evaluation as "shockingly bad" and discussed Klaassen's removal as Chair. [Ex. 81.]

125.     Again with Klaassen's assistance, on November 5, 2011, the Lawrence Journal-World ran an article regarding serious concerns at KUMC and included additional discussions regarding Klaassen's interactions with KUMC. [Ex. 28; Ex. 1006, Atkinson Depo. 251:24-252:8.]

126.     On June 9, 2012, the Lawrence Journal World ran another article discussing how KUMC began taking action against Klaassen only after Klaassen initiated a critical inquiry into Atkinson. [Ex. 30.]

127.     On June 19, 2012, the Lawrence Journal World ran an article identifying Klaassen as a "Whistle-blower" recognizing that Klaassen "had the commitment to the welfare of the school to speak up about Atkinson." [Ex. 31.] The editorial observed that Klaassen "paid the price" by speaking up about Atkinson. [Ex. 31.]

128.     Klaassen spoke with the Lawrence Journal-World and provided information and documents to the newspaper regarding Atkinson's financial mismanagement. [Ex. 1010, Klaassen Depo: 128:7 -129:6.]

129.     Klaassen went to the LJW because he it was the only remaining place he knew he could go to. [Ex. 1010, Klaassen Depo. 139:6 - 140:3.]

130.     Before speaking with LJW, Klaassen spoke with the Chancellor, the Governor of the State of Kansas, and anybody else who would listen. Klaassen testified:

A: I could not make progress originally at K.U. Med Center working, trying to interact with Barbara Atkinson. In fact, she would never meet with me one-on-one. Went to the chancellor, she basically agreed with us, but nothing ever happened and things just kept getting worse and worse and worse. So, I tried to speak out directly at one of these meetings of ten people with Atkinson, had no effect, so, then, I started to go slowly outside, what she considered outside of talking, making it available to the top 40 people maybe at K.U. Med Center so everybody could hear a little bit what's going on as well as outside these two people. Okay, so, then, she fires me. Only place I can go that I knew I could go, first of all, was to the newspaper, sent --talked to many people, went to -- told everybody I could think of, even went to the governor of the state of Kansas.

Q. Which governor was that?

A. The present one [Brownback]. What happened? ZILCH.

[Ex. 1010, Klaassen Depo. 139:8 – 140:3.]

131.    Klaassen talked to the Kansas City Star too, but the Kansas City Star did not want to run an article. [Ex. 1010, Klaassen Depo. 159:-17:23; 145:15-147:9.]

132.    Klaassen talked to the LJW about what he identified as KUMC's mismanagement. [Ex. 1010, Klaassen Depo. 140:11 - 142:9.]

133.    Klaassen advised the LJW of Atkinson's financial mismanagement of KUMC by seeking NCI designation of the Cancer Center and expanding KUMC facilities in Wichita and Salina, Kansas. [Ex. 1010, Klaassen Depo. 139:6-142:9.]

134.    The term slumlord economics was related to the Cancer Center. [Ex. 1022, Carlson Depo. 48:6-8.]

135.    In response to deposition questioning, Carlson stated:

Q. Certainly you were aware in the time frame of 2011 and 2012 early in the year that there were adverse editorials in the Lawrence Journal World?

A. Oh, sure, yes.

Q. And references to Doctor Klaassen and his complaints?

A. Yes. This particular one I have no idea if I saw this before or not. I'm curious, though, why it's entitled whistleblower. I never heard him blow a whistle. I heard him complain loudly about the Cancer Center. So, does it say where the whistle was, what's it about in here?

[Ex. 1022, Carlson Depo. 216:21-217:8.]

## IX.    **KUMC's Administration Closely Monitored the Lawrence Journal-World Articles, Considered the Articles False and Damaging, and Believed that Klaassen Contributed To The Articles**

136.    KUMC closely monitored LJW news articles and anticipated negative articles after disciplining Klaassen. [Ex. 175; Ex. 1006, Atkinson Depo. 225:3-17; 254:25-255:17] In particular,

Atkinson routinely read LJW Saturday editorials authored by Dolph Simons, to whom Dr. Klaassen provided information. [Ex. 1006, Atkinson Depo. 159:5-10.]

137.    KUMC's administration concluded that statements within the LJW articles were "coming from Klaassen himself." [Ex. 175; Ex. 1006, Atkinson Depo. 256:19-257:7.]

138.    KUMC knew that Klaassen contributed to LJW articles because the articles quoted letters that Atkinson had personally provided to Klaassen. [Ex. 101; Ex. 1006 Atkinson Depo. 168:4-7.] KUMC's administration thought it was "unbelievable that Simon seemingly takes everything that Curt tells him at face value." [Ex. 104.]

139.    Klaassen had made it known to Carlson and others that "he had a good inroad with Dolph Simons." [Ex. 1022, Carlson Depo. 141:10-24.]

140.    Carlson considered Klaassen's "publicly growing" behavior to be insubordination. [Ex. 1022, Carlson Depo. 39:13-40:10.]

141.    The LJW Articles bothered KUMC's Administration. [Ex. 1022, Atkinson Depo. 260:6-19.] KUMC's administration was concerned that Simon's editorials would be influential and cause the University to lose money from donors, the legislature, or other sources. [Ex. 1022, Carlson Depo. 146:5-15.] At the time, KUMC was seeking money from the legislature. [Ex. 1018, Jaeschke Depo. 46:15-47:16.]

142.    Carlson presumed Klaassen was Simon's source of information. [Ex. 1022, Carlson Depo. 155:16-18.] Jaeschke knew Klaassen was sending e-mails to the LJW. [Ex. 1018, Jaeschke Depo. 45:6 – 47:4.]

143.    Atkinson spoke with Chancellor Gray-Little about the LJW articles. Without being asked about the content of the articles, Atkinson defined the LJW articles as "editorials about Klaassen." [Ex. 1006, Atkinson Depo. 64:6-15.]

144.     Atkinson believes the LJW articles were "unfair" and "hurtful." [Ex. 1006, Atkinson Depo. 175:6-15.]

145.     Atkinson, and other members of KUMC's Administration, concerned about the negative publicity associated with the article, prepared talking points and a response that they eventually circulated to KUMC employees as part of a "Checking In" e-mail correspondence. [Exs. 26, 161-165; Ex. Atkinson Depo. 153:18-154:7; 159:25-160:8; 168:11-19; 171:22-172:4.]

146.     The Klaassen article in the LJW sparked an outcry and the Kansas Governor's office began getting "many" letters opposed to KUMC's leadership. [Ex. 1006, Atkinson Depo. 177:7-16; Ex. 102.]

147.     The Cancer Center is important to the Kansas City region. [Ex. 1012, Terranova Depo. 138:20-25; Jaeschke Depo. 46:15-47:16.]

148.     Atkinson considered Klaassen a problem because his "level of dissent" was "outrageous." [Ex. 1006; Atkinson Depo. 136:13-23.]

149.     Atkinson believed that Klaassen's public comment about the Cancer Center NCI accreditation and KUMC's financial mismanagement was outrageous and improper. [Ex. 1006, Atkinson Depo. 136:24 – 137:5.]

150.     The articles to which Klaassen contributed related to the following topics that concerned KUMC leadership:

- KUMC's financial solvency under Atkinson's leadership. [Ex. 26; Ex. 1006, Atkinson Depo. 188:6-16.]

- Fiscal sustainability of the medical center in light of the expansion for the program in Salina and improvements in the Wichita medical school; [Ex. 26; Ex. 1006, Atkinson Depo. 190:16-25.]

- Issues with the Cancer Center. [Ex. 26; Ex. 1006, Atkinson Depo. 185:10-25.]

- Atkinson's marginalization of KUMC employees. [Ex. 26; Ex. 1006, Atkinson Depo. 184:11-185:8.]

- Potential issues with getting NCI designation of the Cancer Center [Ex. 26; Ex. 1006, Atkinson Depo. 195:1-11.]

- Concerns with Klaassen's dismissal as Chair; [Ex. 26; Ex. 1006, Atkinson Depo. 194:7-195:1.]

151.   KUMC's leadership was concerned about the LJW articles because the articles were issued at "a very crucial time in terms of building the medical center, particularly the cancer program, and it's just bad to have these kinds of things that are false out in the public with the public thinking they read it in the newspaper it must be right." [Ex. 1006, Atkinson Depo. 178:14-22.]

152.   KUMC's leadership believed the articles were "hurting KU." [Ex. 1006, Atkinson Depo. 182:24-25; Ex. 167.]

153.   Now an administrator at UNLV School of Medicine, Atkinson's biography lists three notable accomplishments at KUMC:

> Before UNLV, Atkinson was dean of medicine and later also executive vice chancellor of the University of Kansas Medical Center campus, where she revitalized the school's vision to better serve regional needs. Examples include the opening of a new campus in Salina to address the state's physician shortage and expansion of the Wichita campus from a two-year program to a full, four-year program. In 2012 the University of Kansas School of Medicine became just the 67th school to earn National Cancer Institute designation.

[Ex. 1025.]

154.   Each identified achievement was a topic of Klaassen's criticisms. [Ex. 1010, Klaassen Depo. 139:6-142:9.]

155.   Atkinson uninvited Klaassen from a meeting with donors because she didn't want "to have somebody that would talk like that about me to the Lawrence Journal World" at a meeting at her house with donors. [Ex. 1006, Atkinson Depo.167:19-25.]

156.   KUMC continued to operate even with the LJW article receiving significant attention. [Ex. 1006, Atkinson Depo. 195:22-196:9.]

157.    KUMC successfully received NCI designation of its Cancer Center. [Ex. 1006, Atkinson Depo. 42:3-8.]

158.    Klaassen's public frustrations concerned the Cancer Center and finances. [Ex. 1022 Carlson Depo. 40:22 – 41:13.]

159.    KUMC thought that Klaassen provided a "scandalous" tip to the LJW regarding internal medicine failures. [Ex. 1006, Atkinson Depo. 229:21-25.]

160.    Atkinson believed that Klaassen's termination as Chair was inevitable because of publicly growing friction between Klaassen and KUMC's leadership. [Ex. 1006, Atkinson Depo. 40:1-10.]

161.    The LJW articles did not cause anybody to do their jobs differently. [Ex. 1006, Atkinson Depo. 232:22 – 233:15.]

162.    Klaassen had no job responsibilities (either as Chair or faculty member) regarding the NCI designation of the Cancer Center, the Salina campus, and the Wichita campus of KUMC. [Ex. 1010, Klaassen Depo. 130:12 - 132:9.]

163.    It was not part of his responsibility as chair of a basic science department or a faculty member to get involved in issues involving the Cancer Center. [Ex. 1022, Carlson Depo. 105:21-106:1; Ex. 1018, Jaeschke Depo. 46:5-14.]

164.    Klaassen was punished not because of "what he said" but because of the "forum he used to say it and how he said it." [Ex. 1022, Carlson Depo. 220:9-20.]

## X.    Klaassen's Removal of Chair "Was Very Damaging" to the Pharmacology Department and "Destroyed a Tox" Program that Took 30 years to Build.

165.    The Pharmacology Department's success was due to Klaassen's scientific acumen and reputation. Professor Steven Weinman ("Weinman") explained despite Klaassen's "emotional, inpolitic, and counterproductive outbursts," the success of the Pharmacology program including

"excellent NIH funding, COBRE grant, spectacularly successfully young faculty recruitment, National prominence, high morale and high level of scientific collaborations" are "primarily due to Curt's efforts." [Ex. 159; Ex. 1006, Atkinson Depo. 159:18-23.]

166.     Weinman was concerned that "Curt's dismissal" as Chair would "trigger an exodus of the best junior faculty." [Ex. 159.]

167.     Weinman's concerns were shared by other faculty. Tenured faculty within Pharmacology, *i.e.*, Klaassen's direct reports, were allegedly subject to abusive and harassing behavior and were "seriously concerned" that removing Klaassen as chair would destroy the department. [Ex. 419; Ex. 1002, Jury Trial Vol. 8 (Jaeschke Testimony) 142:8-16.]

168.     Tenured Pharmacology faculty jointly wrote Atkinson asking her to reverse her decision. They stated:

> Last week, Dr. Curtis Klaassen, Distinguished University Professor, was relieved of his duties as chair of the Department of Pharmacology, Toxicology and Therapeutics. We, the tenured faculty of this department, are seriously concerned about the impact of this decision. Most of us came to KUMC because of Dr. Klaassen's reputation as an internationally renowned toxicologist and the confidence in his leadership qualities to build a world-class department and liver research enterprise. As can be seen by numerous measures, this goal was achieved. However, at a time when several multi-million dollar grants with Dr. Klaassen as principal investigator (COBRE renewal, Toxicology Training grant renewal) are awaiting funding decisions by NIH and many universities are eager to hire funded faculty, his removal as chair bears the risk of severe short-term and especially long-term negative consequences. The decline of the most successful basic science department at KUMC would also negatively impact the Medical Center and KU, and certainly is opposite to your own goals as chancellor to "raise the scholarly stature of KU". Therefore, we respectfully request that you consider appointing a person or a committee from outside of KUMC to independently assess the severe damage both financially and in reputation as a research university the dismissal of Dr. Klaassen as chair of this department may cause. It would be in the interest and to the benefit of the university to find an amicable solution.

[Ex. 419; Ex. 1002, Jury Trial Vol. 8 (Jaeschke Testimony) 142:8-16.]

169.     The tenured faculty's concerns came to light. The removal of Klaassen as Chair was "very damaging to [the] department of pharmacology, and it destroyed a tox program that took [] 30 years – over 40 years to put together." [Ex. 1007, May 2012 Hearing 281:3-9.]

170.    After Klaassen's termination, funded faculty (faculty currently serving as PI on RO1 research grants) including Bryan Cobble, Hong Lu, John Robertson, and Grace Guo all left KUMC. [Ex. 327; Ex. 1004, Jury Trial Vol. 3 (Carlson Testimony) 121:23-122:8.]

171.    Because of departing faculty, the Pharmacology department lost nine R01 grants because the funded faculty "took their grants with them." [Ex. 1008, Jury Trial Transcript Vol. 7 (Jaeschke Testimony) 205:15-21; Ex. 1018, Jaeschke Depo. 26:11-23.]

## XI.    After Being Removed as Chair, From April 2011 Through November 2011 Klaassen Continued To Professionally Perform His Job Responsibilities

172.    Following Atkinson's arbitrary removal of Klaassen as Chair, Atkinson went outside the Pharmacology Department and appointed Chair of Biochemistry Carlson as Interim Chair of Pharmacology, filling Klaassen's former position. [Ex. 1022, Carlson Depo. 65:13-17.]

173.    As of April 2011, Cody Tully was a Management Analyst in the Department of Pharmacology. [Ex. 1004, Jury Trial Transcript Vol. 3 (Tully Testimony) 36:11-38:16).] Tully was responsible for the financial management of department grants including the COBRE grant. [Ex. 1004, Jury Trial Transcript Vol. 3 (Tully Testimony) 38:17-39:5; 47:17-22.]

174.    At various points in time, Tully's wages were paid by the COBRE grant. [Ex. 1004, Jury Trial Transcript Vol. 3 (Tully Testimony) 40:11-24; 41:10-14).]

175.    Tully worked closely with Rosa Meagher, who was an administrative assistant with the Department of Pharmacology. [Ex. 1009, Meagher Depo. 17:15-25.]

176.    When Klaassen was Chair, both Meagher and Tully reported to Klaassen. [Ex. 1004, Jury Trial Transcript Vol. 3 (Tully Testimony) 39:6-14.]

177.    Despite being removed as Chair, Klaassen still served as PI on the COBRE and T32 Training Grant. [Ex. 305; Ex. 317; Ex. 1004, Jury Trial Vol. 3 (Carlson Testimony) 113:5-16.]

178.    The COBRE grant was "an enormous accolade for the [Pharmacology] department" and was very important to the Pharmacology department's success. [Ex. 1009, Meagher Depo. 28:1-5.]

179.    One purpose of the COBRE grant was to provide infrastructural and faculty support, *i.e.*, provide infrastructure and equipment and money for junior faculty to build the department in hopes that the junior faculty would obtain independent funding on their own by obtaining RO1 NIH grants. [Ex. 1009, Meagher Depo. 28:7-25.]

180.    The COBRE grant was awarded in five year increments and was scheduled to be renewed in 2011. [Ex. 1018, Jaeschke Depo. 60:22 – 61:11; Ex. 1008, Jury Trial Transcript Vol. 7 (Tully Testimony) 41:2-9.]

181.    At the time of Klaassen's removal as Chair, the COBRE and the Toxicology Training Grant were awaiting renewal decisions from the NIH. [Ex. 419.]

182.    As PI of the COBRE, Klaassen was responsible for hiring junior faculty and, because the renewal of the COBRE was already in process, Klaassen had started the process of identifying new faculty to work pursuant to COBRE funding and was running job advertisements in Scientific magazines. [Ex. 109; Ex. 1004, Jury Trial Vol. 3 (Carlson Testimony) 102:16-23; Ex. 317.]

183.    Klaassen's job duties relating to the COBRE and T32 included: (1) dividing the COBRE funds into pools of money for the various COBRE projects, (2) hiring faculty, (3) figuring out which faculty would receive COBRE funding support, (4) manage Pharmacology department seminars. [Ex. 1018, Jaeschke Depo. 60:22 – 61:11; Ex. 317.]

184.    Klaassen tirelessly worked to recruit outstanding faculty and to manage the T32 and COBRE grants. However, to do so, he needed the administrative support of Meagher, Tully, and Carlson. Instead of assisting Klaassen, Meagher, Tully, and Carlson systematically refused to

respond to his e-mails, mocked his requests, denied him access to information and ultimately schemed to destroy his research career. [SOAF 185-208.]

185.    Two days after being removed as Chair, on Friday April 8, 2011, Klaassen asked Carlson about the status of the COBRE job applications, wanting to know if the "status of the [job applications] changed in the last week," *i.e.*, the week Klaassen was removed as Chair. [Ex. 109.]

186.    Carlson mocked him in response and did not follow up with him regarding the job applications. [Ex. 109.]

187.    One month later, on May 10, 2011, in response to an e-mail correspondence from the NIH regarding the COBRE grant, Klaassen responded to the e-mail and included Carlson and Meagher in his response to keep them apprised of the situation. [Exs. 306 and 307; Ex. 1004, Jury Trial Vol. 3 (Carlson Testimony) 107:18-108:6.]

188.    Because he was still a member of pharmacology, Klaassen had the right to ask Tully and Meagher for assistance because they were pharmacology employees whose job duties included providing administrative support to pharmacology faculty members. [Ex. 1008, Jury Trial Transcript Vol. 7 (Meagher Testimony) 54:2-6).]

189.    On May 19, 2011, Klaassen asked for a meeting with Tully to discuss the COBRE, training grant, and faculty search. Carlson advised Tully to stall in responding to Klaassen. [Ex. 308; Ex. 1004, Jury Trial Vol. 3 (Tully Testimony) 49:12-24.]

190.    On May 21, 2011, Klaassen asked for help retrieving a voicemail off his phone because there was an issue with authorization codes. Tully, instead of assisting Klaassen, told him to "hit the pound key twice." [Ex. 389; Ex. 1004, Jury Trial Vol. 3 (Tully Testimony) 52:19 – 53:12.]

191.    In early June 2011, Klaassen left the country for several weeks and requested a meeting regarding COBRE financial issues. [Ex. 309; Ex. 1008, Jury Trial Vol. 7 (Meagher Testimony) 54:7-13

192.    Carlson, Tully, and Meagher refused to meet with him and ignored his request in part because they did not want to give him information that he might use for "his Saturday escapades." [Ex. 310-312; Ex. 1008, Jury Trial Vol. 7 (Meagher Testimony) 54:21-22 (Ex. 310); Ex. 1004, Jury Trial Vol. 3 (Tully Testimony) 53:25-54:9 (Ex. 311), (Carlson Testimony) 109:8-12 (Ex. 312).]

193.    Despite being ignored by Carlson, Tully, and Meagher, on June 10, 2011, Klaassen received an e-mail regarding the T32 training grant renewal. He forwarded the e-mail to Carlson asking him to "do what you think is most appropriate." [Ex. 313; Ex. 1004, Jury Trial Vol. 3 (Carlson Testimony) 111:16-22.]

194.    On June 18, 2011, while out of the country and without Klaassen's knowledge, Tully re-keyed Klaassen office so he could not reenter his own office. [Ex. 314; Ex. 1004, Jury Trial Vol. 3 (Tully Testimony) 57:1-8.]

195.    A few weeks later, on June 29, 2011, Klaassen sent another e-mail correspondence to Carlson, identifying his responsibilities, discussed the complications he faced in meeting his responsibilities, and ultimately requested secretarial assistance. [Ex. 317.]

196.    Carlson, instead of responding to his e-mail correspondence, quoted Sarte and mocked Klaassen's "intentions" in sending the e-mail. [Ex. 317.]

197.    Despite receiving no assistance, on July 14, 2011, Klaassen sent another e-mail deferring to Carlson's position as Chair regarding the purchase of a newsletter. [Ex. 318; Ex. 1004, Jury Trial Vol. 3 (Carlson Testimony) 115:21-25.]

198.    On July 21, 2011, Klaassen circulated a Lawrence-Journal World editorial regarding KUMC. [Ex. 319; Ex. 1004, Jury Trial Vol. 3 (Carlson Testimony) 123:22-124:4.]

199.    Carlson e-mailed Atkinson the same day stating that he replied "nastily" to the e-mail because it was his intent to "provok[e] an open confrontation between him and me at a faculty meeting next week." [Ex. 319.]

200.    Carlson reiterated his intent to provoke Curt in a second e-mail correspondence to Meagher and Tully. [Ex. 320; Ex. 1004, Jury Trial Vol. 3 (Tully Testimony) 59:11-22.]

201.    On July 26, 2011, Klaassen wrote Carlson encouraging him to save equipment that a professor who was leaving the university had used. Klaassen wrote to encourage Carlson "to save the equipment for the new faculty that we plan to hire." [Ex. 321; Ex. Jury Trial Vol. 7 (Meagher Testimony) 63:24-64:6.]

202.    Despite acknowledging that Klaassen as PI of the COBRE grant had responsibilities regarding pharmacology hiring and equipment, Meagher called him a "Dictator" in response because she considered the e-mail to be an act of insubordination. [Ex. 321; Ex. 1008, Vol. 7 Jury Trial (Meagher Testimony) 63:24 – 67:13).]

203.    Despite Carlson's attempt to provoke Klaassen, Klaassen continued to send e-mail correspondences to Carlson requesting guidance and direction from the interim Chair. These e-mail correspondences include:

- August 1, 2011 e-mail regarding help with the COBRE renewal; [Ex. 322; Ex. 1004, Jury Trial Vol. 3 (Carlson Testimony) 119:7-120:11.]

- August 1, 2011, e-mail correspondence regarding the payment of textbooks; [Ex. 323; Ex. 1004, Jury Trial. Vol. 3 (Carlson Testimony) 118:17-119:6.]

- August 9, 2011, e-mail correspondence about assisting a colleague in clinical pharmacology. [Ex. 326; 1004, Jury Trial Vol. 3 (Carlson Testimony) 120:12-22.]

204.    In response to Klaassen's e-mails, Carlson mocked him advising him that he was "the expert" and telling him that he did not need to "punt collegiality to the chair." [Ex. 326.]

205.    On October 7, 2011, Klaassen asked for an offer letter template regarding the hire of a new potential faculty member. [Ex. 328; Ex. 1008, Jury Trial Vol. 8 (Meagher Testimony) 69:5-12.]

206.    In response to his request, Meagher wrote, "What an …..!!" [Ex. 328.]

207.    Meagher claimed that she repeatedly ignored Klaassen because he "attacked" her via e-mail. [Ex. 1008, Jury Trial Transcript Vol. 7, (Meagher Testimony 87:11-18).]

208.    Meagher characterized an e-mail from Klaassen in which he states, "I would appreciate it if you would print out a copy of the Training Grant?" as an "attacking" e-mail correspondence. [ECF 326-15, Ex. 335; Ex. 1008, Jury Trial Transcript Vol. 7, (Meagher Testimony) 86:24 -87:18).] Klaassen authored the T32 grant.

## XII.    Atkinson, Terranova, and Carlson Conspire To Destroy Klaassen's Career

209.    On July 17, 2011, two months after the Lawrence Journal-World ran its article regarding KUMC's poor treatment of Klaassen, the Lawrence Journal-World ran another article about Atkinson's failed leadership. [Ex. 1024, Lawrence Journal-World (July 17, 2011).]

210.    Atkinson blamed Klaassen for contributing to the negative press regarding her leadership and Dorothy Knoll, Dean of Students, "damned" Klaassen in a correspondence to Atkinson for his contributions regarding the article. [Ex. 1026, Correspondence Between Atkinson and Knoll, at KU077702.]

211.    A few weeks after the July 17, 2011, Lawrence Journal-World article, Carlson, Atkinson, and Terranova began a conspiracy to retaliate against Klaassen. They started the process of destroying his career and reputation by taking away his NIH grants, destroying his research program, forcing him to move offices, forcing him to accept an appointment in Internal Medicine, and moving him into a basement laboratory. [SOAF 212-236.]

212.     On August 8, 2011, Carlson e-mailed Atkinson about removing Klaassen as PI on the T32 Training Grant. [Ex. 73A; 1004, Jury Trial Vol. 3 (Carlson Testimony) 127:17-22.]

213.     On September 2, 2011, Terranova and Carlson sent correspondence to Atkinson about removing Klaassen as PI on the COBRE grant. [Ex. 74; Ex. 1013, Jury Trial Transcript Vol. 1 (Terranova Testimony) 166:20-167:1.] Carlson stated that he would convince Jaeschke to become PI of the COBRE grant to facilitate removing Klaassen from PI from the COBRE grant. [Ex. 74.]

214.     On September 15, 2011, Carlson e-mailed Atkinson and Terranova about removing Klaassen as PI on the T32 grant again and discussed moving Klaassen out of the Hemenway Building where Klaassen's laboratory and office were located. [Ex. 75; Ex. 1013, Jury Trial Transcript Vol. 1 (Terranova Testimony) 170:2-6; 189:19-190:12.]

215.     Around this time, in an attempt to find a legal justification to remove Klaassen as PI on the COBRE and T32 Grant, KUMC's legal counsel started an investigation into Klaassen's handling of NIH grant monies. KUMC's legal counsel apparently directed Rosa Meagher, Klaassen's long-time administrative aid, to investigate Klaassen's NIH accounting. [Ex. 211; Ex. 1008, Jury Trial Transcript Vol. 8 (Meagher Testimony) 176:3-18.]

216.     The results of the investigation turned up nothing. KUMC refused to produce the results of the investigation, claiming attorney-client and work product privilege. [Ex. 211, Ex. 1012, Terranova Depo. 206:11-16.]

217.     Around this time, KUMC retaliated against professors working closely with Klaassen. Grace Guo, junior funded faculty member and employee in Klaassen's laboratory, testified at trial:

> I left because I feel like I couldn't function as a scientist or faculty in the department. So first we were harassed in a way, not just me, but at least three or four junior faculties that were hired by Klaassen. And then so people came to my office, uh, told me everything bad about Klaassen, or to cut the line with him. So to me I -- I have a very mild personality about who say do not do that to me. And they walk into your office, I cannot say no, but that disrupts my work. I just got my first ROI, and I need

to publish, that's one. And the second, I felt like me as well as a few other professors, junior faculties, they were singled out in the department like for faculty meetings that is supposed to include every faculty.

There's a few months we were not informed about that meeting. So, of course, we couldn't, because we were not there. There was faculty meeting going on, and there's a lot of people accusations made about our knowledge for contribution. So at that time, I felt like it's time for me to leave.

[Ex. 1004, Jury Trial Transcript Vol. 3 (Guo Testimony) 25:4 – 26:1.]

218. On September 18, 2011, the Lawrence Journal World ran another article criticizing Steven Stites' Internal Medicine Department residency pass rate. [Ex. 169.]

219. Atkinson and Stites concluded that Klaassen may have been responsible for the article. [Ex. 1006, Atkinson Depo. 229:21-25.]

220. Stites blamed Klaassen for the article. [Ex. 1006, Atkinson Depo. 230:20-23.]

221. On October 6, 2011, Carlson again e-mailed Atkinson and Terranova and told them that time is becoming of the essence to change PIs. [Ex. 76; Ex. 1004, Jury Trial Transcript Vol. 3 (Carlson Testimony) 136:3-13.]

222. A week later, on October 13, 2011, after an apparent in-person or telephone conference, Carlson e-mailed Terranova and Atkinson about removing Klaassen as PI on the T32 and COBRE grants and removing him from the Pharmacology building. Carlson stated that he did not know what was going on with regards to "due cause replacement for misuse of funds on the two grants." Carlson recommended that changes be made immediately to prevent Klaassen from doing "what he wants with the funds." [ECF 326-20.] Carlson also discussed moving Klaassen out of the Hemenway Building and into the Hixson basement. [ECF 326-20.]

223. One week later, on October 20, 2011, Carlson reiterated to Atkinson and Terranova that "I hope the PI changes and a move off the floor will occur soon." [Ex. 78; Ex. 1013, Jury Trial Vol. 1 (Terranova Testimony) 194:7-11.] Around this time, Jaeschke became involved in the

administration's decision to remove Klaassen from the Pharmacology department and out of the Hemenway building. [Ex. 1018, Jaeschke Depo. 75:15-76:4.]

224.    Terranova responded to Carlson's e-mail, "I do believe I have a plan. Timing must be coordinated." [ECF 326-142.] Terranova later testified that "the Plan" including removing Klaassen from the T32 and COBRE grant as well as forcing him to move his laboratory and office to Hixson 1000, a basement laboratory in the oldest building on campus. [Ex. 1013, Jury Trial Transcript Vol. 1 (Terranova Testimony) 196:9-24.]

225.    At 2:00 pm on Friday October 28, 2011, Terranova stated he is "making progress in the NIH realm" and that he would keep Carlson posted. [ECF 326-21.]

226.    That same day, Klaassen held a meeting with members of the Pharmacology Department to discuss the COBRE grant. At the meeting, Klaassen accused Carlson and Cody Tully, administrative assistant for Pharmacology, of financial mismanagement of grant monies – including the COBRE grant. [ECF 187-31.]

227.    For example, Tully failed to follow Klaassen's instructions as PI of the COBRE grant. Tully refused to charge the purchase of a centrifuge to the COBRE grant and instead charged it to one of Klaassen's other grants. [Ex. 1010, Klaassen Depo. 257:21-24; Ex. 1027]

228.    Klaassen considered Tully's actions to be a violation of NIH policies and practices. [Ex. 1010, Klaassen Depo. 257:4 – 258:5.]

229.    Klaassen was also greatly concerned about "being stonewalled" by Carlson, Tully, and Meagher because Meagher, Tully, and Carlson "wouldn't do anything necessary for these grants" which could cause Klaassen to get into trouble with the NIH as the PI of the COBRE and T32 grants. [Ex. 1002, Jury Trial Transcript Vol. 8 (Klaassen Testimony) 235:2 – 242:7.]

230.     Klaassen believed that Tully's salary was paid of Klaassen's NIH grants. [Ex. 1010, Klaassen Depo.: 257:25-258:10.] Therefore, Tully was expected to dedicate time and energy to working on the NIH grants subordinate to Klaassen's leadership as PI. [Ex. 1010, Klaassen Depo.: 257:25-258:10.]

231.     On Saturday, October 29, 2011, the Lawrence Journal-World ran another article titled "Leadership Issues coming to light KU Medical Center." [Ex. 81.]

232.     The Lawrence Journal-World article described Atkinson's evaluation as "shockingly bad" and discussed Klaassen's removal as Chair. [Ex. 81.] Atkinson forwarded the article to Terranova, Stites, and Girod. [Ex. 82; Ex. 1006, Atkinson Depo. 233:20-234:4.] In 2011, Girod was aware of Klaassen's allegations of financial mismanagement at the hands of Atkinson as it pertained to the Cancer Center. [Ex. 1021, Girod Depo. 230:16-24.]

233.     The article upset Atkinson. [Ex. 171; Ex. 1006, Atkinson Depo. 234:21-235:3.] She expressed concern that KUMC inadequately responded to the article and wanted a stronger response. [Ex. 172; Ex. 1006, Atkinson Depo. 236:14-24.]

234.     On Monday, October 31, 2011, Terranova and Atkinson started the process of suspending Klaassen from campus. [Exs. 83, 84; Ex. 1012, Terranova Depo. 218:3-219:23; Ex. 1006, Atkinson Depo. 246:4-10.] Terranova does not remember why Klaassen was placed on leave a few days after the October 29, 2011, LJW editorial. [Ex. 1012, Terranova Depo. 219:14-23.]

235.     On November 1, 2011, Klaassen met with Menghan Xia, a leader of Systems Toxicology for the NIH. [Ex. 110.]. Tully interrupted the meeting and directed Xia to a different meeting. Several minutes later, Terranova and two armed police officers entered Klaassen's office and escorted him off campus. [Ex. 110; Ex. 1007, May 2012 Hearing 236:8 – 238:22.]

236.    Terranova then informed Klaassen that he was being suspended and was not allowed to set foot on campus, contact his students, the NIH, or any other KUMC employee. [Exs. 83, 84.] On the day Terranova placed Klaassen on administrative leave, Carlson and Tully met with Klaassen's laboratory members. Carlson was "very short" with the Klaassen laboratory members and Tully was passing notes back and forth with another individual giggling about the situation. [Ex. 1063, Jury Trial Transcript Vol. 4 (Renaud Testimony) 10:22-11:6.]

### XIII.   Klaassen's Suspension was in Violation of Its Faculty Handbook Policies

237.    Terranova and Atkinson lacked the authority to suspend Klaassen without a prior administrative hearing. KUMC's Handbook for Faculty and Other Unclassified Staff ("Handbook") states:

> No disciplinary sanctions may be imposed upon a faculty member without notice of the charges against the member and an opportunity for a hearing before the Ad Hoc Investigating Committee.  At any such hearing, the faculty member shall have all rights afforded under the Faculty Hearing or Grievance Procedures.

[Ex. 209, p. AR003673.]

238.    KUMC's Handbook further states that faculty members allegedly violating University rules and regulations possess a "due process" right to be advised of any alleged violations before instituting disciplinary proceedings. [Ex. 209, p. AR003724.]

239.    Allen Rawitch, former Vice-Chancellor for Academic Affairs and KUMC's 30(b)(6) deposition corporate representative with regards to the Handbook, testified that the only difference between administrative leave and suspension with pay is that "administrative leave with pay is identified in the handbook and suspension with pay is not." [Ex. 1015, Rawitch Depo. 132:2-6.]

240.    The Handbook identifies suspension with pay and suspension without pay as disciplinary sanctions. [Ex. 209, at AR003731-3732; Ex. 1015, Rawitch Depo. 158:7-13.]

241.    "Pay" constitutes the only difference between a suspension with pay and suspension without pay. [Ex. 1015, Rawitch Depo. 158:7-13.]

242.    According to the University, it is reasonable for a faculty member to rely on the Handbook's provisions regarding disciplinary proceedings and impositions of sanctions because there is nothing unclear about the Handbook's language. [Ex. 1015, Rawitch Depo. 149:17-22; 154:9-13; 155:12-19.]

243.    KUMC's failure to follow its due process policies forms the basis for an employee grievance, because the Handbook's due process policies are binding. [Ex. 1015, Rawitch Depo. 150:3-12.] KUMC employees are entitled to assume that KUMC will follow its Human Resource policies. [Ex. 1017, Snakenburg Depo. 42:2-7.]

244.    Terranova's letter placing Klaassen on suspension does not identify any polices or procedures Klaassen allegedly breached. The letter imposed the disciplinary sanction of suspension with pay without a hearing in violation of KUMC's Handbook. [Exs. 83-84.]

## XIV.    KUMC strips Klaassen from his status as Principal Investigator on the COBRE and T32 Grants and Charges Him with Professional Misconduct

245.    While suspended Klaassen was completely cut off from his computer accounts, his students, his work, his research, and the NIH. In addition, Klaassen was not allowed to be on campus. [Exs. 83-84.]

246.    As of November 5, 2011, despite banning Klaassen from campus, KUMC neither charged Klaassen with misconduct nor started any investigation into the reasons KUMC used to justify placing Klaassen on administrative leave [ECF 326-36, p. 1.]

247.    On November 5, 2011, the Lawrence Journal-World ran another article regarding Atkinson's mismanagement that specifically mentioned Klaassen. [Ex. 28; SOAF 125.]

248.     Several days later, on November 15, 2011, Terranova notified Rawitch that KUMC placed Klaassen on administrative leave. Terranova requested that Rawitch conduct a broad and open-ended investigation regarding Klaassen. [ECF 326-36, p. 1.] This timing violated KUMC policy. [SOAF ¶¶ 236-244.]

249.     Rawitch then launched a formal inquiry and eventually charged Klaassen with personal and professional misconduct. [ECF 326-36.].

250.     During Klaassen's leave, KUMC, without prior notice to Klaassen, stripped him of his status as PI on the lucrative T32 Training and COBRE grants. [SOAF ¶¶ 252, 253, 254, 263, 266, 269.] While suspended from duties, nobody supervised Klaassen's laboratory. [Ex.1063, Jury Trial Transcript Vol. 4 (Renaud Testimony) 11:13-18.]

251.     Defendants removed Klaassen permanently from the COBRE and T32 Training grants without consulting him or advising him that he was seeking a change with the NIH. [Ex. 1012, Jury Trial Transcript Vol. 1 (Terranova Testimony) 145:14-146:9]

252.      On November 21, 2011, Bruno Hagenbuch, professor of Pharmacology, and Gregory Kopf, Associate Vice Chancellor for Research, wrote the NIH requesting a change in PI for the T32 grant. Hagenbuch requested be the new PI on the T32 training grant. [ECF 326-24.]

253.     On the same day, Jaeschke wrote the NIH and requested a change in PI for the COBRE grant. Jaeschke requested to be appointed as the new PI on the COBRE grant. [ECF 326-24.] Jaeschke did not speak with Klaassen before sending the letter. [Ex. 1018, Jaeschke Depo. 67:9-14.] Jaeschke made the decision to the become the new PI of the COBRE grant. [Ex. 1018, Jaeschke Depo. 74:5-75:3.]

254.   While awaiting a response from the NIH regarding a change in the PI, two days later, on November 23, 2011, Terranova notified Klaassen that KUMC extended his 30-day administrative leave until December 15, 2011. [Ex. 85; Ex. 1012, Terranova Depo. 232:23-233:18.]

255.   During Klaassen's leave in November 2011, Rawitch began preparing a report containing trumped-up charges of misconduct. The January 31, 2012 Inquiry Report outlined a list of incidents Terranova, Rawitch, and Carlson allegedly considered evidence of Klaassen's unprofessional behavior. Those incidents included:

- An October 15, 2010, meeting with Chancellor Gray-Little, in which Klaassen complained of the "colossal mismanagement" of KUMC;

- A March 29, 2011, Basic Sciences planning meeting, in which Klaassen complained about the reduction in budget, forecasted the end of the basic sciences departments, and argued for more transparency in the government of KUMC;

- A March 31, 2011, meeting, at which Klaassen accused KUMC's administration of "slumlord economics;"

- The incidents at the October 28, 2011, meeting regarding Klaassen's COBRE meeting when he accused the administration of violating NIH regulations regarding NIH grants. [ECF 326-36, at pp AR0017-34.]

256.   KUMC alleged that the following PowerPoint slides constituted evidence of personal and professional misconduct:



[ECF 326-36, at AR00052, 55.]

257.   Rawitch oversaw the creation of the Inquiry Report. [ECF 326-36, at pp AR0017-34; Ex. 1015, Rawitch Depo. 69:2-12.]

258.   To create the Inquiry Report, Rawitch conducted a series of interviews with 17 different faculty members. Many of the faculty members testified that Klaassen was not abusive or threatening.

- Tom Pazdernik, Professor of Pharmacology, testified that Klaassen was not abusive but extremely passionate about his work, but was not an effective communicator. [Ex. 1028, Audio Recording Trans. 13:23-14:9; 14:19-23] He stated that Klaassen did an excellent job as a Chair but was not artful with his expression and gave examples of him using his family, father, and religion in PowerPoint slides and presentations. [Ex. 1028, Audio Recording Trans. 16:21 – 17:4.]. He also stated that Klaassen's alleged recent bad behavior was not new. [Ex. 1028, Audio Recording Trans. 15:25 – 16:4.]

- Bryan Copple, former professor Pharmacology, testified that Klaassen was important to his success because he protected the department form unnecessary distractions and allowed him to do his research. [Ex. 1028, Audio Recording Trans. 22:4 – 23:14.]

259.   Rawitch also interviewed McCarson. After McCarson informed Rawitch of his concerns regarding Klaassen, he stated, "[t]he other thing I would leave with you with is that so little of this conversation is new information." [Ex. 1028, Audio Recording Trans. 5:14-17.]

260.     Rawitch interviewed Robert Klein, Vice-Chancellor for Academic Affairs, to give examples of misconduct. Klein stated, " Klaassen certainly is highly outspoken and outspoken about lots of things around the med center, the expenditures for the cancer center to the exclusion of other areas of expertise and excellence. He certainly has taken shots at our leadership pretty continually." [Ex. 1028, Audio Recording Trans. 9:22 – 10:3.]

Klein further stated:

**R. RAWITCH**:·  Okay.·  Given the charge or task that we're responsible for, are there any other issues that you believe we should know about in terms of Klaassen's behavior or actions beyond what you've mentioned to me so far?

 **KLEIN**: Not really.·  I think a lot of it is -- is based on suspicions we all have of leakage of content to (inaudible) journal world and perhaps to other avenues. They certainly seem to be very knowledgeable about his departure and events leading to his departure. If you want to talk about unprofessional behavior, that probably is about as close as I view it of airing an institution's dirty laundry out to the press and to the media. I don't believe that's appropriate, an appropriate way to deal with things.·  You always have the option -- faculty members have the option of finding another position. Probably one of the top five toxicologists in the world, there are other avenues besides going to the media and taking shots at your institution. So those -- those cross the line for me. It's going beyond somebody talking in the hall or at a meeting, getting angry and commenting. That takes it outside our institution and weakens us. So those I view as definitely -- I'd say definitely unprofessional, inappropriate behavior.

[Ex. 1028, Audio Recording Trans 10:6 – 11:13.]

261.     Klein prosecuted Klaassen at the May 2012 hearing. [Ex. 1007, May 2012 Hearing 6:18 – 9:24.]

262.     Many of the incidents listed in the Inquiry Report as examples of professional misconduct involve Klaassen's complaints to KUMC's administration members, including Atkinson, Terranova, Carlson, and Jaeschke. The complaints included the mismanagement of grant monies, lack of oversight and administration, failure to appropriately manage KUMC, and the KUMC's lack of transparency and shared governance. [ECF 326-26, at pp AR0017-34.]

263.    On December 15, 2011, Terranova received notice from the NIH that it was officially transferred the T32 Training Grant to Hagenbuch as PI. [ECF 326-25.]

264.    With the transfer of the T32 Grant complete, Terranova advised Klaassen that same day that he was free to return to campus the next day - December 16, 2011. [ECF 326-24.]

265.    While suspended from campus, Terranova spent money out of Klaassen's research accounts. [Ex. 327, at AR001555.] Klaassen objected to the expenditures, explained how Terranova violated NIH regulations, and requested $187,000 be returned to his research accounts. [Ex. 1029, (Plaintiff's Trial Exhibit 332); Ex. 1013, Jury Trial Transcript Vol. 1 (Terranova Testimony) 213:2-15.]

266.    On December 16, 2011, after he returned to campus, Klaassen requested a meeting at 3:00 p.m. regarding the status of the COBRE grant. At 2:46 p.m., Terranova notified Klaassen via e-mail that he was no longer the PI on the T32 and COBRE grants. [Ex. 87; Ex. 1013, Jury Trial Transcript Vol. 1 (Terranova Testimony) 210:19-211:4.] Terranova does not identify any policy regarding KUMC's authority to change PIs on Klaassen's grants. [Ex. 87.]

267.    Neither Terranova, nor any other KUMC employee, advised Klaassen before it happened that he was going to be stripped of his status of PI of the COBRE grants. [Ex. 1012, Terranova Depo. 237:1-4.]

268.    Klaassen was pulled as PI of he COBRE because it gave "Curt a large audience" to complain about KUMC's administration. [Ex. 1006, Atkinson 227:8-16; ECF 326-21.]

269.    Terranova also advised Klaassen that he was not to manage the COBRE grant as of December 16, 2011. [Ex. 87; Ex. 1010; Klaassen Depo. 109:1-18.] However, Klaassen still maintained PI status of the COBRE grant. [Ex. 1010, Klaassen Depo. 109:1-18.] Jaeschke did not become the new PI on the COBRE grant until April 20, 2012. [Ex. 90.]

270.    Paid suspension was an adverse personal action because it (1) prevented a Klaassen lab member from submitting a grant possibly ruining her career, (2) prevented Klaassen from submitting RO1 research grants to fund his laboratory, (3) prevented Klaassen from working on RO1 research grants to fulfill his research agenda, (4) prevented Klaassen from assisting his students from performing research funded by the grants thereby interfering with his students career, and (5) interfered with academic freedom to obtain research funds at an appropriate time to do the research he desired. [Ex. 1033; Ex. 413; Ex. 1003, Jury Trial Transcript Vol. 6 (Girod Testimony) 53:22-54:23.]

## XV.    Atkinson, Terranova, and Stites Transfer Klaassen to Internal Medicine

271.    In January 2012, Terranova and Atkinson forced Klaassen and the faculty members and post-doctoral students in his laboratory ("Klaassen's Students") to move from Pharmacology to the Internal Medicine Department ("Internal Medicine"). At the time of the move, Klaassen had been a member of Pharmacology for over forty years. [Ex. 1006, Atkinson Depo. 280:15-281:5; Ex. 182]

272.    When asked about the "ultimate decision" to move Klaassen into Internal Medicine, Terranova answered, "Well, we moved him." [Ex. 1007, May 2012 Hearing 67:10-68:4.]

273.    Klaassen's move to Internal Medicine was finalized on September 12, 2012. [Ex. 183; Ex. 1006, 293:22-298:6.] Klaassen retained an adjunct appointment in Pharmacology. [Ex. 1030, KU058892-93.] Steven Stites, Chair of Internal Medicine, signed the paperwork regarding the transfer. [Ex. 183.]

274.    On January 6, 2012, Terranova and Carlson called Klaassen into a meeting. Terranova and Carlson informed Klaassen to move offices to a windowless office in 1000 Hixson, the oldest research building on campus. The building lacked access to necessary research materials and equipment. [Ex. 1007, May 2012 Hearing 77:11-78:7.]

275.     Klaassen's laboratory and office was also moved to the less desirable 1000 Hixson location. [Ex. 1010, Klaassen Depo. 93:10-20.] Klaassen could not adequately perform his research in the 1000 Hixson space. [Ex. 1001, Nov. 2013 Admin Hearing 258:21 – 259:8.] In particular, it took Klaassen over eight months to get water and ice in the Hixson laboratory. [*Id.*; Ex. 1063, Jury Trial Transcript Vol. 4 (Renaud Testimony) 15:15 – 17:10.] The Hixson laboratory was also covered in "deconstruction" debris and contained malfunctioning equipment insufficient to support "high-quality research that the US government" had funded Klaassen to perform. [Ex. 1031, Bates Nos. A00500.]

276.     Although KUMC transferred Klaassen and his Students to Internal Medicine, their research obligations to the NIH and to the University remained the same. [Ex. 353, Ex. 1051, Jury Trial Transcript Vol. 9 (Klaassen Testimony) 70:17-73:2; Ex. 127; Ex. 1020, Jury Trial Transcript Vol. 2 (Terranova Testimony) 17:23- 18:14] Klaassen's NIH RO1 grants budgets presumed Klaassen had free access to equipment. [Ex. 1063, Jury Trial Transcript Vol. 4 (Renaud Testimony) 18:25-19:5.]

277.     KUMC paid Klaassen's Students from NIH grants and the NIH required them to continue to perform their duties on those grants in order to continue to receive NIH funding. [Exs. 125; Ex. 1020, Jury Trial Transcript Vol. 2 (Terranova Testimony) 16:17-23; Ex. 1063, Jury Trial Vol. 4 (Renaud Testimony) 14:12 -15:14; Ex. 127; SOAF ¶¶ 46 – 50.]

278.     To continue to meet their NIH research obligations, Klaassen's Students needed access to a special and expensive piece of equipment known as the UPLC-MS-MS (Mass Spectrometer). [Exs. 125, 127; Ex. 1051, Jury Trial Transcript Vol. 9 (Klaassen Testimony) 76:1-77:20.]

279.    When Klaassen was Chair of Pharmacology, KUMC allowed his Students, along with all other KUMC students, to use the Mass Spectrometer at no cost to the student. [Ex. 353; Ex. 127.]

280.    After learning of their transfer to Internal Medicine in January 2012, Klaassen's Students held a meeting with KUMC Executives – Dean Atkinson, Terranova, Rawitch, and Jaeschke about the move to Internal Medicine and the use of equipment, including the Mass Spectrometer. [Ex 125; Ex. 1063, Jury Trial Transcript Vol. 4 (Renaud Testimony) 14:12 – 15:14.]

281.    At the January 2012, meeting, Jaeschke, Atkinson, and Terranova promised Klaassen's Students and research faculty members that they would permit them to use the Mass Spectrometer free of cost. [Ex. 125; Ex. 1032, Declarations of Klaassen Lab Members.] KUMC further promised the students that nothing would change and that they would continue to be treated like members of the Pharmacology and Toxicology department. [Ex. 125; Ex. 1032, Declarations of Klaassen Lab Members.]

282.    Only months later, however, on August 22, 2012, the administration outright denied Klaassen's students any access to the lab equipment, including the Mass Spectrometer. [Ex. 127, Ex. 1032, Declarations of Klaassen Lab Members.] Moreover, despite promising the use of equipment free of charge, KUMC began secretly billing Klaassen's research accounts for each sample the students ran on the Mass Spectrometer and then denied the students access to the equipment because of outstanding invoices. [Exs. 127-128, Ex. 1032, Declarations of Klaassen Lab Members.]

283.    On September 18, 2012, Klaassen's Students wrote letters to Stites, Terranova, Buddhadeb Dawn (Professor of Medicine), and Rawitch explaining their predicament. [Ex. 127; Ex. 1063, Jury Trial Transcript Vol. 4 (Renaud Testimony) 19:6-13.] However, the administration refused to assist the students. [SOAF ¶¶ 284 – 286.]

284.    Terranova admitted that he knew of what was going on but "did not act on it." [Ex. 1012, Nov. 2013 Hearing: 220:13-17.]

285.    Stites testified that despite the fact that Klaassen's Students were members of Internal Medicine, he did not investigate their complaints. [Ex. 1012, Nov. 2013 Hearing: 173:9-174:10.]

286.    Stites and the KUMC administration did not care about the plight of Klaassen's Students. [Ex. 1032, Declarations of Klaassen Lab Members.]

287.    Klaassen, and the students in his laboratory were widely considered as to the "like the band playing on the Titanic." [Ex. 1032, Declarations of Klaassen Lab Members; Ex. 1018, Jury Trial Transcript Vol. 7 (Jaeschke Testimony) 226:14-24.]

288.    The decision to charge Klaassen's Students for use of the Mass Spectrometer saddled Klaassen's research program with approximately $250,000 in unaccounted costs each year. [Ex. 353.] This unaccounted costs further bankrupted Klaassen's research program. [Ex. 353, 357; Ex. 1051, Jury Trial Transcript Vol. 9 (Klaassen Testimony): 73:3-77:20 (discussing use of Mass Spectrometer and unaccounted costs); 78:2-80:4 (discussing Ex. 357).]

289.    The PI proposes the grant budgets in advance of any research. The NIH then approves the budget when the NIH funds the grant. [Ex. 1012, Terranova Depo.: 113:9 – 115:8.] The NIH approves the budget to ensure that it "meets all guidelines." [Ex. 1012, Terranova Depo.: 115:2-8.].

290.    The PI has an obligation to spend the money in the grant pursuant to the budget the NIH approved in the grant application. [Ex. 1012, Terranova Depo.: 115:18-23.].

291.    Klaassen believed that Stites, Terranova, and Jaeschke were mistreating his students and wrote multiple e-mail requesting help. On July 20, 2012, Klaassen wrote Stites stating:

What did I do other than try to make KUMC a better institution? If I was so "unprofessional, abusive, disruptive, and unacceptable, why did none of the Pharm/Tox faculty leave KUMC when I was chair, but now that I am not chair, why have Drs. Copple, Luyendyk, Wan, Guo, and Zhong left KUMC, and the Pharm/Tox Department lost 10 NIH R01 grants? (11) Even though this hearing is over, the mobbing continues. I am told not to talk to people in the Pharm/Tox department. (12) My African-American female postdoctoral fellow was removed from my training grant. (13) No one will meet with me about my finances. (14) The University decided not to pay for 2/3 of my salary. (15) I have been moved to the Department of Medicine, but I have little knowledge of what that means financially. Usually the Clinical Departments and the Cancer Center provide a potential good researcher millions of dollars to develop a research program, but I am a proven excellent researcher yet am not provided even a secretary, parking, water, ice, or liquid nitrogen. (16) I have little knowledge of my finances for doing research. I have decreased my group by five people: Dr. Youcai Zhang, Dr. Jennifer Zhang, Dr. Xingguo Cheng, Dr Connie Kai Wu, and Dr. Judy Guo. (17) My "fellows" still do not have access to equipment at nights and weekends, and I still don't have access to my electronic files, framed pictures, unframed pictures, power-points, etc. in the Pharm/Tox Department.

[Ex. 351, at AR002250; Ex. 1051, Jury Trial Transcript Vol. 9 (Klaassen Testimony) 63:10-16.]

292.    Stites responded stating he would not help Klaassen and encouraged him to "look forward." [Ex. 351.]

293.    When Klaassen was pulled off the COBRE and T32 grant as PI, he not only lost his status as principle investigator, he lost access to the funding of those grants which supported his research activities. [Ex. 357; Ex. 1051, Jury Trial Transcript Vol. 9 (Klaassen Testimony): 73:3-79:19.]

294.    Removing Klaassen as PI from the COBRE and T32 grants meant that Klaassen's laboratory research went from a $2.5 million a year enterprise to a $0.5 million a year enterprise. [Ex. 357; Ex. 1051, Jury Trial Transcript Vol. 9 (Klaassen Testimony): 73:3-79:19.]

295.    The removal of Klaassen from the COBRE and T32 grant bankrupted his research programs undermining his ability to complete his research program. [Ex. 357; Ex. 1051, Jury Trial Transcript Vol. 9 (Klaassen Testimony): 73:3-79:19.]

296.    The removal of Klaassen from the COBRE and T32 grant caused Klaassen to fire staff and decrease his mice and supplies. [Ex. 357.]

297.    Klaassen had responsibilities as a professor to assist his lab members and students. [Ex. 1033, Bates No. A00513.] Klaassen's lab members and students worked under Klaassen and under Klaassen's NIH Grants to which he served as PI. [Ex. 1033, Bates Nos. A00513.] Retaliatory actions taken against Klaassen's lab students are equivalent to taking retaliatory actions against Klaassen because it interferes with the operation of Klaassen's laboratory and research to which Klaassen is accountable to both KUMC and the NIH and are part of his basic teaching and research responsibilities. [SOAF 13, 293-296; 85-86.]

## XVI.    KUMC Finds Klaassen Guilty of Personal Misconduct at a Hearing on May 29, 2012

298.    On May 29, 2012, pursuant to KUMC's Handbook, KUMC held an *Ad Hoc* Committee hearing on the allegations outlined in the Inquiry Report. [Ex. 1007, May 2012 Transcript at 1.]

299.    Sara Trower, Assistant General Counsel for KUMC, prosecuted Klaassen at the *ad hoc* hearing on May 29, 2012. [Ex. 1007, May 2012 7:2-5.]

300.    At the hearing, the *Ad Hoc* committee heard evidence that Klaassen's public conduct, in which he criticized administration's financial management of KUMC was personal misconduct. [Ex. 1007, May 2012 Hearing 47:20 – 51:17.]

301.    KUMC employees who participated in the disciplinary process and the removal of PI process against Klaassen received significant promotions and pay increases. [Ex. 1034, Salary Information (Under Seal).]

302.    After the hearing, the *Ad Hoc* Committee did not recommend termination but instead recommended that KUMC publically censure Klaassen and asked that Klaassen issue a general apology. [ECF 326-10.]

303.    Stites, who was then serving as Interim Executive Vice-Chancellor, adopted the recommendation of the *Ad Hoc* Committee hearing and enforced its recommendation. [Ex. 19.]

304.     Trower advised Stites on how to rule and prepared the letter censuring and disciplining Klaassen. [Ex. 37, at (PRIV1778-1790, 1805, 1806-1811, 1812-1817, 1824-1832, 1851-1864).]

305.     Klaassen prepared a written apology and Stites publically censured Klaassen, describing Klaassen's conduct (*i.e.*, complaints of the administration's misappropriation of money, organization, and structure) as unprofessional and unacceptable. [Ex. 19; ECF 326-11.]

## XVII.   KUMC Tenured Faculty Demean Klaassen and His Students without Repercussion

306.     Around the time KUMC prosecuted Klaassen, KUMC's tenured professors, administrators, and department chairs systemically mocked Klaassen and his Students without repercussion. [SOAF 307-334.]

307.     KUMC Professors, including Department Chairs and devised a plan to harass Klaassen and "hit him relentlessly." [Ex. 136; Ex. 1002, Jury Trial Transcript Vol. 8 (Jaeschke Testimony) 35:2-36:1.]

308.     Tenured KUMC faculty members (including Jaeschke and Carlson) and employees (including Tully) slurred Klaassen (and his students). [SOAF 307-334.]

309.     On January 23, 2012, the date that Klaassen laboratory was forced to move across campus, Jaeschke notes Klaassen cooperated with the move. In response, Carlson suggested that the remaining member of Pharmacology form a Congo line and chant "No more Dirty Curty!". Carlson states:

>>> Gerald Carlson 1/23/2012 1:52 PM >>>
Well, congratulations! At the end of the day, I suggest that all left form a congo line and dance down the hall chanting, "No more Dirty Curty!" The person at the front of the line should, of course, be ringing a bell. Gerry

[Ex. 116; Ex. 1004, Jury Trial Transcript Vol. 3 (Carlson Testimony) 174:2-8.]

310.    Jaeschke thought Klaassen suffered from "impaired mental status" and was a "lunatic." [Ex. 119; Ex. 1004, Jury Trial Transcript Vol. 3 (Carlson Testimony) 154:17-155:13.]

311.    On January 16, 2012, Carlson encouraged Jaeschke to "tweak him a little bit" and to "have fun" with Klaassen's situation. [Ex. 118; Jury Trial Transcript Vol. 3 (Carlson Testimony) 170:6-8.]

312.    Two weeks later, Jaeschke called Curt as "ass" while noting that the Pharmacology department was "crumbling" without Curt. [Ex. 135; Ex. 1002, Jury Trial Transcript Vol. 8 (Jaeschke Testimony) 42:21-47:14.]

313.    As of January 2012, Jaeschke was conspiring to give Klaassen a "nice legal send off." [Ex. 333; Ex. 1063, Jury Trial Transcript Vol. 4 (Tully Testimony) 53:210-55:7.]

314.    Jaeschke agreed with Carlson's assessment that he should "tweak" Klaassen. [Ex. 118.] By April 2012 Jaeschke and Tully devised a plan to "stay cool and hit Curt relentlessly for everything possible." [Ex. 136.]

315.    That same month, Jaeschke called Klaassen a "slug that crawls around." [Ex. 141; Ex. 1002, Jury Trial Transcript Vol. 8 (Jaeschke Testimony) 49:21-25.]

316.    Despite testifying that he came to KUMC to work for Klaassen and stating that Klaassen was an internally known scientist, Jaeschke called Klaassen "a malignant cancer" and called his science "very poor." [Ex. 140; Ex. 1002, Jury Trial Transcript Vol. 8 (Jaeschke Testimony) 53:9-56:9.]

317.    Jaeschke identified Klaassen as "Dr. Nobody from Leawood" and Weinman referred to Klaassen's career as a "form of pollution of the scientific literature," and accused him of blackmail and perjury. [Exs. 139-140; Ex. 1018, Jaeschke Depo. 121:5-15.]

318.    On April 22, 2012, Tully turned off Klaassen's laboratory computers that were running experiments. [Ex. 388; Ex. 1063 Jury Trial Transcript Vol. 4 (Tully Testimony) 79:3-5.]

319.    On January 28, 2012, Klaassen requested a copy of a T32 training grant, a public document subject to any FOIA or KORA request. Tully refused to provide a copy of the grant noting that an employee who might be sympathetic to Curt's request may be terminated by Jaeschke. [Ex. 390; Ex. 1004 Jury Trial Transcript Vol. 3 (Tully Testimony) 73:3-7.]

320.    On February 7, 2012, Klaassen requests a copy of keys to allow one of his laboratory members, Cui, to access a necessary room. Instead of assisting, Tully mocked Klaassen stating, "boo hoo." [Ex. 337; Ex. 1004 Jury Trial Transcript Vol. 3 (Tully Testimony) 74:16-25.]

321.    Tully repeatedly ignored Klaassen's requests for information telling Jaeschke and Meagher that Klaassen "doesn't get that no response is a response." [Ex. 146; Ex. 1004 Jury Trial Transcript Vol. 3 (Tully Testimony) 76:18-21.]

322.    On February 14, 2012, Klaassen asked for a letter regarding a former student of his. Meagher sent a copy of the letter to Tully. Instead of forwarding the attached letter to Klaassen, Tully simply continued to ignore Klaassen's request. [Ex. 338; Ex. 1004 Jury Trial Transcript Vol. 3 (Tully Testimony) 80:11-15.]

323.    Klaassen explained that he needed the letter to help a student with a fellowship. [Ex. 339; Ex. 1063, Jury Trial Transcript Vol. 4 (Tully Testimony) 61:8-24.]

324.    Tully's response to Klaassen's request – "Maybe this makes me a bad person, but I don't feel sorry for him at all." [Ex. 339.]

325.    Tully and Meagher continued to ignore and harass Klaassen through May 2012. Other examples include:

- Refusing to provide Klaassen with copies of his photographs; [Ex. 144; Ex. 1063, Jury Trial Transcript Vol. 4 (Tully Testimony) 74:5-19.]

- Refusing to provide Klaassen with photographs of the Galapagus islands for Klaassen's grand daughter to use for a school project; [Ex. 145; Ex. 1063, Jury Trial Transcript Vol. 4 (Tully Testimony) 74:20-75:18.]

- Instead of giving Klaassen a copy of his files, PowerPoint presentations, and pictures, Meagher and Tully (at the direction of Jaeschke) either ignored his requests or deleted his e-mails. [Ex. 344; Ex. 1063, Jury Trial Transcript Vol. 4 (Tully Testimony) 75:19-76:16.]

326.    Tully claimed that he ignored and disregarded Klaassen's requests because Klaassen was not a member of the Pharmacology department. [Ex. 1035, Tully Depo. 88:5-23; 88:24-89:3.]

327.    Klaassen remained a member of Pharmacology with an adjunct appointment, which allowed Klaassen to "function" and "collaborate" with Pharmacology faculty and staff. [Ex. 1030, KU058892-93; Ex. 1006, Atkinson Depo. 282:1-5.]

328.    On the day that KUMC forced Klaassen's lab to move out of Hemenway, one of Klaassen's junior faculty members wrote him stating that she was stressed out about the situation and had "swallowed many types of pills." Klaassen forwarded the e-mail and asked for somebody to help him check up on his colleague. Two tenured faculty members and Chairs of two different Basic Science departments mocked the situation referring to it as a "funfest." [Ex. 115.]

329.    Douglas Girod, M.D., ("Girod") Executive Vice-Chancellor for KUMC, testified that such conduct violated KUMC's regulations regarding personal and professional misconduct. [Ex. 1021, Girod Depo.: 242:1 – 247:25.]

330.    From January 2012 through May 2012, after KUMC transferred Klaassen to Internal Medicine, members of Pharmacology, including Jaeschke and Tully, systematically denied Klaassen's Students access to necessary equipment. They locked Klaassen and his Students out of rooms that contained necessary research equipment, computers, and research supplies including liquid nitrogen. [Exs. 149, 129-131; Ex. 1035, Tully Depo. 84:4-24; Ex. 1063, Jury Trial Transcript

Vol. 4 (Renaud Testimony) 12:10 – 19:14.] In addition, Pharmacology denied Klaassen access to copies of his work, research, PowerPoints, and personal photographs. [Exs. 144-146.]

331.    The stated reason Pharmacology denied Klaassen and his Students access to the equipment and information was that they were not members of the Pharmacology department. [Ex. 1035, Tully Depo. 84:4-24, 87:1-6, 88:16-18, 89:8-14; 103:2-5.]

332.    At the time Pharmacology denied Klaassen and his Students access to the equipment, they were still members of Pharmacology and should have had access to the equipment. [SOAF ¶ 327.]

333.    As a result of KUMC's professors conduct, Klaassen laboratory members suffered through "2 years of hell." Professor Weinman explained:

> I think we are trapped by our own missteps in this case. We can't break with Klaassen cleanly because we allowed him to charge $250,000 in overdrafts and now we need his grants to continue to make up the deficits. We cannot say with certainty whether he will be back or not yet this thing has dragged on for more than 3 months and thus we need to make alternative PI arrangements from a very limited and depleted bench. The Klaassen lab members have gone through 2 years of hell and have zero loyalty or incentive to stay at KU. The ones who stay are doing it out of desperation and unlikely to have much fondness or loyalty for KU.

[Ex. 1036.]

334.    Not a single professor who mocked Klaassen or called Klaassen or his Students any of the above-mentioned names has ever been counseled or disciplined for their actions. [Ex. 1021, Girod Depo.: 248:2-249:24.]

## XVIII. Klaassen Sends E-mail Correspondence Asking For A Meeting To Discuss His Concerns

335.    On December 20, 2012, Klaassen requested a meeting with Stites and Dawn, Dean of Research for Internal Medicine, to discuss his concerns regarding KUMC's misappropriation of NIH monies. [Ex. 357.]

336.    Klaassen stated:

> 4. I also informed Christina and Buddha why my finances after having balanced over 150 grant years of NIH budgets, why I consider my finances are so dismal this year.
>     A. The EVC took 12.5 million dollars from me. Thus, I had to decrease my operation overnight from 2.5 to 0.5 million dollars per year.
>     B. The Pharm/Tox department removed an African-American post-doctoral fellow from "my" NIH training grant which costs me an additional 50 thousand dollars a year.
>     C. The Dean of Research spent $180 thousand dollars from my NIH grants.
>     D. The Pharm/Tox department misallocated my funds and used funds from my research accounts to pay for secretaries, centrifuges, rotors, cookies, cakes, dinners, computers, printers, etc.
>     E. Even though my 12 "students" in late

[*Id.*]

337.     Because he recognized that he talked loudly and passionately, in the same correspondence, Klaassen asks for a meeting at a large conference room or his house to discuss his allegations of misappropriation. [*Id.*]

338.     According to Atkinson and Terranova, if Klaassen had concerns, he was suppose to take it up with his supervisor and not the public. [Ex. 1020, Jury Trial Transcript Vol 2 (86:7-17).] Klaassen spoke internally with multiple individuals including the Governor without avail. [SOAF 130.]

339.     No meeting took place until May 1, 2013. The meeting did not take place in a large conference room or his house. [Ex. 1001, Nov. 2013 Admin Hearing 244:4-8, 245:1-13.]

## XIX.     Klaassen Accuses KUMC's Administration of Misappropriating NIH Funds at a May 1, 2013 Meeting

340.     On May 1, 2013, Klaassen met with Stites, Dawn, Amy O'Brien-Ladner, Professor of Medicine, and KUMC employees Christina Hopkins and Dustin Carrillo to discuss Klaassen's NIH grant accounting. Stites claims he requested the meeting. [Ex. 1001, Nov. 2013 Admin Hearing 18:3-6; 18:21-25.]

341.     Klaassen tape-recorded the meeting. [Ex. 1010, Klaassen Depo.: 102:12-22.]

342.     At the meeting, the parties discussed Klaassen's NIH grant funds on his three remaining NIH RO1 grants and a $250,000 deficit. Klaassen informed Stites that he was writing two

new grants. Stites suggested using the monies from the new grants to cover the deficit. Klaassen informed Stites that it would be unethical to use new grant money to pay for past expenses. Dawn confirmed Klaassen's position, stating, "We can't go back . . . we have to go back and pay from the slush fund." [ECF 336 (Conventionally Filed Recording).]

343.    Klaassen further explained to Stites that the administration had misappropriated approximately $180,000 from grants in which Klaassen either presently or previously served as a PI. [Ex. 336, Transcript of May 1, 2013 Meeting.] Klaassen explained that KUMC's administration had misappropriated funds. [Ex. 1001, Nov. 2013 Admin Hearing 261:25 - 262:19; 263:17 - 22.]

344.    Klaassen went to the whiteboard in the conference room and wrote out $180,000 – the amount Klaassen believed Terranova misappropriated. [Ex. 1001, Nov. 2013 Admin Hearing 77:8-24.]

345.    The $180,000 corresponds with Klaassen's prior allegation that KUMC's Dean of Research spent $180,000 out of his NIH grants. [ECF 362-49; Ex. 1001, Nov. 2013 Admin Hearing 77:8-24.]

346.    Stites refused to discuss the topic and ordered Klaassen to "get out!" of the room. The meeting abruptly ended. [ECF 336 (Conventionally Filed Recording).]

347.    One week later, on May 8, 2013, Stites suspended Klaassen from campus with pay because of Klaassen's objections about the administration's mishandling of grant monies. [ECF 326-1.]

348.    Stites's letter placing Klaassen on suspension does not identify any polices or procedures Klaassen allegedly breached and imposes the disciplinary sanction of suspension with pay without a hearing in violation of KUMC's Handbook. [ECF 326-1.]

349.    Stites's letter states the purpose of the administrative leave is to "investigate [ ] incidents" of alleged misconduct. [ECF 326-1.]

350.    On June 7, 2013, Stites continued Klaassen's leave indefinitely in order to continue the "inquiry into matters referenced" in the previous letter. [Ex. 1037.] After placing Klaassen on leave, Klaassen's laboratory members wrote Stites asking for help. [Ex. 198; Ex. 1015, Rawitch Depo. 119:10-18.] After receiving the letter, Stites terminated the employment of most of Klaassen's laboratory members who signed the letter. [Ex. 1063, Jury Trial Transcript Vol. 4 (Renaud Testimony) 21:24 – 23:4.] After Girod forwarded Stites a copy of a letter sent by Klaassen's students to Girod outlining their concerns, Stites wrote Girod, "I am sure they have a lot of concerns . . . ." [Ex. 54; Ex. 1021, Girod Depo. 252:2-24.] The Klaassen lab members also wrote Dr. Rawitch. [Exs. 1054.]

351.    On June 10, 2013, KUMC completed its investigation and charged Klaassen with misconduct. [ECF 326-56.] Despite concluding the investigation, Klaassen was not allowed to return to campus. [Ex. 1037.]

352.    At the time of Klaassen's second administrative leave, Klaassen served as PI on two NIH RO1 grants: the Hepatic Uptake and Drug Processing Gene. The NRF2 Liver grant expired in the summer of 2013. [Ex. 305]

353.    Klaassen's two RO1 grants supported his personal research agenda and funded his research agenda in which Klaassen worked closely with lab members and students who were also funded off the RO1 grants. [Ex. 1020, Jury Trial Transcript Vol. 2 (Terranova Testimony) 29:1-9; Ex. 1013, Jury Trial Transcript Vol. 1 (Terranova Testimony) 151:13-152:4; Ex. 1012, Terranova Depo. 187:7-16.]

354.    In July 2013, with Klaassen away on administrative leave and unable to acquire grant funding for his department and students, Stites fired nearly all the students and staff that worked on research projects under Klaassen's direction. [Ex. 1001, Nov. 2013 Admin Hearing 312:1 – 313:12; Ex. 1032, Declarations of Klaassen Lab Members.]

355.    Stites alleged the dire financial situation of Klaassen's laboratory was the reason for the firings. In contrast to Stites's excuse to the students, however, the NIH awarded Klaassen a new $1.8 million RO1 grant during his ban from campus. Stites obstructed the acceptance of this lucrative grant by banishing Klaassen from KUMC. This federal grant would have been more than sufficient to pay the salaries and research of all of Klaassen's students beginning in August 2013. [Ex. 1001, Nov. 2013 Admin Hearing 312:1 – 313:12; Ex. 1032, Declarations of Klaassen Lab Members; Ex. 1051 Jury Trial Transcript Vol. 9 (Klaassen Testimony) 132:16-20.]

356.    KUMC then devised a "plan to change leadership" in the Klaassen laboratory. [Ex. 93-95; Ex. 1020, Jury Trial Transcript Vol. 2 (Terranova Testimony) 26:4-7, 148:1-13.] In September 2013, KUMC contacted the NIH and permanently removed Klaassen as the PI on his personal RO1 Research grants – the Drug Processing Gene and Hepatic Uptake grants – leaving Klaassen with no remaining NIH grants. [Exs. 93-95; Ex. 1036; Def's SOF ¶¶384-387.] KUMC does not identify any policy in its e-mail correspondence supporting its decision to remove Klaassen as PI from his personal RO1 research accounts. [Exs. 93-95; Ex. 1036.]

357.    KUMC transferred Klaassen's remaining R01 Grants without consulting him. He is not identified on any e-mail correspondence between KUMC and the NIH removing him permanently from his R01 Research Grants [Ex. 93-95.] KUMC did not provide Klaassen with a hearing regarding the transferred R01 Grants.

358.     At the time KUMC transferred the RO1 grants, Klaassen was on administrative leave and not entitled to take any administrative action under KUMC's Handbook. [ECF 326-1; Ex. 1020, Jury Trial Transcript Vol. 2 (Terranova Testimony) 26:14 -28:3.]

359.     KUMC transferred the R01 grants because, without the grants, Klaassen's "value for KUMC goes down to nothing and he is dispensable like a malignant cancer." [Ex. 140.]

360.     While Klaassen was on administrative leave, KUMC fired most of his laboratory members claiming that Klaassen's dire financial situation required Klaassen's laboratory members to lose their jobs; but Klaassen's laboratory was well-funded until KUMC began retaliating against him. [Ex. 1010, Klaassen Depo. 167:4-17; Ex. 1063, Jury Trial Transcript Vol. 4 (Renaud Testimony) 21:24 – 23:4.]

## XX.    Klaassen is Charged with Misconduct At Another *Ad hoc* Committee Hearing

361.     On November 13, 2013, six months after his ban from campus, KUMC held another *Ad Hoc* Committee hearing where it charged Klaassen with professional misconduct and requested his termination. [Ex. 1001, Nov. 2013 Admin Hearing 1.]

362.     KUMC held the hearing before a committee of Klaassen's peers and the voice recording of the May 1, 2013 meeting was played. [Ex. 1001, Nov. 2013 Admin Hearing 249:12 - 251:7.]

363.     During the hearing, Klaassen testified that KUMC officials misused and misappropriated NIH grant funds. [Ex. 1001, Nov. 2013 Admin Hearing 263:17-22; 265:5-6; 262:25 – 263:19.]

364.     After hearing the evidence, the committee recommended that KUMC immediately reinstate Klaassen and that he receive only a written warning. [Ex. 32; Ex. 1010, Klaassen Depo. 356:3-7.]

365.    The Committee expressed concern that KUMC failed to address Klaassen's complaints about the financial mismanagement of his grants. The Committee wrote, "The Committee is sympathetic with Klaassen's concerns regarding grants and his students, and finds that KUMC should provide full and written answers in a timely manner to the questions and complaints that he has expressed." [Ex. 32.]

366.    Girod summarily fired Klaassen on January 6, 2014, despite the Committee's recommendation that Klaassen receive a written warning, and instead of providing "full and written answers" to Klaassen's concerns. Klaassen's date of termination was later extended to January 24, 2014. [ECF 326-15.]

367.    Girod's January 6, 2014 letter stated, "T]he Committee recommended [a] sanction of a written warning for your unprofessional conduct towards colleagues and subordinates. However, the Committee did not have full access to, and was not asked to consider, the totality of the circumstances in your situation. Having considered the Committee's finding and recommendations, and having also considered the totality of the circumstances surrounding your conduct the last few years, I have concluded that a written warning does not address the serious nature of the situation . . . Accordingly, after consultation with the Chancellor, I have determined that termination of your employment and faculty appointment with the University is the only acceptable outcome." [ECF 326-15.]

368.    Girod defined the "totality of the circumstances" as the entire episodes of the previous *Ad Hoc* Committee. [Ex. 1021, Girod Depo. 277:20 -278:6.]

**XXI.  Klaassen Appeals his Termination and the Wyandotte County District Court Orders a New Hearing Finding KUMC Terminated Klaassen In Violation of His Constitutional Rights**

369.     In March 2014, pursuant to KUMC's Faculty Handbook, Klaassen appealed Girod's termination decision in order to exhaust his administrative remedies under the Kansas Judicial Review Act. [ECF 326-137.]

370.     KUMC's Faculty Handbook creates the appeal rights of tenured faculty. [Ex. 209, at Ex. 209, at pp. A003755-56.]

371.     KUMC's Faculty Handbook states:

- "The faculty member shall have access to all relevant information in the possession of the administration to aid in preparing his or her case in an appeal based on any of the three grounds."

- "The *ad hoc* Hearing Committee will afford the appellant a hearing within 30 working days of the filing date of the appeal [see Timelines above]. Testimony and other evidence shall be taken in accordance Guidelines for *ad hoc* Hearing Committee."

[Ex. 209, at pp. A003755-56.]

372.     Despite the Handbook's requirement's that KUMC provide Klaassen with access to all relevant information and to "afford him a hearing," KUMC both denied Klaassen's request for information to aid his appeal and denied him his right to an evidentiary hearing. [Ex. 1039, Correspondence Regarding Appeal.]

373.     On November 19, 2014, *in lieu* of an evidentiary hearing, KUMC allowed Klaassen two and half hours to argue before a committee of professors that Girod improperly terminated Klaassen. [Ex. 1038, November 2014 Appeal Hearing Transcript 1:1 – 6:25.]

374.     On December 23, 2014, Girod upheld his prior decision to terminate Klaassen. Girod's termination letter stated that this decision was a final agency action. [Ex. 326-41]

375.     On January 23, 2015, Klaassen appealed Girod's final agency action letter to a state court pursuant to the Kansas Judicial Review Act. [ECF 326-102; *Klaassen v. University of Kansas*, Case No. 15-CV-78, Petition for Judicial Review.]

376.     On September 21, 2015, the state court held that KUMC violated Klaassen's rights and ordered KUMC to provide Klaassen with a new hearing. [Ex. 1040, *Klaassen v. University of Kansas*, Case No. 15-CV-78, Transcript of September 21, 2015.]

377.     On October 20, 2015, Girod sent Klaassen a different and new termination letter. The new letter restated old reasons and provided new reasons for his termination and stated that he was terminated because of the results of the November 13, 2013, hearing. [ECF 326-16.]

378.     On December 4, 2015, Robert Klein sent Klaassen a letter advising him that rather than holding a new hearing regarding his termination, he could appeal his October 20, 2015 termination again. Klein's letter states, "[a]s before, the appeal will proceed in accordance with the provisions of KUMC's Handbook for Faculty and Other Unclassified Staff, Part 6.J." [Ex. 1041, Correspondence from Klein to Rupe.]

379.     Klein also asked Klaassen to "supplement" his earlier Administrative Notice of Appeal provided to Girod in March 2014. Klaassen objected to Klein's request as inconsistent with and in violation of this Court's remand order. [Ex. 1041, Correspondence from Klein to Mr. Rupe; Ex. 1042, Correspondence from Mr. Rupe to Klein.]

380.     Klaassen objected to the remand hearing because the October 20, 2015 termination letter did not provide Klaassen with any notice of the charges of misconduct. In addition, the October 20, 2015 termination letter was based on the November 13, 2013 and the November 19, 2014 appeal hearings which this Court previously held unconstitutional. [Ex. 1042, Correspondence from Mr. Rupe to Klein.]

381.     KUMC overruled Klaassen's objections and required Klaassen to argue his positions at a post-termination appeal hearing on March 29, 2016. [Ex. 1043, Correspondence from Klein to Mr. Rupe.]

382.     At the March 29, 2016 post-termination appeal, KUMC did not allow Klaassen to call any of the following key witnesses: Stites, Girod, Jaeschke, Tully, Meagher, Carlson, and Terranova. Pursuant to Rule 4.2 of the Kansas Rules of Professional Conduct, Klaassen was not allowed to contact these witnesses directly because of the ongoing state and federal lawsuit. Counsel for KUMC refused to make these witnesses available at the March 29, 2016 post-termination appeal hearing. [Ex. 1044; Correspondence from Mr. Rupp to Mr. Rupe.]

383.     On April 8, 2016, the March 29, 2016 appeal hearing committee sent Klaassen and KUMC's Executive Vice-Chancellor Girod a letter recommending that Klaassen's termination be affirmed. On April 22, 2016, University of Kansas Chancellor Bernadette Gray-Little sent Klaassen a letter stating that she will provide "final agency action" notice. [Ex. 1045; Correspondence from Gray-Little to Klein.]

384.     KUMC's Handbook states that Girod, as Executive Vice-Chancellor, is responsible for providing final agency action notice. It states:

> Within 14 working days from receipt of the *ad hoc* Hearing Committee's decision and recommendation, the Executive Vice Chancellor shall respond in writing to the recommendations of the committee documenting the reasons for agreeing or disagreeing. This response will be sent to the Vice Chancellor for Academic Affairs, the chairperson of the *ad hoc* Hearing Committee and the appellant. It is understood that the final administrative authority resides with the Executive Vice Chancellor, who is the appointed representative of the Board of Regents.

[Ex. 209, at pp. AR03757.]

385.     On May 9, 2016, Gray-Little sent Klaassen final agency action notice affirming his termination. [Ex. 1046, Correspondence from Gray-Little to Klaassen.] Klaassen then accepted a position without state pay at the University of Washington. At the University of Washington,

Klaassen is allowed to receive pay from NIH grants, which are his only source of income at the University of Washington. [Ex. 1010, Klaassen Depo. 19:10 – 22:24.]

## XXII.   Similarly Situated KUMC Professors Who Were Alleged to Have Engaged in Personal Misconduct Were Not Stripped of NIH Grants, Placed on Administrative Leave, or Terminated From Their Employment

386.    Throughout 2011 and 2012, Dr. S.[3], was a tenured professor in Pharmacology. [Ex. 269 (Under Seal); Ex. 1047, Girod Depo. 336:22 - 337: 11 (Under Seal); Ex. 1049, Jury Trial Transcript Vol. 1 (Terranova Testimony) 182:18-24 (Under Seal)..]

387.    Dr. S. reported to Carlson, Jaeschke, and Terranova. [Ex. 269 (Under Seal); .]

388.    In October 2011, KUMC's human resources department received complaints that Dr. S. engaged in abusive and threatening conduct towards his laboratory members. [Ex. 269 (Under Seal).]

389.    KUMC then investigated the allegations. Dr. S. was not placed on administrative leave while the complaints were investigated. [Ex. 269 (Under Seal).]

390.    After investigating the allegations, KUMC determined that Dr. S. engaged in the following improper conduct:

- Used immigration documents to manipulate employees;

- Threatened to deport students;

- Engaged in abusive and threatening behavior sufficient to create a hostile work environment;

- Engaged in behavior that cause students to be scared of Dr. S.'s reaction to request not to perform radiation work; and,

- Threatened other employees who worked in the International Program.

---

[3] The name of certain professors are redacted pursuant to the Protective Order and are identified by initials.

[Ex. 269 (Under Seal).]

391.    There are no allegations that Dr. S. said anything publicly negative about any member of KUMC's administration. [Exs. 269-272 (Under Seal).]

392.    There are no indications that Dr. S. contributed to Lawrence Journal World articles. [Exs. 269-272 (Under Seal).]

393.    In response to Dr. S.'s abusive and threatening behavior, KUMC required Dr. S. to undergo management training and complete a disruptive physician program. [Ex. 269 (Under Seal).]

394.    Carlson, Terranova, and Jaeschke are signatories to the letter. [Ex. 269 (Under Seal).]

395.    Dr. S. was not put on administrative leave because he didn't "sue the University either." [Ex. 1048, Jury Trial Transcript Vol. 3 (Carlson Testimony) 179:14-21 (Under Seal).]

396.    Dr. S. engaged in "repetitive abusive behavior" towards his subordinate laboratory members. [Ex. 1049, Jury Trial Transcript Vol. 1 (Terranova Testimony) 185:3-6 (Under Seal).]

397.    In 2011, Dr. S. was not stripped of his NIH Grants, despite the fact that his alleged personal misconduct concerned the operation of his research laboratory. [Ex. 1049, Jury Trial Transcript Vol. 1 (Terranova Testimony), 185:3-16 (Under Seal).]

398.    Dr. S. was later charged with research misconduct for plagiarism. After completing KUMC's Handbook due process procedure for research misconduct, KUMC found Dr. S. guilty of research misconduct, placed him on administrative leave, removed him from his NIH grants, and terminated his employment. [Ex. 1050, Terranova Depo. 119:1-122:2 (Under Seal); Ex. 270 (Under Seal), Ex. 1047, Girod Depo. 342:14-22 (Under Seal); Exs. 271-272 (Under Seal); Girod Depo. 345:19-24, 346:23-347:2]

399.    From April 2011 through January 2014, KUMC addressed performance issues with two other department chairs – Dr. T. and Dr. K. [SOAF ¶ 400- 409.]

400.     Dr. T. was Chair of KUMC Department.[4] [Ex. 258 (Under Seal); Ex. 1047, Girod Depo 315:1-11 (Under Seal).]

401.     In 2012, concerns arose regarding Dr. T.,  KUMC asked her to perform a fit-for-duty. [Ex. 1047, Girod Depo. 315:15-20 (Under Seal).] Dr. T. was ultimately removed from her position as Chair and an additional administrative position she held. [Ex. 261 (Under Seal); Ex. 1047, Girod Depo. 320:22-321:19.]

402.     Throughout the process, Dr. T. remained as PI on all her NIH grants. [Ex. 261 (Under Seal); Ex. 1047, Girod Depo. 320:22-321:19.]

403.     Girod does not believe that Klaassen was ever asked to complete a fit-for-duty. [Ex. 1047, Girod Depo. 318:11-14 (Under Seal).]

404.     Dr. K. was a Chair of a KUMC Department.[5] [Ex. 1047, Girod Depo. 351:3-9 (Under Seal).]

405.     Under the direction of Girod, Dr. K. was investigated for creating a "hostile work environment" regarding his interaction with residents and hospital staff. [Ex. 1047, Girod Depo. 347: 5-20 (Under Seal).]

406.     There are no documents in Dr. K.'s personnel file indicating that he was ever placed on administrative leave during the investigation. [Ex. 277-278 (Under Seal); Ex. 1047, Girod Depo. 352:21-354:6.]

407.     After the investigation, Dr. K. was asked to step down as a Chair because his actions had created an abusive environment. [Ex. 1047, Girod Depo. 347:5-20; 348:5-19; 351:3-9 (Under Seal).]

---

[4] Dr. T is not a reference or an abbreviation for Terranova.

[5] Dr. K is not a reference or an abbreviation for Klaassen.

408.     Dr. K. was allowed to keep his NIH grants, which he later relinquished to the University as part of a settlement agreement. [Ex. 275(Under Seal); Ex. 1047, Girod Depo. 349:20-24; Ex. 282 (Under Seal); Ex. 1047, Girod Depo. 359:6-11 (Under Seal)]

409.     After resigning from KUMC, Atkinson, now Dean of another University's School of Medicine, welcomed Dr. K. to her new university. [See Ex. 1062, Webpage (Under Seal).]

## ARGUMENTS AND ANALYSIS

I.     This Court's summary judgment standards are well known.

This Court's summary judgments are well-known and will not be repeated at length here. *See Redmond v. Mirror*, Inc., No. 16-cv-4021-DDC-KGS, 2017 U.S. Dist. LEXIS 142897, at *18 (D. Kan. Sep. 5, 2017) (setting out this Court's summary judgment standards). In addition to controverting a significant number of the Defendants' factual allegations, Klaassen also set forth nearly 400 additional material statements of facts. As the non-moving party, Klaassen is entitled to all reasonable inferences of the significant and lengthy factual dispute between the parties. *See id.*; (citing *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010)). At this stage, and on this record, to the extent parties disagree, this Court must accept Klaassen's reasonable inferences of the facts. *Id.*

II.     None of Klaassen's Claims in this suit against the individual defendants are barred by the principles of *res judicata.*

Defendants – who previously insisted, based on grounds of Eleventh Amendment immunity, that a number of Plaintiff's claims be litigated in state court – now feign concern over duplicitous litigation and seek to deploy the doctrines of *res judicata* and collateral estoppel. These doctrines espouse "a policy designed to protect the defendant from harassment and the public from multiple litigation." *Griffith v. Stout Remodeling, Inc.*, 219 Kan. 408, Syl. ¶ 7 (1976). But Plaintiff, who

originally brought all of his claims in this lawsuit, did not choose to litigate his claims in multiple proceedings. Under these circumstances, *res judicata* does not apply.

      A.    <u>Klaassen's individual capacity 1983 and state law claims are not barred by *res judicata*.</u>

"The doctrine of *res judicata* has two aspects: claim preclusion and issue preclusion. Claim preclusion prevents parties from relitigating a cause of action that has been finally adjudicated. It is founded on the principle that the party, or some other party in privity, has litigated or had an opportunity to litigate the same matter in a former action in a court of competent jurisdiction." *Jackson Trak Group, Inc. v. Mid States Port Authority*, 242 Kan. 683, 690, 751 P.2d 122 (1988) (*citing In re Estate of Reed*, 236 Kan. 514, 519, 693 P.2d 1156 (1985)). Defendants are attempting to use claim preclusion to bar Plaintiff's individual capacity claims in this case.

Kansas law governs the application of claim preclusion in this case. *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984) ("[A] federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered."). "Under Kansas law, '[r]es judicata (claim preclusion) prevents relitigation of previously litigated claims and consist[s] of the following four elements: (1) same claim; (2) same parties; (3) claims were or could have been raised; and (4) a final judgment on the merits.'" *Cosgrove v. Kan. Dep't of Soc. & Rehab. Servs.*, 744 F. Supp. 2d 1178, 1184 (D. Kan. 2010). Each of these elements is essential. *See Wachovia Bank, N.A. v. Morris (In re Thomas)*, 362 B.R. 478, 485 (B.A.P. 10th Cir. 2007). In this case, half of the necessary elements are missing: the parties are not the same as in the previous action, nor is there a final judgment on the merits.

      B.    <u>The individual defendants named in this case are not in privity with the Kansas government.</u>

For Defendants to properly invoke the doctrine of *res judicata* in this case, they must be the same as or in privity with the parties sued in the prior action. *Cosgrove*, 744 F. Supp. 2d at 1184 In

the *res judicata* context, "[p]rivity means a mutual or successive relationship to the same legal rights." *Penachio v. Walker*, 207 Kan. 54, 58, 483 P.2d 1119, 1122 (1971) (citing 46 Am. Jur., Judgments, § 508, p. 662).

> "Privity is not established however, from the mere fact that persons happen to be interested in the same question or in proving or disproving the same state of facts, or because the question litigated was one which might affect such other person's liability as a judicial precedent in a subsequent action."

*St. Paul Fire & Marine Ins. Co. v. Tyler*, 26 Kan. App. 2d 9, 18 (1999)

> "In order for a second suit to be barred by the doctrine of *res judicata*, the parties must appear in the same or identical capacities in both suits or must appear in the same quality. The phrase "quality of the person" apparently refers to the status in which a party sues or is sued. Identity of quality or status of the person exists where the defendants are identical and sued in the same capacity in both suits. ***Under this rule, a party appearing in an action in one capacity, individual or representative, is not bound by or entitled to the benefits of res judicata in a subsequent action in which he or she appears in another capacity***."

47 Am Jur 2d Judgments § 557 (emphasis added).

The individual Defendants in this action are not in privity with the governmental defendants in the state court actions. Defendants concede in their brief that two recent cases from this District held that a government employee sued in his or her individual capacity is *not* in privity with the government for purposes of *res judicata*. [ECF 326, p.82 (*citing Cosgrove v. Kan. Dep't of Soc. & Rehab. Servs.*, 744 F. Supp. 2d 1178, 1185 (D. Kan. 2010), *aff'd*, 485 F. App'x 290 (10th Cir. 2012) ("In an abundance of caution, the court assumes that the Kansas Supreme Court may apply the rule of differing capacities."), and *Spiess v. Meyers*, 483 F. Supp. 2d 1082, 1089 (D. Kan. 2007) ("To the extent that plaintiff sued the State of Kansas and its agencies in *Spiess I*, defendants are not in privity with those parties *because in this case plaintiff brings suit against defendants in their individual capacities*.") (emphasis added)). Defendants contend *Cosgrove* and *Spiess* are distinguishable, but

fail to explain why. Defendants also fail to address binding Tenth Circuit authority, and other cases from within this District, contrary to their position.

"The Tenth Circuit has made clear that governmental employees sued in their individual capacity can not claim *res judicat*a effect to former suits brought against their governmental employer." *Brooks v. Graber*, Case No. 00-2262-DES, 2000 U.S. Dist. LEXIS 20582, at *14 (D. Kan. Nov. 6, 2000); *see also Gonzales v. Hernandez*, 175 F.3d 1202, 1206 (10th Cir. 1999) ("The general weight of authority appears to be that while government employees are in privity with their employer in their official capacities, they are not in privity in their individual capacities."); *Willner v. Budig*, 848 F.2d 1032, 1034 n.2 (10th Cir. 1988) ("Government employees in their individual capacities are not in privity with their government employer.").

To counter this overwhelming wave of relevant authority contrary to Defendants' position, Defendants rely on one 1997 case from this District: *Spielman v. City of Newton*, 1997 WL 534468, at *4 n.7, *10 (D. Kan. 1997). But *Spielman* was not based on current Kansas law. In *Spielman*, the Plaintiff alleged deprivations of his constitutional rights in relation to the demolition of a house he claimed to own. *Id.* at *1. Prior to filing suit against the City of Newton and City Environmental Control Officer Mark Detter in the District of Kansas, Plaintiff had filed a lawsuit in Harvey County District Court, attempting to enjoin the demolition. *Id.* at *9. The federal district court did not clarify who the defendants in the earlier state court action were, but implied that there were no individual-capacity defendants in the prior action. The Court determined that regardless of whether the plaintiff brought his federal court claims against Detter in an individual or official capacity, the claims were barred under the principles of *res judicata*.

The Court cited two cases in support of its finding that plaintiff's individual capacity claims against Detter were barred: *Lowell Staats Mining Co. v. Philadelphia Elec. Co.*, 878 F.2d 1271, 1276

(10th Cir. 1989); *see also Cohen v. Shea*, 788 F. Supp. 66, 68 (D. Mass. 1992). Neither case is on point. In *Lowell Staats Mining Co.,* the Tenth Circuit merely recognized that privity can, under certain circumstances, exist when the defendant is an agent of his or her *private* employer. *Id.* at 1276. The Tenth Circuit did not address the issue of privity between an individual defendant and his or her *governmental* employer. *Cohen* is also inapplicable. *Cohen* is a Massachusetts case applying Massachusetts law, *Cohen*, 788 F. Supp. at 68, while Kansas law applies to Plaintiff's claims in this suit. *Migra*, 465 U.S. at 81. For these reasons, the court's statements in *Spielman* are not persuasive. More recent cases from this District and the Tenth Circuit reject the theory that individual defendants are in privity with their governmental employers for the purposes of *res judicata* in Kansas. *See e.g.*, *Brooks v. Graber*, 2000 U.S. Dist. LEXIS 20582, at *14 (D. Kan. Nov. 6, 2000).

The cases cited above, finding that privity does not exist between and individual capacity defendant and his or her governmental employer, are Tenth Circuit and District of Kansas cases applying federal law. But "Kansas law does not appear to differ significantly from the federal law regarding the preclusion doctrines." *Stanfield v. Osborne Indus., Inc.*, 263 Kan. 388, 396 (1997). In fact, the single (unpublished) Kansas case Defendants argue is "on point" cites *Gonzales* and merely holds that individuals acting in their <u>official</u> capacity are in privity with the government for whom they work. *Rhoten v. Hren*, No. 101,826, 2010 Kan. App. Unpub. LEXIS 512, at *13 (Kan. Ct. App. 2010) (unpublished opinion). Because Defendants are sued in their individual capacities, *Rhoten* is irrelevant.

Defendants also wrongly argue that *Rhoten* found that the individual defendants named in that case were in privity with the City of Topeka for purposes of *res judicata*. [ECF 326, p.83]. Defendants misconstrue the court's findings. The *Rhoten* Court concluded that, regardless of *how* the defendants were named, "all acts and omissions complained of *were performed in these defendants'*

*official capacities*." *Rhoten*, 2010 Kan. App. Unpub. LEXIS 512, *13 (Kan. Ct. App. 2010) (emphasis added). When construing pleadings, Kansas courts emphasize substance over form. *Oller v. Kincheloe's, Inc.*, 235 Kan. 440, 446, 681 P.2d 630, 636 (1984). It therefore did not matter in *Rhoten* that the plaintiff *named* defendants in both their individual and official capacities because, in substance, the claims were asserted against the individuals in their official capacities.

Finally, Defendants argue "there is no reason to distinguish between Plaintiff's official capacity, individual capacity, and state law claims." [ECF 326, p. 84] In direct contradiction of that argument, courts in this district have identified good reasons to distinguish official capacity claims from individual capacity claims. Employees serving "in their official capacities . . . have different defenses available to them in a personal-capacity action than in an official-capacity action" *Cosgrove v. Kan. Dep't of Soc. & Rehabilitative Servs.*, 744 F. Supp. 2d 1178, 1185, 2010 U.S. Dist. LEXIS 103719, *14 (D. Kan. 2010). Defendants assert those very defenses (including qualified immunity) in this case and raise it on every issue. They cannot now allege that there is no reason to distinguish between the claims. Defendants are not in privity with the defendants in the prior state court actions and *res judicata* does not apply to bar any of Plaintiff's individual capacity claims.

    C.    <u>The State courts have not yet rendered final judgments on the merits</u>

In addition to Defendants lacking privity with the state court defendants, there has also not been a final judgment rendered in either of the state court actions filed by Plaintiff. As Defendants note, both state court cases against the University are on appeal. They are wrong to assert that final judgments were granted in those cases for the purposes of *res judicata*. In *Rhoten v. Dickson*, 290 Kan. 92, 108 (2010), the Kansas Supreme Court stated "Both federal and Kansas courts have held a pending appeal does not suspend the finality of the lower court's judgment for claim preclusion purposes." Not only is *Rhoten* inapplicable here, courts applying Kansas law are only "duty bound to follow Kansas Supreme Court precedent *absent some indication the court is departing from its*

143

*previous position*." *State v. Merrills*, 37 Kan. App. 2d 81, 83, 149 P.3d 869, 872 (2007) (emphasis added). Since *Rhoten* was decided, the Kansas Supreme Court has clearly signaled such a departure.

First, the *Rhoten* Court was analyzing the preclusive effect of a *federal* court case on a subsequent Kansas state court case. "'[S]tate courts are bound to apply federal rules in determining the preclusive effect of federal-court decisions on issues of federal law.'" *Stanfield v. Osborne Indus., Inc.*, 263 Kan. 388, 396, 949 P.2d 602, 608 (1997) (quoting *Heck v. Humphrey*, 512 U.S. 477, 488 n.9, 129 L. Ed. 2d 383, 114 S. Ct. 2364 (1994)). In the instant case, the Court is required to consider the preclusive effect of a Kansas state court judgment. *Rhoten* has no utility in this analysis. While it is true that "Kansas law does not appear to differ significantly from the federal law regarding the preclusion doctrines," on this point, the difference is significant. *Stanfield v. Osborne Indus., Inc.*, 263 Kan. 388, 396, 949 P.2d 602, 608 (1997).

In declaring that "Kansas courts have held a pending appeal does not suspend the finality of the lower court's judgment for claim preclusion purposes," *Rhoten* cited a single decision well over a century old. *Rhoten,* 290 Kan. at 108-09 (citing *Willard v. Ostrander*, 51 Kan. 481, 489-90, 32 P. 1092 (1893). This does not reflect the current view of the Kansas Supreme Court on the preclusive effect of prior *state* court cases. Less than one year after *Rhoten*, the Kansas Supreme Court, analyzing the preclusive effect of a prior state court decision, ruled that "consistent with the doctrine of *res judicata*, [an] order of dismissal would not be final until the opportunity for an appeal had expired or was exhausted; *only then would the order have preclusive effect*." *State v. Roberts*, 293 Kan. 29, 44-45 (2011) (emphasis added). That *Roberts* is a criminal case is immaterial to its holding on this issue. The Kansas Supreme Court has found that the same *res judicata* principles apply in civil and criminal cases. *State v. Lee*, 210 Kan. 753, 756, 504 P.2d 202, 205 (1972) (Kansas statutes expressly codify the principle of *res judicata* in criminal cases). The Kansas Court of Appeals

followed the *Roberts* Court's ruling in 2015. *Greer v. Cty. of Allen*, 344 P.3d 971 (Kan. Ct. App. 2015) 2015 Kan. App. Unpub. LEXIS 187 at 9-10 ("Because the opportunity for the State to file an appeal had not expired or was not exhausted, the granting of Greer's first motion to dismiss was never final, ***and res judicata did not apply***.")

D.   The rule against claim splitting does not bar Klaassen's claims

Defendants also argue that Plaintiff's claims should be dismissed under the Kansas rule against claim splitting. "Basically, the rule requires a plaintiff suffering a legal injury to join all theories of recovery for that harm in a single action against all of the appropriate defendants." *Bouton v. Byers*, 50 Kan. App. 2d 34, 49 (2014) (rejecting the plaintiff's argument that the rule against claim splitting applied in part because the harms alleged in the lawsuits were "legally distinct.").

Even if the rule against splitting a cause of action were to apply to Klaassen's cases, Defendants have waived it as a defense by insisting that Klaassen's claims against government entities by litigated in state court, thereby procuring the splitting of claims:

> "A defendant may agree to the splitting of a cause of action or he may waive the right to insist upon the rule forbidding the splitting of a single cause of action, and where he invites or procures such splitting he will not, in a second action, be permitted to adopt an inconsistent position by invoking the doctrine against splitting and thus obtain an unjust advantage by defeating a claim for the balance remaining due and unpaid on such cause of action." (Syl. P 2.)

*Kearny Cty. Bank v. Joe Nunn, et al.*, 156 Kan. 563, 566, 134 P.2d 635, 637 (1943).

Defendants attempt to paint the splitting of Plaintiff's claims as Plaintiff's decision. This is false. Plaintiff attempted to bring all his claims in a single action—this action. [ECF 1.] Sovereign immunity is a waivable defense that should be asserted to be invoked. In April and June 2013, the State entity defendants moved to dismiss all claims on the basis of sovereign or eleventh immunity. [See Response to SOF 411 and 412.] Over Plaintiff's strenuous objections, Defendants successfully

moved to dismiss some of Plaintiff's claims on Eleventh Amendment immunity grounds. [ECF 102.] It was not until after Defendants raised the sovereign immunity defense that Klaassen brought his state court claims against the state entity defendants. [ECF 326-119.] Defendants procured the split state and federal court actions here. Having procured this split, Defendants cannot now complain that Plaintiff failed to bring all his claims in a single action. *See Kearny Cty. Bank.*, 156 Kan. at 566.

Moreover, this action was the first lawsuit that Plaintiff filed. If Defendants wished to complain about claim splitting, they should have done so in the state court actions that followed the filing of this action. They did not. The fact that the subsequent, state court action happened to go to trial first should have no bearing on the application of the rule against claim splitting. Defendants were apparently content to litigate parallel actions for years. Only now is it attempting to invoke the rule against claim splitting. Defendants' argument, if it ever was viable, is far too late. Defendants waived this defense.

    E.    <u>Issue Preclusion does not bar Klaassen's due process claims</u>

Defendants next argue that issue preclusion bars Klaassen's due process claims. Issue preclusion requires the following essential elements: "'(1) a prior judgment on the merits which determined the rights and liabilities of the parties on the issue based upon ultimate facts as disclosed by the pleadings and judgment, (2) the parties must be the same or in privity, and (3) the issue litigated must have been determined and necessary to support the judgment.'" *State v. Parson*, 15 Kan. App. 2d 374, 377, 808 P.2d 444, 446 (1991) (quoting *Jackson Trak Group, Inc.*, 242 Kan. at 690). As discussed above, Defendants cannot satisfy the requirements that parties be the same or in privity or of a final judgment. The Kansas Supreme Court has never adopted the theory of nonmutual, defensive issue preclusion that Defendants advance.

Defendants rely on two cases to argue that issue preclusion applies to Klaassen's due process claims: *Parson* and *Goetz v. Bd. of Trs.*, 203 Kan. 340, 350, 454 P.2d 481, 490 (1969). Defendants

point out that in *Parson*, the Kansas Court of Appeals stated that "'strict privity' is not required for application of the bar of collateral estoppel." *Parson*, 15 Kan. App. 2d at 380 (1991). The *Parson* court ultimately held that "the agents of the same government are in privity with each other, since they represent ***not their own rights*** but the right of the government." *Id.* at 379 (emphasis added). Because *Parson* dealt with defendants acting only in their official capacities as agents of a government, its holding does not establish or support the argument that individual Defendants are in privity with their government employer.

Next, Defendants seek to use defensive, nonmutual collateral estoppel to prevent Klaassen from litigating his due process claims against them. Defendants cite *Goetz* to support their argument. In *Goetz*, the Kansas Supreme Court considered whether a husband and wife were in privity for purposes of issue preclusion. *Goetz v. Bd. of Trs.*, 203 Kan. 349-51. The husband, a fireman, had brought a prior claim for a disability pension. *Id.* at 341. He was unsuccessful. *Id.* at 342. After his death, his wife brought a claim for a widow's pension. *Id.* The Court found the spouses were in privity because the wife's entitlement to a pension could only come *through* her deceased husband. *Id.* at 351. Because her husband had litigated the question of whether he was entitled to a pension, the court's decision was binding also on his wife. *Id.*

While discussing whether the wife was precluding from bringing her claim by the prior judgment against her husband, the *Goetz* court cited a 1966 case from the United States District Court for the District of Minnesota to hold that "[a]nother distinction between the two doctrines, *res judicata* and collateral estoppel, is that collateral estoppel does not require mutuality of parties." *Id.* at 349-50 (citing *State of Michigan v. Morton Salt Company*, 259 F. Supp. 35, 65 (D. Minn. 1966), *affirmed* 377 F. 2d 768.) But *Goetz* court did not actually apply nonmutual collateral estoppel – its statements about the doctrine were mere *dicta*. Its decision was based on its finding that privity

existed between the husband and wife. Nonmutual collateral estoppel applies only when privity *does not* exist. *Strong v. Laubach*, 153 F. App'x 481, 485 (10th Cir. 2005).

The Kansas Supreme Court expressly rejected the use of nonmutual collateral estoppel in *McDermott v. Kan. Pub. Serv. Co.*, 238 Kan. 462, 474, 712 P.2d 1199, 1209 (1986) (" . . .we did not then and we do not now abandon the mutuality rule."). Despite Defendants' unsupported claims to the contrary, neither offensive nor defensive collateral estoppel is allowed in Kansas courts. *Jones v. Bordman*, 243 Kan. 444, 460, 759 P.2d 953, 965 (1988) (citing McDermott, 238 Kan. 462). ("[C]ollateral estoppel requires *both the plaintiff and the defendant* to have been parties to the prior litigation.").

No preclusion doctrine bars Klaassen's claims against Defendants. Summary judgment is appropriate.

### III.   Klaassen's First Amendment Retaliation Claims.

Klaassen did not surrender his First Amendment rights by accepting public employment. *Lane v. Franks*, 134 S. Ct. 2369, 2374, 189 L. Ed. 2d 312, 319 (2014). Nevertheless, Defendants improperly took employment action against Klaassen for exercising his constitutional rights guaranteed to him by the First Amendment to the U.S. Constitution.

To determine whether Klaassen can survive summary judgment as to his First Amendment retaliation claim, this Court must apply the framework first announced in *Pickering v. Bd. of Educ.*, as modified by *Garcetti v. Ceballos*. See 391 U.S. 563, 88 S. Ct. 1731 (1968); 547 U.S. 410, 126 S. Ct. 1951 (2006). The *Pickering/Garcetti* framework consists of five prongs and was articulated by the Tenth Circuit Court of Appeals as:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant

would have reached the same employment decision in the absence of the protected conduct.

*Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009) (citations omitted).

"The first three 'prongs' are said to be issues of law to be decided by the court; the last two are factual issues to be decided by the factfinder." *Id.* "[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2510 (1986). Thus, at the summary judgment stage, this Court should only make determinations regarding the first three prongs of the *Pickering/Garcetti* test. *See id.* If Klaassen can identify facts in support of his arguments on each of the first three prongs, it is inappropriate for this Court to grant summary judgment as to Klaassen's First Amendment retaliation claim.

A.      The Defendants' Legal Framework Is Incorrect

In a previous ruling by this Court, this Court stated that 42 U.S.C. § 1983 "creates liability for any person, acting under color of state law, who violates the Constitution and laws of the United States." *Klaassen v. Univ. of Kan. Sch. Of Med.*, 84 F. Supp. 3d 1228, 1248 (D. Kan. 2015) (acknowledging that defendants may assert the defense of qualified immunity). "The statute references no exceptions to this liability." *Id.* The Court then set forth the legal standard applicable to First Amendment Retaliation claims, citing the *Pickering/Garcetti* test. *Id.* at 1249-1251. Defendants now seek to expand the *Pickering/Garcetti* test by citing inapplicable precedent. They should not be allowed to do so for two reasons: (1) this Court has previously articulated the *Pickering/Garcetti* test as the legal framework for resolving the First Amendment retaliation claim, which is the law of the case; and (2) the *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010) case cited by Defendants articulates standards for establishing a Fourteenth Amendment claim, not a First Amendment claim, and is inapplicable.

Defendants cite *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010), for the proposition that individual liability under 42 U.S.C. § 1983 cannot attach to the Defendants unless Klaassen proves that the Defendants:

> "(1) promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." (Doc. 326, p. 88.)

By asserting this argument, Defendants seek to expand the *Pickering/Garcetti* test and the legal standards for proving a First Amendment retaliation claim. The Court's previous articulation of the applicable legal standard is the law of the case, which governs this Court during the summary judgment proceedings. *Entek GRB, LLC v. Stull Ranches, LLC*, 840 F.3d 1239, 1241 (10th Cir. 2016) ("Law of the case doctrine rightly bars the way, precluding the relitigation of issues either expressly or implicitly resolved in prior proceedings in the same court.").

Moreover, the case law cited by the Defendants is factually distinguishable. *Dodds* involved a detention policy which prevented an arrestee from posting bail after hours. 614 F.3d 1185, 1190 (10th Cir. 2010). The First Amendment was not implicated in *Dodds*. Instead, the issue was whether a supervisor could be held liable under 42 U.S.C. § 1983 because the supervisor instituted the questioned detention policy. *Id.* The *Dodds* Court classified Dodds' claim as an "overdetention" claim, implicating the Fourteenth Amendment, and proceeded to consider whether the supervisor was entitled to summary judgment after asserting the defense of qualified immunity. *Id.* at 1192-93. The *Dodds* case is distinguishable from the case before the Court and it implicates an entirely different constitutional right than the right to free speech. Therefore, this Court's analysis of Klaassen's First Amendment retaliation claims should be limited to the *Pickering/Garcetti* framework. Defendants should not be permitted to modify the applicable legal standard by citing inapplicable precedent.

B.    Klaassen engaged in protected speech outside of his official duties on three separate occasions.

To determine whether speech is considered part of an employee's official duties, this Court considers the "employee's chosen audience, or chosen method of disseminating speech." *Rohrbough*, 596 F.3d at 747. A useful example of this evaluation arose in *Brammer-Hoelter*, where the Tenth Circuit found that some of the plaintiff teachers' speech regarding teacher salaries and staffing levels was not made pursuant to their official duties and was therefore entitled to First Amendment protection. 492 F.3d at 1205. In reaching that conclusion, the court emphasized that the speech was directed at "ordinary citizens and parents" and occurred after school hours and off school grounds. *Id.* Although the content of the speech was clearly related to the teachers' official duties and had significant bearing on their day-to-day work, the speech was not made pursuant to their official duties because of their chosen audience and the circumstances of the communication. *Id.* Similarly, the *Garcetti* Court explained that "[e]mployees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government." 547 U.S. at 423.

The *Pickering/Garcetti* test should be applied to *each separate* instance of speech. *Johnson v. Independent School Dist.*, 891 F.3d 1485, 1492 (10th Cir. 1989). Therefore, to prevail on summary judgment, Defendants must demonstrate that each time Klaassen engaged in protected speech, that speech was part of Klaassen's official duties. Defendants cannot make that showing, and summary judgment is inappropriate.

1.    Klaassen engaged in protected speech outside of his official duties when he spoke with the Lawrence Journal-World.

Typically, "communicating with newspapers or . . . legislators" regarding work-related issues is not a part of the employee's official duties. *Zimmerman v. Univ. of Utah*, No. 2:13-cv-01131-JNP-

BCW, 2017 U.S. Dist. LEXIS 129168, at *15-16 (D. Utah Aug. 14, 2017) (quoting *Green*, 472 F.3d at 800). Despite this, Defendants argue that Klaassen's speech to the Lawrence Journal-World ("LJW") was pursuant to his official duties as a professor because it concerned the allocation of resources "affecting his department and basic sciences." [ECF 329, p. 98.] Factually, that is inaccurate; Klaassen spoke to the LJW regarding the mismanagement of KUMC including the following topics: (1) NCI accreditation of the Cancer Center, (2) KUMC's expansion into the Salina and Wichita, Kansas, (3) financial solvency of KUMC, (4) shared governance issues at KUMC, and (5) concerns regarding the ultimate management and direction of KUMC. [SOAF ¶¶ 128-129, 131-133, 134,150,158, 162.] As either Chair of Pharmacology or Tenured Professor, Klaassen had no responsibilities as to any of these topics. [SOAF ¶ 162 -163.]

Further, Defendants' arguments ignore the Supreme Court's recent proclamation that the "critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 134 S. Ct. at 2379. The fact that Klaassen's speech concerned the operation of his employer does not mean that public criticism of KUMC was within the scope of his duties.

Defendants also argue that Klaassen's speech to the LJW is unprotected because "he cannot recall what he told the author" of the LJW articles. But KUMC contributed the articles to him, and KUMC's administration believed that Klaassen was contributing to the articles. In fact, KUMC's administration actually anticipated future negative LJW articles after it punished Klaassen for speaking to the LJW the first time. [SOAF ¶¶ 136-138.]. Thus, the exact content of what Klaassen actually told the LJW is irrelevant. [SOAF ¶¶ 136-138, 148-149, 159, 210.] As the Supreme Court explained in *Heffernan v. City of Paterson,* 136 S. Ct. 1412, 1418 (2016), the First Amendment is concerned with the employer's motive, *i.e.*, the reason for taking the adverse action. *Id.* Even if

KUMC was mistaken as to the extent of Klaassen's involvement with the LJW articles, it still may not take adverse action against Klaassen just because he spoke with the LJW. *See id*. That is clearly prohibited by the First Amendment.

Defendants next argue that Klaassen's speech is unprotected under the Fifth's Circuit opinion in *Hurst v. Lee County*, 764 F.3d 480 (2014), *cert. denied* 135 S. Ct. 1179 (2015). Klaassen's case is not remotely similar. In *Hurst*, a jail house sheriff deputy was authorized to provide certain information to the local media regarding arrests from the night before. Pursuant to policy, the deputy was allowed to provide additional information if he first sought his supervisor's permission. In *Hurst*, the deputy gave extra information about an arrest without first seeking permission from his supervisor, in violation of company policies. He was terminated. The Fifth Circuit reasonably concluded that the deputy could not assert a First Amendment claim because – as an employee authorized to speak to media about arrests – he was acting pursuant to his official duties when he spoke to the media about an arrest. *Id.* at 485.

Klaassen was not acting pursuant to his official duties when he spoke to the LJW and was not tasked with providing the media information as part of his job duties. Therefore *Hurst* is distinguishable. The types of activities that Klaassen was compensated for include medical research and management of the Department of Pharmacology at the University of Kansas Medical School ("KUMC"). [SOAF 41-46.] Rendering an opinion to the LJW was not an activity that Klaassen was paid to do and was beyond the scope of his official duties. [SOAF ¶ 162 -163.] Therefore, Klaassen was speaking as a member of the public and not pursuant to his official duties when he communicated with the LJW.

Klaassen's case is indistinguishable from the landmark *Pickering* case that first recognized Klaassen's right to speak on matters of public concern. The communications in *Pickering* are similar

to the communications between Klaassen and LJW. In *Pickering*, the school board dismissed a teacher who wrote a letter to a newspaper that criticized how the school board raised and used funds. 391 U.S. at 566-67. The *Pickering* Court held that the teacher spoke as a member of the public because the teacher's employment was only tangentially related to the subject matter of the speech. *Id.* at 574. Like the teacher in *Pickering*, Klaassen is an educator who criticized the use of educational funds by giving his opinion to the press. [SOAF ¶¶ 128-129, 131-133, 134,150,158, 162.]

> 2.   Klaassen engaged in protected speech outside of his official duties when his PowerPoint presentations were disseminated to the university at large and to the LJW.

Klaassen PowerPoint presentations were disseminated to the university at large and to the Kauffman Foundation. It has long been settled that an individual's conduct is a form of speech protected by the First Amendment. *Tex. v. Johnson*, 491 U.S. 397, 406-07, 109 S. Ct. 2533, 2541 (1989). Defendants confuse the issue by emphasizing the content of Klassen's PowerPoint presentations and the reason Klaassen originally created the presentations. (Doc. 326, p. 92.) Defendants claim that Klaassen created the PowerPoints in his official capacity as a professor, and that undermines his First Amendment claims. These arguments should be disregarded.

Klaassen's creation of the PowerPoints for internal use is a separate and distinct act from the subsequent distribution of the PowerPoints. Klaassen's First Amendment retaliation claims are based on the actions taken by Defendants after the PowerPoints were disseminated to the university at large and to the Kauffman Foundation. [SOAF 116.] Klaassen's goal in disseminating the PowerPoints was to raise public awareness of management decisions taken by the KUMC administration. Distributing critical materials about how the science departments were being managed exceeded the scope of the activities that Klaassen was paid to do as a professor. The dissemination of the PowerPoints to the public at large is an example of conduct-based speech, protected by the First

Amendment, and Klaassen was not acting in his official capacity when the PowerPoint presentations were distributed. *See Brammer-Hoelter*, 492 F.3d at 1205 (concluding that distributing work-related information to the public at large is not official duties speech). The PowerPoints were disseminated to the Kauffman Foundation, an important donors to the University of Kansas and its Cancer Center initiative. The PowerPoints were distributed at a time in which the University was concerned about losing funding because of Klaassen's critical comments. [SOAF 91-94, 116-120, 141.]

3.    <u>Klaassen engaged in protected speech outside of his official duties on March 31, 2011.</u>

Finally, Klaassen's speech on March 31, 2011, is protected conduct. No doubt, the purpose of the meeting was for the department chairs to see a software demonstration from out an outside vendor. But Klaassen transcended the original purpose of the meeting when he used that public forum as an opportunity to speak critically about the administration's financial management, criticizing their management of KUMC and using the metaphor "slumlords." [SOAF 102, 107.] KUMC's administration knew Klaassen's comments concerned KUMC's financial mismanagement and misuse of taxpayer funds. [SOAF 106, 107.] It is uncontroverted that Klaassen had no official responsibilities with regards to the purchase of the software. [SOAF 108.] Klaassen used a public venue to express his concerns. Under the Tenth Circuit's analysis in *Brammer-Hoelter*, 492 F.3d at 1205, Klaassen's speech was not pursuant to his official duties.

Since Klaassen's speech was not made pursuant to his official duties, the analysis of Klaassen First Amendment claim must proceed to the second prong.

C.    <u>Klaassen's statements regarding the management of KUMC are of a legitimate public concern.</u>

Klaassen's speech was not made pursuant to his official duties, and is protected by the First Amendment. Under the second prong of the *Pickering/Garcetti* test, this Court must now determine whether the speech was on a matter of public concern. Matters of public concern include "those of

interest to the community, whether for social, political, or other reasons." *Lytle v. City of Haysville*, 138 F.3d 857, 863 (10th Cir. 1998). Courts consider the content, form, and context of a public employee's speech when determining if the employee's speech is on a matter of public concern. See *Borough of Duyea v. Guarnieri*, 564 U.S. 379, 398, 131 S. Ct. 2488, 2501(2011). Matters of public concern include exposing official improprieties. *Nixon v. City & County of Denver*, 784 F.3d 1364, 1367-68. (10th Cir. 2015). Purely personal grievances typically do not qualify as a matter of public concern. *Id.*

"**The objectives, purposes, and mission of a public university are undoubtedly matters of public concern.**" *Gardetto v. Mason*, 100 F.3d 803, 813 (10th Cir. 1996) (quotations omitted). Moreover, in general, "speech about the use of public funds touches upon a matter of public concern." *Id.* (quotations omitted). Thus, speech about school policies and funding is speech that is a matter of public concern. See *Pickering*, 391 U.S. at 571 (adequacy of school funds considered to be a matter of public concern); *Johnson*, 891 F.2d at 1490 (school nurse's concerns about school district's medication policy considered a matter of public concern); *Brammer-Hoelter*, 492 F.3d at 1206 (renewal of school charter and election of board members constitute a matter of public concern); *Kurtz v. Vickrey*, 855 F.2d 723, 730 (11th Cir. 1988) (complaints about the proposed closing of a branch of a university or its spending priorities, when these decisions affect the basic functions and missions of the university, also constitute speech on matters of public concern); *Gardetto*, 100 F.3d at 813 (holding employee's criticism of reduction in force plan and criticism of school administration is speech as a matter of public concern).

Klaassen's First Amendment retaliation claims are predicated on Klaassen's public objections and complaints regarding KUMC's lack of shared governance; misappropriation of taxpayer monies; lack of transparency; financial mismanagement; concerns regarding KUMC's push

to obtain NCI accreditation of the Cancer Center; KUMC's expansion into Salina and Wichita, Kansas; and the financial solvency of KUMC. [SOAF ¶¶ 110, 128-129, 131-133, 134,150,158, 162.].) Each of these are matters of a public concern.

Overall, Klaassen's statements are very similar to those made by the teacher in *Pickering*; both the *Pickering* plaintiff and Klaassen shared concerns over the misuse of school funds. 391 U.S. at 571. The management of a university's funds is an even greater public concern than that of a K-12 school (like in *Pickering*) because universities generally have more students, are responsible for more complex education, and have substantial endowments. Defendants even admit that comments KUMC's push to obtain NCI accreditation of the Cancer Center were of a public concern. Atkinson testified that obtaining NCI Designation of the Cancer Center was one of her top priorities and that it was important because obtaining "the very best cancer care possible for people that lived in the Kansas City region or Kansas was a very important goal." [SOAF 89, 147.] Terranova also testified that the Cancer Center was important to the Kansas City region. [SOAF 147.]

The Supreme Court has defined public concern as "something that is a **subject of legitimate news interest**; that is, a subject of general interest and of value and concern to the public at the time of publication. . . ." *City of San Diego v. Roe*, 543 U.S. 77, 83-84, 125 S. Ct. 521, 160 L. Ed. 2d 410 (2004); *see also Thayer v. City of Holton*, 515 F. Supp. 2d 1198, 1206 (D. Kan. 2007). The Supreme Court's conclusion makes sense. Newspapers are not in the business of publishing irrelevant articles that have no significance to the public. Newspapers are in the business of advising the public on matters that it believes are important.

The actual interest by both the media and the public belies the Defendants' unbelievable claims that Klaassen's speech was not a matter of public concern. Both the LJW and the Kansas City Star ran over a half-dozen articles regarding Klaassen's criticisms of KUMC, including Atkinson's

management of KUMC, KUMC's financial solvency, and KUMC's push to obtain NCI accreditation. [See SOAF 121-127.] After the articles were published, the public commented extensively online on the LJW articles. [See Exhibits cited SOAF 121-127.] The State of Kansas' governor's office began receiving letters concerned about the operation of KUMC. [SOAF 146.] Klaassen's concerns were a legitimate news interest; the public's response to articles indicate that Klaassen's public comments mattered. *See, e.g.*, *Mattingly v. Milligan*, 2011 U.S. Dist. LEXIS 126665, *8-9, 2011 WL 5184283 (Nov. 1, 2011) ("According to Milligan, six constituents were motivated by Mattingly's posts to call him at home to complain about the terminations. Television news stations, newspapers, and an internet blogger reported on the Milligan's decision to terminate the employees. Viewing the evidence in Mattingly's favor, her Facebook posts touched on a matter of public concern.").

Defendants next argue that Klaassen's speech was unprotected because they were personal attacks on Atkinson. [ECF 362, p. 98 (citing SOF 24).] This is a grossly unfair characterization of Klaassen's speech. Admittedly, at one time, Klaassen publically used the metaphor of "slumlord" to describe KUMC's as an institution. [SOAF 102-107.] But Atkinson herself acknowledged that Klaassen called KUMC's **as an institution** a slumlord – that is far from a personal attack. [SOAF 103.] Whether Klaassen called Atkinson personally a slumlord is a disputed fact that cannot be resolved on summary judgment. [SOAF 103.]

Also, Defendants understood Klaassen's slumlord comments as a metaphor for his criticisms of the administrations push for NCI designation of the Cancer Center and concerns regarding the use of taxpayer funds. [SOAF 107, 109, 113, 134.] In *Gardetto v. Mason*, 100 F.3d 803, 812 (10th Cir. 1996), the Tenth Circuit concluded that criticisms of a "highly visible public official, such as the

president of a college" is speech as a matter of public concern because it "obviously impact the social and political life of a community." *Id.*

Finally, KUMC argues that Klaassen's speech does not implicate public concern because he did not accuse the administration of any illegal acts. So what? Neither did the professor in *Pickering* or *Gardetto*. Illegality is not the standard. Defendants identify no case that says otherwise. Applying the second prong of *Pickering/Garcetti* test, Klaassen's speech was on a matter of public concern that deserves First Amendment protection.

### D.     Klaassen's free speech rights were not outweighed by his employer's interest in promoting efficiency or harmony in the workplace.

Since Defendants cannot demonstrate that Plaintiff's speech was part of his official duties and cannot dispute that his speech was on a matter of public concern, summary judgment is only appropriate if Defendants can demonstrate that it had a higher interest in taking action against him than he had in his speech. There is no easy formula for weighing an employee's First Amendment right to free speech against an employer's interest in preserving an efficient and disciplined work environment. *Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1333 (10th Cir. 2007). "Arguably, 'the only public employer interest that can outweigh a public employee's recognized speech rights is the interest in avoiding direct disruption, **by the speech itself**, of the public employer's internal operations and employment relationships.'" *Brammer-Hoelter*, 492 F.3d at 1207 (citing *Flanagan v. Munger*, 890 F.2d 1557, 1566 (1989) (emphasis added).

When weighing the employer's interest against the employee's rights, the Court may consider:

> whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.

*Id.* "[T]he employer bears the burden of justifying its regulation of the employee's speech." *Id.*

Defendants argue that Klaassen's inter-office conduct was unnecessarily disruptive and suggests that Klaassen was responsible for damaging professional relationships among the faculty. (Doc. 326, p. 102-104.) Defendants, however, do not identify a **single instance in which a statement by Klaassen to the LJW or to the public caused a disruption to the University.** Atkinson testified that the **comments had no affect** on any employment relationship and the University was able to successfully fulfill its goals and obtain NCI accreditation of the Cancer Center despite Klaassen's public speech. [SOAF 156, 157, 161.]

Instead, Defendants argue that Klaassen was disruptive as evidenced by his history of acting out, pounding on tables, displaying images of guns, and being loud. [ECF 326, p. 102.] Fair enough. But Klaassen had engaged in the same behavior since at least 1988, was promoted, and grew the Pharmacology Department to become the most successful basic science departments in the history of KUMC. [SOAF § III.] Klaassen's behavior was not a problem *until* he publically criticized the University on March 31, 2011. Defendants' circular reasoning should be rejected.

In addition, the evidence does not support Defendants' contention that Klaassen was disruptive. Instead, it was Defendants' retaliatory actions against Klaassen that caused the disruption to the Pharmacology department. After Klaassen was terminated as Chair, funded faculty left and took NIH grants monies with them forcing Pharmacology to rebuild. [SOAF § X.] The exodus of KUMC's best faculty was caused by Atkinson's decision to remove Klaassen as Chair of the Pharmacology department. [SOAF §§ X,XI.] After Klaassen was removed as Chair, faculty wrote Atkinson, asking her to reconsider her decision to remove Klaassen as Chair, and stating that faculty would leave without Klaassen's guidance and direction. [SOAF 167-169.] Unfortunately for KUMC, those faculty members were right. After removing Klaassen as Chair, KUMC then interfered with his ability to continue to serve as professor and PI of the COBRE grant by routinely ignoring his e-

mails and requests for assistance, secretly planning to kick him out of the department, removing him from the building, and stripping him of $13 million of NIH Grant funding. [See SOAF §§ X, XI, XII.] If there was a disruption to Pharmacology, there is a material dispute as to who was responsible for the disruption in light of the ample evidence that all disruption was caused by Defendants.

Defendants wholly fail to demonstrate how the **communications** which form the basis of Klaassen's First Amendment retaliation claims caused any disruption in the workplace. Klaassen's public speech caused no *direct* disruptions of internal operations. See *Brammer-Hoelter*, 492 F.3d at 1207 (stating the communications must cause a direct disruption of internal operations). Klaassen staged no sit in; he held no protests at the University. He did speak with the LJW and the public regarding his concerns about KUMC's management. Atkinson testified that the LJW articles did not cause any employee to do their job differently. [SOAF 156, 157, 161.] No additional inquiry is necessary. Defendants can show no facts that suggest that they had any interest in regulating the speech of Klaassen, much less an interest that outweighed his First Amendment rights. Summary judgment is inappropriate.

     E.    <u>The fourth and fifth prongs of the *Pickering/Garcetti* analysis are questions of fact that should not be resolved pursuant to Defendants' Motion for Summary Judgment.</u>

Defendants reserve the fourth and fifth prongs of the *Pickering/Garcetti* analysis for the individual memorandums. Plaintiff responds here only to note that the fourth and fifth prongs are question of fact that should ordinarily be determined by the factfinder during trial. See *Dixon*, 553 F.3d at 1302; *Cragg v. City of Osawatomie*, 143 F.3d 1343, 1346 (10th Cir. 1998).

Resolving the fourth and fifth prongs of the *Pickering/Garcetti* analysis during summary judgment proceedings is appropriate only when "any reasonable jury would [have found] that [the plaintiff] would have been terminated even absent any desire on the Defendants' part to punish him in retaliation for his allegedly protected speech." *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 117

(2d Cir. 2011). Stated differently, even if Defendants had jointly sought summary judgment on fourth or fifth prongs, Defendants would be required to demonstrate that no reasonable juror would find in favor of Klaassen. See *id.* They cannot.

F.     Defendants Subjected Klaassen to Adverse Job Actions

Defendants contend that because Klaassen's salary did not change, he was not subjected to an adverse employment action sufficient to support a First Amendment retaliation claim. [ECF 326, p. 105-106.] But Klaassen's salary obviously did change; he was ultimately fired. Regardless, a change in salary has **never been the standard** in a First Amendment retaliation case. *See Morfin*, 906 F.2d at 1437 n.3. The Tenth Circuit has "repeatedly concluded that a public employer can violate an employee's First Amendment rights by subjecting an employee to repercussions that would not be actionable under Title VII." *Baca v. Sklar*, 398 F.3d 1210, 1220 (10th Cir. 2005); *Morfin v. Albuquerque Public Schools*, 906 F.2d 1434, 1437 n.3 (10th Cir. 1990) (rejecting proposition that "only adverse employment decisions, such as termination, suspension, or transfer, in retaliation for constitutionally protected conduct are illegal"). In the Tenth Circuit, the following incidents are adverse employment actions in First Amendment retaliation cases:

- Plaintiff transferred to another building (*Morfin,* 906 F.2d 1434; *Schuler v. City of Boulder*, 189 F.3d 1304, 1310 (10th Cir. 1999));
- Harassment directed towards plaintiff (*Morfin,* 906 F.2d 1434);
- Changing job duties (*Schuler*, 189 F.3d at 1310);
- Written reprimand (*Id.*);
- Low-performance evaluation (*Id.*);
- Encouraging employees not to follow direction from the Plaintiff (*Baca*, 398 F.3d 1210, 1221 (10th Cir. 2005));
- Paid suspension; (*Hogan v. City of Indep.*, No. 02-2254-JWL, 2003 U.S. Dist. LEXIS 12325, at *10 (D. Kan. July 11, 2003));
- Subject to repeated small retaliatory actions; (*Baca*, 398 F.3d at 1213-1215);
- Removing plaintiff's job accoutrements including badges, phones, etc. (*Lincoln v. Maketa*, 176 F. Supp. 3d 1179 (D. Colo. 2016)); and,
- Administrative Leave (*Lincoln*, 176 F. Supp. 3d 1179 (D. Colo. 2016)).

Klaassen suffered ongoing and repeated adverse personnel actions. He was suspended twice in November 2011 and in May 2013. [SOAF 234-236, 347.] During his suspension, KUMC stripped him (without consulting him) of the grants that funded his research programs. [SOAF § XIV.] In June 2012, Stites censured him for calling KUMC a "slumlord institution" publically. [SOAF § XVI.] When Klaassen lost access to the COBRE and T32 research grants, he lost access to grant funds causing to reduce his research operations from $2.5 million a year enterprise to a $0.5 million. [SOAF 293-297.] In 2013, when he lost access to his remaining R01 grants in 2013, he became "dispensable like a malignant cancer," and KUMC cut him out of their future terminating his employment. [SOAF 359.]

Also, Defendants forced Klaassen to change departments and move buildings. [SOAF § XV.] After the move, Klaassen was repeatedly harassed by Tully, Meagher, and Jaeschke who all admitted to "hit[ting] him relentlessly." [SOAF § XVII.] Forced to move to a basement laboratory, Klaassen's lab members were denied access to necessary research equipment, and Klaassen's research accounts were charged for expenses that were previously free. [SOAF 276-291.] The expenses caused future financial difficulties for Klaassen's research lab. [SOAF 293-297.] When Klaassen complained to Stites about his treatment in June 2012, he was told to look forward. [SOAF 292.] When he accused the administration of lying to him because it promised to help him and his students but went back on their word, they fired him.

Defendants argue that "context matters" when determining whether Klaassen suffered an adverse employment action. [ECF 326-104.] But no amount of "context" can immunize the job repercussions Klaassen suffered from First Amendment scrutiny, which is probably why Defendants identify none to support their positions. It is too late to do so now. *Wagher v. Guy's Foods, Inc.*, 765

F. Supp. 667, 671 (D. Kan. 1991). ("In pursuit of fairness and proper notice," the court generally

summarily denies or excludes "all arguments and issues first raised in reply briefs.").

> G.     The Defendants are not entitled to qualified immunity for retaliating against
>        Klaassen because the prohibition on retaliating against employees for exercising
>        their First Amendment right to free speech is clearly established law.

Qualified immunity analysis requires this Court to determine whether a reasonable official

would have known that their challenged conduct was unconstitutional. *Lee v. Kan. State Univ.*, No.

12-CV-26382013 U.S. Dist. LEXIS 80592, **18-21 (D. Kan. June 7, 2013). The Court "cannot find

qualified immunity wherever we have a new fact pattern." *Casey v. City of Federal Heights*, 509

F.3d 1278, 1284 (10th Cir. 2007). The Tenth Circuit has "shifted the qualified immunity analysis

from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry

of whether the law put officials on fair notice that the described conduct was unconstitutional."

*Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir. 2006) (internal quotation marks and citation

omitted). "[A] general constitutional rule . . . can apply with obvious clarity to the specific conduct

in question, even though [such conduct] has not previously been held unlawful." *Anderson v. Blake*,

469 F.3d 910, 914 (10th Cir. 2006) (internal quotation marks and alteration omitted).

Defendants are not entitled to qualified immunity on plaintiff's First Amendment retaliation

claims. Defendants argue that because *Pickering* requires a factual balancing test, no state employee

could ever be denied qualified immunity because there are "numerous factors at play." [ECF 326, p.

109.][6] Courts reject this argument noting that circuit courts across the country have "definitively held

---

[6] Defendants also argue that they are entitled to qualified immunity under *Demers v. Austin*, 746
F.3d 402, 417 (9th Cir. 2014), and *Mpoy v. Fenty*, 901 F. Supp. 2d 144, 158 (D.D.C. 2012). Neither
opinion is persuasive. In *Demers*, the Ninth Circuit concluded that the professor engaged in conduct
that was pursuant to his "official duties" but declined (for the first time) to apply *Garcetti* to
academic setting. Therefore, the Court held that the defendants were entitled to qualified immunity
because they were not on notice that official duty speech under *Garcetti* could form the basis for
liability. *Mpoy* is entirely unremarkable. There the D.C. District Court concluded that the teacher's
(footnote continued)

that 'where the *Pickering* balancing factors weigh heavily in favor of the employee, the law is clearly established and qualified immunity is therefore unavailable." *McGreevy v. Stroup*, 413 F.3d 359, 366 (3d Cir. 2005) (*citing Paradis v. Montrose Mem'l Hosp.*, 157 F.3d 815, 819 (10th Cir. 1998) (denying qualified immunity after Pickering balancing because the case law clearly established that plaintiff's speech was a matter of public concern and entitled to protection under the First Amendment). Defendants' argument is also inconsistent with more recent Tenth Circuit case law stating that qualified immunity is not a scavenger hunt for prior cases with similar facts. *Gomes*, 451 F.3d at 1134.

Here, fortunately, no scavenger hunt is necessary to find a prior case with similar facts. The *Pickering* case is factually indistinguishable. There, the school board dismissed a teacher who wrote a letter to a newspaper that criticized how the school board raised and used funds. 391 U.S. at 566-67. Like the teacher in *Pickering*, Klaassen is an educator who criticized the use of educational funds by providing his opinion to the press. *Pickering*, standing alone, forecloses Defendants' attempts to cloak themselves in qualified immunity.

It is indisputable that at the time of Defendants' acts of retaliation, a public employer could not terminate an employee in retaliation for the employee's protected First Amendment activities. *Singh v. Shonrock*, No. 15-cv-9369-JWL, 2017 U.S. Dist. LEXIS 168747, at *50 (D. Kan. Oct. 12, 2017) (citing *See Brammer-Hoelter*, 602 F.3d at 1187). This law is clearly established. The relevant inquiry, then, is whether Defendants could have reasonably believed, at the time they retaliated against Klaassen, that the administration could retaliate against a university professor because the professor publically criticized the university's handling of funds, operation, and organization. See

---

complaints about conduct in his classroom concerned his official duties and was not protected speech.

*Lane*, 2014 WL 2765285, at *6 ("The relevant question for qualified immunity purposes is this: Could Franks reasonably have believed, at the time he fired Lane, that a government employer could fire an employee on account of testimony the employee gave, under oath and outside the scope of his ordinary job responsibilities?"). The answer to that question is no.

Defendants were also on notice that Klaassen's commentary to the LJW was protected speech that involved matters of public concern. In 1996, the Tenth Circuit held that the "**objectives, purposes, and mission of a public university are undoubtedly matters of public concern.**" *Gardetto v. Mason*, 100 F.3d 803, 813 (10th Cir. 1996) (quotations omitted). Tenth Circuit and Supreme Court cases have also consistently recognized that terminating a professor for publically criticizing the administration or the administrations' use of taxpayer funds violates a professor's First Amendment rights. See *Johnson*, 891 F.2d at 1490 (school nurse's concerns about school district's medication policy considered a matter of public concern); *Brammer-Hoelter*, 492 F.3d at 1206 (renewal of school charter and election of board members constitute a matter of public concern); *Gardetto*, 100 F.3d at 813 (holding employee's criticism of reduction in force plan and criticism of school administration is speech as a matter of public concern).

*Garcetti* did not change the *Pickering* analysis. In fact, *Garcetti* specifically excluded speech like Klaassen's from its holding. *Garcetti*, 547 U.S. at 425. And, as recently as 2014, the Supreme Court reaffirmed it did not stutter when it held teachers have to right to speak out freely about the operation of their schools. *See Lane*, 2014 WL 2765285, at *6. Furthermore, both before and after *Garcetti*, the Tenth Circuit has expressly held educators do not speak as employees when they criticize their school's administration and handling of funds. *See Brammer-Hoelter*, 492 F.3d at 1204-05; *Hulen v. Yates*, 322 F.3d 1229 (10th Cir. 2003).

Defendants identify no case in which a teacher or professor criticized its school's administration to a news outlet, the employee was terminated, and the employer then successfully argued that it was entitled to qualified immunity. It is clearly established law that such behavior, like the behavior exhibited by Defendants here, violates the law. Defendants cannot assert the defense of qualified immunity and summary judgment is inappropriate.

IV.     Klaassen possesses a property interest in the right to conduct research because KUMC's policies and pratices prevent the University from interfering with Klaassen's research tenure rights.

Klaassen was a basic science researcher. [SOAF 11.] His job duties included obtaining outside funding to fulfill his research agenda. [SOAF 9-13.] And Klaassen was exceptional at it. [SOAF 11.] In Klaassen's 45-year career, he obtained over $ 75 million in research grants. [SOAF 9, 13.] The grants funded his research laboratories, his research staff and employees, and provided a basis for his publications. [SOAF 9-13.] However, without notice or a chance to be heard, in December 2011, KUMC permanently stripped Klaassen as PI of two NIH Grants – the T32 Training and COBRE Grant – depriving him of the money in the grant to fund his research operations. [SOAF XIV.] Later, against without notice and a chance to be heard, in August 2013, KUMC stripped him of this two remaining RO1 Grants and prevented him from accepting an award from the NIH of a third RO1 Grant. [SOAF 352-360.] At this same time, Stites blocked Klaassen from accepting a $1.8 million NIH RO1 Grant that had been awarded to Klaassen by the NIH. [SOAF 354-355.] Klaassen possessed a property interest in the right to research which included the right to obtain and utilize outside funding including the grants KUMC removed from him. Because Klaassen possessed a property interest in the right to obtain outside funding, Klaassen was entitled some notice and a chance to be heard before being having sources of outside funding removed from him by the State.

In 2015, KUMC argued to this Court that Klaassen's theory as pleaded failed to state a claim. On May 15, 2015, applying Rule 12 standards, this Court concluded that KUMC's Faculty

Handbook provisions combined with its course of conduct was sufficient to show that Klaassen "had a property interest in a right to conduct research." [ECF 120, p. 10.] Now, on summary judgment, the Faculty Handbook provisions speak for themselves and KUMC's alleged course of conduct which caused the Court to deny the motion to dismiss is supported by competent evidence. Because there is, at the very least, a factual dispute regarding KUMC's right to unilaterally and without notice deprive Klaassen of his constitutionally protected right to conduct research, summary judgment is improper.

A.      Defendants Cite No Law Supporting Their Argument

Defendants acknowledge that Klaassen's property interest is created by an implied contract between the University and Klaassen but surprisingly cite no law regarding implied contracts in Kansas. [ECF 326, pp. 110-113.] If Defendants had bothered to cite relevant law, its application would reveal that Klaassen is entitled to a jury trial.

As a threshold matter, "whether an implied contract exists which creates a property interest in employment is **normally a question of fact for the jury.**" *Koopman v. Water Dist. No. 1*, 972 F.2d 1160, 1164 (10th Cir. 1992). This is because it is necessary to determine both parties' "subjective intent to form a contract." *Anglemyer v. Hamilton Cty. Hosp*., 58 F.3d 533, 537 (10th Cir. 1995) (citation omitted). Summary judgment is appropriate only where (1) no material facts are in dispute and (2) the plaintiff presents only evidence of his **own unilateral expectations**. *Warren v. City of Junction City*, 176 F. Supp. 2d 1118, 1126 (D. Kan. 2001) (citations omitted); *Crowley v. City of Burlingame*, 352 F. Supp. 2d 1176, 1182 (D. Kan. 2005).

The existence of an implied contract depends on the intent of the parties, determined from the totality of the circumstances. *Anglemyer*, 58 F.3d at 537. To guide this determination, the Kansas Supreme Court has stated in employment cases:

> Where it is alleged that an employment contract is one to be based upon the theory of implied in fact, the understanding and intent of the parties is to be ascertained from several factors which include written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced.

*Panis v. Mission Hills Bank*, N.A., 60 F.3d 1486, 1492-93 (10th Cir. 1995) (quoting *Morriss v. Coleman Co.*, 241 Kan. 501, 738 P.2d 841, 848 (Kan. 1987) (further citation omitted)). These factors are commonly known as the *Kastner* factors. *See Kastner v. Blue Cross & Blue Shield of Kansas, Inc.*, 21 Kan.App.2d 16, Syl. ¶ 3, 894 P.2d 909 (1995).

There is significant evidence in the summary judgment record demonstrating an intent between KUMC and Klaassen that professors – particularly, tenured professors – have the right to research within their field of study which includes the right to obtain outside funding. Nearly every individual defendant agrees that KUMC recognizes such a protected interests

- KUMC's corporate representative testified that tenure is a "guarantee for faculty members to freely pursue their research interests" and acknowledged that right included the "right to seek funding through their institutions to do research that are in their field." [SOAF 54, 60.];

- KUMC's Chancellor testified that KU professors have the "full freedom of research" [SOAF 65.]

- Terranova testified that faculty members have the right to conduct research "by getting gift or grant money for that research." [SOAF 67];

- Terranova, who worked for KUMC since 1977, cannot recall a single instance in which a faculty member was denied the right to serve as PI on a NIH grant; [SOAF 68 - 69];

- With regards to the COBRE grant specifically, Atkinson testified that professors had "full protection for the ability to do the work related to nuclear receptors and liver health." [SOAF 80.]

- Jaeschke testified that he had a right as a faculty member to "pursue whatever research" he wanted subject only to whether the NIH would "give [him] money" for the research; [SOAF 61-62.]

- Klaassen testified that in his experience at KUMC since 1964 no professor has ever been removed as PI unless they passed away; [SOAF 63.]

- According to Terranova, since 1977 (the date Terranova began employment at KUMC), Klaassen is the only professor to lose his status as PI on a research grant; [SOAF 68-69.];

- KUMC's Faculty Handbook protects professors right to "full freedom in research" [SOAF 71.]; and,

- Professors may reasonable rely on **all** provisions of KUMC's Faculty Handbook because KUMC follows its Handbook policies, and does not differentiate between aspirational and binding policies [SOAF 72-73.]

At this stage, these facts are taken as true. These facts standing alone are sufficient to show that KUMC "fostered a custom or mutual understanding that its faculty and administration would not interfere with a tenured professor's research." *Hamid v. John Jay Coll. of Criminal Justice*, No. 99 CIV 8669, 2000 WL 666344, at *6 (S.D.N.Y. May 19, 2000). This is not a case about Klaassen's <u>unilateral expectations</u> regarding his right to conduct research including the right to seek, obtain, and utilize NIH grants. Summary judgment is improper.

Application of the *Kastner* factors identified above also favors an understanding that a professor's research interests are constitutionally protected. First, KUMC's Handbook, which guarantee the right to "full freedom in research" was a negotiated instrument agreed to by both faculty and KUMC's administration. [ECF 326, p. 116.] Second, the record unequivocally shows that from 1968 to 2014 KUMC did not interfere with a professor's research interests. [SOAF 63, 68-69.] Third, the conduct between KUMC and Klaassen over the course of his 40-year career shows that Klaassen's expectation that he would not be removed as PI was reasonable. Klaassen, who had more experience with NIH grants than any other professor at KUMC, testified that it is unheard of at KUMC and in the country to remove a professor as PI. [SOAF 13, 63.] And, as explained below, the only professor that KUMC identified who was removed as PI from a grant was removed **after** a due process hearing. [SOAF § XXII. ] In addition, there is substantial evidence in the record that even

terminated faculty are allowed to maintain their RO1 grants. At KUMC, after Klaassen was terminated as Chair, nine **funded** faculty left the department, each one taking their research funding with them. [SOAF § X.] Fourth, as Jaeschke testified, KUMC has an interest in funded faculty because any academic institution has an interest in supporting academic freedom rights, *i.e.*, the right of faculty members to research areas of interest in their fields. KUMC also has an interest in professors getting funded because it takes "indirect costs" from the grant. [SOAF 61-62.] More money for the professor means more money for the University. Carlson described it best when asked about the purpose of grants:

> Depends on who you are. If you're a scientist, some scientists are after fame, others are after truth, others are after just doing something they really enjoy doing. If you're an administrator they seem to think the indirect cost is a lot more interesting than the grant.

[SOAF 62.]

Finally, the fact Klaassen was <u>tenured</u> bolsters the reasonableness of his understanding that that KUMC would not interfere with his research. Academic tenure serves two primary purposes: (1) it protects professors from arbitrary dismissal and (2) it ensures professors possess the ability to research and teach subjects within their fields. [SOAF 54.] The circumstances surrounding the employment relationship between Klaassen and KUMC show there is (at an absolute minimum) a material factual dispute regarding the existence of a contract implied in fact supporting Klaassen's right to conduct research.

The Kansas Appellate courts repeatedly recognize that (1) statements in a faculty handbook plus (2) other conduct on behalf the employer are sufficient evidence to show a contract implied in

fact.[7] In *Morriss v. Coleman Co.*, 241 Kan. 501, 505, 738 P.2d 841, 844 (1987), the plaintiff alleged that he was not an at-will employee and had a contract implied-in-fact that he could be terminated only for good cause. The plaintiff's supervisor admitted that the employer would "only discharge its employees for good cause." *Morriss*, 241 Kan. at 505 (noting that defendant employer admitted that it "only discharges employees if a good reason exists"). This was sufficient to preclude summary judgment because the issue in *Morriss* was not whether there was a contract implied in fact to only terminate an employee for "good cause," but whether the employee's actions provided the requisite "good cause," a question for the jury. Like *Morris*, here, the Defendants testified that tenure is a "guarantee for faculty members to freely pursue their research interests" and acknowledged that right included the "right to seek funding through their institutions to do research that are in their field." [SOAF 54, 60.]. *See also Allegri v. Providence-St. Margaret Health Ctr.*, 9 Kan. App. 2d 659, 662, 684 P.2d 1031, 1034 (1984) (affirming denial of summary judgment because there was material evidence of a contract implied in fact because of combination of "just cause" termination provisions in employee handbook and employee's 30-year work experience with employer).

An employee possesses a property interest in a particular employment status or benefit if the employer lacks the absolute discretion to remove the employment benefit. *See Hennigh v. City of Shawnee*, 155 F.3d 1249, 1254 (10th Cir. 1998). Because KUMC's own policies and course of conduct remove *any* – much less *absolute* – discretion to diminish a tenured professor's ability to conduct research, Klaassen has a property interest.

---

[7] Admittedly most of these cases arise in situations in which there is a dispute regarding employment tenure, *i.e.*, was the employee at-will or something more. However, the Court's reasoning is still applicable here.

B.      Defendants' Reliance on the PI Change Policy Should Be Disregarded

Defendants contend that Klaassen can state no claims because (1) it has changed PI's in the past and (2) this Court should disregard its KUMC Faculty Handbook in favor of its PI change policy. [ECF 326, p. 114-115.] None of the Defendants' arguments are availing.

To support their first point, Defendants rely exclusively on Girod's deposition testimony. [SOF 368.]. At his deposition, Girod identified two situations in which Defendants removed a professor as PI from an NIH grant. The first situation involved Dr. T. and is controverted. Girod, in November 2015, testified that Dr. T. was removed as PI from her NIH grant but stated he was unfamiliar with the details. [Response SOF 368.] After Girod testified that Dr. T. lost her status as PI, KUMC then produced correspondence from Girod to Dr. T. that states, "You will remain the principal investigator on any grants on which you currently serve as principal investigator." [Response to SOF 368.] On summary judgment, this Court's only available conclusion is that Dr. T. was not removed as PI. [*Id.*]

The other situation Girod identified involved Dr. S., who was not removed as PI until **after** he had a due process hearing regarding allegations of research misconduct. [Response to SOF ¶ 368; SOAF ¶¶ 397, 398.] The summary judgment record is clear – other than Klaassen, from 1968 to 2014 the **only** known time KUMC removed a professor as PI occurred **after** the professor received a due process hearing. [SOAF ¶¶ 398.] Defendants' facts support Klaassen's argument that he was entitled to a due process hearing and a possessed a property interest in outside funding.

Second, KUMC argues that this Court should disregard its faculty handbook in favor of its PI Change policy. KUMC argues that because its Handbook is merely aspirational and not contractual, KUMC can remove Klaassen as PI under its PI Policy. But Defendants admit that the PI Policy itself is a "flexible guideline." [Response to SOF 366.] And there is no evidence that KUMC relied on the PI Policy at the time it removed Klaassen as PI. [SOAF 266, 356.] There is no evidence KUMC ever

provided Klaassen with a copy of the PI Policy before using it to remove Klaassen from his grants. [Response to SOF 366.]

The PI Policy, which KUMC attempts to argue after the fact that it authorizes KUMC to change PIs on NIH Grants, is inconsistent with KUMC's Handbook, KUMC's course of conduct, and the testimony of its Corporate Representative.  Like at-will disclaimers in employer handbook, KUMC's PI Policy is nothing more than a factor to be considered by a jury.  *Accord Morriss v. Coleman Co.*, 241 Kan. 501, 514, 738 P.2d 841, 849 (1987) ("The disclaimer in the supervisor's manual quoted above does not as a matter of law determine the issue."); *Brown v. United Methodist Homes for Aged*, 249 Kan. 124, 139 (1991) (affirming denial of summary judgment and jury verdict in implied-fact case in which employer possessed at-will disclaimer in its handbook);   At best, KUMC's reliance on the PI Policy creates an issue of material fact as to whether KUMC can at its sole and unique discretion remove professors from NIH Grants without notice or a chance to be heard. Whether KUMC's conduct is regulated by the PI Policy, its Handbook, or was reflected in its course of conduct are factual issues for a jury.

### C.   Defendants Concede that Klaassen's Research Program Was Protected By Principles of Academic Freedom and Tenure Because It Was Related to Klaassen's Job Duties as Pharmacology Research Professor

Defendants argue that because nobody challenged Klaassen's right to conduct the subject-matter of the research that was funded by the RO1, COBRE, and T32 Training grants, any inquiry into Klaassen's protected academic freedom rights are irrelevant. [ECF 326, p. 114 (citing SOF 404-408).] Defendants miss the point and in doing so concede the argument. Because all parties agree that Klaassen's research funded by the RO1, COBRE, and T32 Training Grants were proper under KUMC's principles of academic freedom and tenure, Defendants necessarily agree that those activities are constitutionally protected property interests. [See SOF 404-408; SOAF 54-74.] By removing Klaassen from the NIH grants, Defendants challenged the subject matter of his protected

research. As mentioned, KUMC's Corporate Representative, Chancellor, Vice-Chancellor for Research, and tenured faculty professors all testified that KUMC's tenure and academic freedom rights included the right to conduct research by obtaining grant money. [Pl's SOAF 54-74.]

Finally, KUMC argues that Klaassen did not have a right to be employed in a particular department, right to laboratory equipment, or a right to money in University accounts. [ECF 326, pp. 116-117.] Klaassen is not pleading the existence of a separate property interests in a particular department or laboratory equipment. He does claim that removing him from the department and depriving him of necessary access to laboratory equipment are retaliatory actions. [*Supra* Argument and Analysis § III.F.]

D.    Klaassen Received No Notice or Opportunity to Be Heard

Defendants never spoke with Klaassen regarding their plan to remove him from any of his NIH Grants. [SOAF § XIV, 352-360.] He received neither notice or an opportunity to be heard regarding the Defendants clandestine plan to destroy his research career. [SOAF § XIV, 352-360.] Defendant also, by removing Klaassen from the grants and defunding his laboratory, destroyed his career. Klaassen's research agenda was dependent on obtaining outside funding. [*Supra* Argument and Analysis § III.F.] By eliminating Klaassen's outside funding, KUMC destroyed Klaassen's career and made him dispensable like a "malignant cancer." [SOAF 359.]

Defendants argue that Klaassen was not entitled to a due process because he "fails to prove a property interest in a right to conduct research." [ECF 326, p. 116.] But the facts show a material dispute regarding whether Klaassen possesses a property interest at KUMC in his right to research including the right to obtain and utilize sources of outside funding. *See supra* Analysis and Argument § IV.A-C. It is beyond dispute that that once a property interest exists, clearly established law requires that the University must provide some due process protections. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 546 (1985) (holding that due process hearings are required

for the removal of protectable property interests); *see also Jones v. Hernandez*, No. 07-2042, 2007 U.S. App. LEXIS 28320, **10-11 (10th Cir. Dec. 6, 2007) (qualified immunity ruling improper because there was a factual dispute over whether the city had discretion to eliminate benefits of employment). Because Klaassen received no due process protections, the sole issue on Klaassen's due process claim is a question of fact for the jury – did Klaassen possess a property interest in the right to obtain outside funding.

  E. <u>Defendants are not entitled to Qualified Immunity on Klaassen's Due Process Claim</u>

  Defendants qualified immunity argument has already been raised and dismissed by this Court. This Court previously concluded that Klaassen's allegations, "create an inference that the Individual Defendants fostered "rules and understandings," that the individuals would not interfere with a professor's principal investigator status." [ECF 120, pp. 11-13 (citing *Perry v. Sindermann*, 408 U.S. 593 (1972). Defendants raise the same arguments now that they raised earlier in response to Klaassen's motion for leave to amend. [Compare ECF 326, at 112; with ECF 109, at 7-8 (citing same cases).] The arguments were unpersuasive in March 2015; they remain unpersuasive now.

  Qualified immunity analysis requires this Court to determine whether a reasonable official would have known that the conduct at issue was unconstitutional. *Lee.*, U.S. Dist. LEXIS 80592, **18-21. As mentioned earlier, this Court "cannot find qualified immunity wherever we have a new fact pattern." *Casey*, 509 F.3d at 1284.

  On this summary judgment record, Plaintiff presents adequate evidence that the Defendants fostered rules and understanding that KUMC would not interfere with a professor's academic research so long as the research was within the professor's field of study. [See SOAF § V.] Klaassen's property right to conduct research was established and recognized as both a protectable employment status or benefit and a protectable implied contract. The Tenth Circuit and the United

States Supreme Court have recognized these property rights for decades. *See Perry v. Sindermann*, 408 U.S. 593, 595 (1972) ("A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing."); *Hennigh*, 155 F.3d at 1254 (recognizing property interest in employment status); *Hulen v. Yates*, 322 F.3d 1229, 1241, (10th Cir. 2003) (recognizing property interest in employment status for tenured professors based on the terms of the faculty handbook); *Bishop v. Wood*, 426 U.S. 341, 344 (1976) (property interest may be created by implied contract). Also, there is no dispute that that once a property interest exists, clearly established law requires that the University must provide some due process protections. *Loudermill*, 470 U.S. at 546

   If the University's argument is correct that implied in fact analysis is too nuanced to ever defeat qualified immunity, then the United States Supreme Court case law recognizing implied contracts as a constitutionally protected property interest is meaningless. *See, e.g.*, *Perry*, 408 U.S. at 595; *Wood*, 426 U.S. at 344 A contract implied in fact is just that—a contract created by the unique factual circumstances. *Kastner*, 21 Kan. App. 2d at 17, Syl. ¶ 2. The precise nature of the property right will no doubt vary based on the underlining situation, but variance in the exact right is not determinative of the existence of qualified immunity. Indeed, the Supreme Court has warned that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). But defendants, (most of whom testified that academic freedom preserves the right to obtain and utilize NIH Grants ) cannot claim surprise that Klaassen possesses a property interest in the very research interest Defendants personally acknowledged existed. The Defendants are not entitled to qualified immunity.

## CONCLUSION

Plaintiff Curtis Klaassen, Ph.D. respectfully requests that Defendants' Motion for Summary Judgment be denied for the reasons stated above.

**/s/ Alan L. Rupe**
Alan L. Rupe #08914
Jeremy K. Schrag #24164
LEWIS BRISBOIS BISGAARD & SMITH LLP
1605 N. Waterfront Parkway, Suite 150
Wichita, Kansas 67206
Telephone: (316) 609-7900
Facsimile: (316) 462-5746
alan.rupe@lewisbrisbois.com
jeremy.schrag@lewisbrisbois.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2018, I electronically filed the foregoing Response using the CM/ECF system, which will send electronic notices to the following counsel of record:

Anthony F. Rupp, KS #11590
Tara S. Eberline, KS #22576
FOULSTON SIEFKIN LLP
32 Corporate Woods, Suite 600
Overland Park, KS 66210
trupp@foulston.com
teberline@foulston.com

*Attorneys for Defendants*

**/s/ Alan L. Rupe**
Alan L. Rupe