.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

.

CURTIS KLAASSEN, Ph.D.,

       Plaintiff,

    vs.              Case No. 13-CV-2561-DDC/KGS

THE UNIVERSITY OF KANSAS

SCHOOL OF MEDICINE, et al.,

       Defendants.

-------------------------------------------

IN THE TWENTY-NINTH JUDICIAL DISTRICT

DISTRICT COURT, WYANDOTTE COUNTY, KANSAS

CURTIS KLAASSEN, Ph.D.,

       Plaintiff,

    vs.              Case No. 14-CV-603

UNIVERSITY OF KANSAS,

UNIVERSITY OF KANSAS SCHOOL

OF MEDICINE, and the UNIVERSITY

OF KANSAS MEDICAL CENTER,

       Defendants.

.

VIDEOTAPED DEPOSITION OF

DR. ALLEN RAWITCH

.

PLAINTIFF'S EX. 1015

1   taken on behalf of the Plaintiff, pursuant to

2   Notice to Take Deposition, beginning at 8:58 a.m.

3   on the 14th day of April, 2016, at the University

4   of Kansas Medical Center, 3901 Rainbow Boulevard,

5   in the City of Kansas City, County of Wyandotte,

6   and State of Kansas, before Barbara J. Hoskinson,

7   Certified Court Reporter, Kansas License No. 0434.

8   .

9   .

10   .

11   .

12   .

13   .

14   .

15   .

16   .

17   .

18   .

19   .

20   .

21   .

22   .

23   .

24   .

25   .

```
 1                         APPEARANCES

 2      .

 3      .

 4   ON BEHALF OF THE PLAINTIFF:

 5      .

 6         Mr. Jeremy K. Schrag

 7         Lewis, Brisbois, Bisgaard & Smith, LLP

 8         1605 N. Waterfront Pkwy, Suite 150

 9         Wichita, Kansas, 67206

10         316-609-7900

11         jeremy.schrag@lewisbrisbois.com

12      .

13   ON BEHALF OF THE DEFENDANTS:

14      .

15         Mr. Tony F. Rupp

16         Foulston Siefkin, LLP

17         9225 Indian Creek Parkway, Suite 600

18         Overland Park, Kansas, 66210

19         913-498-2100

20         trupp@foulston.com

21      .

22      .

23   ALSO PRESENT:

24         Dr. Curtis Klaassen

25         Mr. Junior Soto, Videographer
```

Page 4

```
 1                        INDEX
 2     .
 3     .
 4     Certificate----------------------------- 171
 5     .
 6     .
 7                        WITNESS
 8     ON BEHALF OF PLAINTIFF:              PAGE
 9     DR. ALLEN RAWITCH
10     Direct-Examination by Mr. Schrag       6
11     Cross-Examination by Mr. Rupp        161
12     Redirect-Examination by Mr. Schrag   165
13     .
14     .
15                        EXHIBITS
16     DEPO EXHIBIT NO.:                   MARKED
17     No 194  Deposition Notice             36
18     No 195  Elizabeth Levant Depo 5/23/12 63
19     No 196  Inquiry Report                68
20     No 197  Copy of PowerPoint slides     97
21     No 198  Memo from Klaassen lab members 119
22     No 199  Audio recording 078015       122
23     No 200  Audio recording 078020       124
24     No 201  Audio recording 078016       125
25     No 202  Audio recording 070719       128
```

```
 1   No 203   Email chain 5/20/13              130

 2   No 204   Audio recording 078023          132

 3   No 205   Audio recording 078031          134

 4   No 206   Audio recording 078025          135

 5   No 207   Audio recording 078027          135

 6   No 208   Email from Klaassen 5/8/13      137

 7   No 209   Faculty Handbook                138

 8       .

 9       .

10       .

11       .

12       .

13       .

14       .

15       .

16       .

17       .

18       .

19       .

20       .

21       .

22       .

23       .

24       .

25       .
```

1          THE VIDEOGRAPHER:  Good morning.  My name

2    is Junior Soto, the videographer.  The court

3    reporter is Barb Hoskinson.  We are with Appino &

4    Biggs Reporting Service.  Today is the 14th day of

5    April, 2016, and the time is approximately 8:58

6    a.m.  We are at the University of Kansas Medical

7    Center to take the deposition of Doctor Allen

8    Rawitch in the matter of Curtis Klaassen, Ph.D.,

9    vs. The University of Kansas School of Medicine,

10   et al., Case No. 13-CV-2561-DDC.  Would counsel

11   please state your appearances for the record.

12          MR. SCHRAG:  Jeremy Schrag for Doctor

13   Curtis Klaassen.

14          MR. RUPP:  Tony Rupp for the defendants.

15               ALLEN RAWITCH,

16   called as a witness on behalf of the Plaintiff,

17   was sworn and testified as follows:

18   DIRECT-EXAMINATION

19   BY MR. SCHRAG:

20   Q.   Can you please tell us your name and

21   where you live.

22   A.   My name is Allen Rawitch.  I live at 5307

23   West 199th Street in Stillwell, Kansas.

24   Q.   Okay, my name is Jeremy Schrag and I

25   represent Doctor Klaassen.  Do you understand who

1          Q.    And was that in what department?

2          A.    It was in the department, the

3    biochemistry division of the chemistry department.

4          Q.    And after you finished your postdoc work

5    where did you go?

6          A.    I took my first academic job, which was

7    at Kent State University in Northeast Ohio.

8          Q.    And were you an assistant professor

9    there?

10         A.    Yes, sir.

11         Q.    Did you achieve tenure at Kent State?

12         A.    I did.

13         Q.    And do you remember what year you

14   achieved tenure?

15         A.    It was either 1973 or '74.

16         Q.    And what is your understanding -- what

17   does -- strike that.   What does tenure mean?

18         A.    Well, that's a matter of some discussion

19   among who you ask, but tenure originated as a

20   guarantee for faculty members to freely pursue

21   their research interests without criticism or

22   restrictions within their areas of research.

23         Q.    And how does tenure guarantee faculty

24   members the right to freely pursue their research

25   interests without criticism or restrictions?

1       A.    I'm not sure I understand that question.

2       Q.    You indicated that tenure is, originated

3   as a guarantee for faculty members to freely

4   pursue their research interests.  My question to

5   you is: What protections that are associated with

6   tenure that grant those guarantees?

7       A.    Freedom from the institution or others to

8   restrict your areas of inquiry.

9       Q.    And by areas of inquiry do you mean

10  freedom from restrictions on classroom teachings?

11              MR. RUPP:  Overbroad.

12  BY MR. SCHRAG:

13      Q.    You can go ahead and answer.

14      A.    The purpose of tenure in terms of

15  teaching is to allow you to express controversial

16  opinions, et cetera, within the classroom as long

17  as they are within your area of expertise and

18  research, within the context of the course that

19  you're teaching.

20      Q.    Do those same protections that apply to

21  classroom teaching apply to academic research?

22      A.    To academic research?  In one's area of

23  expertise they would, yes.

24      Q.    So, tenure would provide protections for

25  a biochemist to research areas of interest within

1    the field of biochemistry?

2         A.    Correct.

3         Q.    That that particular tenured professor

4    deems are worthwhile or worth pursuing?

5         A.    Yes.

6         Q.    And when a professor is obtaining or

7    seeking to obtain research will the professor

8    frequently seek out outside funding for that

9    research?

10        A.    Yes, particularly in the sciences.

11        Q.    Is it possible to do research without

12   obtaining outside funding?

13        A.    At a very minimal level, but not

14   significant research, yes.

15        Q.    So, does the right of tenure then include

16   not only the right to research in the area of a

17   professor's interest that's in the professor's

18   field, but also to seek and obtain money to

19   complete that research?

20             MR. RUPP:   Object, overbroad, calls for a

21   legal conclusion.

22        BY MR. SCHRAG:

23        Q.    You can go ahead and answer.

24        A.    I think I would have to state a lot of

25   qualifications in my answer, so, maybe we should

1   consult.

2       Q.    I would like you to go ahead and

3   answer the questions and if you have any

4   qualifications --

5           MR. RUPP:  You have to answer the

6   question to the extent that it's a question that

7   you can answer.

8       A.    Okay.  The, the application for external

9   funding for a professor at this university and

10  most universities has to go through the

11  university.  It is subject to both the

12  restrictions that relate to that research, human

13  subjects and other areas, that might put

14  restrictions on what kinds of research

15  applications you could submit.  It has to have the

16  application typically in the sciences, in the

17  medical, basic medical sciences has to have the

18  endorsement of the institution.  So, professors

19  are not individual entrepreneurs that can go out

20  and seek funding personally.  They have to apply

21  through their institutions.

22      BY MR. SCHRAG:

23      Q.    And tenure would protect a professor's

24  right to seek the funding through their

25  institutions to do research that are in their

1    field?

2            MR. RUPP:  Object, vague.  Go ahead.

3        A.    The -- the question of tenure in terms of

4    research applications is related to my earlier

5    answer and that is to say it guarantees your

6    ability to do research in the area that you wish;

7    so, I think the answer would be a qualified yes.

8        BY MR. SCHRAG:

9        Q.    Okay.  Thank you.  And we spoke generally

10   about tenure here.  Would you say that those

11   general principles of tenure that we discussed

12   apply to the University of Kansas?

13       A.    General principles, yes.

14       Q.    Let's return a little back to your

15   timeline.  So, after you were at Kent State, how

16   long were you at Kent State?

17       A.    Through the middle of 1975.

18       Q.    And after Kent State where did you go?

19       A.    I was recruited here.

20       Q.    And who recruited you here?

21       A.    The then chair of biochemistry, Doctor

22   Kurt Ebner.

23       Q.    And what was your first position here at

24   K.U. Med?

25       A.    I was recruited here as an associate

1    the Department of Medicine, Doctor Bill Narayan

2    who was chair of microbiology, Doctor Gill

3    Greenwald who was chair of physiology, Doctor

4    Aryeh Hurwitz, who was a clinical pharmacologist.

5    I think that was most of them.  Oh, and

6    occasionally we would have some ladies join us,

7    Doctor Susan Pingleton would join us and

8    occasionally Doctor Amy O'Brien Ladner.

9         Q.   And you mentioned that this group met to

10   solve the problems of the world.  Were those

11   problems of the world at KUMC or was it a more

12   general social gathering?

13        A.   It was what I would describe as a general

14   social gathering, although topics from the

15   university certainly came up as well as lots of

16   other things.

17        Q.   Can you give me an example of a topic

18   that would come up with regards to KUMC?

19        A.   I can't remember that far back.

20        Q.   When did you first become aware that the

21   University of Kansas's administration was

22   concerned about the personal conduct of Curt?

23        A.   Within the context of this process it was

24   actually the day after he was put on

25   administrative leave and I learned about it

1  because Curt called me and was quite concerned and

2  upset and I thought legitimately so because his E-

3  mail had been cut off and, so, I immediately

4  started making calls and got the process started

5  to get what was described to me as an oversight

6  rectified so his E-mail got turned back on, and I

7  called Doctor Terranova who had initiated the

8  administrative leave process to ask basically what

9  was going on and it was at some time thereafter

10  and in my earlier testimony it was clarified that

11  it was probably 10 days or more from the time I

12  asked for that that I did get a folder from Doctor

13  Terranova with specifics that included written

14  statements from a variety of people with specific

15  incidents and accusations.

16      Q.   Are any of those written statements in

17  the black binder in front of you?

18      A.   I don't believe those are included in

19  this, no.  They were in the, in that original file

20  which counsel has because they took all of my

21  paper files quite some time ago.

22      Q.   Was that folder or the statements

23  contained within the folder ever provided to Curt

24  as part of the administrative process?

25      A.   Give me a moment to think through the

1      BY MR. SCHRAG:

2          Q.   And, Doctor, you've seen this report

3      before, correct?

4          A.   Yes.

5          Q.   Did you write this report?

6          A.   I drafted it in concert with a number of

7      other people, yes.

8          Q.   And who are those other people?

9          A.   They would have been Doctor Werle and

10     Doctor Wood who had input into the draft, and I

11     probably asked for input from university counsel,

12     but I don't specifically remember that.

13         Q.   Do you remember which university counsel?

14             MR. RUPP:  Object.  He just said he

15     didn't remember who, or that he even did it.

16         A.   And I do not remember specifically which.

17         BY MR. SCHRAG:

18         Q.   And to make sure we're all using the same

19     terms, this would have been the final step in the

20     preliminary inquiry into the allegations raised

21     against Doctor Klaassen?

22         A.   Correct.

23         Q.   On, I believe, at the very bottom of this

24     document you'll see it says agency record and,

25     then, has a page?

1   That's to the best of my recollection.

2       Q.   Okay.  So, to the best of your

3   recollection, the difference is that

4   administrative leave with pay is identified in the

5   handbook and suspension with pay is not?

6       A.   As I recall, yes.

7       Q.   Okay.  I'm going to mark as Exhibit 203 -

8   - sorry, 204, K.U. 078023 which is a recording of

9   Beth Levant's interview.

10          (THEREUPON, Rawitch Deposition Exhibit

11  No 204 was marked for identification; WHEREUPON, a

12  portion of audio recording 078023 was played.)

13          MR. SCHRAG:  I will stop there at the

14  6:15 mark.

15      BY MR. SCHRAG:

16      Q.   Same question, is that a true and

17  accurate clip of the recording of your interview

18  of Beth Levant?

19      A.   Yes.

20      Q.   And do you remember Beth Levant's having

21  a kind of timeline of allegations regarding Doctor

22  Klaassen during that meeting?

23      A.   I do.

24      Q.   And that timeline kind of started in 2005

25  and ended in 2011, is that correct?

Page 138

1    excellence in research at KUMC.

2         Q.   Did you ever do an investigation into any

3    of Doctor Klaassen's concerns that he alleges in

4    paragraph 3?

5         A.   I did not because this was focused on the

6    meeting and his continued inability to get along

7    with the chair of his department so that the

8    things that he alleges were his, in his opinion,

9    so, there was nobody else that substantiated any

10   of this.  I had no one else to interview, so, this

11   was basically Doctor Klaassen basically saying

12   he's going to put me on leave, I'm going to put

13   him on leave.

14        Q.   And, I think, we established earlier that

15   the last meeting you had with any of Doctor

16   Klaassen's students was during the time that they

17   were moving from Hixon to Hemenway, is that

18   correct?

19        A.   I think that's true, yes.

20        Q.   And that would have been before Thursday,

21   May 9, 2013?

22        A.   Yes.

23        Q.   I'm going to go ahead and mark as Exhibit

24   209, and I'll let you identify that for me.

25             (THEREUPON, Rawitch Deposition Exhibit

 1   No 209 was marked for identification.)

 2        A.   This is the KUMC handbook.  This is

 3   actually one edition later I believe than the one

 4   that applied when this began.  I'm not sure of the

 5   date.  I think -- I believe, the one that was

 6   revised in 2008 was the pertinent version of the

 7   handbook and this looks like it is one version

 8   more than that, but those were minor revisions at

 9   that point so...

10        BY MR. SCHRAG:

11        Q.   Were there any revisions in October of

12   2011 that affected the inquiry report process --

13        A.   No.

14        Q.   -- or the tenure dismissal process?

15        A.   No.

16        Q.   And we'll go through this handbook and

17   I'll ask you about various questions concerning

18   the handbook and if at any time you think those

19   sections were revised in October of 2011 I'll ask

20   that you let me know.  Can you agree to do that?

21        A.   Sure.

22        Q.   Do university professors receive

23   appointment letters?

24        A.   All faculty receive appointment letters,

25   yes.

1    leave off?

2             THE REPORTER:  But the handbook states

3    that if the university's position on academic

4    freedom is fully...

5         A.   Okay.

6    BY MR. SCHRAG:

7         Q.   Let me repeat the question.

8         A.   Please.

9         Q.   KUMC's faculty handbook states the

10   university's position on academic freedom is fully

11   reflected by the three paragraphs it repeats below

12   from the 1940 AAUP statement.  Did I summarize

13   that sentence?

14        A.   Yes, and I said we aspire to that, but

15   that it is not a statutory or legally binding

16   statement.

17        Q.   If you could turn to page 80.  Is it

18   reasonable for a faculty member to rely on the

19   policies that are stated in the faculty handbook?

20        A.   Is it reasonable for them to rely on

21   those policies?  I would certainly say as a

22   starting point, yes.

23        Q.   And that would include relying on

24   policies that you don't necessarily consider to be

25   contractual or binding on the university?

1       A.   I guess that would depend on the specific

2   case and context, to be frank about it.

3       Q.   Does the handbook anywhere delineate

4   between what it considers to be aspirational

5   policies and binding policies?

6       A.   No.  However, if a faculty member filed a

7   grievance and indicated that we were not following

8   due process as defined in the handbook, that would

9   be the basis for a grievance hearing for sure and

10  there are several cases where the lack of

11  following due process could be the basis of a

12  grievance.

13      Q.   Could a professor file a basis for a

14  grievance the fact that the university is not

15  complying with its position on academic freedom?

16      A.   We have had such a grievance in the

17  previous case of the person that was dismissed, as

18  a matter of fact, and there is a process for

19  filing such a grievance and, and hearing for

20  academic freedom violations in the handbook, yes.

21      Q.   Okay.  And, in your experience there was

22  only one of those in your 13 years as vice-

23  chancellor for academic affairs and that was also

24  part of a termination proceedings as well?

25      A.   A termination proceedings, a wage

1  counsel about members to put on the ad hoc

2  committee?

3          MR. RUPP:  And, at this point he's not

4  asking for the content of the communication, but

5  just whether there was a consultation.

6      A.   Yeah, that's simple.  The answer is no, I

7  did not.

8      BY MR. SCHRAG:

9      Q.   Are there any parts of the faculty

10 handbook specifically here in section 6, which

11 deals with appeals and grievances, that you feel

12 are unclear or misleading?

13     A.   Not to me, but I will say that, that when

14 the group that looked at this the last time looked

15 at it, they felt that there could be some

16 confusion and, so, there were some diagrams

17 presented or redone and those are in the handbook

18 that show the flow of process for grievances and

19 appeals.

20     Q.   So, they clarified -- they were concerned

21 about confusion regarding the process of

22 grievances and appeals?

23     A.   Right, right.

24     Q.   And was that done in 2011 or more

25 recently?

1         A.    I am not sure whether it was in 2008 or

2    2011 that they added these diagrams --

3         Q.    Okay.

4         A.    -- but the process itself was not

5    substantially changed.

6         Q.    And because this is the 2011 update,

7    those flow charts may actually be in here?

8         A.    They should be in there, yes.

9         Q.    If you could take a look at page 94,

10   subsection E?

11        A.    I'm sorry, page what?

12        Q.    94, agency record 3726.  And, I want you

13   to take a minute to review section E and it

14   continues on to the next page and let me know if

15   you feel there's any part of this section that is

16   either unclear, vague or confusing.

17        A.    Starting with section E?

18        Q.    Just section E.

19        A.    No.  The only -- if I were to change this

20   I would soften the timelines only because my

21   experience has been that the functioning of these

22   committees and these timelines probably should be

23   more flexible, and, so, they might set those as a

24   target as opposed to saying within X weeks or X

25   days; but the attempt to address that was that the

1        Q.   And in the list of sanctions it includes

2    warning, restitution, recommendation of censure,

3    recommendation of suspension and recommendation of

4    suspension without pay or dismissal.  Did I state

5    that correctly?

6        A.   Uh-huh.  Yes.

7        Q.   What's the difference between

8    recommendation of suspension and recommendation of

9    suspension without pay?

10        A.   Pay.

11        Q.   So, suspension with pay then is a

12    sanction under the faculty handbook?

13        A.   It is a sanction.  It is not considered a

14    adverse reaction.  Only suspension without pay or

15    dismissal are in that category.

16        Q.   And that's identified above in the

17    sentence that says, sanctions 1, 2, 3 and 4 below

18    are considered corrective and not subject to

19    appeal?

20        A.   Correct.

21        Q.   Are all investigations into the various

22    complaint procedures identified in the faculty

23    handbook, including personal misconduct and

24    research misconduct or scientific misconduct, are

25    those all conducted by the office of academic