# Declaration of Jerry jie liu



Klaassen Exhibit 68

My name is Jerry Jie Liu. I am over the age of 18 and have personal knowledge of each of the facts set forth in this declaration. If called to testify, I could and would competently testify thereto. I understand I am submitting this declaration for use by Curtis Klaassen, Ph.D. This declaration was typed for me, but all the statements within are my own and are true and accurate to the best of my memory and knowledge. I have had sufficient time and opportunity to review this declaration to ensure its accuracy.

I came from China to the United States to work at the Kansas University School of Medicine with Dr. Curtis Klaassen in 1987. I worked with Dr. Klaassen from 1987 until 2009. After a year serving as a visiting professor In Zunyi, China, I returned to KUMC and continued to work with Dr. Klaassen until KUMC terminated my appointment in September 2013. In 1987, I came to KUMC to study under Dr. Klaassen as a visiting professor. I left in 2013 as a Research Professor. My job duties mainly involve research in the following areas: "Role of Nrf2 in hepatoprotection".

During my 20 years of work with Dr. Klaassen, he has always treated me and my colleagues with the upmost respect and dignity. He has shown great interest in the development of my career. Dr. Klaassen goes out of his way to work with me and the other students in his lab. Under Dr. Klaassen's tutelage, I received several NIH grants and published over 200 peer-reviewed articles.

In January 2012, Dr. Klaassen's Lab was abruptly required to move from Hemenway Life Sciences Innovation Center (HLSIC) to the Hixon Building, one of the oldest buildings at KUMC. The transition was difficult. Our new lab space was deficient and lacked basic resources like water an ice. During the move, members of the KUMC administration promised me and other members of the Klaassen laboratory that we could continue to use important shared laboratory equipment for free. However, months after making the promise, were informed that we could not use the equipment for free, the doors to the laboratories were the equipment was stored were locked, and our key-card deactivated. Cody Tully, in particular, would refuse to provide us with access to important and necessary lab equipment.

I filed several complaints with both KUMC's Equal Opportunity and Human Resources department. I believe that no investigation was completed. On April 12, 2012, I filed a complaint directly with Adrian Fitzmaurice. He told me the next day that he

would look into it. But no members of Klaassen's laboratory were ever interviewed. I do not believe that any investigation was completed. I was told by a previous research professor in the Klaasen laboratory, Xingguo Cheng, and Dr. Hartmut Jaeschke that future complaints about Mr. Tully or the administration would result in "shutting down everything for the Klaassen lab". Dr. Jaeschke told me that he was unhappy for me to go to Human Resources.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746 and the laws of the State of Kansas, K.S.A. § 53-601, that the foregoing statements are true and correct to the best of my personal knowledge.

Executed this 10th day of November 2013.

_____/s/ Jie Liu_____
Jerry Jie Liu



Klaassen Exhibit 69

# DECLARATION OF HELEN RENAUD

My name is Helen Renaud. I am over the age of 18 and have personal knowledge of each of the facts set forth in this declaration. If called to testify, I could and would competently testify thereto. I understand I am submitting this declaration for use by Curtis Klaassen, Ph.D. This declaration was typed for me, but all the statements within are my own and are true and accurate. I have had sufficient time and opportunity to review this declaration to ensure its accuracy.

I am currently a post-doctoral employee at the University of Kansas School of Medicine. My job duties include designing and performing experiments, contributing to writing grant applications, and writing manuscripts for publication in scientific journals. I have studied under and worked for Dr. Curtis Klaassen since 2010. Dr. Klaassen is a hardworking, driven, and kind individual. I have never seen Dr. Klaassen bully another colleague or student. Dr. Klaassen has gone out of his way to support my career and development as a scientist. In particular, when I was on maternity leave, Dr. Klaassen worked hard to accommodate me and frequently checked in on me to make sure I was doing well.

Dr. Klaassen places great emphasis on honesty in his work. He is a very driven and passionate individual. While I have seen him raise his voice when addressing an important topic, I have never seen him yell at another individual. And I have never felt threatened, intimidated, or scared when working with Dr. Klaassen.

In January 2012, Dr. Klaassen's Lab was abruptly required to move from Hemenway Life Sciences Innovation Center (HLSIC) to the Hixon Building, one of the oldest buildings at KUMC. I composed an e-mail summarizing Klaassen's lab member's notes regarding a meeting with Gerald Carlson about the move. During the meeting, lab students expressed concern that tension and frustration might be created because Klaassen's students did not have enough time to move and continue our experiments. Carlson told them, "of course this will create tension and frustrations." When other members of the Klaassen Lab told Carlson that our education and research was being hurt, Carlson said, "you're transient." The lab members said, "we are the victims in this case" and Carlson said, "of course you are a god damn victim in this god damn situation." The lab members asked if there was a forum they could go to for support and Carlson replied, "basically, no." According to the lab members, Carlson approached the situation with a joking attitude, very sarcastic, and rude. He had an "I don't care" attitude. One lab member was told by Dr. Jaescke that the students and postdocs of the Klaassen Lab "were like the band playing on the Titanic."

Five days before the completion of our move, our telephone lines were shut off, leaving our laboratory and offices without appropriate means of communication. After

the move, members of the KUMC administration promised us that we could continue to use important shared laboratory equipment in the department of Pharmacology, Toxicology, and Therapeutics for free at a meeting in January 2012. I took minutes of the meeting. My minutes are a true and accurate reflection of the events of the meeting. However, months after making the promise, I was informed that I could not use the equipment free, the doors to the laboratories where the equipment was stored were locked, and my key-card deactivated.

Cody Tully, who works for Dr. Jaescke, the Chair of the Pharmacology, Toxicology, and Therapeutics Department, was the person responsible for ensuring that members of Klaassen's laboratory had access to shared equipment. However, he made accessing the equipment difficult. One day, I e-mailed Tully asking him how I gain access to a room in which liquid nitrogen is stored. Tully instructed me to read a sign on the door of the room. I followed Tully's instruction and went to the door. I did not see a sign on the door. I then e-mailed Tully again, and asked for further clarification. Tully informed me to look again. I followed Tully's instruction and again I went to the door. This time I noticed a sign beside the door. The sign said ask Tully for access to the room. This is just one example of how Cody Tully's harassing behavior impedes our research and makes members of the Klaassen lab feel unwelcome at KUMC.

Our department relies on Dr. Klaassen to obtain NIH funding so we may conduct our research. Since Dr. Klaassen's second administrative leave, KUMC fired many of my colleagues due to a lack of NIH grant funding. Occasionally, I feel unwelcome at work. Despite the fact that my current salary is paid for by a fellowship and not a NIH grant, KUMC attempted to fire me earlier this year and sent me a termination letter that stated that the grant funding for my salary was depleted.

In addition, KUMC misspent my fellowship money. I was informed that the fellowship was overspent by approximately $30,000 because KUMC was using the money to pay for both my salary and benefit. However, the fellowship money was to be spent only on my salary. I do not know where KUMC came up with the $30,000 to reimburse the fellowship.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746 and the laws of the State of Kansas, K.S.A. § 53-601, that the foregoing statements are true and correct to the best of my personal knowledge.

Executed this 14th day of November 2013.

_____
Helen Renaud

4847-7286-3510.2



## DECLARATION OF JULIA YUE CUI

My name is Julia Yue Cui. I am over the age of 18 and have personal knowledge of each of the facts set forth in this declaration. If called to testify, I could and would competently testify thereto. I understand I am submitting this declaration for use by Curtis Klaassen, Ph.D. This declaration was typed for me, but all the statements within are my own and are true and accurate to the best of my memory and knowledge. I have had sufficient time and opportunity to review this declaration to ensure its accuracy.

I came from China to the United States to work at the Kansas University School of Medicine with Dr. Curtis Klaassen, and have worked for and studied under Dr. Klaassen since 2007. I am currently a research assistant professor at KUMC. My job duties mainly involves research, grant writing, and helping other students in the Klaassen Laboratory in their experiments.

During my work with Dr. Klaassen, he has always treated me and my colleagues with the upmost respect and dignity. He has shown great interest in the development of my career.. He has gone out of his way to work with me and other students in his lab, and he has shown extra interest in the development of the careers of women scientists. He has trained over 100 students during 46 years of his career in KUMC, and he has made outstanding contribution in the development of research and education programs of our institution. His students including myself hold him of highest regard, and we are grateful for his mentorship as well as treating us as his extended family. He won numerous awards in mentoring and education, including the National Society Toxicology Elsevier Mentoring award to acknowledge his great achievement in mentoring women scientists. Not only did Dr. Klaassen provide his mentorship in our career development, he also truly cares about our general well-being. For example, he gave me a ride to the car dealership and gave me suggestions on purchasing my first car in US; he helped another international postdoc carrying heavy furniture to that person's new apartment; he sent flowers and greeting cards to a previous female student during her battle with breast cancer, and he worked with multiple female students/postdocs for a more flexible working schedule when they were expecting a baby. I'd like to quote a sentence from his female trainees in their nomination letters for Dr. Klaassen to get the Elsevier Mentoring Award which acknowledges outstanding individual who has contributed significantly in mentoring women scientists at the National Society of Toxicology Women in Toxicology Specialty section: "To many people, Dr. Klaassen is an excellent scientist and chair, and an internationally recognized leader in Toxicology; but to us, he is also a gentleman, supportive, kind and forgiving, our academic father that we will be eternally grateful to for the rest of our lives".

I have never seen him yell, scream, bully, or treat another faculty member or student with disrespect, nor have I ever felt intimidated or uncomfortable around him.

In working with Dr. Klaassen over the years, it has been my observation that Dr. Klaassen is passionate about his work, teaching and research and he "stands up" for what he believes is scientifically, ethically, and morally correct, and he is driven for research excellence. However, I have always found that Dr. Klaassen is willing to engage in rational and logical discussion about difficult and important topics. As a Chinese scholar myself, from my personal conversations with the Chinese junior faculty members of the Pharm/Tox department, such as Dr. Xiaobo Zhong, Dr. Xiaochao Ma, Dr. Grace Guo, they all deeply appreciate and are grateful for Dr. Klaassen's help in their career development. These 3 faculty members successfully obtained their NIH R01 grants during Dr. Klaassen's chairmanship and they all left the department and took their R01 grants away from KUMC after Dr. Klaassen stepped down as chair.

My time at KUMC has not always been easy. In April 2011, when I was still a postdoctoral member of Pharmacology and Toxicology Department, I was awarded a $25,000 K-INBRE fellowship, which is funded by the National Institute of Health. The fellowship was to be used to pay for my salary, plus a minor portion for travel and computer equipment. To the best of my knowledge, Cody Tully, a KUMC employee who was responsible for administering the account, let the money sit in the account for over 9 months. However, the K-INBRE society notified him by email on Day 1 when this award should have been started to pay for my salary. When I realized that he did not do his job (which was almost one-year later), I emailed him immediately to request him to spend this fund within the time limit appropriately, but he did not even have the courtesy to reply. I believe this to be unethical to misallocate the NIH grant and not use it on trainees as it should be. In addition, Cody also changed keys to my previous office on the 4th floor of HLSIC, but did not provide me a key, even though Dr. Jaeschke orally promised me that I could have a copy of the key to finish my data analysis before moving to Hixon. On a Saturday morning, Cody blocked my access to my computer which was locked in this office, and refused to open the door in a timely manner, using the reason that "Dr. Klaassen moved samples to some freezers". Also he yelled at me saying "Your lab are not welcome to the Department!!!" and "move out your computer as quickly as you can!" I felt deeply hurt, harassed, and discriminated against by Tully. Cody let me stand outside of the office where my computer was running large amount of data analysis (this analysis requires my immediate attention to clean up the intermediary files), I was carrying very heavy things such as protocols, papers, lunch and dinner, laptop with both of my hands. I begged him several times to let me work. There was a significant delay for him to finally open the door for me and after I finally got in, I found that I encountered significant problems in data analysis due to not being able to work in a timely manner, and a significant amount of my work was ruined. I called Dr. Jerry Liu (a research professor in Dr. Klaassen's lab) right after this unpleasant encounter and expressed my frustration about Cody. As a consequence of Cody's harassment, I lost significant amount of sleep, and was extremely scared and intimated by him. I forwarded some of my e-mail conversations to Dr. Larry Long and Dr. James Dungan and expressed my frustrations about Mr. Tully.

In addition to this incidence of harassment, Tully also refused to upload my department home homepage for more than a year, and then removed it in three months. Tully also delayed my requests for printing and when he finally printed the documents, he did not inform me the project was complete. Some people in the lab complained they did not get color copies so they were not able to perform the scientific review on the figures.

As a Chinese girl from China, it has always been my dream since I was a childe to be able to study in America where top levels of education and research are generously offered to students and scholars. I have always been a quiet, soft, and agreeable girl, never choose to be involved in dispute, and in my culture, it is important to be nice to others and respect their different perspectives, and agree to disagree with full respect of others in situations where we have different opinions. However, the harassment from Cody Tully had far exceeded my tolerance level because my research and education were jeopardized by him. Therefore, according to the KUMC's regulation policy on harassment and equal opportunities of working, I had no choice but to file a complaint to Office of Equal Opportunity Office at KUMC. I was told that my case was not within their scope of investigation, and I was told that I should contact the Human Resources. Therefore, I contacted KUMC's Human Resource department about Mr. Tully's actions. I was told that they would look into it and promptly address the matter within 48 hours or a week. I did not hear back from KUMC within the 48 hours or a week that they promised, and to the best of my knowledge, I am unaware if the issue was ever resolved. I was promised by HR officer that they would contact the University Lawyers and make sure no retaliation from Cody would occur to me or the lab. However, I heard from Dr. Jerry Liu (a previous research professor of the Klaassen) that Dr. Hartmut Jaeschke mentioned to Dr. Xingguo Cheng (a previous member of the Klaassen lab) that he was unhappy that I complained to HR about Cody, and any future complaints about Mr. Tully or the administration would result in "shutting down everything for the Klaassen lab". I was recently told by two American postdocs (Matt Pratt-Hyatt and Andy Lickteig) that Cody forwarded some of my complaint to them by email and wrote Matt and Andy: "because of this, our communication will break into concussion". I heard from one lab member Dr. Ivan Csanaky that Dr. Hartmut Jaeschke said that "the students and postdocs of the Klaassen Lab were like the band playing on the Titanic.

As a student from KUMC and a member of our institution for over 8 years, may I say that I sincerely hope this political issue would be resolved peacefully, so that we could continue focus on our research and education, and put our 100% effort in career development. The mission and strategic plan of our institution has always been to provide excellent patient care, research and education to students and our community. And thus I would feel sorry to see any of our research programs on campus being jeopardized due to politics. Dr. Klaassen has served our institution for over 45 years, and he contributed significantly especially in establishing and expanding the research and education program

**Agency Record 003459**

in the Pharm/Tox department. I personally assure you that Dr. Klaassen is not a violent or intimidating person. On the contrary, he is a very supportive mentor to me and other members, and he contributed significantly to many other junior faculty members' career development in KUMC as well as nationally and internationally. May I say that I would like to express my trust to all the jury members during this hearing that you would provide a fair investigation. I would like to request that jury members to remember the 46-years of devoted service that Dr. Klaassen has provided to his beloved institution, and his passion and effort in giving the best he has to improve the research and education in our institution, to remember his personal guidance to each and everyone of the over 100 junior scientists who then succeeded in their careers and carried on the value of pursuing excellence in research and education in their own career and lives.

    I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746 and the laws of the State of Kansas, K.S.A. § 53-601, that the foregoing statements are true and correct to the best of my personal knowledge.

    Executed this 10th day of November 2013.

*[signature]*

_____
Julia Yue Cui

Klaassen Exhibit 72

# DECLARATION OF EDUGIE EKUASE

My name is Edugie Ekuase. I have personal knowledge of each of the facts set forth in this declaration. If called to testify, I could and would competently testify thereto. I understand I am submitting this declaration for use by Curtis Klaassen, Ph.D. This declaration was typed for me, but all the statements within are my own and are true and accurate. I have had sufficient time and opportunity to review this declaration to ensure its accuracy.

I joined the Klaassen laboratory here at the University of Kansas Medical Centere in July of 2011 to study how enzymes (sulfotransferases) metabolize bile acids in order to render them non-toxic. I was then added to the T32 training grant. My understanding at the time was that I will be paid from the training grant for no longer than three years. However, four months after I arrived, Dr. Klaassen was placed on administrative leave. My project involved purifying different isoforms of Sulfotransferase, I was unable to get good yield of some of the isoforms I was working with and I needed to discuss with my mentor as per the way forward. I did the best I could to push the research forward without guidance from my mentor because he was on administrative leave.

Dr. Klaassen is a passionate individual. I have never felt threatened, intimidated, or scared when working with Dr. Klaassen.

In January 2012, Dr. Klaassen's Lab was abruptly required to move from Hemenway Life Sciences Innovation Center (HLSIC) to the Hixon Building, one of the oldest buildings at KUMC. There were several instrument that KUMC's administration told us (the Klaassen lab) that we could continue to use free of charge. Those equipment included an Autoclave, a Plate reader, and a Mass-spectrophotometer. However, without warning one day, the department of pharmacology deactivated my key card as well as those of others. I was unable to use the instrument/equipment, which were necessary for my research. Some of my research is time sensitive, and when I asked if I could use the Autoclave or Plate Reader, I was told to use those located elsewhere on campus.

Our laboratory relies on Dr. Klaassen to obtain NIH funding so we may conduct our research. Dr. Klaassen and I put in an NIH supplemental minority training grant that would have been funded since September of 2013. Due to Dr. Klaassen's second administrative leave, NIH has not released the fund which would have helped in paying my salary. Therefore, due to alleged lack of NIH grant funding, I was given a termination letter, even though my salary was supposed to be paid through this supplemental minority training grant.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746 and the laws of the State of Kansas, K.S.A. § 53-601, that the foregoing statements are true and correct to the best of my personal knowledge.

Executed this 12th day of November 2013.

_____
Edugie Ekuase

4822-8380-6230.1