IN THE DISTRICT COURT OF WYANDOTTE COUNTY, KANSAS
CIVIL DEPARTMENT


CURTIS KLAASSEN, Ph.D.,

           Plaintiff,

     vs.                                  No. 2014CV-603

UNIVERSITY OF KANSAS,
UNIVERSITY OF KANSAS SCHOOL
OF MEDICINE, and THE UNIVERSITY
OF KANSAS MEDICAL CENTER,


           Defendant.


VOLUME IX
TRANSCRIPT OF JURY TRIAL


     PROCEEDINGS had before the Honorable
Daniel A. Duncan, Judge of Division 3 of the
District Court of Wyandotte County, Kansas, at
Kansas City, Kansas, on the 9th day of
December, 2016.


APPEARANCES:

        The Plaintiff, Curtis Klaassen, Ph.D.,
appeared by Alan L. Rupe and Jeremy K. Schrag,
Attorneys at Law, Lewis Brisbois Bisgaard &
Smith, LLP, 1605 N. Waterfront Parkway, Suite
150, Wichita, Kansas  67206.

        The Defendant, University of Kansas,
University of Kansas School, and the
University of Kansas Medical Center, appeared
by, Anthony F. Rupp and Tara S. Eberline,
Attorneys at Law, Foulston Siefkin, LLP, 32
Corporate Woods, Suite 600, Overland Park,
Kansas  66210.

PLAINTIFF'S EX. 1051

<u>I</u>  <u>N</u>  <u>D</u>  <u>E</u>  <u>X</u>

PAGE

PLAINTIFF'S WITNESS:

CURTIS KLAASSEN, PhD (CONT'D)
   Direct Examination by Mr. Rupe...    7
   Cross-Examination by Mr. Rupp....  127


Certificate........................  240

```
                          EXHIBITS

    DESCRIPTION                        OFFERED RECEIVED


     8    E-mail chain                  224    225
          With Christina
          Hopkins 3/13
          Re 4-6-11 firing
          Of Curt Klaassen

     9    E-mail from
          Christina Hopkins
          To Curtis Klaassen
          Re grant accounting

    11    E-mail from Curt
          Klaassen to
          Attendees of
          May 1 Meeting

    12    Series of Power-
          Points re Faculty
          Meetings

    18    Letter to Curt
          Klaassen re decision
          Of Ad Hoc Committee
          Meeting dated
          5-31-12

    19    Censure Letter from
          Committee to Curt
          Klaassen

    32    Letter re Curt
          Klaassen Reinstatement
          At May 1 and May 7
          Meetings

    33    Letter from committee
          To Curt Klaassen
          Dated January 2014

    87    E-mail from
          Paul Terranova to
          Curt Klaassen re
          Cobre Grant Meeting
```

```
127     E-mail from Curt
        Klaassen

128     E-mail dated 9-28
        Re usage of mas
        Spectrometer

186     Faculty Meeting          209     210

187     Cobre Meeting on
        10-28-2011 re
        Whistle Blowing
        By Curt Klaassen

188     E-mail to Curtis
        Klaassen from
        SFDKUMC@yahoo.com

189     E-mail for Students
        Of Democracy

191     Letter dated 1-9-12
        By Hartmut Jaeschke
        To Curtis Klaassen

192     Letter to Hartmut
        Jaeschke from Curt
        Klaassen

332     E-mail from Curt
        Klaassen to Paul
        Terranova

341     E-mail to Hartmut
        Jaeschke from Curt
        Klaassen

342     E-mail from Curt         38      38
        Klaassen to Greg
        Koph on 2/21

348     E-mail dated 4-12-12
        From Curt Klaassen
        To Greg Kopf

353     E-mail from Curt
        Klaassen to Buddha
        Dawn
```

| 356 | NIH Policy Statement | | |
| 357 | E-mail re Meeting On 12-20-12 | | |
| 360 | White Board with Numbers by Curt Klaassen | | |
| 361/606 | Meeting with Christina Hopkins On May 1 | | |
| 362/7 | Incident Report Re suspension of Curt Klaassen | | |
| 385 | Photos of items Hanging in Curt Klaassen office in Hemenway and Hixson | 122 | 122 |
| 395 | E-mail between Hartmut Jaeschke and Curt Klaassen | | |
| 608 | Total of prints taken And number of Paragraphs and Invoices produced By defendant | 122 | 122 |
| 613 | Document referencing Monthly expenses | | |
| 653 | E-mail in August 2013 from Curt Klaassen to his Grad students | | |
| 656 | E-mail from Curtis Klaassen to Jerry Lou and lab members | | |
| 657 | Letter from Curtis Klaassen to lab Members | | |

```
666      E-mail from             130    131
            Curt Klaassen to
         Helen Renaud dated
         12-12-13
```

```
 1                    FRIDAY DECEMBER 9, 2016
 2                         (The jury was seated; after
 3                         which the following proceedings
 4                         were heard before the Court and
 5                         jury.)  All right, we're back
 6                         on the record in class versus
 7                         the med center.  We have the
 8                         same appearances.  The jury's
 9                         all present, seated, in their
10                         appropriate places.  We're
11                         ready to continue to direct
12                         examination of Dr. Klaassen.)
13
14              THE COURT:  Do you recall sir, you're
15         still under oath?
16              THE WITNESS:  Yes, sir, I do.
17              THE COURT:  You may proceed.
18              MR. RUPE:  Thank you, Your Honor.
19              DIRECT EXAMINATION (CONT'D)
20    BY MR. RUPE:
21    Q.   Let's go back through a couple of things that
22         I wanted to talk to you about, and let's go to
23         a meeting the day after April 6th, 2011, that
24         we've heard a little bit of testimony about.
25         That was an occasion where I believe there's
```

```
 1        been testimony that you said something to the
 2        effect about Barbara Atkinson, "The bitch must
 3        go."  Do you recall hearing that testimony in
 4        the courtroom?
 5   A.   Yes.
 6   Q.   Tell the jury what you recall?  What was the
 7        meeting, and what happened?
 8   A.   Okay.  So as you recall and it's noted on this
 9        slide, on April 6th, Atkinson fired Klaassen.
10        That's a slight exaggeration in that April 6th
11        is the day that she told me that she was going
12        to fire me if I didn't resign, and I had
13        another five days to decide.  So, at that
14        time, I was still chair of the department.  It
15        wasn't looking good.  And I decided on
16        April 7th to have a faculty meeting, and just
17        tell them where things were at.  And that's
18        what I did and, you know, this was 24 hours
19        after I was fired.  I might've said, "We've
20        got to get rid of the bitch," but I won't deny
21        that.  In fact, I'm pretty sure I said it.
22   Q.   Okay.  Fast forward now to the next thing we
23        heard about, which was in either May or June.
24        And Mr. Tully and Ms. Meyer talked about it,
25        and it was a conversation where they allege
```

1          that Carlson turned every decision to Cody, so

2          that's what was happening.  Those two were

3          running the department, and running my grants.

4    Q.   Now, in that context, please explain to the

5          jury what you meant when you indicated to this

6          group, that you thought Carlson was a Ford

7          dealer trying to run a Mercedes dealership?

8    A.   Well, I don't know if I can say this nicely,

9          but Dr. Carlson and I were appointed chairman

10         within 30 days of each other.  And he was the

11         chair of biochemistry, and I was the chair of

12         pharmacology as you've heard.  And both

13         departments were not doing well, especially in

14         research, and that's why I became new chair.

15         And so when I became the chair, I told you

16         that we got this Cobre Grant, and the

17         department went from maybe three R01's to

18         maybe 20 R01's.  Well, whereas in

19         biochemistry, when he came in, there maybe was

20         -- I don't know the exact number here -- but

21         it didn't do well.  It maybe went from three

22         R01's to five R01's, or maybe stayed three

23         R01's.  It didn't improve, and they didn't

24         have all of these nice accessories, let's say,

25         like the Cobre Grant.  I mean, the reason we

1        those grants?

2   A.   No.

3   Q.   And we heard comments by -- or attributed to

4        you -- by Hartmut Jaeschke, the comment that

5        after that meeting in his office, you

6        explained to him -- and we've seen the

7        e-mails, I'm not going to put them up again --

8        but you said something to him along the lines

9        of, if you become -- if he becomes the

10       department chair, you were going to support

11       him, and then said something to the effect,

12       "But if you fuck me, I will fuck you."  Curt,

13       did you say that to him?

14  A.   No.  In fact -- in fact, this was on a Friday.

15       See, I still thought at that time --

16  Q.   Hang on.  What's on a Friday, October 28th?

17  A.   October 28th.  It's Halloween time, right?

18       Put it in perspective.  This was on a Friday

19       afternoon when this meeting was where I first

20       spilled the beans to many people that there's

21       a lot of illegal things going on here, and I

22       might go to jail.  Before that, I had been

23       thinking it, and knew what was happening,

24       because I was paying for Cody and he was a

25       ghost worker.  The government was paying his

1      salary, but he wasn't working for me or doing

2      anything that he was supposed to.  And the

3      same thing is true for Rosa.  Okay, I guess I

4      didn't quit answer your question.

5   Q.  You read my mind.  Here's what I want to know,

6      Curt, and that is, put it in context in terms

7      of what the meeting was, and explain to the

8      jury why you're certain you never said

9      anything like that?

10  A.  So when the police came and got me was on

11     Tuesday, so there was a Monday in between,

12     right?  So over the weekend I needed to get

13     this grant going.  I did have a meeting with

14     Carlson, and you've heard about that, and that

15     lasted five minutes that I might've raised my

16     voice, but that was kind of the end of the

17     day.  So I thought about this over the

18     weekend.  How can we get the Cobre going?  How

19     can we get this thing going?  And I said, what

20     I'm going to do on Monday morning, and I did,

21     is I brought in Hagenbuch and I brought in --

22  Q.  Jaeschke?

23  A.  -- Jaeschke, and I says, "I am failing."  "I

24     cannot get Carlson from stopping being the PI

25     of the grant, and that's illegal."  "It's my

```
 1          responsibility."  "The only way I think I can
 2          solve this question, is that you guys" --
 3          mainly Hagenbuch and Jaeschke -- "is kind of
 4          be an intermediary, is that you see if you can
 5          talk to him and see if we can hire faculty,
 6          you know."  "You kind of be my super secretary
 7          or something to do that."  "And then also in
 8          regard to dividing the big account into the
 9          smaller account."  So they were still my true
10          best buddies at that time, even though I now
11          know that six weeks before they were planning
12          how they were going to stab me in the back.
13  Q.      And now just a little bit about your language,
14          is that a word that you frequently use?
15  A.      I never use that word.
16  Q.      Okay.  Now you're back on campus.  You had
17          several weeks on what was called
18          administrative leave.  And during that time,
19          you didn't perform any administrative tasks,
20          your office has been moved, you've been pulled
21          as the PI.  Describe when you learned that you
22          were going to be removed from pharmacology
23          toxicology, and moved over to internal
24          medicine, Dr. Klaassen?
25  A.      Okay.  So --
```

```
 1        same appearances.  The jury's all seat in
 2        their appropriates places we're all ready to
 3        continue to direct examination of
 4        Dr. Klaassen, do you recall sir that you're
 5        under oath.
 6                THE WITNESS:  Yes.
 7                THE COURT:  All right, you may proceed.
 8                MR. RUPE:  Thank you, Your Honor.
 9   BY MR. RUPE:
10   Q.   Let's put up Exhibit 351 which has been
11        admitted into evidence.  And I want to make
12        sure that we're on track as to what this
13        exhibit contains.  It has a response from
14        Dr. Stites to you dated August 1, 2012; is
15        that correct?
16   A.   Yes.
17   Q.   All right.  And this is the response that we
18        Talked to Dr. Stites about where he indicates
19        to you that he has been presented an
20        opportunity for a fresh start.  He wants to
21        look forward and not backward.  Do you recall
22        that?
23   A.   Correct.
24   Q.   And then it goes backwards to a time to a
25        series of e-mails where, in the July
```

```
 1            for the finances.  There are even items on

 2            that line, flowers for Betty Calkins.  Who in

 3            the heck is Betty Calkins?  How can that be

 4            candy for somebody else?  How can I --

 5            that's -- that's not nice.

 6    Q.    And in terms of when you say it's not nice, is

 7            that because you are reporting based on your

 8            knowledge of the rules, regulations, and laws?

 9    A.    Yes.

10    Q.    Okay.  Let's go to -- oh, by the way, were you

11            aware that Copple had made a report about your

12            spending the grant money at the time?

13    A.    Oh no, that never came to me at the time.

14    Q.    Were you aware that Rosa Meagher was asked to

15            look into your spending?

16    A.    No, not at that time.  I know now.

17    Q.    All right.  Let's go to August of 2012.  I

18            think we covered that.  That's included in

19            351.  We've covered that.  Let's go to

20            September 12, 2013, and take a look at

21            Exhibit 353.  Okay.  In January of 2012, the

22            administration, we've heard, told the students

23            there wouldn't be charges for equipment on the

24            core charges until years down the road.  Do

25            you recall that testimony?
```

```
 1   A.   Yes.
 2   Q.   And is that a correct statement by
 3        administration that there shouldn't be charges
 4        on that until years down the road?
 5   A.   Yes, very much so.
 6   Q.   And you wrote the grant, didn't you?
 7   A.   Yes.
 8   Q.   And the renewal?
 9   A.   And the renewal.
10   Q.   Did it get an excellent score?
11   A.   A super excellent score.
12   Q.   Was it renewed?
13   A.   Yes.
14   Q.   And in May, May 1, 2012, Hartmut Jaeschke says
15        he's changed his mind and they're going to
16        start charging for the core charges, didn't
17        he?
18   A.   Yeah.
19   Q.   And we talked about what that does to your
20        RO1s in terms of the effect of those, and he
21        indicated that the investigators would not go
22        bankrupt.  My question to you is as -- because
23        of your RO1s as Dean Atkinson states in the
24        January meeting, as she said in the meeting
25        with the students, was it was -- were those --
```

1       she said, "Those core charges were not

2       budgeted."  What does that mean?

3   A.  That we hadn't written that into a new grant

4       yet.  This was a relatively new piece of

5       instrument, and the goal was -- is to get

6       people used to this equipment, see how useful

7       it would be for their research.  So when they

8       wrote their next RO1, they would say I need to

9       use this equipment, and it's going to cost me

10      maybe $3,000 a month, and so NIH, can I have

11      $3,000 a month to do that.

12  Q.  Okay.  Now, let's go to Exhibit 353 on the

13      screen, because in this e-mail from you to

14      Buddha Dawn -- and by the way, why were you

15      e-mailing Buddha Dawn?

16  A.  Steve Stites said that it was best for me to

17      contact Buddha Dawn rather than himself.

18  Q.  So you were complying with his request when

19      you authored 353?

20  A.  Correct.

21  Q.  And in this e-mail, does it authorize taking

22      money out of your accounts and showing an

23      accumulation of $25,000 in core charges from

24      May 1, 2012, through August 31, 2012?

25  A.  No, not at that time.

```
 1   Q.   Okay.

 2   A.   I don't believe.

 3   Q.   Is that an in Exhibit 357?

 4   A.   I know I expressed that concern to him at some

 5        time, or a number of times.  I don't remember

 6        exactly.

 7   Q.   Okay.  I have the wrong exhibit.  Let's put

 8        127 up on the screen.  And that's

 9        September 28th.

10   A.   Okay.  So this is -- and you've seen this

11        before many times.  This is one of the 17

12        e-mails, letters, that were sent to the

13        administration about the problems they were

14        having at KU Med Center doing their research.

15   Q.   Okay.  Hang on, because we've seen this.

16        Let's move to Exhibit 128, which is what I was

17        looking for?

18   A.   Okay.

19   Q.   This is from Steve Stites to you dated

20        September 28th.  And does that show $25,286.26

21        usage of the mas-spectrometer located in

22        Hemenway, liquid nitrogen usage, and minus a

23        freezer repair?

24   A.   Yes.

25   Q.   And you mentioned that freezer was damaged in
```

```
 1        the move, and you were charged for it?  Is
 2        that the same one?
 3   A.   Yes.
 4   Q.   Okay.  Now, the 25,286, is that for all time
 5        sake, or is that for a period of time?
 6   A.   I think that's probably for one month too.
 7   Q.   So in terms of your accounts, did you have
 8        concern that what was to be free when you had
 9        submitted a budget to the NIH, was now being
10        charged?
11   A.   You bet.
12   Q.   And was that a serious concern in your mind?
13   A.   Well, take $25,000 a month times 12 months in
14        a year, and five years of a grant, that's a
15        fair amount of money.
16   Q.   And that's what you told Buddha Dawn on
17        September 23, 2012, in Exhibit 353, which is
18        the one we had up on the screen previously.
19        "And your prediction under thus, I will be
20        270,000 in the red by the end of the fiscal
21        year."  That's what you were telling them?
22   A.   Yes.
23   Q.   By the way, I heard Dr. Jaeschke say that
24        Cobre charges were not written into the Cobre
25        as part of the grant when the grant renewal
```

```
 1           application was prepared in 2010, is that

 2           correct?

 3    A.     Repeat that.

 4    Q.     I thought I heard Jaeschke say that core

 5           charges were not -- I said Cobre.  That's what

 6           threw you.  That what the core charges were

 7           not written into the Cobre as part of the

 8           grant when the grant renewal application was

 9           prepared in 2010?

10    A.     Yeah.  There was never any attempt to pay for

11           any of the use of that equipment in the grant

12           that I wrote for NIH and was funded.

13    Q.     And in the renewal?

14    A.     And in the renewal.

15    Q.     It received excellent scores?

16    A.     Excellent scores.

17    Q.     And if you were paying out of a grant that you

18           had submitted, and it's been issued and then

19           renewed, and items are being spent outside the

20           grant, is that a serious matter to you?

21    A.     Yes, it was a serious matter to me very much.

22    Q.     And that's what you were reporting higher up

23           when you were communicated that to Buddha

24           Dawn, correct?

25    A.     Yes.
```

1   Q.   Give us an idea what those charges are based

2        on.  The charges were based on samples?

3   A.   Yes.  So we collect from mice, specifically

4        the bile, which goes from your liver into your

5        intestine.  And we collected liver tissue,

6        intestine tissue, blood of these animals, and

7        also fat, because we thought if we study this

8        a little better, we could decrease obesity in

9        America.  And so we had to, on each of these

10       samples, we had to measure bio-acid

11       concentration.  So the department had three

12       mass specs.  We had none before I was Chair.

13       And when I was Chair, we got three mass specs.

14       And so the one mass spec, as you've seen

15       previously, we use 99 percent of the time.

16       And the other mass spec was probably used four

17       percent of the time.  So we originally wanted

18       to move the mass spec to our lab.  There was

19       also the Cobre -- I had written into the Cobre

20       a service contract.  And what that means is

21       every time it breaks down, the service man

22       comes down, and you know, you've in essence

23       prepaid just like with your refrigerator to

24       get a service contract.  Well, we had that on

25       the mass spec.  I mean it's an expensive

```
 1        equipment.
 2   Q.   $25,000 a month is quite a bit of samples.
 3        Was the sample what, $12 and something per
 4        sample?
 5   A.   Yeah.  What we had -- I think Paul Terranova
 6        or somebody said that we had like eight minus
 7        80 freezers, which are refrigerators or
 8        freezers, the size that you have in your home,
 9        and they have tubes that are that big, and put
10        in all little holes, and that was all full.
11        We had enough samples to run 24 hours a days,
12        seven days a week for five years.
13   Q.   But you said -- you reported that this was
14        with these assessments, this was going to cost
15        you $250,000 in unaccounted costs within your
16        grant?
17   A.   Exactly.
18   Q.   Did that effect the scope and operation of
19        those grants?
20   A.   Yes.  I mean we were going bankrupt.
21   Q.   And then let's go to the 353 e-mail again.
22        This is your communication to Buddha Dawn
23        telling him the status of these assessments
24        and what it's going to do in terms of
25        bankruptcy in your lab?
```

```
 1   A.   Yes.
 2   Q.   Okay.  Let's go to 357.  And 357's been
 3        admitted.  And I want to talk to you about
 4        this e-mail you sent regarding a meeting
 5        yesterday on December 20, 2012.  And let's go
 6        through the e-mail.  It is from you to
 7        Dr. Oyea. (Sp)  Am I pronouncing that right?
 8   A.   Yes.  And he's the head of gastroenterology.
 9   Q.   And then Steve Stites?
10   A.   Who was the EVC.
11   Q.   And then Buddha Dawn?
12   A.   That's my recorder as far as research.
13   Q.   And on the time line, the first time that
14        Christina Hopkins's name comes up, is the end
15        of December 2012.  Who is she?
16   A.   She was kind of the secretary/accountant for
17        the internal medicine department in
18        relationship to research.
19   Q.   Okay.  And we've heard about this meeting that
20        was with whom in your recollection?
21   A.   Okay.  So this meeting was actually in Buddha
22        Dawn's office, and Christina came, and I was
23        at that meeting.
24   Q.   Okay.  And the -- Christina brought to the
25        meeting a snapshot of the NIH grant account?
```

```
 1  A.   Right.  And I'd like to explain what a
 2       snapshot is.  It's not like what you get from
 3       a bank each month that says who you wrote the
 4       checks out to, but rather the snapshot that
 5       said what your balance was.  So all I had was
 6       how much was left in Account A, how much was
 7       left in Account B, how much was Account C.  So
 8       I still didn't know how any of the money was
 9       spent.  That's my --
10  Q.   And by the way, you are reporting up the chain
11       to Steve Stites and Buddha Dawn in this, is
12       that right?
13  A.   Exactly.
14  Q.   And Dr. Oyeh?
15  A.   Yes.
16  Q.   And actually if we could juxtapose 351 and
17       357.  Is it fair to say, Curt, that you're
18       raising some of the concerns that you had
19       raised before in 351, yeah, in 351?
20  A.   I'm asking and asking and asking for my
21       accounting, especially when I know there's
22       flowers and things like that.
23  Q.   So you're repeating in 357, in December, many
24       of the same concerns and complaints you had
25       regarding cookies, the research accounts, the
```

```
 1   Q.   And then Christina Hopkins was at the May 1
 2        meeting, correct?
 3   A.   Right.
 4   Q.   And then you had the meeting with her on
 5        May 7th.  And what I'm asking you is, with
 6        regard to this diagram, was that on paper or
 7        was that on a white board?
 8   A.   It was on paper.
 9   Q.   And in terms of paper, describe first of all,
10        before we go to the meeting, describe what
11        that is?
12   A.   Okay.  So I went to her office simply to give
13        her a number of bills that she needed to pay
14        for, and I did this every two or three days,
15        okay, the invoices.  And they were paid for.
16        Okay.  So while I was there, I said, "You
17        know, what medicine is doing is really very
18        strange," and so -- if I can stand up?
19   Q.   Yes.
20   A.   So what I tried to do here was -- I'm a
21        scientist, so I explain things to people with
22        a graph.  So here is in essence months, month
23        one, two, three, four, five, six, seven,
24        eight, for twelve months of a grant.  So let's
25        say in the beginning of the year on month zero
```

```
 1        you get $180,000.  I use the example here.  I
 2        don't know why I used 180,000.  But then,
 3        normally, you get a report every month.  And
 4        what you try to do when you are running your
 5        budget, is just like at home, except you don't
 6        get paid all in one day for the year, so it's
 7        even more difficult.  But you kind of carry
 8        this along, and you say well, if I spend too
 9        much, boy we've got to really be careful.  And
10        so what you try to do is to make this come to
11        zero at about twelve months.  And then you get
12        another 180,000, let's say, and again you hope
13        for that's to last a year, but there were no
14        reports.  So where was I at, who knew?  So
15        what had happened, because a lot of these
16        charges, it turned out that this line actually
17        went down below.  I went in the red without
18        ever knowing it.
19   Q.   And is that what you have written there is
20        red?
21   A.   Right, so it went in the red.  So then when I
22        got the money for the second year, I thought I
23        had 180,000, right, but what did I have,
24        30,000, and nobody ever told me.  I said, "You
25        know" -- I said, "While this might be legal,
```

```
 1        and I'm not a lawyer, this is not right."
 2        You've got to tell me at least what's going
 3        on.  That was the point, and I probably got
 4        that loud as I did to you with her.  I didn't
 5        blame her.
 6   Q.   And was there a disconnect in the meeting
 7        between you and her over accounting methods?
 8   A.   Well, I guess you call this a disconnect the
 9        way they were doing it, and the way I thought
10        it should be done.
11   Q.   How long did that meeting last?
12   A.   Probably the same length as the one I just
13        described to you, probably three to
14        five minutes.
15   Q.   And how did the meeting end?
16   A.   Well, I've heard this week that -- okay, what
17        I say.
18   Q.   Where was it?  Was it in her office?
19   A.   It was in her office, so after that I just
20        left.
21   Q.   And you got in her office, because you always
22        went in and dropped the invoice off, and then
23        the conversation with her turned to what had
24        been discussed at the May 1 meeting?
25   A.   Right.
```

```
 1  Q.   And you indicated in the tone of voice you've
 2       just indicated, what you've done on that
 3       Exhibit 606, or Plaintiff's 361, and at that
 4       point, who came into the room?
 5  A.   Nobody.
 6  Q.   Okay.  Describe for the jury what happened?
 7  A.   So when this was done, I walked out of the
 8       hall, I was going to a microbiology seminar.
 9       When I was a hundred feet down the hall or so,
10       Buddha Dawn met me and we stopped and talked
11       about that meeting that he was at that
12       previous -- on May 1st.
13  Q.   Okay.
14  A.   And basically what I told Buddha Dawn at that
15       time, I said, "You know, your Chair really
16       made a fool out of himself last Friday at the
17       meeting, don't you think?"  And he says,
18       "Well, he doesn't understand how NIH grants
19       work.  And I said, "Well, he's never had one,
20       has he?"  And Buddha says, "Can we talk
21       somewhere?"  "Can we go to my office?"  And I
22       said, "No, I need to go to a seminar in
23       microbiology, because I'm also going out to
24       dinner with him that evening."
25  Q.   Dinner with who?
```

```
 1        what you say about this communication and
 2        every communication that you've had since
 3        May 8th is all no, we have not communicated
 4        today or any day since May 8," and you wrote
 5        that in big letters, is that correct?
 6   A.   Right.
 7   Q.   Now let's go down to the section that starts,
 8        Section 3.  Let's do the whole section.  "And
 9        you're telling them to write a letter and hear
10        some suggestions for the letter."  "Buddha was
11        to be the faculty person to help us."  "He
12        never came to our lab except with the police."
13        That's what you're telling them to write?
14   A.   I was suggesting.  It was suggestions for the
15        letter.
16   Q.   And your suggestion was that STUDENTS,
17        capital, all of caps, were fired when NIH had
18        1.8 million dollars they wanted to give to
19        Curt Klaassen?
20   A.   That is absolutely correct.
21   Q.   And so you're suggesting then in the next one,
22        "Let's raise minority student fired even when
23        NIH had fellowship they wanted to give to Curt
24        Klaassen?
25   A.   And that was true, and that was so sad.  Here
```

1   Q.   Let's put up Exhibit 191 if we could.  This is

2         the letter that we've seen several times, but

3         I'm not going to walk through it again, just

4         remind folks where we are on time on this,

5         this was the January 9, 2012, letter

6         Exhibit 191, where Dr. Jaeschke points out

7         several conversations that have been discussed

8         at some length already, so I'm not going to go

9         through them again.  Now let's put up 192.

10        The first part of that you said, "Hartmut, I

11        can understand why you might not have much

12        confidence in me at the present time."  "If I

13        did not have graduate students and post doc

14        students, I would have retired nine months

15        ago."  Did you mean that statement?

16   A.   At the end of this first faculty evaluation,

17        you know, that was really a kangaroo court.  I

18        probably would have just said what the heck

19        with it and just retired, or gone to another

20        University.  But it's difficult for me to go

21        to another University, because we built this

22        nice house, and because my children and

23        grandchildren live in Kansas City and Wichita.

24        So my wife won't move, and I don't blame her.

25        But if you have these students, what comes

```
 1        first, you or your students?  It's like you

 2        and your children.  These students to me, in

 3        fact, we call -- everybody calls us "The

 4        Klaassen Academic Family."  I had to stay

 5        there.  I wanted to stay there.  I wanted to

 6        help them.  So I am here saying, you know,

 7        when I came into your office X months ago, and

 8        I went like that and said, "Why did you take

 9        $13,000,000 from me without telling me when

10        you were planning this two months -- two

11        months ago, three months ago, when I thought

12        you were my best buddy?  I apologize, even

13        though they were doing these things to me.

14   Q.   Now I want to jump ahead to the May 1, 2013,

15        budget meeting that we've heard about several

16        times.  And this is the one where we played

17        the tape.  And at that point, Dr. Stites was

18        the department Chair, is that correct?

19   A.   Correct.

20   Q.   And this was in the internal medicine

21        department, and he had a right to determine

22        where the meeting was going to be, correct?

23   A.   Yeah, but I had offered two places, and I had

24        asked for the meetings many, many, months

25        ahead of time.  I didn't care if it was in his
```