## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CURTIS KLAASSEN, PH.D.,         )
                                              )
                  PLAINTIFF,      ) CASE NO. 13-CV-2561-DDC/KGS
                                              )
V.                                       )
                                              )
                                              )
BARBARA ATKINSON,         )
ET AL.,                          )
                                              )
                  DEFENDANTS.    )

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

Respectfully Submitted,

FOULSTON SIEFKIN LLP

By: /s/ *Anthony F. Rupp*
Anthony F. Rupp, KS #11590
Tara S. Eberline, KS #22576
32 Corporate Woods, Suite 600
9225 Indian Creek Parkway
Overland Park, KS 66210
Telephone: (913) 498-2100
Facsimile: (913) 498-2101
Email: trupp@foulston.com
        teberline@foulston.com

ATTORNEY FOR DEFENDANTS

## TABLE OF CONTENTS

I.   RESPONSE TO DR. KLAASSEN'S STATEMENT OF ADDITIONAL
     MATERIAL FACTS ........................................................................................ 1

II.  ARGUMENTS AND AUTHORITIES.......................................................... 70

     A.   Introduction........................................................................................ 70

     B.   All of Dr. Klaassen's Claims Are Barred by Principles of Res
          Judicata............................................................................................... 71

          1.   Claim preclusion bars Dr. Klaassen's individual capacity and
               state law claims...................................................................... 72

               a.   There is privity............................................................. 72

               b.   The state court decisions are final judgments............... 74

          2.   Issue preclusion bars Dr. Klaassen's due process claims ......... 75

     C.   Dr. Klaassen's First Amendment Retaliation Claim Fails............................ 76

          1.   The Defendants' legal framework is correct.............................. 76

          2.   All of Dr. Klaassen's allegedly protected speech occurred
               pursuant to his official duties.................................................. 78

               a.   Lawrence Journal World articles .................................. 79

               b.   PowerPoint presentations and disseminations .............. 79

               c.   March 31, 2011 stakeholders' meeting......................... 81

          3.   Dr. Klaassen's alleged speech was merely an airing of his
               personal grievances, not a matter of public concern................. 82

          4.   The University's interest in speaking with a single voice on
               policy matters outweighs Dr. Klaassen's interest in free speech.............. 84

          5.   Several of Dr. Klaassen's acts of retaliation are not adverse
               employment actions.................................................................. 85

          6.   The Individual Defendants are entitled to qualified immunity
               on Dr. Klaassen's First Amendment Retaliation claims.......................... 87

     D.   Dr. Klaassen's "Procedural Due Process Taking of NIH Grants"
          Claim Fails as a Matter of Law ........................................................ 91

          1.   Dr. Klaassen's procedural due process rights were not violated
               because he does not have a constitutionally protected property
               interest.................................................................................... 92

i

a. Dr. Klaassen has no constitutionally protected property interest in serving as PI on grants awarded to the University ................................................................ 93

(i) Implied Contract ............................................... 93

(ii) No property interest as a matter of law ............................. 97

b. Dr. Klaassen was not entitled to notice and a hearing before being removed as PI........................................ 98

2. The Individual Defendants are entitled to qualitied immunity on this claim .......................................................... 98

**E.** **Dr. Klaassen conceded that punitive damages are inappropriate**.................. **99**

**F.** **Dr. Klaassen conceded that this Court should decline to exercise supplemental jurisdiction over his state law claims**.......................................... **99**

**III.** **CONCLUSION** ................................................................................. **99**

I.      **RESPONSE TO DR. KLAASSEN'S STATEMENT OF ADDITIONAL MATERIAL FACTS**

1.      It is uncontroverted that Dr. Klaassen was employed by the University of Kansas beginning in 1968 and that Dr. Klaassen later attained the title of Distinguished University Professor.

2.      Uncontroverted.

3.      Uncontroverted.

4.      Uncontroverted.

5.      Uncontroverted.

6.      Uncontroverted.

7.      Uncontroverted.

8.      Uncontroverted.

9.      Controverted in part. Various types of grants were awarded to the University of Kansas and/or the University of Kansas Medical Center Research Institute, Inc., for which Dr. Klaassen served as either the principal investigator or a co-principal investigator, including institutional grants and other grants, obtained on behalf of the University of Kansas. For example, see Ex. 13, a grant commonly known as the "COBRE" grant, in which Dr. Klaassen is identified as the principal investigator, the University of Kansas Medical Center Research Institute, Inc. is identified as the Applicant Organization, Thomas Noffsinger is the official authorized to sign for the Applicant Organization, and the grant purpose is to develop a Center of Biomedical Research Excellence at Kansas University Medical Center with a focus on Nuclear Receptors and their Role in Liver Health and Disease. This grant is intended to provide mentoring opportunities for junior faculty members. A co-investigator was identified. The grant

references an Internal Advisory Committee and an External Advisory Committee. (Ex. 13, COBRE Grant.)

  10. Uncontroverted.

  11. Controverted. To be properly characterized as a summary of Dr. Klaassen, one would need to include the next two paragraphs of Dr. Klein's statement, as follows:

> His scientific acumen is not in question. The issue is Dr. Klaassen's behavior. Deliberate actions to disrupt departmental and university activities, threats and bullying of faculty and staff and failure to disclose his use of university resources for the Mid-America toxicology course over the past several decades. Dr. Klaassen's misconduct is not one single event. It has been substantial, repeated, and serious. It warrants the imposition of serious sanctions.

(Ex. 714, May 2012 Ad Hoc Hearing Transcript, 9:2-12.)

  12. Controverted. Dr. Klaassen's statements in his curriculum vitae are not admissible evidence of whether he was the seventh most highly rated toxicologist in the world. Moreover, the issue in this case is not his scientific acumen. It is his behavior.

  13. Defendants do not controvert this factual allegation for purposes of this motion only. Defendants have not fact-checked the allegations with regard to the total number of grants for which he was the principal investigator or co-principal investigator or whether any KUMC professor received more, as these allegations are not material to any disputed issue.

  14. Controverted in part. The letter makes no reference to "despite Klaassen's contribution."

  15. It is uncontroverted that those terms appear in the 2002 letter offering Dr. Klaassen the position of Chair of the Department.

  16. It is uncontroverted that those terms appear in the 2002 letter offering Dr. Klaassen the position of Chair of the Department.

  17. Uncontroverted.

18.     Controverted in part. Ms. Meagher left the Department in August 2011. (Ex. 780, Dec. 7, 2016 Jury Trial Transcript, Vol. VII, Meagher testimony, 116:15-23.)

19.     Uncontroverted.

20.     Uncontroverted.

21.     It is uncontroverted that Ms. Meagher testified that Dr. Klaassen has always been a "bully." (Ex. 781, Meagher Depo, 56:6-15). Ms. Meagher left the department in August 2011. (Ex. 780, Dec. 7, 2016 Jury Trial Transcript, Vol. VII, Meagher testimony, 116:15-23.) Accordingly, she has no personal knowledge of Dr. Klaassen's subsequent behavior.

22.     Controverted in part. The testimony refers to a PowerPoint presentation in which Dr. Klaassen referred to his chairmanship of the Department as a "failure" and how, in 2006, he perceived, "If one is paranoid, it does not mean that people are not out to get you." He emphasized that no one in the department should ever say anything negative about the department. He went on to demean two members of his faculty that he "inherited" from the former chair, referring to them as "low achievers, to say it in a positive way." He asserted that these low achievers were "part of the mob way back then." He described the mob as "all the people that worked together to get me and keep me off the university." (Ex. 782, Klaassen Depo, 176:4-184:13.)

23.     Controverted. Dr. Atkinson's testimony is not in relation to the time of her appointment of Dr. Klaassen as chair and does not imply in any way that these faculty members were low achieving. She described that Dr. Klaassen was very insulting when he talked about some of the pharmacology professors who were in the department before he became chair, and that she suspected he was insulting when he spoke with those individuals. (Ex. 783, Atkinson Depo, 69:3-73:11.)

3

24.      Uncontroverted.

25.      It is uncontroverted that Dr. Klaassen referred to these two faculty members as "low achievers" and as individuals whom he "inherited" who were part of a "mob" out to get him.

26.      Uncontroverted.

27.      It is uncontroverted that Dr. Atkinson became aware that Dr. Klaassen had no respect for faculty members hired by the former chair. It is not identified in the exact year she became aware of this lack of respect.

28.      Controverted in part. Dr. Atkinson's testimony was that the complaint at that time was that Dr. Klaassen was yelling, treating them badly, not showing them any kind of respect at all. Dr. Levant's description did not reference having to work "too hard." She did reference his preference for faculty to work on evenings and weekends.

29.      Uncontroverted.

30.      Uncontroverted.

31.      Controverted in part. There is nothing in the cited testimony that supports that KUMC administration or Dr. Atkinson, in particular, had specific knowledge of the contents of the PowerPoint slides.

32.      Controverted. Dr. Atkinson did counsel Dr. Klaassen on his interactions with professors in his department. Additionally, Dr. Klaassen was provided two Inquiry Reports and four ad hoc hearings based on his conduct and outbursts. (Ex. 196, Jan. 31, 2012 Inquiry Report; Ex. 602, June 10, 2013 Inquiry Report; Ex. 18, May 31, 2012 Ad Hoc Committee findings; Ex. 638, Dec. 9, 2013 Ad Hoc Committee findings; Ex. 609, Dec. 5, 2014 Ad Hoc Committee findings; Ex. 610, Apr. 8, 2016 Ad Hoc Committee findings.)

33.     Uncontroverted.

34.     Controverted in part. There is nothing in the cited testimony that supports that Dr. Atkinson had specific knowledge of the contents of the PowerPoint slides.

35.     Uncontroverted.

36.     Uncontroverted.

37.     Uncontroverted.

38.     It is uncontroverted that Dr. Klaassen created and compelled his faculty members to fill out an evaluation of him in 2010. This came following a prior evaluation in which he ridiculed the faculty for educating him "about my incompetence." (Ex. 12, PowerPoint Slides, p. 102.) He called the faculty members who conducted that evaluation "losers" and underachievers. (Ex. 784, Dec. 09, 2016 Jury Trial Transcript, Vol. IX, Klaassen testimony, 188:23 – 189:5.)

39.     Controverted. Direct costs do not belong to the PI. Direct costs are costs such as salaries, equipment that may be needed - known expenses that can be categorized. Indirect costs are things that can't be easily categorized, such as maintenance. (Ex. 785, Dec. 05, 2016 Jury Trial Transcript, Vol. V, Stites testimony, 202:9 – 203:14.) On the COBRE Grant, Ex. 13, for example, some of the direct costs to be paid to KUMCRI are identified beginning at p. 6 of 207 and run through p. 9 of 207. (Ex. 13, COBRE Grant.)

40.     It is uncontroverted that the University of Kansas seeks and obtains federal grant funding from various federal agencies, including the National Institutes of Health ("NIH"), to support its research work. Dr. Klaassen submitted grant proposals on behalf of the University to the NIH as one or more of the proposed principal investigator of such grant proposals.

41.     Controverted in part. Dr. Terranova testified that the PI is a person "designated by the University to serve as the lead in a grant." The University is where "the buck stops." (Ex. 786, Terranova Depo, 101:16 – 102:22.)

42.     Controverted in part. Dr. Terranova's testimony was, "Principal Investigator is a faculty member usually, doesn't have to be, but it's usually a faculty member who's designated by the University to serve as the lead in a grant application." (Ex. 786, Terranova Depo, 100:20-24.) The Faculty Handbook states, "All faculty may exercise the privilege of being named as P.I. or project director on proposals submitted for external support." (Pl.'s Pl.'s Ex. 209, Faculty Handbook, p. 181, emphasis added.)

43.     Controverted in part. The description given by Dr. Jaeschke that the PI manages the grant is a shorthand for the role of the PI and not the legal definition. In fact, counsel for Dr. Klaassen prefaced the question by making it clear that he was not looking for the legal definition, stating, "I won't plow this around, we've plowed it before." (Ex. 780, 2016-12-07 Jury Trial Transcript, Vol. VII, Jaeschke testimony, 184:15-19.) The KUMCRI maintains a policy to ensure consistent compliance with accounting guidelines. An example from 2015 is Ex. 304. Ex. 13, the COBRE Grant, identifies four people who are authorized to sign for all matters related to research and sponsored grants and contracts (Ex. 13, COBRE Grant, p. 2), an entire COBRE Administration staff (Ex. 13, COBRE Grant, p. 10), an External Advisory Committee to provide independent review and oversight (Ex. 13, COBRE Grant, p. 11), an Internal Advisory Committee to evaluate progress, communicate program updates, facilitate scientific exchange, and plan and coordinate research activities (Ex. 13, COBRE Grant, p. 61), mentors under the Grant, and a co-principal investigator (Ex. 13, COBRE Grant, p. 53).

44.     Controverted in part. Dr. Terranova's testimony made it clear that the PI's financial management responsibilities are obligations to the University, and that the buck stops with the University. (Ex. 786, Terranova Depo, 102:15-22.) (*See also* SOF 361, 362.)

45.     Controverted in part. Dr. Klaassen states that the fact is "subject to the NIH regulations," but he cites no such regulation. The NIH Grants Policy Statement defines the role of the Principal Investigator as "an individual designated by the applicant organization to have the appropriate level of authority and responsibility to direct the project or program supported by the award." It further explains that the PI is "responsible and accountable to the recipient organization or, as appropriate, to a collaborating organization, for the proper conduct of the project or program, including the submission of all required reports." (Ex. 752, NIH Grants Policy Statement, Section 2.1.2; Ex. 627, May 2013 NIH Notice of Award – Drug Processing Gene.)

46.     Controverted in part. Dr. Klaassen states that the fact is "pursuant to NIH regulations," but he cites no such regulation. The NIH Grants Policy Statement defines the role of the Principal Investigator as "an individual designated by the applicant organization to have the appropriate level of authority and responsibility to direct the project or program supported by the award." It further explains that the PI is "responsible and accountable to the recipient organization or, as appropriate, to a collaborating organization, for the proper conduct of the project or program, including the submission of all required reports." (Ex. 752, NIH Grants Policy Statement, Section 2.1.2; Ex. 627, May 2013 NIH Notice of Award – Drug Processing Gene.)

47.     Controverted in part. The current provisions related to fraud, waste and abuse are set forth in Section 2.3.10. The current provisions related to the responsibilities of the Principal

7

Investigator are set forth in Section 2.3 and 2.1.2 The NIH defines the role of the Principal Investigator as "an individual designated by the applicant organization to have the appropriate level of authority and responsibility to direct the project or program supported by the award." It further explains that the PI is "responsible and accountable to the recipient organization or, as appropriate, to a collaborating organization, for the proper conduct of the project or program, including the submission of all required reports." (Ex. 752, NIH Grants Policy Statement, Section 2.1.2; 2.3.)

48.     Controverted. Both before and after Dr. Klaassen served as PI on various NIH grants, Dr. Klaassen's salary was not reduced. Dr. Klaassen's salary was not reduced when the grants on which he was a principal investigator were reassigned. (*See* SOF 376.)

49.     Controverted in part. The sources of funding that paid Dr. Klaassen's salary included state and federal funds and other sources. (Ex. 787, Klaassen Depo, 33:19-23; Ex. 709, Klaassen Depo, 200:25-201:10; 452:7-20.)

50.     Uncontroverted.

51.     Controverted in part. The question and answer involved broad general descriptions of institutional grants versus RO1 grants. No legal definitions were provided. Generally, Defendants agree, for purposes of this brief, that the COBRE and Training Grants are institutional grants and that the RO1 grants support specific research projects.

52.     Controverted in part. The question and answer involved broad general descriptions of institutional grants versus RO1 grants. No legal definitions were provided.

53.     It is uncontroverted that Dr. Klaassen gave such testimony. His comments do not purport to be a legal definition of an RO1 grant and stray off into his thoughts about "mobs" and "plots" and contain hearsay about what unnamed others have told him.

54. Controverted. Dr. Rawitch was not asked for the University's definition of tenure, and he did not purport to give the University's definition of tenure. He was asked for his personal understanding and he described, "That's a matter of some discussion among whom you ask." The Academic Freedom Complaint Procedure provides for an investigation of academic freedom complaints, a determination by the Faculty Steering Committee whether there is reasonable evidence that academic freedom is at issue, and hearings and finding of an Ad Hoc Hearing Committee about any intrusions into academic freedom. Dr. Klaassen never invoked any academic freedom issues. (Pl.'s Ex. 209, Faculty Handbook, pp. 114-119.)

55. Controverted. Dr. Rawitch was not asked for the University's definition of tenure, and he did not purport to give the University's definition of tenure. He was asked for his personal understanding and he described, "That's a matter of some discussion among whom you ask."

56. Controverted. Dr. Rawitch was not asked for the University's definition of tenure, and he did not purport to give the University's definition of tenure. He was asked for his personal understanding and he described, "That's a matter of some discussion among whom you ask."

57. Uncontroverted.

58. Controverted. Dr. Rawitch was not asked for the University's definition of tenure, and he did not purport to give the University's definition of tenure. He was asked for his personal understanding and he described, "That's a matter of some discussion among whom you ask." In addition, there was an objection to the vague nature of the question, and Dr. Rawitch indicated his answer was "qualified." (Ex. 788, Rawitch Depo, 16:23 – 17:6.) The Handbook's definition of the right of tenured faculty is set forth at Pl.'s Ex. 209, p. 43 of 264.

59. Controverted. Dr. Rawitch made no reference in his testimony to the words "nearly impossible." Dr. Jaeschke's testimony was that junior faculty members need to have

publications to get promoted and that if junior faculty members do not get grant funding within a certain amount of years, termination is likely. (Ex. 789, Jaeschke Depo, 25:14 – 26:4.)

60.     Controverted in part. Dr. Rawitch's testimony was that "I think I would have to state a lot of qualifications in my answer." He noted that professors are not individual entrepreneurs who can seek funding personally. They have to apply through their institutions. (Ex. 788, Rawitch Depo, 15:15 – 16:21.) The Faculty Handbook states, "All faculty may exercise <u>the privilege</u> of being named as P.I. or Project Director on proposals, submitted for external support." (Pl.'s Ex. 209, Faculty Handbook, p. 181, emphasis added.)

61.     It is uncontroverted that Dr. Jaeschke gave that general description about his understanding. Neither the question nor the answer was directed specifically to any particular grants or any particular provisions related to the University.

62.     Controverted in part. There are multiple purported facts asserted under this number and none purport to address the University's definition of tenure or academic freedom.

63.     It is uncontroverted that Dr. Klaassen gave testimony inaccurately indicating that "[t]hey took my grants away." The grants belonged to the University. These were not property of Dr. Klaassen. (Ex. 13, COBRE Grant; Ex. 14, Training Grant; Ex. 70, July 4, 2011 Notice of Award.)

64.     Uncontroverted.

65.     Uncontroverted.

66.     It is uncontroverted that Dr. Terranova gave such testimony. In order to protect academic freedom, the Faculty Handbook includes an Academic Freedom Complaint Procedure. If a faculty member believes his academic freedom has been infringed, it provides a process to

address his claims. Dr. Klaassen never invoked the Academic Freedom Complaint Procedure. (Pl.'s Ex. 209, Faculty Handbook, p. 119.)

67.     It is uncontroverted that Dr. Terranova gave such testimony. In order to protect academic freedom, the Faculty Handbook includes an Academic Freedom Complaint Procedure. If a faculty member believes his academic freedom has been infringed, it provides a process to address his claims. Dr. Klaassen never invoked the Academic Freedom Complaint Procedure. (Pl.'s Ex. 209, Faculty Handbook, p. 119.)

68.     It is uncontroverted that Dr. Terranova gave such testimony. In order to protect academic freedom, the Faculty Handbook includes an Academic Freedom Complaint Procedure. If a faculty member believes his academic freedom has been infringed, it provides a process to address his claims. Dr. Klaassen never invoked the Academic Freedom Complaint Procedure. (Pl.'s Ex. 209, Faculty Handbook, p. 119.)

69.     It is uncontroverted that Dr. Terranova gave such testimony. In order to protect academic freedom, the Faculty Handbook includes an Academic Freedom Complaint Procedure. If a faculty member believes his academic freedom has been infringed, it provides a process to address his claims. Dr. Klaassen never invoked the Academic Freedom Complaint Procedure. (Pl.'s Ex. 209, Faculty Handbook, p. 119.)

70.     It is uncontroverted that Dr. Terranova gave such testimony. In order to protect academic freedom, the Faculty Handbook includes an Academic Freedom Complaint Procedure. If a faculty member believes his academic freedom has been infringed, it provides a process to address his claims. Dr. Klaassen never invoked the Academic Freedom Complaint Procedure. (Pl.'s Ex. 209, Faculty Handbook, p. 119.)

71.     Controverted as incomplete. The full text reads:

Academic Freedom

The University of Kansas has a long tradition of dedication to the principals of academic freedom and has sought to implement these principles as they are embodied in the 1940 Statement of Principles on Academic Freedom and Tenure of the American Association of University Professors and the American Association of Colleges. The University's position on academic freedom is therefore fully reflected by the following paragraphs from the AAUP statement:

> The teacher is entitled to full freedom in research and in the publication of the results, subject to the adequate performance of his other academic duties . . .
>
> The teacher is entitled to freedom in the classroom in discussing his subject, but he should be careful not to introduce into his teachings controversial matter which has no relation to his subject.
>
> The . . . university teacher is a citizen, a member of a learned profession, and an officer of an educational institution. When he speaks or writes as a citizen, he should be free from institutional censorship or discipline, but his special position in the community imposes special obligations. As a man of learning and an educational officer, he should remember that the public may judge his profession and his institution by his utterances. Hence he should at all times be accurate, should exercise appropriate restraint, should show respect for the opinions of others, and should make every effort to indicate that he is not an institutional spokesman.

The following regulation on academic freedom and campus disruption was adopted by the Board of Regents on June 19, 1970:

WHEREAS, the members of the State Board of Regents recognize that academic freedom is a necessary adjunct of higher education in the State of Kansas, and

WHEREAS, academic freedom includes not only the right of dissent, but also the freedom to pursue academic aims by all segments of our colleges and universities, and

WHEREAS, small numbers of the student bodies and/or employees of Kansas state colleges and universities are pursuing activities deliberately designed to, and which do, disrupt regularly scheduled activities of said institutions, and

WHEREAS, disciplinary boards organized to provide student and faculty review of disruptive action are, at times, harassed and delayed in conducting said reviews, and

WHEREAS, the interests of citizens and taxpayers of the State and of the majority of students and faculty are detrimentally affected.

NOW, THEREFORE, BE IT RESOLVED by the State Board of Regents that the chief administrative officer of each of the state universities and colleges be and are hereby directed to immediately suspend any employee, faculty member or student of said institution where said student, faculty member or employee is engaging in activities deliberately designed to, and which do, disrupt the normal ordinary process of education and training offered by said institutions, said suspension to remain in effect pending such procedural steps as may be required under the rules and regulations of the state institutions and the laws of the State of Kansas. The heads of the state institutions shall take action as is necessary to stop such activities.

BE IT FURTHER RESOLVED that this action not be considered as limiting any authority of said chief administrative officers in the performance of their duties.

(Pl.'s Ex. 209, Faculty Handbook, pp. 44-45.)

72.     Controverted in part. Dr. Rawitch made it clear that the Handbook is not a contract. (Ex. 788, Rawitch Depo, 149:14-16.) The Handbook states, "The University reserves the right to expand upon, alter, amend, or delete any provisions contained herein as may be deemed necessary or appropriate by the administration." Accordingly, the policies described in this Handbook are not intended to create a contract between the University of Kansas and its employees. (Pl.'s Ex. 209, Faculty Handbook, p. 17.)

73.     Controverted in part. The Faculty Handbook contains an "Academic Freedom Complaint Procedure" that is set forth at Pl.'s Ex. 209, pp. 114-119. Dr. Klaassen never asserted an Academic Freedom Complaint as set forth at Pl.'s Ex. 209, p. 116. The Academic Freedom Complaint Procedure provides for an investigation of academic freedom complaints, a determination by the Faculty Steering Committee whether there is reasonable evidence that academic freedom is at issue, hearings and findings of an Ad Hoc Hearing Committee. (Pl.'s Ex. 209, Faculty Handbook, p. 118.) Dr. Klaassen never invoked any academic freedom issues or the Academic Freedom Complaint Procedure. (Pl.'s Ex. 209, Faculty Handbook, p. 119.)

13

74. Controverted in part. The Faculty Handbook contains an "Academic Freedom Complaint Procedure" that is set forth at Pl.'s Ex. 209, pp. 114-119. Dr. Klaassen never asserted an Academic Freedom Complaint as set forth at Pl.'s Ex. 209, p. 116. The Academic Freedom Complaint Procedure provides for an investigation of academic freedom complaints, a determination by the Faculty Steering Committee whether there is reasonable evidence that academic freedom is at issue, hearings and finding of an Ad Hoc Hearing Committee. (Pl.'s Ex. 209, Faculty Handbook, p. 118.) Dr. Klaassen never invoked any academic freedom issues or the Academic Freedom Complaint Procedure. (Pl.'s Ex. 209, Faculty Handbook, p. 119.)

75. Uncontroverted.

76. Controverted in part. The NIH awarded the COBRE grant to the University of Kansas Medical Center Research Institute, not to Dr. Klaassen personally. The purpose of the COBRE grant is to provide mentoring opportunities for junior faculty members. Dr. Klaassen is identified as the Principal Investigator. A co-investigator was identified on the grant application. The grant references an Internal Advisory Committee and an External Advisory Committee. (Ex. 13, COBRE Grant; Ex. 69, COBRE Grant Notice of Award.)

77. Uncontroverted.

78. It is uncontroverted that the COBRE Grant Application identified various individuals in various anticipated roles, including Dr. Klaassen as the principal investigator.

79. Uncontroverted.

80. It is uncontroverted that the University had no problem with the subject matter of the research done under the COBRE Grant.

81. Controverted in part. The "Training Grant" was awarded to the University of Kansas Medical Center Research Institute, not to Dr. Klaassen personally. As indicated in its

14

name, the purpose of the grant is to provide training to trainees in the Toxicology Training Program at the University of Kansas Medical Center. Dr. Klaassen is identified as the Principal Investigator. Dr. Terranova was identified in the grant as the co-Principal Investigator. (Ex. 14, Training Grant; Ex. 70, Training Grant Notice of Award.)

82.     Controverted in part. The grant was received by the University of Kansas Medical Center Research Institute, Inc. Dr. Klaassen is the PI. (Ex. 628, Nrf2 Liver Grant Notice of Award.)

83.     Controverted in part. The Drug Processing Gene grant was received by the University of Kansas Medical Center Research Institute, Inc. Dr. Klaassen is the PI. (Ex. 627, Drug Processing Gene Grant Notice of Award.)

84.     Controverted in part. The Hepatic Uptake grant was received by the University of Kansas Medical Center Research Institute, Inc. Dr. Klaassen is the PI. (Ex. 706, Hepatic Uptake Grant Notice of Award.)

85.     Controverted in part. Dr. Terranova specifically noted that institutional grants such as the COBRE and the Training Grants could not be taken to another University. (Ex. 786, Terranova Depo, 151:13-19.) Dr. Terranova and Dr. Jaeschke testified that RO1 grants can generally be transferred to another University when a faculty member is the PI on an RO1 grant when he or she leaves the University to take a position at another University. (Ex. 786, Terranova Depo, 258:2-7.) This requires the approval of the KUMCRI.

86.     Controverted in part. NIH regulations govern these issues. The regulations speak for themselves, and Dr. Klaassen's assertion is an overbroad legal conclusion. The provisions related to fraud, waste, and abuse are set forth in Section 2.3.10 of the NIH Grants Policy Statement. The current provisions related to the responsibilities of the Principal Investigator are

set forth in Section 2.3 and 2.1.2. The NIH defines the role of the Principal Investigator as "an individual designated by the applicant organization to have the appropriate level of authority and responsibility to direct the project or program supported by the award." It further explains that the PI is "responsible and accountable to the recipient organization or, as appropriate, to a collaborating organization, for the proper conduct of the project or program, including the submission of all required reports." (Ex. 752, NIH Grants Policy Statement, Section 2.1.2; 2.3.)

87.    Uncontroverted.

88.    Uncontroverted.

89.    Uncontroverted.

90.    Uncontroverted.

91.    Uncontroverted with clarification. The KU Endowment Association is a nonprofit organization and the official fundraising foundation for the University of Kansas. Dr. Girod testified that KU Endowment raised money to help support the NCI Initiative, and that the Kauffman Foundation contributed to that effort. (Ex. 1021, Girod Depo, 88:8-15.)

92.    Uncontroverted.

93.    Uncontroverted.

94.    It is uncontroverted that Dr. Girod referred to the Kauffman Foundation as a "great partner" for KUMC.

95.    Controverted in part. This email addresses what Dr. Atkinson told Dr. Carlson about her conversation with Dr. Klaassen.

96.    Controverted. The cited testimony does not support the conclusions alleged. It is acknowledged that a group of basic science chairs met with the Chancellor in 2010 and that Dr. Klaassen and Dr. Carlson were part of that group. The cited testimony reflects Dr. Carlson's

testimony about his own participation and his recollection that Dr. Klaassen was silent at the meeting with the Chancellor. (Ex. 790, Carlson Depo, 105:12-14.)

97.     Controverted. The cited testimony does not support the conclusions alleged. A group of basic science chairs met with the Chancellor in 2010 and Dr. Klaassen and Dr. Carlson were part of that group. Dr. Carlson testified about his own participation and his recollection that Dr. Klaassen was silent at the meeting with the Chancellor.  (Ex. 790, Carlson Depo, 46:22-49:2.)

98.     Controverted. The cited testimony does not support the conclusions alleged. A group of basic science chairs met with the Chancellor in 2010 and Dr. Klaassen and Dr. Carlson were part of that group. Dr. Carlson testified about his own participation and his recollection that Dr. Klaassen was silent at the meeting with the Chancellor.  (Ex. 790, Carlson Depo, 46:22-49:2.)

99.      Controverted. All that is clear from the cited testimony is that Dr. Klaassen has formed an opinion that the development of the Cancer Center was detrimental to Dr. Klaassen. (Ex. 787, Klaassen Depo, 15:5-8.) In particular, Dr. Klaassen cites to the following passage from his deposition:

Q:      And what does that have to do with this lawsuit?

A:      Again, it's a part of the Cancer Center showing that everything that she was doing was to the detriment of K.U. Med Center and especially to me.

(Ex. 782, Klaassen Depo, 15:3-8.)

100.    Controverted. The cited testimony does not support the conclusions alleged. It is acknowledged that a group of basic science chairs met with the Chancellor in 2010 and that Dr. Klaassen and Dr. Carlson were part of that group. The cited testimony reflects Dr. Carlson's testimony about his own participation and his recollection that Dr. Klaassen was silent at the

meeting with the Chancellor. The letter from the Chancellor related to the meeting with the representatives of the basic science departments substantiates that the meeting dealt with internal governance issues such as a recent change in the leadership and organization of reproductive biology. (Ex. 96, Aug. 26, 2010 Gray-Little email.)

101.    Controverted in part. The letter from the Chancellor related to the meeting with the representatives of the basic science departments substantiates that the meeting dealt with internal governance issues such as a recent change in the leadership and organization of reproductive biology. (Ex. 96, Aug. 26, 2010 Gray-Little email.)

102.    Controverted. The meeting was not a "large public meeting." It was a stakeholders' meeting of department chairs and other similarly situated individuals from KUMC with a software vendor related to a potential software product for use by KUMC. (Ex. 714, May 29, 2012 Hearing Transcript, 61:18-62:25.) Dr. Klaassen was there in his role as department chair. (Ex. 714, May 29, 2012 hearing, 61:18-62:25.) Dr. Klaassen has acknowledged that his intent at the stakeholders' meeting related to "basic science policies and what was happening." (Ex. 714, May 29, 2012 hearing, 220:21-222:7.) Dr. Klaassen "acted out" at the meeting and demeaned the Dean and the University in a manner entirely inappropriate at a presentation by a software vendor. He claimed that the Dean was engaging in "slumlord economics." (Ex. 714, May 29, 2012 hearing, pp. 48:22 - 52:19; Ex. 186, April 7, 2011 Faculty Meeting.)

103.    Controverted in part. Dr. Klaassen's counsel has stated on the record that, "So March 31, 2011, Dr. Klaassen accuses the administration of being a slumlord or slumlord economics." (Ex. 740, Mar. 29, 2016 Hearing Transcript, 36:16-25.) Dr. Klaassen's counsel went on to state, "And we've already established that he referred to Dr. Atkinson either as slumlord or

her policies and her direction of the – of the – of KUMC as being like slumlord economics." (Ex. 740, Mar. 29, 2016 Hearing Transcript, 100:3-11.)

104.    Controverted in part. The cited exhibit does not indicate anything about Dr. Atkinson requesting these summaries. Additionally, this was not a public meeting, and Dr. Klaassen's comments were not "public complaints." (*See* SOF 75-85.)

105.    Controverted. Exhibit 57 identifies a complaint submitted by Dr. Brooks to Dr. Atkinson regarding the "embarrassing incident at yesterday's KUMC Stakeholders—Faculty Reporting System presentation." He noted that Dr. Klaassen's behavior was inappropriate in that setting and that the reference to the University as a "slum lord institution" was inflammatory. In that context, Dr. Brooks reported to Dr. Atkinson that the behavior was unprofessional and inappropriate. (Ex. 57, April 1, 2011 letter.) Additionally, Dr. Carl Weiner noted, "He was attacking this guy (the vendor) over something that had nothing to do with his product." Another witness, Helen Connors, noted: "Dr. Klaassen kind of confronted the vendor during his presentation, but not about the product." Witness Judy Otey noted, "Discussion? Is that what you call that? I'll be happy to give you my take/my point of view regarding this. It was extremely inappropriate. The vendor was presenting his product, and people were asking questions. Dr. Klaassen said what's the point of this? I don't get it. Then he went off on a trip about administration being a slum lord and why were we spending money to get a system when we're asking his department to take cuts." (Ex. 196, Jan. 31, 2012 Inquiry Report, 8-9.)

106.    Controverted in part. Dr. Klaassen testified that his use of the slumlord phrase related to his department, and that he was telling Dr. Atkinson "you basically do the same thing in that we have to at the end of the year get another cut in the amount of money that we have to run the department." (Ex. 709, Klaassen Depo, 120:22-121:9.) Dr. Klaassen intended the term to

be disparaging to Dr. Atkinson, stating that a slum landlord "is a person that just takes advantage of other people and, you know, just doesn't have any ethics." (Ex. 709, Klaassen Dep. 138:6-19.)

107.    Controverted in part. The context of the question directed at Dr. Atkinson was Dr. Klaassen's statement in a PowerPoint that "my acting out finally got your attention." (Ex. 783, Atkinson Depo, 128:13–129:13-23.) Dr. Atkinson went on to testify that she does not remember the specifics of his complaint. (Ex. 783, Atkinson Depo, 130:18-21.)

108.    Controverted. Dr. Klaassen was there because this was an on campus meeting of stakeholders related to the purchase of a software project for use on campus. Defendants adopt and incorporate their response to SOAF 102.

109.    It is uncontroverted that the meeting advising Dr. Klaassen of his removal from the "serve at the pleasure" position as department chair took place one week after Dr. Klaassen's unprofessional conduct at the stakeholders' meeting. He had received a $40,000 stipend as department chair. He did not receive that stipend when he was no longer the department chair.

110.    Controverted in part. The meeting between Dr. Klaassen and Dr. Atkinson took place after Dr. Carlson had agreed to become the interim chair. Dr. Atkinson advised Dr. Klaassen of her intent to remove him as chair. Thereafter, Dr. Klaassen provided a PowerPoint in which he acknowledged he was speaking as a faculty member and that he had been acting out. (Ex. 186, April 7, 2011 Faculty Meeting Presentation.) It is unclear who circulated this PowerPoint to various others afterwards, some of whom forwarded it further. (Ex. 57, April 1, 2011 letter.)

111.    Controverted in part. Dr. Atkinson's email references that there have also been "extremely inappropriate things he has said to his faculty, the administration and the public." (Ex. 62, April 9, 2011 email.)

112.    Controverted in part. The question was whether she recalled anything "other than what you have already told us." (Ex. 783, Atkinson Depo, 140:8-14.)

113.    Controverted with regard to the lawyer's conclusion. The quotation from Dr. Atkinson is an accurate quotation as to <u>one</u> of the triggering events.

114.    Controverted. Dr. Carlson defined the "public" to which he was referring as the group of 8 deans and the vendor who was harassed by Dr. Klaassen. (See Defs.' Resp. to Pl.'s SOAF 158.) Dr. Klaassen acknowledges he was "acting out." (Ex. 186, April 7, 2011 Faculty Meeting.)

115.    Controverted. The cited exhibit does not establish anything about discipline for whistleblowing. Dr. Jaeschke's email sets forth his opinion that it is unhealthy for a department chair to "criticize the boss too much." (Ex. 120, April 24, 2011 email.) As acknowledged by Dr. Klaassen, the position of department chair is a "serve at the pleasure position." (Ex. 782, Klaassen Depo, 181:16-182:11.) Dr. Jaeschke worsened his opinion of Dr. Klaassen when Dr. Jaeschke became department chair and had to deal with Dr. Klaassen's threats, unprofessional conduct, and the hostile work environment that Dr. Klaassen created. (Ex. 712, Jaeschke Depo, 131:7-132:20.)

116.    Controverted in part. Dr. Klaassen circulated the PowerPoint to others. At least one of the recipients sent the PowerPoint on. (Ex. 57, April 1, 2011 letter.) The PowerPoint acknowledges that Dr. Klaassen was "acting out" and acting in his capacity as a "university professor." (Ex. 186, April 7, 2011 Faculty Meeting Presentation.)

117.    Controverted. The PowerPoint acknowledges that Dr. Klaassen was acting out and acting in his scope as a university professor. (Ex. 186, April 7, 2011 Faculty Meeting Presentation.) Dr. Klaassen acknowledges that the University's decision to establish a cancer

center, a Wichita campus, and a Salina campus are not illegal. (Ex. 709, Klaassen Depo, 143:4-16.)

118.    It is uncontroverted that the email states, "Whoa, what the heck?"

119.    Uncontroverted.

120.    Controverted in part. Falsely portraying himself as "Students for Democracy at the University of Kansas Medical Center," Dr. Klaassen circulated a document containing false information, including that Dr. Atkinson forced each of the basic science faculty to take a 50% salary cut. (Ex. 709, Klaassen Depo, 483:7-485:13.)

121.    It is uncontroverted that the Lawrence Journal-World published several opinion columns pertaining to the Medical School. It is acknowledged that one such headline inaccurately referred to Dr. Klaassen as a "Dean" and another headline inaccurately referred to him as a "whistleblower." Of course, a headline in a newspaper does not make Dr. Klaassen either a Dean or a whistleblower. To the contrary, the commentaries and attached public comments are inadmissible hearsay and inadmissible opinions of a lay witness under Fed. R. Evid. 701. *See also* Defs.' Resp. to SOAF 128, incorporated here.

122.    Controverted in part. The July 17, 2011 column did not purport to be a news article, but rather was an editorial column of Mr. Simons. It did not mention Dr. Klaassen by name, and no speech is attributed to Dr. Klaassen. There is nothing in the editorial that purports to "echo Dr. Klaassen's concerns." The commentary is inadmissible hearsay and inadmissible opinions of a lay witness under Fed. R. Evid. 701.

123.    Controverted in part. The Lawrence Journal World published such a commentary. It was not a news article. The commentary constitutes inadmissible hearsay and inadmissible opinions of a lay witness under Fed. R. Evid. 701.

124.     Controverted in part. The October 29, 2011 column did not purport to be a news article, but rather was an editorial column of Mr. Simons. Nothing in the column attributes any input to Dr. Klaassen, and no speech of Dr. Klaassen is cited. The opinions cited are attributed to the editorial writer. The commentary is inadmissible hearsay and inadmissible opinion of a lay witness under Fed. R. Evid. 701.

125.     Controverted in part. The November 5, 2011 column did not purport to be a news article, but rather was an editorial column of Mr. Simons. Nothing in the column attributes any input to Dr. Klaassen, and no speech of Dr. Klaassen is cited. The opinions cited are attributed to the editorial writer. The commentary is inadmissible hearsay and inadmissible opinion of a lay witness under Fed. R. Evid. 701.

126.     Controverted. Ex. 30 is a June 9, 2012, newspaper article that references a lawsuit filed by Dr. Klaassen in May 2012, noting that "Klaassen and his attorney asked a federal court to stop a faculty hearing scheduled for May 29." The article does not mention that the Court denied Dr. Klassen's motion for Temporary Restraining Order on May 25, 2012 and dismissed the Complaint for lack of subject matter jurisdiction on May 29, 2012. (Ex. 791, May 29, 2012 Order.) Dr. Klaassen testified that he never spoke with Andy Hyland, the author of the article. (Ex. 709, Klaassen Depo, 336:1-7.)

127.     Controverted. The June 19, 2012 column did not purport to be a news article and is clearly identified as the opinion of the columnist. While the columnist offered up his editorial opinion that Dr. Klaassen is a "whistle-blower," the editorial opinion is inadmissible hearsay. It is not based on any personal knowledge under Fed. R. Evid. 701, and he has not been identified as an expert under Fed. R. Evid. 702. In the Wyandotte County District Court case in which Dr. Klaassen alleged that he was terminated for whistle blowing, the Court correctly stated that "just

because someone calls someone a whistle blower doesn't make them a whistle blower. Like if someone called me good looking, it wouldn't make me good looking." (Ex. 792, Nov. 29, 2016 Jury Trial Transcript, Vol. I, 117:8-17.)

128.    Controverted in part. The cited text does not identify what he told Mr. Simons, when he spoke with Mr. Simons, and what documents, if any, he provided Mr. Simons. Dr. Klaassen cannot recall what he told Mr. Simons. (Ex. 709, Klaassen Depo, 142:14-16.)

129.    It is uncontroverted that Dr. Klaassen gave that testimony.

130.    It is uncontroverted for purposes of this motion only that Dr. Klaassen gave that testimony.

131.    It is uncontroverted for purposes of this motion only that Dr. Klaassen gave that testimony. The allegation that the Kansas City Star did not want to run the article is inadmissible hearsay.

132.    Controverted. Immediately after the cited testimony, Dr. Klaassen retracted it. He indicated that he could not have been discussing the NIH Grants, for example, because that hadn't happened yet. (Ex. 709, Klaassen Depo, 141:7-18.) He admitted he could not recall what he told Mr. Simons, "You think I know what I told him when I met with him six years ago or whatever it was?" (Ex. 709, Klaassen Depo, 142:14-16.)

133.    Controverted. See Defs.' Resp. to Pl.'s SOAF 132.

134.    Controverted. The question that was asked of Dr. Carlson included a reference to the Cancer Center. Dr. Carlson went on to explain that "slumlord economics was a term used when the, there was a tirade against the poor sales rep who's demonstrating equipment and was also used at least one occasion in the dean's office when the group of us were meeting with her." (Ex. 790, Carlson Depo, 48:12-22.) Dr. Klaassen intended the term to be disparaging to Dr.

Atkinson, stating a slum landlord "is a person that just takes advantage of the other people and, you know, just doesn't have any ethics." (Ex. 709, Klaassen Depo, 138:6-19.)

135.    Uncontroverted.

136.    Controverted in part. The cited quotations from Dr. Atkinson noted that she read Mr. Simons' Saturday editorials and that she expected "an even more terrible column because of the action we took on Monday." By reference, on that Monday, Dr. Klaassen had been placed on administrative leave. (Ex. 783, Atkinson Depo, 255:7-17.)

137.    Controverted. The citation references the view of a public affairs vice chancellor, not a defendant, that the editorial was "Half focused on Klaassen, the other on football, many misstatements, probably coming from Klaassen himself." (Ex. 783, Atkinson Depo, 256:19 – 257:1.)

138.    Controverted in part. Dr. Atkinson did not testify that she "knew" the source was Dr. Klaassen. She testified that she "believed the source was Dr. Klaassen."

139.    Uncontroverted that he testified to this.

140.    Controverted in part. The context of the quotation is not the reference to any editorials in the Lawrence Journal-World, but rather Dr. Klaassen's removal as Chair of the Department of Pharm/Tox, which occurred on April 5, 2011. None of the LJW editorials had been written at that time. (Ex. 790, Carlson Depo, 37:18–38:9.) Dr. Carlson said that he considered it inevitable that Dr. Klaassen would be removed as Department Chair because of Dr. Klaassen's "behavior that would be classified by virtually everyone, certainly everyone in the business world but even most people in academics where there is a much broader range, as being insubordinate; and it was only a matter of time until she couldn't take it anymore." (Ex. 790, Carlson Depo, 40:1-10.)

141.    Controverted. The testimony of Dr. Atkinson was that she was bothered by the editorials by Mr. Simons as they were very personal and hurtful and wrong. (Ex. 783, Atkinson Dep. 260:6-19.)

142.    Uncontroverted.

143.    Controverted in part. The referenced opinion pieces were editorials, not articles.

144.    Uncontroverted.

145.    Controverted. Ex. 161 is an email to the chairs of several faculty committees on April 30, 2011 correcting information that appeared in an editorial in the Lawrence Journal-World. Dr. Atkinson states, "I do not want anyone who got tenure to think they didn't deserve it. I don't know how that information got out, and now I particularly don't know whether there is anything that can be done to correct this misconception without making it worse." (Ex. 161, April 30, 2011 email.) Her testimony was, ". . . I'll tell you why I objected to this being out. The P and T committee is supposed to be absolutely confidential, and the very fact that some of the people who got tenured who actually were voted to get tenured by the committee would think that I had to overturn a negative decision would be insulting to the very best faculty we had." (Ex. 783, Atkinson Depo, 155:6-14.)

146.    Controverted. The cited language does not reference an "outcry" or "many" letters in response to the columns.

147.    Uncontroverted.

148.    Controverted in part. The question dealt with why Dr. Atkinson had not responded to a letter from a person who had written to her on behalf of Dr. Klaassen when he was removed as a department chair position in April 2011. There is no reference in the discussion to the Cancer Center or the LJW.

149.    Controverted. Dr. Atkinson testified with regard to Dr. Klaassen's removal as Department Chair that "it was not in the leadership best interest of his department to have him acting out and being abusive to people and being—just being disruptive of meetings, of research projects of people's careers, of the institution itself. It was not something that could be remedied at this stage, and it was not related to his science or his research." (Ex. 783, Atkinson Depo, 136:24-137:13.)

150.    Controverted. There is no documentation establishing which editorials Dr. Klaassen contributed to and what information, if any, he contributed, nor could Dr. Klaassen remember what information he allegedly gave. (*See* SOF 328.) The editorial opinions of Mr. Simons as set forth in his editorials speak for themselves. The editorials are inadmissible hearsay and constitute inadmissible lay opinion under Fed. R. Evid. 701.

151.    Controverted in part. The discussion dealt with Dr. Atkinson's comments about a May 3, 2011 email exchange shortly after Dr. Klaassen had been removed from his prior role as department chair. Her comments about the editorials up to that point are accurately quoted. (Ex. 1006, Atkinson Depo, 177:20-178:23; Ex. 166, May 3, 2011 email.)

152.    It is uncontroverted that Dr. Atkinson testified the editorials were misleading and hurting KU.

153.    Uncontroverted.

154.    Controverted. The statement does not identify to whom such "criticism" was made, when it was made, and the circumstances under which it was made. In terms of his communications with Mr. Simons, he testified, "You think I know exactly what I told him when I met with him six years ago or whatever it was?" (Ex. 709, Klaassen Depo, 142:14-16.)

155.    Uncontroverted.

156.    Controverted in part. Nothing about the cited material suggests that any LJW editorial "receiv[ed] significant attention." The cited testimony is that Dr. Atkinson agreed that the Promotion and Tenure Committee and the Cancer Center continued to operate. (Ex. 783, Atkinson Depo, 195:22-196:9.)

157.    Uncontroverted.

158.    Controverted. Dr. Carlson indicated that prior to Dr. Klaassen's termination as chair of Pharm/Tox, in meetings with the group of eight basic science chairs, Dr. Klaassen was "unable to control his emotions and his temper and the dean couldn't defuse it." In response to a question of the source of this anger, Dr. Carlson said, "I'm not entirely sure. It mostly had to do with finances and the Cancer Center." (Ex. 790, Carlson Depo, 41:11-13.) Dr. Carlson said the "public" to which he was referring was the group of eight (all KUMC faculty) and the meeting with the sales vendor where "Curtis made all sorts of accusations to a poor helpless sales rep and would not stop." (Ex. 790, Carlson Depo, 42:22–43:3.)

159.    Controverted. To suggest that KUMC thought anything is inaccurate. The communication dealt with several individuals who may have provided the information, one of whom was Dr. Klaassen. (Ex. 783, Atkinson Depo, 229:3-25.)

160.    Controverted in part. Dr. Carlson defined the "public" to which he was referring as the group of 8 deans and the vendor who was harassed by Dr. Klaassen. (See Defs.' Resp. to SOAF 158.)

161.    Controverted in part. Dr. Atkinson stated the editorials did not have an effect on what she did or the decisions she made and that the executive team didn't do its jobs differently.

162.    Controverted in part. Dr. Klaassen was a chair of one of the basic sciences departments. His contention was that dollars should not go to other areas of campus, but rather

should be spent on the basic sciences and his department. His contention was that dollars should be spent in his area rather than those. (See Defs.' Resp. to SOAF 99, 105, 106.)

163.   Defendants incorporate their response to SOAF 162.

164.   Controverted in part. The discussion on these pages had to do with Dr. Carlson's opinion of the decision to remove Dr. Klaassen as department chair. Dr. Carlson's testimony is about how Dr. Klaassen was unable to control his emotions and his temper and how Dean Atkinson was unable to defuse that anger. Dr. Carlson was not the decision maker in removing Dr. Klaassen as Chair of the Department. Moreover, Dr. Carlson did not reference a "punishment." (Ex. 1022, Carlson Depo, 22:9-10.)

165.   Controverted. The referenced April 10, 2011 email was the view of one faculty member as an "outsider" with regard to the just-completed removal of Dr. Klaassen as department chair. Dr. Weinman recognized his "limited perspective on the issues" and stated, "I understand the many issues you are required to consider and respect your judgment." (Ex. 159, April 10, 2011 email.) Dr. Weinman's email also stated that Dr. Klaassen was emotional and could have counter-productive outbursts. (Ex. 159, April 10, 2011 email.)

166.   Defendants incorporate their response to SOAF 165.

167.   It is uncontroverted that several faculty members – including several who are named defendants here – initially wrote a letter in support of Dr. Klaassen remaining as Department Chair on April 11, 2011. However, these opinions about Dr. Klaassen changed following Dr. Klaassen's removal as Chair. Dr. Jaeschke testified that "the hostile work environment got increasingly bad in the department." (Ex. 712, Jaeschke Depo, 130:25–132:20.)

168.   Defendants incorporate their response to SOAF 167.

169.    Controverted. An emeritus faculty member testified on behalf of Dr. Klaassen at the first ad hoc hearing. While supporting Dr. Klaassen, the professor recognized, "I was aware of the fact that Curt's behavior during the time after he was dismissed by Barbara as the chair of our department that he was very upset and very angry." (Ex. 714, May 29, 2012 hearing, 280:21–281:9). The professor went on to say that he had counseled Dr. Klaassen because of his concern about Dr. Klaassen's emotions. He testified that Dr. Klaassen didn't follow his advice. (Ex. 714, May 29, 2012 Hearing Transcript, 285:18–286:15.)

170.    Controverted in part. While it is true that Drs. Copple, Liu, Robertson and Guo left KU, the implication that they left in protest is inaccurate. In the October 28, 2011 PowerPoint, Dr. Klaassen notes that Dr. Copple did not trust him. (Ex. 187, Oct. 28, 2011 PowerPoint.) Dr. Klaassen had issues with Dr. Copple. (Ex. 173, Nov. 30, 2016 Jury Trial transcript, Vol. II, 117:14–118:2.) Dr. Copple took a position at Michigan State University. (Ex. 793, Dec. 1, 2016 Jury Trial transcript, Vol. III, 130:4-15.) Dr. Copple made a report about his concerns that Dr. Klaassen was misspending funds. (Ex. 784, Dec. 9, 2016 Jury Trial transcript, Vol. IX, 70:11-13.) Dr. Copple did not leave because Dr. Klaassen was removed as department chair. (Ex. 780, Dec. 7, 2016 Jury Trial transcript, Vol. VII, 115:3-13.) Dr. Klaassen testified that Dr. Robertson was "part of the mobbing group" against him. (Ex. 784, Dec. 9, 2016 Jury Trial transcript, Vol. IX, 183:15-16.)

171.    Defendants incorporate their response to SOAF 170.

172.    Controverted. Nothing about the citation supports plaintiff's argumentative assertion that the decision to remove Dr. Klaassen as Department Chair was "arbitrary." Dr. Carlson was not a member of the Pharm/Tox Department until he served as Interim Chair from April 2011 until January 9, 2012 (SOF 35).

173.    Controverted. Mr. Tully was a Management Analyst II from Fall 2008 until August 2011. Up until April 6, 2011, he reported to Dr. Klaassen and was assigned by Dr. Klaassen to the intra-departmental administration of the post-award portion of a grant award. (Ex. 793, Dec. 1, 2016 Jury Trial transcript, Vol. III, 38:17–39:14.) Dr. Terranova testified, "So, the PI proposes the budget. The Research Institute goes over and approves the budget and says this fits within the guidelines, the percent efforts for each faculty member, et cetera. So, a whole legal and financial process occurs before the grant is submitted. The grant is then submitted electronically to the NIH." (Ex. 786, Terranova Depo, 114:17-25.)

174.    Controverted only as to the terminology. At various points in time, Mr. Tully's salary or portions of it, were allocated to the COBRE Grant.

175.    Controverted only as to the lack of identification of the dates of Ms. Meagher's role within the departments. She left the Pharm/Tox Department on August 28, 2011 to take a position in another department. (Ex. 780, Dec. 7, 2016 Jury Trial transcript, Vol. VII, 116:24–117:7.)

176.    Uncontroverted.

177.    It is uncontroverted that Dr. Klaassen remained as the PI of the COBRE Grant and Training Grant for several months after he was no longer Department Chair.

178.    Uncontroverted.

179.    Uncontroverted.

180.    Uncontroverted.

181.    Uncontroverted.

182.    Controverted to the extent that it suggests that Dr. Klaassen was solely responsible for hiring staff. Such hiring within a department involves departmental money and

department commitments, so the hiring of faculty is subject to the approval of others, including the department chair. (Ex. 793, Dec. 1, 2016 Jury Trial transcript, Vol. III, 64:8-65:6; 195:25–197:4.)

183.   Controverted. None of the citations support the allegation. Nor is the allegation limited in time to the period in which Dr. Klaassen served as both Department Chair and PI under both COBRE and Training Grants. Defendants incorporate their response to SOAF 182.

184.   Controverted and objection. This argumentative statement is inaccurate, unlimited as to time, lacks specificity and is not cited to any admissible evidence. Defendants incorporate their response to SOAF 185 – 208.

185.   Controverted. The email is addressed to "Dr. Herr Professor Chairmen Carlson." This insulting salutation came one day after Dr. Klaassen told Dr. Carlson that Dr. Carlson should serve only as the "titular" head. (Ex. 109, Apr. 8, 2011 email chain; Ex. 704, Carlson Depo, 112:23-113:5.)

186.   Controverted. Dr. Carlson responded to the confusing and insulting email as set forth in Ex. 109.

187.   Controverted in part. There is no dispute that Ms. Meagher was copied on Ex. 306 and that Dr. Carlson was copied on Ex. 307. Dr. Klaassen does not identify the reason he sent the copies in the body of the email.

188.   Controverted in part. There is no dispute that Tully and Meagher worked for the Department. They reported to Dr. Carlson until Ms. Meagher left the Department in August 2011. (Ex. 780, Dec. 7, 2016 Jury Trial Transcript, Vol. VII, Meagher testimony, 116:15-23.)

189.   Controverted in part. The guidance referenced "if you think anything is crossing the line." (Ex. 308, May 19, 2011 email.)

190.   Controverted in part. Mr. Tully's note says, "Since he couldn't ask nicely in an email, nor in person . . ." (Ex. 389, May 22, 2011 email.)

191.   It is uncontroverted that Ex. 309 is an email from Dr. Klaassen to Dr. Carlson about vacation and the COBRE Grant.

192.   Controverted. Ex. 312 is a response from Dr. Carlson to Dr. Klaassen's email.

193.   Controverted. Dr. Klaassen's request received a response from Dr. Carlson. (Ex. 312, June 8, 2011 email.)

194.   It is uncontroverted that faculty offices in the Pharm/Tox department were re-keyed in June 2011 and that Dr. Klaassen was out of town at that time.

195.   Uncontroverted.

196.   Controverted in part. Dr. Carlson responded and quoted Sarte and questioned Dr. Klaassen's intentions. Dr. Carlson didn't mock Dr. Klaassen.

197.   Controverted. There is nothing about the email exchange in Ex. 318 that supports that Dr. Klaassen received no assistance.

198.   Controverted in part. The circulation of the email was internal to the Pharm/Tox Department.

199.   It is uncontroverted that Dr. Carlson responded as set forth in the email, including, "I haven't responded with emotion to a single one of his previous missiles, but this nonsense has gone on long enough."

200.   It is uncontroverted that Dr. Carlson was dealing with a "long-winded and misguided" email from Dr. Klaassen and expressed his intent that "reason prevail."

201.   Uncontroverted.

202.    It is uncontroverted that Ms. Meagher used the word "Dictator." The remainder of the allegation is not supported by the cited testimony.

203.    Controverted. The email correspondence cited makes no reference to the comment, "Despite Carlson's attempt to provoke Klaassen."

204.    Controverted. The conclusion that Dr. Carlson "mocked" Dr. Klaassen is not a factual statement and is not supported by the cited testimony.

205.    Uncontroverted.

206.    Controverted. Ms. Meagher's email as of 4:29 p.m. provided the requested information. The reference to Dr. Klaassen as an "....!!!" was not in an email to Dr. Klaassen.

207.    Uncontroverted.

208.    Controverted in part. Ms. Meagher discussed how Dr. Klaassen would "grind us" and that "he was not a very pleasant person."

209.    It is uncontroverted that an editorial appeared in the Lawrence Journal-World on July 17, 2011. The editorial is inadmissible hearsay and inadmissible lay opinion under Fed. R. Evid. 701.

210.    It is uncontroverted that Ex. 317 is a copy of an email involving Ms. Knoll and Dr. Atkinson. The word "damn" is used by Ms. Knoll but not in the context suggested in this fact.

211.    Controverted. The purported factual statement simply cites to arguments written by Dr. Klaassen's counsel and not to factual statements. There is no cited support for any of the contentions. Four faculty committees found that Dr. Klaassen engaged in unprofessional behavior. (SOF 132.) The faculty committees supported the decision to remove him as the PI of the COBRE and Training Grants, moving to the Internal Medicine Department and moving from

34

a lab in the Pharm/Tox Department to a lab in the Internal Medicine Department. (Ex. 18, May 31, 2012 Committee Hearing decision, Ex. 638, Dec. 9, 2013 Committee Hearing decision; Ex. 609, Dec. 5, 2014 Committee Hearing decision; Ex. 610, April 8, 2016 Committee Hearing decision.) These decisions were upheld in the Wyandotte County District Court. (Ex. 761, Nov. 29, 2016 Order.)

212.    Controverted. The email does not mention removing Dr. Klaassen as PI on the Training Grant. The email refers to Dr. Carlson's initiative to "get the PT training grant advisory committee actually involved in the training grant's administration." (Ex. 73A, Aug. 8, 2011 email.)

213.    It is uncontroverted that Dr. Terranova referenced the removal of Dr. Klaassen as the PI on the COBRE grant by email dated September 2, 2011. (Ex. 74, Sept. 2, 2011 email.)

214.    Uncontroverted.

215.    Controverted. The only citation for the alleged fact is to a privilege log. Such conclusions cannot be reached from a privilege log. There is nothing in the cited testimony that supports the assertion that there was an attempt to find legal justification to remove Dr. Klaassen as PI. The cited testimony of Dr. Terranova relates to the location of Dr. Klaassen's relocated lab.

216.    Controverted in part. The only purported citation for the alleged fact is the citation to a privilege log. Dr. Terranova testified that nothing of substance was found.

217.    Controverted. The statement that there was "retaliation" is an improper argument. Dr. Guo's testimony that "people came to my office and told me everything bad about Klaassen" is inadmissible hearsay from unnamed sources. Moreover, it does not demonstrate retaliation or that anything any of these unnamed individuals said was inaccurate.

35

218.    Uncontroverted that there was an article pertaining to the Internal Medicine pass rate.

219.    It is uncontroverted that Dr. Klaassen was considered one of the possible sources.

220.    Controverted in part. In the exhibit Dr. Stites states, "this does make me think Curt, but he must have sources of his own." (Ex. 169, Sept. 19, 2011 email.)

221.    Controverted in part. There is discussion about the timing of a change in PI, but the words "time is of the essence" do not appear. (Ex. 76, Oct. 6, 2011 email.)

222.    Controverted in part. Dr. Carlson described the "nightmare" created by Dr. Klaassen and encouraged the removal of Dr. Klaassen as PI "as soon as possible." (Ex. 77, Oct. 14, 2011 email.) There is no discussion of a "basement." Dr. Carlson suggested that moving Dr. Klaassen to a new lab should be done in conjunction with changing out the PI on the two institutional grants so that these issues could all be handled at one time. (Ex. 77, Oct. 14, 2011 email.)

223.    Controverted in part. Dr. Jaeschke is discussed in the email, but he is not an author or recipient of it.

224.    Uncontroverted. Dr. Terranova testified that a planning process is necessary when changing the PI on a grant and appointing a new Department Chair. (Ex. 713, Nov. 30, 2016 Jury Trial transcript, Vol. II, Terranova testimony, 92:23–93:16.)

225.    Uncontroverted.

226.    Controverted. Dr. Klaassen called a meeting that day that was purported to be a "COBRE" meeting. In it, he engaged in insubordinate behavior, including saying that the department chair was a "Ford chair trying to be a Mercedes chair – major conflict of interest." Also referring to interim chair Dr. Carlson in a PowerPoint, Dr. Klaassen wrote, "Gerald is doing

everything he can to destroy the department. (Ex. 187, Oct. 28, 2011 PowerPoint.) Dr. Jaeschke described that this meeting included a number of individuals not associated with the COBRE grant, wasn't focused on the COBRE grant, and deteriorated very quickly. (Ex. 712, Jaeschke Depo, 53:13-58:11.)

227.    Controverted. The cited testimony begins at p. 255, line 11, and relates to Dr. Klaassen's contention that Cody Tully is part of a mob. Dr. Klaassen did testify in that context regarding money spent on the centrifuge. (Ex. 782, Klaassen Depo, 255:11-257:24.)

228.    Controverted. Nothing about Dr. Klaassen's testimony offering his opinion that Mr. Tully is a part of a mob establishes that there has been any finding or conclusion by anyone that there was a violation of NIH policies. Dr. Klaassen acknowledges that the NIH funds are federal dollars (Ex. 782, Klaassen Depo, 32:1-8.) He never complained to any governmental agency about the alleged misuse of such funds. (Ex. 782, Klaassen Depo, 33:4-34:3.) He never identified any experts to offer an opinion that such expenditures are improper. He never cited to any language in any grant or in any NIH regulation supporting his conclusion. The Wyandotte County District found that Dr. Klaassen did not have a good faith belief that any wrongdoing with regard to the NIH grants has occurred. (SOF 426.)

229.    Controverted. Dr. Klaassen gave conclusory opinions that he was "being stonewalled." These opinions are not factual but rather are conclusory opinions. In his unsuccessful state court trial dealing with the grants, he did not offer any experts or any evidence of a violation of any federal law. A directed verdict was granted in favor of the University. (SOF 424.)

230.    Controverted. The reference to these being "Klaassen's" grants is inaccurate. The grants belong to the University (See Exhibits 13 and 14.) Following the appointment of Dr.

Carlson as interim department chair, Tully was changed to an administrative officer, and none of his salary was allocated to COBRE funds. (Ex. 794, Tully Depo, 34:19-24.)

231.     It is uncontroverted that a columnist in the Lawrence Journal-World published a column with the stated title on October 29, 2011. The column is inadmissible hearsay and inadmissible opinion evidence under Fed. R. Evid. 701.

232.     It is uncontroverted that the column is based on hearsay from alleged "leaks" at KUMC stating that the columnist "understood" the evaluation to be "shockingly bad." The hearsay description by a newspaper columnist does not establish the truth of the assertion. It is uncontroverted that Dr. Klaassen is mentioned in the column. (Ex. 81, Oct. 29, 2011 LJW article.) The columnist offers inadmissible opinion testimony under Fed. R. Evid. 701.

233.     Controverted in part. No language is cited in which Dr. Atkinson says she is upset. There were internal emails about whether to submit a response. (Ex. 172, Oct. 29, 2011 email.)

234.     Controverted. Dr. Klaassen was placed on administrative leave on November 1, 2011. Dr. Atkinson described that people were "frightened of Dr. Klaassen at that point in time." (Exhibit 84, Nov. 1, 2011 Administrative Leave letter; Ex. 702, Atkinson Depo, 246:18-22.) Dr. Terranova's answer that is cited there sought an opportunity to look at his notes. Ex. 84 identifies the reasons Dr. Klaassen was placed on administrative leave.

235.     It is uncontroverted that this was the testimony of Dr. Klaassen.

236.     Controverted. The letter describes that Dr. Klaassen "is hereby placed on administrative leave." Dr. Klaassen was advised that his leave was a paid leave and that he was not to be on campus except for specified circumstances. (Ex. 84, Nov. 1, 2011 Administrative Leave letter.)

237.    Controverted. Dr. Klaassen's administrative leave was not a disciplinary sanction, and no prior administrative hearing was required. Dr. Klaassen was advised that this was an administrative leave (Ex. 84, Nov. 1, 2011 Administrative Leave letter), and that this was not a disciplinary sanction (Ex. 203, May 20, 2013 email).

238.    Controverted. The cited page includes several elements of the due process to be accorded to faculty. Dr. Klaassen's purported factual statement does not quote from any of them. (Pl.'s Ex. 209, Faculty Handbook, p. 92.) Administrative leave is not a disciplinary sanction. (Ex. 203, May 20, 2013 email.) Defendants incorporate their response to SOAF 237.

239.    Controverted in part. Dr. Rawitch wrote to Dr. Klaassen and advised him that administrative leave is not a disciplinary sanction. He noted that administrative leave with pay is not an adverse personnel action and is within the inherent authority of the administration. This is consistent with the Board of Regents policy on Interference with Conduct of Institution, Section II(G)(17). (Ex. 203, May 20, 2013 email; Ex. 732, Board of Regents Policy.)

240.    Controverted in part. While the Handbook does identify suspensions with pay and suspensions without pay, Dr. Klaassen did not receive either. He was placed on administrative leave with pay, which is not an adverse personnel action and is within the inherent authority of the administration. This is consistent with the Board of Regents policy on Interference with Conduct of Institution, Section II(G)(17). (Ex. 203, May 20, 2013 email; Ex. 732, Board of Regents Policy.)

241.    Controverted. While Dr. Rawitch did provide the cited testimony, he was distinguishing between suspensions as described in the Faculty Handbook. Dr. Klaassen was not suspended. Rather, Dr. Klaassen was placed on administrative leave with pay, which is not an adverse personnel action and is within the inherent authority of the administration. This is

consistent with the Board of Regents policy on Interference with Conduct of Institution, Section II(G)(17). (Ex. 203, May 20, 2013 email; Ex. 732, Board of Regents Policy.)

242.    Controverted in part. While the University followed its own Faculty Handbook, the cited testimony of Dr. Rawitch does not support the conclusion that Dr. Klaassen submits. The Handbook, as approved by the Faculty, includes the following: "The University reserves the right to expand upon, alter, amend, or delete any provisions contained herein as may be deemed necessary or appropriate by the administration. Accordingly, the policies described in this handbook are not intended to create a contract between the University of Kansas and its employees…" (Pl.'s Ex. 209, Faculty Handbook, p. 17.)

243.    Defendants incorporate their response to SOAF 242.

244.    Controverted. Dr. Klaassen was placed on administrative leave with pay, which is not a disciplinary sanction. (Ex. 84, Nov. 1, 2011 Administrative Leave letter; Ex. 203, May 20, 2013 email.)

245.    Controverted. Exhibit 84 indicates that Dr. Klaassen should remain off campus during the administrative leave, but it does not include the other references in this alleged statement of fact. (Ex. 84, Nov. 1, 2011 Administrative Leave letter.)

246.    Controverted in part. Dr. Klaassen was on administrative leave on November 5, 2011. Dr. Rawitch began working on the preliminary inquiry on November 15, 2011. (Ex. 196, Jan. 31, 2012 Inquiry Report; Ex. 203, May 20, 2013 email.)

247.    It is uncontroverted that a column pertaining to KUMC appeared in the Lawrence Journal-World on November 5, 2011. The column constitutes inadmissible hearsay and the opinions of the author are not admissible under Fed. R. Evid. 701.

248.    Controverted. While it is accurate that the communication between Dr. Terranova and Dr. Rawitch occurred on November 15, 2011, there is no support for Dr. Klaassen's contention that the timing violated any policy. Dr. Klaassen simply cites to his counsel's arguments as support for the assertion.

249.    Controverted in part. Dr. Rawitch conducted an inquiry and found reasonable grounds to believe that Dr. Klaassen engaged in misconduct warranting further investigation by a faculty ad hoc hearing committee. (Ex. 196, Jan. 31, 2012 Inquiry Report.)

250.    Controverted. The letter of November 1, 2011, makes clear that during his administrative leave, KUMC would determine the direction of all programs he directs at KUMC and would include consultation with the NIH. (Ex. 84, Nov. 1, 2011 Administrative Leave letter.)

251.    Controverted. The letter of November 1, 2011, makes clear that during his administrative leave, KUMC would determine the direction of all programs he directs at KUMC and would include consultation with the NIH. (Ex. 84, Nov. 1, 2011 Administrative Leave letter.)

252.    Controverted in part. The letter was on behalf of the KUMCRI and signed by Dr. Kopf as Associate Vice Chancellor for Research Administration and Dr. Hagenbuch as Professor of Pharmacology. The change in PI on each of the grants at issue was approved by the NIH. (Ex. 89, Dec. 15, 2011 Notice of Award revised grant; Ex. 715, Notice of Award.)

253.    Controverted in part. The letter was on behalf of the KUMCRI and signed by Dr. Kopf as Associate Vice Chancellor for Research Administration and Dr. Jaeschke as Professor of Pharmacology. The change in PI was approved by the NIH. (SOF 378). Dr. Jaeschke agreed to serve in that role.

254.    Uncontroverted.

255.    Controverted. No charges were "trumped up." To the contrary, four faculty committees unanimously found that Dr. Klaassen engaged in unprofessional behavior. (SOF 133.) Consistent with the Faculty Handbook, an Inquiry Report was prepared and provided to Dr. Klaassen. The report was 145 pages long and addressed multiple issues. It concluded that there were reasonable grounds to warrant further investigation by an Ad Hoc Hearing Committee. (Ex. 196, Jan. 31, 2012 Inquiry Report.) The KJRA Court has found substantial evidence in support of the University. (SOF 325.)

256.    It is uncontroverted that the attached slides were among numerous examples of inappropriate conduct cited as reasonable grounds to warrant further investigation by an Ad Hoc Hearing Committee. (Ex. 196, Jan. 31, 2012 Inquiry Report.)

257.    Uncontroverted.

258.    Controverted. It is correct that a number of individuals were interviewed. The interviews were not "testimony." The cited statements during the interviews are accurate representations of portions of the interview tapes. There was extensive information that Dr. Rawitch found upon his investigation. Based on that information, he concluded that there were reasonable grounds to warrant further investigation by an Ad Hoc Hearing Committee (Ex. 196, Jan. 31, 2012 Inquiry Report.)

259.    It is uncontroverted that Dr. McCarson's interview included the comment that Dr. Klaassen's behavior is not new and that Dr. Klaassen was "very agitated" after Dr. Atkinson released him of the chairmanship. Dr. McCarson described that he has seen Dr. Klaassen throw Coke cans and pens across the room. He described that Dr. Klaassen has a propensity for

"bullying in faculty meetings and, in interactions with faculty, raising his voice. He often, will …

beat on the table." (Pl.'s Ex. 1028, Audio Recording Transcript, 4:17-5:22.)

260.    It is uncontroverted that Dr. Klein responded to the interview question about whether there is anything else the interviewer should know about beyond what he had previously mentioned with the quoted comments.

261.    Dr. Klein appeared without objection in his role as associate dean for professional development faculty affairs. (Ex. 714, May 29, 2012 Hearing Transcript, 7:1-17.)

262.    Controverted and argumentative. Exhibit 196, which speaks for itself, sets forth the conclusion that there is a reasonable basis for further investigation by the Ad Hoc Hearing Committee. (Ex. 196, Jan. 31, 2012 Inquiry Report.)

263.    Uncontroverted.

264.    Controverted. The language that, "With the transfer of the T-32 grant complete…" is argumentative. The sole cited support, Ex. 88, is the letter to the NIH requesting a change of the PI.

265.    Controverted. Ex. 327 is a part of an email exchange after Dr. Klaassen returned from administrative leave. In the email exchange, Dr. Terranova states, "I have an explanation in a note to you (see attached) and the documentation associated with the explanation. Feel free to correspond with me through email." (Ex. 327, Aug. 9, 2011 Courtesy Appointment letter.)

266.    Controverted. Exhibit 87 is an email notifying Dr. Klaassen about the change in PI on the T-32 and COBRE grants, but it does not reference any request by Dr. Klaassen for a meeting. (Ex. 87, Dec. 16, 2011 email.)

267.    Controverted in part. On November 1, 2011, Dr. Terranova advised Dr. Klaassen that while he was on leave, "KUMC administration will decide the future direction and

continuation of all programs that you direct at KUMC. This determination will include consultation with appropriate faculty, other administrators at KUMC, and the NIH." (Ex. 84, Nov. 1, 2011 Administrative Leave letter.)

268.    Controverted in part. Dr. Atkinson indicated that she did not recall if she saw the referenced email and that she does not recall what she thought at the time. (Ex. 783, Atkinson Depo, 227:7-23.)

269.    Controverted. The NIH provided KUMC with a Notice of Award dated December 16, 2011 identifying Dr. Jaeschke as the principal investigator of the COBRE Grant. (Ex. 715, Notice of Award.)

270.    Controverted. This is a legal argument by plaintiff's counsel and not a factual statement. Administrative leave is not an adverse personnel action. (Ex. 203, May 20, 2013 email.)

271.    Controverted in part. Dr. Klaassen's behavior had been considered intolerable in the Department of Pharmacology, and he had been insubordinate and threatening to the interim chair, Dr. Carlson, and the applicant for the permanent chair (Defs.' SOF 14, 15, 16, 21, 22, 23, 24, 26.) As a result, Dr. Klaassen was reassigned to Internal Medicine, where Dr. Atkinson believed Dr. Klaassen would be a good fit. (Ex. 702, Atkinson Depo, 280:15-281:5.)

272.    It is uncontroverted that the decision was made to move Dr. Klaassen to Internal Medicine.

273.    Controverted. The transfer was effective in January 2012. Certain administrative paperwork associated with the change did not occur until later. Exhibit 329 indicates that Dr. Klaassen maintained a title of "Adjunct Faculty member in P&T" and clarified that "any future

communication with the P&T dept (specifically, with Dr. Jaeschke, Cody Tully, and secretaries) will occur through the IM Research Office (Brenda/Dr. Dawn)."

274.    Controverted. Nothing about the cited quote supports any of the statements other than that there was a decision made to move Dr. Klaassen to the Hixson building. (Ex. 714, May 2012 Hearing Transcript, 77:11-78:8.)

275.    Controverted. The Hixson building had been recently renovated and was just across the street from his prior lab space. (Ex. 702, Atkinson Depo, 284:20-285:1.)

276.    Controverted. As of December 16, 2011, Dr. Klaassen was no longer the Principal Investigator on either the Training Grant or the COBRE Grant. (Ex. 89, Dec. 15, 2011 Notice of Award; Ex. 715, Notice of Award.)

277.    Controverted. As of December 16, 2011, Dr. Klaassen was no longer the Principal Investigator on either the Training Grant or the COBRE Grant. (Ex. 89; Dec. 15, 2011 Notice of Award revised grant; Ex. 715, Notice of Award.) The COBRE and the Training Grant were the subject of a jury trial in the State case. Dr. Klaassen presented no evidence of a violation of any NIH rules or regulations. (Ex. 757, Dec. 15, 2016 Judge's rulings.)

278.    It is uncontroverted that this was stated by some of the lab members.

279.    It is uncontroverted that Dr. Klaassen did not charge for these core services when he was the PI of the COBRE Grant. However, he acknowledged that the NIH requires there to be charges in order to show the grant is part of a self-sustaining core by year 11 of the grant. Other cores on campus bill for their services. (Ex. 787, Klaassen Depo, 504:9-505:5; Ex. 193, Grant Overview.)

280.    Uncontroverted.

281.    Controverted. The purported factual statement does not accurately characterize the conversation. For example, it was discussed that the mass spectrometer was currently broken and that there would need to be a charge associated with that. (Ex. 789, Jaeschke Depo, 135:14-24.)

282.    Controverted in part. Dr. Jaeschke testified that as the PI of the COBRE grant, he was tasked with transitioning the COBRE grant in the direction that it can be sustained, and one of the ways to sustain the COBRE grant and similar core facilities is to charge fees to users. (Ex. 712, Jaeschke Depo, 86:21-87:13.) The University could not get to a path to full sustainability unless it charged for the mass spectrometer because it was the most expensive equipment to maintain. (Ex. 789, Jaeschke Dep. pp. 136:17-138:7.) The Pharm/Tox Department continues to charge for the use of the mass spectrometer today. (SOF 395.)

283.    It is uncontroverted that Exhibit 127 is a letter addressed to certain administrators and others. It is controverted that the "administration refused to assist the students." No factual support is provided for that allegation.

284.    Controverted in part. Dr. Jaeschke testified that the letter was addressed to Dr. Stites, and "it was dealt with in some manner." (Ex. 367, Nov. 2013 Hearing, 220:13-21.)

285.    Controverted. The questions and answers on the cited pages do not address the issues cited in this factual statement. (Ex. 367, Nov. 2013 Hearing, 173-174.) Dr. Stites testified, "We tried to see if that would stop, and at the end said we would have to pay whatever to support the students." (Ex. 367, Nov. 2013 Hearing, 174:10-13.)

286.    Controverted. There are no documents cited, no affidavits, and no sworn testimony to support the argumentative conclusion that KUMC did not care about the "students." This declaration is unable to address the mindset of "Stites and the KUMC administration."

287.    Controverted in part. At a time when Dr. Klaassen's behavior was considered intolerable (Ex. 795, Dec. 6, 2016 Jury Trial, Vol. VI, Girod testimony, 108:8-16.), Dr. Jaeschke heard the term used and used it himself. (Ex. 780, Dec. 7, 2016 Jury Trial Transcript, Vol. VII, Jaeschke testimony, 226:14-24.)

288.    Controverted. The email from Dr. Klaassen to Dr. Dawn is dated September 23, 2012. (Ex. 353, Sept. 23, 2012 email.) As of December 16, 2011, Dr. Klaassen was no longer the PI on either the Training Grant or the COBRE Grant. (Ex. 89, Dec. 15, 2011 Notice of Award revised grant; Ex. 715, COBRE Notice of Award.) Nothing about the email from Dr. Klaassen establishes such a conclusion.

289.    Controverted. The purported factual statement ignores the testimony of Dr. Terranova as to the role KUMCRI plays. Dr. Terranova testified, "So, the PI proposes the budget. The Research Institute goes over and approves the budget and says this fits within the guidelines, the percent efforts for each faculty member, et cetera. So, a whole legal and financial process occurs before the grant is submitted. The grant is then submitted electronically to the NIH." (Ex. 786, Terranova Depo, 114:17-25.)

290.    Controverted. The grant application is submitted on behalf of an applicant organization. There is a signature of an official (not the PI) on behalf of the applicant organization. There is a proposed budget submitted as part of the application. By way of example, the application for the COBRE grant identifies the role of an External Advisory Committee (p. 123) and an Internal Advisory Committee (p. 122). (Ex. 13, COBRE Grant.) The NIH regulations, the grant application, and the notice of award direct how money can be spent by the University on the grant. The PI is designated by the University and is responsible to the University. There is flexibility in a grant, including re-budgeting, sending money back to the

NIH, carryover, and other options. (Ex. 786, Terranova Depo, 113:17-116:22; Ex. 752, NIH Grants Policy Statement.) Dr. Terranova testified, "So, the PI proposes the budget. The Research Institute goes over and approves the budget and says this fits within the guidelines, the percent efforts for each faculty member, et cetera. So, a whole legal and financial process occurs before the grant is submitted. The grant is then submitted electronically to the NIH." (Ex. 786, Terranova Depo, 114:17-25.) After an 11-day trial, the State Court found that "nothing the University of Kansas did was wrong" with respect to the use of the grant funds. (SOF 425.)

291.    Controverted in part. Dr. Klaassen wrote a lengthy email to Dr. Stites on a wide range of topics.

292.    Controverted. Nothing about Dr. Stites's response indicates a refusal to help. Dr. Stites stated, "As I told you when you were assigned to Internal Medicine, and as I reiterated when we have met, you have been a successful member of the KUMC faculty. You have been presented an opportunity for a fresh start. Buddhadeb Dawn has been working with you to address issues related to your ongoing (and vital) research efforts. He will continue to do so." (Ex. 351, Aug. 1, 2012 email.)

293.    Controverted. Nothing about Ex. 293 or the cited testimony demonstrates the matters asserted. The COBRE and Training Grants were institutional grants, and those grants continued for the purposes they were intended. These were not RO1 grants.

294.    Controverted. Nothing about Ex. 293 or the cited testimony demonstrates the matters asserted. The COBRE and Training Grants were institutional grants, and those grants continued for the purposes they were intended.

295.    Controverted. Nothing about Ex. 357 establishes any of the facts asserted.

296.    Controverted. Nothing about Ex. 357 establishes that the removal of Dr. Klaassen from any grants was the cause.

297.    Controverted. The statements associated with the paragraph are arguments and not factual assertions. Defendants incorporate their response to SOAF 13, 85-86, 293-296.

298.    It is uncontroverted that an ad hoc hearing committee was convened on May 29, 2012. Dr. Klaassen and the University appeared by counsel and there was an ad hoc hearing committee present. (Ex. 714, May 29, 2012 Hearing Transcript.) The Hearing Committee issued its recommendation and noted in a letter addressed to Dr. Rawitch, "The hearing lasted approximately seven hours. The Committee heard from nine witnesses, including one who appeared by phone. The Committee received and reviewed hundreds of pages of exhibits, including the inquiry report you prepared (and its appendices), approximately 234 exhibits provided by Dr. Klaassen, and 24 exhibits submitted by KUMC Administration." (Ex. 18, May 31, 2012 Ad Hoc Committee conclusions.)

299.    Uncontroverted.

300.    Controverted. There is no citation to any financial mismanagement by KUMC. The committee's findings as to Dr. Klaassen's "Disruptive and Unprofessional Behavior" are set forth in the Findings as follows:

> As stated above, the Committee unanimously finds that Dr. Klaassen has engaged in unprofessional conduct during meetings with people from both inside and outside the University. The Committee condemns Dr. Klaassen's conduct. His behavior towards colleagues and subordinates was unprofessional, abusive, disruptive, and unacceptable. Some colleagues and staff quite reasonably felt threatened and intimidated as a result of his actions.
>
> The Committee was troubled by Dr. Klaassen's testimony. His testimony revealed that he is blind to his own behavior and its impact, and that despite the events leading up to and even including the hearing in this matter, he remains largely in denial. His conduct substantially interfered with proper University operations and particularly disrupted the Department. Most importantly, it has harmed those he

49

claims to care about most – his students and postdoctoral fellows. He expressed no remorse and demonstrated no sense of responsibility for bringing these actions upon himself. Dr. Klaassen's blindness to these facts damaged his credibility in the eyes of the Committee.

KUMC Administration, however, is not blameless in these events, and it bears some responsibility for the handling of this matter. Dr. Klaassen's conduct was tolerated for too long. Administration appeared indifferent to the obligations under Dr. Klaassen's research grants when extending his administrative leave, potentially jeopardizing his research, his relationship with the NIH, and the productivity of his students. Decisions were not properly coordinated or timely and effectively communicated.

(Ex. 18, May 31, 2012 Ad Hoc Committee conclusions.)

301.    Controverted. Exhibit 1034 deals with the following individuals only:

1.    Cody Tully
2.    Rosa Meagher
3.    Kenneth McCarson
4.    Beth Levant
5.    Hartmut Jaeschke
6.    Bruno Hagenbuch
7.    Greg Reed

The witnesses on behalf of the University at the May 29, 2012 ad hoc hearing were:

1.    Beth Levant (by deposition)
2.    Allen Rawitch
3.    Paul Terranova
4.    Kenneth McCarson
5.    Gerald Carlson
6.    Hartmut Jaeschke
7.    Rosa Meagher

(Ex. 18, May 31, 2012 Ad Hoc Committee conclusions.)

Accordingly, Dr. Klaassen's statement includes Cody Tully (not a witness at that hearing), Dr. Hagenbuch (not a witness at that hearing), and Dr. Reed (not a witness at that hearing). There is no reference to Drs. Rawitch, Terranova or Carlson, all of whom where witnesses at the hearing.

In 2011, Mr. Tully was promoted and Ms. Meagher took a new position and negotiated a salary increase well before there was an Inquiry. Dr. Jaeschke moved from professor to Department Chair in January 2012, well before the First Ad Hoc Committee hearing. (Ex. 794, Tully Depo, 23:17-18; Ex. 781, Meagher Depo, 16:1-8; Ex. 796, Dec. 8, 2016 Jury Trial transcript, Jaeschke testimony, 75:8-19.) As acknowledged by Dr. Klaassen in SOAF 258, Dr. Rawitch interviewed 17 individuals for the Inquiry Report. (Ex. 196, Jan. 31, 2012 Inquiry Report.)

302.    It is uncontroverted that the "Committee unanimously agreed that Dr. Klaassen committed misconduct by engaging in abusive and unprofessional treatment of faculty and staff and substantially disrupted the proper operations of the academic unit, specifically the Department of Pharmacology, Toxicology and Therapeutics. The Committee further finds Dr. Klaassen committed misconduct by failing to properly report his role in the Mid-America Toxicology Course and by using University resources in support of that Course. The Committee recommends sanctions." (Ex. 18, May 31, 2012 Ad Hoc Committee conclusions.)

303.    Uncontroverted.

304.    Controverted. There is no basis for a conclusion from the cited privilege log that Ms. Trower advised Dr. Stites how to rule. In fact, Dr. Stites accepted the Findings of the First Ad Hoc Hearing Committee. (Ex. 19, Stites Adopted Findings; Ex. 795, Dec. 6, 2016 Jury Trial transcript, Vol. VI, Stites testimony, 159:10–160:20.)

305.    It is uncontroverted that Dr. Klaassen signed a written apology and was censured. The purported description of Dr. Klaassen's conduct is inaccurate and does not appear in the cited exhibit. In response to questions from his own counsel, Dr. Klaassen acknowledged that he accepted the formal censure. (SOF 195.)

306.    Controverted. The allegation is circular, citing to the allegation as support for the allegation. There is no support cited for any systemic mocking of Dr. Klaassen or his students. Defendants incorporate their response to SOAF 307–334.

307.    Controverted. The cited email (Exhibit 136) does not involve a "plan" by KUMC professors at all. The exhibit must be read in context. The email is between the acting chair of the Pharm/Tox department and a staff person within the department. There is nothing about the email that reflects any sort of a plan. It involves the frustration associated with unsupported allegations Dr. Klaassen had made against the department. One of the participants states, "how long do you want to cover for this guy [Klaassen] and what is the risk you are taking for the university by doing that?" It should be noted that this email is *after* Dr. Klaassen had threatened to ruin the career of one of the participants in the email (Ex. 191, Jan. 9, 2012 letter.)

308.    Controverted. The only citation is to additional facts. Defendants incorporate their response to SOAF 307-334.

309.    Controverted in part. The cited emails do not support the allegations of slurs against Dr. Klaassen. Exhibit 116 reflects that the email writers were pleased that Dr. Klaassen is no longer with the pharmacology department.

310.    Controverted in part. The references were not to a medical diagnosis but rather to the behavior that Dr. Klaassen exhibited.

311.    Controverted in part. The email from Dr. Carlson notes that Dr. Klaassen "is going to do everything in his power to make your life as hellish as he tried to make mine." (Ex. 118, Jan. 17, 2012 email.)

312.    Controverted in part. The email exchange cited is between only two individuals. It does not refer to the department crumbling. It indicates the "house of cards created by Curt" is crumbling.

313.    Controverted. Dr. Jaeschke and Dr. Weinman stated that when Dr. Klaassen "goes ballistic," they would give him a nice legal send-off.

314.    Controverted in part. The email from Dr. Carlson notes that Dr. Klaassen "is going to do everything in his power to make your life as hellish as he tried to make mine." (Ex. 118, Jan. 17, 2012 email.)

315.    Controverted in part. In association with an assertion that Dr. Klaassen was planning at least 50 lawsuits, Dr. Jaeschke noted the comment as part of a direction that "we need to move forward and try to build this liver center." (Ex. 141, Apr. 13, 2012 email.)

316.    Controverted in part. The argument that "despite the fact" that Dr. Jaeschke was hired by Dr. Klaassen is argumentative. Dr. Jaeschke shared an opinion of Dr. Klaassen with one other faculty member as reflected in Ex. 140.

317.    It is uncontroverted that Dr. Jaeschke and Dr. Weinman shared adverse opinions of Dr. Klaassen in emails that were between themselves. By the time of Ex. 139, Dr. Klaassen's employment had been terminated from the University.

318.    Controverted in part. Ex. 388 establishes only the accusation by Dr. Klaassen against a staff member who is not a party to this lawsuit.

319.    Controverted in part. The request was not pursuant to FOIA or KORA and nothing about the email discusses or analyzes FOIA or KORA. Tully, who is not a party, was investigated and was removed from further interaction with Dr. Klaassen's students. After

August 2012, Mr. Tully had no contact with such students. (Ex. 797, Dec. 2, 2016 Jury Trial transcript, Vol. IV, Tully testimony, 78:23-85:13.)

320.   It is uncontroverted that Mr. Tully had an email on 2-7-12 that said "boo-hoo." Tully, who is not a party, was investigated and was removed from further interaction with Dr. Klaassen's students. After August 2012, Mr. Tully had no contact with such students. (Ex. 797, Dec. 2, 2016 Jury Trial transcript, Vol. IV, Tully testimony, 78:23-85:13.)

321.   It is uncontroverted that Mr. Tully did not respond to an email request of Dr. Klaassen after Dr. Klaassen was in a different department.

322.   It is uncontroverted that Mr. Tully did not respond to an email request of Dr. Klaassen after Dr. Klaassen was in a different department.

323.   Uncontroverted.

324.   Uncontroverted.

325.   Controverted. Neither Mr. Tully nor Ms. Meagher are parties to this lawsuit. The assertion that these actions constituted an effort to harass Dr. Klaassen is an argument of counsel and not a factual assertion. Mr. Tully was investigated and removed from any contact with Dr. Klaassen's students as of August 2012. (Ex. 797, Dec. 2, 2016 Jury Trial transcript, Vol. IV, Tully testimony, 78:23-85:13.) In 2012, Dr. Klaassen, Mr. Tully, and Ms. Meagher were all in different departments. Neither Mr. Tully nor Ms. Meagher reported to Dr. Klaassen. Nevertheless, Dr. Klaassen continued to make multiple requests of them. Mr. Tully was never involved in the decisions to terminate Dr. Klaassen, place him on administrative leave, remove him from the chair position, take away the PI designation. (Ex. 797, Dec. 2, 2016 Jury Trial transcript, Vol. IV, Tully testimony, 87:4-23.) Mr. Tully considered Dr. Klassen's behavior toward him to be so hostile that he was contemplating retaining a lawyer against the University.

(Ex. 713, Nov. 30, 2016 Jury Trial transcript, Vol. II, Tully testimony, 110:7-10.) He testified that the stress caused him to gain 30 pounds. (Ex. 797, Dec. 2, 2016 Jury Trial testimony, Vol. IV, Tully testimony, 110:4-6.) He testified that Dr. Klaassen falsely sent an email about him to all faculty within the Department that made him look bad. (Ex. 797, Dec. 2, 2016 Jury Trial testimony, Vol. IV, Tully testimony,109:21–110:33.) He said the "harassment and bullying was becoming too much." (Ex. 797, Dec. 2, 2016 Jury Trial testimony, Vol. IV, Tully testimony, 110:11-18.)

326.    It is uncontroverted that Dr. Klaassen moved to the Internal Medicine Department in January 2012. Pl.'s SOAF 273. Mr. Tully did not report to Dr. Klaassen at that point.

327.    Controverted. The transfer was effective in January 2012. Certain administrative paperwork associated with the change did not occur until later. Exhibit 1030 indicates that Dr. Klaassen maintained a title of "Adjunct Faculty member in P&T" and clarified that "Any future communication with the P&T dept (specifically, with Dr. Jaeschke, Cody Tully, and secretaries) will occur through the IM Research Office (Brenda/Dr. Dawn)."

328.    Controverted. The University immediately responded to Dr. Klaassen's email and checked on Julia, the referenced post-doctoral faculty member. Upon receiving the "pills" email, Julia's mentor, Dr. Klaassen, did not call the police, did not call an ambulance, and did not go to her house. He never asked her if she attempted suicide. He admits that there was no suicide attempt that he is aware of. Neither Julia nor Dr. Klaassen complained to the University about any failure to follow up on a suicide attempt. (Ex. 782, Klaassen Depo, 480:1-482:19.) Julia, along with Dr. Klaassen, had also inaccurately held themselves out as a group called "Students for Democracy at KUMC." (Ex. 782, Klaassen Depo, 482:23-483:18.)

329.    Controverted. Dr. Girod was not questioned about any of the circumstances involved in any of the emails above. The deposition questions involved inaccurate and incomplete hypotheticals. His overall response was that it "depends on the circumstances" and "I mean, give me context. That's so vague I don't even know how to respond." (Ex. 798, Girod Depo, 242:16-244:25.)

330.    Controverted. The cited testimony from Mr. Tully sets forth a different explanation of the liquid nitrogen access than that set forth in the allegation. There is no support stated to establish that any complaints by others were the result of any "systemic" actions. To the contrary, there was an investigation of a staff member and there were no complaints by the post-docs about such behavior after that investigation. (Ex. 794, Tully Depo, 121:13-23.)

331.    Controverted. The cited testimony does not support the allegations asserted. For example, Mr. Tully's testimony at pages 87:1-6 does not deal with access to equipment at all. It deals with a request for certain photographs.

332.    Controverted. The statement is not a factual contention but is an argument without citation to any record. Dr. Klaassen and his lab had moved to Internal Medicine. Defendants incorporate their response to SOAF 273.

333.    Controverted. The opinion of Dr. Weinman is critical of Dr. Klaassen for putting his lab members through, in his opinion, two years of hell because Dr. Klaassen charged $250,000 in overdrafts. Dr. Weinman's opinion is not admissible evidence, as it is improper lay opinion under Fed. R. Evid. 701.

334.    Controverted. The statement is argumentative and assumes facts not in evidence about mocking or other activity that would require discipline.

335.    Controverted in part. The email does request a meeting, but it does not request such a meeting for the purpose of discussing "misappropriation of NIH grant monies." The stated reason, as set forth in paragraph 8 of the letter, is to increase the academic environment of the Internal Medicine Department. (Ex. 357, Dec. 20, 2012 email.)

336.    It is uncontroverted that the cited language was included in the email.

337.    It is uncontroverted that Dr. Klaassen said this in his email. Per Dr. Stites, "First of all, meetings are meant to occur at the University, that's our house, if you will . . ." (Ex. 780, Dec. 7, 2016 Jury Trial transcript, Vol. VII, Stites testimony, 25:18 – 26:13.)

338.    Controverted. The citation refers to testimony by Dr. Terranova about whether there were "mechanisms at the University where Dr. Klaassen has a concern about that he wants to voice, that he could come and voice it to you or someone else." Dr. Terranova identified such alternatives as opposed to going on a tirade against a software vendor. (Ex. 713, Nov. 30, 2016 Jury Trial transcript, Vol. II, Terranova testimony, 85:1 – 86:17.)

339.    It is uncontroverted that there was a meeting that included Dr. Stites, Dr. Dawn, Dr. O'Brien-Ladner, Ms. Hopkins, Mr. Carillo and Dr. Klaassen at KUMC on May 1, 2013.

340.    It is uncontroverted that the May 1, 2013 meeting was called by Dr. Stites, the chair of the Department of Medicine, to see if there was a way the department might be able to help bridge some part of Dr. Klaassen's funding gap until Dr. Klaassen found out about further NIH grants. (Ex. 367, Nov. 12, 2013 hearing, 154:25-155:10.)

341.    It is uncontroverted that Dr. Klaassen secretly tape recorded the meeting. (Ex. 709, Klaassen Depo, 104:21-24.) At the time he created the secret recording, there were no inquiry reports pending against Dr. Klaassen. (Ex. 709, Klaassen Depo, 108:6-17.) He claims to

have tape recorded the meeting because he considered the five persons in the meeting to be part of a "mobbing scheme" to get rid of him. (Ex. 709, Klaassen Depo, 105:17-106:1.)

342.    It is uncontroverted that the parties in the room discussed methods of resolving the funding gap and that Dr. Dawn used the term "slush fund," and immediately thereafter explained what he meant by the term. (Ex. 371, May 1, 2013 Budget Meeting audio.) Dr. Stites testified,

> Q:    Buddha uses the word "slush fund" and everybody laughs. Was there some nefarious motive to all of that?
>
> A:    There's no nefarious motive. Dr. Dawn is the Vice Chair of Research and he's really in charge of the research budget, and then he reports to me as the Chair. So I rely on him to help us say, "This is who we should do transition funding with. For example, our bridge funding to help stimulate Dr. Klaassen."

(Ex. 795, Dec. 6, 2016 Jury Trial transcript, Vol. VI, Stites testimony, 180:12-23.) Dr. Stites attempted to have Dr. Klaassen identify what $250,000 he was talking about. Dr. Klaassen could not specify. (Ex. 795, Dec. 6, 2016 Jury Trial transcript, Vol. VI, Stites testimony, 189:7–190:3.)

343.     Controverted. Dr. Klaassen wrote numbers on the board. Dr. Stites testified:

> Q:    Do you have any idea what $180,000 he alleges Dr. Terranova took from him?
>
> A:    I wasn't – on that day, I was not – I'm still [not] clear, but on that day, I definitely was not clear what $180,000 he was trying to refer to.

(Ex. 795, Dec. 6, 2016 Jury Trial transcript, Vol. VI, Stites testimony, 192:20-25.)

344.    Controverted. Defendants incorporate their response to SOAF 343.

345.    Controverted. Defendants incorporate their response to SOAF 343.

346.    Controverted. The meeting ended after Dr. Klaassen called Stites – the department chair and his boss – a "liar" and a "big shot" and said that Dr. Stites had "no ethics."

In addition, the circumstances in the room caused Dr. Stites to state, "Step back. Step back now. Step back from me now." (Ex. 371, May 1, 2013 Budget Meeting Audio.) Dr. Stites testified, "I'm sitting there saying this could be workplace violence, and I was frightened. And so my voice did raise, because I wanted him out of the room. And if that happened today, I would do the same thing, because it was right to do that. He needed to leave, and the meeting needed to be over at that point." (Ex. 795, Dec. 6, 2016 Jury Trial transcript, Vol. VI, Stites testimony, 203:12-18.)

347.    Controverted. The letter states, "It has been observed by me and reported to me by others that you have engaged in behavior and made statements that were belligerent and abusive to other University faculty and staff. … These interactions were frightening to the individuals and witnesses concerned and totally unacceptable in our University work environment. In order to fully review and investigate these incidents, and to provide for the safety of others, you are hereby placed on administrative leave…" (Ex. 7, May 8, 2013 Administrative Leave letter.)

348.    Controverted. The letter places Dr. Klaassen on administrative leave and identifies that during this administrative leave there will be an investigation. (Ex. 7, May 8, 2013 Administrative Leave letter.) The faculty responsibilities with regard to personal and professional misconduct are set forth in Section III, Part 3 of the Faculty Handbook. (Pl.'s Ex. 209.) The mechanism for handling complaints about faculty misconduct is set forth in Section III, Part 6F, of the Faculty Handbook (Pl.'s Ex. 209, Faculty Handbook.)

349.    Uncontroverted.

350.    Controverted. There are multiple factual assertions set forth in this Statement. Dr. Stites' letter advises that the administrative leave is extended until July 15, 2013 or until otherwise notified. He goes on to state that Dr. Klaassen will remain on administrative leave

"pending the conclusion of the process currently underway." (Ex. 337, Feb. 7, 2012 email.) Defendants incorporate their response to SOAF 354.

351.    Controverted. The completion of the Inquiry Report is not the conclusion of the process. (Pl.'s Ex. 209, Section III, Part 6.) (SOF 171–187, 263–265.)

352.    Uncontroverted.

353.    Controverted in part. These two RO1 grants were awarded to the University with Dr. Klaassen as the PI for his specific research. (Ex. 799, Nov. 30, 2016 Jury Trial transcript, Vol. II, 29:3-5.)

354.    Controverted. Nothing about the cited exhibits supports the allegations in the purported factual statement. Julia Cui remained at KUMC following the removal of Dr. Klaassen as chair and moved with him when he moved to Internal Medicine. She is now at the University of Washington as an Assistant Professor. Dr. Ekuase stayed at KUMC until July 2014. Donna Fu graduated from the department in 2013. Dr. Lickteig, a postdoc, took a position with a local biotech company in August 2013. Dr. Liu, a research professor, retired. Dr. Guo moved on to be a Research Assistant Professor at St. John's University in August 2012. Dr. Csanaky took a position as a Research Assistant Professor at Children's Mercy Hospital in 2015. Dr. Pratt-Hyatt, a postdoc, took a position with the Stowers Institute in August 2013. Dr. Renaud, a postdoc, moved to Canada with her husband, who took a faculty position. She remained on the University payroll until she left in June 2014. Dr. Selwyn, then a graduate student, completed her PhD in May 2014 and moved to the University of Washington for postdoctoral studies. Kai Wue, a graduate student, completed her PhD in 2012 and took a position in Pennsylvania. Dr. Zhang, a research assistant professor, moved to California with her husband in August 2012. (Ex. 800, Mar. 31, 2016 email.)

355.    Controverted. The evidence Dr. Klaassen provided in purported support of this allegation is inadmissible hearsay. Additionally, there are no allegations about this alleged grant in the Amended Pretrial Order. Further, nothing about the cited exhibits supports the allegations in the purported factual statement. No $1.8 million grant on which Dr. Klaassen was named principal investigator was awarded to KUMC in 2013 by the NIH. Further, the NIH does not award grants to individual professors. It awards them to institutions. (Ex. 752, Grants Policy Statement.)

356.    Controverted in part. In September 2013, Dr. Klaassen was on administrative leave and thus absent from the University. Contrary to the earlier assertion that nearly all of the post-docs and graduate students were terminated by the University, the University requested and the NIH granted a reassignment of the grants to two such individuals. Dr. Cui became the PI for the Hepatic Uptake Grant. She had worked closely with Dr. Klaassen and was a participant in writing and designing the grant. (Ex. 93, Aug. 26, 2013 email.)

357.    Controverted. The NIH approved the transfer of the grants in April 2014. (Ex. 750, April 3, 2014 Notice of Award regarding Hepatic Uptake Grant; Ex. 749, April 24, 2014 Notice of Award regarding Drug Processing Grant.) It is "absolutely within the authority of the NIH to do so." (Ex. 767, Dec. 12, 2016 Jury Trial transcript, Vol. X, Klaassen testimony 88:14-20.)

358.    Controverted in part. The letter placing him on administrative leave indicated that he was not to "administratively direct" anyone at KUMC. (Ex. 38, May 8, 2013 letter.)

359.    Controverted. Ex. 140 is an email exchange between two faculty members who were not involved in the transfer of the two RO1 grants to members of Dr. Klaassen's lab while he was unavailable to perform services while he was on administrative leave. Exhibit 16, the

KUMCRI Principal Investigation Changes or Absences Policy, authorized such a change as Dr. Klaassen was unavailable to fulfill his obligations under the award.

360.    Controverted. Defendants incorporate their response to SOAF 354.

361.    It is uncontroverted that the Second Ad Hoc Hearing Committee convened on November 13, 2013, and that Dr. Klaassen had been placed on administrative leave on May 8, 2013.

362.    Uncontroverted.

363.    Controverted in part. Dr. Klaassen contended at the November 2013 Ad Hoc Hearing that he had "raised the question" of whether money was inappropriately taken from one of his grants. His own testimony at the cited pages does not show any misuse. (Ex. 367, Nov. 13, 2103 Hearing Transcript, 263:3-16.)

364.    Controverted in part. The Ad Hoc Hearing Committee concluded that Dr. Klaassen was "guilty of professional misconduct as defined by the faculty handbook, in his treatment of fellow faculty and staff." It recommended that he be reinstated and sanctioned, and that if there is any continuation and repetition of the conduct within the next year, that there be more severe disciplinary action. (Ex. 32, Ad Hoc Hearing Committee Report.)

365.    Controverted in part. The Committee does not say anything about "financial mismanagement."

366.    Controverted. The contention that Dr. Girod "summarily fired" Dr. Klaassen is inaccurate. Dr. Girod set forth in a detailed letter the reasons for his decision. As Executive Vice Chancellor, he had the authority to decide whether to accept the recommendation of the Ad Hoc Committee under the Faculty Handbook. (Pl.'s Ex. 209, Faculty Handbook.) As noted in Dr. Girod's termination letter, Dr. Girod concluded that a written warning "does not address the

serious nature of the situation or recognize the repeated and continuing nature of your conduct, for which there is no excuse and for which you have been disciplined previously. You have repeatedly failed to recognize and understand the serious nature of your misconduct or the concerns it creates for other faculty and staff. Because of the escalation of your conduct since 2012, including the physically threatening nature of the most recent conduct in May 2013, I have to consider that future misconduct and volatile behavior by you is more likely than not." (Ex. 33, Ad Hoc Hearing Committee Report; Ex. 39, Letter.)

367.    Uncontroverted.

368.    Controverted in part. The cited quotation from the deposition of Dr. Girod does not ask for a definition of the "totality of the circumstances." Rather, Dr. Girod was asked what the prior committee did not have access to, and Dr. Girod responded that they did not revisit the entire episodes of the prior ad hoc committee. (Ex. 798, Girod Depo, 277:20-278:4.)

369.    Uncontroverted.

370.    Uncontroverted.

371.    Uncontroverted, but incomplete. Per the Faculty Handbook, the Vice Chancellor for Academic Affairs may extend any timetables provided that parties are notified. (Pl.'s Ex. 209, Faculty Handbook, p. 124.)

372.    Controverted. Dr. Klein specifically addressed the Faculty Handbook and its reference to relevant information. Dr. Klein responded to counsel for Dr. Klaassen's request for information and stated, "We have reviewed your requests and do not find them to be relevant to the three narrow grounds for appeal contained in the *Handbook for Faculty and Other Unclassified Staff.* They also request materials that are protected by the attorney-client privilege and attorney work product privileges." (Ex. 801, Apr. 25, 2014 Letter.) Further, Dr. Klaassen

received an appeal hearing on November 19, 2014. (Ex. 609, Dec. 5, 2014 Ad Hoc Committee Conclusions.)

373.    It is uncontroverted that Dr. Klaassen was granted two-and-one-half hours to present argument on appeal at the November 19, 2014 appeal hearing.

374.    Uncontroverted.

375.    Uncontroverted.

376.    Controverted in part. The Court's order is reflected in a trial docket entry dated 9/21/15 that reads, "Matter remanded to agency for re-hearing with additional notice and opportunity to be heard." (Ex. 739, Sept. 21, 2015 Order.)

377.    Controverted. Consistent with the remand from the Wyandotte County District Court, Dr. Girod sent a letter to Dr. Klaassen. The letter states that "the purpose of this letter is to clarify any misunderstanding that you may have as to the reason for my Decision." (Ex. 41, Oct. 20, 2015 Letter.) The letter speaks for itself.

378.    Controverted. Consistent with the remand of the Court directing a re-hearing with additional notice and opportunity to be heard, Dr. Klein advised Dr. Klaassen's counsel of the opportunity to either submit a supplemental appeal document or advise in writing that Dr. Klaassen wishes to proceed based on the appeal submitted in 2014. (Ex. 1041, Dec. 4, 2015 email.)

379.    Controverted. Consistent with the remand of the Court directing a re-hearing with additional notice and opportunity to be heard, Dr. Klein advised counsel of the opportunity to either submit a supplemental appeal document or advise in writing that Dr. Klaassen wishes to proceed based on the appeal submitted in 2014. Counsel was asked to provide a supplemental appeal document by December 30, 2015, as well as certain additional information. (Ex. 1041,

Dec. 4, 2015 email.) It is uncontroverted that Dr. Klaassen's counsel did not provide the requested information by December 30, 2015. On January 29, 2016, nearly a month later, Dr. Klaassen's counsel sent a letter objecting to the appeal hearing. (Ex. 1042, Dec. 28, 2015 email.)

380.    Controverted. Consistent with the remand of the Court directing a re-hearing with additional notice and opportunity to be heard, Dr. Klein advised counsel of the opportunity to either submit a supplemental appeal document or advise in writing that Dr. Klaassen wishes to proceed based on the appeal submitted in 2014. Counsel was asked to provide a supplemental appeal document by December 30, 2015, as well as certain additional information. (Ex. 1041, Dec. 4, 2015 email.) It is uncontroverted that Dr. Klaassen's counsel did not provide the requested information by December 30, 2015. On January 29, 2016, nearly a month later, Dr. Klaassen's counsel sent a letter objecting to the appeal hearing. (Ex. 1042, Dec. 28, 2015 email.)

381.    It is uncontroverted that Dr. Klaassen's objections were overruled and that Dr. Klaassen's post-termination appeal was scheduled to accommodate the convenience of Dr. Klaassen's counsel on March 29, 2016. (Ex. 1043, Feb. 24, 2016 email.)

382.    Controverted. Dr. Klaassen was permitted to offer into evidence the depositions of the defendants, and the Ad Hoc Hearing Committee had before it the prior testimony of these witnesses. Dr. Klaassen's counsel made no proffer of any questions it would have asked or any answers that it would have received had any of these witnesses been present, rather than by prior testimony. The University did not prohibit any of the witnesses from appearing. Counsel for Dr. Klaassen was advised:

> Dr. Klein has made each of the individuals identified below aware of your request for their attendance. The University has no subpoena power over them, and it is up to them whether to appear. Dr. Klein provided the witnesses with your contact information and advised them to contact you directly to make arrangements with you if they wished to appear. As to the individuals who are not defendants, KRPC 4.2 prohibits communications with a constituent of the organization who regularly

consults with the organization's lawyer concerning this matter. In my opinion, Ms. Meagher falls in that category. The other non-defendant individuals do not. I do not object to your contacting them directly. If you intend to seek any University documents from them, that should be done through the litigation process. As to your request that I require Ms. Meagher or the individual defendants to be there, I believe that falls outside of my authority or yours. The litigation process permits depositions. We have fully complied and produced witnesses subject to the reasonable and agreed time and numerical limitations under the applicable court rules. You have deposed Dr. Girod, Dr. Terranova, Dr. Carlson, Dr. Jaeschke, Mr. Tully, and Dr. Atkinson. You have their videotaped testimony. We further agreed to produce Dr. Stites for a deposition, and you chose to cancel it. You and/or Dr. Klaassen's prior counsel have previously examined Dr. Rawitch, Dr. McCarson, Dr. Carlson, Dr. Jaeschke, Ms. Meagher, Dr. Stites, Dr. Dawn, Dr. O'Brien-Ladner, Dr. Terranova (twice) and Ms. Hopkins in the prior administrative hearings, and you have that testimony. We have agreed to produce Dr. Rawitch and Ms. Meagher for their depositions, and dates have been agreed upon. Beyond the extensive deposition and administrative testimony that has been taken, you and your client have the availability of more than 80,000 pages of documents that the University has produced in discovery. You have the entire agency record of the prior ad hoc hearing proceedings at KUMC, including the transcripts from each of those proceedings. You were counsel in two of those proceedings. Under the circumstances, your client has a complete opportunity to be heard with regard to the extensive record that has been made. There is no disadvantage to you. The University has advised that it does not intend to call live witnesses at the remand hearing. Your request came late Thursday afternoon in advance of a Tuesday hearing. This is the first request I have heard from you with regard to making these individuals available. When I asked your client about the identification of potential witnesses at his March 10 deposition, you refused to allow him to answer the question. Moreover, Dr. Klein has given you multiple opportunities to identify witnesses over the past several months. Had you wanted some or all of these individuals to have notice that their attendance was requested by you, professional courtesy to the multiple individuals involved suggests that you might have let Dr. Klein and counsel know much sooner.

(Ex. 1044, Mar. 29, 2016 email.)

383.    It is uncontroverted that on April 8 the ad hoc hearing committee recommended that the termination be affirmed, and that on April 22 Dr. Gray-Little sent a letter indicating, among other things, that she would take the final action in her role as CEO of the University. (Ex. 232, April 22, 2016 Extension Letter.)

384.    It is uncontroverted that such language appears in the Faculty Handbook. The Handbook, as approved by the Faculty, also includes the following: "The University reserves the right to expand upon, alter, amend, or delete any provisions contained herein as may be deemed necessary or appropriate by the administration. Accordingly, the policies described in this handbook are not intended to create a contract between the University of Kansas and its employees…" (Pl.'s Ex. 209, Faculty Handbook, p. 17.) The Faculty Handbook goes on to describe that the chief executive officer of the University is the Chancellor. It describes that the Chancellor serves as "head of the state agency units that comprise the University of Kansas." (Pl.'s Ex. 209, Faculty Handbook, p. 19.) Per the Faculty Handbook, the Vice Chancellor for Academic Affairs may extend any timetables provided the parties are notified. (Pl.'s Ex. 209, Faculty Handbook.)

385.    Uncontroverted.

386.    Uncontroverted.

387.    Controverted for clarification. Ex. 269, which is an unsigned letter dated February 2, 2012, notes that Dr. Carlson had been the Interim Chair of the Pharm/Tox Department and that Dr. Jaeschke was the Chair at that time. Dr. Terranova signed the letter in his role as Vice Chancellor for Research.

388.    Uncontroverted.

389.    It is uncontroverted that Dr. S. was not placed on administrative leave at that point. However, he was specifically advised of the State of Kansas Workplace Violence Policy and advised that any regression on his part could lead to formal disciplinary action.

390.    Uncontroverted.

391.    Uncontroverted that there is no reference in Ex. 269 to Dr. S. saying anything publicly negative about any member of KUMC's administration.

392.    Uncontroverted that there is no reference in Ex. 269 to Dr. S. contributing to Lawrence Journal-World articles.

393.    Controverted as incomplete. Ex. 269 set forth four separate requirements for Dr. S. to meet "if you are going to continue to work here." The letter identifies, "Completing this training and meeting these conditions are required as part of your continued employment with the University." (Ex. 269, Feb. 2, 2012 Letter.)

394.    Uncontroverted that there are signature lines for each of those three individuals.

395.    Controverted. Plaintiff cites to a side comment by Dr. Carlson. Dr. Carlson made clear his lack of personal knowledge. He testified he did not recall being involved in the performance improvement plan for Dr. S. and that he did not recall that Dr. S. was placed on administrative leave. (Ex. 801, Dec. 1, 2016 Jury Trial transcript, Carlson testimony, Vol. III, 178:7-12 filed under seal.) (Ex. 801, Dec. 1, 2016 Jury Trial transcript, Vol. III, Carlson testimony, 179:14-18 filed under seal.)

396.    Uncontroverted.

397.    It is uncontroverted that Dr. S., who had RO1 grants in 2011, was not removed from his grants at that time, similar to Dr. Klaassen, who was not removed from his RO1 grants until his absence during his second administrative leave in 2013. SOF 384, 385, 386, 387.

398.    Uncontroverted.

399.    Objection. The allegation cites to the allegation as support for the allegation. Defendants incorporate their responses to SOF 400–409.

400.    Uncontroverted.

401.    It is uncontroverted that a document entitled Fitness for Duty was completed, and much later, a change in her appointments occurred. Nothing about the citations ties those events together.

402.    Controverted. Dr. Girod testified Dr. T. was removed as PI, most likely when Dr. T. was on leave. (Ex. 802, Girod Depo, 320:22–321:6 filed under seal.) Dr. Girod testified that he was not a part of that process. (Ex. 802, Girod Depo, 78:2-16 filed under seal.)

403.    Controverted for clarification. One of the conditions of Dr. Klaassen's return to duty in December 2015 was the completion of a program for distressed physicians, which Dr. Klaassen completed in Chicago. (Ex. 803, Dec. 12, 2015 Jury Trial transcript, Vol. X, 85:19–86:11; Ex. 86.)

404.    Uncontroverted.

405.    Uncontroverted.

406.    Uncontroverted.

407.    Uncontroverted.

408.    Uncontroverted.

409.    Uncontroverted.

II.     **ARGUMENTS AND AUTHORITIES**

A.     **Introduction**

Dr. Klaassen does not dispute his bad behavior in the Introduction to his Response Brief. Rather, he expresses that his behavior was "long-tolerated" and used as a pretext. Doc. 349, p. 7. There is no evidence that his termination was pretextual. There is no right to exercise bad behavior in a workplace.

Dr. Klaassen was removed from the "serve at the pleasure" position as department chair on April 6, 2011. He remained a member of the faculty in the Pharm/Tox Department and remained PI on the COBRE and Training Grants, as well as on his R01 grants. SOF 113. Dr. Atkinson told Dr. Klaassen that she wished he would remain as a really superb researcher with the same grants and programs, but that he would no longer serve as a department chair. SOF 90. No disciplinary action was taken against him. Rather than heeding Dr. Atkinson's advice, he made it his mission to disrupt the Pharm/Tox Department. His disruption was substantial. He caused faculty members to be frightened of him. SOF 136, 192-193. He threatened to destroy the career of a colleague who submitted his name to become permanent chair of the Pharm/Tox Department. SOF 148, 154. He was insulting and insubordinate to the faculty and to the Acting Chair. SOF 93-136. On January 11, 2012, he wrote to the new chair of the Pharm/Tox Department, "I can understand why you might not have much confidence in me at the present time. If I did not have graduate students and post-doctoral students, I would have retired 9 months ago." SOF 159. The next day, he wrote, "I think the Department has become de-unified the last several months, and I am probably the reason for most of that splintering, and I will take full responsibility." SOF 160. Unfortunately, his bad behavior continued and escalated.

There was no rush to terminate Dr. Klaassen. Most of the events that Dr. Klaassen claims as purported "protected speech" occurred in April of 2011. Dr. Klaassen was not terminated until January of 2014. During the interim years, four faculty hearing committees of Dr. Klaassen's peers found that Dr. Klaassen engaged in unprofessional conduct that disrupted the workplace. SOF 14. His own faculty peers "condemned" his behavior and criticized the University for tolerating his conduct for too long. SOF 193. While Dr. Klaassen has been noted for his research accomplishments, the First Ad Hoc Hearing Committee specifically recognized, "Research excellence, however, is not a license for unprofessional conduct." SOF 193.

He has filed four lawsuits arising out of these facts and circumstances. His 2012 Injunction Case was dismissed for lack of subject matter jurisdiction. SOF 409-410. His State Case for retaliatory discharge seeking the same damages and based on the same facts and challenging the same decisions made by the same individuals resulted in a directed verdict in favor of the University. SOF 424. He also challenged his termination in the KJRA case, seeking the same relief as here. In doing so, he challenged Dr. Girod's use of the term "totality of the circumstances" in his termination letter, asserting largely the same arguments about the same decisions as here. SOF 318-326. The Wyandotte County District Court ruled in favor of the University in both the State Case and the KJRA Case. SOF 325.

Defendants submit that Dr. Klaassen's claims fail for the reasons that have been set forth in the consolidated and individual motions for summary judgment and supporting memoranda.

### B.      All of Dr. Klaassen's Claims Are Barred by Principles of Res Judicata.

Dr. Klaassen has not controverted any material facts related to the res judicata issue, and he has not alleged any additional relevant facts related to that issue. The question of whether Dr. Klaassen's claims are barred by res judicata is a legal issue ripe for determination. Dr. Klaassen

contends that he did not choose to litigate his claims in multiple lawsuits. Doc. 349, p. 139. To the contrary, every claim Dr. Klaassen brought in federal court could have been brought in the State Case. Dr. Klaassen sought the same relief for the same acts by the same individuals in each of the three lawsuits. SOF 321, 417; Doc. 298, pp. 29-31. Now that the KJRA Case and the State Case are final, Dr. Klaassen's claims are barred by claim preclusion, regardless of when he split his claims between state and federal court, and regardless of when Defendants asserted claim-splitting as a defense. Defendants timely asserted claim preclusion in June 2015. Doc. 123, p. 19. Dr. Klaassen split his claims between state court and federal court, and in so doing, he risked claim preclusion whenever one of the actions became final. *See Carter v. City of Emporia*, 815 F.2d 617, 621 (10th Cir. 1987) (concluding that plaintiffs may not split a cause of action between federal and state courts without risking claim preclusion and holding that § 1983 claims pending in federal court were barred by claim preclusion after state court action became final). Because that's what happened here, Dr. Klaassen's claims are now barred by claim preclusion.

1. **Claim preclusion bars Dr. Klaassen's individual capacity and state law claims.**

Dr. Klaassen asserts that half of the necessary elements for claim preclusion are missing because the parties are not the same and there is no final judgment. His argument is in error in that the Individual Defendants are in privity with the state court defendant, and there is a final judgment in the state court action. *See* Doc. 296, pp. 2-3.

a. **There is privity.**

Privity can be shown if "the parties in the two actions are really and substantially in interest the same." *Cain v. Jacox*, 354 P.3d 1196, 1201 (Kan. 2015) (quoting *Lowell Staats Min. Co. v. Philadelphia Elec. Co.*, 878 F.2d 1271, 1275 (10th Cir. 1989)). Whether privity exists "is an equitable determination grounded in principles of fundamental fairness and sound public

policy" that requires "careful examination into the circumstances of each case as it arises." *Id*. at 1200. Kansas law has not addressed whether a government employee sued in his individual capacity is in privity with his government employer. But Kansas courts frequently have found privity in the claim preclusion context if an agent acts on behalf of a principal, such as between an employee and employer, or specifically between a government employee and a government entity. *See, e.g., State v. Parson*, 808 P.2d 444, 447-48 (Kan. App. 1991) ("With no hesitation we find the requisite privity existing here insofar as Harp Well and Pump Services, Inc., and Parson—an employer and its employee—are concerned."); *Midwest Crane & Rigging, LLC v. Schneider*, No. 113,725, 2016 WL 1391805, at *7 (Kan. App. April 8, 2016) ("As agents acting in furtherance of Emcon's interests rather than their own in the events giving rise to this litigation, Defendants are in privity with Emcon for the purposes of res judicata."); *Van Deelen v. City of Kansas City*, No. 101,226, 2009 WL 3738833, at *4 (Kan. App. Nov. 6, 2009) ("A government and its agents are in privity with one another because the agents represent not their own rights but the rights of the government."). It follows that if the actions of an employee subject the employer to vicarious liability, privity exists between the employee and employer because their interests are "really and substantially in interest the same." *See Cain*, 354 P.3d at 1201. Therefore, privity exists between the employee and employer for the purpose of claim preclusion when an employee acts within the scope of his employment and not for a personal purpose. *See Midwest Crane*, 2016 WL 1391805, at *7. Dr. Klaassen is making the same claims—based on the same set of facts—against the individual defendant employees that he made (or could have made) against the University employer in the state court cases. Therefore, privity exists. Defendants submit that (a) privity is determined on a case-by-case basis under Kansas law, (b) Kansas is harsh in invoking claim preclusion, (c) Kansas has a robust history of

disfavoring multiple lawsuits addressing the same events, and (d) the sole Kansas case addressing the topic found privity to exist. Doc. 326, pp. 82-83.

### b.    The state court decisions are final judgments.

Kansas state court cases are "final" for purposes of claim preclusion, even if an appeal is pending. *Rhoten v. Dickson*, 223 P.3d 786, 798 (Kan. 2010) ("Both federal and Kansas courts have held a pending appeal does not suspend the finality of the lower court's judgment for claim preclusion purposes."). Specifically, the Kansas Supreme Court held that the Court of Appeals erred in determining that a decision in a prior action was not final for claim preclusion purposes while an appeal was pending. *Id.* (citing *Willard v. Ostrander*, 32 P. 1092 (Kan. 1893)). Dr. Klaassen points to no authority or reasoning why it should matter whether the prior actions were state or federal cases.

The Kansas Supreme Court has not overruled *Rhoten* or indicated that its holding is in question. In *State v. Roberts*, cited by Dr. Klaassen, the Court's analysis was based on the interpretation of a distinct criminal statute, and the issue was whether the State could appeal an order of dismissal—not whether claim preclusion applies. 259 P.3d 691, 700-01 (Kan. 2011). The Court does not address *Rhoten* or indicate that the Court is departing from its holding. Similarly, the analysis in *Greer v. County of Allen* is based on a recodified version of the same criminal statute in *Roberts*, and there is no citation to *Rhoten*, 2015 WL 1310932, at *3-4 (Kan. App. March 13, 2015). In any event, an unpublished per curium opinion of the Court of Appeals has no bearing on whether the Kansas Supreme Court has indicated an intent to depart from a previous holding. For these reasons, the Wyandotte County decisions are final for the purpose of claim preclusion.

## 2.    Issue preclusion bars Dr. Klaassen's due process claims.

Dr. Klaassen does not appear to contest that the due process issues are the same in the KJRA case or that he had a full and fair opportunity to litigate the issues there. Dr. Klaassen focuses on his argument that issue preclusion should not apply because the parties aren't the same. Doc. 349, p. 146. The Tenth Circuit has held that federal law governs the application of res judicata if the issue is not clearly substantive. *Northern Natural Gas Co. v. Nash Oil & Gas, Inc.*, 506 F. Supp. 2d 520, 528 (D. Kan. 2007) (citing *Petromanagement Corp. v. Acme-Thomas Joint Venture*, 835 F.2d 1329, 1333 (10th Cir. 1988). Mutuality of parties is not a distinctively substantive matter. *Id*. (citing *Scheufler v. General Host Corp.*, 881 F. Supp. 492, 495 (D. Kan. 1995)). Thus, the federal law of issue preclusion applies. *See id*.

Allowing a plaintiff a second chance to litigate the same issues under the same facts does not make sense. *See, e.g., Blonder-Tongue Labs., Inc. v. Univ. of Illinois Found.*, 402 U.S. 313, 329 (1971) ("In any lawsuit where a defendant, because of the mutuality principle, is forced to present a complete defense on the merits to a claim [that] the plaintiff has fully litigated and lost in a prior action, there is an arguable misallocation of resources" devoted "to relitigation of a decided issue."). *See Kearney v. Kansas Public Service Co.*, 665 P.2d 757, 774-75 (Kan. 1983) ("We are not called upon and do not here decide whether mutuality of estoppel is still a valid requirement for the application of the doctrine of collateral estoppel in other cases."). Defensive use of issue preclusion—where a plaintiff is estopped from asserting a claim that he had previously litigated and lost against another defendant—prevents a plaintiff from relitigating identical issues by merely "switching adversaries." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979). That means that defensive use of issue preclusion "is permissible by a party who was not present in the prior action—when at least the party against whom it is invoked was a party to

the prior litigation." *Northern Natural Gas*, 506 F. Supp. 2d at 528. Accordingly, courts in this

district have routinely allowed the use of defensive issue preclusion. *See id.* at 529.

### C.   Dr. Klaassen's First Amendment Retaliation Claim Fails.

Defendants are entitled to summary judgment on all five elements of the *Garcetti/*

*Pickering* analysis.[1]

### 1.   The Defendants' legal framework is correct.

Dr. Klaassen argues that the Defendants have asserted an incorrect legal framework,

apparently alleging that the Defendants seek to add elements to the *Pickering/Garcetti* test. Doc.

349, p. 149. Dr. Klaassen argues that such an alleged attempt is improper because (1) the law of

the case controls and (2) the case cited implicates a different constitutional right. Both arguments

fail.

As an initial matter, the Defendants cite verbatim the Tenth Circuit's statement of the

five-element *Garcetti/Pickering* test. Doc. 326, p. 88. Then, separately, the Defendants cite

*Dodds v. Richardson* for a legal standard that applies generally to all § 1983 claims, regardless of

the specific constitutional right at issue. Doc. 326, p. 88. There is no effort to expand the

*Garcetti/Pickering* test; only an effort to state the uncontroversial position that personal

participation is required in every § 1983 claim. *See Schneider v. City of Grand Junction Police*

*Dep't*, 717 F.3d 760, 768 (10th Cir. 2013) ("Individual liability under § 1983 must be based on

[the defendant's] personal involvement in the alleged constitutional violation.") (quoting *Foote*

*v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997)); *Robertson v. Las Animas Cty. Sheriff's Dep't*,

500 F.3d 1185, 1193 (10th Cir. 2007) ("It is axiomatic that, to prevail on a damages claim for a

---

[1] Dr. Klaassen's suggestion that the Court cannot resolve the fourth and fifth prongs of the analysis is incorrect. *See Trant v. Oklahoma*, 754 F.3d 1158, 1167 (10th Cir. 2014); *Rohrbough v. Univ. of Colorado Hosp. Auth.*, 596 F.3d 741, 750 (10th Cir. 2010). As explained more thoroughly in the Individual Defendants' briefs, the Court must grant summary judgment to Defendants if no reasonable jury could find in Dr. Klaassen's favor on one or both of those elements. *Id.*

constitutional violation pursuant to § 1983, the plaintiff must show that the defendant, acting under color of state law, 'personally participated in the alleged violation.'") (quoting *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996)).

Further, it isn't clear which element of the *Dodds* citation, if any, that Dr. Klaassen disputes. To the extent Dr. Klaassen argues that law of the case applies, this Court didn't address the issue of personal participation in its previous ruling on Defendants' motion for judgment on the pleadings, thus by definition, law of the case doesn't apply. *See Entek GRB, LLC v. Stull Ranches, LLC*, 840 F.3d 1239, 1241 (10th Cir. 2016) ("Law of the case doctrine rightly bars the way, precluding the relitigation of issues either expressly or implicitly resolved in prior proceedings in the same court.").

Finally, Dr. Klaassen apparently argues that the elements required in every § 1983 case should be ignored because *Dodds* happens to involve the Fourteenth Amendment instead of the First Amendment. Doc. 349, pp. 149-150. Dr. Klaassen misses the point. In *Dodds*, the Court listed the elements of a § 1983 claim—as cited in Defendants' Brief, Doc. 326, p. 88—and cited a free speech case as authority for those elements. *See Dodds v. Richardson*, 614 F.3d 1185, 1199-1200 (10th Cir. 2010) (citing *Summum v. City of Ogden*, 297 F.3d 995, 1000 (10th Cir. 2002)). All constitutional rights fall under the § 1983 umbrella. In any event, personal participation is an essential element in any § 1983 claim, including First Amendment retaliation claims. *See, e.g.*, *McDonald v. Sch. Dist. No. 1 in the Cty. of Denver*, 83 F. Supp. 3d 1134, 1152-53 (D. Colo. 2015) (granting summary judgment on First Amendment claims because there was no evidence that defendants personally participated in employment actions).

2.      **All of Dr. Klaassen's allegedly protected speech occurred pursuant to his official duties.**

This Court undertook an extensive analysis of when a public employee is speaking "pursuant to his official duties" in its Memorandum and Order of January 24, 2014. Doc. 102, pp. 28-33. The Court held that the Individual Defendants are entitled to qualified immunity on Dr. Klaassen's First Amendment retaliation claim, and only permitted the claim to survive based on new allegations Dr. Klaassen asserted regarding purported speech to the LJW and in PowerPoints. *Id.* The same reasoning precludes his latest theory. Dr. Klaassen once again paints with a broad brush and asserts that his First Amendment retaliation claims are predicated on statements he made regarding KUMC's lack of shared governance, misappropriation of taxpayer money, lack of transparency, financial mismanagement, concerns regarding KUMC's push to obtain NCI accreditation of the Cancer Center, KUMC's expansion into Salina and Wichita, and the financial solvency of KUMC. In its earlier Memorandum and Order, however, the Court stated, "[t]he statements concerned (1) financial mismanagement and lack of shared governance at KUMC and (2) mismanagement and misappropriation of grant money. Plaintiff's expressions about these subjects were made pursuant to his 'official duties' as a KUMC employee." Doc. 102, p. 33. Dr. Klaassen spoke at all times as a department chair, University Distinguished Professor, and faculty member, and his speech is not protected.

Dr. Klaassen contends that he engaged in protected speech on three separate occasions: (1) his purported but unspecified comments to the LJW, (2) the dissemination of the PowerPoint presentations, and (3) the March 31, 2011 stakeholders' meeting. The parties agree that the *Pickering/Garcetti* test should be applied to each separate instance of speech. Doc. 349, p. 151.

### a.     Lawrence Journal World articles

Dr. Klaassen does not know what he told the LJW, and no speech is attributed to Dr. Klaassen in any of the editorials. SOF 327-338. The LJW commentaries are those of the editorial writer, not Dr. Klaassen. It is unclear (even to Dr. Klaassen) what information he provided. "You think I know what I told him when I met him six years ago or whatever it was." Defs.' Resp. to Pl.'s SOAF 132. To the best of his knowledge, he did not accuse the University of any illegal acts. SOF 338. The application of the test to each separate instance of speech establishes that Dr. Klaassen cannot establish that he engaged in any protected speech at all. To the extent his anonymous contributions constitute "speech," Dr. Klaassen wanted more money to be spent on his department rather than on other functions in the University, such as the development of campuses in Salina and Wichita and the development of a NCI designation. SOF 336. Accordingly, he was speaking within his official duties.

### b.     PowerPoint presentations and disseminations

Dr. Klaassen does not dispute that he created the applicable PowerPoint presentations pursuant to his official duties. Doc. 349, p. 154. He argues instead that "creation of the PowerPoints for internal use is a separate and distinct act from the subsequent distribution of the PowerPoints." Doc. 349, p. 154. There is nothing cited in the record to establish how or by whom a PowerPoint presentation was distributed or why it was distributed. Dr. Klaassen's brief states, without support, that "Klaassen's goal in disseminating the PowerPoints was to raise public awareness of management decisions taken by the KUMC administration." *Id.* This allegation is not supported by credible evidence. Nevertheless, even if he distributed it to the University at large and a donor, the fact remains that the statements concerned (1) financial mismanagement and lack of shared governance at KUMC, and (2) mismanagement and

misappropriation of grant money. His expressions about these subjects were made pursuant to his official duties as a KUMC employee. Doc. 102, p. 33. Accordingly, the speech has no protection.

Dr. Klaassen cites *Texas v. Johnson*, 491 U.S. 397, 406–07 (1989) for the proposition that "an individual's conduct is a form of speech protected by the First Amendment." While this general proposition is true, *Johnson* provides the Court no guidance for this specific situation. First, *Johnson* was decided long before *Garcetti*, so it has no discussion of official duties analysis and provides no guidance on the issue. *Knopf v. Williams*, 884 F.3d 939, 947 (10th Cir. 2018) (holding that cases decided before *Garcetti* provide almost no guidance on the official duties issue). Second, in *Johnson*, the Court concentrated on the communicative nature of the expression, which was the burning of an American flag. *See Johnson*, 491 U.S. 406–07. Here, the communicative nature of Dr. Klaassen's expression was not the *act* of him distributing the PowerPoints. There is no evidence that the act of hitting "send" on an email – set apart from content within PowerPoints themselves – was an  expressive act or that any adverse action was taken against him as a result. Rather, it was the content contained within the PowerPoints – speech he admits was made pursuant to his official duties – that is at issue here.

Dr. Klaassen cites to *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1205 (10th Cir. 2007) for the overbroad proposition that "distributing work-related information to the public at large is not official duties speech."  There, the plaintiffs expressed concern to the public on a variety of topics.  *Id.* at 1204–05.  On several topics, the court found that the plaintiffs' speech was not made pursuant to their official duties because the plaintiffs had "no supervisory responsibility and no duty to report with regard to any of the problems being discussed." *Id.* at 1205.  On others, though, such as student behavior, the court found the plaintiffs' speech was "made pursuant to [their] inherent duty as teachers," and it did not matter

that it was distributed to the public. *Id.* at 1204. Here, any speech of Dr. Klaassen was speech pursuant to his inherent, official duties to the public.  This is precisely the kind of speech the court in *Brammer-Hoelter* declined to protect.

As the Tenth Circuit presciently noted in *Rohrbough v. Univ. of Colo. Hosp. Auth.*, "an employee's decision to go outside of their ordinary chain of command does not necessarily insulate their speech." 596 F.3d 741, 747 (10th Cir. 2010). "Rather, . . . the proper focus is ultimately still whether the speech stemmed from and was of the type that the employee was paid to do, regardless of the exact role of the individual or entity to which the employee has chosen to speak." *Id.* (citation and alterations omitted). *Renken v.Gregory*, 541 F.3d 769, 773-75 (7th Cir. 2008), is more closely on point. There, a professor who complained to university officials about the difficulties he encountered in administering a grant was speaking as an employee because the grant was "for the benefit of students" and therefore "aided in the fulfillment of his teaching responsibilities."

### c.      March 31, 2011 stakeholders' meeting

This Court already ruled that Dr. Klaassen's "statements concerning (1) financial mismanagement and lack of shared governance at KUMC, and (2) mismanagement and misappropriation of grant money" were made pursuant to his official duties and therefore receive no First Amendment protection. Doc. 102, p. 27.  Dr. Klaassen does not mention the Court's previous ruling or argue that it does not apply to his March 31 statements. Because he did not respond to Defendants' argument, it is now waived. *See Montoya v. Fin. Fed. Credit, Inc.*, 872 F. Supp. 2d 1251, 1274 (D.N.M. 2012). Dr. Klaassen should not be permitted to unilaterally revive this claim without the permission of the Court, which has been neither requested, nor permitted.

To the extent the allegations are considered, Dr. Klaassen cannot controvert that the stakeholders' meeting was held on campus for department chairs and similarly situated

individuals from KUMC to see a demonstration of a software product that was being considered for the KUMC campus, that Dr. Klaassen was there in his role as Department Chair, that Dr. Klaassen "acted out" at the meeting and demeaned the Dean and the University, and that his purpose was to notify other "big shots" of his criticisms of Dr. Atkinson. SOF 75-80. He also cannot dispute that his actions disrupted the purpose of the meeting. SOF 81-85. These actions were taken in his official capacity and are not protected.

> **3.**     **Dr. Klaassen's alleged speech was merely an airing of his personal grievances, not a matter of public concern.**

In the March 31, 2011 meeting, Dr. Klaassen did not address topics of public interest. Rather, he disrupted a meeting and referred to his boss and the administration in demeaning terms. In dealing with the LJW, he does not know what he said. SOF 128. In the PowerPoints, he acknowledges he was speaking as part of his official duties.  In all respects, Dr. Klaassen was always acting out in an effort to get more money for his department, which is an internal matter and not one of public concern. Doc. 349, p. 154. He believed that spending money elsewhere in the University was to his detriment. Dr. Klaassen's own deposition testimony explains his motive. *Nixon v. City & Cty. of Denver*, 784 F.3d 1364, 1367 (10th Cir. 2015) (explaining that the speaker's motive is an important consideration). He said: "Again, it's a part of the Cancer Center showing that everything that she was doing was to the detriment of K.U. Med Center and *especially to me*."  (emphasis added). Defs.' Resp. to Pl.'s SOAF 99. The fact that he now contends his personal grievances with Dean Atkinson's policies also concerned a public institution is inapposite. *Farhat v. Jopke*, 370 F.3d 580, 593 (6th Cir. 2004) (holding that incidental references to matters of public concern do not require constitutional protection).

Dr. Klaassen asserts that there was media interest in his criticisms of KUMC.  Doc. 349, pp. 157-158. However, as noted above, Dr. Klaassen cannot recall what information he provided

to the editorial writer. None of the editorials quoted Dr. Klaassen. SOF 330-338. "[M]edia publicity of a dispute is not determinative of whether a public employee's speech was a matter of public concern." *Lancaster v. Indep. Sch. Dist. No. 5*, 149 F.3d 1228, 1233 (10th Cir. 1998).

Dr. Klaassen's degrading remarks about Dr. Atkinson at the stakeholders' meeting and purportedly to the LJW receive no protection. *Walkers v. Churches*, 511 U.S. 661, 672 (1994). Dr. Klaassen argues that his remarks were made about KUMC as an institution, rather than Dean Atkinson personally. He fails to explain why that matters. "One who publishes defamatory matter concerning a corporation is subject to liability to it if, although not for profit, it depends upon financial support from the public, and the matter tends to interfere with its activities by prejudicing it in public estimation." *Nat'l Motor Club of Am., Inc. v. Auto Club of Am. Corp.*, No. 01-4077-SAC, 2003 WL 715902, at *4 (D. Kan. Feb. 12, 2003) (quoting Restatement (Second) of Torts § 561 (1977)). Moreover, Dr. Klaassen's own counsel has acknowledged the references to "slumlord" were "directed to Dr. Atkinson either as slumlord or her policies and her direction of the – of the – of KUMC as being like slumlord economics." Defs.' Resp. to Pl.'s SOAF 103. Dr. Klaassen's comments do not receive First Amendment protection either way. Dr. Klaassen intended the term to be disparaging, indicating that a "slumlord" "is a person that just takes advantage of the other people and you know, just doesn't have any ethics." Defs.' Resp. to Pl.'s SOAF 106.

Dr. Klaassen also failed to respond to Defendants' argument that his purported speech failed to sufficiently inform the public on any issue as to receive protection.  Speech which airs grievances of a purely personal nature generally does not receive protection. *Nixon,* 784 F. 3d at 1367–68; *Cvancara v. Reams*, 676 F. App'x 774, 778 (10th Cir. 2017); *Dill v. City of Edmond*, 155 F.3d 1193, 1202 (10th Cir. 1998).

"The objectives, purposes, and mission of a public university are undoubtedly matters of public concern." *Gardetto v. Mason*, 100 F.3d 803, 813 (10th Cir. 1996). True, but Dr. Klaassen ignores two crucial limitations the court places on that statement in the same paragraph. It says: "[T]he details of internal budgetary allocations at an institution of public education are not matters of public concern. Management practices or decisions allocating management responsibility to particular individuals also do not involve matters of public concern." *Id.* at 814. Given that Dr. Klaassen's speech was personal in nature and mostly concerned with budgetary allocations, it properly falls in the limitations to public concern, rather than the general rule.

### 4. The University's interest in speaking with a single voice on policy matters outweighs Dr. Klaassen's interest in free speech.

Defendants submitted more than 50 statements of fact dedicated to the litany of disruptions caused by Dr. Klaassen and his behavior. Doc. 326, pp. 97-99; *see also* SOF 15, 24, 25, 103, 133, 134, 217. Dr. Klaassen does not attempt to controvert many of the key facts associated with this behavior, including Doc. 326, pp. 102-110, 114-115, and 119-125. Dr. Klaassen acknowledged the disruptions he caused through the department by his inappropriate conduct. SOF 15, 160.

The University has a legitimate interest to have employees in high-ranking policy positions "speak publicly with a single voice on policy matters." *Rock v. Levinski*, 791 F.3d 1215, 1217 (10th Cir. 2015). In *Rock*, the principal of a school spoke at a public meeting in opposition to the superintendent's proposal to close her school because of monetary concerns. *Id.* at 1218. Shortly after her public speech, the superintendent, Mr. Levinski, decided not to renew Ms. Rock's contract. *Id.* The Tenth Circuit affirmed dismissal of Ms. Rock's First Amendment retaliation claim because the District's interest in efficient public service outweighed Ms. Rock's interest in free speech. *Id.* at 1219. The Tenth Circuit reasoned that as a high-ranking employee,

Ms. Rock had to speak with a greater amount of caution than an ordinary employee. *Id.* at 1220–21. The court noted:

> Rock's public speech did not expose corruption or other unlawful conduct, or even some secret agenda of the District. It simply expressed her opposition to the policy adopted by her superiors. And it is well established that the First Amendment does not require a government employer to tolerate such disloyalty from the upper echelons of the administration (even though we may question the wisdom of the termination). In such circumstances, the balance of interests favors the government employer . . . . The management of a public institution, such as a university, . . . is not required to retain in a management or policymaking position a person who publicly opposes its policies. . . Rather, such an institution is entitled, for the sake of effective implementation of its policies, to have in management positions, . . . persons who will support its policies, rather than persons who will undermine its goals by voicing public opposition to them.

*Id.* at 1221–22 (citation and alterations omitted).

The University has an interest in promoting the efficiency of public service that outweighs Dr. Klaassen's interest in demeaning the administration.

### 5.   Several of Dr. Klaassen's acts of retaliation are not adverse employment actions.

Dr. Klaassen does not dispute that he did not suffer a loss in salary associated with his litany of perceived "adverse job actions." Doc. 349, p. 162. He does not explain how he has been damaged by any of these actions. His claims in the Amended Pretrial Order do not set forth any such damages. Doc. 298, p. 30-31. Dr. Klaassen provides a list of inapplicable incidents that he broadly asserts were considered "adverse employment actions" in other Tenth Circuit cases. He does not address with specificity how any one of those cases is applicable to Dr. Klaassen. He then, in the broadest terms, misstates the facts. By way of illustration, Dr. Klaassen asserts that in June of 2012, Dr. Stites "censured him for calling KUMC a 'slumlord institution' publically." The reality is that on May 31, 2012, a faculty committee of Dr. Klaassen's peers unanimously condemned Dr. Klaassen's behavior and concluded that Dr. Klaassen engaged in

abusive and unprofessional treatment of faculty and staff and substantially disrupted the proper operations of the academic unit. It recommended a formal censure with swift and increased punishment should any further episodes of unprofessional conduct occur. SOF 193. Dr. Stites accepted that recommendation. SOF 194.   Moreover, a "censure does not trigger First Amendment scrutiny" because it is not an adverse employment action. *See Phelan v. Laramie Cty. Cmty. Coll. Bd. of Trs.*, 235 F.3d 1243, 1247 (10th Cir. 2000); *Couch v. Bd of Trustees of Mem'l Hosp. of Carbon Cty.*, 587 F.3d 1223, 1236 (10th Cir. 2009); *Baca v. Sklar*, 398 F.3d 1210, 1220 (10th Cir. 2005). Not every slight against a disgruntled employee is actionable. Only his termination meets that standard. The relationship between his allegedly protected speech and any of the University's other actions is immaterial because none of the University's other actions constitute "adverse employment actions." *Id.*

In *Lincoln v. Maketa*, 880 F.3d 533, 542 (10th Cir. 2018) the Court recently held there was no clearly established guidance on when paid administrative leave becomes an adverse employment action for First Amendment retaliation purposes. In deciding this, the court cited positively to a Seventh Circuit opinion finding no adverse employment action when an employee was placed on administrative leave for three months. *Id.* (citing *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 787 (7th Cir. 2007)). Dr. Klaassen's first paid leave lasted only 45 days, and his Dr. Klaassen's second paid leave lasted just long enough for the University to conclude its investigation which included the Inquiry, an ad hoc hearing, and the decision by the EVC. *See Lincoln*, 880 F.3d at 542 (citing *Juarez v. Utah*, 263 F. App'x 726, 737 (10th Cir. 2008)). Here, neither paid administrative leave constitutes an adverse employment action.

Dr. Klaassen's laboratory transfer argument relies on *Schuler v. City of Boulder*, 189 F.3d 1304 (10th Cir. 1999), but in *Schuler*, the court specifically noted that "the involuntary transfer

appeared to be contrary to city policy for filling such vacancies." *Id.* at 1307. Here, Dr. Klaassen's transfer was not against University policy. SOF 6 (providing no restrictions on the University's right to transfer professors from one department to another). The University had every right to transfer Dr. Klaassen's laboratory, it caused him no damage, and implementing that right was not an adverse employment action.

Dr. Klaassen argues that he lost a significant amount of money when the NIH removed him as PI from the COBRE and T32 research grants. Doc. 349, p. 163.  He is incorrect. First, the NIH had the right to change the PI on any NIH grant. SOF 360.  Second, the dollars he refers to were not his; they always belonged to the University, for use only for the purposes identified in the grants. SOF 362. The Faculty Handbook describes serving as a PI on a grant to be a "privilege." Defs.' Resp. to Pl.'s SOAF 42, 60. Dr. Klaassen's removal from the grants is not an adverse employment action.

### 6.      The Individual Defendants are entitled to qualified immunity on Dr. Klaassen's First Amendment retaliation claims.

The Individual Defendants did not violate clearly established law. Dr. Klaassen cannot identify a case with sufficiently similar facts that put a reasonable professor or administrator on clear notice that his or her actions were unlawful. He cannot establish beyond debate: (1) that the Individual Defendants' actions violated Dr. Klaassen's First Amendment rights (*See* Defs.' Consol. Reply Br., *supra* § C.1–5.), or (2) that Dr. Klaassen's First Amendment rights were "clearly established law" at the time the Individual Defendants acted. *Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018) (citing *White v. Pauly*, 137 S. Ct. 548, 551 (2017)). The Individual Defendants could not have violated any clearly established law when two previous courts cleared Defendants of any wrongdoing. Defendants submit that the findings of four ad hoc

hearing committees, the Chancellor, and two courts establish there has been no violation of clearly established law.

When a defendant moves for summary judgment based upon qualified immunity, the burden shifts to the plaintiff, who must meet a two-part test before the defendant will bear the traditional burden of a movant for summary judgment under Fed. R. Civ. P. 56. *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1185 (10th Cir. 2001).

> Specifically, [t]he plaintiff initially bears a heavy two-part burden [and] must show (1) that the defendant's actions violated a constitutional...right, and (2) that the right allegedly violated [was] clearly established at the time of the conduct at issue. Unless the plaintiff carries [his] twofold burden, the defendant prevails.

*Reynolds v. Powell*, 370 F.3d 1028, 1030 (10th Cir. 2004) (internal quotation marks and citations omitted). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment–showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) (internal quotation marks omitted); *see Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012).

The Tenth Circuit has made clear that "before we may declare the law to be clearly established, we generally require (1) a Supreme Court or Tenth Circuit decision on point, or (2) a showing that the clearly established weight of authority from other courts has found the law to be as the plaintiff maintains." *Sause v. Bauer*, 859 F.3d 1270, 1275 (10th Cir. 2017) (quotations and citation omitted). *See also Knopf*, 884 F.3d at 944; *Lincoln v. Maketa*, 880 F.3d 533, 537 (10th Cir. 2018). To find appropriate precedent, the Court must define the right that the Individual Defendants allegedly violated, but not at a high level of generality; instead, "the clearly established law must be 'particularized' to the facts of the case." *Knopf*, 884 F.3d at 944 (quoting *White*, 137 S. Ct. at 552). "The precedent must be clear enough that any reasonable official

would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018).

Dr. Klaassen's definition of the clearly established law applicable here would eviscerate the rule of qualified immunity. He describes the clearly established law allegedly violated by the Individual Defendants as "whether Defendants could have reasonably believed, at the time they retaliated against Klaassen, that the administration could retaliate against a university professor because the professor publically criticized the university's handling of funds, operation, and organization." Doc. 349, p. 165. This abstract definition contains none of the particularized facts of Dr. Klaassen's situation. *Ellison v. Ladner*, No. 17-4025-DDC-JPO, 2018 WL 1400449, at *7 (D. Kan. Mar. 20, 2018). Dr. Klaassen did not define the clearly established law that was allegedly violated, using particularized facts.

***Official Duties.*** *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1918), which Dr. Klaassen describes as "factually indistinguishable," is similar only in that it involves an educator.  The Supreme Court published *Pickering* long before *Garcetti*, so it provides no guidance for clearly established law on the official duties analysis. *Knopf*, 884 F.3d at 947. Moreover, the Supreme Court reiterated at least three times in *Pickering* that "no question of maintaining either discipline by immediate superiors or harmony among coworkers is presented here," *Id.* at 572. This contrasts with Klaassen's behavior, which he acknowledges caused disruption. SOF 15, 160. Finally, *Pickering* involved an ordinary employee, not a high-ranking one, so it does nothing to distinguish *Rock*, 791 F.3d 1215.

Dr. Klaassen argues that "educators do not speak as employees when they criticize their school's administration and handling of funds." Doc. 349, p. 166. The cases he cites do not support this assertion. In addition, this Court's prior Memorandum and Order concluded that Dr.

Klaassen's speech was pursuant to official duties when it related to financial mismanagement, shared governance and misappropriation of grant money. Doc. 102, p. 33. There, the Court differentiated *Lane v. Franks*, 134 S. Ct. 2369, 2378 (2014), where the Supreme Court held that "testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen [and not as an employee] for First Amendment purposes." Doc. 102, p. 33. In *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1205 (10th Cir. 2007), the plaintiffs' speech occurred after hours and off school property, not at faculty meetings where the speech specifically was made as "a university distinguished professor." *Hulen v. Yates*, 322 F.3d 1229 (10th Cir. 2003), was also decided before *Garcetti*. Dr. Klaassen cites no analogous Supreme Court or Tenth Circuit opinion establishing that a reasonable administrator would have known Dr. Klaassen was not speaking pursuant to his official duties in any of the three categories of alleged speech at issue here.

*Matter of Public Concern.* As noted above, Dr. Klaassen was not speaking on a matter of public concern. Dr. Klaassen cites no Tenth Circuit or Supreme Court opinion where the particularized facts showed the *Pickering* balancing factors favored a high-ranking employee whose vague and insulting speech caused a litany of disruptions. Although it is Dr. Klaassen's burden to provide analogous precedent showing the Individual Defendants violated clearly established law, it was the Individual Defendants who provided the most analogous precedent in *Rock v. Levinski,* 791 F.3d 1217 (10th Cir. 2015). Not only does *Rock* not show the Individual Defendants violated clearly established law, it affirmatively shows they acted within the law.

*Balancing test.* The balancing test – perhaps even more so than the other elements of the *Garcetti/Pickering* test, lends itself to a grant of qualified immunity. When there is any question as to which way the balance of interests falls, the Court must grant qualified immunity. Dr.

Klaassen has not identified any caselaw that would have put every reasonable administrator on notice as to how the balance of interests falls. *See Ditter v. City of Hays, Kansas*, No. 15-9083, 2016 WL 81226, at *8 (D. Kan. Jan. 7, 2016) ("government officials are not expected to be prescient and are not liable for damages simply because they legitimately but mistakenly believed that the balancing of interests tipped in the State's favor"); *Wulf v. City of Wichita*, 883 F.2d 842, 865 (10th Cir. 1989) ("where supervisors, in a reasonable and good-faith exercise of their duties, discipline employees without the direction that would come through analogous cases, a determination that the law is clearly established will be precluded by the fact-specific nature of the *Pickering* balancing.").

### D.    Dr. Klaassen's "Procedural Due Process Taking of NIH Grants" Claim Fails as a Matter of Law.

Summary judgment on Dr. Klaassen's procedural due process claim (Count 2) is appropriate because the claim fails as a matter of law and the Individual Defendants are entitled to qualified immunity. *See Reynolds*, 370 F.3d at 1030; *Hidahl v. Gilpin Cnty. Dep't of Soc. Servs.*, 938 F.2d 1150, 1155 (10th Cir. 1991) (presumption in favor of qualified immunity unless plaintiff proves otherwise). First, Dr. Klaassen has failed to show that the Individual Defendants' conduct violated his procedural due process rights. Second, Dr. Klaassen has not established that the constitutional right at issue was clearly established or that any of the Individual Defendants' conduct was objectively unreasonable. Defendants respectfully suggest that this Court can forego resolving the more difficult constitutional question and grant qualified immunity because Dr. Klaassen's purported "right to research which included the right to serve as a principal investigator on NIH grants" was not clearly established by prior law. *See Reichle*, 132 S. Ct. at 2093; *Ashcroft v. al-Kidd*, 131 S. Ct. at 2080 ("Courts should think carefully before expending

scarce judicial resources to resolve difficult and novel questions of constitutional or statutory interpretation that will have no effect on the outcome of the case.") (internal citation omitted).

      1.      **Dr. Klaassen's procedural due process rights were not violated because he does not have a constitutionally protected property interest.**

Dr. Klaassen's Response variously asserts that he possessed a property interest in the "right to research which included the right to obtain and utilize outside funding including [research] grants" (Doc. 349 at 167), "right to research within [one's] field of study which includes the right to obtain outside funding," (*id.* at 169), "right to conduct research including the right to seek, obtain, and utilize NIH grants" (*id.* at 170), and "property interest in the right to obtain outside funding," (*id.* at 176). *See also* Amended Pretrial Order, Doc. 298, p. 22 ¶ 2(a) (defining the purported property interest as the "tenure right to conduct research, which included the right to serve as a principal investigator on NIH grants"). Dr. Klaassen's procedural due process claim fails as a matter of law because there is no such "constitutionally cognizable" property interest. *See Martin Marietta Materials, Inc. v. Kansas Dept of Transp.*, 810 F.3d 1161, 1171-72 (10th Cir. 2016) (procedural due process claim requires constitutionally cognizable property interest, deprivation of that interest, and a lack of constitutionally adequate notice and opportunity to be heard). Moreover, Dr. Klaassen does not controvert that the University provided him with an opportunity to be heard regarding his removal as PI at the First Ad Hoc Committee Hearing. SOF 382; Pl.'s Resp. to SOF 382. Defendants also note that contrary to Dr. Klaassen's assertion (at Doc. 349, pp. 167-168), this Court's ruling allowing Dr. Klaassen to file his Third Amended Complaint was not a ruling on the merits as to whether there was a property interest. The Court viewed the allegations in the light most favorable to the plaintiff and held that

the plaintiff had met his pleading burden. Doc. 120, p. 10. This matter is now on summary judgment motion, and he must now meet his factual burden, not just his pleading burden.

> **a.      Dr. Klaassen has no constitutionally protected property interest in serving as PI on grants awarded to the University.**

In the procedural due process context, state law determines whether a plaintiff has a constitutionally protected property interest. Doc. 102, p. 35 (citing *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 577 (10th Cir. 1996)). But not all property interests are protectable under the Fourteenth Amendment. *Paul v. Davis*, 424 U.S. 693, 709 (1976) ("the range of interests protected by procedural due process is not infinite") (quoting *Board of Regents v. Roth*, 408 U.S. 564, 570 (1972)). Rather, protectable property "interests attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law . . . ." *Id.* at 710; *accord Anglemyer v. Hamilton Cty. Hosp.*, 58 F.3d 533, 536 (10th Cir. 1995) ("procedural due process protections apply only to an individual deprived of a *recognized* property or liberty interest.") (citing *Roth*, 408 U.S. at 569) (emphasis added). Dr. Klaassen has identified no such property interest in this case.

> **(i)      Implied contract**

At the Motion for Judgment on the Pleadings stage, Dr. Klaassen argued that provisions in the KUMC Handbook related to "academic freedom" coupled with the Individual Defendants' conduct created an implied contract, which in turn gave Dr. Klaassen a protectable property interest. *See* Doc. 102, p. 36. This Court rejected his argument because it had not been properly pled, but permitted Dr. Klaassen to file his Third Amended Complaint to pursue the theory. *See* Doc. 120. Discovery is now complete, and the record is clear that the University had no intent to form an implied contract with Dr. Klaassen under which he was granted any right to conduct research or maintain his PI status.

Dr. Klaassen's argument relies heavily on the false premise that the Handbook's "academic freedom" provision gives rise to the "tenure right to conduct research, which included the right to serve as a principal investigator on NIH grants a right to conduct research." This argument has no merit. First, the Handbook provides that faculty's status as PI is a *privilege*, not a right. Defs.' Resp. to Pl's SOAF 42, 60. Second, Dr. Klaassen acknowledges that research is not an entitlement; research is a privilege. SOF 403. Third, he agrees that the AAUP Guidelines do not create a contract between any employee and the University. SOF 404. Fourth, Dr. Klaassen has already acknowledged that the "full freedom in research" provision relates to the freedom from challenge to the *subject matter* of one's research. SOF 405. The subject matter of the research has never been at issue here. It does not create a right of the PI, or any person associated with a grant award, to maintain his position on a grant. Dr. Klaassen cites no legal authority to support the position that principles of academic freedom give rise to a property interest that is protectable under the Fourteenth Amendment. *See Davis*, 424 U.S. at 709.

Fifth, if Dr. Klaassen believed that his "academic rights" were violated, the Handbook mandates a complaint procedure—entitled the "Academic Freedom Complaint Procedure"—to address and resolve a claim that a faculty member has been denied academic freedom. *See* Defs.' Resp. to Pl.'s SOAF 73. The complaint is to be filed within 30 days. It allowed Dr. Klaassen to request in writing an investigation of an academic freedom complaint by the Vice Chancellor of Academic Affairs if the resolution process didn't work. And after the remedies above, it allowed for consideration by the Faculty Steering Committee and an ad hoc hearing committee on academic freedom issues to be convened. Dr. Klaassen never exercised any of these rights or procedures. Finally, the KUMCRI has a policy specifically authorizing the removal of PIs, SOF 366, and Dr. Klaassen has acknowledged that it is "absolutely" within the authority of the NIH to

remove a PI. SOF 379. There is simply nothing in the Handbook that gives rise to a property interest in the right to PI status or that evidences any intent by the University to form an implied contract.

Dr. Klaassen's Response does not cite any cases to support his position that he has a constitutionally protected property interest in the "right to conduct research which includes the right to serve as PI on NIH grants" under the implied contract theory. Even where the facts might support an implied contract, its application is as an exception to the employment-at-will doctrine. *See Masterson v. Boliden-Allis, Inc.*, 865 P.2d 1031, 1034 (Kan. Ct. App. 1993) (citing *Morriss v. Coleman Co.*, 241 Kan. 501, 509, 738 P.2d 841 (1987)). This exception "allows an action for wrongful discharge when an employee is fired in breach of an implied-in-fact contract of employment." *Kastner v. Blue Cross & Blue Shield of Kansas*, Inc., 894 P.2d 909, 915 (Kan. Ct. App. 1995); *see also* Pattern Inst. Kan. Civil 124.55, Wrongful Discharge – Implied Contract (recognizing "implied contract not to discharge an employee except for just cause"). Dr. Klaassen has identified no case law in which a court applied the implied contract analysis to recognize a new property interest that has no independent source in state law.

In *Anglemyer v. Hamilton Cty. Hosp.* 58 F.3d 533 (10th Cir. 1995) (cited by Dr. Klaassen at p. 168), the Tenth Circuit found that even if an implied employment contract existed to create the constitutionally-protected right to continued employment, the scope of the interest was not so broad as to include a right to a particular job assignment. *See Anglemyer*, 58 F.3d at 538-39. The court held that even if an implied employment contract existed, the implied contract analysis did not apply because (as in this case) plaintiff's right to continued employment was not at issue. *See id.* at 538. Rather, the issue was whether plaintiff had a right to a *particular job assignment* as a part of her employment. *Id.* The court looked to Kansas law as a basis for that right. *Id.* There

was no Kansas case on point, so the court looked to "state court decisions, federal decisions, and the general weight and trend of authority" to determine the existence of the property interest, and ultimately concluded that no such right existed in that case. *See id.* at 538-39.

Dr. Klaassen cannot establish such a right based only on his own unilateral expectations of a contract. *See Ney v. City of Hoisington, Kan.*, 508 F. Supp. 2d 877, 893 (D. Kan. 2007), *aff'd sub nom.*, 264 F. App'x 678 (10th Cir. 2008); *Kastner*, 894 P.2d at 916; *see also* Doc. 326 at 110-116 (variously asserting Dr. Klaassen's "expectations," beliefs, and subjective "understanding" that he would have the unfettered right to conduct research). This is insufficient to establish an implied contract. Dr. Klaassen's belief that the Handbook's inclusion of language supporting academic freedom guaranteed him the unconditional right to remain as PI on the University's grants is not probative of any such intent by the University. *See Kastner*, 894 P.2d at 917 (rejecting plaintiff's argument that an implied contract was evidenced by a statement in the employee handbook statement that "violation of any policies covered in the booklet are just cause for termination," because "telling an employee about certain grounds for termination is not the same as telling an employee that he or she will not be terminated absent those grounds."). Moreover, even if such a guarantee were provided, Dr. Klaassen did not exercise the Academic Freedom Complaint Procedure. This reference to academic freedom simply does not evidence any intent by the University to guarantee Dr. Klaassen a right to serve as PI. *See id.*at 918 (statements in the employee handbook that certain conduct would justify termination were "not probative of whether an implied-in-fact contract" existed because the statements did "not promise that [the employee] would be terminated only for good cause.").

Dr. Klaassen fails to demonstrate how deposition excerpts, even if they said what plaintiff contends, establish an implied contract. These excerpts, taken out of context, do not

constitute University policies, nor are they probative of the University's subjective intent to enter into a contract with Dr. Klaassen. Defs.' Resp. to Pl.'s SOAF 72. In fact, Dr. Rawitch testified that the Faculty Handbook does not create a contract. Defs.' Resp. to Pl.'s SOAF 72. *See Kastner*, 894 P.2d at 918. And Dr. Klaassen's subjective belief that KU has never removed a PI from an NIH is not only irrelevant to the inquiry. Even if KU had never removed a PI, it would be insufficient to create an implied contract on these facts.[2] Dr. Klaassen also has not established that any such implied contract was enforceable against the University. The Tenth Circuit has made clear that although due process property interests may arise out of implied contracts, "such property interests arise only out of *enforceable* agreements, *see Kirkland*, 464 F.3d at 1190–91 ('Because the resignation agreement . . . never became an enforceable contract, Kirkland never gained a property interest in that agreement such that it would be subject to due process protections.'" *Fisher Sand & Gravel, Co. v. Giron*, 465 F. App'x 774, 781 (10th Cir. 2012) (emphasis supplied by court).

### (ii)     No property interest as a matter of law

Dr. Klaassen has pointed to no Kansas law recognizing a property interest in the right to serve as a PI on a grant awarded to the University. His unsupported, single-sentence assertion that he possessed such an interest because "KUMC's own policies and course of conduct" removed all discretion to "diminish a tenured professor's ability to conduct research," is insufficient to meet this burden. *See Hennigh v. City of Shawnee*, 155 F.3d 1249, 1254 (10th Cir. 1998) (a property interest is created if a "statute or regulation places substantive restrictions on the [employer's] discretion" to remove the alleged right).

---

[2] Dr. Klaassen incorrectly states (at pg. 170) that his asserted facts must be "taken as true." Although this Court views facts in the light most favorable to Dr. Klaassen, his version of the facts must find support in the record. *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009).

**b.** **Dr. Klaassen was not entitled to notice and a hearing before being removed as PI.**

Because Dr. Klaassen fails to prove a property right to serve as a PI on NIH Grants, he was not entitled to notice and an opportunity to be heard before the University exercised its discretion to request a change in PIs. Doc. 326, p. 112. Dr. Klaassen has not contested that the Faculty Handbook does not set forth any sort of due process procedure before a PI is removed. Dr. Klaassen stated his case pertaining to removal as PI to the First Ad Hoc Committee, which concluded that "it was not inappropriate" to remove him as the PI on the grants. SOF 382. Dr. Klaassen does not controvert that fact, nor does he address it in his Response.

**2.** **The Individual Defendants are entitled to qualified immunity on this claim.**

Dr. Klaassen's contention that his "property right" was "clearly established" is undermined by his own argument that "whether [he] possesses a property interest at KUMC in his right to research" is a question of fact for the jury. Doc. 349, pp. 175-176.  If the issue is so susceptible of debate that it must be decided by a jury, it cannot possibly be an issue that was so "obvious" that each of the Individual Defendants should have known that "interfering" with such right would be unlawful. *White*, 137 S. Ct. at 552; *Mullenix v. Luna*, __ U.S. __, 136 S. Ct. 305, 308 (2015) (per curiam) ("existing precedent must have placed the statutory or constitutional question beyond debate.").

Dr. Klaassen has not identified any binding authority that alerted any—much less every—reasonable official that their conduct (replacing a PI on a research grant in accordance with University policy) was unlawful. *Wesby*, 138 S. Ct. at 590. ("The [clearly established] precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that every reasonable official would know.") (internal quotations and citations omitted). Nor has he pointed to any

facts to suggest that any of the Individual Defendants' conduct was objectively unreasonable. *See Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012). It was objectively reasonable for the Defendants to replace Dr. Klaassen as PI pursuant to University policy, and a committee of Dr. Klaassen's peers agreed. SOF 382. Qualified immunity is therefore appropriate.

      **E.**    **Dr. Klaassen conceded that punitive damages are inappropriate.**

The Individual Defendants asserted that punitive damages are not appropriate on any of Dr. Klaassen's claims. Doc. 326, p. 118. Dr. Klaassen has not responded. Accordingly, summary judgment should be entered in favor of Defendants on this issue. *See Lancaster v. Sprint/United Mgmt. Co.*, 670 F. App'x 984, 985 (10th Cir. 2016) (plaintiff waived claim by failing to respond to summary judgment arguments on that claim); *Palmer v. Unified Gov't of Wyandotte Cty./Kansas City*, 72 F. Supp. 2d 1237 (D. Kan. 1999) ("[T]he court deems plaintiff's failure to respond to an argument raised in defendants' papers tantamount to an express abandonment of any such claim.")

      **F.**    **Dr. Klaassen conceded that this Court should decline to exercise supplemental jurisdiction over his state law claims.**

The Individual Defendants asserted that this Court should decline to exercise supplemental jurisdiction over Dr. Klaassen's state law claims if any, and not dismissed on their merits. Doc. 326, pp. 115-116. Dr. Klaassen did not respond to this argument. Accordingly, summary judgment should be entered in favor of Defendants on this issue. *See Lancaster*, 670 F. App'x at 985; *Palmer*, 72 F. Supp. 2d 1237.

**III.**    **CONCLUSION**

Defendants respectfully request that summary judgment be entered in their favor on all claims and all issues for the reasons set forth herein.

Respectfully Submitted,

FOULSTON SIEFKIN LLP

By: /s/ Anthony F. Rupp
Anthony F. Rupp, KS #11590
Tara S. Eberline, KS #22576
32 Corporate Woods, Suite 600
9225 Indian Creek Parkway
Overland Park, KS 66210
Telephone: (913) 498-2100
Facsimile: (913) 498-2101
Email: trupp@foulston.com
        teberline@foulston.com

ATTORNEY FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served upon all counsel of record via notice of electronic filing made under the Court's Electronic Filing System on May 10, 2018, upon the following:

Alan L. Rupe #08914
Jeremy K. Schrag #24164
LEWIS BRISBOIS BISGAARD & SMITH LLP
1605 N. Waterfront Parkway, Suite 150
Wichita, KS 67206
Telephone: (316) 609-7900
Facsimile: (316) 630-8021
Email: alan.rupe@lewisbrisbois.com
Email: jeremy.schrag@lewisbrisbois

ATTORNEYS FOR PLAINTIFF

/s/ Anthony F. Rupp
Anthony F. Rupp
Attorney for Defendants