## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CURTIS KLAASSEN, Ph.D.,

       Plaintiff,

v.

BARBARA ATKINSON, et al.,

       Defendants.

Case No. 13-2561-DDC-KGS

## MEMORANDUM AND ORDER

This case is a highly contentious employment dispute. Plaintiff Curtis Klaassen, Ph.D., served as a tenured professor at the University of Kansas Medical Center ("KUMC") until KUMC fired him in 2014. Dr. Klaassen brings this lawsuit against KUMC and various current and former KUMC officials. He alleges that defendants retaliated against him because he criticized KUMC for financial mismanagement, a perceived absence of appropriate governance, and other alleged misconduct. Dr. Klaassen asserts a First Amendment retaliation claim, Due Process claims, and various claims under Kansas state law.

The facts giving rise to this lawsuit were the subject of four faculty ad hoc committee hearings at KUMC, final agency action by the Chancellor of the University of Kansas, and two state court lawsuits filed by Dr. Klaassen. All of these proceedings resulted in decisions adverse to Dr. Klaassen. This is the fourth lawsuit that Dr. Klaassen has filed stemming from his employment dispute with KUMC. His original Complaint in this case sued the Kansas Board of Regents, the University of Kansas, KUMC, and 10 individuals who are, or once were, faculty and staff at KUMC. In its current posture, only seven individuals remain as defendants.

Collectively, they have filed a Motion for Summary Judgment (Doc. 325), seeking summary judgment against each claim Dr. Klaassen asserts in this lawsuit.

The court recognizes that this case involves a lot of facts. The parties' dispute began years ago, and the material facts involve many participants. This history has produced an extensive factual record. Indeed, defendants submitted more than 400 statements of material fact to support their Motion for Summary Judgment. Doc. 326 at 5–80. Dr. Klaassen responded to defendants' 400-plus statements of fact with 409 statements of material fact of his own. Doc. 349 at 68–138.

Defendants filed a Joint Memorandum in Support of their Motion for Summary Judgment. With the court's approval, defendants submitted 40 pages of Arguments and Authorities, 10 more pages than our local rule allows. Doc. 326. Dr. Klaassen's response also includes 40 pages of Arguments and Authorities. Doc. 349. And defendants submitted a Reply containing 30 pages of Arguments and Authorities. Doc. 366. Also, the individual defendants each filed their own 15-page memoranda in support of their summary judgment motions. Docs. 327, 328, 329, 330, 331, 332, 333. Dr. Klaassen submitted responses to each of the individual defendants' memoranda. Docs. 351, 352, 353, 354, 355, 356, 357. Finally, the individual defendants submitted individual replies. Docs. 368, 369, 370, 371, 372, 373, 374.

To say the least, the matter is fully briefed. The court has reviewed the parties' many pages of briefing as well as the extensive factual record. And now it is prepared to rule. For reasons explained below, the court grants defendants' Motion for Summary Judgment against Dr. Klaassen's federal claims and dismisses those claims with prejudice. The court declines to exercise supplemental jurisdiction over Dr. Klaassen's state law claims and thus dismisses those claims without prejudice.

## I.      Uncontroverted Facts

The following facts are either stipulated facts taken from the Amended Pretrial Order (Doc. 298), or are uncontroverted and stated in the light most favorable to plaintiff as the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 379 (2007).

### *The University of Kansas and Kansas University Medical Center*

The University of Kansas ("KU") is a state educational institution.  The Kansas University Medical Center ("KUMC") includes that University's School of Medicine, School of Nursing, and School of Health Professions.  The University's chief executive officer is the Chancellor, who is named by and serves at the pleasure of the Kansas Board of Regents.  The Chancellor is responsible for all of the University's operations.

The primary administrative and academic officer for the KUMC campus is the Executive Vice Chancellor ("EVC").  The EVC is appointed by and serves at the pleasure of the Chancellor.  The chief administrator of each school at KUMC is a dean.  The EVC and the Chancellor appoint the dean, and the dean serves at their pleasure.

In 2005, KUMC faculty adopted a Handbook for Faculty and Other Unclassified Staff ("KUMC Handbook").  The policies contained in KUMC's Handbook "are not intended to create a contract between the University of Kansas and its employees."  Doc. 326-38 at 17.

### *Dr. Curtis Klaassen*

In 1968, Dr. Klaassen began his employment with the University of Kansas.  In 1974, Dr. Klaassen became a tenured member of the University of Kansas faculty, and in 2002, he was named a University Distinguished Professor.  Only seven members of the University's 1,200 faculty members have received the title of Distinguished Professor.  A Distinguished

Professorship is awarded based solely on merit. It requires exemplary scholarship and preeminent teaching ability.

As a research professor at KUMC, Dr. Klaassen worked with graduate students, post-doctoral students, and junior research faculty. His job responsibilities included working with these individuals on his research programs. Those programs largely were funded by research grants. After completing their research, Dr. Klaassen and his students then would publish the results of their research.

In 2003, Dr. Barbara Atkinson, Executive Dean of the School of Medicine, named Dr. Klaassen to serve as Chair of the Department of Pharmacology and Toxicology ("Pharm/Tox"). Dr. Atkinson promoted Dr. Klaassen to this position because she thought he was the right person to revitalize the Department and move it to the next level. She expected Dr. Klaassen to move the Pharm/Tox Department into the top half of pharmacology and toxicology programs in the country. When Dr. Atkinson offered Dr. Klaassen the Chair position in November 2002, she also recommended him for appointment as a University Distinguished Professor, an appointment Dr. Klaassen received later in 2002.

The position of Department Chair serves at the pleasure of the Dean, and Dr. Klaassen understood as much. He also acknowledges that no due process requirements apply to removals from a "serve-at-the-pleasure" position.

### *Dr. Klaassen's Behavior at KUMC*

During his tenure at KUMC, Dr. Klaassen used loud language, pounded on tables in staff meetings, and sometimes would turn red in the face and shake. Also, Dr. Klaassen displayed images of guns and discussed suicide in PowerPoint presentations. Dr. Carlson recalled several times when Dr. Klaassen was so angry that he turned red and began shouting.

Rosa Meagher, a longtime KUMC employee, worked closely with Dr. Klaassen from 1988 to 2011. Ms. Meagher testified that when Dr. Klaassen was promoted to Chair of the Pharm/Tox Department, he had a reputation for having passionate outbursts, including loud language, pounding on tables in staff meetings, turning red in the face, and shaking.

Dr. Klaassen criticized professors who, he felt, were low achievers. One of the faculty members who Dr. Klaassen called a "low achiever" was Dr. Beth Levant. Dr. Levant complained about Dr. Klaassen's outbursts in 2005 and 2006. She complained that Dr. Klaassen had yelled at faculty, turned red, banged on tables, and showed pictures of guns in PowerPoint presentations. Also, she complained about a "Life is Hell" Power Point slide that Dr. Klaassen presented at a Department meeting.

Dr. Atkinson met annually with Dr. Klaassen to provide an evaluation. Dr. Atkinson testified that she evaluated Dr. Klaassen in the good-to-excellent range. Also, during these evaluations, Dr. Atkinson discussed with Dr. Klaassen the way he treated the people in his Department. Also, Dr. Paul Terranova, KUMC's Vice Chancellor for Research, met with Dr. Klaassen annually to discuss the Pharm/Tox Department's performance under his leadership. Dr. Terranova described Dr. Klaassen's evaluations as "excellent."

### Dr. Klaassen's Criticisms of Dr. Atkinson

When Dr. Atkinson was Executive Dean, she directed KUMC to ramp up its efforts to secure a National Cancer Institute designation. Securing this designation was one of Dr. Atkinson's top priorities when she became Executive Dean. Dr. Klaassen criticized Dr. Atkinson's management at KUMC, including her decision to pursue the National Cancer Institute designation. KUMC eventually achieved the National Cancer Institute designation.

The Kansas University Endowment Association ("KU Endowment") is the nonprofit corporation statutorily authorized to act as the investing agent for endowments to the University. KU Endowment holds the funds in endowment accounts for the benefit of the University—not for any particular individual. KU Endowment raised money to help support KUMC's initiative to seek a National Cancer Institute designation. KU Endowment secured funding from the Kauffman Foundation for that initiative. Specifically, the Kauffman Foundation provided $8 million to KUMC to start a program called "Institute for Advancing Medical Innovation." KU Endowment matched the Kauffman Foundation's grant. KUMC designed the Institute for Advancing Medical Information to build new business and develop new drugs under the cancer center's auspices. Dr. Douglas Girod—former EVC of KUMC and now KU's current Chancellor—testified that the Kauffman Foundation is a "great partner" of KUMC.

In 2010, Dr. Klaassen and a group of basic science chairs met with KU Chancellor Bernadette Gray-Little to express their concerns about KUMC's governance. Dr. Gerald Carlson testified that he attended this meeting. In it, he expressed concerns about the lack of transparency and funding at KUMC. Also, Dr. Carlson testified, this group of basic science chairs had decided not to oppose the efforts to secure designation as a National Cancer Institute because it would have made them look bad. Dr. Klaassen testified that he thought pursuing the National Cancer Institute designation was detrimental to KUMC and to him personally. After the meeting, Chancellor Gray-Little sent a letter to Dr. Atkinson about the meeting. It conveyed the concerns expressed during her meeting with the group of basic science chairs.

### *Dr. Klaassen's Service as Chair of the Pharm/Tox Department*

As Chair of the Pharm/Tox Department, Dr. Klaassen was a manager of the faculty in that Department. In his role as Chair, Dr. Klaassen hosted Department meetings. In these

meetings, he led the Pharm/Tox faculty's efforts to develop a philosophy of success, set a positive tone for the Department, and share information about other developments in the Department and around campus.

In his role as Department Chair, Dr. Klaassen shared information about sources of money to his Department and how it was using grant funds. Dr. Klaassen recognizes that faculty and administration often have disputes or disagreements about the percentage of salaries that are attributable to grants. Also, he acknowledges, faculty and administration members usually work together to come to an agreement on this issue.

At least once in 2010, when Dr. Klaassen served as Chair of the Pharm/Tox Department, he asked his faculty members during a faculty meeting to sign a vote of "no-confidence" against Dr. Atkinson. Also, Dr. Klaassen told the faculty that anyone who didn't support his view about Dr. Atkinson was a traitor.

In February 2011, Dr. Paul Terranova, KUMC's Vice Chancellor for Research, invited Dr. Klaassen to dinner with Ann Bonham, an outside speaker from the American Association of Medical Colleges. Dr. Terranova testified that Dr. Klaassen, in front of Dr. Bonham, began venting about the University. Dr. Terranova considered Dr. Klaassen's behavior unprofessional for a Department Chair. After the dinner, Dr. Terranova reported to Dr. Atkinson that Dr. Bonham had told him she had never been exposed to such inappropriate behavior from a high level administrator. Dr. Klaassen denies that he acted inappropriately during this dinner.

On March 31, 2011, the University conducted a stakeholders meeting on campus for department chairs and similarly situated individuals from KUMC. During the meeting, the participants watched a demonstration of a software product that KUMC was considering. Dr. Klaassen attended the meeting as one of the department chairs. During the meeting, Dr.

Klaassen accused Dr. Atkinson of mismanagement at KUMC. Dr. Klaassen testified that he criticized Dr. Atkinson and the University at the meeting because he wanted to notify other department chairs about his concerns that Dr. Atkinson was mismanaging KUMC. Dr. Klaassen also accused Dr. Atkinson of engaging in "slumlord economics." Dr. Klaassen testified that his comment about "slumlord economics" meant that Dr. Atkinson was spending money frivolously, like a landlord who buys an expensive car and then raises rent on his tenants to pay for his expensive purchase. In his deposition testimony, Dr. Klaassen conceded in his deposition that the outside vendor was not a governmental authority and was not in a position to do anything to respond to Dr. Klaassen's complaint about Dr. Atkinson.

Dr. Terranova testified that Dr. Klaassen came late to the meeting. Also, he testified that Dr. Klaassen's comments about mismanagement disrupted the meeting, a meeting convened to hear how a software product would work. Dr. Terranova considered Dr. Klaassen's behavior at the meeting insulting and embarrassing. Also, he described Dr. Klaassen's comments as ones directed to individuals who could do nothing about his complaints.

Dr. William Brooks is a faculty member who attended the March 2011 meeting. Afterwards, he submitted a complaint to Dr. Atkinson about Dr. Klaassen's behavior. Dr. Brooks described Dr. Klaassen's behavior as embarrassing and inappropriate for the setting. Also, he found Dr. Klaassen's reference to the University as a "slumlord" inflammatory. Dr. Brooks also termed Dr. Klaassen's behavior during the March 2011 meeting unprofessional and inappropriate. He recognized Dr. Klaassen held strong opinions but, until that meeting, had kept his opinions "behind closed doors." Doc. 326-17.

Dr. Carl Weiner also attended this meeting. Afterwards, he complained that Dr. Klaassen was attacking the vendor about something that had nothing to do with its product. Another attendee, Judy Otey, described Dr. Klaassen's behavior as extremely inappropriate.

### *Dr. Atkinson Removes Dr. Klaassen as Chair of the Pharm/Tox Department*

On April 5, 2011, Dr. Atkinson asked Dr. Gerald Carlson if he would agree to serve as the Interim Chair of the Pharm/Tox Department. Dr. Carlson accepted. On April 6, 2011, Dr. Atkinson met with Dr. Klaassen and gave him the option either to resign or face termination from his position as Chair of the Pharm/Tox Department. Dr. Atkinson told Dr. Klaassen that she hoped he would remain with KUMC as a superb researcher with access to all the same grants and programs, but he would no longer serve as Department Chair. During the meeting, Dr. Klaassen provided Dr. Atkinson a PowerPoint presentation that criticized Dr. Atkinson's management at KUMC.

On April 12, 2011, Dr. Atkinson sent Dr. Klaassen a letter formally confirming that she had terminated him from his role as Chair of the Pharm/Tox Department. In that letter, Dr. Atkinson instructed Dr. Klaassen that he was not "to direct or lead the faculty and may no longer call department faculty meetings." Doc. 326-27 at 1. The letter also advised that Dr. Klaassen was "not to interfere with the financial management of the department in any way." *Id.* By losing his Chair position, Dr. Klaassen no longer received a $40,000 annual stipend that he had received as a Department Chair.

Dr. Atkinson explained that she removed Dr. Klaassen as Chair because of his lack of leadership, his treatment of faculty, and the extremely inappropriate things he had said to his faculty, the administration, and the public. Dr. Hartmut Jaeschke commented about Dr.

Klaassen's removal as Chair: "The lesson to be learned here is that even if you do an excellent job as chair, it is still unhealthy to criticize your boss too much."  Doc. 349-45 at 1.

After Dr. Klaassen's meeting with Dr. Atkinson, his PowerPoint presentation was circulated to others,[1] including individuals at the Kauffman Foundation and KU Endowment. The PowerPoint presentation questioned whether Dr. Atkinson was "bankrupting the future of KUMC."  Doc. 349-15 at 5.  A representative from the Kauffman Foundation and a representative of KU Endowment received the PowerPoint presentation and said that it troubled them.  After Dr. Terranova received this PowerPoint presentation, he wrote to Dr. Atkinson and reported that he found it "upsetting."

After meeting with Dr. Atkinson, Dr. Klaassen had a conversation with Dr. Carlson about his role as Interim Chair.  Dr. Carlson testified that Dr. Klaassen did not understand that he was now Dr. Klaassen's supervisor.  Dr. Carlson testified that Dr. Klaassen made it clear to him that he intended to run the Department jointly with Dr. Carlson—even though Dr. Atkinson had appointed Dr. Carlson as Interim Chair.

In response to Dr. Atkinson's removing Dr. Klaassen as Department Chair, some faculty members expressed their concern that the decision could damage the Pharm/Tox Department.  A group of tenured faculty members wrote to Dr. Atkinson and asked her to reverse the decision.

### Dr. Klaassen's Behavior After He Was Removed as Chair of the Pharm/Tox Department

On April 7, 2011, Dr. Klaassen gave a final presentation to the Pharm/Tox faculty.  In that meeting, he asked faculty what his role should be in the Department going forward.  One of the options he presented to the faculty was that he would continue running the day-to-day operations while Dr. Carlson—the proposed new Interim Chair—would sign papers and work

---

[1]     The parties don't dispute that Dr. Klaassen's PowerPoint was circulated to others but the summary judgment record never identifies the individual who circulated the PowerPoint.

with the administration.  More specifically, Dr. Klaassen provided the Pharm/Tox faculty with

seven options he could take in response to his removal as Department Chair.  Quoted verbatim,

Dr. Klaassen's options were:

- Commit suicide
- Retire
- Move to new University
- Move to a different place on campus
- Stay physically in Department, but put tin foil over my door and not attend any departmental functions
- Stay physically in department and attend functions as all faculty
- Do what I am doing what I can, have Carlson sign papers and talk to administration

Doc. 326-30 at 29.

Dr. Klaassen presented this PowerPoint presentation at the faculty meeting.  It included

some of his criticisms of Dr. Atkinson, including that she had told him that he was not on the

KUMC Planning Committee because he was not in her future plans.  It also described his April

6, 2011, meeting with Dr. Atkinson.  Dr. Klaassen's PowerPoint presentation asserts that Dr.

Atkinson had told him that he was doing a good job as Chair of the Department but that he must

resign or she would fire him.

Also, Dr. Klaassen's PowerPoint presentation concedes that Dr. Klaassen's "acting out"

had captured Dr. Atkinson's attention.  It includes a slide reading:  "My statements, which [Dr.

Atkinson] apparently [doesn't] like, are comments as a University Distinguished Professor that

has spent many years at KUMC, not as a Chair."  Doc. 326-30 at 17.  The PowerPoint slides

following this slide discuss inadequate joint governance and inadequate communication; other

slides question various financial decisions KUMC had made.  Also, Dr. Klaassen's presentation

discusses KUMC's decisions to establish a cancer center and open medical school campuses in

Wichita and Salina.  A faculty member who attended the meeting testified that Dr. Klaassen

said—referring to Dr. Atkinson—"the bitch must go."  Dr. Klaassen has conceded that he called Dr. Atkinson a bitch in front of the Pharm/Tox faculty.

In the days after Dr. Klaassen's April 7 meeting with the Pharm/Tox faculty, one of Dr. Klaassen's students circulated an email and flyer on behalf of a group identified as "Students for Democracy at the University of Kansas Medical Center."  Dr. Klaassen has conceded that he provided information to the student who circulated the email and flyer.  Some of the information contained in the email and flyer was false, including one assertion that Dr. Atkinson forced each of the basic science faculty to take a 50% salary cut.

The Students for Democracy flyer argued that more money should go to basic sciences, where Dr. Klaassen served as a faculty member.  No one in the basic science faculty took a 50% salary cut.  Also, the flyer described Dr. Klaassen as a commonly recognized well-qualified Chair of the Pharm/Tox Department.  And it implies that Dr. Atkinson caused another medical school to declare bankruptcy because she mismanaged the school while serving as its Dean.

After he was removed as Department Chair, Dr. Klaassen continued in his appointment as a member of the faculty in the Pharm/Tox Department and remained the Principal Investigator on the COBRE and Training grants.  During this period, Dr. Terranova received reports from Pharm/Tox Department members complaining about Dr. Klaassen's disruptive behavior.  On May 20, 2011, Dr. Klaassen even apologized to a staff member for his behavior that Dr. Klaassen described as "overly aggressive."  Dr. Terranova testified that such behavior can slow the Department's progress and disrupt the faculty's ability to perform their jobs, including research, teaching, and administrative duties.

On April 8, 2011, Dr. Klaassen sent an email to Dr. Carlson addressed to "Dr. Herr Professor Chairmen Carlson."  Doc. 349-39 at 1.  Dr. Klaassen's email asked about the status of

COBRE job applications.  Dr. Carlson responded to the email but didn't respond to Dr.

Klaassen's question.  On May 19, 2011, Dr. Klaassen sent an email to Dr. Carlson, Cody Tully

(a Management Analyst in the Pharm/Tox Department), and Rosa Meagher (an administrative

assistant) to set up a meeting to discuss the COBRE grant, the Training grant, and a faculty

search.  Dr. Carlson told Mr. Tully and Ms. Meagher that they shouldn't hesitate to postpone the

meeting if they thought "anything is crossing the line."  Doc. 349-88 at 1.

In June 2011, Dr. Klaassen sent another email to Dr. Carlson, Ms. Meagher, and Mr.

Tully.  It asked for a meeting to discuss certain topics.  Among themselves, Dr. Carlson, Ms.

Meagher, and Mr. Tully responded that they didn't see the need to hold the meeting.  Ms.

Meagher responded by email that she was reluctant to meet with Dr. Klaassen because she didn't

want to provide him with any information he could "use in his Saturday escapades."  Doc. 349-

90 at 1.  But eventually, Dr. Carlson responded to Dr. Klaassen and offered to meet with him.

In June 2011, while Dr. Klaassen was out of town, the faculty offices—including Dr.

Klaassen's—were re-keyed.  Grace Guo is a junior faculty member who worked closely with Dr.

Klaassen.  She testified that she felt people were harassing her around this time because Dr.

Klaassen had hired her.  A few weeks later, Dr. Klaassen sent an email to Dr. Carlson discussing

the complications he faced in meeting his grant responsibilities and requesting assistance.  In a

response by email, Dr. Carlson quoted Jean-Paul Sartre and questioned Dr. Klaassen's intentions

for sending the email.

On July 21, 2011, Dr. Klaassen circulated an article from *The Lawrence Journal-World*

about KUMC to the Pharm/Tox faculty.  Dr. Carlson informed Dr. Atkinson about Dr.

Klaassen's email.  Dr. Carlson told Dr. Atkinson that he responded "nastily" to Dr. Klaassen

with the goal of  "provoking an open confrontation between [Dr. Klaassen] and [Dr. Carlson] at a

faculty meeting next week." Doc. 349-97 at 1. Dr. Carlson continued: "I haven't responded with emotion to a single one of his many previous missiles, but this nonsense has gone on long enough." *Id.*

On July 26, 2011, Dr. Klaassen sent an email to Dr. Carlson asking whether he had a plan for certain equipment. Rosa Meagher sent a response to the email to Cody Tully. It read: "Dictator?" Doc. 349-99 at 1. Ms. Meagher testified that she ignored Dr. Klaassen repeatedly because he had attacked her by email, he "grinded" on her, and he was not a very pleasant person.

In the fall of 2011, Dr. Terranova and Dr. Carlson exchanged emails about the "interrelated issues" of removing Dr. Klaassen as Principal Investigator for the COBRE grant, removing Dr. Klaassen as the Principal Investigator for the Training grant, placing a new permanent Chair in the Pharm/Tox Department, and moving Dr. Klaassen's laboratory from the Hemenway building to the Hixson building. Doc. 326-20 at 1. Dr. Terranova testified he believed that it was good that they were planning and preparing for the issues together because the issues involved guidelines compliance, forming hiring committees, contacting the National Institutes of Health, and other tasks.

On Friday, October 28, 2011, Dr. Klaassen called a meeting, purportedly to discuss the COBRE grant. Dr. Klaassen called this meeting in his capacity as Principal Investigator of the COBRE grant. He invited people associated with this grant to attend this meeting. But he did not invite Dr. Carlson, the Interim Chair of the Pharm/Tox Department. In an email to Dr. Terranova, Dr. Carlson complained that Dr. Klaassen's COBRE meetings provided Dr. Klaassen with "a large audience to rant and rave about the Dean, Cody [Tully] and me and to tell half-

truths and lies." Doc. 326-21 at 1. Dr. Carlson noted that Dr. Klaassen wouldn't be able to hold such meetings if he was no longer the Principal Investigator on the COBRE grant.

At the meeting, Dr. Klaassen presented another PowerPoint presentation. In one of the PowerPoint slides, Dr. Klaassen referred to Dr. Carlson as a "Ford chair trying to be a Mercedes chair—major conflict of interest." Doc. 326-31 at 1. In another slide, Dr. Klaassen accused Dr. Carlson of "doing everything he can to destroy the department." *Id.* at 3. And yet in another slide, Dr. Klaassen stated that his future cooperation with the department "will largely be dependent on the new Chair's respect" for him. *Id.* at 5. Dr. Klaassen told the faculty that he would not allow the new Department Chair to become the Principal Investigator of the COBRE grant—a major source of funding for the Pharm/Tox Department. Also, Dr. Klaassen stated that his comments were made in the meeting "as a university distinguished professor." *Id.* at 11. Some members of the Department walked out of this meeting to protest Dr. Klaassen's behavior.

Also on October 28, 2011, Dr. Klaassen told Dr. Hartmut Jaeschke that he had heard that Dr. Jaeschke had applied for the position as Chair of the Pharm/Tox Department. When Dr. Jaeschke responded that he had applied, Dr. Klaassen threatened Dr. Jaeschke. Dr. Klaassen told Dr. Jaeschke, "[If] you fuck me over[,] I'm going to fuck you over." Doc. 326-77 at 3 (Jaeschke Dep. 57:6–58:11).

In response to the October 28, 2011, events, Dr. Carlson and Dr. Jaeschke reported Dr. Klaassen's behavior to Dr. Terranova. Dr. Terranova described the complaints ones as reporting disruptive behavior by Dr. Klaassen in the Department. Dr. Terranova testified that Dr. Klaassen's description of Dr. Carlson as a "Ford chair trying to be a Mercedes chair" was insulting, insubordinate, and not relevant to the COBRE grant. He also thought it was insubordinate for Dr. Klaassen to state in his PowerPoint presentation that Dr. Carlson was doing

everything he can to destroy the Department. Dr. Terranova found Dr. Klaassen's behavior seriously inflammatory and beyond the bounds of expectations for a university environment. Dr. Atkinson testified that people, by this point in time, were frightened of Dr. Klaassen.

### *Dr. Klaassen is Placed on Administrative Leave*

On Tuesday, November 1, 2011, the University placed Dr. Klaassen on administrative leave with full pay. Dr. Klaassen testified that he was in a meeting on November 1, 2011. Dr. Terranova and two armed police officers entered the room and escorted him off campus. While on leave, Dr. Klaassen's duties were suspended, meaning that he was not to carry out any duties while on administrative leave. Dr. Terranova provided Dr. Klaassen with a letter describing the reason for placing him on paid administrative leave. It read:

> It has been reported to me that you have exhibited behavior and engaged in statements that were belligerent and frightening to other University faculty and staff. You made these statements and engaged in this behavior in meetings related to the COBRE grant, in administrative meetings with faculty and staff related to budget uses, and in a one-to-one meeting with a faculty member in your department. I understand that these were not simply disagreements on a professional basis, but were seriously inflammatory and frightening to several individuals concerned and completely beyond the bounds of what is expected in a University environment.

Doc. 326-22 at 1. The letter informed Dr. Klaassen that his leave was paid leave, and that he was not to come on campus except for specified circumstances.

Dr. Terranova told Dr. Klaassen that the KUMC administration would consider the future direction of Dr. Klaassen's programs—including grants for which Dr. Klaassen was Principal Investigator—while he was on leave. More specifically, the letter provided:

> During your suspension from duties, KUMC administration will decide the future direction and continuation of all programs that you direct at KUMC. This determination will include consultation with appropriate faculty, other administrators at KUMC, and the NIH. Any adverse or unacceptable behavior on your part, including any activities by you to inappropriately undermine this action and any transition that may be directed, will be dealt with expeditiously and in accordance with the Handbook for Faculty and Other Unclassified Staff.

*Id.* at 2.

On November 15, 2011, Dr. Terranova asked Dr. Allen Rawitch, Vice Chancellor for Academic Affairs, to investigate the accusations that Dr. Klaassen had engaged in personal and professional misconduct. Dr. Terranova said he did so to determine whether reasonable grounds existed to convene a faculty Ad Hoc Hearing Committee.

On November 21, 2011, the University of Kansas Medical Research Institute wrote to the National Institutes of Health ("NIH"). The letter asked the NIH to change the Principal Investigator on the COBRE and Training grants from Dr. Klaassen to other KUMC faculty members. Dr. Terranova testified that, based on Dr. Klaassen's inappropriate, belligerent, offensive, and threatening behavior, he believed Dr. Klaassen could not perform the duties of the Principal Investigator on the COBRE and Training grants.

On November 23, 2011, Dr. Terranova notified Dr. Klaassen that KUMC had extended his 30-day administrative leave until December 15, 2011.

### *Dr. Klaassen Speaks with* **The Lawrence Journal-World**

Although he does not recall precisely when, at some point during 2011, Dr. Klaassen called *The Lawrence Journal-World* ("*LJW*") on the telephone and then visited its office in person. Dr. Klaassen spoke with Dolph Simons, Jr., who worked at the *LJW* and wrote some of its editorials. Dr. Klaassen did not discuss his removal as Principal Investigator for any of the NIH Grants with Mr. Simons because that had not yet happened.

On April 28, 2011, the *LJW* published a news story written by Andy Hyland. It ran under the headline, "Department chairman at Kansas University Medical Center asked to step down." Doc. 326-13 at 1. This was the first article that the *LJW* had published about Dr. Klaassen. The story discussed KUMC's decision to remove Dr. Klaassen from the Department Chair position.

But it included no comment from Dr. Klaassen. The article specifically reported that Dr. Klaassen had "no comment." *Id.* Dr. Klaassen denies that he ever spoke with Mr. Hyland.

Two days later, the *LJW* published a column expressing Mr. Simons's editorial opinion that "Dr. Klaassen's firing reveals broader concerns at the University's medical center." Doc. 326-12 at 1. Mr. Simons did not quote Dr. Klaassen in this editorial. But the editorial quoted letters that Dr. Atkinson personally had provided to Dr. Klaassen.

On July 17, 2011, the *LJW* published another editorial critical about Dr. Atkinson's leadership at KUMC. This second editorial doesn't quote or even mention Dr. Klaassen. On September 22, 2011, the *LJW* published a third editorial about what it described as a "poor pass rate" of KUMC's department of internal medicine residents. Dr. Atkinson and others at KUMC communicated about the article and suggested several people—including Dr. Klaassen—who may have provided this information to the *LJW*.

On October 29, 2011, Mr. Simons published a Saturday column under the headline, "Leadership issues coming to light at KU Medical Center." Doc. 326-112. This column described organizational changes needed at KUMC. The column included no comments by Dr. Klaassen, but it briefly referred to Dr. Klaassen's removal as Department Chair.

On November 5, 2011, Mr. Simons published another editorial. It opined that leadership problems existed in both KU's athletic department and at the medical school. The column criticized Dr. Atkinson for "fir[ing]" Dr. Klaassen as chair of the Pharm/Tox Department. Doc. 326-14 at 1. This editorial included no comments by Dr. Klaassen.

Dr. Klaassen testified that he spoke to the *LJW* to help KU make its medical school better. Dr. Klaassen testified that he also tried to talk to *The Kansas City Star* about his concerns. Dr. Klaassen testified that he went to the *LJW* because it was the only place left he

knew he could go to complain about KUMC's management. In particular, Dr. Klaassen complained that KUMC was mismanaging funds with its decisions to develop campuses in Salina and Wichita and to seek designation as a National Cancer Institute. Dr. Klaassen conceded that these decisions were not illegal. But he believed the decisions were unethical and that KUMC should have involved the faculty in the decision-making process.

Dr. Atkinson testified that she read Dolph Simons's Saturday editorials about KUMC. Also, she testified that she had anticipated negative articles after KUMC placed Dr. Klaassen on administrative leave. Dr. Atkinson believed the source for the *LJW*'s articles was Dr. Klaassen. Indeed, some of the articles quoted letters that Dr. Atkinson had provided to Dr. Klaassen. Dr. Atkinson testified that the *LJW* editorials bothered her because they were hurtful and wrong. Dr. Atkinson spoke with Chancellor Bernadette Gray-Little about the editorials. In April 2011, Dr. Atkinson prepared a response to the information that had appeared in the *LJW* editorial. The response was circulated among KUMC employees. Dr. Atkinson testified that, in response to the *LJW* editorials, the Governor's Office for the State of Kansas had received many letters criticizing her leadership.

Dr. Atkinson testified that the April 30, 2011, *LJW* editorial was bad publicity for KUMC. And it came at a crucial time when KUMC was building new projects, particularly the cancer center program. Dr. Atkinson thought it was bad for KUMC to have this false information out in the public to read. Dr. Atkinson also thought the editorials were misleading and hurting KU. Around this time, Dr. Atkinson uninvited Dr. Klaassen to a party for donors because she didn't want someone in her own home who would talk about her to the *LJW* as Dr. Klaassen had done. But Dr. Atkinson testified that, otherwise, the *LJW* articles did not have any effect on how she operated KUMC or made decisions.

Dr. Klaassen made it known to Dr. Carlson that he had made a good inroad with Dolph Simons. Dr. Carlson presumed that Dr. Klaassen was the source of information for Mr. Simons's editorials. Also, Dr. Jaeschke knew that Dr. Klaassen was sending emails to the *LJW*.

### Dr. Klaassen's Return from Administrative Leave

On December 16, 2011, Dr. Klaassen returned from administrative leave. As of that date, Dr. Klaassen was no longer the Principal Investigator for the Training grant or the COBRE grant.

When Dr. Klaassen returned from administrative leave, KUMC provided him with a list of expectations that he must follow going forward. Dr. Klaassen acknowledged these expectations in writing. They included: (1) Dr. Klaassen would comply with all University policies, including those prohibiting abusive and unprofessional treatment of students or faculty; (2) Dr. Klaassen would treat all faculty, staff, vendors, visitors, and others with whom he interacted with respect and dignity, and refrain from engaging in insulting, demeaning, disruptive, hostile, aggressive, or threatening conduct, including yelling and storming out of meetings; (3) Dr. Klaassen would refrain from using illustrations of guns in presentations; (4) Dr. Klaassen would refrain from retaliating against those who participated in the inquiry; and (5) Dr. Klaassen would complete a program for distressed physicians. Doc. 326-23 at 2.

Dr. Terranova believed it was important for the expectations of Dr. Klaassen's to include treating others with respect and dignity because Dr. Klaassen had not treated some individuals with respect and dignity. Dr. Terranova testified that this treatment was part of the reason for Dr. Klaassen's administrative leave. Also, Dr. Terranova thought it was important for Dr. Klaassen's expectations to include refraining from using guns in presentations because some faculty members had reported Dr. Klaassen's use of guns as something that concerned them. Dr.

Klaassen testified, though, that he had been using images of firearms in his presentations since 2005.

On December 16, 2011—Dr. Klaassen's first day back to work and even though he had acknowledged that he was to treat all faculty with dignity and respect—Dr. Klaassen interrupted a meeting in Dr. Jaeschke's office.  Dr. Klaassen repeatedly pounded his fists on file cabinets.  Also, he yelled to express his view that the COBRE and Training grants were his grants and that he would give them up only when he was dead.  Dr. Klaassen yelled at Dr. Jaeschke:  "You want to be chair of this department!  How do you think our relationship will be after that?"  Doc. 326-33 at 1.

On December 31, 2011, Dr. Steven Stites, Chair of the Internal Medicine Department, received a call from Shelley Gebar, Chief of Staff for Dr. Atkinson.  Ms. Gebar asked Dr. Stites to accept Dr. Klaassen in the Internal Medicine Department.  On January 4, 2012, Dr. Terranova notified Dr. Klaassen that the University was moving his office and laboratory space from KUMC's Hemenway Building (where Pharm/Tox was located) to the Hixson Building.  Dr. Terranova advised that this move would occur on February 1, 2012.  Dr. Terranova was involved in discussions about Dr. Klaassen's transfer to the Internal Medicine Department, but Dr. Atkinson made the final decision.

Dr. Klaassen complained that the Hixson Building provided inadequate space for him to perform his research.  He testified that it took over eight months to secure access to water and ice in that building.  He also complained about construction debris.  Dr. Atkinson testified that the Hixson Building was directly across the street from the Hemenway Building and had just undergone renovations.

Later in the day on January 4, 2012, Dr. Klaassen entered Dr. Jaeschke's office uninvited and criticized Dr. Jaeschke for about an hour. He blamed Dr. Jaeschke for Dr. Klaassen's impending laboratory move. Dr. Jaeschke described the interaction in a letter he sent to Dr. Klaassen. It read, in part:

> On January 4, 2012, you again entered my office uninvited and proceeded to engage in a heated conversation and harangue for approximately an hour. You were clearly upset about the pending move of your laboratory to Hixson. You blamed the move on me. You repeatedly asked in a very agitated tone of voice: " How can you throw me out of this building after all I have done for you? What will this do to your reputation? What will I do when I get the COBRE grant and the training grant back and I am across the street? If I am here, I will hand it over to you, if I am across the street, I will not support you or the department. My move will destroy the department. I am your biggest asset over here but I will work against you if I am across the street." In addition, you repeatedly pointed out that fifty-percent of the Society of Toxicology council are your former students, then proceeded to state: "What do you think this will do to your career? What do you want me to say about you and this place when I get my merit award in 2 months? That you kicked me out and destroyed my career after 43 years, just 2 years before I will leave? What do you think that will do to your career in toxicology or hepatology?" Your comments made it very clear to me that you would work against me if I became chair, that you would tell everyone that I had destroyed your career and in so doing, you would actively work to destroy my career and reputation in toxicology and the liver field.

Doc. 326-33 at 2.

On January 9, 2012, Dr. Atkinson named Dr. Jaeschke Chair of the Pharm/Tox Department. Dr. Jaeschke testified that he thought the relationship between Dr. Klaassen and the Pharm/Tox Department was irretrievably broken. On January 10, 2012, Dr. Atkinson met with Dr. Klaassen for about an hour. During this meeting, Dr. Atkinson gave Dr. Klaassen a letter that informed him that she was contemplating transferring him from the Pharm/Tox Department to the Department of Internal Medicine because Dr. Klaassen had created a hostile environment within Pharm/Tox. The letter explained that Dr. Klaassen's conduct had "irretrievably damaged relationships with the faculty and staff in Pharm/Tox" and had led her to conclude that his

"continued presence in Pharm/Tox would only serve to continue to disrupt the department's effective and orderly operations." Doc. 326-82 at 4. Also, Dr. Atkinson's letter gave Dr. Klaassen one week to provide information to her to consider before making her final decision about the proposed transfer.

On January 11, 2012, Dr. Klaassen sent an email to Dr. Jaeschke. It acknowledged: "I can understand why you might not have much confidence in me at the present time. If I did not have graduate students and post-doctoral students, I would have retired 9 months ago." Doc. 326-34 at 1. The email also described how Dr. Klaassen views his students like his own children, and that he wanted to stay at the University to help them. The next day, Dr. Klaassen sent another email to Dr. Jaeschke. It acknowledged: "I think the Department has become de-unified the last few months, and I am probably the reason for most of that splintering, and I will take full responsibility." Doc. 326-55 at 2.

On January 20, 2012, Dr. Klaassen wrote to Dr. Atkinson that he had met with Dr. Stites and Dr. Dawn from Internal Medicine and "all parties are optimistic that the transfer can and will occur," and that he "will conduct [himself] in a professional manner as [he had] sought professional help to further understand [his] behavior." Doc. 326-83 at 1. Dr. Stites, Chair of Internal Medicine, testified that his reasons for agreeing to take Dr. Klaassen into the Department were "[m]ulti-factorial." Doc. 326-75 at 15 (Tr. 205:7–9). He explained:

> Of course, [Dr. Atkinson] was my boss, and she asked me to do it, so I felt a little bit of obligation to try and help. Second of all, Dr. Klaassen is a Distinguished Professor, and one of the investigators at KU over many years. And we thought if we can help transition him, and he could be in a safer place, because then he could help mentor some of our faculty and people of the Department of Medicine. So we had the best intentions. There was nothing to try to hurt him or hurt his lab or students whatsoever. And that just would be dumb, that's dumb. So we really were there to try to be helpful. And all those things—we knew there was a risk, and this controversy in Pharmacology. I didn't know all the specifics about it, and that that

was fine, because I don't know that I should know that.  But we were there to try and be helpful.

*Id.* (Tr. 205:7–206:1).  Dr. Stites denied that the transfer was part of a plan to run Dr. Klaassen out of the University.

On January 20, 2012, Dr. Atkinson notified Dr. Klaassen that KUMC was transferring him to the Internal Medicine Department.  Dr. Atkinson explained that Dr. Klaassen's conduct had "irretrievably damaged relationships with faculty and staff in Pharm/Tox and created a hostile work environment, thereby interfering with the operations of the department and jeopardizing the ability of the department to succeed."  Doc. 326-29 at 1.

Dr. Atkinson testified that she believed Dr. Klaassen would be a good fit in the Internal Medicine Department.  On January 23, 2012, KUMC moved Dr. Klaassen's office.  Also, when Dr. Klaassen transferred from the Pharm/Tox Department, KUMC moved his laboratory into available laboratory space in the Hixson Building.

Dr. Helen Renaud is a former graduate student who came to the University of Kansas to study with Dr. Klaassen.  Dr. Renaud had complained that Cody Tully, a staff member in the Pharm/Tox Department, was not cooperative with the lab members.  Dr. Renaud has testified, however, that the Internal Medicine Department welcomed the lab members.  Also, she testified, Dr. Stites was very friendly and helpful.

Mr. Tully (a staff member in the Pharm/Tox Department) did not respond to various requests that Dr. Klaassen made by email.  Mr. Tully testified that he ignored Dr. Klaassen's requests because, at the time, he was no longer the Chair of the Pharm/Tox Department.  Dr. Klaassen's students complained that Mr. Tully had prevented them from accessing necessary equipment and supplies.  The University investigated Mr. Tully's behavior.  Mr. Tully received

counseling for his actions.  And afterwards, Mr. Tully had no more interaction with the students in Dr. Klaassen's lab.

During this same period, several members of KUMC's faculty communicated with one another about Dr. Klaassen.  On January 23, 2012—the day KUMC moved Dr. Klaassen's office—Dr. Carlson sent an email to Dr. Jaeschke suggesting that they form a conga line that would dance down the hall chanting, "No more Dirty Curty!"  Doc. 349-42 at 1.  In another email, Dr. Carlson accused Dr. Klaassen of behaving like a "lunatic."  Doc. 349-44 at 1.  On January 16, 2012, in response to Dr. Jaeschke's complaints about Dr. Klaassen's behavior, Dr. Carlson told Dr. Jaeschke not to let Dr. Klaassen get under his skin because Dr. Klaassen is "going to do everything in his power to make your life as hellish as he tried to make mine."  Doc. 349-43 at 1.  Dr. Carlson told Dr. Jaeschke not to hesitate to "tweak [Dr. Klaassen] a little bit." *Id.*  In other correspondence, Dr. Jaeschke called Dr. Klaassen an "ass," a "malignant cancer," a "slug that crawls around," and "Dr. Nobody from Leawood."  Docs. 349-52 at 1, 349-56 at 1, 349-57 at 1, 349-58 at 1.

### First Inquiry Report

KUMC's Handbook defines "Personal and Professional Misconduct" as conduct that fails to meet KUMC's expectation that faculty "act professionally in their interactions with students, faculty and staff," and "conduct themselves in a manner that by normal standards would be considered as morally and professionally acceptable conduct."  Doc. 326-38 at 25.  KUMC's Handbook also includes a "Personal and Professional Misconduct Complaint Procedure" for making and processing formal allegations of faculty misconduct.  The Complaint Procedure delegates the responsibility for responding to allegations of faculty misconduct to the Vice Chancellor for Academic Affairs.  If the Vice Chancellor for Academic Affairs has reason to

believe that misconduct may have occurred, he initiates "an Inquiry into the allegations in order to determine whether the allegation has substance and if an investigation is warranted." Doc. 326-38 at 31. When that occurs, KUMC notifies the faculty member involved in the Inquiry that the Vice Chancellor for Academic Affairs has initiated an Inquiry. Also, KUMC provides the faculty member with a copy of the written Inquiry Report and an opportunity to respond to it.

If the Vice Chancellor for Academic Affairs determines that the allegation has substance, then the matter proceeds to an investigation. The KUMC Handbook defines this "investigation" this way: "The formal examination and evaluation of all relevant facts to determine if there exists a reasonable basis for the allegation or complaint, and if so, to determine the responsible person, the seriousness of the misconduct and the appropriate administrative response." *Id.* at 25.

At the investigation stage, an Ad Hoc Hearing Committee is assembled. The Ad Hoc Hearing Committee consists of faculty members—one chosen by the aggrieved party, one chosen by the faculty member, and four selected by the Faculty Assembly Steering Committee with the approval of the Vice Chancellor for Academic Affairs. After the ad hoc hearing is held, the Ad Hoc Hearing Committee recommends to the EVC whether personal or professional misconduct occurred, and what discipline, if any, is appropriate.

After receiving the Ad Hoc Hearing Committee's recommendation, the EVC—as the deciding official—issues the "final administrative response to findings of misconduct." *Id.* at 24. KUMC's Handbook provides a list of possible sanctions, including warning, restitution, censure, suspension with pay or without pay, and dismissal.

If the administrative response is termination or some other adverse change in the faculty member's terms and conditions of employment, the faculty member may appeal. On appeal, the

Ad Hoc Hearing Committee "shall make its determination as to the validity of the appellant's claims," and shall issue a written opinion "delineating its decision, the reasons therefore, and its recommendation for disposition." *Id.* at 36–37. The Ad Hoc Hearing Committee must provide a copy of its written opinion to the appealing faculty member and the EVC.

After receiving the Ad Hoc Hearing Committee's decision and recommendation, the EVC "shall respond in writing to the recommendations of the committee documenting the reasons for agreeing or disagreeing." *Id.* at 37. The EVC's decision serves as the final administrative authority, and it exhausts the KUMC internal administrative process. Also, the EVC's decision constitutes a final agency action.

In 2011, KUMC initiated a first Inquiry against Dr. Klaassen involving allegations of misconduct by him. During this first Inquiry, Dr. Allen Rawitch, the Vice Chancellor for Academic Affairs, with the assistance of two other professors, interviewed 19 witnesses about Dr. Klaassen's alleged misconduct. Also, Dr. Rawitch and the two assisting professors met with Dr. Klaassen and his counsel. At least two of the witnesses interviewed told investigators that Dr. Klaassen was not abusive. One of the witnesses described bullying behavior by Dr. Klaassen and stated that his abusive behavior was not new. Robert Klein, Vice-Chancellor for Academic Affairs, told investigators that he suspected Dr. Klaassen had taken information to the *LJW*. He described such action as unprofessional.

On January 31, 2012, Dr. Rawitch provided Dr. Klaassen with an Inquiry Report. It included text and exhibits totaling 145 pages. The Inquiry Report concluded that reasonable grounds existed to believe that Dr. Klaassen had engaged in personal and professional misconduct warranting further investigation by the Ad Hoc Hearing Committee. The Inquiry Report detailed the investigation's findings about many incidents involving Dr. Klaassen.

### *First Ad Hoc Hearing*

In May 2012, a faculty ad hoc hearing committee ("First Hearing Committee") convened to hear the allegations described in the January 2012 Inquiry Report. The First Hearing Committee consisted of five of Dr. Klaassen's faculty peers, one of whom Dr. Klaassen had selected. The hearing lasted about seven hours, and the committee heard from nine witnesses. It also received and reviewed hundreds of pages of exhibits, including 234 exhibits presented by Dr. Klaassen and 24 exhibits presented by KUMC Administration. Counsel represented Dr. Klaassen at the hearing. His counsel called and cross-examined witnesses, including Dr. Klaassen.

The First Hearing Committee heard testimony that faculty members in the Pharm/Tox Department had concerns for their own safety. Dr. Ken McCarson, a member of the Pharm/Tox faculty, testified:

> Well, because with the reoccurrence of the imagery of the guns, it was very clear to those of us who had been around long enough—you have to keep in mind that at the time, in 2010, 2011, most of the members of the faculty had been recruited since 2006. There was really very little institutional memory in the room. So many of them had not seen the initial go-round with the images of the guns and the pillorying of faculty peers and anger directed out at other members of the faculty and the university.

> And so seeing the life is hell litany and the gun—the firearm imagery return, to me, was a very clear signal that [Dr. Klaassen's] agitation level was rapidly escalating and in what I perceived to be a threatening manner.

> And I know that on several occasions in early 2011, especially immediately before he was removed from the chair position, I expressed concern about his agitated, erratic behavior to peers within the institution and then ultimately to administration within the institution.

> So, for example, right around the time that he was let go and Gerry Carlson became chair, I know that I and I think several other members of the faculty expressed our concerns about potentially threatening behavior at those meetings.

Doc. 326-79 at 105–06 (Tr. 105:18–106:22).

Another member of the Pharm/Tox faculty, Dr. Beth Levant, testified that Dr. Klaassen's conduct and behavior had "caused [her] a great deal of anxiety." Doc. 326-93 at 3–4 (Levant Dep. 22:21–23:6). She explained that his behavior had made her "afraid to be at work," and it had "interfered with [her] performance at [her] job." *Id.*

On May 31, 2012, the First Hearing Committee unanimously condemned Dr. Klaassen's behavior. It concluded that Dr. Klaassen had committed misconduct by engaging in abusive and unprofessional treatment of faculty and staff, and he substantially had disrupted the proper operations of the academic unit. Among other conclusions, the First Hearing Committee found:

- Dr. Klaassen engaged in unprofessional conduct during meetings with people from both inside and outside the University.

- Dr. Klaassen's behavior towards colleagues and subordinates was unprofessional, abusive, disruptive and unacceptable.

- Some colleagues and staff quite reasonably felt threatened and intimidated as a result of his actions.

- Dr. Klaassen's own testimony revealed that he is blind to his own behavior and its impact and that he remains largely in denial.

- Dr. Klaassen's blindness to the facts damaged his credibility in the eyes of the committee.

- The University tolerated his conduct for too long.

- The University also appeared indifferent to Dr. Klaassen's research grant obligations when it extended his administrative leave. The University's handling of the matter could have jeopardized his research, his relationship with the NIH, and the productivity of his students.

- Research excellence is not a license for unprofessional conduct.

- Dr. Klaassen's removal as Pharm/Tox Chair and transfer to the Department of Internal Medicine were "entirely appropriate and necessary."

- The Committee recommended a formal censure and swift and increased punishment should any further episodes of unprofessional conduct occur.

Doc. 326-10 at 2–3.

KUMC Interim Executive Vice Chancellor Dr. Stites adopted the Committee's recommendation and publicly censured Dr. Klaassen on June 13, 2012. Dr. Stites advised Dr. Klaassen that the University of Kansas would send the following statement of formal censure via broadcast email to all KUMC faculty, and it would publish it in the News Archive section of the KUMC News website:

> Formal Censure—Curtis D. Klaassen, Ph.D., University Distinguished Professor, has been found by a faculty hearing committee to have engaged in abusive and unprofessional treatment of faculty and staff and substantially disrupted the proper operations of the academic unit, specifically the Department of Pharmacology, Toxicology and Therapeutics. Dr. Klaassen's conduct was found to be unprofessional, abusive, disruptive, and unacceptable. These findings were accepted and approved by Acting Executive Vice Chancellor Steven Stites. This announcement represents formal censure of Dr. Klaassen for his actions.

Doc. 326-86 at 2. Dr. Klaassen has acknowledged that he accepted the formal censure.

Also, Dr. Stites directed Dr. Klaassen to submit a general apology. Dr. Stites explained to Dr. Klaassen the reasons for the apology:

> Your abusive and unprofessional behavior caused substantial disruption to the academic unit that also adversely impacted the KU Medical Center community. I believe that an apology from you will assist both you and the KU Medical Center community in bringing closure to this matter and will be an important first step in repairing the damages your actions have caused.

*Id.* at 3.

By accepting the First Hearing Committee's recommendation, Dr. Stites sought to send a message to Dr. Klaassen that, "[Y]ou can't abuse people. You can't be disruptive. You can't be unprofessional. Those are not how we treat each other. And it doesn't matter how many NIH grants you've had. It doesn't matter how many papers you've published." Doc. 326-130 at 8–9 (Tr. 161:6–162:18).

On June 13, 2012, Dr. Klaassen apologized "for any actions that may have embarrassed the University and Medical Center community and colleagues or caused colleagues to feel abused or harassed." Doc. 326-11 at 1. Also, he said he would do his best "to represent the University of Kansas Medical Center professionally in all regards." *Id.*

On June 13, 2012, Dr. Stites met with Dr. Klaassen to deliver the sanction decision. During that meeting, Dr. Stites reiterated the message that he had given Dr. Klaassen when he was transferred to Internal Medicine—that the University was giving him a chance at a fresh start. And, to succeed, Dr. Klaassen needed to focus on looking forward, not backward on past issues.

### Charges for the Use of the Mass Spectrometer

When Dr. Jaeschke became the Principal Investigator for the COBRE grant and Chair of the Pharm/Tox Department, he was responsible for managing the core equipment held by the Department. This responsibility included the mass spectrometer, a piece of equipment worth several-hundred-thousand-dollars. In 2012, as the Principal Investigator of the COBRE grant, Dr. Jaeschke implemented user fees for the mass spectrometer. (When Dr. Klaassen was Chair, he did not impose user fees for using the mass spectrometer.) Dr. Jaeschke made this decision to make using that piece of equipment consistent with the University's other core facilities, all of whom charged user fees. Dr. Jaeschke testified that the user fees were necessary to sustain the COBRE program because if the COBRE grant indefinitely bore all costs of the mass spectrometer and other core equipment, the equipment would not be sustainable after the COBRE grant funds ended. The Pharm/Tox Department continued charging for use of the mass spectrometer after Dr. Klaassen and his students had left the University.

Dr. Stites was not involved in the decision to institute the charge for using the mass spectrometer. Dr. Stites never told the students that they would incur charges associated with using mass spectrometer when Dr. Klaassen and his lab moved to Internal Medicine. Neither Dr. Stites nor the Internal Medicine Department realized any advantage from the Pharm/Tox Department sending a bill to the Internal Medicine Department for using the mass spectrometer.

In a January 2012 meeting, Dr. Jaeschke told Dr. Klaassen's lab members that they could continue to use the equipment for free. But Dr. Jaeschke changed course and implemented the user fees several months later. He did so because he understood he had an obligation to make the COBRE grant sustainable for the long term. Dr. Jaeschke made the decision to charge for using the mass spectrometer without consulting Dr. Atkinson (who had left the University of Kansas by then), Dr. Terranova, Dr. Stites, or Dr. Carlson. On September 18, 2012, several of Dr. Klaassen's students wrote a letter to Dr. Stites and other administrators. This letter complained that they were denied access to equipment because they had to pay for it. Dr. Stites testified that KUMC looked into whether it could stop imposing the charges. But eventually, KUMC agreed to pay whatever was needed to support the students.

### More LJW Articles

On June 9, 2012, the *LJW* ran an article about a federal lawsuit that Dr. Klaassen had filed where he sought to enjoin KUMC from holding the First Ad Hoc Hearing. Dr. Klaassen testified that he never spoke with Andy Hyland, the article's author. On June 19, 2012, the *LJW* ran an editorial commenting about KUMC's recent censure of Dr. Klaassen.

### Dr. Klaassen's Behavior after the First Ad Hoc Hearing

Dr. Buddhadeb Dawn, Vice Chairman for Research of the Internal Medicine Department, was responsible for supervising Dr. Klaassen's conduct after he transferred to that Department.

Also, Dr. Dawn was tasked with helping Dr. Klaassen to reestablish his career and work with Internal Medicine faculty.

On May 26, 2012, Dr. Dawn sent an email to Dr. Klaassen instructing him that he should not communicate directly with Pharm/Tox. It read, in part: "[P]lease do not send such accusatory emails to [Pharm/Tox] dept members in the future. Instead, direct your questions/comments to me/Brenda. I will be happy to discuss if you have any question[s]." Doc. 326-89 at 1.

After Dr. Klaassen's transfer to Internal Medicine, Dr. Dawn looked at Dr. Klaassen's available funding and his monthly expenses. She saw that the projected expenses would produce a future deficit. (Dr. Klaassen asserts that he was not responsible for the deficit.) Dr. Dawn instructed Christina Hopkins (the Internal Medicine Department's Research Administrator) to provide Dr. Klaassen with periodic printouts of his grant accounts. Also, Dr. Dawn worked with Dr. Klaassen to identify solutions to "right size" his research operations and bring their spending into a positive balance.

On December 19, 2012, March 6, 2013, and May 1, 2013, Dr. Dawn, Dr. Klaassen, and Ms. Hopkins held meetings where they reviewed the financial records for Dr. Klaassen's research program and laboratory operations. At the December 19, 2012, meeting, Dr. Klaassen was shown that his research laboratory's expenses were too high for the available funding. Dr. Dawn and Ms. Hopkins discussed various options to cut expenses with Dr. Klaassen. He became upset and angry during the meeting. Ms. Hopkins testified that Dr. Klaassen's hands were visibly shaking, he was repeatedly standing up and sitting down, and he was moving around the office. Ms. Hopkins also testified that Dr. Klaassen launched into an irrational discussion about how he wouldn't have been in this situation except for what was done to him.

On December 20, 2012, Dr. Klaassen sent an email to Dr. Stites, Dr. Dawn, and Ms. Hopkins about their meeting the previous day. In that email, he explained that his finances were not balanced because "the EVC took 12.5 million dollars" from him. Doc. 349-114 at 1. Dr. Klaassen asked for a two hour meeting either at his house or in his conference room. He said he wanted the meeting in one of those two places because he talks loud sometimes and he didn't want to disrupt others. But Dr. Klaassen did not meet with Dr. Stites until May 1, 2013.

At the March 6, 2013, meeting with Dr. Klaassen, Dr. Dawn, and Ms. Hopkins, Dr. Dawn reiterated to Dr. Klaassen that his spending was unsustainable. He suggested that Dr. Klaassen consider reducing payroll expenses on his research projects. In response, Dr. Klaassen removed his checkbook from his pocket and asked what he had to do.

On March 7, 2013, Ms. Hopkins provided Dr. Klaassen with monthly financial reports for the grants where Dr. Klaassen served as the Principal Investigator. The reports began on March 1, 2012, and ran through February 28, 2013. Ms. Hopkins answered Dr. Klaassen's questions about the account information she had provided him.

### *May 1, 2013 Incident*

On May 1, 2013, Dr. Klaassen was invited to a meeting with Dr. Stites, Chair of the Department of Internal Medicine, and others from Internal Medicine. By then, Dr. Stites was no longer serving as Interim EVC. The meeting was held in Dr. Stites's conference room. The meeting's other attendees included: Dr. O'Brien-Ladner (Vice Chair of the Internal Medicine Department), Dr. Dawn, Dustin Carrillo, and Christina Hopkins. The meeting's purpose was to review Dr. Klaassen's laboratory budget numbers and to identify possible solutions to sustain his laboratory operations because the current numbers showed that spending was exceeding available funds. Dr. Klaassen denies that he was responsible for the deficit.

Dr. Stites testified that he wanted to see if the Department could help bridge some part of Dr. Klaassen's funding gap until Dr. Klaassen found out about future NIH grants. At the May 1, 2013, meeting, the group discussed three R01 grants. These grants are distinct from the COBRE grant and the Training grant. The COBRE grant and Training grant remained in the Pharm/Tox Department, and Dr. Klaassen no longer served as the Principal Investigator for either grant. More than a year earlier, the NIH had reassigned other Principal Investigators to those two grants.

Dr. Klaassen tape recorded the May 1, 2013, meeting, though he never informed that he was taping the meeting. He testified that he did so because he considered the five persons in the meeting to be part of a "mobbing scheme" to get rid of him. Doc. 326-74 at 3 (Klaassen Dep. 103:12–106:1). On May 1, 2013, Dr. Klaassen was not the subject of any pending inquiry report. Dr. Stites testified that nothing about the meeting was intended to provoke Dr. Klaassen. Instead, the purpose was to help Dr. Klaassen because his expenditures were exceeding available funds by $52,000 per month.

The meeting began with a review of the budget reports and a discussion of ways the Internal Medicine Department could provide additional funds on a short-term basis, Dr. Klaassen's endowment funds, and Dr. Klaassen's prospects for securing additional grant funding. Dr. Stites perceived that Dr. Klaassen became agitated during the meeting. Dr. Stites described Dr. Klaassen's behavior this way:

> What we have done for other investigators in the department, and we were hoping that we could find a solution recognizing that there would have to be a combination of some cost savings as well as some departmental bridge funds to see if he could get to the next potential funding from the NIH. We had confidence in his abilities as a scientist.
>
> But the meeting rapidly deteriorated. Curt—Dr. Klaassen while sitting at the table began to flush, his voice started getting angry as he started talking about

the $250,000 that I had personally taken from him.  He called me a liar.  He moved to the white board where he wanted to try and write out all the information that he had said, all the while his behavior was clearly becoming more agitated.  He was— starting to shake his—his face continued to turn red and it became clear that he was getting angrier and angrier when his voice continued to rise.  At that point I asked him to sit down, that we didn't want to use the white board.  He did not do that, and instead his behavior continued to escalate in a fashion that I find unacceptable for a faculty member, and frankly, was both scary and concerning to me and, I think, the other people in the room.

Doc. 326-51 at 39 (Tr. 155:8–156:19).

About 26 minutes into Dr. Klaassen's audio recording of the meeting, Dr. Stites told Dr. Klaassen:  "So I'm not going to get into this right now," and Dr. Klaassen responded in a louder voice:  "Why not?"  Doc. 371 (Audio Recording 26:35–26:53).  Dr. Stites responded:  "Because I have to be at a different place at the moment.  So if you can put that in a piece of paper I'd be happy to look at it.  I know you said you sent it to me but send it again.  But as I told you, things have happened on the University level.  Or things that happened before you joined the Department.  We are not going to get into."  *Id.*  Dr. Klaassen responded, "Okay.  I know you're not going to touch it.  I want . . . Okay then tell me what's going to the future.  What does it mean to be a member of this department?  I haven't the slightest idea.  Everything you told to my lab, you lied to them."  *Id.* (Audio Recording 26:54–27:40).  The audio recorded by Dr. Klaassen captures these words at a higher volume than other statements made in the meeting.  Dr. Stites responded to Dr. Klaassen:  "Curt, Curt, no I didn't Curt."  *Id.*  Professor Klaassen continued:  "Yes."  *Id.*

Dr. Stites then said:  "At that level, right now this meeting is adjourned.  I'm not going to go into that.  If you are going to say something like that and get angry and this worked up, then we're not going to meet.  And so this meeting is over."  *Id.*  Dr. Klaassen responded:  "Sure, it's very easy to do it when you're a bigshot.  You don't want to know the facts.  Why did you

charge me $200,000 a year from now on?  Why?"  *Id.*  Dr. Stites responded:  "Curt, the meeting's over."  *Id.*  Dr. Klaassen then responded:  "I know it's over.  Why, because you have no ethics."  *Id.*

Around 28 minutes into the audio recording, Dr. Stites told Dr. Klaassen:  "Step back now.  Step back away from me right now.  You stay there.  Stay there.  Leave the room.  The meeting's done, Curt."  *Id.* (Audio Recording 28:00–28:38).  Dr. Klaassen responded:  "May I get my coffee?"  *Id.*  Dr. Stites told him again:  "Get out.  Get out."  *Id.*  Professor Klaassen again asked:  "May I get my coffee?"  *Id.*  Dr. Stites responded:  "Get out.  And if you ever pull that again, you will be out of this Department."  *Id.*  Dr. Klaassen responded:  "Pull what?"  *Id.* And Dr. Stites responded:  "Curt, get out.  You don't walk in a meeting and call me a liar and unethical.  Get out, get out."  *Id.*[2]

Participants in the May 1, 2013, meeting testified that Dr. Klaassen was visibly angry and agitated, his face red and his hands shaking.  Also, they testified that Dr. Klaassen came very close to Dr. Stites physically in a challenging manner and that he pointed his finger very close to Dr. Stites's face.  Dr. Klaassen disputes these accounts and asserts that Dr. Stites physically approached him in the meeting.  Given the summary judgment standard, the court accepts that Dr. Klaassen's description is correct for purposes of the current motion.

---

[2]     Dr. Klaassen disputes that he spoke loudly during these exchanges or that he ever yelled or screamed.  Instead, he describes his comments as made "with passion and concern about his financial situation and the treatment of his students."  Doc 349 at 39.  Also, he accuses Dr. Stites as the one yelling or screaming.  Dr. Klaassen's uncontroverted audio recording captures Dr. Klaassen speaking in a louder voice during some of his exchanges with Dr. Stites.  Also, the audio recording captures Dr. Stites speaking at a normal tone during this conversation.  The audio recorded by Dr. Klaassen reflects that Dr. Stites raised his voice when he told Dr. Klaassen to "get out."  While the uncontroverted characteristics of the participants' voices is manifested by the unchallenged audio recording, the relative volume level is not material to any of the decisions made by this Order.

Several participants in the May 1 meeting testified about their perception of Dr. Klaassen in the meeting. Dr. Stites testified that he felt threatened by Dr. Klaassen's conduct during the meeting. Over the course of his 23 years as a faculty member at KUMC, Dr. Stites testified that he had never had an encounter with a faculty member like the one he had with Dr. Klaassen on May 1, 2013. When Dr. Klaassen accused Dr. Stites of lying to the students, Dr. Stites did not understand Dr. Klaassen's reference. If he was talking about his student's use of the mass spectrometer, Dr. Stites testified that the University does not charge students personally for use. All of the costs of the mass spectrometer were borne by grant funds or other University funds—not by any individual's personal funds.

Dr. Dawn testified that he never had seen a faculty member engage in belligerent behavior like Dr. Klaassen displayed during the May 1, 2013, meeting. Dr. O'Brien-Ladner testified that she had never seen someone as angry and physically active as Dr. Klaassen was in the May 1, 2013, meeting. Also, Dr. O'Brien-Ladner testified she never had seen a faculty member conduct himself in a way that made her contemplate calling security. She testified that Dr. Klaassen's behavior destabilized the meeting and prompted the meeting's premature cancellation.

Christina Hopkins testified that Dr. Klaassen's conduct in the May 1, 2013, meeting made her "nervous," and she "didn't know what to expect next." Doc. 326-51 at 81 (Tr. 66:14–19). She explained:

> [P]ersonally my heart [was] beating, you know, rapidly. I'm not sure what to do with it, escalated. You know, thinking about, well, the door's behind me, the phone's in the corner, those kinds of things if it, you know—what would happen next. I know that the loud tone of his voice, it was scary. Yeah.

*Id.* (Tr. 67:7–15).

Dr. Klaassen does not controvert that the Internal Medicine Department eventually had to pay expenses because of Dr. Klaassen's over-expenditures

### *May 7, 2013 Incident*

On May 7, 2013, Dr. Klaassen had another encounter with staff member Christina Hopkins. Dr. Klaassen came to Christina Hopkins and Jennifer Bean's office and, initially, asked Ms. Bean about a receipt. After speaking with Ms. Bean, Dr. Klaassen came to Ms. Hopkins's desk and asked: "Did Stites come back to bully anybody else after the meeting the other day?" Doc. 326-51 at 18 (Tr. 70:5–72:19). Ms. Hopkins responded: "No. He went off to his next meeting pretty much right away." *Id.*

Dr. Klaassen then told Ms. Hopkins that he needed to explain to her the difference between her way of accounting and his way of accounting. He asked Ms. Hopkins for a blank piece of paper, and she handed him one. Dr. Klaassen began writing on the paper, and Ms. Hopkins described him as becoming increasingly angry and agitated. Ms. Hopkins testified that Dr. Klaassen was in close proximity to her and told her: "You wouldn't handle your personal finances this way." *Id.* at 81 (Tr. 73:7–16). Ms. Hopkins told Dr. Klaassen that his complaints were out of her control. In a written complaint made after the meeting, Ms. Hopkins described that Dr. Klaassen was waving his pen in his hand within an inch of her face and that she thought his proximity and volume was an attempt to intimidate her. Also, she testified that Dr. Klaassen's loud and angry tone of voice and his physical proximity startled and upset her. She described his behavior as scaring her and making her feel helpless.

Dr. Klaassen disputes Ms. Hopkins's account of the meeting. He testified that he was not loud during their meeting. But he conceded that Ms. Hopkins could have felt intimidated by his

conduct.  In response to Ms. Hopkins's statement that Dr. Klaassen's behavior had intimidated her, Dr. Klaassen testified:

> Hey, most people when they're around me they feel intimidated, so, I don't doubt that she felt intimidated.  I don't try to intimidate anybody, but when people know I'm so successful, they automatically are intimidated by me, just like a president would come into this room right now, we'd all be intimidated of the President of the United States.

Doc. 326-74 at 11 (Klaassen Dep. 154:5–14).

Paula Daugherty worked across the hall from Ms. Hopkins.  She witnessed Dr. Klaassen's interaction with Ms. Hopkins on May 7.  Ms. Daugherty saw Dr. Klaassen standing in front of Ms. Hopkins's desk as Ms. Daugherty passed the office.  She saw that Dr. Klaassen was in close proximity to Ms. Hopkins and stooped over her desk.  Ms. Daugherty could hear Dr. Klaassen's voice get louder before she heard Ms. Hopkins tell him that she couldn't do anything about it.  Ms. Hopkins's response prompted Ms. Daugherty to leave her desk, cross the hall, and look into Ms. Hopkins's office.  There, she saw Dr. Klaassen standing behind Ms. Hopkins's desk.  Ms. Daugherty went to find Dr. Dawn and Dustin Carillo to intervene.

After receiving a call to intervene, Dr. Dawn ran upstairs to Ms. Hopkins's office.  There, he saw that Ms. Hopkins was visibly shaken and close to tears.  Dr. Klaassen was standing in front of her desk, visibly angry.  Dr. Dawn directed Dr. Klaassen to leave the room and come with him.  Dr. Klaassen said he was running late for a conference, and he left without following Dr. Dawn to another location.

After watching Dr. Klaassen's conduct on May 7, 2013, Ms. Hopkins perceived Dr. Klaassen's behavior as threatening, and based on that experience, she concluded she would not meet with him in person or work with him unless her supervisor was present.  She testified that she reached this conclusion because she did not want to end up in another incident where she

was left helpless without a response and cornered in her office. Ms. Bean testified that she felt

very uncomfortable with and scared by the volume he observed Dr. Klaassen using. Ms. Bean

testified that she didn't want to stay in the office with Dr. Klaassen and Ms. Hopkins. But also,

she did not want to leave Ms. Hopkins alone with Dr. Klaassen. Ms. Bean never has witnessed

another faculty member act as Dr. Klaassen did on May 7, 2013.

Dr. Dawn described Dr. Klaassen's conduct and behavior in the May 1, 2013, and May 7,

2013, incidents as "accusatory, belligerent, disobedient and insubordinate." Doc. 326-51 at 30

(Tr. 119:10–24). Dr. Dawn testified that such behavior "should not be tolerated, cannot be

tolerated," and that he "would condemn those behaviors on both occasions in the strongest

fashion or in the strongest manner." *Id.*

### Dr. Klaassen's Second Administrative Leave

On May 8, 2013, Dr. Stites sent Dr. Klaassen a letter. It informed Dr. Klaassen that the

University was placing him on administrative leave with pay and suspending his duties while he

was on administrative leave. The letter provided the University's reason for Dr. Klaassen's

suspension:

> It has been observed by me and reported to me by others that you have engaged in
> behavior and made statements that were belligerent and abusive to other University
> faculty and staff. You made these statements and engaged in this behavior in a
> meeting involving department leadership and subsequently with a department staff
> member. These interactions were frightening to the individuals and witnesses
> concerned and totally unacceptable in our University work environment.

Doc. 326-1 at 1.

The letter explained that the University was placing Dr. Klaassen on administrative leave

to review and investigate the incidents fully, and to provide for the safety of others. Also, the

letter informed Dr. Klaassen that he was not "permitted to administratively direct anyone at

KUMC, travel for business-related purposes, or appear or present at any meeting or conference,"

except in his personal capacity and unrelated to his work at KUMC. *Id.* The letter also stated that during his suspension from duties, KUMC administration would decide the future direction and continuation of all programs Dr. Klaassen directed at KUMC.

Though the letter prohibited Dr. Klaassen from directing anyone at KUMC while on suspension, Dr. Klaassen began holding class at his home within a week after his administrative leave began. KUMC never charged Dr. Klaassen with misconduct for holding class at this home.

Dr. Allen Rawitch wrote to Dr. Klaassen and advised him that administrative leave is not a disciplinary sanction at KUMC. He noted that administrative leave with pay is not an adverse personnel action and is a measure within the inherent authority of the administration. Such action is consistent with the Board of Regents policy on Interference with Conduct of Institution, Section II(G)(17). Doc. 326-97.

Dr. Klaassen is aware that the State of Kansas Work Place Violence Policy authorizes the removal of any person who makes threats, exhibits threatening behavior, or engages in violent acts on State-owned or -leased property pending the outcome of the investigation. Dr. Klaassen denies that he ever violated this policy in any way.

On May 13, 2013, Dr. Klaassen sent an email to Dr. O'Brien-Ladner, Dr. Stites, Dr. Dawn, and others. He apologized for his statements during the May 1, 2013, meeting. Dr. Klaassen testified that his May 13, 2013, email apology was not sincere. Instead, he testified that he sent the email so that he could get back on campus and help his students. Dr. Klaassen never apologized to Ms. Hopkins, but he believes he spoke with her in a normal voice, and so, an apology wasn't necessary.

On June 7, 2013, Dr. Stites wrote a letter to Dr. Klaassen advising that KUMC was extending his leave until July 15, 2013, or until otherwise notified, because the investigation was

not yet complete. While Dr. Klaassen was on leave, several of his laboratory members wrote a letter to Dr. Stites, Dr. Dawn, and Dr. Rawitch expressing their support for Dr. Klaassen. Doc. 349-81. Several of Dr. Klaassen's laboratory members received termination letters from KUMC advising that their termination was based on grant funding levels. While Dr. Klaassen was on leave, the University requested that the NIH remove Dr. Klaassen as Principal Investigator for two of the R01 grants (specific research grants for Dr. Klaassen's research). The University asked the NIH to replace Dr. Klaassen with two of his laboratory members. The NIH granted that request.

### Second Inquiry Report

Consistent with the KUMC Handbook, the University again conducted an inquiry into Dr. Klaassen's conduct. Dr. Allen Rawitch (Vice Chancellor for Academic Affairs) received witness statements and emails and conducted telephone interviews. After conducting the investigation, Dr. Rawitch concluded:

> In light of the unanimous agreement by the witnesses to the recent behavior that Dr. Klaassen's behavior was overtly threatening, and considering Dr. Klaassen's prior discipline and censure by KUMC in June 2012, as a result of a prior complaint where he was found to have engaged in abusive and unprofessional treatment of faculty and staff, and of behavior that was disruptive and unacceptable (see June 2012 censure letter attached hereto as Exhibit E), I recommend a full investigation by an ad hoc committee as defined in the KUMC Handbook.

Doc. 326-56 at 2. This Inquiry Report was six pages long. It attached many exhibits about the events that were the subject of the full investigation recommended by Dr. Rawitch.

On June 10, 2013, Dr. Rawitch provided the Inquiry Report to Dr. Klaassen. Dr. Klaassen, through his counsel, provided a written response to the June 10, 2013, Inquiry Report.

In August 2013, Dr. Klaassen emailed his students and encouraged them to spend money on experiments. He told them not to waste any money, but he advised them not to run out of supplies because the University was paying for them.

On November 1, 2013, before the Second Ad Hoc Hearing Committee convened, Dr. Klaassen advised his students:

> I talked to my lawyer and asked if you guys should or should not talk to a news reporter. He said it was OK. If you do, say positive things about me and negative things about the university. Try not to say anything bad about me (I realize you probably have a list of 1000 bad things), and when it comes to the university, emphasize the bad—especially in regard to education.

Doc. 326-63 at 1.

### *Second Ad Hoc Hearing*

On November 13, 2013, the Second Ad Hoc Hearing Committee convened to hear the allegations about Dr. Klaassen's personal and professional misconduct. The Second Ad Hoc Hearing Committee consisted of Dr. Klaassen's faculty peers, including one professor selected by Dr. Klaassen. Counsel represented Dr. Klaassen at the hearing. The hearing lasted a full day and included introduction of hundreds of exhibits. The University called the following witnesses: Dr. O'Brien-Ladner, Ms. Hopkins, Dr. Dawn, Ms. Bean, Dr. Stites, and Dr. Terranova. Dr. Klaassen's counsel was permitted to cross-examine each one of these witnesses. Dr. Klaassen's counsel called Dr. Klaassen and Julie Cui as witnesses. Dr. Klaassen testified that he had raised issues of financial mismanagement at KUMC.

On direct examination, Dr. Stites did not offer any testimony about the duration of the May 1 confrontation. When asked by Dr. Klaassen's counsel on cross examination how long Dr. Klaassen was screaming during the May 1 meeting, Dr. Stites stated: "I don't remember how long it was." Doc. 326-51 at 42 (Tr. 168:11–14). Dr. Klaassen's counsel then asked whether the

confrontation lasted more than five minutes, and Dr. Stites speculated that "it was probably somewhere between five and ten minutes." *Id.* (Tr. 168:15–18). After Dr. Stites testified, Dr. Klaassen's counsel played the tape recording for the Hearing Committee.

About a month after the November 2013 hearing, on December 12, 2013, Dr. Klaassen asked the members of his lab to provide false information to the University's Administration. Specifically, Dr. Klaassen told the members of his lab in an email message: "Helen et al. ALL KNOW THAT WE HAVE NOT COMMUNICATED TODAY OR ANY DAY SINCE MAY 8." Doc. 326-64 at 1. When Dr. Klaassen sent this December 12, 2013, email to his lab members, he was awaiting a decision from the EVC about his future at the University.

The Second Ad Hoc Hearing Committee found Dr. Klaassen guilty of professional misconduct in his treatment of faculty and staff. It found:

> Dr. Klaassen's passion and agitation could be interpreted by others as abusive and threatening. During the May 1 meeting and in the separate incident on May 7, 2013, he conducted himself in a fashion which could be interpreted as unprofessional toward other faculty and staff. This conduct appears to flow from his inability to self-monitor his behavior, and sometimes shows little respect for others.

Doc. 326-60 at 3. The Committee concluded that Dr. Klaassen's behavior "was not appropriate" and found him "guilty of professional misconduct as defined by the [KUMC] handbook, in his treatment of fellow faculty and staff." *Id.* at 4. The Committee recommended that Dr. Klaassen receive a sanction in the form of a written warning. It also recommended that he return "immediately to work as a university distinguished professor with all the rights and responsibilities of such a position." *Id.* And it recommended that "continuation and repetition of the conduct found wrongful here within the next year (12 months) may be cause for more severe disciplinary action." *Id.*

Also, the Committee recognized Dr. Klaassen's frustration with the lack of transparency about his grant funding and loss of his students' privileges to use laboratory equipment. The Committee reported that it is "sympathetic with Dr. Klaassen's concerns regarding grants and his students, and finds that KUMC should provide full and written answers in a timely manner to the questions and complaints that he has expressed." *Id.* Nevertheless, the Committee found that Dr. Klaassen had engaged in inappropriate behavior.

### Termination Decision

Dr. Douglas Girod—then EVC of KUMC—determined that dismissal from employment was the proper sanction for Dr. Klaassen's personal and professional misconduct. He reached this decision exercising the discretion vested in him by the KUMC Handbook. In a January 6, 2014 letter, Dr. Girod explained his reason for imposing the dismissal sanction. He noted that Dr. Klaassen's recent misconduct was the same kind of conduct that the University had warned him in 2012 that it would not tolerate. Despite that warning, Dr. Girod said, Dr. Klaassen's behavior had escalated in just a year. Also, Dr. Girod noted Dr. Klaassen's repeated failure to recognize and understand the seriousness of his misconduct. This failure, in turn, led Dr. Girod to conclude that it was more likely than not that Dr. Klaassen would repeat similar misconduct and volatile behavior in the future. Dr. Girod concluded that placing Dr. Klaassen back in the workplace was "a risk that the University is unwilling to take." Doc. 326-15 at 2.

Dr. Girod recognized that the Ad Hoc Committee had recommended that Dr. Klaassen receive only a written warning. But Dr. Girod explained why he was not following that recommendation:

> The Committee recommended sanction of a written warning for your unprofessional conduct towards colleagues and subordinates. However, the Committee did not have full access to, and was not asked to consider, the totality of the circumstances in your situation. Having considered the Committee's

findings and recommendations, and having also considered the totality of the circumstances surrounding your conduct the last few years, I have concluded that a written warning does not address the serious nature of the situation or recognize the repeated and continuing nature of your conduct, for which there is no excuse and for which you have been disciplined previously . . . Accordingly, after consultation with the Chancellor, I have determined that termination of your employment and faculty appointment with the University is the only acceptable outcome.

*Id.* at 1–2.

Dr. Girod's January 6, 2014, letter informed Dr. Klaassen that his dismissal would take effect on January 10, 2014. By agreement, the parties extended that effective date until January 24, 2014. The KUMC Handbook recognizes that dismissal is "a for-cause disciplinary sanction" that may result from a finding of personal misconduct. Doc. 326-38 at 23.

Dr. Klaassen testified that he recognizes that the ultimate termination rested with Dr. Girod. But he asserts that the KUMC Handbook did not authorize Dr. Girod to engage in independent fact finding. Dr. Girod believes that the Handbook, instead, limits the proceedings to the "evidence received during the hearing. *Id.* at 28.

### *Third Ad Hoc Hearing*

Dr. Klaassen appealed his dismissal under the KUMC Handbook's procedures. In an appeal from dismissal, the appealing faculty member bears the burden of proving the grounds for appeal. The KUMC Handbook identifies the following grounds for appeal: "(a) that the Executive Vice Chancellor had no reasonable basis in fact for selecting the appellant for dismissal, (b) that improper procedures were followed in dismissing the appellant, or (c) the selection of the appellant was based on age or on constitutionally impermissible reasons." Doc. 326-38 at 35.

On November 19, 2014, the Third Ad Hoc Hearing Committee heard Dr. Klaassen's appeal. The Third Ad Hoc Hearing Committee again consisted of faculty members—Dr.

Klaassen's peers, including one professor selected by Dr. Klaassen. Dr. Klaassen was present at the hearing and represented by counsel. Dr. Klaassen submitted records, exhibits, and transcripts from the Second Ad Hoc Hearing. One of these submissions included playing his tape recording of the May 1, 2013, meeting for the Committee. Also, Dr. Klaassen had the opportunity to speak to the Third Ad Hoc Hearing Committee.

On December 5, 2014, the Third Ad Hoc Hearing Committee submitted its decision and recommendation. It concluded that Dr. Klaassen had failed to prove any of the grounds for appeal and that Dr. Girod had acted within his administrative capacity when he terminated Dr. Klaassen's employment. Specifically, the Committee found:

- We note that all State of Kansas employees are required to undergo annual compliance training programs, one module of which covers the State of Kansas Policy on Workplace Violence and clearly states "Workplace Violence includes any incident in which an employee, student, or other person is abused, threatened, intimidated, or assaulted, including any other disruptive behavior which unreasonably interferes with work performance by fellow employees, students or by a member of the public" and that verbal abuse includes "Threats, Verbal Intimidation, Harassment."
- Dr. Klaassen, as a long-standing and senior faculty member and as a past Chair of a School of Medicine Department, should have been knowledgeable about the KU Medical Center's Human Resources policy on workplace violence.

* * *

- Dr. Stites placed Professor Klaassen on administrative leave with pay, a specifically authorized administrative action that is not a disciplinary sanction. Dr. Stites's response is consistent with preserving a safe work environment as required by the Kansas State Policy on Workplace Violence and with the Human Resources policies for KU Medical Center.
- Professor Klaassen's claim neglects the rights of his peers, co-workers, and subordinates to expect a safe work setting free of intimidation and disruptive behavior.

Doc. 326-57 at 2, 3.

The Committee concluded:

> Based on Dr. Klaassen's 2012 censure and for the reasons outlined in 1.B. above, the Appeal Committee concludes Dr. Klaassen should have been aware of the unacceptability of the behavior in which he engaged on May 01 and May 07, and of the potential serious consequences stemming from such behavior.

*Id.* at 4.  Also, it noted that "Dr. Klaassen claimed several times that his termination was in retaliation for his outspoken views on KUMC policies and administration." *Id.* at 7.  But "[t]he Appeal Committee was not provided with any evidence that Dr. Girod's dismissal decision was related to a violation of Dr. Klaassen's First Amendment rights." *Id.*

The Third Ad Hoc Hearing Committee considered and rejected each of the following arguments, ones that Dr. Klaassen asserted:  (1) witnesses were promoted or awarded for their testimony; (2) the factual basis of Dr. Girod's decision was unclear; (3) KUMC had disciplined Dr. Klaassen without notice by placing him on administrative leave; (4) Dr. Klaassen was terminated without authority; (5) the University had failed to follow the KUMC Handbook; and (6) the University had forced witnesses to appear at the hearing.  *Id.* at 2–5.  The Committee also addressed Dr. Klaassen's claim that the hearing's four-hour time limit prevented Dr. Klaassen from presenting the evidence fully.  *Id.* at 4, 5.

On December 23, 2014, Dr. Girod issued his final decision on the appeal.  He accepted the Third Ad Hoc Hearing Committee's determination that Dr. Klaassen's appeal had not met any of the required criteria to warrant a different outcome and that the dismissal decision should stand.

### *KJRA Case in Wyandotte County*

On January 23, 2015, Dr. Klaassen filed a Petition for Judicial Review in Wyandotte County, Kansas District Court under the Kansas Judicial Review Act ("KJRA Matter").  The allegations in Dr. Klaassen's KJRA Petition mirror those asserted in Dr. Klaassen's First Amended Complaint in this case, with only minor changes and a couple of additional paragraphs.

On June 19, 2015, Dr. Klaassen filed his brief in Support of Judicial Review in the KJRA Matter. His arguments alleged due process violations. His first argument recited the following: "The University acted arbitrarily, failed to follow its policies, and took actions based on determinations of fact not supported by substantial evidence when it terminated Dr. Klaassen in violation of his due process rights." Doc. 326-103 at 12. Dr. Klaassen also argued that he was fired "without notice or an opportunity to be heard in violation of his constitutionally protected due process rights." *Id.* at 22.

On September 21, 2015, after hearing oral arguments in the KJRA Matter, Wyandotte County District Judge Daniel A. Duncan remanded the matter to the University "for re-hearing with additional notice and opportunity to be heard." Doc. 326-104 at 1. When ordering this remand, the court expressed concern that the University had not provided Dr. Klaassen with notice and an opportunity to be heard at the hearing. First, the court found that Dr. Girod's use of the phrase "totality of the circumstances" may have referred to charges of which Dr. Klaassen had not previously received notice. Second, the court found that the four-hour limit on Dr. Klaassen's testimony denied him an opportunity to be heard.

On October 20, 2015, Dr. Girod sent a letter to Dr. Klaassen. Its purpose was "to clarify any misunderstanding [Dr. Klaassen] may have had as to the reason for" the termination decision. Doc. 326-16 at 1. Dr. Girod's letter explained that he made the termination decision after considering: (1) the 2012 First Ad Hoc Committee's Recommendation; (2) Dr. Stites's 2012 decision adopting the First Ad Hoc Committee's Recommendation and sanctioning Dr. Klaassen; and (3) the 2013 Second Ad Hoc Committee's Recommendation. Also, Dr. Girod's letter read, in part:

> I concluded that the sanction of written warning was inadequate to address the very serious nature of your misconduct and failed to recognize the repeated and

continuing nature of your conduct, for which there is no excuse and for which you were disciplined previously . . . .

* * *

Because the record demonstrated that severe discipline like that imposed in 2012 did not succeed in compelling you to correct your misconduct, I had to consider that future misconduct and volatile behavior by you was more likely than not. The University cannot tolerate a continuing pattern of escalating, unprofessional and disruptive conduct from any faculty or staff member, particularly when, as here, it led to other faculty and staff feeling physically threatened, regardless of the passion that you feel about your situation or the perceived mistreatment you believe that you have experienced. Placing you back into the workplace was a risk that the University was unwilling to take. Therefore, I have concluded that your dismissal was the proper sanction and write to reaffirm my January 6, 2014 Decision, as clarified in this letter.

*Id.* at 3–4.

In December 2015, Dr. Klaassen's counsel objected to how KUMC was handling the appeal hearing after remand. His counsel asserted that Dr. Girod's October 15, 2015 termination letter did not provide Dr. Klaassen with notice of the charges of misconduct. KUMC overruled Dr. Klaassen's objections and required Mr. Klaassen to argue his appeal on March 29, 2016.

### Fourth Ad Hoc Hearing

On March 29, 2016, the Fourth Ad Hoc Hearing Committee considered Dr. Klaassen's appeal on remand from the Wyandotte County District Court. The Fourth Ad Hoc Hearing Committee consisted of a faculty committee of Dr. Klaassen's peers. Dr. Klaassen was present at the hearing and represented by counsel. The hearing lasted about six hours. Dr. Klaassen's counsel did not call any witnesses to appear and testify during the hearing. This included Dr. Klaassen, who was present at the hearing. Also, Dr. Klaassen did not use the full six hours that Dr. Klein, Vice Chancellor for Academic Affairs, had allotted for Dr. Klaassen to present his case. Instead, Dr. Klaassen completed his presentation in about two and a half hours. But, before the hearing, Dr. Klaassen's counsel had asked the University to make the following

witnesses available to testify at the hearing:  Dr. Stites, Dr. Girod, Dr. Jaeschke, Mr. Tully, Ms. Meagher, Dr. Carlson, and Dr. Terranova.  The University advised these individuals that Dr. Klaassen had requested their attendance, but it advised Dr. Klaassen's counsel that it had no subpoena power over them.  These witnesses already had testified earlier, in depositions, and the Ad Hoc Committee was presented with these witnesses' prior testimony.

Both parties made oral arguments, submitted additional briefing, and submitted new evidence.  The University played excerpts from videotaped depositions for the Committee.  Dr. Klaassen also submitted:  (1) the hearing transcript and all testimony provided in the First, Second, and Third Ad Hoc Committee Hearings; (2) the entire KJRA Agency Record, comprising nearly 8,000 pages of documents, and the tape recording of the May 1, 2013 meeting; (3) the complete deposition transcripts for seven witnesses, including Dr. Klaassen; (4) all 186 deposition exhibits that existed at the time; and (5) a PowerPoint presentation setting forth Dr. Klaassen's arguments.

On April 8, 2016, the Fourth Ad Hoc Hearing Committee issued a letter conveying its findings.  According to this letter, the Committee "specifically considered arguments and evidence presented by Dr. Klaassen on March 29, 2016 in reaching" its decision.  Doc. 326-58 at 1.  And, it concluded, "Dr. Girod's termination of Dr. Klaassen was within Dr. Girod's authority as EVC, and was an appropriate sanction for Dr. Klaassen's misconduct."  *Id.*

The Committee considered and rejected each of Dr. Klaassen's challenges to the termination decision.  *Id.* at 1–3.  The Committee found:  "[T]he adverse personnel actions against Dr. Klaassen were imposed for legitimate reasons, based on Dr. Klaassen's professional and continued personal misconduct rather than an intentional retaliation for his criticism of

KUMC administration." Doc. 326-58 at 1. The Committee rejected Dr. Klaassen's argument that Dr. Girod's termination decisions were inconsistent fabrications. It held:

> Dr. Girod's termination letter of 01/06/14 clearly states [that] the termination is based on a pattern of unacceptable conduct. Dr. Klaassen had previously been censured for this conduct and had been warned . . . that any repetition would not be tolerated. Those reasons were stated in the letter of 10/20/15.

*Id.* at 2.

Also, the Fourth Ad Hoc Hearing Committee rejected Dr. Klaassen's arguments that KUMC had retaliated against him for criticizing the Administration or otherwise violated his First Amendment rights. The Committee noted, "[W]hile Dr. Klaassen certainly is entitled to express his opinion in public venues, we do not believe he can then assert that adverse actions must necessarily be in retaliation for so doing." *Id.* The Committee ended its decision with the following statement:

> Our Appeals Panel has taken seriously our responsibility to render a fair decision, both for Dr. Klaassen as a colleague and for the wider community of KU Medical Center. We have been deliberate and careful in considering the events leading up to Dr. Klaassen's dismissal as presented by both parties. We acknowledge contributions made by Dr. Klaassen to our academic and scientific communities, while recognizing the negative effects of his actions on other members of these same communities. After hearing the evidence provided on March 29th, 2016 and deliberating, the Appeals Panel was unanimous in concluding the termination of Dr. Klaassen was within Dr. Girod's authority as EVC, and was an appropriate sanction for Dr. Klaassen's misconduct.

*Id.* at 3.

### Decision by Chancellor

On April 11, 2016, Dr. Girod forwarded the Fourth Ad Hoc Hearing Committee's decision to Chancellor Bernadette Gray-Little for her consideration. On April 22, 2016, Chancellor Gray-Little notified Dr. Klein and the parties' counsel that she would take final action on the matter in her role as CEO of the University.

On May 9, 2016, Chancellor Gray-Little notified Dr. Klaassen of her decision that termination of his employment was appropriate. By letter, Chancellor Gray-Little explained that she had reviewed various documents containing information about Dr. Klaassen's conduct and discipline. These materials included the transcripts and decisions from the First, Second, Third, and Fourth Ad Hoc Hearing Committees. "Based on [her] review [of the documents] and the preponderance of evidence in the record," Chancellor Gray-Little affirmed the termination decision. Doc. 326-39 at 2. She found that Dr. Klaassen "repeatedly engaged in unprofessional and personal misconduct." *Id.*

### KJRA Remand Proceedings

On June 10, 2016, Dr. Klaassen filed a Petition for Judicial Review on Remand in the KJRA Matter. Dr. Klaassen then filed an First Amended Petition on September 6, 2016. In his First Amended Petition, Dr. Klaassen contended: (1) KUMC's Appeal Hearing of March 29, 2016, violated the KJRA Court's Remand Order of September 21, 2015; (2) Dr. Girod's shifting termination explanations lacked a factual basis supported by the evidence, are unreasonable and arbitrary and in violation of the remand order; (3) KUMC violated Dr. Klaassen's constitutional rights by having the prosecuting attorney serve as Dr. Klaassen's adjudicator; and (4) KUMC violated its procedures and policies on remand. Doc. 326-108 at 25, 28, 30, 32.[3]

In his Brief in Support of Judicial Review on Remand, Dr. Klaassen argued that the KJRA authorized the court to grant Dr. Klaassen relief under four circumstances: (1) the University's Final Agency Action terminating his employment was unconstitutional; (2) the University engaged in an unlawful procedure or failed to follow prescribed procedure; (3) the

---

[3]      Dr. Klaassen's First Amended Petition omitted one claim he asserted in his original Petition: the claim asserting KUMC had terminated Dr. Klaassen in violation of his First Amendment rights. Doc. 326-107 at 32.

University's action was based on a determination of fact that was not supported by the appropriate standard of proof; and (4) the University's actions were otherwise unreasonable, arbitrary, or capricious. Doc. 326-109 at 10–11. In his prayer for relief, Dr. Klaassen sought reinstatement, front pay, compensatory damages, back pay, and attorney fees.

Each party submitted briefs, exhibits, and deposition transcripts to the Wyandotte County District Court. Also, that court had access to a record consisting of more than 7,400 pages, including full transcripts of each hearing below. The administrative record alone consisted of 14 notebooks. The court held a half-day hearing. On November 28, 2016, after hearing oral arguments, the court ruled for the University. Specifically, the Wyandotte County District Court found that the University had remedied the court's concerns when it had remanded the matter. Also, the court found "substantial competent evidence to support the decision" of the University. Doc. 326-111 at 2 (Tr. 117:23–25). The court thus denied the administrative appeal. Dr. Klaassen since has appealed the KJRA ruling to the Kansas Court of Appeals.

### *NIH Grants*

The University of Kansas Medical Center Research Institute ("KUMCRI") is a § 501(c)(3) non-profit organization that was established to support research grant administration for the University. KUMCRI has several divisions, including legal and finance. And it ensures that grant funds are spent according to the guidelines and wishes of the sponsor.

When Dr. Klaassen was placed on his first administrative leave in 2011, he was the Principal or Co-Principal Investigator for five NIH grants, including the COBRE grant and the T32 Training grant.[4] Both grants are large institutional grants. Grant proceeds from the NIH

---

[4] The other three NIH grants for which Dr. Klaassen served as Principal Investigator were: (1) an R01 research grant titled "the DK-081461 (1-4), Nrf2 as a Master Regulator in Liver Disease Prevention and Therapy"; (2) an R01 research grant titled "ES-019487 (1-5) Developmental Regulation of Drug Processing Genes"; and (3) an R01 research grant titled "ES-009649 (8-12), Regulation of Hepatic

help pay for professors' salaries, laboratories, lab equipment, and salaries for employees who work on the grant (including post-doctoral students and junior faculty).

One purpose of the COBRE grant was funding research projects for nuclear receptors and liver health. Another purpose of the COBRE grant was funding mentoring opportunities for junior faculty members. The grant application identified Dr. Klaassen as the Principal Investigator, and it also named a co-investigator. The grant also referenced an Internal Advisory Committee and an External Advisory Committee.

On October 20, 2004, the University submitted an Application Phase 1 of the COBRE grant. Doc. 326-6. It identified the "Applicant Organization" and Grantee as KUMCRI. The application identified Mei-Shya Chen as the Administration Official to notify if the award is made. The "Official Signing for the Applicant Organization" was Thomas Noffsinger with KUMCRI. The University authorized four persons to sign research and sponsored program grants and contracts. Dr. Klaassen was not one of the four. The description of the program stated, in relevant part:

> Five years of funding are requested to develop a Center of Biomedical Research Excellence at Kansas University Medical Center with a focus on Nuclear Receptor and their Role in Liver Health and Disease. Five talented new faculty who share this research interest were selected with the goal of helping them become funded, independent researchers. A PI, a co-PI, and internal advisory committee of experienced senior faculty and an external advisory committee of prominent scientists have been assembled to mentor them to this goal.

*Id.* at 3. On May 15, 2007, KUMCRI was notified that its application for a COBRE grant was awarded.

---

Uptake of Endogenous Signaling Molecules and Xenobiotics." The R01 grants were grants based on Dr. Klaassen's specific research. This meant that Dr. Klaassen, if he left the University, could take those grants with him to another institution. But he could not take the COBRE or Training grants with him because those grants were institutional grants.

On May 10, 2005, the University submitted an application for a Training grant to help train graduate and post-graduate doctoral toxicology students to perform research at KUMC. The Training grant was awarded to KUMCRI, not to Dr. Klaassen personally. Dr. Klaassen was identified as the Principal Investigator for the Training grant. Dr. Paul Terranova was identified as the co-Principal Investigator. The "Applicant Organization" and "Grantee" for the Training grant was KUMCRI. The application identified Mei-Shya Chen as the Administration Official to notify if the award is made. The "Official Signing for the Applicant Organization" was Ted R. Knaus with KUMCRI. The description of the program stated in relevant part:

> During the past 25 years, over 200 students have received instruction in the Toxicology Training Program at the University of Kansas Medical Center . . . Contained in this proposal is a request for five additional years of funding for the program.

Doc. 326-7 at 2. On July 4, 2011, the Training grant was awarded to the KUMCRI.

The NIH has many rules governing use of money it has granted. The NIH Grants Policy Statement defines the role of the Principal Investigator as "an individual designated by the applicant organization to have the appropriate level of authority and responsibility to direct the project or program supported by the award." Doc. 326-116 at 18. Also, the Policy Statement explains that the Principal Investigator is "responsible and accountable to the grantee organization or, as appropriate, to a collaborating organization, for the proper conduct of the project or program, including the submission of all required reports." *Id.* Dr. Klaassen acknowledges that NIH has the authority to approve a change in a grant's Principal Investigator.

The Principal Investigator for a grant reports to the University, and he is responsible to the University. The Grantee organization—the University—receives the money. The Principal Investigator provides leadership and direction about the grant and has primary responsibility for administering the program. Dr. Klaassen testified that it was within his role as Principal

Investigator to host meetings of the grant team, make hiring decisions about the grant team, and use the grant money as directed in the grant. As the Principal Investigator of the COBRE grant, Dr. Klaassen was responsible for overseeing liver research programs. Dr. Klaassen also was involved in the COBRE research projects and was identified as a collaborator on them.

Dr. Girod testified that KUMCRI follows a process to verify expenses before the University submits any expenses to the NIH. Also, KUMCRI has a policy titled "Principal Investigator Changes or Absences." Doc. 326-8. It provides:

> When the Principal Investigator (PI) who has been granted a sponsored award or is participating in other funded research including privately funded clinical trials is unavailable to fulfill his or her obligation to the award agreement, the sponsoring agency or the project sponsor, in collaboration with the University of Kansas Medical Center (KUMC) will decide the course of action for the remaining terms of the award.

*Id.* at 1.

The KUMC Handbook does not require any sort of due process procedure before changing a Principal Investigator. The University has removed other individuals as Principal Investigators from grants. But Dr. Klaassen testified that, in his 45 years as a tenured faculty member, he had never seen a Principal Investigator removed from a grant. Dr. Klaassen testified that he believes he had the right to do research at KUMC but KUMC "took [his] grants away." Doc. 349-130 at 16–17 (Klaassen Dep. 30:1–31:19).

Based on Dr. Klaassen's insubordinate behavior as a member of the Pharm/Tox Department in 2011, various individuals within KUMC discussed whether it continued to make sense to have Dr. Klaassen serve as the Principal Investigator of the COBRE and Training grants. Dr. Terranova consulted with the NIH about its process for changing the Principal Investigator. On November 1, 2011, Dr. Terranova advised Dr. Klaassen that while he was on leave, "KUMC administration will decide the future direction and continuation of all programs

that you direct at KUMC.  This determination will include consultation with appropriate faculty, other administrators at KUMC, and the NIH."  Doc. 326-22 at 2.

As already discussed, above, KUMC requested that the NIH change the Principal Investigator on the COBRE and Training grants on November 21, 2011.  KUMC's request asked NIH to remove Dr. Klaassen and replace him with other KUMC professors.  Dr. Terranova testified that he made the final decision to seek a change of the Principal Investigator on the COBRE and Training grants based on Dr. Klaassen's unprofessional behavior at KUMC.  Dr. Terranova testified that he had lost faith in Dr. Klaassen's ability to lead those grants, and he had become concerned that Dr. Klaassen's unprofessional behavior was compromising the goals of the grants.

On November 21, 2011, KUMCRI wrote to the NIH proposing:  (1) to replace Dr. Klaassen as the Principal Investigator for the COBRE grant with Dr. Jaeschke as the new Principal Investigator; and (2) to replace Dr. Klaassen as the Principal Investigator for the T32 Training grant with Dr. Hagenbuch as the new Principal Investigator.

From July 1, 2011 until July 20, 2013, Dr. Klaassen's annual salary was $293,646.  On July 21, 2013, Dr. Klaassen's salary increased to $294,296.  Dr. Klaassen's annual salary remained at that rate until his termination in January 2014.

On December 15, 2011, the NIH approved the change in the Principal Investigator for the Training grant from Dr. Klaassen to Dr. Hagenbuch.  Doc. 326-25 at 4.  On December 16, 2011, the NIH approved the change in the Principal Investigator on the COBRE grant from Dr. Klaassen to Dr. Jaeschke.  Doc. 326-80 at 4.  Dr. Klaassen has acknowledged that the NIH has the authority to change the Principal Investigator on a grant.  The NIH has not criticized the University for requesting the change in the Principal Investigator for the COBRE grant or

Training grant.  Also, the NIH has not criticized the University for preventing Dr. Klaassen from making all decisions about the grants while he was on administrative leave.  In May 2012, the First Ad Hoc Hearing Committee considered evidence about Dr. Klaassen's removal from the COBRE and Training grants.  The Hearing Committee concluded ". . . it was not inappropriate to remove him as the PI on the COBRE and Training grants."  Doc. 326-10 at 3.

In 2013, Dr. Klaassen was the Principal Investigator on three R01 grants that the NIH had awarded.  *See supra* n.3 (describing the three R01 grants for which Dr. Klaassen served as Principal Investigator.)  On August 30, 2013, while Dr. Klaassen was on administrative leave, the KUMCRI requested a permanent change in the Principal Investigator for the Hepatic Uptake grant from Dr. Klaassen to one of the post-doctoral students in his lab, Dr. Julia Y. Cui.  Also on August 30, 2013, the University requested that the NIH make a permanent change in the Principal Investigator on the Drug Processing Gene grant.  The NIH granted KUMCRI's requests.  On April 20, 2014, the NIH assigned Dr. Julia Cui to serve as the Principal Investigator of the Hepatic Uptake grant.  On April 3, 2014, the NIH assigned Dr. Ivan Csanaky to serve as the Principal Investigator of the Drug Processing Gene grant.

Dr. Klaassen testified that the NIH, since he was removed from these roles, has expressed no unwillingness to recognize him as a Principal Investigator for other grants.  Dr. Klaassen also testified that, since his termination from KU, he has applied for and received one NIH grant at the University of Washington.  Also, he testified that he intends to continue to apply for more grants.

### Academic Freedom at KUMC

At KUMC, tenured professors enjoy the academic freedom to research topics in their chosen field.  KUMC has adopted an Academic Freedom Policy.  It provides:

60

The University of Kansas has a long tradition of dedication to the principals of academic freedom and has sought to implement these principles as they are embodied in the 1940 Statement of Principles on Academic Freedom and Tenure of the American Association of University Professors and the American Association of Colleges. The University's position on academic freedom is therefore fully reflected by the following paragraphs from the AAUP statement:

The teacher is entitled to full freedom in research and in the publication of the results, subject to the adequate performance of his other academic duties . . .

The teacher is entitled to freedom in the classroom in discussing his subject, but he should be careful not to introduce into his teachings controversial matter which has no relation to his subject.

The . . . university teacher is a citizen, a member of a learned profession, and an officer of an educational institution. When he speaks or writes as a citizen, he should be free from institutional censorship or discipline, but his special position in the community imposes special obligations. As a man of learning and an educational officer, he should remember that the public may judge his profession and his institution by his utterances. Hence he should at all times be accurate, should exercise appropriate restraint, should show respect for the opinions of others, and should make every effort to indicate that he is not an institutional spokesman.

The following regulation on academic freedom and campus disruption was adopted by the Board of Regents on June 19, 1970:

WHEREAS, the members of the State Board of Regents recognize that academic freedom is a necessary adjunct of higher education in the State of Kansas, and
WHEREAS, academic freedom includes not only the right of dissent, but also the freedom to pursue academic aims by all segments of our colleges and universities, and
WHEREAS, small numbers of the student bodies and/or employees of Kansas state colleges and universities are pursuing activities deliberately designed to, and which do, disrupt regularly scheduled activities of said institutions, and
WHEREAS, disciplinary boards organized to provide student and faculty review of disruptive action are, at times, harassed and delayed in conducting said reviews, and
WHEREAS, the interests of citizens and taxpayers of the State and of the majority of students and faculty are detrimentally affected.
NOW, THEREFORE, BE IT RESOLVED by the State Board of Regents that the chief administrative officer of each of the state universities and

> colleges be and are hereby directed to immediately suspend any employee, faculty member or student of said institution where said student, faculty member or employee is engaging in activities deliberately designed to, and which do, disrupt the normal ordinary process of education and training offered by said institutions, said suspension to remain in effect pending such procedural steps as may be required under the rules and regulations of the state institutions and the laws of the State of Kansas. The heads of the state institutions shall take action as is necessary to stop such activities.
>
> BE IT FURTHER RESOLVED that this action not be considered as limiting any authority of said chief administrative officers in the performance of their duties.

Doc. 349-178 at 44–45.

The KUMC Handbook includes an Academic Freedom Complaint Procedure. *Id.* at 114–19. The policy provides a procedure for filing complaints alleging infringement of a faculty member's academic freedom. Also, it provides for an investigation of the complaint, a determination (by the Faculty Steering Committee) whether reasonable evidence exists that academic freedom is an issue, and hearings and findings of an Ad Hoc Hearing Committee. Dr. Klaassen never invoked the Academic Freedom Complaint Procedure during his employment at KUMC.

### *The "Right to Research"*

Dr. Klaassen has told his faculty that research is not an entitlement; research is a privilege. Dr. Klaassen never was criticized or reprimanded for anything associated with his research or the types of research he was doing. Also, Dr. Klaassen was given academic freedom to decide the types of research he was doing. Nobody has challenged—whether on the basis of academic freedom or otherwise—the propriety of doing research for the grants on which Dr. Klaassen has served as Principal Investigator. And, during his employment at KUMC, Dr. Klaassen never filed any complaints using the Academic Freedom Complaint Procedure.

In 2011 and 2012, Dr. S. was a tenured professor in KUMC's Pharm/Tox Department. In October 2011, KUMC's human resources department received complaints that Dr. S. had engaged in abusive and threatening conduct towards his laboratory members. KUMC investigated the allegations. KUMC did not place Dr. S. on administrative leave while it investigated the complaints.

After investigating the allegations, KUMC determined that Dr. S. had engaged in the following improper conduct: (1) using immigration documents to manipulate employees; (2) threatening to deport students; (3) engaging in abusive and threatening behavior sufficient to create a hostile work environment; (4) engaging in behavior that made students fearful of Dr. S.'s reaction to their requests asking not to perform radiation work; and (5) threatening other employees who worked in the International Program. In response to Dr. S.'s abusive and threatening behavior, KUMC required Dr. S. to undergo management training and complete a disruptive physician program. KUMC advised him that attending the training and the physician program, along with fulfilling other requirements, were mandatory conditions for him to continue working at KUMC. The letter advising Dr. S. of the investigation's results contains signature lines for Dr. Carlson, Dr. Terranova, and Dr. Jaeschke. The University did not remove Dr. S. as Principal Investigator for the two NIH Grants where he was identified as the Principal Investigator.

Later, KUMC charged Dr. S. with research misconduct for plagiarism. After completing KUMC's Handbook due process procedure for research misconduct, KUMC found Dr. S. guilty of research misconduct, placed him on administrative leave, and removed him as Principal Investigator from the NIH grants. KUMC then terminated Dr. S.'s employment.

Dr. T. was Chair of a KUMC Department.  KUMC later removed Dr. T. both from her position as Chair and an additional administrative position she held.  In a letter informing Dr. T. that KUMC was relieving her of the administrative position, KUMC advised that she would remain as the Principal Investigator on the grants where she currently served as the Principal Investigator.  But Dr. Girod testified that KUMC eventually removed Dr. T. as Principal Investigator from the grants, most likely while she was out on leave.

Dr. K. was a Chair of a KUMC Department.  Under the direction of Dr. Girod, KUMC investigated Dr. K. for creating a hostile work environment based on his interactions with residents and hospital staff.  Nothing in Dr. K.'s personnel file shows that KUMC placed him on administrative leave during the investigation.  After the investigation concluded, KUMC asked Dr. K. to resign as Chair because his actions had created an abusive environment.  Dr. K. was allowed to keep his NIH grants, but he later relinquished them to the University as part of a settlement agreement.  After resigning from KUMC, Dr. Atkinson, now serving as Dean of another University's School of Medicine, hired Dr. K. at the university where she was serving as Dean.

### 2012 Federal Court Lawsuit

On May 25, 2012, Dr. Klaassen filed a Verified Complaint in the United States District Court for the District of Kansas seeking Declaratory and Injunctive Relief against the Kansas Board of Regents, the University of Kansas Medical Center, and the members of the First Ad Hoc Hearing Committee.  Complaint, *Klaassen v. Kansas Bd. of Regents*, No. 12-2326-JTM-JPO (D. Kan. May 25, 2012), ECF No. 1.  Four days later, Judge Marten dismissed the case for lack of subject matter jurisdiction.  Order, *Klaassen v. Kansas Bd. of Regents*, No. 12-2326-JTM-JPO (D. Kan. May 29, 2012), ECF No. 7.

In June 2014, while this case was pending, Dr. Klaassen filed some, but not all, of the same claims asserted here in a state court lawsuit in Wyandotte County, Kansas (the "State Case"). The 78 paragraphs recited in the "Facts" section of Dr. Klaassen's State Court Petition mirror Dr. Klaassen's First Amended Complaint in this case.

On October 11, 2016, the District Court of Wyandotte County granted summary judgment for the University and against Dr. Klaassen on his age discrimination claim and his retaliation claim under the Kansas False Claims Act. In the Pretrial Order in the State Case, Dr. Klaassen's allegations included:

> On March 31, 2011, Klaassen publicly accused Atkinson of financial mismanagement. He accused her of acting as a "slumlord," someone who raises rent on the poor in less than adequate rental facilities to fund the landlord's expensive habits. One week later Atkinson fired Klaassen as Chair of Pharmacology. She explained that she terminated him because of the "extremely inappropriate things he has said to his faculty, the administration and to the public." A few days later, on April 9, 2011, a PowerPoint prepared by Klaassen regarding the lack of shared governance and Atkinson's financial management was widely distributed among folks on campus, the University of Kansas Endowment, and the Kauffman Foundation.

Doc. 326-134 at 3.

> Dr. Klaassen also alleged in the Pretrial Order:

> Dr. Klaassen's oral and written reports to KUMC of its misappropriation of NIH grants monies were made within the following correspondence or at the following events:

> - October 28, 2011 COBRE meeting (Ex. 187; Ex. 12);
> - Correspondence between Drs. Klaassen and Terranova in January 2012 (Ex. 332);
> - Correspondence between Drs. Klaassen and Jaeschke in February 2012 (Ex. 342);
> - Correspondence between Drs. Klaassen and Terranova in March 2012 (Ex. 346);
> - Correspondence between Drs. Klaassen and Stites in July and August 2012 (Ex. 351);
> - Correspondence between Drs. Klaassen and Dawn in September 2012 (Ex. 353);
> - Correspondence between Drs. Klaassen and Stites and Dawn in December 2012 (Ex. 357);

- May 1, 2013 Budget Meeting (Exs. 360, 371);
- May 7, 2013 Meeting with Ms. Hopkins (Ex. 361); and
- November 2013 Ad Hoc Hearing (Ex. 367).

*Id.* at 5.  Also, Dr. Klaassen alleged the following in the State Case Pretrial Order:

> In particular, on May 1, 2013, the chair of Internal Medicine Steven Stites called Klaassen into a meeting at KUMC in a small conference room.  At the meeting, Klaassen stood up, advocated for his students and his research, accused KUMC of stealing NIH grant monies, and asked Stites to provide his students with access to necessary research equipment.  Stites abruptly ended the meeting and told Klaassen to leave.  One week later, on May 7, 2013, Dr. Klaassen approached Christina Hopkins who provided grant accounting services for KUMC.  Klaassen explained to Ms. Hopkins that KUMC's grant accounting practices were improper.  The next day, Dr. Stites had armed police officers (again) escort Klaassen out off campus.  Stites then banned Klaassen from campus forever and charged Klaassen with personal misconduct at a November 13, 2013 hearing.

*Id.*

> The damages Dr. Klaassen sought in the State Case included:

> a.    Plaintiff seeks declaratory relief that Defendant terminated his employment and converted his personal property in violation of the Kansas common law;

> b.    Plaintiff seeks prospective and injunctive relief including reinstatement as a University Distinguished Tenured Professor and return of his personal property that KUMC continues to unlawfully withhold;

> c.    Plaintiff seeks actual damages against Defendant in the following amounts:

>> i.    For his lost wages, benefits, and retirement income, Plaintiff has sustained actual damages in an ongoing amount currently valued at approximately $2,454,622 plus interest;

>> ii.    Plaintiff seeks damages for emotional distress in the amount of $500,000; and,

>> iii.    Plaintiff seeks compensation for loss [of] reputation in the amount of $500,000.

*Id.* at 7.

The following witnesses testified in depositions taken as part of the State Case: (1) Dr. Curtis Klaassen; (2) Dr. Barbara Atkinson; (3) Dr. Doug Girod; (4) Dr. Steven Stites; (5) Dr. Gerald Carlson; (6) Dr. Paul Terranova; and (7) Dr. Hartmut Jaeschke. Also, during the State Case, Dr. Klaassen called Gary Baker as a witness. He was Dr. Klaassen's expert economist. Dr. Klaassen has identified Dr. Baker as his expert economist in this case. Dr. Baker prepared only one expert report for use in both this case and the State Case. In each of his three lawsuits, Dr. Klaassen has sought reinstatement and asserted claims for back pay, front pay, and attorney fees.

After 11 trial days on the claims that survived for trial in the State Case, Dr. Klaassen rested. On December 12, 2016, the Wyandotte County District Court considered defendant's motion for judgment under Kan. Stat. Ann. § 60-250 (judgment as a matter of law). The Wyandotte County District Court granted the University's motion for judgment against Dr. Klaassen's remaining claims. The court considered the evidence that Dr. Klaassen had presented, including his evidence that the University had spent money out of "Dr. Klaassen's" grants improperly, and found that "nothing the University of Kansas did was wrong." Doc. 326-129 at 199 (Tr. 199:17–19.) Also, the Wyandotte County District Court held that Dr. Klaassen did not have a good faith belief that any wrongdoing with respect to the NIH grants had occurred at the University, specifically stating, "I find that he did not have a good faith belief." *Id.* at 200 (Tr. 200:12–13.) Dr. Klaassen has appealed the rulings in the State Case. That appeal still is pending.

*Individual Defendants*

In this lawsuit, Dr. Klaassen asserts claims against seven individuals: (1) Dr. Barbara Atkinson; (2) Dr. Gerald Carlson; (3) Dr. Douglas Girod; (4) Dr. Paul Terranova; (5) Dr. Bruno Hagenbuch; (6) Dr. Steven Stites; and (7) Dr. Hartmut Jaeschke.

Dr. Atkinson began serving as Executive Dean of the School of Medicine in 2002. In 2005, Dr. Atkinson began serving as KUMC's EVC. On April 9, 2012, Dr. Atkinson resigned as EVC and Executive Dean of the School of Medicine. The First Ad Hoc Hearing was held in May 2012. Because she had resigned from the University in April 2012, Dr. Atkinson was not involved with the First Ad Hoc Hearing—or any others. Dr. Atkinson was not involved in placing Dr. Klaassen on administrative leave in May 2013. Also, she was not involved in terminating Dr. Klaassen's employment in 2014.

Dr. Carlson is the Chair of the Biochemistry Department at KUMC. Beginning in April 2011, Dr. Carlson served as Interim Chair of the Pharm/Tox Department after Dr. Klaassen's removal from that position. Dr. Carlson served as Interim Chair until January 9, 2012, when Dr. Jaeschke was named Chair of the Department. Before he was Interim Chair of the Pharm/Tox Department, Dr. Carlson did not supervise Dr. Klaassen. Instead, he and Dr. Klaassen each served as a department chair in a basic science department. After January 9, 2012, Dr. Klaassen did not report to Dr. Carlson. Since then, Dr. Carlson has not made any decisions about Dr. Klaassen. Dr. Carlson was not involved in the decision to remove Dr. Klaassen as Pharm/Tox Department Chair. Also, Dr. Carlson was not involved in the decision to terminate Dr. Klaassen's employment.

Dr. Girod was named Dean of the School of Medicine and EVC of KUMC on February 2, 2013. Dr. Girod succeeded Dr. Steven Stites, who had served as Acting EVC. Dr. Girod remained the EVC until he became the Chancellor of the University of Kansas in July 2017.

Dr. Terranova served as Vice Chancellor for Research at KUMC beginning in 2007 and served in that role until his retirement on January 2, 2015. At the direction of Dr. Atkinson, Dr. Terranova placed Dr. Klaassen on administrative leave on November 1, 2011, following complaints of unprofessional behavior. Such behavior included the events of the previous Friday, October 28, 2011, when Dr. Klaassen purportedly had engaged in unprofessional behavior at a COBRE meeting. Dr. Terranova also worked with the NIH in 2011, to arrange reassignment of the Principal Investigator role for two grants issued by the NIH to the KUMCRI. Dr. Terranova did not make the decision to terminate Dr. Klaassen's employment.

Dr. Hagenbuch was, and remains, a faculty member in the Pharm/Tox Department at KUMC. Dr. Hagenbuch was reassigned as the Principal Investigator on the Training grant after Dr. Klaassen's removal from that position. Dr. Klaassen testified that he has sued Dr. Hagenbuch because Dr. Hagenbuch signed a letter asking the NIH to reassign him as the Principal Investigator on the Training grant, thereby replacing Dr. Klaassen.

Dr. Stites served as Chair of the Department of Internal Medicine at KUMC from 2007 through 2014. In January 2012, Dr. Stites accepted Dr. Klaassen as a faculty member of the Internal Medicine Department. Dr. Stites did not receive a raise for accepting Dr. Klaassen into the Internal Medicine Department. In April 2012, Dr. Stites was named Acting EVC and Acting Executive Dean of the School of Medicine. He served in those positions until February 1, 2013, when Dr. Girod was named Executive Dean of the School of Medicine and EVC of KUMC.

Dr. Stites was not involved in Dr. Jaeschke's 2012 decision to begin charging to use the mass spectrometer. On May 8, 2013, Dr. Stites placed Dr. Klaassen on paid administrative leave. In 2015, Dr. Stites was named Vice Chancellor for Clinical Affairs. When Dr. Stites testified in 2013,[5] that position was not an open one.

Dr. Jaeschke joined the Pharm/Tox Department as a faculty member in 2006. On January 9, 2013, Dr. Jaeschke became Department Chair. He continues to serve today as the Pharm/Tox Department Chair. Initially, Dr. Jaeschke was supportive of Dr. Klaassen when Dr. Klaassen was removed as Chair of the Pharm/Tox Department. But later, Dr. Jaeschke observed what he believed was a hostile work environment created by Dr. Klaassen, including threats and unprofessional conduct aimed at Dr. Jaeschke.

After Dr. Klaassen was removed as the Principal Investigator of the COBRE grant, Dr. Jaeschke was assigned to serve as the Principal Investigator for that grant. Dr. Jaeschke did not place Dr. Klaassen on administrative leave. Also, Dr. Jaeschke did not make the decision to terminate Dr. Klaassen's employment.

## II.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *Nahno-Lopez v. Houser*, 625

---

[5] This fact comes from the unconverted facts of the parties. Doc. 326 at 13 (Statement of Material Facts ¶ 58); Doc. 349 at 15 (Response to Defendants' Statement of Material Facts ¶ 58). But the parties never identify what testimony they are referring to when they reference Dr. Stites's testimony in 2013. The summary judgment record here contains so many transcripts—from depositions, to Ad Hoc Hearings, to state court proceedings. It's not the court's job to parse through the record to determine which 2013 testimony the parties reference here. But since the fact is uncontroverted, the court includes it in its recitation of the uncontroverted facts.

F.3d 1279, 1283 (10th Cir. 2010). "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citing *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To meet this burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim." *Id.* (citing *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof." *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 670 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

### III.    Analysis

Dr. Klaassen asserts six claims in this lawsuit.  They are:

1.    Count 1:  First Amendment retaliation in violation of 42 U.S.C. §§ 1983 and 1988, a claim he asserts against Dr. Girod in his individual and official capacities and Dr. Atkinson, Dr. Terranova, Dr. Carlson, Dr. Jaeschke, and Dr. Stites in their individual capacities;

2.    Count 2:  Procedural Due Process violations under 42 U.S.C. §§ 1983 and 1988 for taking NIH grants, a claim he asserts against Dr. Atkinson, Dr. Terranova, Dr. Carlson, Dr. Jaeschke, and Dr. Stites in their individual capacities;

3.    Count 3:  Procedural Due Process violations under 42 U.S.C. §§ 1983 and 1988 based on termination of Dr. Klaassen employment, a claim he asserts against Dr. Girod in his official and individual capacities and Dr. Stites in his individual capacity;

4.    Count 4:  Substantive Due Process violations under 42 U.S.C. §§ 1983 and 1988 based on termination of Dr. Klaassen's employment, a claim he asserts against Dr. Girod in his official capacity;

5.    Count 5:  Tortious interference with a business expectancy, a claim he asserts against Dr. Terranova, Dr. Jaeschke, Dr. Hagenbuch, and Dr. Carlson in their individual capacities; and

6.    Count 7:  Tortious inference with contract, a claim he asserts against Dr. Stites in his individual capacity.

Doc. 298 at 20–26.

Defendants assert they are entitled to summary judgment against each of Dr. Klaassen's claims for a variety of reasons.  The court addresses each of their arguments, in turn, below.

### A.  Res Judicata and Collateral Estoppel

Defendants ask the court to dismiss all of Dr. Klaassen's claims because, they assert, the doctrines of res judicata (claim preclusion) and collateral estoppel (issue preclusion) bar any possible recovery.[6]  Defendants argue that Dr. Klaassen has filed three other lawsuits arising out

---

[6]    The preclusive effect of a state court decision on an action filed in federal court is a matter of state law.  *Weaver v. Boyles*, 172 F. Supp. 2d 1333, 1339 (D. Kan. 2001), *aff'd*, 26 F. App'x 908 (10th

of Dr. Klaassen's employment relationship with and his termination from that position with

KUMC. In two of the lawsuits, Dr. Klaassen sought the same relief that he seeks here—*i.e.*,

reinstatement, back pay, front pay, and attorney's fees. In all three lawsuits, the deciding courts

have rendered judgments for the University and against Dr. Klaassen's claims, or dismissed

them. Defendants assert that principles of res judicata and collateral estoppel bar Dr. Klaassen

from litigating his claims in this case because he already asserted the same claims unsuccessfully

in his other lawsuits, or he could have asserted them. The court considers defendants' res

judicata and collateral estoppel arguments in the following four subsections, as well as a related

rule against claim splitting.

### 1. Res Judicata Bars Dr. Klaassen's Official Capacity Claims.

The full faith and credit provision of 28 U.S.C. § 1738 requires that federal courts "must

give to a state-court judgment the same preclusive effect as would be given that judgment under

the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd.*

*of Educ.*, 465 U.S. 75, 81 (1984). The preclusive effect of a state court decision on an action

filed in federal court is a matter of state law. *Weaver v. Boyles*, 172 F. Supp. 2d 1333, 1339 (D.

Kan. 2001), *aff'd*, 26 F. App'x 908 (10th Cir. 2002). The court thus applies Kansas law to

determine whether the doctrine of res judicata bars Dr. Klaassen's claims here in this lawsuit.

"Res judicata, or claim preclusion, precludes a party or its privies from relitigating issues

that were or could have been raised in an earlier action, provided that the earlier action

---

Cir. 2002). The Kansas Supreme Court has explained that "[w]hile the concept of res judicata is broad enough to encompass both claim preclusion and issue preclusion, the modern trend is to refer to claim preclusion as res judicata and issue preclusion as collateral estoppel." *Waterview Resolution Corp. v. Allen*, 58 P.3d 1284, 1290 (Kan. 2002) (citing 46 Am. Jur. 2d *Judgments* § 516); *see also Carter v. City of Emporia*, 815 F.2d 617, 619 n.2 (10th Cir. 1987) ("Res judicata is sometimes used to refer only to the narrower concept of claim preclusion, as distinguished from issue preclusion, which is sometimes called collateral estoppel.").

proceeded to a final judgment on the merits." *King v. Union Oil Co.*, 117 F.3d 443, 445 (10th Cir. 1997); *see also Winkel v. Miller*, 205 P.3d 688, 697 (Kan. 2009) ("The doctrine of res judicata (or claim preclusion) prohibits a party from asserting in a second lawsuit any matter that might have been asserted in the first lawsuit." (citation and internal quotation marks omitted)).

"The doctrine of res judicata rests upon considerations of economy of judicial time and public policy which favors establishing certainty in judgments." *Neunzig v. Seaman Unified Sch. Dist. No. 345*, 722 P.2d 569, 576 (Kan. 1986); *see also Plotner v. AT & T Corp.*, 224 F.3d 1161, 1168 (10th Cir. 2000) ("The fundamental policies underlying the doctrine of res judicata (or claim preclusion) are finality, judicial economy, preventing repetitive litigation and forum-shopping, and the interest in bringing litigation to an end." (citations and internal quotation marks omitted)). Also, "[t]he doctrine of res judicata expresses a policy designed to protect the defendant from harassment and the public from multiple litigation." *Griffith v. Stout Remodeling, Inc.*, 548 P.2d 1238, 1240 Syl. ¶ 7 (Kan. 1976). The Kansas Supreme Court has described the doctrine of res judicata this way:

> This rule is one of public policy. It is to the interest of the state that there be an end to litigation and an end to the hardship on a party being vexed more than once for the same cause. The doctrine of res judicata is, therefore, to be given a liberal application but not applied so rigidly as to defeat the ends of justice.

*In re Estate of Reed*, 693 P.2d 1156, 1160 (Kan. 1985).

Under Kansas law, "res judicata (claim preclusion) . . . contains four elements: (1) same claim; (2) same parties; (3) claims were or could have been raised; and (4) a final judgment on the merits." *Neunzig*, 722 P.2d at 575. An exception applies, though, "if the party seeking to avoid preclusion did not have a full and fair opportunity to litigate the claim in the prior suit." *Rhoten v. Dickson*, 223 P.3d 786, 797 (Kan. 2010). To establish that res judicata bars a

plaintiff's claims, a defendant bears the burden of presenting sufficient evidence on each element. *Spiess v. Meyers*, 483 F. Supp. 2d 1082, 1089 (D. Kan. 2007) (citations omitted).

Here, defendants have established all of the requisite elements. *First*, in this federal action, Dr. Klaassen asserts the same claims against Dr. Girod in his official capacity as he asserted against the University in his state court lawsuits. As the court recognized in its February 3, 2015 Order granting defendants' Motion for Judgment on the Pleadings in part and denying it in part, Dr. Klaassen could assert "a suit in federal court to enjoin a state official prospectively from violating federal law." Doc. 55 at 19. Thus, the court held that Dr. Klaassen could assert § 1983 claims against Dr. Girod in his official capacity because he is the only defendant with the power to reinstate Dr. Klaassen. *Id.* at 21–22.

In Kansas, "the claim or cause of action is defined in terms of the injury for which relief is demanded, that is to say, in terms of the factual circumstances of the controversy rather than the legal theory or remedial statute on which the suit is grounded." *Carter v. City of Emporia*, 815 F.2d 617, 620 (10th Cir. 1987) (citing *Wells v. Ross*, 465 P.2d 966, 968 (Kan. 1970)). Said another way, "Kansas courts find claims to be identical where plaintiff uses different words to describe a claim, but makes the same argument and relies upon the same operative facts as in his prior case." *See Cosgrove v. Kan. Dep't of Soc. and Rehab. Serv.*, 744 F. Supp. 2d 1178, 1186–87 (D. Kan. 2010) (first citing *Winkel v. Miller*, 205 P.3d 688, 697 (Kan. 2009) (holding same claim presented where plaintiff presented "essentially the same complaints that were litigated in *Winkel I*, modified only slightly to include unsupported allegations"); then citing *Collins v. State*, 199 P.3d 188, 2009 WL 196194, at *4 (Kan. Ct. App. Jan. 23, 2009) (finding same claim where the only differences between the two motions were plaintiff's "legal theories with respect to the facts, not the operative facts themselves")).

In both the KJRA Matter and the State Case that he filed in Wyandotte County, Kansas state court, Dr. Klaassen challenged his termination and sought reinstatement. In the KJRA Matter, Dr. Klaassen argued that the University had violated his constitutional rights. The Wyandotte County District Court disagreed, holding that the University had remedied the court's concerns after the Wyandotte County court had remanded the matter. Also, the court found "substantial competent evidence to support the decision" by the University to terminate Dr. Klaassen's employment. Doc. 326-111 at 2 (Tr. 117:23–25). And in the State Case, Dr. Klaassen asserted a retaliatory discharge claim and sought reinstatement as a remedy. The court rejected Dr. Klaassen's retaliatory discharge claim and entered judgment as a matter of law against Dr. Klaassen and in the University's favor.

These state court claims are the same claims that Dr. Klaassen asserts here against Dr. Girod in his official capacity. Dr. Klaassen's § 1983 claims arise from his employment and eventual dismissal from employment by KUMC. Also, he seeks reinstatement as a remedy. Although Dr. Klaassen "uses different words to describe" the § 1983 claims in this lawsuit, he "makes the same argument and relies upon the same operative facts" that he argued and relied on in his two state court cases. *Cosgrove*, 744 F. Supp. 2d at 1186–87. Dr. Klaassen thus asserts the same claim in this lawsuit for res judicata purposes.

*Second*, the case involves the same parties, even though he sued the University in the state court actions and has sued Dr. Girod in his official capacity in this case. "Kansas follows the general rule that 'a judgment binds not only the parties to the action but also those who are in privity with them.'" *Carter*, 815 F.2d at 620 (quoting *Wells*, 465 P.2d at 969). A government official who is sued in his official capacity is in privity with the government for which he works. *See, e.g.*, *Gonzales v. Hernandez*, 175 F.3d 1202, 1206 (10th Cir. 1999) (recognizing that "the

general weight of authority" is that a government employee sued in his official capacity stands in privity with his employer); *Spielman v. City of Newton*, No. 96-2463-KHV, 1997 WL 534468, at *4 n.7 (D. Kan. July 25, 1997) (applying Kansas law and holding "[t]o the extent that plaintiff sues [an individual defendant] in his official capacity, he and [his municipal government employer] are in privity for collateral estoppel and res judicata purposes."); *Rhoten v. Hren*, 234 P.3d 866, 2010 WL 2977939, at *5 (Kan. Ct. App. July 23, 2010) (explaining that "[a] government and its agents are in privity with each other because the agent represents the rights of the government" and thus holding that res judicata barred plaintiff's claims against individual defendants sued in their official capacity because plaintiff had asserted the same claims against the individuals' employer—the City of Topeka—as sued in an earlier action). Here, Dr. Klaassen has sued Dr. Girod in his official capacity. He is in privity with the University—the party named as a defendant in Dr. Klaassen's state court cases—and thus, for res judicata purposes, plaintiff's official capacity claim against Dr. Girod is the equivalent of a suit against the University.

*Third*, Dr. Klaassen either did raise or could have raised his official capacity claims against Dr. Girod in his two state court lawsuits. Indeed, the State Case's Petition includes factual allegations that are almost identical to the ones Dr. Klaassen asserted in his First Amended Complaint here. *Compare* Doc. 66 *with* Doc. 326-119. Also, Dr. Klaassen had a full and fair opportunity to litigate his claims in the State Case. Instead, he chose to split his claims between two forums. But a plaintiff may not "freely split a cause of action between federal and state courts and pursue both actions without risking claim preclusion." *Carter*, 815 F.2d at 621. Indeed, "Kansas law is explicit and harsh in invoking claim preclusion to bar splitting a cause of action." *Id.* at 622. In Kansas, "'[t]he fact that plaintiff did not foresee the legal consequences of

splitting [his] cause of action has no bearing on the issues or the result herein.'" *Id.* (quoting *Pretz v. Lamont*, 626 P.2d 806, 810 (Kan. Ct. App. 1981)).

Dr. Klaassen argues that he never chose to split his claims. Instead, he contends, he was forced to assert his state law claims in state court after this court dismissed the claims without prejudice in the federal lawsuit. But that doesn't change anything. Dr. Klaassen still made the choice. He chose to assert state law claims in the state forum while pursuing his federal claims in this lawsuit. As noted, Dr. Klaassen cannot "freely split a cause of action between federal and state courts and pursue both actions without risking claim preclusion." *Carter*, 815 F.2d at 621.

Also, Dr. Klaassen argues that defendants have waived a res judicata defense by not asserting it. The court disagrees. Defendants asserted the res judicata defense in the Amended Pretrial Order. Doc. 298 at 29 (Pretrial Order ¶ 4.b.18.) ("Plaintiff's claims are or may become barred by claim preclusion, issue preclusion, or principles of res judicata. In particular, on November 28, 2016, the Wyandotte County District Court ruled in favor of the University of Kansas on Plaintiff's Kansas Judicial Review Act Petition for Review, and on December 12, 2016, the Wyandotte County District Court ruled in favor of the University of Kansas on Plaintiff's claim for retaliatory discharge under Kansas common law . . . Plaintiff could have raised every claim in this case in that Wyandotte County lawsuit.").

The Pretrial Order now controls the action and supercedes the pleadings. *See Weyerhaeuser Co. v. Brantley*, 510 F.3d 1256, 1267 (10th Cir. 2007) ("The subsequent pretrial order supercedes the pleadings." (citing *Wilson v. Muckala*, 303 F.3d 1207, 1216 (10th Cir. 2002))). But, even before the res judicata defense was asserted in the Pretrial Order, defendants asserted the defense more than three years ago when they filed their Answer to Dr. Klaassen's Third Amended Complaint. Doc. 123 at 19 ("Plaintiff's claims are or may become barred by

claim preclusion, issue preclusion, or principles of res judicata."). The Third Amended Complaint was the first federal court pleading that excluded Dr. Klaassen's state court claims, and thus, defendants' Answer to that generation of the Complaint was defendants' first opportunity to assert a res judicata defense. They did so. And they have continued to assert this defense throughout the lawsuit. Dr. Girod has not waived his res judicata defense.

*Finally*, the state court cases resulted in final judgments on the merits. Dr. Klaassen argues that the judgments are not final because he has appealed both rulings. But "[b]oth federal and Kansas courts have held a pending appeal does not suspend the finality of the lower court's judgment for claim preclusion purposes." *Rhoten v. Dickson*, 223 P.3d 786, 798 (Kan. 2010) (first citing *Roberts v. Anderson*, 66 F.2d 874, 875–76 (10th Cir. 1933); then citing *Willard v. Ostrander*, 32 P. 1092, 1094 (Kan. 1893)). Dr. Klaassen tries to distinguish *Rhoten*, claiming it differs from this case because it considered the preclusive effect of a *federal* court judgment— not a state court judgment. This is a distinction without a difference. As *Rhoten* explains, both federal and state courts hold that a pending appeal does not affect the judgment's finality. *See id.* at 798 (citing *Roberts*, 66 F.2d at 875–76). And as *Rhoten* recognizes, "Kansas law does not appear to differ significantly from the federal law regarding preclusion doctrines." *Id.* at 797 (quoting *Stanfield v. Osborne Indus., Inc.*, 949 P.2d 602, 608 (Kan. 1997)).

Dr. Klaassen also argues that the Kansas Supreme Court has departed from *Rhoten*'s precedent since it decided that case. For support, he cites *State v. Roberts*, 259 P.3d 691 (Kan. 2011). *Roberts* considered whether the State could appeal an order dismissing a criminal case. *Id.* at 692. The defendant argued that Kan. Stat. Ann. § 3108(b) prohibited the State from appealing the order because the statute "bars trying the case 'in a subsequent prosecution' if a first attempt '[w]as terminated by a final order or judgment, even if entered before trial, which

required a determination inconsistent with any fact necessary to a conviction.'" *Id.* at 700 (quoting Kan. Stat. Ann. § 3108(b)). When interpreting § 3108(b)'s statutory language—whether "by a final order or judgment"—the Kansas Supreme Court concluded: "consistent with the doctrine of res judicata, the order of dismissal would not be final until the opportunity for an appeal had expired or was exhausted; only then would the order have preclusive effect." *Id.* The supreme court thus found that the State had the right to appeal the dismissal order and that § 3108(b) did not bar the appeal. *Id.* at 701. But *Roberts* never overruled *Rhoten*, and it never discussed claim preclusion. Also, *Roberts* neither discussed *Rhoten* nor suggested that it was departing from its earlier holding that a pending appeal does not suspend the finality of a judgment for claim preclusion purposes. The court thus declines to depart from the Kansas Supreme Court's holding in *Rhoten*. Instead, the court concludes that judgments in Dr. Klaassen's state court cases are final judgments even though Dr. Klaassen has appealed those rulings and those appeals are still pending.

Because Dr. Girod has established all four elements of a res judicata defense, the court concludes that res judicata applies to bar Dr. Klaassen's claims against Dr. Girod in his official capacity. The court thus grants summary judgment against Dr. Klaassen on all such claims.

### 2. Res Judicata Does Not Apply to Bar Dr. Klaassen's Individual Capacity Claims Under § 1983 and His State Law Claims.

Next, defendants assert that res judicata likewise bars the individual capacity claims that Dr. Klaassen makes under § 1983 and as well as his state law claim claims. They argue that this applies to all claims asserted against the individual defendants.

The same res judicata elements discussed above apply to defendants' res judicata arguments against Dr. Klaassen's individual capacity § 1983 and state law claims. In response, Dr. Klaassen asserts that defendants cannot establish at least one of the res judicata elements. He

argues that the individual defendants are not the same parties or in privity with the governmental defendants in the state court cases.

Defendants correctly assert that the Kansas courts have not decided whether a governmental employee sued in his individual capacity is in privity with his government employer. But, many times, the Tenth Circuit and our court have held that governmental employees sued in their individual capacity are not in privity with their governmental employer. *See, e.g.*, *Gonzales v. Hernandez*, 175 F.3d 1202, 1206 (10th Cir. 1999) ("The general weight of authority appears to be that while government employees are in privity with their employer [when sued] in their official capacities, *they are not in privity [when sued] in their individual capacities*." (emphasis added)); *Spiess v. Meyers*, 483 F. Supp. 2d 1082, 1089–90 (D. Kan. 2007) (holding that individual defendants were not in privity with parties to the earlier litigation—*i.e.*, the State of Kansas and its agencies—because plaintiff asserted his claims against the defendants in their individual capacities); *Brooks v. Graber*, No. 00-2262-DES, 2000 WL 1679420, at *5 (D. Kan. Nov. 6, 2000) (explaining that "the Tenth Circuit has made [it] clear that governmental employees sued in their individual capacity cannot claim res judicata effect to former suits brought against their governmental employer").[7]

In *Cosgrove v. Kansas Department of Social and Rehabilitative Services*, Judge Crow considered whether res judicata applies to bar a plaintiff's individual capacity claims against four

---

[7] Defendants cite just one case to argue that our court has held that res judicata bars individual capacity claims against individual defendants. In *Spielman v. City of Newton*, the court recognized that a governmental employee sued in his *official* capacity is in privity with his governmental employer. No. 96-2463-KHV, 1997 WL 534468, at *4 n.7 (D. Kan. July 25, 1997). But the court never held that a governmental employee sued in his *individual* capacity is in privity his employer. Instead, the court held that plaintiff's individual capacity claims were "precluded by [plaintiff's] failure to raise them in his" state court case and plaintiff could not "relitigate issues which he should have raised earlier." *Id.* This conclusion reaches the third element of a res judicata claim—whether the claims were raised or could have been raised in the earlier action. Contrary to defendants' argument, it does not hold that an individual defendant sued in his individual capacity is in privity with his employer.

individuals where plaintiff earlier had filed a similar state court lawsuit against these individuals, suing them in their official capacity. 744 F. Supp. 2d at 1185. Judge Crow recognized, "Kansas has not addressed this rule or applied it in the context of res judicata." *Id.* And other courts have reached conflicting results. *Id.* But, "[i]n an abundance of caution, the court assume[d] that the Kansas Supreme Court may apply the rule of differing capacities." *Id.* The court recognized that the individual defendants "merely served as representatives of the government when sued previously in their official capacities and have different defenses available to them in a personal-capacity action than [they do] in an official-capacity action." *Id.* So, Judge Crow reasoned, the individual defendants "did not represent precisely the same legal right as they now do." *Id.* Judge Crow thus held that res judicata did not bar plaintiff's current suit against the four individuals in their individual capacities. *Id.*

The same reasoning applies here. Dr. Klaassen is suing the individual defendants in their individual capacities. The parties to the state court cases—all governmental defendants— "did not represent precisely the same legal right as [the individual defendants] now do." *Id.* The court finds Judge Crow's reasoning persuasive, and it reaches the same conclusion here. The court predicts, that if presented with this issue, the Kansas Supreme Court would come to the same conclusion and hold that governmental employees sued in their individual capacity are not in privity with their governmental employer. Thus, res judicata does not bar Dr. Klaassen's individual capacity § 1983 claim or his claims arising under state law.

The court is not persuaded by defendants' argument that the Kansas Supreme Court would come out the other way—*i.e.*, holding that an individual defendant sued in his individual capacity is in privity with his employer. Trying to support this position, defendants cite Kansas cases holding that an employee acting on behalf of an employer is in privity with his employer.

*See, e.g.*, *Midwest Crane & Rigging, LLC v. Schneider*, No. 113,725, 2016 WL 1391805, at *7 (Kan. Ct. App. Apr. 8, 2016) ("As agents acting in furtherance of [the employer's] interests rather than their own in the events giving rise to this litigation, Defendants are in privity with [the employer] for the purposes of res judicata."); *Van Deelen v. City of Kansas City*, No. 101,226, 2009 WL 3738833, at *4 (Kan. Ct. App. Nov. 6, 2009) ("A government and its agents are in privity with one another because the agents represent not their own rights but the rights of the government."); *State v. Parson*, 808 P.2d 444, 447–48 (Kan. Ct. App. 1991) ("With no hesitation we find the requisite privity existing here insofar as Harp Well and Pump Services, Inc., and Parson—an employer and its employee—are concerned."). But, to apply these holdings, the court would have to conclude—and on summary judgment—that the undisputed facts establish that the individual defendants were acting on behalf of their employer.

Here, defendants assert that all of Dr. Klaassen's claims seek to hold the individual defendants liable for actions taken during the course of their employment. But the summary judgment record here will not abide that conclusion—at least it won't at summary judgment. While a reasonable jury might conclude that the individual defendants were acting in their official capacity when they took various actions affecting Dr. Klaassen's employment at KUMC, a reasonable jury also could find that defendants were acting in their individual capacity. The summary judgment record simply doesn't permit the court to conclude—as a matter of law—that Dr. Klaassen merely is asserting official capacity claims against the individual defendants. Thus, on summary judgment, the court cannot find that the individual defendants Dr. Klaassen has sued in their individual capacity are in privity with the governmental defendants that Dr. Klaassen sued in his state court cases.

Because defendants cannot establish that Dr. Klaassen's individual capacity claims are asserted against the same parties who he sued in the state court actions, res judicata does not apply to bar Dr. Klaassen's individual capacity claims under § 1983 or his state law claims. The court declines to enter summary judgment on this basis.

### 3. The Court Declines to Apply Kansas's Rule Against Claim Splitting.

Next, defendants assert that Kansas's rule against claim splitting bars Dr. Klaassen from asserting his claims in his federal lawsuit when a state court already has adjudicated other claims involving the same factual allegations. This argument relies on the rule against claim splitting.

Under Kansas law, the rule against claim splitting "requires a plaintiff suffering a legal injury to join all theories of recovery for that harm in a single action against all of the appropriate defendants." *Bouton v. Byers*, 321 P.3d 780, 791 (Kan. Ct. App. 2014) (citations omitted). The rule prohibits a plaintiff from "split[ting] off some theories of recovery or some defendants in separate suits." *Id.* (citation omitted). The rule's purpose "obviously promotes judicial efficiency and prevents a plaintiff from serially suing defendants for a single legal wrong." *Id.*

Here, defendants contend, Dr. Klaassen's claims in this federal lawsuit arise out of the same actions that formed the basis for his claims in his state court cases. Defendants contend that Dr. Klaassen, in effect, has split his claims among multiple cases in two distinct forums. Thus, defendants argue, the court should preclude Dr. Klaassen from litigating his claims in this case when the state courts already have ruled his other claims.

Dr. Klaassen responds, arguing that defendants have waived this argument. And indeed, unlike their res judicata affirmative defense, defendants never asserted in the Pretrial Order that the prohibition against claim splitting bars Dr. Klaassen from pursuing his claims in this lawsuit. The Kansas Supreme Court has explained:

> A defendant may agree to the splitting of a cause of action or he may waive the right to insist upon the rule forbidding the splitting of a single cause of action, and where he invites or procures such splitting he will not, in a second action, be permitted to adopt an inconsistent position by invoking the doctrine against splitting and thus obtain an unjust advantage by defeating a claim for the balance remaining due and unpaid on such cause of action.

*Kearny Cty. Bank v. Nunn*, 134 P.2d 635, 637 (Kan. 1943). Defendants do not respond to Dr. Klaassen's waiver argument in their Reply. Thus, defendants have abandoned their claim splitting argument. The court declines to apply Kansas's rule against claim splitting to bar Dr. Klaassen's claims in this case.

### 4. Issue Preclusion Does Not Bar Dr. Klaassen's Due Process Claims.

Last, defendants argue that the doctrine of issue preclusion applies, and it bars Dr. Klaassen's substantive and procedural due process claims. Specifically, defendants assert that the court in the KJRA Matter determined that the University never violated Dr. Klaassen's due process rights, and issue preclusion prevents him from relitigating those claims in this lawsuit.

"Issue preclusion prevents a second litigation of the same issue between the same parties, even when raised in a different claim or cause of action." *In re Application of Fleet for Relief from a Tax Grievance*, 272 P.3d 583, 589 (Kan. 2012). Issue preclusion has three required elements: "(1) a prior judgment on the merits that determined the parties' rights and liabilities on the issue based upon ultimate facts as disclosed by the pleadings and judgment; (2) the same parties or parties in privity; and (3) the issue litigated must have been determined and necessary to support the judgment." *Id.* at 589–90 (citing *Venters v. Sellers*, 261 P.3d 538, 547 (Kan. 2011)).

Defendants claim that all three requirements are satisfied here. Beginning with the second requirement—*i.e.*, that the earlier litigation involved the same parties or parties in privity—defendants assert that, in Kansas, "'collateral estoppel does not require mutuality of the

parties.'" Doc. 326 at 91 (quoting *Goetz v. Bd. of Trs.*, 454 P.2d 481, 489 (Kan. 1969)). But, as our court has recognized, "the suggestion in *Goetz* that collateral estoppel does not require mutuality of parties has found no further support in the rulings of Kansas courts." *Jetcraft Corp. v. FlightSafety Int'l, Inc.*, 781 F. Supp. 687, 692–693 (D. Kan. 1991). "Rather, the Kansas Supreme Court has consistently required, as a prerequisite to the use of collateral estoppel, that the parties of the subsequent litigation be identical to or in privity with parties in the earlier action." *Id.* at 693 (first citing *Jones v. Bordman*, 759 P.2d 953, 965 (Kan. 1988); then citing *Patrons Mut. Ins. Ass'n v. Harmon*, 732 P.2d 741, 744 (Kan. 1987); then citing *McDermott v. Kan. Pub. Serv. Co.*, 712 P.2d 1199, 1208 (Kan. 1986) (other citations omitted)). *Jetcraft* discussed—and rejected—the very argument that defendants make here. In *Jetcraft*, Judge Kelly of our court recognized that the Kansas Supreme Court's opinion in *McDermott* "explicitly concluded that 'abandonment of the mutuality rule, it seems to us, would be unfair.'" 781 F. Supp. at 693 (quoting *McDermott*, 712 P.2d at 1208). Judge Kelly also noted that "in *Jones*, the [supreme] court reached the same conclusion, stating that, under Kansas law, 'collateral estoppel, or issue preclusion, require[s] mutuality, *i.e.*, the issue subject to preclusion must have arisen in a prior case in which both of the current parties were adequately represented.'" *Id.* (quoting *Jones*, 759 P.2d at 965). "Faced with such consistent and explicit adherence to the rule of mutuality," Judge Kelly reasoned that "for the plaintiffs to suggest herein—on the basis of [*Goetz*'s] isolated comment in dicta in an early case—that mutuality is not required is quite remarkable." *Id.* Judge Kelly thus refused to apply collateral estoppel to plaintiff's claims in *Jetcraft* because mutuality was lacking. *Id.* at 695.

The law in Kansas hasn't changed since Judge Kelly summarized the Kansas law of mutuality in the issue preclusion context. Indeed, it's just the opposite. About five years after

*Jetcraft*, in 1997, the Kansas Supreme Court was asked to dispense with the mutuality requirement of collateral estoppel. *Kan. Pub. Emps. Ret. Sys. v. Reimer & Koger Assoc., Inc.*, 941 P.2d 1321, 1343 (Kan. 1997). Again, it declined. *Id.* And, then in 1999, the Kansas Supreme Court reiterated its adherence to the mutuality element: "[S]trict application of the mutuality requirement is still the Kansas rule." *Regency Park, LP v. City of Topeka*, 981 P.2d 256, 261 (Kan. 1999).

In their Reply, defendants assert that the court should apply the federal law of issue preclusion—and not Kansas law. Our court typically refuses to consider issues raised for the first time in a reply brief. *Liebau v. Columbia Cas. Co.*, 176 F. Supp. 2d 1236, 1244 (D. Kan. 2001) (citations omitted); *see also Nat'l R.R. Passenger Corp. v. Cimarron Crossing Feeders, LLC*, No. 16-1094-JTM-TJJ, 2018 WL 489100, at *1 (D. Kan. Jan. 19, 2018) ("[T]he Court will not consider arguments raised for the first time in a reply brief, particularly where the arguments could have been made in the first instance."). But the reasons for rejecting defendants' argument aren't confined to this procedural principle. The court instead rejects this argument on the merits.

To support their position that the court should apply the federal law of issue preclusion, defendants cite cases applying federal law to successive *federal* diversity actions—not state court judgments. *See, e.g.*, *Petromanagement Corp. v. Acme-Thomas Joint Venture*, 835 F.2d 1329, 1332 (10th Cir. 1988); *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 506 F. Supp. 2d 520, 528 (D. Kan. 2007); *Scheufler v. Gen. Host Corp.*, 881 F. Supp. 492, 495 (D. Kan. 1995). But that isn't what's going on in this case. Here, the court must determine the preclusive effect of Dr. Klaassen's prior litigation in Kansas state court. As already noted, the full faith and credit provision of 28 U.S.C. § 1738 requires federal courts to "give to a state-court judgment the same

preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." 28 U.S.C. § 1738. The court thus applies the Kansas law of issue preclusion to defendants' argument here.

Because Kansas requires mutuality of the parties for issue preclusion to apply, defendants must establish that "the parties of the subsequent litigation [are] identical to or in privity with parties in the earlier action." *Jetcraft Corp.*, 781 F. Supp. at 693. As discussed above, the individual defendants sued in their individual capacities in this lawsuit cannot establish that they are in privity with the governmental defendants sued in Dr. Klaassen's state court actions. *See supra* Part III.A.2. Issue preclusion thus does not apply, and this doctrine doesn't bar Dr. Klaassen's procedural and substantive due process claims.

### B. First Amendment Retaliation Claim (Count 1)

Defendants' next group of summary judgment arguments turns from procedure-based defenses to substantive challenges to Dr. Klaassen's claims. The court begins its analysis of those arguments with Dr. Klaassen's First Amendment retaliation claim.

To establish a claim for First Amendment retaliation, a plaintiff must identify constitutionally protected speech and show that defendants retaliated against him for exercising that speech right. *Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014). Here, Dr. Klaassen identifies four types of speech that, he contends, led the individual defendants to retaliate against him. They are: (1) Dr. Klaassen accused Dr. Atkinson of financial mismanagement and voiced opposition to KUMC seeking the National Cancer Institute designation on March 31, 2011, during a software vendor's presentation to University stakeholders; (2) in April 2011, Dr. Klaassen prepared a PowerPoint presentation criticizing the absence of shared governance at KUMC and Dr. Atkinson's alleged financial mismanagement; (3) beginning in April 2011, Dr.

Klaassen shared information with the *LJW* about alleged mismanagement at KUMC; and (4) on

October 28, 2011, Dr. Klaassen presented a PowerPoint presentation to members of the

Pharm/Tox Department that criticized Dr. Atkinson's decision to remove him as Chair of the

Department.  Doc. 298 at 7–8, 11.

The court analyzes Dr. Klaassen's First Amendment retaliation claim under the tests

established in *Pickering v. Board of Education*, 391 U.S. 563 (1968), and *Garcetti v. Ceballos*,

547 U.S. 410 (2006).  *See Dixon v. Kirkpatrick*, 553 F.3d 1294, 1301–02 (10th Cir. 2009)

(referring to the test as the "*Garcetti/Pickering* analysis").  The *Garcetti/Pickering* analysis has

five elements:  "(1) whether the speech was made pursuant to an employee's official duties; (2)

whether the speech was on a matter of public concern; (3) whether the government's interests, as

employer, in promoting the efficiency of the public service are sufficient to outweigh the

plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the

adverse employment action; and (5) whether the defendant would have reached the same

employment decision in the absence of the protected conduct."  *Id.* at 1302.  The Tenth Circuit

has instructed that the first three elements present "issues of law to be decided by the court."  *Id.*

"The last two are factual issues to be decided by the factfinder."  *Id.*

The summary judgment facts, defendants assert, present no triable issue under the

*Garcetti/Pickering* test.  Viewing the summary judgment facts in Dr. Klaassen's favor, the court

concludes that they present no genuine, triable issue for the first three elements of a First

Amendment retaliation claim, and defendants thus are entitled to summary judgment as a matter

of law.  The court's conclusion identifies three independent reasons why summary judgment is

appropriate.  The court thus grants summary judgment against this claim and explains its

reasoning, below.

### 1. Dr. Klaassen's speech was made as part of his official duties.

The first inquiry under the *Garcetti/Pickering* analysis "is whether the employee spoke 'pursuant to [his] official duties.'" *Hesse v. Town of Jackson*, 541 F.3d 1240, 1249 (10th Cir. 2008) (quoting *Garcetti*, 547 U.S. at 421) (other citation omitted)). "While 'employees retain the prospect of constitutional protection for their contributions to the civic discourse,' they do not have First Amendment protection for statements made 'pursuant to employment responsibilities.'" *Id.* (first quoting *Garcetti*, 547 U.S. at 422; then quoting *id.* at 423–24). "If the employee speaks pursuant to his official duties, then there is no constitutional protection because the restriction on speech 'simply reflects the exercise of employer control over what the employer itself has commissioned or created.'" *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 (10th Cir. 2007) (quoting *Garcetti*, 547 U.S. at 422). "Thus, 'speech relating to tasks within an employee's uncontested employment responsibilities is not protected from regulation.'" *Hesse*, 541 F.3d at 1249 (quoting *Brammer-Hoelter*, 492 F.3d at 1203). "The determination of whether a public employee speaks pursuant to official duties is a matter of law." *Id.* (citing *Brammer-Hoelter*, 492 F.3d at 1203).

The Tenth Circuit takes a "broad" view of the definition of speech that is "pursuant" to an employee's "official duties." *Thomas v. City of Blanchard*, 548 F.3d 1317, 1324 (10th Cir. 2008). "[S]peech may be made pursuant to an employee's official duties even if it deals with activities that the employee is not expressly required to perform." *Brammer-Hoelter*, 492 F.3d at 1203 (holding that speech could be considered within the scope of an employee's official duty even if "the speech concerns an unusual aspect of an employee's job that is not part of his everyday functions."). So long as the employee's speech "reasonably contributes to or facilitates

the employee's performance of the official duty, the speech is made pursuant to the employee's official duties." *Id.*

"The ultimate question is whether the employee speaks as a citizen or instead as a government employee—an individual acting 'in his or her professional capacity.'" *Id.* (quoting *Garcetti*, 547 U.S at 422). To decide this question, the Tenth Circuit "take[s] a practical view of all the facts and circumstances surrounding the speech and the employment relationship." *Id.* at 1204 (quoting *Garcetti*, 547 U.S at 422 ("'The proper inquiry is a practical one.'")). The Tenth Circuit uses "a case-by-case approach, looking both to the content of the speech, as well as the employee's chosen audience, to determine whether the speech is made pursuant to an employee's official duties." *Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 746 (10th Cir. 2010). The court thus applies this governing standard to determine whether Dr. Klaassen made the types of speech that he claims are constitutionally protected "pursuant to [his] official duties." *Garcetti*, 547 U.S at 421.

*First*, Dr. Klaassen asserts that his comments during a March 31, 2011, University stakeholders meeting called to hear a software vendor's presentation are entitled to First Amendment protection. But the court already has held in its February 3, 2015, Order that Dr. Klaassen's statements at this meeting addressed "(1) financial mismanagement and lack of shared governance at KUMC and (2) mismanagement and misappropriation of grant money" and "were made pursuant to his 'official duties' as a KUMC employee." Doc. 102 at 27, 33. Defendants assert that the court already has decided this issue and that Dr. Klaassen cannot reargue it again on summary judgment. And, even so, defendants contend the summary judgment facts establish that Dr. Klaassen's comments were made as part of his official duties when he attended this meeting. The court agrees.

On summary judgment, the uncontroverted facts establish that this March 31, 2011, meeting was held on campus and attended by department chairs and similarly situated individuals from KUMC. Dr. Klaassen attended the meeting as the Chair of one of KUMC's departments. Trying to support his argument that his speech during this meeting was not made pursuant to his official duties, Dr. Klaassen relies on the Tenth Circuit's holding in *Brammer-Hoelter*. In that case, the Circuit held that speech by teachers raising concerns about their salaries and staffing levels was not made pursuant to their official duties. 492 F.3d at 1205. But Dr. Klaassen's argument ignores key, contextual facts, *i.e.*, where and when the teachers spoke. The teachers spoke during meetings held after hours and outside of their school. The meetings' participants included ordinary citizens and parents who were not employed by the school that the teachers criticized. *Id.* Also, the Circuit held that the teachers' speech was protected for those subjects for which they had no supervisory responsibility and no duty to report—things such as salaries and staffing levels. *Id.* But the court held that "[n]early all" of the other communications at issue—including ones complaining about how the school was spending money—were unprotected because they fell within the scope of the teachers' "inherent duty as teachers to ensure they had adequate materials to educate their students." *Id.* at 1204.

Dr. Klaassen asserts that his comments during the March 31, 2011, meeting "transcended the original purpose of the meeting," and that he turned the meeting into a public forum when he began criticizing Dr. Atkinson. Doc. 349 at 155. Even viewing the summary judgment facts in Dr. Klaassen's favor, the court cannot make the leap Dr. Klaassen's argument makes. Dr. Klaassen testified that his purpose in criticizing Dr. Atkinson and the University at this meeting was to notify other department chairs about his concerns that Dr. Atkinson was mismanaging KUMC. Also, Dr. Klaassen admitted in his deposition that the outside software vendor present

at the meeting was not a governmental authority and was in no position to do anything in response to Dr. Klaassen's complaints. Thus, the only remaining audience at the March 31 meeting was his peers—*i.e.*, other KUMC faculty. They attended the meeting—as Dr. Klaassen did—in their roles as department chairs. And, like the teachers in *Brammer-Hoelter*, Dr. Klaassen's complaints about how Dr. Atkinson was managing KUMC's financial affairs fell within his duties as a Department Chair "to ensure [he] had adequate materials to educate [his] students." *Id.* at 1204. Dr. Klaassen's complaints at the March 31, 2011, meeting were made "pursuant to his official duties" under the *Garcetti/Pickering* test. *Hesse*, 541 F.3d at 1249. They thus provide no basis for his First Amendment retaliation claim.

*Second*, Dr. Klaassen asserts that he engaged in constitutionally protected speech when he prepared two PowerPoint presentations criticizing Dr. Atkinson's management of KUMC. Dr. Klaassen prepared the first presentation in April 2011. He gave it to Dr. Atkinson during their meeting on April 6, 2011, when she told him that he would no longer serve as Department Chair. Dr. Klaassen also presented this PowerPoint to the Pharm/Tox Department at a faculty meeting on April 7, 2011. The summary judgment record doesn't reveal whether the presentations given to Dr. Atkinson and the Pharm/Tox faculty were identical. But, for purposes of this element of the *Garcetti/Pickering* test, it doesn't matter. The summary judgment facts establish that both of these PowerPoint presentations complained about Dr. Atkinson's financial management at KUMC and the absence of shared governance at KU. Also, both PowerPoint presentations included a slide reading: "My statements, which [Dr. Atkinson] apparently [doesn't] like, are comments as a University Distinguished Professor that has spent many years at KUMC, not as a Chair." Doc. 326-30 at 17; Doc. 349-15 at 3. Again, Dr. Klaassen's complaints in his PowerPoint presentation about KUMC's management fall well within his

official duties. His comments were directed internally to Dr. Atkinson and the faculty members of the Pharm/Tox Department. And Dr. Klaassen even concedes in the PowerPoint presentation that he was making his comments as a University Distinguished Professor.

In his Opposition papers, Dr. Klaassen asserts that the court shouldn't focus on Dr. Klaassen's purpose when he created the PowerPoint presentation and shared it internally. Doc. 349 at 154. Instead, he argues, the court should consider that "[Dr.] Klaassen's goal in disseminating the PowerPoints was to raise public awareness of management decisions taken by KUMC." *Id.* But the summary judgment record contains no facts capable of supporting a finding that Dr. Klaassen distributed the PowerPoint presentation publicly. Although some individuals outside of KUMC received the PowerPoint, no evidence suggests that Dr. Klaassen sent the information to those recipients. Indeed, the email string forwarding the PowerPoint presentation to an individual at the Kauffmann Foundation, and eventually, to another individual at KU Endowment does not identify Dr. Klaassen as the person who distributed the presentation to this external audience. Doc. 349-15. Indeed, the summary judgment record contains no facts showing who, when, how, or why the April 2011 PowerPoint was distributed. The court thus concludes that Dr. Klaassen has failed to shoulder his burden at the summary judgment stage because he has adduced no evidence that his speech in this PowerPoint presentation was circulated outside of his official duties.

The second PowerPoint presentation Dr. Klaassen relies on is the one he shared at an October 28, 2011, meeting with members of the Pharm/Tox Department about the COBRE grant. The dispositive facts are undisputed. Dr. Klaassen convened this meeting in his capacity as Principal Investigator for the COBRE grant. Dr. Klaassen's PowerPoint presentation criticized Dr. Carlson's performance as Department Chair and conveyed that Dr. Klaassen would not allow

the new Department Chair to become the Principal Investigator for the COBRE grant. For the same reasons discussed above, the court concludes that Dr. Klaassen's complaints about governance at KUMC qualify as speech made pursuant to his official duties. This is especially true because Dr. Klaassen made his comments internally at a Pharm/Tox faculty meeting that he had convened in his capacity as Principal Investigator for the COBRE grant. And, Dr. Klaassen's PowerPoint explicitly admitted that his comments were made in the meeting where he appeared "as a university distinguished professor." Doc. 326-31 at 11.

*Last*, Dr. Klaassen asserts that the information he shared with the *LJW* about his beliefs that Dr. Atkinson was mismanaging KUMC are entitled to First Amendment protection. Dr. Klaassen asserts that "'communicating with newspapers or . . . legislators' regarding work-related issues is not part of the employee's official duties." Doc. 349 at 151 (quoting *Zimmerman v. Univ. of Utah*, No. 2:13-cv-01131-JNP-BCW, 2017 WL 3491843, at *6 (D. Utah Aug. 14, 2017)). First of all, Dr. Klaassen's argument overstates *Zimmerman*. In that case, the Utah district court explained that such conduct "is *likely* not a part of the employee's official duties." *Zimmerman*, 2017 WL 3491843, at *6 (emphasis added). But, as our Circuit has instructed, "speech may be made pursuant to an employee's official duties even if it deals with activities that the employee is not expressly required to perform." *Brammer-Hoelter*, 492 F.3d at 1203. Also, speech may fall within the scope of an employee's official duty even if "the speech concerns an unusual aspect of an employee's job that is not part of his everyday functions." *Id.* And if the speech "reasonably contributes to or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duties." *Id.*

Here, the summary judgment record doesn't establish as an uncontroverted fact that talking to the news media was one of Dr. Klaassen's official job duties. Also, the summary

judgment record doesn't plainly identify what he told the *LJW*.  Dr. Klaassen made his comments anonymously.  None of the articles quote Dr. Klaassen.  And so they don't attribute any particular words to him.  Nevertheless, Dr. Klaassen has testified generally that his comments to the *LJW* criticized Dr. Atkinson's decisions to develop campuses in Salina and Wichita and to seek a National Cancer Institute designation.  He thought all these decisions were unwise and financially detrimental to KUMC—and to him personally as well.  Also, Dr. Klaassen testified that his purpose when he spoke these words to the *LJW* was to improve the University's medical school.

In *Brammer-Hoelter*, the Tenth Circuit held that "[n]early all of the matters" that a group of teachers discussed—in meetings conducted off-campus, convened after work hours, and attended by ordinary citizens and parents who were not employed by the school—were not protected by the First Amendment.  492 F.3d at 1204.  The court reached this decision because the teachers' complaints about how the school was spending money were made "pursuant to [their] inherent duty as teachers to ensure that they had adequate materials to educate their students."  *Id.*  Speaking at public meetings held off-campus and after hours likely was not part of the teachers' official job duties—just like speaking with the news media was not part of Dr. Klaassen's job duties.  But instead of focusing on the "employee's official job description [which] is not dispositive," the Tenth Circuit considered the content of the speech, recognizing that the subject matter (*i.e.*, complaining that the school was not spending money on instructional aids, furniture, and classroom computers) was "made pursuant to [the teachers'] official duties and could be freely regulated by the [school]."  *Id.*

Likewise here, Dr. Klaassen's speech about KUMC complained about governance issues (*i.e.*, the administration hadn't included faculty, like himself, in decision-making) and about how

Dr. Atkinson was choosing to spend KUMC funds (*i.e.*, by developing campuses in Salina and Wichita and seeking a National Cancer Institute designation instead of investing its funds in other endeavors at KUMC, including Dr. Klaassen's Department). Thus, Dr. Klaassen's "speech was related to alleged 'wrongdoing directly impacting . . . [his] ability to carry out . . . [his] official duties.'" *Dunn v. Morse*, No. 16-4164-SAC, 2017 WL 1197649, at *5 (D. Kan. Mar. 31, 2017) (quoting *Joyce v. N. Metro Task Force*, No. 10-cv-00649-CMA-MJW, 2011 WL 2669162 at *6 (D. Colo. July 7, 2011)). "'Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* (quoting *Garcetti*, 547 U.S. at 421–22). These binding authorities persuade the court that Dr. Klaassen's speech to the *LJW* was made pursuant to his official duties. It thus is not entitled to First Amendment protection. The court grants summary judgment against Dr. Klaassen's First Amendment retaliation claim because the uncontroverted summary judgment facts, even when viewed in Dr. Klaassen's favor, present no triable issue about the first element of the *Garcetti/Pickering* test.

## 2. Dr. Klaassen's speech is not a matter of public concern.

Even if Dr. Klaassen could establish that his speech fell outside his official duties, his First Amendment retaliation claim still would fail as a matter of law because his speech does not satisfy the second element of the *Garcetti/Pickering* test—*i.e.*, his speech is not a matter of public concern. Speech is a matter of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Lane v. Franks*, __ U.S. __, 134 S. Ct. 2369, 2380 (2014) (quoting *Snyder v.*

*Phelps*, 562 U.S. 443, 453 (2011)).  "The inquiry turns on the 'content, form, and context' of the speech."  *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 147–48 (1983)).

To demonstrate that he could discharge this requirement, Dr. Klaassen must establish that his speech "involve[d] a matter of public concern and not merely a personal issue internal to the workplace."  *Moore v. City of Wynnewood*, 57 F.3d 924, 931 (10th Cir. 1995) (citing *Connick*, 461 U.S. at 146–47); *see also Morris v. City of Colo. Springs*, 666 F.3d 654, 661 (10th Cir. 2012) ("[S]peech relating to internal personnel disputes and working conditions ordinarily will not be viewed as addressing matters of public concern." (citation and internal quotation marks omitted)).  To decide this issue, the court may consider "'the motive of the speaker and whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's interest.'"  *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1205 (10th Cir. 2007) (quoting *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1224 (10th Cir. 2000)).  "Statements revealing official impropriety usually involve matters of public concern."  *Id.* (citing *Lighton*, 209 F.3d at 1224).  "Conversely, speech that simply airs 'grievances of a purely personal nature' typically does not involve matters of public concern."  *Id.* (quoting *Lighton*, 209 F.3d at 1225).  In short, a public employee's First Amendment right to free speech "'is not a right to transform everyday employment disputes into matters for constitutional litigation.'"  *Morris*, 666 F.3d at 663 (quoting *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 399 (2011)).

Here, Dr. Klaassen asserts that "'[t]he objectives, purposes, and mission of a public university are undoubtedly matters of public concern.'"  Doc. 366 at 87 (quoting *Gardetto v. Mason*, 100 F.3d 803, 813 (10th Cir. 1996)).  But this argument misapprehends *Gardetto*.  As the Tenth Circuit explained in this case "the First Amendment protects neither public employee

'criticisms of internal management decisions,' nor public employee complaints about the structure of purely internal administrative bodies." *Id.* at 813–14 (first quoting *Kurtz v. Vickrey*, 855 F.2d 723, 730 (11th Cir. 1988); then citing *Bunger v. Univ. of Okla. Bd. of Regents*, 95 F.3d 987, 992 (10th Cir. 1996)). "Likewise, the details of internal budgetary allocations at an institution of public education are not matters of public concern." *Id.* "Management practices or decisions allocating management responsibility to particular individuals also do not involve matters of public concern." *Id.*

Here, viewed in Dr. Klaassen's favor, the undisputed summary judgment facts establish that Dr. Klaassen's speech criticized how Dr. Atkinson was managing KUMC. Dr. Klaassen complained about the lack of governance—as he perceived it. He also complained about how Dr. Atkinson was choosing to allocate resources at KUMC—specifically, devoting the medical school's resources to pursuing the National Cancer Institute designation and opening other campuses in Salina and Wichita. Dr. Klaassen's speech never asserted an official impropriety by Dr. Atkinson. Indeed, as Dr. Klaassen has conceded, none of Dr. Atkinson's management decision were illegal. Instead, Dr. Klaassen criticized her decisions because he personally believed that they were unethical and that KUMC should have involved its faculty members in the decision-making process more robustly. Certainly, Dr. Klaassen may hold and express opinions on these subjects. But his passion for these topics cannot, by itself, transform them into matters of public concern that will support a First Amendment retaliation claim. Dr. Klaassen's complaints involved merely grievances of a personal nature and did not involve matters of public concern.

Specifically, at the March 31, 2011, meeting involving a software presentation from an outside vendor, Dr. Klaassen criticized how Dr. Atkinson had chosen to allocate KUMC's

resources. He accused her of "slumlord economics." Dr. Klaassen testified that his comment about "slumlord economics" meant that Dr. Atkinson was spending money frivolously, like a landlord who buys an expensive car and then raises his tenants' rent to pay for his expensive purchase. All of his comments at the meeting conveyed Dr. Klaassen's personal opinion criticizing Dr. Atkinson's management decisions. But he never identified any misconduct or official impropriety. Thus, these comments did not raise a matter of public concern.

Likewise, Dr. Klaassen's PowerPoint presentations included complaints about Dr. Atkinson's management of KUMC. But none of them identified any misconduct or improprieties. Instead, Dr. Klaassen profoundly disagreed with how Dr. Atkinson was choosing to allocate KUMC's resources—specifically to the National Cancer Institute designation. Dr. Klaassen testified that he thought pursuing the National Cancer Institute designation was detrimental to KUMC and to him, personally, because it diverted funds to Dr. Atkinson's chosen endeavor and away from other things at KUMC. But he concedes that Dr. Atkinson's spending decisions were not illegal. Also, the court recognizes that Dr. Klaassen's April 2011 PowerPoint questioned whether Dr. Atkinson's decisions were "bankrupting the future of KUMC" and speculated "maybe it is fiscal irresponsibility." Doc. 349-15 at 4. But, as written, his speech merely questioned the effect of Dr. Atkinson's decisions; Dr. Klaassen's speech never asserted that Dr. Atkinson's decisions *in fact* involved a misuse of public funds. *Id.* The summary judgment facts establish that Dr. Klaassen's speech in his PowerPoint presentations involved personal grievances—and did not a disclose any misconduct—and thus his speech was unrelated to a topic of public concern.[8]

---

[8] Also, it is undisputed that, when Dr. Klaassen presented one of the PowerPoint presentations to the Pharm/Tox faculty at a meeting on April 7, 2011, he said "the bitch must go"—referring to Dr. Barbara Atkinson. Our court has recognized that "[d]enigrating or defamatory remarks are . . . not ordinarily afforded First Amendment protection." *Thayer v. City of Holton*, 515 F. Supp. 2d 1198, 1207

Last, Dr. Klaassen asserts that the information he shared with the *LJW* necessarily involved a matter of public concern because his speech produced media coverage, public comments on the *LJW*'s website, and letters to the Governor from members of the public. But "[m]edia publicity of a dispute is not determinative of whether a public employee's speech was a matter of public concern." *Lancaster v. Indep. Sch. Dist. No. 5*, 149 F.3d 1228, 1233–34 (10th Cir. 1998) (citing *Koch v. City of Hutchinson*, 847 F.2d 1436, 1448 (10th Cir. 1988) (en banc)); *see also Morris v. City of Colo. Springs*, 666 F.3d 654, 663 (10th Cir. 2012) ("[T]he fact that the incident mentioned in [plaintiff's speech] gained public interest does not mean that the [speech] itself was framed in a manner calculated to ignite that public interest."). Instead, the correct analysis focuses "on the extent to which the content of the employee speech was calculated to disclose wrongdoing or inefficiency or other malfeasance on the part of governmental officials in the conduct of their official duties." *Id.* at 1234 (quoting *Koch*, 847 F.2d at 1445) (other citation omitted)).

The summary judgment facts here establish that Dr. Klaassen's comments to the *LJW* involved criticisms of Dr. Atkinson's management and financial decisions. Viewed in Dr. Klaassen's favor, the summary judgment facts don't permit a reasonable inference that the purpose of Dr. Klaassen's speech was to disclose wrongdoing, inefficiency, or other malfeasance. Instead, Dr. Klaassen simply chose to air his personal belief that Dr. Atkinson's management decisions were detrimental to KUMC and him personally. As Dr. Klaassen testified, his purpose for his speech to the *LJW* was to make the University's medical school better—and not to disclose misconduct or official impropriety.

---

(D. Kan. 2007) (citing and quoting *Waters v. Churchill*, 511 U.S. 661, 672 (1994) ("[W]e have never expressed doubt that a government employer may bar its employees from using . . . [ an] offensive utterance to members of the public or to the people with whom they work . . . .")).

Dr. Klaassen claims his speech is similar to the speech at issue in *Pickering*—which the Supreme Court held—involved a matter of public concern. 391 U.S. at 571. *Pickering* involved a teacher who complained about how a school district was allocating funds between educational and athletic programs. *Id.* at 569. The teacher had sent a letter to a local newspaper asserting that the real reason that the school district was seeking additional tax revenues though a tax increase proposal was that the district was spending too much money on athletics instead of educational programs. *Id.* Thus, the teacher's letter accused the school district of misusing public funds. *Id.* The Supreme Court held the teacher's speech qualified for First Amendment protection because "the question whether a school system requires additional funds is a matter of legitimate public concern." *Id.* at 571. The summary judgment facts are different. They fail to establish that Dr. Klaassen's complaints about Dr. Atkinson's financial decisions involved a misuse of public funds—like the teacher's speech in *Pickering*. Nothing in the summary judgment record suggests that KUMC was seeking additional funds to pay for Dr. Atkinson's chosen programs. Instead, Dr. Klaassen simply disagreed with how Dr. Atkinson had chosen to allocate KUMC's financial resources—not that she was misusing the funds or engaging in any other improprieties.

In sum, Dr. Klaassen's complaints about how Dr. Atkinson was managing KUMC are not matters of public concern, even though the information he shared with the *LJW* resulted in media coverage. *See Lancaster*, 149 F.3d at 1233–34 (affirming summary judgment against a First Amendment retaliation claim because, even though plaintiff's speech was published in the *Tulsa World*, the comments involved an "internal personnel dispute" that was not of a public concern); *see also Morris*, 666 F.3d at 662–63 (affirming dismissal of a First Amendment retaliation claim because plaintiff's speech involved complaints about "*her own* working conditions" and thus was

not a matter of public concern even if her speech "was the subject of a great deal of media coverage"). The court thus grants summary judgment against Dr. Klaassen's First Amendment retaliation claim for this second, independent reason—that the unconverted summary judgment facts, viewed in Dr. Klaassen's favor, fail to establish a triable issue on the second element of the *Garcetti/Pickering* test.

### 3. The employer's interest outweighs the free speech interest of Dr. Klaassen.

The court grants summary judgment against Dr. Klaassen's First Amendment retaliation claim for a third and independent reason. The unconverted summary judgment facts, viewed in Dr. Klaassen's favor, establish that his employer's interest in avoiding disruptions in the workplace outweighed Dr. Klaassen's free speech interest.

The Tenth Circuit has explained: "[T]here is no easy formula for 'weighing' an employee's First Amendment speech against an employer's interest in an efficient and disciplined work environment." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1207 (10th Cir. 2007) (quoting *Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1333 (10th Cir. 2007)). "Nevertheless, the question is whether the employer 'has an efficiency interest which would justify it in restricting the particular speech at issue.'" *Id.* (quoting *Cragg v. City of Osawatomie*, 143 F.3d 1343, 1346 (10th Cir. 1998)).

When it performs this balancing test, the court does not consider the speech in a vacuum. *Id.* Instead, "'the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose.'" *Id.* (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)). "Pertinent considerations include 'whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the

speaker's duties or interferes with the regular operation of the enterprise." *Id.* (quoting *Rankin*, 483 U.S. at 388). "Arguably, 'the only public employer interest that can outweigh a public employee's recognized speech rights is the interest in avoiding direct disruption, *by the speech itself*, of the public employer's internal operations and employment relationships." *Id.* (quoting *Flanagan v. Munger*, 890 F.2d 1557, 1566 (10th Cir. 1989)). The employer shoulders the burden to justify its regulation of the employee's speech. *Id.* (citing *Connick v. Myers*, 461 U.S. 138, 150 (1983)).

Defendants have shouldered their burden here. The summary judgment record establishes that the employer's interest in avoiding disruption of its internal operations and employment relationships outweighed Dr. Klaassen's free speech interest. Dr. Klaassen does not dispute that he engaged in "outbursts" at work, using loud language, pounding on tables in staff meetings, turning red in the face, and sometimes shaking. Doc. 349 at 7. Indeed, Dr. Klaassen engaged in such behavior when he transmitted the speech at issue here.

At the March 31, 2011, meeting, Dr. Klaassen criticized Dr. Atkinson's management of KUMC, accusing her among other things of behaving like a "slumlord." Dr. Klaassen testified that his "slumlord" comment meant that Dr. Atkinson was like a landlord who spends money frivolously and then raises his tenants' rent to pay for the expenses. Dr. Klaassen asserted his complaints about Dr. Atkinson at a meeting convened to hear how a software product would work—not to discuss governance issues at KUMC. Dr. Terranova considered Dr. Klaassen's behavior at the meeting insulting and embarrassing. And at least three other attendees of that meeting complained that Dr. Klaassen's behavior was unprofessional and inappropriate.

On April 7, 2011, Dr. Klaassen presented one of his PowerPoint presentations to the Pharm/Tox faculty. The presentation sought input from the faculty about his role in the

Department after his removal as Chair. The presentation suggested that he would continue running the day-to-day operations while Dr. Carlson—the new Interim Chair—would sign papers and work with the administration. Dr. Klaassen also outlined other options for actions he could take in response to his pending removal as Department Chair, including his own suicide. Dr. Klaassen's presentation conceded that his "acting out"—those are his words—had captured Dr. Atkinson's attention. And Dr. Klaassen's PowerPoint included other slides criticizing Dr. Atkinson's management of KUMC. One faculty member present at the meeting testified that Dr. Klaassen said "the bitch must go"—referring to Dr. Atkinson. And Dr. Klaassen doesn't dispute that he called Dr. Atkinson a bitch in front of the Pharm/Tox faculty.

Six months later, on October 28, 2011, Dr. Klaassen presented another PowerPoint presentation at a meeting he called to discuss the COBRE grant. But Dr. Klaassen didn't confine the meeting to that grant. Instead, Dr. Klaassen used the meeting to criticize Dr. Atkinson for her decision to remove him as Chair of the Pharm/Tox Department. In one of the PowerPoint slides, Dr. Klaassen referred to Dr. Carlson—his successor serving as Interim Chair—as a "Ford chair trying to be a Mercedes chair—major conflict of interest." Doc. 326-31 at 1. In another slide, he accused Dr. Carlson of "doing everything he can to destroy the department." *Id.* at 3. And in yet another, Dr. Klaassen stated that his future cooperation with the department "will largely be dependent on the new Chair's respect" for him. *Id.* at 5. Also, Dr. Klaassen told the faculty that he would not allow the new Department Chair to become the Principal Investigator of the COBRE grant. Some members of the Department found Dr. Klaassen's behavior so inappropriate that they walked out of the meeting in protest.

To establish that the employee's speech has threatened the employer's interest, the "employer need not show that the employee's speech *in fact* disrupted internal operations and

employment relationships." *Helget v. City of Hays*, 844 F.3d 1216, 1222 (10th Cir. 2017) (citing *Trant v. Oklahoma*, 754 F.3d 1158, 1166 (10th Cir. 2014)). "Instead, '[i]t need[ ] only to establish that the speech could potentially become so disruptive to the [employer's] operations as to outweigh [the employee's] interest in the speech.'" *Id.* (quoting *Trant*, 754 F.3d at 1166); *see also Rock v. Levinski*, 791 F.3d 1215, 1220 (10th Cir. 2015) ("The employer need not await the detrimental impact before taking action. Preemptive steps to avoid such an impact can be acceptable, and we will generally defer to a public employer's reasonable predictions of disruption . . . ." (citation and internal quotation marks omitted)).

The summary judgment facts, viewed in Dr. Klaassen's favor, don't just establish that his speech at the March 31, April 7, and October 31 meetings "could potentially become so disruptive to the [employer's] operations as to outweigh [the employee's] interest in the speech.'" *Helget*, 844 F.3d at 1222 (quoting *Trant*, 754 F.3d at 1166). But the undisputed facts establish more. The summary judgment facts establish that Dr. Klaassen's speech *in fact* was disruptive. Other faculty complained that his comments were inappropriate and unprofessional, and some faculty members even walked out of one meeting in response to his speech. The employer's interest here is strong.

The Tenth Circuit has held that an employee's interest in free speech does not outweigh the employer's interest in an efficient workplace when the employee's speech does not disclose any misconduct. *Helget*, 844 F.3d at 1224. As the court already has discussed extensively, Dr. Klaassen's speech never disclosed misconduct or improprieties. Instead, his speech simply disagreed with Dr. Atkinson's management decisions. Also, the Tenth Circuit has held that the "manner in which [the employee] elected to air [his] discourse . . . minimizes her claimed interest in the speech." *Id.* In *Helget*, the plaintiff signed an affidavit supporting a party who

was adverse to her employer in pending litigation. *Id.* The Tenth Circuit recognized that, before plaintiff signed the affidavit, she "did not raise the issue with her superiors, let alone inform them after executing the affidavit" despite "several opportunities to address the issue with [them]." *Id.* "This fact intensified the disruptive impact of [plaintiff's] disclosure," and the Circuit "discounted accordingly" her interest in making the statements. *See id.* at 25 (affirming summary judgment against plaintiff's First Amendment retaliation claim because her employer's "strong interests as a public employer outweigh[ed] [plaintiff's] interest in supplying an affidavit in a former employee's litigation").

Likewise here, the court discounts Dr. Klaassen's interest in his free speech for two reasons. First, his speech never disclosed any misconduct to anyone. And second, the time, place, and manner where Dr. Klaassen elected to make his speeches was disruptive to the employer's internal operations and employment relationships. Other employees complained about the manner Dr. Klaassen had used to convey his speech at internal meetings, describing his behavior as inappropriate and unprofessional. The court thus finds that the University's strong interest as a public employer significantly outweighs Dr. Klaassen's interest in criticizing Dr. Atkinson's management decisions at KUMC.

Dr. Klaassen responds, contending that his speech was not disruptive. Instead, he argues that KUMC created the disruption by removing him as Department Chair, interfering with his ability to serve as a Principal Investigator on the COBRE grant, refusing his requests for assistance, removing him from the Pharm/Tox Department, and transferring him to the Hemenway building. Dr. Klaassen asserts that these facts present a material dispute about who was responsible for the disruption. But Dr. Klaassen's argument simply omits a critical component of the governing standard.

When considering this prong of the *Garcetti/Pickering* test, the court considers "'the manner, time, and place of the employee's expression [as well as] the context in which the dispute arose.'" *Brammer-Hoelter*, 492 F.3d at 1207 (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)). The court has considered all of those factors in the context of the undisputed facts pertinent to Dr. Klaassen's allegedly protected speech. In that context, Dr. Klaassen created disruptions repeatedly by the way he behaved and where he chose to speak. The University did not cause those disruptions. Indeed, most of the disruptions that Dr. Klaassen claims the University caused came *after* he engaged in disruptive speech at the March 31, April 7, and October 31 meetings.

Also, Dr. Klaassen asserts that the summary judgment record contains no facts showing that his comments to the *LJW* caused disruption at the University. Indeed, Dr. Atkinson testified that the *LJW* articles did not have any effect on how she operated or made decisions about KUMC. But as the Tenth Circuit noted, "a government employer has an interest 'in speaking in a single, consistent voice.'" *Rock v. Levinski*, 791 F.3d 1215, 1222 (10th Cir. 2015) (citing *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1308–09 (10th Cir. 2009)). And the Circuit previously "rejected a First Amendment retaliation claim because the employee had 'frustrated the ability of [the government agency] to control and fashion its own message.'" *Id.* (quoting *Dixon*, 553 F.3d at 1308–09). The *Rock* decision illustrates this principle, as it applies to Dr. Klaassen's claim.

In *Rock*, the Tenth Circuit found that the employee's "speech did not expose corruption or other unlawful conduct, or even some secret agenda of [the public employer]." *Id.* at 1221. Instead, it "simply expressed [the employee's] opposition to the policy adopted by her superiors. And it is well established that the First Amendment does not require a government employer to tolerate such disloyalty from the upper echelons of the administration (even though we may

question the wisdom of the termination).” *Id.* The Tenth Circuit held: “In such circumstances, the balance of interests favors the government employer.” *Id.*

Supporting its conclusion that the balance of interest favored the employer, *Rock* cited a Second Circuit case that “grant[ed] qualified immunity to the president and provost of a university who were sued for First Amendment retaliation by a professor demoted from a deanship because of his public opposition to university policies.” *Id.* (citing *Faghri v. Univ. of Conn.*, 621 F.3d 92, 97–99 (2d Cir. 2010)). *Faghri* held: “[T]he management of a public institution, such as a university, is not required to retain in a management or policymaking position a person who publicly opposes its policies.” 621 F.3d at 97. Instead, “[s]uch an institution is entitled, for the sake of effective implementation of its policies, to have in management positions, especially high-ranking executive positions, persons who will support its policies, rather than persons who will undermine its goals by voicing public opposition to them.” *Id.*

Like the employee in *Rock*, Dr. Klaassen’s speech exposed no corruption or other unlawful conduct. Instead, he merely expressed his profound disagreement with Dr. Atkinson’s management decisions. As the Tenth Circuit has explained, “it is well established that the First Amendment does not require a government employer to tolerate such disloyalty from the upper echelons of the administration.” *Rock*, 791 F.3d at 1221. Dr. Klaassen made some of his allegedly protected speech when he still served as Chair of the Pharm/Tox Department. He made the others as a Distinguished University Professor. Consistent with *Rock* and *Faghri*, the court concludes that the University’s interest in efficient public service vastly outweighed Dr. Klaassen’s interest in the speech at issue. *See Rock*, 791 F.3d at 1223 (affirming summary judgment against plaintiff’s First Amendment retaliation claims because the public employer

"should be able to expect loyalty and support, at least in public, from a high-ranking employee like a principal who is responsible for implementing his policies"); *see also Faghri*, 621 F.3d at 99 (holding that individual defendants were entitled to summary judgment against plaintiff's First Amendment retaliation claims based on qualified immunity because plaintiff "had no clearly established right to remain as dean while voicing opposition to the policies of the team he was hired to be part of").

Dr. Klaassen cannot establish the third prong of the *Garcetti/Pickering* test. The court thus grants summary judgment against his First Amendment retaliation claim for this third and independent reason.

### 4. The individual defendants are entitled to qualified immunity.

The individual defendants also assert that they are protected by qualified immunity against Dr. Klaassen's First Amendment retaliation claim. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

To establish a § 1983 claim against an individual defendant asserting the defense of qualified immunity, a plaintiff must "make out a violation of a constitutional right," and demonstrate that "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). A court has

discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. Addressing the clearly established question first "may avoid the risk of deciding a case incorrectly given insufficient briefing on the constitutional violation question." *Weise v. Casper*, 593 F.3d 1163, 1166–67 (10th Cir. 2010) (citing *Pearson*, 555 U.S. at 232).

A right is clearly established if "'there [is] a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts found the law to be as the plaintiff maintains.'" *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011) (quoting *Stearns v. Clarkson*, 615 F.3d 1278, 1282 (10th Cir. 2010)). But the "plaintiff cannot simply identify a clearly established right in the abstract and allege that the defendant has violated it." *Herring v. Keenan*, 218 F.3d 1171, 1176 (10th Cir. 2000) (citation and internal quotation marks omitted)). Instead, the court must determine "'whether the violative nature of *particular* conduct is clearly established.'" *Ziglar v. Abbasi*, __ U.S. __, 137 S. Ct. 1843, 1866 (2017) (quoting *Mullenix v. Luna*, __ U.S. __, 136 S. Ct. 305, 308 (2015)).

Conversely, to hold a defendant liable under § 1983, it is not necessary that "'the very action in question has previously been held unlawful.'" *Id.* at 1866–67 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Thus, the Supreme Court does not require a "reported case directly on point" for qualified immunity to apply. *Id.* at 1867 (citation and internal quotation marks omitted). Instead, the court must evaluate whether "the unlawfulness of the officer's conduct '[is] apparent'" viewed "in the light of pre-existing law." *Id.* (quoting *Anderson*, 483 U.S. at 640). This governing standard "'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *Lane v. Franks*, __ U.S. __, 134 S. Ct. 2369, 2381 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743

(2011)).  In short, the doctrine of qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Ziglar*, 137 S. Ct. at 1867 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Here, the court already has concluded that Dr. Klaassen cannot satisfy one of the two prongs to survive a qualified immunity defense—*i.e.*, the uncontroverted summary judgment facts fail to establish a constitutional violation.  But, even if Dr. Klaassen had carried his summary judgment burden and could establish a triable case for encroachment on his constitutional rights, Dr. Klaassen identifies no Supreme Court or Tenth Circuit decisions to establish the second prong—*i.e.*, that the right was clearly established when the alleged constitutional violation occurred.[9]

Dr. Klaassen asserts the clearly established law prohibited the individual defendants from "retaliat[ing] against a university professor because the professor publicly criticized the university's handling of funds, operation, and organization."  Doc. 349 at 165.  The court disagrees.  As discussed above, the existing case law won't support the conclusion that a reasonable administrator would have known:  (1) that Dr. Klaassen was speaking outside his official duties when he complained about a lack of governance at KUMC and how Dr. Atkinson was managing the medical school; (2) that Dr. Klaassen was speaking on a matter of public concern when his speech involved no allegations of misconduct or impropriety but instead consisted of Dr. Klaassen's personal beliefs that Dr. Atkinson was mismanaging KUMC; and (3)

---

[9]  Defendants argue that four Ad Hoc Hearing Committees, KU's Chancellor, and two courts have found that the University engaged in no wrongdoing.  Thus, the individual defendants could not have violated any clearly established law when these other entities cleared the University of wrongdoing.  But neither of the two state court rulings specifically addressed Dr. Klaassen's First Amendment retaliation claim because he never asserted that claim in the state court proceedings.

that the public employer's interest in an efficient and disciplined work environment did not outweigh Dr. Klaassen's interest in free speech.

Indeed, our court has recognized that a reasonable government official may have difficulty determining whether his actions violate the third *Garcetti/Pickering* prong because it involves a balancing of interests. Quoting the Seventh Circuit, our court has explained:

> "Differences in the nature of the competing interests from case to case make it difficult for a government official to determine, in the absence of case law that is very closely analogous, whether the balance that he strikes is an appropriate accommodation of the competing individual and governmental interests. We must remember that government officials are not expected to be prescient and are not liable for damages simply because they legitimately but mistakenly believed that the balancing of interests tipped in the State's favor."

*Ditter v. City of Hays*, No. 15-9083-JAR-JPO, 2016 WL 81226, at *8 (D. Kan. Jan. 7, 2016) (quoting *Gregorich v. Lund*, 54 F.3d 410, 414–15 (7th Cir. 1995)).

Here, Dr. Klaassen cites no analogous case establishing that the right that his First Amendment claim places in issue was clearly established when the alleged violations occurred. Although Dr. Klaassen argues that *Pickering* is "factually indistinguishable" from this case, Doc. 349 at 165, the court already has explained how *Pickering* differs from the facts here. *Pickering* involved a teacher who complained that a school district had proposed a tax increase to pay for its misuse of public funds by spending too much money on athletics instead of educational programs. 391 U.S. at 571. Dr. Klaassen's complaints were different. He never alleged that KUMC was misusing or misappropriating funds. Instead, he simply voiced personal disagreement about how Dr. Atkinson was choosing to allocate funds at the medical school— specifically to the National Cancer Institute effort and new campuses in other locations. *Pickering* did not establish a violation of a clearly established constitutional right held by Dr. Klaassen. The court concludes that even if Dr. Klaassen had demonstrated he could survive

summary judgment on his First Amendment claim, qualified immunity would protect the individual defendants from that suit. The court thus grants summary judgment against this claim for this additional reason.

### C. Procedural Due Process Claim Based on NIH Grants (Count 2)

Dr. Klaassen's Count 2 asserts a procedural due process claim under 42 U.S.C. §§ 1983 and 1988 against Dr. Atkinson, Dr. Terranova, Dr. Carlson, Dr. Jaeschke, and Dr. Stites, all sued in their individual capacity. Count 2 alleges that these individual defendants deprived Dr. Klaassen of "his property interest in his tenure right to conduct research, which included the right to serve as a principal investigator on NIH grants, without notice and a chance to be heard." Doc. 298 at 22.

"'Procedural due process imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the . . . Fourteenth Amendment.'" *Brown v. Montoya*, 662 F.3d 1152, 1167 (10th Cir. 2011) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 322 (1976)). A procedural due process claim requires a two-step inquiry: (1) whether the plaintiff had a constitutionally protected interest; and (2) whether the process afforded was adequate to protect that interest. *Washington v. Unified Gov't of Wyandotte Cty.*, 847 F.3d 1192, 1201 (10th Cir. 2017) (citing *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1253 (10th Cir. 1998)).

Defendants argue that Dr. Klaassen's procedural due process claim fails as a matter of law because the unconverted summary judgment facts establish that: (1) Dr. Klaassen had no constitutionally protected property interest in a right to research or a right to serve as Principal Investigator on NIH grants;[10] (2) Dr. Klaassen had no right to notice and a hearing before

---

[10] In addition to his claim that defendants deprived him of a right to research by removing him as Principal Investigator for the NIH grants, Dr. Klaassen asserts in the Pretrial Order that defendants

KUMC removed him as Principal Investigator; and, in any event, (3) the individual defendants are entitled to qualified immunity against this procedural due process claim.  The court addresses each argument, below.

>    1.    **The uncontroverted facts establish no triable issue whether Dr. Klaassen possessed a property interest in the right to conduct research.**

Dr. Klaassen asserts that the summary judgment record reveals a factual dispute whether KUMC deprived Dr. Klaassen of a constitutionally protected right to conduct research, including the right to serve as Principal Investigator for the NIH grants.  Defendants respond, arguing that Dr. Klaassen has no constitutionally protected right to serve as a Principal Investigator for the NIH grants because the NIH awarded those grants to the University—not to any individual.  Indeed, the NIH Grants Policy Statement defines the role of the Principal Investigator as "an individual *designated by the applicant organization* to have the appropriate level of authority and responsibility to direct the project or program supported by the award."  Doc. 326-116 at 18 (emphasis added).  Also, the NIH's Policy Statement explains that the Principal Investigator is "responsible and accountable to the grantee organization or, as appropriate, to a collaborating organization, for the proper conduct of the project or program, including the submission of all

---

deprived him of a property interest by "spending money from Dr. Klaassen's NIH grant accounts without authorization, spending money from Dr. Klaassen's endowment account without authorization, transferring him to a different department, and denying him access to necessary laboratory equipment." Doc. 298 at 22.  Defendants assert that Dr. Klaassen has no judicially recognized property interest in any of these alleged rights.  Dr. Klaassen responds that he "is not pleading the existence of . . . separate property interests in a particular department or laboratory." Doc. 349 at 175.  Instead, he explains, he asserts these actions were retaliatory ones, and he uses them to support his First Amendment retaliation claim. *Id.*  Dr. Klaassen does not respond to defendants' argument that he has no judicially recognized property interest in funds held in University accounts.  Because Dr. Klaassen has abandoned his procedural due process claims based on these purportedly protected property interests, the court grants summary judgment against these aspects of his due process claim.

required reports." *Id.* Dr. Klaassen even concedes that the NIH has the authority to approve a change in a grant's Principal Investigator.

But to determine whether Dr. Klaassen possessed a property interest in a right to research, the court "look[s] to state law to determine whether [Dr. Klaassen] has a protected property interest." *Washington*, 847 F.3d at 1201 (citing *Darr v. Town of Telluride*, 495 F.3d 1243, 1251 (10th Cir. 2007)). Under this approach, "independent sources such as state statutes, regulations, municipal ordinances, university rules, and even express or implied contracts" may create and define constitutionally protected property interests. *Anglemyer v. Hamilton Cty. Hosp.*, 58 F.3d 533, 536 (10th Cir. 1995) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)); *see also Fisher Sand & Gravel, Co. v. Giron*, 465 F. App'x 774, 779 (10th Cir. 2012) ("'[C]onstitutionally protected property interests are created and defined by statute, ordinance, contract, implied contract and rules and understandings developed by state officials.'" (quoting *Kirkland v. St. Vrain Valley Sch. Dist. No. Re-1J*, 464 F.3d 1182, 1190 (10th Cir. 2006))). "'Valid contracts may constitute a property interest for purposes of due process.'" *Id.* at 779–80 (quoting *S. Disposal, Inc. v. Tex. Waste Mgmt.*, 161 F.3d 1259, 1265 (10th Cir. 1998)).

Here, Dr. Klaassen asserts that he had a protected property interest in a right to research because an implied contract existed between KUMC and Dr. Klaassen, and this implied contract granted him that property right. Dr. Klaassen argues that the KUMC Handbook's policies governing academic freedom, coupled with KUMC's "course of conduct," created this implied contract.[11]

---

[11] Dr. Klaassen asserts that the court already has "concluded that KUMC's Faculty Handbook provisions combined with its course of conduct was sufficient to show that [Dr.] Klaassen 'had a property interest in a right to conduct research.'" Doc. 349 at 168 (quoting Doc. 120 at 10). By cherry-picking these words from an earlier Order in this case, Dr. Klaassen makes it appear that the court already has decided this issue in his favor. But his argument ignores the context of the earlier Order. It ruled a motion for judgment on the pleadings, a motion requiring the court to view Dr. Klaassen's allegations "in

116

To support his argument, Dr. Klaassen cites Kansas cases that decide whether an implied contract exists that is sufficient to create a property right in continued employment.[12] In Kansas, "[a] contract implied in fact arises from facts and circumstances showing mutual *intent* to contract." *Allegri v. Providence-St. Margaret Health Ctr.*, 684 P.2d 1031, 1035 (Kan. Ct. App. 1984) (citation and internal quotation marks omitted); *see also Anglemyer*, 58 F.3d at 536 ("The existence of an implied contract depends on the intent of the parties, divined from the totality of the circumstances." (citing *Morriss v. Coleman Co.*, 738 P.2d 841, 846 (Kan. 1987))). The Kansas Supreme Court has directed courts applying Kansas law to consider several factors when determining if the parties shared a mutual intent to enter an implied contract. *Morriss*, 738 P.3d at 848. Specifically, the Kansas Supreme Court has explained:

> "Where it is alleged that an employment contract is one to be based upon the theory of 'implied in fact,' the understanding and intent of the parties is to be ascertained from several factors which include written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced."

*Id.* (quoting *Allegri*, 684 P.2d at 1033 Syl. ¶ 5).

Dr. Klaassen asserts that the issue whether the parties had created an implied contract with one another is a factual question normally reserved for the jury. Doc. 349 at 168 (citing *Koopman v. Water Dist. No. 1*, 972 F.2d 1160, 1164 (10th Cir. 1992)). But still, as the Tenth

---

the light most favorable to" Dr. Klaassen. Doc. 120 at 10. The court, faithful to that standard, concluded that the Complaint's allegations "satisf[ied] [Dr. Klaassen's] pleading burden to show that he had a property interest in a right to conduct research." *Id.* The court's previous ruling does not control the decision here, a decision that applies a wholly different standard.

[12] Dr. Klaassen cites no Kansas cases discussing whether an implied contract exists to create a property right in a particular job function—for example, researching—or in a particular employment assignment—such as an assignment as a Principal Investigator on a grant.

Circuit has explained, "summary judgment is proper if the employee's evidence shows only 'his own unilateral expectations of continued employment,'" and the summary judgment facts present no triable issue of mutual intent to enter a contract. *Abbott v. BNSF Ry. Co.*, 383 F. App'x 703, 708 (10th Cir. 2010) (quoting *Warren v. City of Junction City*, 176 F. Supp. 2d 1118, 1126 (D. Kan. 2001)); *see also Zwygart v. Bd. of Cty. Comm'rs*, 412 F. Supp. 2d 1193, 1199 (D. Kan. 2006), *aff'd* 483 F.3d 1086 (10th Cir. 2007). Judge Lungstrum's decision in *Zwygart* is particularly instructive. In that case, he granted summary judgment against a procedural due process claim because plaintiff presented no triable issue whether he possessed a property right in continued employment. *Zwygart*, 412 F. Supp. 2d at 1201. Judge Lungstrum's opinion explains that whether an implied contract exists "ordinarily" is "a fact question for a jury," but this principle "does not preclude a district court from granting summary judgment" when the plaintiff fails to adduce "'specific facts tending to establish a triable issue concerning whether the parties possessed the mutual intent to create a legitimate expectation of continued employment.'" *Id.* at 1199 (quoting *Emerson v. Boeing Co.*, 53 F.3d 342, 1995 WL 265932, *2 (10th Cir. May 8, 1995) (collecting federal cases applying Kansas law where summary judgment in this context was affirmed)). The Circuit affirmed this summary judgment ruling. *Zwygart*, 483 F.3d 1086.

Here, Dr. Klaassen asserts that certain provisions in the KUMC Handbook establish a triable issue whether the parties had a mutual understanding that Dr. Klaassen held a protectable constitutional right in his research. This much is undisputed. Under the Handbook, tenured KUMC professors enjoy the academic freedom to research topics in their chosen fields. KUMC has adopted an Academic Freedom Policy recognizing that faculty are "entitled to full freedom in research and in the publication of the results . . . ." Doc. 349-178 at 44. Dr. Klaassen argues this policy created an implied contract right to conduct research, including the right to continue

serving as a Principal Investigator on NIH grants. Viewing the facts in Dr. Klaassen's favor, no reasonable jury could infer a mutual intent to form a contract from this single provision in the KUMC Handbook.

Contrary to Dr. Klaassen's assertions, based on this one provision in the KUMC Handbook, another provision in that Handbook makes it clear that the policies in the Handbook "are not intended to create a contract between the University of Kansas and its employees." Doc. 326-38 at 17. Also, Dr. Klaassen has conceded that he has told his faculty that research is not an entitlement, but a privilege. Doc. 349-130 at 60 (Klaassen Dep. 193:18–21 (asked whether he had told his faculty that research is a privilege, not an entitlement, Dr. Klaassen responded "That's darn right.")). And importantly, Dr. Klaassen recognizes that the Academic Freedom Policy is designed to prevent KUMC from challenging the subject matter that a faculty member chooses to research. *Id.* at 63 (Klaassen Dep. 211:1–6). No one ever challenged the subject matter of Dr. Klaassen's research. And Dr. Klaassen never filed any complaints under the KUMC Handbook's Academic Freedom Complaint Procedure alleging infringement of his right to academic freedom.

Also, KUMCRI has adopted a policy called "Principal Investigator Changes or Absences." It explicitly applies to situations when a Principal Investigator is "unavailable to fulfill his or her obligation" to the grant. Doc. 326-8 at 1. The policy permits the sponsoring agent, "in collaboration with" KUMC, to decide a course of action for the remaining terms of the grant. *Id.* Dr. Klaassen asserts that this policy doesn't authorize KUMC to change the Principal Investigator for a grant because it's inconsistent with KUMC's Handbook. But the summary judgment record, viewed in Dr. Klaassen's favor, reveals no inconsistencies between KUMCRI's policy and KUMC's Handbook—especially when the KUMC Handbook explicitly recited that it

is not intended to create any contract rights. Also, Dr. Klaassen concedes, the NIH has unilateral authority to change the Principal Investigator on a grant. Doc. 326-129 at 7 (Tr. 88:14–19) (agreeing that it is "absolutely" within the NIH's authority to change the Principal Investigator).

Next, Dr. Klaassen relies on something he describes as "KUMC's course of conduct" as support for his implied contract theory. He cited his testimony to explain what he means by this reference. *See* Doc. 349 at 79 (¶ 63); *see also id.* at 170. In his cited testimony, Dr. Klaassen explains that during his 45 years as a tenured faculty member, he never saw a Principal Investigator removed from a grant. Perhaps Dr. Klaassen's statement is accurate—so far as it goes. That is, he may not have witnessed removal of a Principal Investigator. Also, Dr. Klaassen asserts, the uncontroverted summary judgment facts establish that KUMC has removed only one faculty member as a Principal Investigator—Dr. S.—and it did so only after providing him a due process hearing. But these facts about Dr. Klaassen's memory of KUMC's treatment of other Principal Investigators—alone—cannot establish that the parties *mutually* intended to form a contract. As the case law recognizes, a plaintiff's subjective beliefs about an employer's prior conduct cannot establish an implied contract right. *See Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972) (explaining that a public employee cannot establish a property interest in state employment based on "an abstract need or desire for it" or "a unilateral expectation of it"); *see also Zwygart*, 483 F.3d at 1093 (same). Thus, Dr. Klaassen's subjective beliefs about KUMC's prior conduct with other Principal Investigators does not form the required mutual intent to support an implied contract.

Finally, Dr. Klaassen argues that "terminated faculty are allowed to maintain their R01 grants." Doc. 349 at 171. But he cites no evidence in the summary judgment record to support this purported fact. *Id.* The summary judgment record does include facts showing that R01

grants are specific to a particular faculty member's research, and that faculty may take these grants with them if they move to another university. But the summary judgment facts also establish that KUMC has removed other faculty from the position of Principal Investigator for R01 grants.

In sum, when viewed in Dr. Klaassen's favor, the summary judgment facts present no triable issue whether KUMC intended to create an implied contract granting Dr. Klaassen the right to research, including a right serve as Principal Investigator for NIH grants. The absence of such evidence precludes a genuine dispute about the requirement of mutual intent. And mutual intent is an essential element under Kansas law for a submissible implied contract claim. *See Allegri v. Providence-St. Margaret Health Ctr.*, 684 P.2d 1031, 1035 (Kan. Ct. App. 1984). Dr. Klaassen thus has failed to carry his summary judgment burden.

> **2. Because Dr. Klaassen cannot establish that he had a constitutionally protected property interest, KUMC was not required to provide him notice and an opportunity to be heard before KUMC removed him as Principal Investigator.**

Because Dr. Klaassen has failed to establish the first requirement of the due process inquiry—*i.e.*, that he had a constitutionally protected property interest—the court need not address the second step—*i.e.*, whether he was entitled to notice and an opportunity to respond. *See Zwygart*, 412 F. Supp. 2d at 1201 ("Because [plaintiff] fails to clear the initial hurdle of establishing a protected property interest, the court need not reach the second step of deciding whether the process he in fact received was fair.").

> **3. The individual defendants are entitled to qualified immunity.**

Last, even if Dr. Klaassen had demonstrated a due process claim capable of surviving summary judgment, defendants assert that qualified immunity immunizes them from that suit. As shown above, Dr. Klaassen cannot establish the front prong of the qualified immunity

analysis.  The summary judgment facts fail to establish a triable issue whether he held a constitutionally protected property interest.  The court also concludes that Dr. Klaassen cannot satisfy the second prong of the qualified immunity test because, under the summary judgment facts, he has not established that the individual defendants violated "'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Dr. Klaassen responds, asserting that the court already has dismissed defendants' qualified immunity argument.  When considering whether Dr. Klaassen had stated a procedural due process claim sufficient to survive a qualified immunity defense on a motion for judgment on the pleadings, the court viewed the facts alleged in Dr. Klaassen's Third Amended Complaint in the light most favorable to him.  The court thus assumed the truth of his allegations—as it was required to do—and held that "these allegations . . . create an inference that the Individual Defendants fostered 'rules and understandings,' that the individuals would not interfere with a professor's principal investigator status."  Doc. 120 at 12 (quoting *Perry v. Sindermann*, 408 U.S. 593, 595 (1972)).  The court recognized that "[i]f such an understanding existed in 2011 or 2013, a reasonable official in the Individual Defendants' shoes would have realized that plaintiff had a valid interest in his right to conduct research."  *Id.*

But asserting that the court already has decided this issue, Dr. Klaassen again ignores that the court addresses the qualified immunity defense at summary judgment in a much different light than when it considered that defense in the earlier motion.  At the motion for judgment on the pleadings stage, the court considered the reasonableness of the individual defendant's conduct as alleged by the Third Amended Complaint.  *See Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).  But, on summary judgment, Dr. Klaassen "can no longer rest on the pleadings, and

the court looks to the evidence before it (in the light most favorable to the plaintiff)" when it conducts the qualified immunity analysis. *Id.* (citing Fed. R. Civ. P. 56).

Dr. Klaassen has cited no Supreme Court or Tenth Circuit authority establishing that the individual defendants' particular conduct violated a clearly established constitutionally protected property interest in an implied contract right to conduct research, including the right to serve as a Principal Investigator for NIH grants. *See Ziglar v. Abbasi*, __ U.S. __, 137 S. Ct. 1843, 1866 (2017) (explaining that, under the second prong of the qualified immunity analysis, the court must determine "whether the violative nature of *particular* conduct is clearly established" (citation and internal quotation marks omitted)). On Dr. Klaassen's best day, the summary judgment facts, viewed in his favor, establish that KUMC had adopted an Academic Freedom Policy that prohibited KUMC from interfering with the subject matter of faculty research. But the Policy never conferred an enforceable right on faculty members to conduct research or a right to serve as a Principal Investigator for a grant. KUMC's Handbook explicitly recites that its policies "are not intended to create a contract between the University of Kansas and its employees." Doc. 326-38 at 17. Dr. Klaassen has identified no cases holding that an employee has a protected property interest in a right to conduct research or a right to serve as a Principal Investigator for a grant under facts similar to the ones presented by the uncontroverted summary judgment facts. Dr. Klaassen has failed to establish that the right he asserts in his due process claim was clearly established when the alleged constitutional violation occurred.

To his credit, Dr. Klaassen concedes that he relies on Kansas cases recognizing an implied contract right to continued employment as the basis for his claim that he owned a constitutionally protected property interest to a right to conduct research. Doc. 349 at 172 n.7. But as defendants note, Dr. Klaassen has identified no case law where a court applied the implied

contract analysis to establish a new property interest that has no independent source in Kansas state law. Indeed, in *Anglemyer v. Hamilton County Hospital*, the Tenth Circuit recognized that, under Kansas law, an employee may have a protectable property interest in an implied contract right to continued employment. 58 F.3d 533, 538 (10th Cir. 1995). But the issue in *Anglemyer* was whether the employee had a protectable property interest in continued employment *in a particular position*. *Id.* at 538. The Tenth Circuit recognized that no Kansas cases addressed this issue. *Id.* So, it turned "to other state court decisions, federal decisions, and the general weight and trend of authority" to assess the claim. *Id.* at 538–39 (citations and internal quotation marks omitted). The Circuit concluded that "the overwhelming weight of authority holds that no protected property interest is implicated when an employer reassigns or transfers an employee absent a specific statutory provision or contract term to the contrary." *Id.*

The analysis here is similar. Dr. Klaassen identifies no Kansas law recognizing a constitutionally protected property interest in the right to conduct research or serve as a Principal Investigator for a grant. Indeed, he has cited no authority of any source recognizing such a right.

In its earlier order, the court cited "a factually similar district court case decided in the Southern District of New York." Doc. 120 at 12 (citing *Hamid v. John Jay Coll. of Criminal Justice*, No. 99 CIV 8669 WK, 2000 WL 666344 (S.D.N.Y. May 19, 2000)). Like this court's earlier order, *Hamid* considered a qualified immunity defense on a motion to dismiss. The case involved a professor who alleged that his college had deprived him of his procedural due process rights by removing him as principal investigator on two research grants. *Id.* at *5. The court recognized that *Perry v. Sindermann* held that "rules or mutually explicit understandings" can support a claim of entitlement to a protected property interest. *Id.* at *5 (quoting *Perry*, 408 U.S. at 601). Citing *Perry* and taking the professor's allegations as true, the New York federal court

denied qualified immunity on a motion to dismiss, concluding that the law existing at the time "sufficiently explained that unwritten 'tenure rights' [e.g., the right to conduct research,] demand the strictures of due process." *Id.* at *7. Because the law was clearly established, the court held that the "plaintiff should have the chance to show that the College fostered a custom or mutual understanding that its faculty and administration would not interfere with a tenured professor's research . . . ." *Id.* at *6.

For at least two reasons, *Hamid* cannot provide Dr. Klaassen with the clearly established right he must show to survive the qualified immunity defense. *Hamid* is an unpublished opinion from the Southern District of New York. It's not binding authority in the Tenth Circuit, and so, the right was not clearly established in this jurisdiction when the alleged constitutional violations occurred. Also, *Hamid* was decided on a motion to dismiss. It merely decided that the case's plaintiff "should have the chance to show that the College fostered a custom or mutual understanding that its faculty and administration would not interfere with a tenured professor's research . . . ." *Id.* at *6. It never considered what facts might support a triable issue whether the employer had "fostered a custom or mutual understanding." Thus, it provides no clearly established law for the court to apply here on summary judgment.

In sum, Dr. Klaassen has not shown that the individual defendants violated a clearly established constitutional right that a reasonable person would have known about when he allegedly violated Dr. Klaassen's constitutional rights. The individual defendants thus are entitled to qualified immunity against Dr. Klaassen's procedural due process claim that they deprived him of a property interest in a right to conduct research or a right to serve as a Principal Investigator on an NIH grant.

### 4. Conclusion: The court grants summary judgment against the procedural due process claim asserted by Count 2 for two reasons.

The court grants summary judgment against Count 2's procedural due process claim for two, independent reasons. One, Dr. Klaassen has failed to establish a triable issue whether he possessed a constitutionally protected property interest in a right to conduct research or a right to serve as a Principal Investigator for NIH grants. Two, under the summary judgment facts, defendants are entitled to qualified immunity against this claim.

### D. Procedural Due Process Based on Termination (Count 3)

Dr. Klaassen's Count 3 asserts a procedural due process claim under 42 U.S.C. §§ 1983 and 1988 based on KUMC's termination of his employment. Dr. Klaassen asserts this claim against Dr. Girod, both in his official and individual capacity, and Dr. Stites in his individual capacity. For reasons explained, the court grants summary judgment for both Dr. Stites and Dr. Girod against Dr. Klaassen's procedural due process claim in Count 3.

### 1. Dr. Stites

In his Third Amended Complaint, Dr. Klaassen alleged that Dr. Stites damaged his liberty interest in his reputation by testifying falsely at the Second Ad Hoc Hearing on November 13, 2013. Doc. 121 at 31–32 (Third Am. Compl. ¶¶ 135–36). Specifically, Dr. Klaassen alleged that Dr. Stites testified falsely "that Dr. Klaassen lost control and was 'screaming' at him for somewhere between 5 and 10 minutes during the May 1, 2013, meeting." *Id.* at 31 (Third Am. Compl. ¶ 135).

Dr. Stites asserts that the court should grant summary judgment against this claim for several reasons. First, he argues that Dr. Klaassen has abandoned this claim by not including it in the Pretrial Order. *See, e.g.*, *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002)

("[C]laims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint."). Second, Dr. Stites asserts, the court already has held that he is entitled to absolute immunity for his testimony at the Second Ad Hoc Hearing. *See* Doc. 102 at 40 (Feb. 3, 2015 Mem. & Order). Third, Dr. Stites asserts that he is entitled to qualified immunity against suit on this theory. And last, Dr. Stites asserts that the summary judgment facts can't support Dr. Klaassen's claim that Dr. Stites testified falsely at the hearing. Indeed, Dr. Stites initially testified that he didn't remember how long Dr. Klaassen had screamed at him during their meeting on May 2, 2013. Doc. 326-51 at 42 (Tr. 168:11–14). When Dr. Klaassen's counsel asked him whether the confrontation lasted more than five minutes, Dr. Stites estimated that "it was probably somewhere between five and ten minutes." *Id.* (Tr. 168:15–18). After Dr. Stites testified, Dr. Klaassen's counsel played the tape recording for the Hearing Committee. So, Dr. Stites asserts, the Hearing Committee could draw its own conclusions because it had the tape recording of the exchange and thus could compare it with Dr. Stites's testimony. And, even if Dr. Stites had testified incorrectly about the length of his confrontation with Dr. Klaassen, Dr. Stites never testified definitively about how long their exchange had lasted. Instead, he testified that he didn't know how long it lasted, and when pressed to speculate, he provided an estimate. Dr. Stites also argues that Dr. Klaassen asserted this same claim—*i.e.*, that Dr. Stites testified falsely at the November 13, 2013, hearing—to three ad hoc hearing committees, the KU Chancellor, the KJRA Court, and the Wyandotte County court in the State Case. All of them have rejected his argument, Dr. Stites claims.

Dr. Klaassen never responds to Dr. Stites's arguments seeking summary judgment against Count 3's procedural due process claim. *See generally* Doc. 351 (Pl.'s Resp. to Steven Stites's Individual Mot. for Summ. J.); *see also* Doc. 369 at 12 (acknowledging in Dr. Stites's

Reply that "Dr. Klaassen did not respond regarding Count 3"). Dr. Klaassen thus has abandoned this claim. *See Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768–69 (10th Cir. 2001) (affirming district court's dismissal of plaintiff's equal protection claim after it concluded that plaintiff had abandoned the claim because he had not addressed it in his memorandum opposing summary judgment); *see also C.T. v. Liberal Sch. Dist.*, 562 F. Supp. 2d 1324, 1337 (D. Kan. 2008) (concluding that plaintiff had abandoned his retaliation claim by not responding to defendant's motion for summary judgment against the claim). For this reason, the court grants summary judgment to Dr. Stites against Count 3's procedural due process claim against him.

### 2. Dr. Girod

Dr. Klaassen's Count 3 also asserts that Dr. Girod's termination decision in January 2014 deprived Dr. Klaassen of procedural due process. As already explained, a procedural due process claim requires a two-step inquiry: (1) whether plaintiff had a constitutionally protected interest; and (2) whether the process afforded was adequate to protect that interest. *Washington v. Unified Gov't of Wyandotte Cty.*, 847 F.3d 1192, 1201 (10th Cir. 2017) (citing *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1253 (10th Cir. 1998)).

Dr. Girod doesn't dispute that Dr. Klaassen satisfies the first requirement. He acknowledges Dr. Klaassen had a constitutionally protected interest in his employment at KUMC. But Dr. Girod asserts that the summary judgment facts fail to present a triable issue about the second requirement because Dr. Klaassen was afforded an appropriate level of process.

The undisputed facts establish that the University conducted an inquiry into Dr. Klaassen's alleged misconduct after KUMC faculty and staff complained that Dr. Klaassen had acted unprofessionally at meetings on May 1 and May 7, 2013. After conducting that investigation, Dr. Rawitch issued an Inquiry Report. Among other things, Dr. Rawitch's report

concluded that Dr. Klaassen had engaged in threatening conduct, and he recommended that an ad hoc committee investigate the matter fully. Dr. Rawitch provided the Inquiry Report to Dr. Klaassen, and his counsel submitted a written response to it. On November 13, 2013, the Second Ad Hoc Hearing Committee convened to hear the allegations asserted against Dr. Klaassen. Dr. Klaassen appeared personally, and counsel represented him at the hearing. The hearing lasted a full day. The Committee received hundreds of exhibits. The University called six witnesses, and Dr. Klaassen called two, including himself. Dr. Klaassen's counsel was permitted to cross-examine each one of the University's witnesses. At the end of the hearing, the Second Ad Hoc Committee found Dr. Klaassen guilty of professional misconduct. It recommended that Dr. Klaassen receive a sanction in the form of a written warning and that he return to work immediately.

On January 6, 2014, Dr. Girod sent Dr. Klaassen a letter advising that KUMC was terminating his employment. Dr. Girod recognized that the Second Ad Hoc Hearing Committee had recommended that Dr. Klaassen receive a written warning. But Dr. Girod elected not to follow that recommendation because, he concluded, a written warning did not address the serious nature of the situation or recognize the repeated and continuing nature of Dr. Klaassen's conduct. Dr. Girod reported that he had considered the Committee's findings and recommendations as well as "the totality of the circumstances surrounding [Dr. Klaassen's] conduct the last few years." Doc. 326-15 at 1–2. And he concluded that terminating Dr. Klaassen's employment was the appropriate sanction. *Id.* at 2.

Dr. Klaassen appealed his dismissal. On November 19, 2014, the Third Ad Hoc Hearing Committee heard Dr. Klaassen's appeal. Dr. Klaassen was present at the hearing and represented by counsel. Dr. Klaassen submitted records, exhibits, and transcripts from the

Second Ad Hoc Hearing.  One of his submissions included his tape recording of the May 1, 2013, meeting.  Also, Dr. Klaassen had the opportunity to speak at the hearing.  On December 5, 2014, the Third Ad Hoc Hearing Committee submitted a decision and recommendation.  It concluded that Dr. Klaassen had failed to prove any of his grounds for appeal.  Also, it concluded that Dr. Girod had acted within his administrative authority when he terminated Dr. Klaassen's employment.  On December 23, 2014, Dr. Girod issued a final decision on the appeal.  This decision accepted the Third Ad Hoc Hearing Committee's determination that the dismissal decision should stand.  "But that was not the end of it.  That was not even the beginning of the end of it."  *Ute Indian Tribe v. Myton*, 835 F.3d 1255, 1259 (10th Cir. 2016) (Gorsuch, J.).

Dr. Klaassen then filed the KJRA Matter seeking judicial review of his termination under the Kansas Judicial Review Act.  Dr. Klaassen asserted in the KJRA Matter that KUMC had violated his due process rights to notice and an opportunity to be heard.  On September 21, 2015, the Wyandotte County court remanded the matter to the University for rehearing with additional notice and opportunity to be heard.

On October 15, 2015, Dr. Girod sent a letter to Dr. Klaassen "to clarify any misunderstanding" about the termination decision.  Doc. 326-16 at 1.  Dr. Girod identified the specific materials that he considered when he made the termination decision.  Also, he explained that he concluded the Committee's recommendation of a written warning was not adequate to address the serious nature of Dr. Klaassen's misconduct.  Instead, Dr. Girod concluded dismissal was the proper sanction, and his letter reaffirmed his January 6, 2014, termination decision.

On March 29, 2016, the Fourth Ad Hoc Hearing Committee considered Dr. Klaassen's appeal on remand.  Again, Dr. Klaassen was present at the hearing and represented by counsel.  The hearing lasted six hours.  The parties made oral arguments, submitted additional briefing,

submitted new evidence, and played excerpts from depositions. On April 8, 2016, the Fourth Ad

Hoc Hearing Committee issued its findings. It concluded that Dr. Girod had acted within his

authority when he terminated Dr. Klaassen, and it found dismissal was an appropriate sanction

for his misconduct. On May 9, 2016, KU Chancellor Bernadette Gray-Little took final action on

the matter. In a letter, she identified the materials she had reviewed about Dr. Klaassen's

conduct and discipline, including the transcripts and decisions from all four ad hoc hearing

committees. Based on her review of those materials and the preponderance of the record

evidence, the Chancellor affirmed the termination decision.

Dr. Klaassen then sought judicial review again as part of the KJRA Matter. Dr. Klaassen

again argued that KUMC had violated his constitutional rights. Each party submitted briefs,

exhibits, and deposition transcripts to the Wyandotte County court. The court held a half-day

hearing, and after oral arguments, it ruled for the University and against Dr. Klaassen. Dr.

Klaassen has appealed that ruling. His appeal still is pending before the Kansas Court of

Appeals.

These undisputed facts, viewed in Dr. Klaassen's favor, present no triable issue whether

Dr. Klaassen received adequate process. Just the opposite, the summary judgment facts establish

that Dr. Klaassen received ample notice and multiple opportunities to be heard in his challenge to

the termination decision. Due process requires: (1) oral or written notice of the charges, (2) an

explanation of the evidence, and (3) an opportunity to respond. *Montgomery v. City of Ardmore*,

365 F.3d 926, 936 (10th Cir. 2004). Dr. Klaassen was afforded both pre-termination and post-

termination hearings. The Supreme Court has held that a "pretermination 'hearing,' though

necessary, need not be elaborate." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545

(1985). "[T]he formality and procedural requisites for the hearing can vary, depending upon the

importance of the interests involved and the nature of the subsequent proceedings." *Id.* (citations and internal quotation marks omitted). "In general, 'something less' than a full evidentiary hearing is sufficient prior to adverse administrative action." *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 343 (1976)).

As described, Dr. Klaassen received notice of the charges against him before the Second Ad Hoc Committee Hearing convened on November 13, 2013. He appeared at the hearing, where he heard an explanation of the University's evidence and had an opportunity to respond. KUMC afforded Dr. Klaassen a full-blown evidentiary hearing even though it would have sufficed to provide "something less." *Id.* Afterwards, the Second Ad Hoc Committee found Dr. Klaassen guilty of professional misconduct, and it recommended that Dr. Klaassen receive a written warning.

On January 6, 2014, Dr. Girod terminated Dr. Klaassen's employment. His termination letter recited that he had considered the Committee's findings and recommendations as well as "the totality of the circumstances surrounding [Dr. Klaassen's] conduct the last few years," and Dr. Girod concluded that terminating Dr. Klaassen's employment was the appropriate sanction for that conduct. Doc. 326-15 at 1–2. In the KJRA Matter, Dr. Klaassen argued that this letter did not provide him proper notice because it referenced the "totality of the circumstances," which included information that never was presented to the Second Ad Hoc Hearing Committee. The Wyandotte County court agreed and remanded the matter to the University for rehearing with additional notice and opportunity to be heard.

On October 15, 2015, Dr. Girod sent a letter to Dr. Klaassen "to clarify any misunderstanding" about the termination decision. Doc. 326-16 at 1. Dr. Girod's letter recited that he had based his termination decision on the Second Ad Hoc Hearing Committee's findings

"in light of the 2012 Committee's findings and Dr. Stites' 2012 decision."  *Id.*  Dr. Klaassen argues that this letter never provided proper notice of the charges because it based the termination decision on the findings of the Second Ad Hoc Committee.  But, Dr. Klaassen asserts, the Wyandotte County court had held the Committee's decision was void for violating due process.  It is true that, in Kansas, "[a] denial of due process renders the resulting *decision* void."  *Davenport Pastures, LP v. Morris Cty. Bd. of Cty. Comm'rs*, 238 P.3d 731, 736 (Kan. 2010) (emphasis added).  And that's why Dr. Klaassen was afforded another hearing on remand—to provide him the due process that, the Wyandotte County court found, was lacking before the termination decision was made.

But nothing in Kansas law provides that the *findings* of a university committee are void if the accused was deprived of due process.  Dr. Girod's October 2015 letter provided notice to Dr. Klaassen of the information he had relied on to make the termination decision.  KUMC then provided Dr. Klaassen another hearing to respond to those charges.  After the Fourth Ad Hoc Committee found the dismissal was an appropriate sanction for Dr. Klaassen's misconduct, KU's Chancellor reviewed the matter and took final action, affirming the termination decision.  Yet more judicial review followed, and the Wyandotte County court ruled against Dr. Klaassen.  Specifically, the Wyandotte County court held that the University had remedied the court's earlier concerns about adequate notice and an opportunity to be heard.  It also held that "substantial competent evidence [existed] to support the [University's] decision."  Doc. 326-111 at 2 (Tr. 117:23–25).

Based on these undisputed facts, the court concludes that no triable issue exists whether Dr. Klaassen received adequate due process.  Indeed, as defendants argue, the KJRA Court already has considered and rejected Dr. Klaassen's arguments that the University failed to afford

him adequate process. Although the court does not apply res judicata to this finding, it recognizes that another judicial body already has considered Dr. Klaassen's arguments and rejected them. For the same reasons, the court rejects Dr. Klaassen's procedural due process arguments here, and it grants summary judgment against Count 3.

The court also finds that Dr. Girod is entitled to qualified immunity against this claim. Dr. Klaassen identifies no clearly established law that would have put Dr. Girod on notice that his actions violated Dr. Klaassen's constitutional rights. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009) ("The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))). Indeed, as already noted, Dr. Klaassen cites no case law holding that a government employer violates an employee's due process rights by providing notice to the employee that it based its termination decision on—among other things—the findings of a committee that convened as part of an earlier due process hearing that resulted in a void decision. For this reason, the court also grants summary judgment against Count 3 because Dr. Girod is immune from liability under the doctrine of qualified immunity.

### E. Substantive Due Process Based on Termination (Count 4)

Dr. Klaassen's Count 4 asserts a substantive due process claim under 42 U.S.C. §§ 1983 and 1988 based on his termination from employment. Dr. Klaassen asserts this claim against Dr. Girod in his official capacity only. Because the court already has concluded above that res judicata bars Dr. Klaassen's claims against Dr. Girod in his official capacity, the court grants summary judgment against Dr. Klaassen's substantive due process claim asserted by Count 4.

### F. Kansas State Law Claims (Counts 5 & 7)

Last, Dr. Klaassen asserts two claims under Kansas state law. He asserts a claim against Dr. Terranova, Dr. Jaeschke, Dr. Hagenbuch, and Dr. Carlson in their individual capacities for tortious interference with a business expectancy. He also asserts a claim against Dr. Stites in his individual capacity for tortious interference with a contract. But, because the court has concluded that defendants deserve summary judgment against all of Dr. Klaassen's federal claims, the court may decline to exercise supplemental jurisdiction over his remaining state law claims. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction [when] the district court has dismissed all claims over which it has original jurisdiction.").

Here, defendants specifically ask the court to decline supplemental jurisdiction over the state law claims if no federal claims survive for trial. Doc. 326 at 119; Doc. 366 at 102. Dr. Klaassen never responds to this request.

The decision whether to exercise supplemental jurisdiction in this circumstance is committed to the district court's sound discretion. *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1138–39 (10th Cir. 2004). Indeed, the Tenth Circuit has expressed the preference that district courts decline jurisdiction over state law claims if it dismisses all federal claims. *See Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, *and usually should*, decline to exercise jurisdiction over any remaining state claims." (emphasis added)). The Supreme Court has directed district courts, when deciding whether to maintain supplemental jurisdiction over state law claims, to consider "the values of judicial economy, convenience, fairness, and comity . . . ." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *see also Wittner v. Banner Health*, 720 F.3d

770, 781 (10th Cir. 2013) ("[W]e have said the court should consider retaining state claims when, given the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction." (citation and internal quotation marks omitted)).

Exercising its discretion, the court declines to assert supplemental jurisdiction over Dr. Klaassen's state law claims. The governing factors favor this outcome. Dismissing Dr. Klaassen's state law claims without prejudice will not waste judicial resources because discovery is complete and the case is ready for a summary judgment ruling or trial by a Kansas state court on the state claims.

This result is not unfair for Dr. Klaassen for two reasons. First, Dr. Klaassen never opposes defendants' request that the court decline to exercise supplemental jurisdiction. Second, 28 U.S.C. § 1367 tolls the statute of limitations for state law claims while they are pending in federal court and for 30 days after they are dismissed "unless State law provides for a longer tolling period." 28 U.S.C. § 1367(d); *see also Brooks v. Gaenzle*, 614 F.3d 1213, 1230 (10th Cir. 2010). Kansas's "saving statute" affords a plaintiff six months to commence a new action if an earlier timely filed action has failed "otherwise than upon the merits." Kan. Stat. Ann. § 60-518. A dismissal "otherwise than upon the merits" includes a dismissal without prejudice. *Rogers v. Williams, Larson, Voss, Strobel & Estes*, 777 P.2d 836, 839 (Kan. 1989). In sum, nothing will prevent Dr. Klaassen from refiling his state law claims in Kansas court, so long as he timely files them.

The Kansas state courts also provide the same level of convenience and fairness as the federal courts. And, importantly, comity strongly favors remand. Kansas state courts have a strong interest in deciding matters involving purely state law claims—as plaintiff's tortious

interference claims do here. *Brooks*, 614 F.3d at 1230 ("'[N]otions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary.'") (quoting *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995)).

Because all the factors favor dismissal without prejudice and there is no compelling reason to the contrary, the court declines to exercise its supplemental jurisdiction over Dr. Klaassen's remaining state law claims. The court dismisses the two state law claims asserted in Counts 5 and 7 without prejudice.[13]

## IV. Conclusion

For the reasons explained above, the court grants defendants' Motion for Summary Judgment (Doc. 325) in part and denies it in part. The undisputed summary judgment facts, viewed in plaintiff's favor, present no triable issue whether defendants retaliated against Dr. Klaassen in violation of the First Amendment or whether defendants violated Dr. Klaassen's due process rights. The court thus grants summary judgment against Dr. Klaassen's claims asserted under federal law. The court declines to exercise supplemental jurisdiction over Dr. Klaassen's remaining Kansas state law claims. It thus dismisses, without prejudice, Dr. Klaassen's state law tortious interference claims in Counts 5 and 7.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion for Summary Judgment (Doc. 325) is granted in part and denied in part. The Clerk shall enter a judgment consistent with this ruling.

**IT IS SO ORDERED.**

**Dated this 28th day of September, 2018, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

---

[13]     Dr. Klaassen preserves these claims in the Pretrial Order. Doc. 298 at 24–26.